FILED
2022 May-31  PM 12:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT A

Page 1

1      IN THE UNITED STATES DISTRICT COURT FOR THE

2              NORTHERN DISTRICT OF ALABAMA

3                 SOUTHERN DIVISION

4

5    CIVIL ACTION NO.:  2:20-CV-01863-ACA

6

7    LANITRA JETER,

8              Plaintiff,

9    vs.

10   DANNY CARR, in his official

11   capacity as District Attorney

12   of Jefferson County,

13              Defendant.

14

15

16                 DEPOSITION

17                    OF

18                JUDY YATES

19             February 3, 2022

20

21

22   REPORTED BY:

          Ellie Pickett,

23        Certified Court Reporter and

          Notary Public

Page 2

```
 1        A P P E A R A N C E S
 2
 3  FOR THE PLAINTIFF:
 4       Mr. Artur Davis
 5       Attorney at Law
 6       HKM Employment Attorneys
 7       3355 Lenox Road NE
 8       Atlanta, Georgia 30326
 9
10  FOR THE DEFENDANT:
11       Mr. James E. Murrill, Jr.
12       Mr. Robert R. Riley, Jr.
13       Attorneys at Law
14       Riley & Jackson, P.C.
15       3530 Independence Drive
16       Birmingham, Alabama 35209
17
18  OTHERS PRESENT:
19       LaNitra Jeter
20
21
22
23
```

Page 4

```
 1       INDEX OF EXHIBITS (Continuing)
 2
 3  PLAINTIFF'S                    PAGE:
 4  Exhibit 23              181
 5       Memo dated January 9, 2020
 6
 7  Exhibit 24              181
 8       Memo dated January 8, 2020
 9
10  Exhibit 25              182
11       Memo dated November 18, 2019
12
13
14  NOTE:  Plaintiff's Exhibit 18 was withdrawn by
15  counsel.
16
17
18
19
20
21
22
23
```

Page 3

```
 1       INDEX OF EXAMINATION
 2
 3                      PAGE:
 4  EXAMINATION BY MR. DAVIS          8
 5
 6       INDEX OF EXHIBITS
 7
 8  PLAINTIFF'S              PAGE:
 9  Exhibit 18              38
10       Memo dated November 22, 2019
11
12  Exhibit 19              89
13       Typewritten document dated
14  9/19/2019
15
16  Exhibit 20              172
17       Memo dated September 23, 2019
18
19  Exhibit 21              180
20       Memo dated January 10, 2020
21
22  Exhibit 22              180
23       Memo dated February 25, 2020
```

Page 5

```
 1       INDEX OF EXHIBITS (Continuing)
 2
 3       The following exhibits, having been
 4  previously marked for identification in the
 5  deposition of Danny Carr, were referenced in
 6       this deposition:
 7
 8                          PAGE:
 9  Plaintiff's Exhibit 2         228
10  Plaintiff's Exhibit 3         98
11  Plaintiff's Exhibit 5         220
12  Plaintiff's Exhibit 6         218
13  Plaintiff's Exhibit 7         199
14  Plaintiff's Exhibit 9         209
15  Plaintiff's Exhibit 10        209
16  Plaintiff's Exhibit 11        209
17  Plaintiff's Exhibit 12        209
18  Plaintiff's Exhibit 13        209
19  Plaintiff's Exhibit 14        209
20  Plaintiff's Exhibit 15        209
21  Plaintiff's Exhibit 16        213
22  Plaintiff's Exhibit 17        212
23
```

2 (Pages 2 - 5)

Page 6

1          S T I P U L A T I O N
2          IT IS STIPULATED AND AGREED, by
3  and between the parties, through their
4  respective counsel, that the deposition of
5  JUDY PICKETT may be taken before Ellie Pickett,
6  Commissioner, Certified Court Reporter and
7  Notary Public;
8          That the signature to and reading
9  of the deposition by the witness is waived, the
10 deposition to have the same force and effect as
11 if full compliance had been had with all laws
12 and rules of Court relating to the taking of
13 depositions;
14         That it shall not be necessary for
15 any objections to be made by counsel to any
16 questions, except as to form or leading
17 questions, and that counsel for the parties may
18 make objections and assign grounds at the time
19 of trial, or at the time said deposition is
20 offered in evidence, or prior thereto.
21
22
23

Page 7

1          I, Ellie Pickett, a Certified
2  Court Reporter of Birmingham, Alabama, and a
3  Notary Public for the State of Alabama at
4  Large, acting as Commissioner, certify that on
5  this date, as provided by the Federal Rules of
6  Civil Procedure of the United States District
7  Court, and the foregoing stipulation of
8  counsel, there came before me at the law
9  offices of Riley & Jackson, P.C., 3530
10 Independence Drive, Birmingham, Alabama 35209,
11 on February 3, 2022, commencing at
12 approximately 9:30 a.m., JUDY YATES, witness in
13 the above cause, for oral examination,
14 whereupon the following proceedings were had:
15
16          JUDY YATES,
17          The witness, having first been
18 duly sworn or affirmed to speak the truth, the
19 whole truth and nothing but the truth,
20 testified as follows:
21
22
23          THE COURT REPORTER:  Usual

Page 8

1  stipulations?
2          MR. MURRILL:  That's fine.
3          MR. DAVIS:  Yes.
4
5  EXAMINATION BY MR. DAVIS:
6      Q.   Good morning, Ms. Yates, how are
7  you?
8      A.   I'm good.
9      Q.   Obviously we know who you are, but
10 let me just ask you to state your full name,
11 first name, middle name, and last name.
12     A.   Judy Ann Yates.
13     Q.   Ms. Yates, am I correct that you
14 have been a long time member of the victim
15 services office for the district attorney in
16 Jefferson County?
17     A.   Yes.
18     Q.   We are going to have a deposition
19 for the next several hours, let me formally
20 introduce myself.  My name is Artur Davis.  My
21 co-counsel, Brian Noble, and I represent the
22 lady who is seated close to me, LaNitra Jeter.
23 Do you remember Ms. Jeter?

Page 9

1      A.   Oh, absolutely.
2      Q.   And we represent Ms. Jeter in a
3  lawsuit that she has filed.  Are you aware that
4  she's filed a lawsuit?
5      A.   Yes.
6      Q.   And it's a little quirk of the law
7  in the state of Alabama that you can't actually
8  sue the district attorney's office, you have to
9  sue Mr. Carr and you have to sue him in what's
10 called his official capacity.  So the named
11 defendant in this case is Danny Carr.  Are you
12 aware of that?
13     A.   Yes.
14     Q.   But are you aware that even though
15 Mr. Carr is the named defendant, in effect this
16 is a lawsuit against the Jefferson County
17 district attorney's office as a practical
18 matter?
19     A.   Repeat that.
20     Q.   Well, let me ask it another way.
21          Do you understand that the
22 Jefferson County DA's office and the activities
23 in the Jefferson County DA's office are subject

3 (Pages 6 - 9)

1 to this lawsuit?
2     A.   No.
3     Q.   Okay.  And is this the first time
4 that you have ever had your deposition taken?
5     A.   No.
6     Q.   How many other times have you had
7 a deposition taken?
8     A.   One.
9     Q.   What was the circumstance of that?
10     A.   It was when my husband and I were
11 trying to get custody of his son.
12     Q.   So it would have been a domestic
13 relations family matter?
14     A.   Yes.
15     Q.   Is this the first time you have
16 been a witness in an employment discrimination
17 lawsuit?
18     A.   Yes.
19     Q.   Is it the first time you have been
20 a witness in a lawsuit that involves the
21 Jefferson County district attorney's office in
22 any way, shape, or form?
23     A.   Yes.

1     Q.   Do you testify at trials?
2     A.   Only one time.  Rarely, so --
3     Q.   So let me just walk you through a
4 few ground rules.  There aren't a whole lot of
5 rigid hard and fast rules during these
6 depositions.  There are sort of a few
7 guideposts that I would ask you to work with me
8 to follow.
9         We have a reporter who is here
10 literally not only recording everything we say
11 but also literally typing everything that we
12 say, and her obligation is to produce a
13 transcript, as would have been the case in the
14 hearing you had with your husband a number of
15 years ago, and it is vitally important that she
16 capture everything that's said.  And her
17 obligation is to get any word spoken by any of
18 us who are in this room right now.  So the most
19 challenging thing that happens for a court
20 reporter is if two people talk at the same
21 time.  So literally when you read a transcript
22 of two people talking at the same time, it
23 sounds like three-year-olds trying to have a

1 conversation.
2     A.   Uh-huh.
3     Q.   And we want the judge -- and we
4 want the judge and law clerk to think that we
5 know how to use the English language in
6 complete sentences.  So I will make every
7 attempt today to not even inadvertently
8 interrupt you, and I would ask you to do the
9 same for me.  So even if you know exactly what
10 I'm asking and you are agreeing with me or
11 disagreeing with me, don't start saying yes or
12 no until you've heard the question mark at the
13 end of my voice.  And that will prevent you
14 from sort of inadvertently talking over me, and
15 I'll do the same for you.  And since we are not
16 on the phone and can look at each other, it's a
17 lot easier.  So I will do everything in my
18 power to wait until I hear the period at the
19 end of your sentence.  Is that fair as a set of
20 ground rules?
21     A.   It is.
22     Q.   The other thing is that
23 occasionally your lawyers or the lawyers who

1 are representing Mr. Carr in the DA's office
2 may make objections.  They have every right to
3 do that.  But as you see, there is no judge in
4 this room and you heard us say the usual
5 stipulations.  What that means in nonlawyer
6 talk is that the lawyers can make objections,
7 but we'll still just continue.  So the
8 expectation, with one exception I'll get to in
9 a moment, the expectation is that you will
10 still answer the question.  The one exception
11 to that is if I inadvertently ask you something
12 that the natural answer would require you to
13 describe conversations you've had with Mr.
14 Riley or Mr. Murrill, or, for that matter, the
15 previous lawyer in this case, Ms. Garner, I'm
16 not allowed to ask about conversations you've
17 had with those three folks, Ms. Garner, the
18 previous lawyer, Mr. Murrill, or Mr. Riley.
19 Anybody else I can ask you about conversations
20 with them, and that includes Carr, it includes
21 Roberts, and it includes any folks you work
22 with at the DA's office.  Is that understood?
23     A.   It is.

4 (Pages 10 - 13)

Page 14

1    Q.   So there are a few background
2 questions that we lawyers ask in an obligatory
3 kind of way at the beginning.  They can sound
4 like odd questions, they can even sound
5 invasive, but I'll tell you why we ask them.
6        We may well have a jury trial in
7 this case in Birmingham a year from now.  And
8 if we have a jury trial, we're going to want --
9 we being Mr. Noble and myself, are going to
10 want to make sure that there aren't people on
11 the jury who know you and who know your family
12 or who figured out during the trial, wait a
13 minute, that's Judy from my church.  So I like
14 to ask a set of questions just to know a little
15 bit about your background and your associations
16 and your family so that when we strike a jury,
17 we can have the judge ask does anybody belong
18 to this church or know these people.  So in
19 that vein, are you still married?
20    A.   I'm recently widowed.  My husband
21 passed away December 13th.
22    Q.   I am very, very sorry to hear
23 that.

Page 15

1        Where did your husband work?
2    A.   He was self-employed at the time
3 he passed.  He was a forensic scientist
4 consultant.  He did firearms and tool mark
5 examinations.  He was hired by civil and
6 criminal attorneys to look at cases that
7 involved firearms and maybe tool marks if those
8 were needed.  He did that.  He testified in
9 trials across the country.  Prior to that, he
10 worked for twenty-five years with the State of
11 Alabama Department of Forensic Sciences.  He
12 was the lab director in Birmingham.  He also
13 did firearms and tool marks examinations there,
14 and he also was the attorney for their
15 department.  He also had -- once he retired, he
16 did work as a -- for a few years as an
17 assistant DA in the Blount County district
18 attorney's office, and he's also worked in
19 criminal and civil attorneys' offices.
20    Q.   Do you have adult children who
21 live in the Birmingham community?
22    A.   No.
23    Q.   Do you have brothers-in-law,

Page 16

1 sisters-in-law, or brothers and sisters who
2 live in the Birmingham community?
3    A.   No.
4    Q.   Is there a regular church that you
5 go to?
6    A.   Yes.
7    Q.   And may I ask you the name of it?
8    A.   Mountain Grove Congressional
9 Christian Church.  That's in Hanceville,
10 Alabama, in Cullman County.
11    Q.   Are there any organizations or
12 civic groups of which you are a member?
13    A.   No.
14    Q.   With respect to your background at
15 the district attorney's office, when did you
16 start working there?
17    A.   In 1996, it was April the 29th, I
18 believe, of 1996.
19    Q.   What was the initial job that you
20 had?
21    A.   Victim service officer.
22    Q.   Have you been a victim services
23 officer for pretty much the last twenty -- let

Page 17

1 me do my math -- the last twenty-six years?
2    A.   Yes.
3    Q.   Yesterday when I was talking with
4 Mr. Carr, he indicated that you don't have the
5 formal title director of victim services or
6 manager of victim services but that you have
7 for a long time been the most senior victim
8 services officer.  Is all of that accurate?
9    A.   With regards to until the grant,
10 yes, that's accurate.  Once the grant went into
11 place, Joe Roberts made me director of victim
12 services.
13    Q.   And when you say the grant, just
14 so the record is clear, what are you talking
15 about?
16    A.   Well, in -- I can't remember the
17 year it started because it was several years
18 ago, the Federal Government had a grant that
19 was to provide victim service officers for
20 every district attorney's office in the state
21 of Alabama, and they did it for other states as
22 well, and so they provided our salary to the
23 different DA's offices.

5 (Pages 14 - 17)

1    Q.   So once that happened, did you in
2 effect become designated as the director of
3 victim services once there was that grant
4 entity that was funding the section of the
5 office?
6    A.   Within our office, yes, because I
7 was then supervisor of four other victim
8 service officers.
9    Q.   And I understand you don't
10 remember the exact year that that happened, but
11 could you give me a ballpark?  Are we talking
12 about fifteen years ago?  Five years ago?  Just
13 give me your best ballpark.
14    A.   I would say within the last five
15 years.
16    Q.   So within the past five years, the
17 number of people working on victim services in
18 the Jefferson County DA's office has expanded,
19 correct?
20    A.   Correct.
21    Q.   And now the number is about five,
22 correct?
23    A.   Correct.

1    Q.   And it's been about five since the
2 grant expanded; is that correct?
3    A.   Correct.
4    Q.   And you are one of the five; is
5 that right?
6    A.   Correct.
7    Q.   Do you also carry your own load as
8 a victim services officer or are your
9 responsibilities now solely limited to
10 supervision?
11    A.   I carry my load as well as
12 supervising.
13    Q.   How many years have you supervised
14 other victim services officers?
15    A.   Since I was hired in 1996.
16    Q.   So over the years, you've had
17 supervisory responsibility over -- just give me
18 a ballpark estimate of how many folks.
19    A.   For clarification, the number of
20 individuals that have worked there or
21 positions?
22    Q.   Well, the number of individuals.
23 I'm looking for a sense of how many --

1    A.   That we have hired there, okay.
2    Q.   Yes.  Who have been hired as
3 victim services officers.
4    A.   Okay.  Not secretaries, because at
5 one time we had secretaries as well.
6    Q.   Sure.  That's fine.
7    A.   Okay.  Thirteen.
8    Q.   So of that group of thirteen
9 people that you've supervised over the years,
10 may I ask how many of them have been
11 African-American?
12    A.   Let's see.  Four.
13    Q.   How many of those four were victim
14 services officers?
15    A.   Two.
16    Q.   Ms. Jeter is one; is that correct?
17    A.   Correct.
18    Q.   Who is the other one?
19    A.   Alaysia Myles.
20    Q.   When was Alaysia Myles hired?
21    A.   I don't remember the exact date,
22 but it was around August of 2021.
23    Q.   So would you agree with me that

1 prior to LaNitra Jeter joining the victim
2 services office, that there had not been an
3 African-American victim services officer during
4 your tenure?
5    A.   That's correct.
6    Q.   Do you happen to have a sense of
7 the demographics in Jefferson County, and by
8 that I mean the percentage of people who are
9 African-American, the percentage of people who
10 are white?  Do you have a general sense of that
11 just from living in this community?
12    A.   Yes.
13    Q.   I'll represent to you that I
14 believe at present Jefferson County is about
15 fifty-eight to sixty-two percent white.  Would
16 you challenge that or disagree with that, or
17 does that sound about right to you?
18    A.   I'm not going to challenge it.
19    Q.   And I'll represent to you that the
20 city of Birmingham itself -- and you are aware
21 Birmingham is by far the biggest city in
22 Jefferson County, correct?
23    A.   Yes.

6 (Pages 18 - 21)

Page 22

1    Q.   I think it's the biggest city in
2  the state of Alabama, correct?
3         MR. MURRILL:  Incorrect now.
4  Huntsville is the largest.
5    A.   Maybe not now.
6    Q.   (BY MR. DAVIS:)  Understood.
7  Understood.
8         But you would agree that during
9  most of the time you have been at the victim
10  services office, Birmingham has been the
11  biggest city in the state, correct?
12    A.   Right.
13    Q.   Surely one of the biggest.
14    A.   Correct.
15    Q.   And I'll represent to you if the
16  city of Birmingham is currently about
17  seventy-four percent African-American and has
18  been predominantly African-American since the
19  '90s, would you challenge that or quibble with
20  that in any way?
21    A.   No.
22    Q.   I asked Mr. Carr yesterday roughly
23  what percentage of victims in Jefferson County,

Page 23

1  what percentage of people who are victims of
2  criminal acts are African-American, and he
3  agreed with me that it was certainly a
4  substantial number.  Would that also be your
5  perspective?
6    A.   I'm not sure.  There is a large
7  percentage, yes.
8    Q.   And a lot of crimes happen in
9  neighborhoods like Ensley and Fairfield and
10  parts of this community that are almost
11  entirely or largely African-American; is that
12  correct?
13    A.   I guess.
14    Q.   So -- and I don't mean this as an
15  accusatory question, I'm generally trying to
16  get some perspective from you, how long have
17  you been involved in hiring decisions for
18  victim services officers?
19    A.   Since I was hired in '96.
20    Q.   Is it accurate to say that every
21  victim services officer since 1996 in Jefferson
22  County is someone that you personally have
23  hired?

Page 24

1    A.   Yes.
2    Q.   And I understand that Mr. Roberts,
3  or whoever is the deputy DA, may have to
4  formally sign off on some of the hires for
5  administrative purposes.  Am I right about
6  that?
7    A.   Correct.
8    Q.   But practice in the last
9  twenty-six years has been the deputy DA accepts
10  your recommendations on hires.  Is that fair?
11    A.   That's fair.
12    Q.   And that's because you've built up
13  trust with the deputy DA, correct?
14    A.   Correct.  But may I go back and
15  change my answer before?
16    Q.   Sure, you can.
17    A.   Because when -- I served under
18  four different DAs.  When Mr. Barber was the
19  DA, he had to make the final hiring decision.
20    Q.   Understood.
21    A.   And he was there for the majority
22  of the time.  And I hired -- to give proper
23  background here, I've had very few people to

Page 25

1  hire because prior to the VSOs that Ms. Jeter
2  was a part of, I only had three VSOs.  One left
3  because she became a counselor.  Another left
4  because she had a baby and wanted to stay home
5  and take care of her baby.  Then I hired Cheryl
6  Black, and she has been in my office as the VSO
7  for twenty years now, and there have been no
8  other positions until we were fortunate to get
9  a grant to hire someone else.
10    Q.   Understood.
11         But just so I'm clear, the only
12  two African-Americans who have been hired as
13  VSOs during your tenure, regardless of who
14  hired them or who made the final decision or
15  approval, the only two African-Americans who
16  have held that position would be the young lady
17  who is seated here and a young lady who was
18  hired a few months ago; is that correct?
19    A.   That is correct.  And I will add,
20  though, that I only have had four
21  African-Americans who have applied for the job,
22  and that was during the time that I hired
23  Ms. Jeter and Ms. Myles.  So it's not that I

7 (Pages 22 - 25)

Page 26

1 didn't want to hire an African-American; I
2 didn't have any who were interested in the job.
3     Q.   And I wasn't actually asking about
4 your motives.  I was just asking about the
5 shear numbers.
6        But let me ask you this question:
7 Remind me again, I know you've literally just
8 answered this, but I'm thinking of several
9 things at once, remind me of the month that Ms.
10 Myles was hired again.
11    A.   I'm guessing, but I'm going to
12 guess that it was -- I may have said 2021.  If
13 I did that before, I was incorrect.  It would
14 have been in August of 2020 I believe was the
15 correct month, or September.  Actually it may
16 have been September.
17    Q.   Understood.
18        You think it was August or
19 September of '20?
20    A.   Yes.
21    Q.   And when you hired Ms. Myles, did
22 Mr. Roberts have to sign off on that hire?
23    A.   He did.  But it was after Mr. Carr

Page 27

1 personally interviewed every candidate that I
2 thought was appropriate for the position.  He
3 made the final decision on every person that
4 was hired this past time.  He interviewed them
5 personally.
6     Q.   And when you say this past time,
7 are you talking about the Myles hire?
8     A.   Yes.
9     Q.   Did Mr. Carr play that kind of
10 role in Ms. Jeter's hire?
11    A.   He didn't.  And that was probably
12 just because Mr. Roberts and I made that
13 decision for whatever reason.  I can't --
14    Q.   Who are the current VSOs?
15    A.   Myself, Cheryl Black, Alaysia
16 Myles, Carla Counts, and Lucy Mendoza.
17    Q.   When was Ms. Mendoza hired?
18    A.   Around the same time that
19 Ms. Myles was.
20    Q.   Did Mr. Carr participate in the
21 hiring of Ms. Mendoza?
22    A.   He did.
23    Q.   When was Ms. Counts hired?

Page 28

1     A.   Around the same time.
2     Q.   Did Mr. Carr participate in the
3 hiring of Ms. Counts?
4     A.   He did.
5     Q.   So Mr. Carr participated in all
6 three hires that occurred in 2020 in roughly
7 the August/September, summer/fall timeframe; is
8 that correct?
9     A.   Correct.
10    Q.   And to your recollection, he had
11 not participated in the previous hire which
12 would have been Ms. Jeter, correct?
13    A.   Correct.
14    Q.   When was Erin Driskill hired?  Or
15 it may be Elise Driskill.  Am I getting --
16    A.   May.
17    Q.   What was the first name?
18 D-r-i-s-k-i-l-l?
19    A.   Right.  Elise.
20    Q.   Is Elise her first name?
21    A.   Elise, E-l-i-s-e.
22    Q.   When was Ms. Driskill hired?
23    A.   She was married, so I don't

Page 29

1 remember the exact date, she was hired a couple
2 of months after Ms. Jeter.
3     Q.   Did Mr. Carr participate in
4 Ms. Driskill's hire?
5     A.   He did not.
6     Q.   And what about Erin Barefield,
7 when was Ms. Barefield hired?
8     A.   Around the same time.  I believe
9 she may have started around March of 2019.
10    Q.   So roughly a month before
11 Ms. Jeter; is that right?
12    A.   I believe so.
13    Q.   And did Mr. Carr participate in
14 Ms. Barefield's hire?
15    A.   He did not.
16    Q.   Just so I'm clear, Mr. Carr has
17 been DA since 2018, correct, the end of 2018?
18    A.   I believe so.
19    Q.   And did Mr. Carr -- well, just to
20 be clear, was Mr. Carr the DA when Ms. Jeter
21 was hired?
22    A.   Yes, I believe so.
23    Q.   Was Mr. Carr the DA when

8 (Pages 26 - 29)

Page 30

1  Ms. Barefield was hired?
2      A.   Yes.
3      Q.   Was Mr. Carr the DA when
4  Ms. Driskill was hired?
5      A.   Yes.
6      Q.   So the hires in which Mr. Carr
7  participated from a calendar standpoint would
8  have all been after the EEOC charge by
9  Ms. Jeter which was filed in March of 2020.
10  Would you agree with that?
11         MR. MURRILL:  Object to the form.
12     A.   I don't know.
13     Q.   (BY MR. DAVIS:)  Okay.  Do you
14  know when Ms. Jeter's EEOC charge was filed?
15     A.   No, I do not.
16     Q.   And if I represent to you -- it
17  was obviously after her termination.  Can we
18  agree on that?
19     A.   Yes.
20     Q.   And she was terminated on March
21  16th, 2020; is that right?
22     A.   I believe so.
23     Q.   So the hires in which Mr. Carr

Page 31

1  participated would have all been after March
2  16th, 2020, correct?
3      A.   Yes.
4      Q.   Do you know or can you shed any
5  light on why Mr. Carr became involved in the
6  hiring process after Ms. Jeter's departure when
7  he was not involved previously?
8      A.   No.
9      Q.   And did he talk with you about why
10  he was going to get involved in the hiring
11  process when he hadn't been previously
12  involved?
13     A.   No.
14     Q.   Did Mr. Roberts talk with you
15  about the fact that Danny Carr was going to get
16  involved in the hiring process for VSOs after
17  Ms. Jeter's departure when he previously had
18  not been involved?
19     A.   No.
20     Q.   Did you see any sort of memo that
21  explained that going forward, the DA, Mr. Carr,
22  is going to be involved in the hiring process
23  for VSOs?

Page 32

1      A.   No.
2      Q.   Do you recall any sort of staff
3  meeting or conversation or discussion about the
4  fact that Mr. Carr is now going to be involved
5  in the hiring process for VSOs?
6      A.   No.
7      Q.   How did you find out he was going
8  to be involved?
9      A.   He told me that he wanted to do
10  the final interview.
11     Q.   For all of the positions that
12  occurred around 2020?
13     A.   I am only aware of him wanting to
14  be involved in the -- in an interview of the
15  candidates that I had and that he would tell me
16  who he preferred, but he did ultimately tell me
17  that it was my final decision.  I do remember
18  that.  But he wanted to interview them as well,
19  the candidates that I thought were the best
20  fit, and then he would give me his opinion.
21     Q.   And with respect to these
22  candidates, Ms. Mendoza, Ms. Counts, and Ms.
23  Myles, who did you recommend for all three of

Page 33

1  those positions?
2      A.   Those three.
3      Q.   And did Mr. Carr have any
4  different perspective, or did he suggest that
5  he would have preferred anyone other than those
6  three?
7      A.   The only thing that he said, he --
8  depending on how many I wanted to hire, Carla
9  Counts was his first choice, Lucy Mendoza his
10  second choice, and he said if I only wanted to
11  hire four, that was who he would prefer and
12  that Alaysia Myles was his third.  The fourth
13  candidate he didn't like at all.
14     Q.   So that person didn't get hired,
15  did they?
16     A.   No, they did not.
17     Q.   What was the race of that
18  candidate?
19     A.   She was white.
20     Q.   So the three top ranked candidates
21  from Mr. Carr's perspective that he articulated
22  to you would have been one white female, one
23  Latina female?

9 (Pages 30 - 33)

Page 34

1   A.   Yes.
2   Q.   Ms. Mendoza Latina?
3   A.   She is.
4   Q.   And then the African-American
5 female, Ms. Myles, correct?
6   A.   Yes.
7   Q.   Is Ms. Myles still there?
8   A.   She is.
9   Q.   And just so I'm clear, I have no
10 reason to think it so, but I do have to ask,
11 has Ms. Myles filed any sort of EEOC charge in
12 the time that she's been there?
13   A.   Not that I'm aware of.
14   Q.   And to your knowledge, has Ms.
15 Myles made any complaint about discrimination
16 of any sort since she's been there?
17   A.   Not that I'm aware of.
18   Q.   Of the people that you've
19 supervised over the last twenty-six years, has
20 anyone other than Ms. Jeter, to your knowledge,
21 made a complaint of discrimination?
22   A.   Not that I'm aware of.
23   Q.   To your knowledge, other than

Page 35

1 Ms. Jeter, has anyone else you've complained
2 about gone to the deputy DA or to higher
3 management in the DA's office to make a
4 complaint about you?
5        MR. MURRILL:  Object to the form.
6   A.   I was going to say I don't
7 understand the question.
8   Q.   (BY MR. DAVIS:)  Sure.  Happy to
9 repeat it.
10        You agree that Ms. Jeter, and
11 we'll obviously talk about this at length over
12 the course of the morning, but at some point
13 Ms. Jeter made a complaint about you while she
14 was a victim services officer.  Are you aware
15 of that?
16        MR. MURRILL:  Object to the form.
17   A.   No, I'm not aware of that.
18   Q.   (BY MR. DAVIS:)  Are you aware
19 that at some point she asked to have a meeting
20 with Joe Roberts to raise a complaint that you
21 had treated her unfairly?
22        MR. MURRILL:  Object to the form.
23   A.   I --

Page 36

1        THE DEPONENT:  Sorry.
2   Q.   (BY MR. DAVIS:)  You have to still
3 answer.
4        MR. RILEY:  Sometimes Jay may
5 object, but if you understand the question, you
6 can still answer unless Jay says to not answer.
7        THE DEPONENT:  Okay.
8   Q.   (BY MR. DAVIS:)  And that's one of
9 the things I explained to you at the beginning
10 today.
11   A.   Right.  The reason I stopped was I
12 thought I was interrupting him.  I'm sorry.
13   Q.   (BY MR. DAVIS:)  Understood.
14        MR. MURRILL:  She was doing what
15 she was told.
16   Q.   (BY MR. DAVIS:)  So would you
17 answer my question?
18   A.   Ask it again because I'm --
19   Q.   Sure.
20        MR. DAVIS:  Would you read the
21 last question that I asked?
22        (Whereupon, the last question was
23        read to the deponent.)

Page 37

1   Q.   (BY MR. DAVIS:)  What's the answer
2 to that, Ms. Yates?
3        MR. MURRILL:  Object to the form.
4        MR. RILEY:  I thought she had
5 actually answered that question.  I think there
6 was one after that.
7        MR. DAVIS:  Well, let me actually
8 ask Ms. Yates and not her lawyers to answer the
9 question.
10   Q.   (BY MR. DAVIS:)  What's your
11 answer to that, Ms. Yates?
12        MR. RILEY:  No, I think she had
13 answered, Artur.
14   Q.   (BY MR. DAVIS:)  I'm asking what
15 your answer was.
16        MR. RILEY:  Okay.
17   A.   No.
18   Q.   (BY MR. DAVIS:)  So I'm going to
19 show you a document which is a memo that you
20 wrote and I'm going to ask you about your
21 language in that document.  And I don't think
22 this was an exhibit yesterday and we'll check
23 during one of the breaks and determine that

1 because I don't want to have double exhibits,
2 but for now we are going to make this
3 Plaintiff's Exhibit Number 18.
4          (Whereupon, Plaintiff's Exhibit 18
5          was marked for identification
6          and was later withdrawn by
7          counsel.)
8     Q.   And I'm going to ask you if you
9 have seen the document that is Plaintiff's
10 Exhibit 18 before today?
11    A.   Yes.
12    Q.   And would you agree with me that
13 that document is a memo to file that you wrote?
14    A.   It is.
15    Q.   It has the word memo at the top;
16 is that correct?
17    A.   Yes.
18    Q.   And it says from Judy Yates; is
19 that correct?
20    A.   That is correct.
21    Q.   And it says to file, correct?
22    A.   It is.  But may I clarify the
23 question that you asked earlier and why I

1 answered no?
2     Q.   Well, let me actually ask you
3 another question before you clarify.
4     A.   Okay.
5     Q.   I want you to read the first
6 sentence, and I understand that there is a
7 partial sentence that's here --
8     A.   Yeah.
9     Q.   -- but I want you to read the
10 first sentence that starts with the word Joe.
11 Just read the first sentence, please, ma'am.
12    A.   Joe had forwarded an e-mail Nitra
13 had sent him regarding not understanding the
14 chain of command and that she was not being
15 treated fairly.
16    Q.   What's the date of that memo that
17 you wrote, Ms. Yates?
18    A.   November 22nd, 2019.
19    Q.   That would have been while
20 Ms. Jeter was a victim services officer,
21 correct?
22    A.   Yes.
23    Q.   Would you agree that that memo

1 makes it clear that you were aware that
2 Ms. Jeter had made a complaint about you?
3     A.   No.
4          MR. MURRILL:  Object to the form.
5          THE DEPONENT:  Oh, I'm sorry.
6          MR. MURRILL:  That's all right.
7 Go ahead.
8     A.   No.  What the e-mail that
9 Mr. Roberts sent me did not say that she
10 mentioned my name.  It just said she felt she
11 was being treated unfairly.
12          The second part of this -- the
13 next sentences that I wrote in here I am
14 speculating because it says I believe this
15 stemmed.  I'm speculating and I'm just putting
16 this in my file so that I can try and remember
17 what occurred.  But the e-mail that Mr. Roberts
18 sent me did not say she said I was treating her
19 unfairly.  It said she felt she was being
20 treated unfairly.  That could have been by
21 anyone in the DA's office, whether it was a DA,
22 me, another VSO, or anyone else within the DA's
23 office.  I just wrote this to say this is what

1 I thought it stemmed from because of a domestic
2 violence training.
3     Q.   Are you the only person who had
4 supervisory authority over LaNitra Jeter on
5 November 22nd, 2019?
6     A.   No.
7     Q.   Who else supervised LaNitra Jeter
8 besides yourself?
9     A.   Well, if you go up the chain of
10 command, Mr. Roberts and Mr. Carr.
11    Q.   Did you have any reason to believe
12 in November 22nd, 2019, that Ms. Jeter had made
13 a complaint about Danny Carr?
14    A.   No.
15    Q.   Did you have any reason to believe
16 in November 22nd of 2019 that Ms. Jeter had
17 made a complaint about Joe Roberts?
18    A.   Not that I was aware of.
19    Q.   And during the time that Ms. Jeter
20 was a victim services officer, to your
21 knowledge, how much did she interact with Danny
22 Carr?
23    A.   I have no idea.

Page 42

1    Q.   Did you ever see them having a
2 meeting together?
3    A.   No. I'm not close to his office.
4    Q.   Did you ever know of Mr. Carr to
5 have him perform assignments for him?
6    A.   No, not to my knowledge.
7    Q.   Did you ever see her with Mr. Carr
8 one on one?
9    A.   No.
10   Q.   To your knowledge, did Mr. Carr
11 ever direct her or give her any sort of
12 assignment?
13   A.   Not that -- not that I know of.
14   Q.   So it would have been a little bit
15 hard for her to have a complaint about Mr. Carr
16 if she rarely interacted with him and he didn't
17 give her assignments. Do you agree?
18   A.   I don't know. Depends on your
19 perspective.
20   Q.   Well, what's your perspective?
21   A.   I don't know. I'm just saying
22 that the memo that was sent to me from
23 Mr. Roberts was that she said she was being

Page 43

1 treated unfairly, and he told her to come and
2 see me. She said she was going to, and she
3 never did.
4    Q.   So just so we are clear, did
5 Mr. Roberts, to your knowledge, ever give
6 Ms. Jeter assignments?
7    A.   Not that I'm aware of.
8    Q.   To your knowledge, did Mr. Roberts
9 ever supervise Ms. Jeter's work in any way,
10 shape, or, form in which you are aware?
11   A.   No.
12   Q.   To your knowledge, did Mr. Roberts
13 regularly interact with Ms. Jeter?
14   A.   No.
15   Q.   And to your knowledge, did you
16 ever see Mr. Roberts meeting with Ms. Jeter one
17 on one?
18   A.   Not to my knowledge.
19   Q.   Is there anyone that you know of
20 who -- let's just say as of November 22nd,
21 2019, when you wrote this memo, is there anyone
22 else that you know of who interacted with
23 LaNitra Jeter who had more -- is there anyone

Page 44

1 who interacted with Ms. Jeter more than you is
2 the November 2019 timeframe in the DA's office?
3    A.   More than me that interacted with
4 her?
5    Q.   Yes.
6    A.   She interacted with other VSOs
7 more than she interacted with me. She
8 interacted with deputy DAs. And if there were
9 times that I was off on vacation or out of the
10 office, Cheryl Black was -- I would let them
11 know that she was to be -- you know, they were
12 to go to her in the chain of command, that if I
13 wasn't there, then it was Cheryl Black. If me
14 and Cheryl both were not there, then they were
15 to go to Joe. If he wasn't there, to go to
16 Danny. If none of us were there, to go to the
17 deputy DA that was in charge that day. And if
18 that person wasn't there, then it was Michael
19 McCurry. And if that person wasn't there, then
20 Cheryl Lockhart. So there were other people
21 that they could have interacted with.
22        You're asking -- well, that's all
23 I'm going to say.

Page 45

1    Q.   So with respect to all of those
2 people that you just named, did you have any
3 reason on November 22nd, 2019, to believe that
4 LaNitra Jeter was making a complaint about any
5 of them?
6    A.   I didn't know. She never came to
7 me to let me know what it was she thought she
8 was being treated unfairly about.
9    Q.   So just to ask my question again,
10 with respect to the various people that you
11 just mentioned, did you have any reason on
12 November 22nd, 2019, to believe that LaNitra
13 Jeter was complaining about a single one of
14 them?
15        MR. MURRILL: Object to the form.
16   Q.   (BY MR. DAVIS:) And I didn't ask
17 you to speculate. I asked you if you had any
18 reason to think that she was complaining about
19 any one of them.
20        MR. MURRILL: Object to the form.
21   A.   I don't know.
22   Q.   (BY MR. DAVIS:) Well, let me
23 direct you back to your memo. Do you state in

Page 46

1  your memo on November 22nd to the file that
2  you're not sure who LaNitra is complaining
3  about?  Do those words appear in your memo?
4          MR. MURRILL:  Object to the form.
5  The memo speaks for itself.
6      Q.   (BY MR. DAVIS:)  Do those words
7  appear in this memo?
8          MR. MURRILL:  Object to the form.
9      Q.   (BY MR. DAVIS:)  You can answer.
10     A.   I know.  I'm waiting for him to --
11         MR. MURRILL:  I've made my
12  objection.
13     Q.   (BY MR. DAVIS:)  And I'm happy to
14  have you look at it.  Do you write in this memo
15  -- and, again, I'm simply asking you a very
16  simple question.
17     A.   No.
18     Q.   All right.
19     A.   I'm trying to make an assumption
20  about myself.
21     Q.   I understand.
22     A.   I have no idea if it could have
23  been about anyone else, but this was for my

Page 47

1  personal -- my personal memory, no one else's
2  at the time, but for my personal memory that
3  gee, what -- what did she think she was being
4  treated unfairly.  Because I treated her as
5  fairly as I did anyone else, but the only thing
6  that had occurred recently that I could think
7  of was that training.
8      Q.   So we can do this one of two ways.
9  I can simply have you read the memo into the
10  record, or you can answer my question.
11         Do you state in this memo that you
12  were not sure who LaNitra Jeter was complaining
13  about?
14     A.   I do not state that, no.
15     Q.   And do you speculate in this memo
16  that you wrote at any point that LaNitra could
17  be complaining about any number of individuals?
18     A.   No, I do not.
19     Q.   And, again, you were the one who
20  wrote this memo, correct?
21     A.   That's correct.
22     Q.   So to your knowledge in the time
23  you have been in a supervisory role in the

Page 48

1  victim services office, Ms. Yates, other than
2  Ms. Jeter, are there any other employees that
3  you know of who have raised concerns that they
4  were being treated unfairly by anybody in the
5  DA's office?
6      A.   Oh, I'm sure there have been many.
7      Q.   Give me a specific example.  And,
8  again, understand I'm only asking about the
9  universe of people that you've supervised.
10     A.   Oh, no.
11     Q.   So just so we are clear, in the
12  twenty-six-year history that you've had with
13  the DA's office, you've said that you've had
14  supervisory responsibility for that entire
15  twenty-six years.  Is that accurate?
16     A.   Uh-huh.
17     Q.   You have to answer yes or no.
18     A.   I'm sorry, yes.
19     Q.   And other than LaNitra Jeter who
20  is sitting here with me today, do you know of
21  any other victim services personnel that you've
22  supervised who have raised complaints that they
23  were treated unfairly while they were working

Page 49

1  in the Jefferson County DA's office?
2      A.   Yes.
3      Q.   And tell me about that instance.
4      A.   I had a VSO white female, I have
5  to think of her name.  This was twenty
6  something years ago.  Honestly I do not
7  remember her name.  She was my second VSO hire.
8      Q.   Was it a long time ago?
9      A.   It was a long time ago.  She was
10  using work time to type and fax personal
11  information instead of doing her job, and I
12  told her not to.  I actually wrote her up on
13  it, and she complained to the DA about that.
14     Q.   And in that instance, you
15  specifically wrote up that individual.  Am I
16  correct?
17     A.   At the request of the DA, I did.
18  Mr. Barber asked me to write it up.
19     Q.   And when you say you wrote it up,
20  does that mean that you sent a letter to that
21  employee or a memo to that employee saying that
22  you have done this, please don't do it again or
23  please avoid this conduct?  Is that a fair

13 (Pages 46 - 49)

1 characterization of it?
2     A.   I don't recall exactly, no.
3     Q.   So when you say --
4     A.   It was not a letter, no.
5     Q.   So when you say you wrote her up,
6 what did you do?
7     A.   I wrote a memo that stated the
8 facts of the situation that -- I don't remember
9 the details of it, but it was a memo just
10 stating the facts of her actions --
11     Q.   Did you write the memo --
12     A.   -- that was going in her personnel
13 file.
14     Q.   Did you write the memo to her or
15 did you write it to file?
16     A.   I don't recall.
17     Q.   And when you say you wrote her up,
18 did you tell her that you wrote her up?
19     A.   Yes.  Yes, I did.
20     Q.   Presumably the reason that you
21 told her you wrote her up was because you
22 wanted her to be aware of it.  Is that fair?
23     A.   Correct.

1     Q.   And you would have wanted her to
2 be aware of it so that she could change her
3 behavior and not make the same mistake again.
4 Is that also fair?
5     A.   No.  Well, yes and no.  Yes and
6 also because that's what I was directed to do.
7     Q.   Understood.
8          So with respect to that
9 employee -- and I understand you don't remember
10 her name -- or do you remember her name?
11     A.   Well, it's coming to me, I'm not
12 sure I will get her last name right, her first
13 name was Tara.  I'm not going to say her last
14 name, it's Mc something, but -- it will come to
15 me.
16     Q.   All right.  So with respect to
17 Tara who worked in the VSOs office more than
18 twenty years ago who was doing personal work on
19 government time or on the government computer,
20 you wrote Tara up; is that correct?
21     A.   Correct.
22     Q.   And you told Tara that you wrote
23 her up?

1     A.   I don't recall.  To be honest, I
2 don't recall.  We had a meeting, I do know
3 that.
4     Q.   Okay.  So you had a meeting with
5 Tara in which you told her that she was
6 engaging in behavior that needed to stop,
7 correct?
8     A.   Uh-huh.
9     Q.   But you did -- your phrase was
10 that you wrote her up.  Is that still fair?
11     A.   That is true.  I did say that.
12     Q.   So just to leap ahead for a
13 moment, during the roughly year that LaNitra
14 Jeter worked under your supervision at the
15 Jefferson County DA's office, not talking about
16 memos to file because we are going to talk
17 about those in a moment --
18     A.   Right.
19     Q.   -- I'm talking about memos that
20 you wrote to her, LaNitra Jeter, that were one
21 of the following categories:  Disciplinary,
22 corrective, instructions to stop certain
23 behavior or not do anything again, how many --

1 and -- and, again, I'm not talking about memos
2 to file that you wrote for you --
3     A.   I understand.
4     Q.   -- how many times did you write up
5 LaNitra Jeter while she was a VSO?
6          MR. MURRILL:  Object to the form.
7 Go ahead.
8     A.   I don't believe I did.
9     Q.   (BY MR. DAVIS:)  And I'll
10 represent to you that your very able lawyers
11 and your office have provided thousands of
12 pages to me and Mr. Noble, a number of them
13 repetitive, but still thousands of pages to me
14 and Mr. Noble from documents you generated,
15 from documents that they generated, from Ms.
16 Jeter's entire personnel file, and I'll
17 represent to you that I have not seen a single
18 write-up of LaNitra Jeter from you --
19     A.   Right.
20     Q.   -- and you don't know of any
21 write-ups that you did on LaNitra Jeter, do
22 you?
23     A.   I don't.  I believe our

Page 54
1 discussions were verbal.
2          MR. MURRILL:  And I want to say
3 for the record there was an implication that
4 we, the lawyers, generated a document.  We
5 didn't generate any documents.
6          MR. DAVIS:  Well, when I say
7 generated, I mean produced the documents.  So I
8 apologize if that term was bothersome or
9 upsetting to you.
10          MR. MURRILL:  That's fine.
11     Q.   (BY MR. DAVIS:)  So let me ask you
12 this, Ms. Yates:  Would you agree that one
13 virtue of writing someone up is that you make a
14 record of the situation?  Is that one virtue of
15 writing someone up?
16     A.   State that again, please.
17     Q.   Is it a virtue of writing someone
18 up that you make a record of the situation?
19     A.   It could be, yes.
20     Q.   And if you write someone up and
21 hypothetically three or four years later there
22 is a lawsuit, you don't have to depend on the
23 witnesses testifying about what was said but if

Page 55
1 you've written them up, you have a document
2 that you can point to; is that correct?
3     A.   I suppose so, yes.
4     Q.   Now, let's sort of go back a
5 little bit in time, but it's actually a very
6 good transition from the conversation we are
7 having, some offices -- and I do plaintiff's
8 employment work, so I spend all of my time
9 representing people who are filing lawsuits
10 against government entities or corporations or
11 nonprofits or employers of some sort.  With a
12 lot of organizations that I sue, Ms. Yates,
13 there is something called a progressive
14 discipline policy.  Have you heard of the term
15 progressive discipline before I just used it?
16     A.   No.
17     Q.   And I'll describe it to you, and
18 you tell me if Jefferson County DA's office has
19 this.  A lot of the progressive discipline
20 policies that I see with various organizations
21 say that if an employee commits an infraction
22 that there is going to be a series of things
23 that happen.  Many of those policies will say

Page 56
1 that the employee should be verbally counseled
2 or noticed.  Then if there is a second offense
3 that the person should receive a written note
4 or memo or write-up.  If there is a third
5 offense that the person should be disciplined,
6 perhaps suspended or put on administrative
7 leave or given a warning.  And then often if
8 there is a fourth offense, there would be a
9 recommendation of termination.  The idea is
10 that you try to get the person to do better and
11 if that doesn't work, there are steadily
12 escalating consequences.  Do you understand
13 everything I have just said?
14     A.   Uh-huh.
15     Q.   You have to answer out loud.
16     A.   Yes, I'm sorry.
17     Q.   Does the Jefferson County DA's
18 office, to your knowledge, have a policy
19 similar to what I just described?
20     A.   Not for state employees, no.  We
21 are not merit system employees.
22     Q.   So have you ever seen -- and
23 yesterday with Mr. Carr, I talked about the

Page 57
1 personnel manual in this case that applies to
2 VSOs.  I assume at some point you have seen the
3 personnel manual that applies to VSOs?
4     A.   In regards to the grant or --
5     Q.   Yes.
6     A.   Yes.
7     Q.   And, in fact, as the person who
8 supervises the grant, it's important for you to
9 understand what's contained in the personnel
10 manual for your employees, correct?
11     A.   Correct.
12     Q.   Can you tell me if there is any
13 section of the -- and the actual official term
14 is personnel policies and procedures manual, in
15 the personnel policies and procedures manual
16 for VSOs, is there any section that deals with
17 discipline or describes the disciplinary
18 process?
19     A.   I don't know.
20     Q.   Well, I'm happy to have you look
21 at the 2019 version, which is Plaintiff's
22 Exhibit 1, and feel free to thumb through that
23 or if at some point you are confident the

1 answer is yes or no, let me know.

2 My question specifically is, is
3 there a section of that document that deals
4 with discipline of employees.

5 A. (Reviewing document.) Not to my
6 knowledge. I don't see that.

7 Q. And let me backtrack for one
8 second -- well, actually let me move on to one
9 other thing before I forget it.

10 Again, I'm basing this on what I
11 see with entities that I sue. With some
12 entities that I sue, there are very specific
13 attendance policies that are in place and at
14 some of these entities, the attendance policies
15 work as follows: If you miss a day off of
16 work, there are a certain number of points
17 assigned to it and at the end of a year, the
18 company looks at the total number of points
19 someone has and if you've exceeded a certain
20 number of points, there sometimes would be
21 guidance or notice or a warning that you've
22 exceeded this number of points, and depending
23 on the number of points, there might be

1 disciplinary action. Do you understand
2 everything I've just said?

3 A. Yes.

4 Q. To your knowledge, does the
5 Jefferson County DA's office have any policy in
6 place that matches what I just said?

7 A. No, sir. Not for state employees.
8 I don't know about county.

9 Q. But for VSOs you don't know of any
10 such policy, do you?

11 A. No.

12 Q. And on several documents that we
13 are going to talk about and that Mr. Carr and I
14 talked about, there is the name of Tamika
15 Jackson who appears. Who is Tamika Jackson?

16 A. She is a county employee that one
17 of her jobs is to keep up with employee's time
18 and to make sure that they are accurate
19 according to the county system because the
20 employees have to swipe in and out at the
21 beginning and end of the day and that the time
22 that they put on their time sheets -- she
23 calculates their sick, vacation, comp time.

1 That's one of her duties.

2 Q. What is Ms. Jackson's exact job
3 title, if you know?

4 A. I do not know.

5 Q. Do you view her as a senior person
6 or as a more junior person? Has she been there
7 a long time or a short time?

8 A. She has been there -- I don't
9 know. COVID has time in a weird frame for me,
10 but I don't know, six years maybe. I mean, I
11 really don't know.

12 Q. Do you consider Ms. Jackson to be
13 competent in her job?

14 A. Yes.

15 Q. Do you consider Ms. Jackson to be
16 organized and thorough in her job?

17 A. Yes.

18 Q. Do you consider Ms. Jackson to be
19 meticulous in her understanding of details?

20 A. Yes.

21 Q. At any point while LaNitra Jeter
22 worked under your supervision, did Tamika
23 Jackson send you a memo or any other document

1 that raised concerns that LaNitra Jeter was
2 taking too much time off work?

3 A. To me, no.

4 Q. And, to your knowledge, did Tamika
5 Jackson send a document to anybody suggesting
6 that LaNitra Jeter was taking too much time off
7 work?

8 A. I don't know.

9 Q. And you've never seen such a
10 document, have you?

11 A. No.

12 Q. Did Tamika Jackson ever pick up
13 the phone and call you and say Judy, LaNitra is
14 taking too much time off work?

15 A. No.

16 Q. Did Tamika Jackson ever in any
17 way, in any form, or in any manner suggest to
18 you that LaNitra Jeter was taking too much time
19 off work?

20 A. No.

21 Q. Did Ms. Jackson ever suggest to
22 you that Ms. Jeter was abusing sick leave time?

23 A. No.

16 (Pages 58 - 61)

Page 62

1    Q.   Did Ms. Jackson ever suggest to
2  you that Ms. Jeter was abusing comp time?
3    A.   No.
4    Q.   Did Ms. Jackson ever suggest to
5  you that Ms. Jeter was abusing vacation time?
6    A.   No.
7    Q.   One of the things that I try to do
8  in all of my cases, Ms. Yates, is to understand
9  the job that we're talking about because we
10 have a lot of names that fly around these
11 cases, but I always think it's important for a
12 good lawyer to actually understand the job the
13 person was doing.  I didn't ask Mr. Carr this
14 question, as I suspected he probably wouldn't
15 have been the best person to ask, but I think
16 you're the best person to ask what exactly does
17 a victim services officer do?
18   A.   Well, our -- an overview of the
19 job is that we are a liaison between victims of
20 crimes and the deputy DAs to assist victims
21 through the criminal justice system.  We --
22 when they're victims of property crimes, we
23 send out letters and forms to them so if they

Page 63

1  have losses that they can request documentation
2  or provide documentation to request restitution
3  if an offender is convicted or pleads guilty.
4  In violent crimes, they receive the letter and
5  that documentation along with an application to
6  a state agency that may be able to assist them
7  with losses due to injuries or loss of income,
8  funeral expenses.  We can go to court with them
9  during preliminary hearings to sit with them.
10 I do travel arrangements if they live out of
11 state or far enough away that we need to bring
12 them into town for trial.  We do check on
13 restitution if it has been ordered and it's not
14 been paid, we follow up with the DDAs to see if
15 they can file a motion to show cause as to why
16 the offender is not paying his restitution.  We
17 do follow-up postconviction information to
18 victims, parole hearings, pardon hearings.  We
19 are now involved in Lisa's Law in notifying
20 victims of that when offenders that are
21 incarcerated have accounts that are now over
22 five thousand dollars, the victims can civilly
23 sue for recovery.  We document information that

Page 64

1  comes from Alabama Crime Victims Compensation
2  Commission and help fill out information to
3  assist victims in their application and
4  receiving payment for the losses that they
5  filed with that agency.  I mean, there is a
6  whole list of things.  I can't remember all of
7  the details, but it's basically trying to
8  assist victims through the criminal justice
9  system from the time that a warrant has been
10 issued until the case is over, as far as not
11 just prosecution, but end of sentence.
12   Q.   And if you had to pick out the
13 four or five most important characteristics of
14 a good VSO, what would they be, Ms. Yates?
15   A.   Someone who is a good communicator
16 with victims in explaining the criminal justice
17 system to them.
18   Q.   That's one.
19   A.   Compassionate.
20   Q.   That's two.
21   A.   Meticulous.
22   Q.   That's three.
23   A.   Professional.

Page 65

1    Q.   That's four.
2    A.   Trustworthy.
3    Q.   That's five.
4         Do you give evaluations to your
5  victim services officers?
6    A.   I have not until recently when the
7  grant now requires it once a year.
8    Q.   Did you ever give Ms. Jeter an
9  evaluation?
10   A.   No.  They were not required then.
11   Q.   Did you ever give her any sort of
12 written feedback about how she was doing as a
13 VSO?
14   A.   Written, no, sir.
15   Q.   Did you ever schedule meetings
16 with her to talk about her job performance as a
17 VSO?
18   A.   Schedule meetings, no, sir.
19   Q.   Did you ever communicate to
20 Ms. Jeter during the roughly year that she
21 worked under your supervision that she was
22 struggling in her job performance as a victim
23 services officer?

17 (Pages 62 - 65)

Page 66

1    A.   Not that I recall.
2    Q.   And we've already said --
3    A.   And --
4    Q.   -- that you didn't write her up.
5         MR. MURRILL:  I don't think she
6 was finished.
7    A.   Let me change that answer because
8 her performance does include -- yes, I have --
9 ask that question again so I can make sure I'm
10 answering it correctly.
11        THE DEPONENT:  Can you read it
12 back for me?
13    A.   Or can you restate it?
14    Q.   (BY MR. DAVIS:)  Well, the
15 specific question that I believe I asked you
16 was about Ms. Jeter's job performance.  And I'm
17 not talking about her attendance right now.  I
18 promise you we will talk about her attendance
19 in a moment.  I'll give you a chance to give
20 your side of that conversation.  But right now
21 I'm not talking about her attendance.
22    A.   Uh-huh.
23    Q.   I'm talking about her performance

Page 67

1 of her job as a victim services officer.  You
2 do agree, I assume, that Ms. Jeter did perform
3 her job as a victim services officer and did
4 have deliverables, she did work with victims,
5 she did do the various things you described
6 required for the core job description, correct?
7    A.   Yes.  Okay.
8    Q.   Was Ms. Jeter a good communicator
9 with victims?
10    A.   I don't know.
11        MR. RILEY:  Let me object.  She
12 had asked if she could go back to a question,
13 Artur.
14        MR. DAVIS:  Well, Mr. Riley, thank
15 you, but I'm actually doing the deposition.
16 I'm not letting the witness do the deposition.
17        MR. RILEY:  That's fine.  But the
18 witness -- but if you are going to say that the
19 witness cannot go back and clarify her
20 answer --
21        MR. DAVIS:  Oh, she can clarify
22 her answer all she wants.
23        MR. RILEY:  She was trying to

Page 68

1 answer the question, Artur.
2         MR. MURRILL:  In all fairness, she
3 said "and" --
4         MR. DAVIS:  And I'm happy to let
5 her --
6         MR. MURRILL:  -- and you shifted.
7 If you don't want her to, we'll follow up with
8 her later.
9         MR. DAVIS:  And I'm happy to have
10 you follow up with her later, and you will have
11 plenty of time to do that.
12        MR. RILEY:  Okay.  I do want the
13 record to reflect that you have not allowed her
14 to finish the answer.
15        MR. DAVIS:  Well, A, that's not
16 accurate.
17        MR. RILEY:  The record will show
18 --
19        MR. DAVIS:  I'm going to ask the
20 questions, Counsel, as I want to ask them, and
21 you will have an opportunity to redirect.
22        MR. RILEY:  Okay.  The record will
23 show --

Page 69

1         MR. DAVIS:  And if there is
2 something --
3         MR. RILEY:  That's fine.  The
4 record will show she was trying to finish an
5 answer and you did not let her.
6         MR. DAVIS:  That's not accurate.
7         MR. RILEY:  That's fine.
8         MR. DAVIS:  That's not accurate.
9         MR. RILEY:  Go ahead.
10    Q.   (BY MR. DAVIS:)  But what I am
11 going to do is I'm going to ask my questions.
12 And, Ms. Yates, at any time you want to add an
13 answer, we'll be here as long as we need to be.
14 Theoretically under the rules, I have up to
15 seven hours.  I don't intend to take them, but
16 I will give you every opportunity because I'm
17 interested first and foremost in what you have
18 to say and not what your lawyers have to say.
19 So is that fair?
20    A.   That's fair.
21    Q.   So to go back to my question,
22 which I don't believe I ever got an answer
23 because of the interruption, was Ms. Jeter a

18 (Pages 66 - 69)

Page 70

1  good communicator with victims?
2      A.   The times I witnessed, yes.
3      Q.   From the times you've witnessed
4  and observed, which is obviously all you can
5  talk about, was Ms. Jeter compassionate with
6  victims?
7      A.   With some victims, yes.
8      Q.   Did you ever write up Ms. Jeter
9  for not being compassionate with victims?
10     A.   No.
11     Q.   Did you ever send Ms. Jeter a
12  message that she was not sufficiently
13  compassionate with the victim?
14     A.   No.
15     Q.   Your third metric was
16  meticulousness.  What did you mean by
17  meticulous?
18     A.   Meticulous in that every document
19  that we assist a victim in filling out, first
20  of all, has to be accurate, that we have to
21  make sure victims are -- well, we can't make
22  sure a victim is telling us the truth but that
23  we don't encourage them to -- you know, that we

Page 71

1  put down the correct numbers on restitution
2  forms or the correct answers, to the best of
3  their knowledge and ours, and that the
4  documentation that we are entering into our
5  computer system, it's called Filemaker, and for
6  us that pretty much was our file.  We didn't
7  do -- we didn't maintain files on victims.  We
8  entered our information into this database, and
9  so we were to be meticulous in entering every
10  interaction with a victim and updating their
11  addresses and that type of information.
12     Q.   Was Ms. Jeter meticulous about
13  preparing and compiling documents as you just
14  described?
15     A.   I don't know.
16     Q.   Do you know of any instance where
17  she was not sufficiently meticulous in
18  compiling and preparing documents as you
19  previously described?
20     A.   No.
21     Q.   And did you ever bring to her
22  attention that you had an issue with the
23  quality of the documents that she prepared?

Page 72

1      A.   No.
2      Q.   What did you mean by the word
3  professionalism?
4      A.   Well, in this exhibit that you
5  gave me, your professional conduct, not just
6  within your coworkers, but when you are in
7  court, when you are in public, when you are
8  outside the office, professionalism for us is
9  24/7.  We represent Mr. Carr, and that means
10  that all of our behavior and demeanor, attire,
11  everything that is presented to the public
12  needs to be presented in a professional manner
13  because we are representatives of Mr. Carr.
14     Q.   Ms. Yates, are there any specific
15  examples that you can cite to me where you
16  believe that Ms. Jeter did not perform
17  professionally as a victim services officer?
18     A.   Yes.
19     Q.   And tell me what they are.
20     A.   She was observed in court during a
21  trial falling asleep, eating, and texting on
22  her phone, which judges make known you're not
23  to be on your phone during any -- any time

Page 73

1  you are in their courtroom.  A court -- a trial
2  coordinator who works in our office came to me
3  and told me because there were several people
4  that observed the behavior.
5      Q.   What was that trail coordinator's
6  name?
7      A.   Stephanie Walters.
8      Q.   How many times did Stephanie
9  Walters come to you with the kind of
10  information you just described?
11     A.   It was that one time.
12     Q.   What was the date of that one
13  time, if you can recall?
14     A.   I don't recall.
15     Q.   Was it early in Ms. Jeter's
16  tenure, middle of her tenure, or late in her
17  tenure?
18     A.   I don't recall.
19     Q.   Did you fire Ms. Jeter after this
20  episode?
21     A.   That is not my -- I'm not allowed
22  to do that, so that is not my job.
23     Q.   Did you recommend that Ms. Jeter

19 (Pages 70 - 73)

Page 74

1 be fired after this episode?
2     A.   No, I did not.
3     Q.   Did you report the episode you
4 just described to Danny Carr after you heard
5 about it?
6     A.   No.  I never went directly to
7 Mr. Carr.
8     Q.   So did you report the episode you
9 just described to Joe Roberts after you heard
10 about it?
11     A.   I don't recall.
12     Q.   Did you write up a note to file
13 around the time this incident happened,
14 Ms. Yates?
15     A.   I don't recall.
16     Q.   Did you reach out to Ms. Jeter
17 about this incident after it happened?
18     A.   Not directly, no.
19     Q.   Well, did you text her about this
20 incident after it happened?
21     A.   No.  We had a staff meeting and I
22 covered in December, so it would have had to
23 have been sometime right before that.  We had a

Page 75

1 staff meeting, and that was one of the points
2 that I covered in the staff meeting.  I didn't
3 want to -- you know, it was to cover a whole
4 bunch of things that several VSOs were doing
5 that we needed to be more aware of.
6     Q.   What were some of the things that
7 several VSOs were doing that you needed to be
8 more aware of?
9     A.   Can I see the memo?  I know one of
10 them was bringing a child to her office without
11 letting me know.  It was on a day that I wasn't
12 at work.
13     Q.   Who is that?
14     A.   Erin Barefield brought her
15 daughter, and Joe Roberts came to me and told
16 me that, you know, we weren't to have children
17 in our offices anymore.  It was actually a
18 violation of the county rules.
19     Q.   So Joe Roberts said to you that
20 Erin Barefield was violating county rules?
21     A.   Well, he didn't -- we are liable
22 for anyone who is in the building, and he said,
23 you know, for me to make sure that everyone

Page 76

1 knows that their children were not to be -- we
2 weren't to have our children there and baby-sit
3 them at work during work hours.
4     Q.   So Erin Barefield from your
5 perspective was violating county rules by
6 bringing her child to the office; is that
7 correct?
8     A.   Correct.
9         MR. MURRILL:  Object to the form.
10 Go ahead.
11     A.   Okay.
12     Q.   (BY MR. DAVIS:)  How often did
13 Ms. Barefield do this?
14     A.   I don't -- don't know.
15     Q.   Was it a regular sort of problem
16 or just an every now and then sort of thing?
17     A.   Occasional.  Just --
18     Q.   What were some of the other things
19 that you alluded to when you said VSOs who were
20 doing things that they shouldn't be doing, or
21 whatever your phrase was?
22     A.   Well, I was just trying to remind
23 everyone about like our personnel data base,

Page 77

1 that if people are going to take off and they
2 know, let's say, that I've got a doctor's
3 appointment next week, I should go ahead today
4 and put in for it because, you know, there
5 might be something going on where I need -- you
6 know, if everybody wants to take off on the
7 same day, somebody is going to have to be told
8 no, you can't take off technically is one of
9 the reasons for that.  But it's to -- when you
10 know in advance that you have things you are
11 going to have to take care of, you should put
12 in your request prior to taking off.  Don't
13 take off and then come back days later and then
14 request it.
15     Q.   Were there VSOs who were not
16 timely reporting that they were going to take
17 days off?
18     A.   Ms. Jeter.
19     Q.   Were there others?
20     A.   Not that I recall.
21     Q.   And during this particular staff
22 meeting, did you single out Ms. Jeter and
23 say --

20 (Pages 74 - 77)

Page 78

1      A.   I did not.  I didn't want to
2  single anybody out during the meeting.  I just
3  did it as a general, that these are our rules
4  to remind them of that.  I did not single out
5  anyone.
6      Q.   Did you at any point send a
7  message or memo or document to Ms. Jeter
8  telling her that she was not timely providing
9  notice of leave time?
10     A.   No.
11     Q.   Do you remember -- well, before we
12 leave that, again, were there any other issues
13 that you felt were -- and I'm trying to
14 remember the exact phrase that you used, you
15 said that you were trying to point out to VSOs
16 that there were things that we needed to be
17 doing or shouldn't be doing.  That's what I
18 recall you saying.
19     A.   The chain of command I -- I was
20 reminding them because Mr. Carr several times
21 prior to the staff meeting, there had been a
22 couple of e-mails that he had sent out in the
23 past year to remind everyone to follow the

Page 79

1  chain of command.  Mr. Carr is -- and I'm going
2  to explain what I know about that, is --
3  Mr. Carr is such a nice person that everybody
4  felt like they could just go to him directly
5  and sidestep their supervisor to, you know,
6  look, I need to do this, why don't you tell so
7  and so that I am not going -- you know,
8  different -- you know how people are.  So he
9  sent out -- he had sent out an e-mail telling
10 people to follow their chain of command, and
11 evidently people still were not following it.
12 He sent out a second one.  So I added that in
13 my staff meeting to remind my VSOs the chain of
14 command again, me, Joe Roberts, and -- you
15 know, you have to come to me first, then we
16 will go to Joe Roberts, then Mr. Carr if that's
17 appropriate.
18     Q.   To your knowledge, had Ms. Jeter
19 ever violated the chain of command by going
20 directly to Danny Carr?
21     A.   To Mr. Carr, not that I'm aware
22 of.
23     Q.   To your knowledge, had Ms. Jeter

Page 80

1  violated the chain of command at all?
2      A.   Yes.
3      Q.   How many times?
4      A.   I'm not familiar -- I don't know.
5  I do know the one time when she went to
6  Mr. Roberts.
7      Q.   And that's the one time that we
8  talked about in the November memo, correct?
9      A.   Correct.
10     Q.   Do you know of any other times
11 during the time that she was a VSO that
12 Ms. Jeter in your opinion violated the chain of
13 command?
14     A.   Yes.  There were -- there was at
15 least -- once or twice, I don't know the exact
16 count, but let's just say there were times that
17 she went to Michael McCurry to ask him about
18 her time instead of coming to me, and he would
19 tell -- one time she went to him and said she
20 was going to have surgery and she was going to
21 need to make comp time, and he told her to come
22 to me.  She never came to me.
23     Q.   Did you write her up for that?

Page 81

1      A.   I wrote a memo about it, but I did
2  not write her ---I mean, that's all just for my
3  own opinion.  She never came to me, so I
4  couldn't address -- if someone else had already
5  told her I can't help you, you got to go back
6  to your supervisor, then I'm waiting for her to
7  come to me.
8      Q.   Did you write her up for it?
9      A.   No.
10     Q.   Did you go to Ms. Jeter and did
11 you say to her, LaNitra, you violated the chain
12 of command by going to Mike McCurry?
13     A.   I did not.
14         MR. RILEY:  Artur, let's go about
15 five more minutes.
16         MR. DAVIS:  Yeah.  That will take
17 us to 11:00.  That's perfectly fine.
18     Q.   (BY MR. DAVIS:)  And with respect
19 to Ms. Jeter -- again, I promise you we are
20 going to get a chance to talk about her
21 attendance issues, but putting her attendance
22 aside for a moment, Ms. Yates, was LaNitra
23 Jeter a competent victim services officer?

21 (Pages 78 - 81)

Page 82

1    A.    She could have been -- I will say
2  yes.  She could have been a great asset.
3    Q.    And why is that?
4    A.    Her counseling abilities, there
5  were several times that I and the DA used her
6  to help us calm down a situation with some
7  victims that had mental health issues, so --
8    Q.    Did you value her input and her
9  work in those instances where you had victims
10  with mental health issues?
11    A.    Absolutely.
12    Q.    Did you think she did an excellent
13  job of showing empathy with the victims in
14  circumstances you just described?
15    A.    Yes.
16    Q.    And did you take note of that?
17    A.    Absolutely.  And I told her
18  several times how -- how valuable she was to
19  our office and in those regards.
20    Q.    Did you tell Danny Carr that as
21  well?
22    A.    I -- no, I did not.
23    Q.    Did you tell Joe Roberts?

Page 83

1    A.    Yes.
2    Q.    Again, after the break we are
3  going to get into the attendance issues, but
4  before we get to the attendance issues, was
5  there any performance related reason to remove
6  LaNitra Jeter from her job as a victim services
7  officer?
8    A.    Yes.
9    Q.    What were they?
10    A.    Her not being trustworthy,
11  leaving --
12    Q.    Tell me --
13    A.    I'm sorry --
14    Q.    Tell me -- well, I think you were
15  about to answer my next question, but I'll ask
16  it, tell me how many specific times Ms. Jeter
17  was untrustworthy to victims.
18    A.    That was not going to be my
19  answer.  That wasn't the question I was
20  expecting, but she had a victim that was
21  someone she knew, and I sat in with her when we
22  dealt with this victim.  I believe it was a
23  domestic violence case, and I allowed her

Page 84

1  because she knew this person, but instead of
2  just doing her job and being -- you -- still if
3  you know someone that's a victim, you have to
4  take a professional approach to it.  She talked
5  to her in a manner that I thought was
6  inappropriate in that she's making -- you know,
7  like I can't -- well, I don't know how to word
8  it.  Let me think.  She was making remarks to
9  the victim that were accusatory of her actions
10  in the situations -- in the situation which is
11  not appropriate.  We don't condemn victims for
12  them being a victim.  Yes, they make bad
13  decisions, but that's not our place to make
14  that call, it's to assist them through the
15  system.
16    Q.    Did you write up Ms. Jeter for
17  this episode you just described?
18    A.    I did not.
19    Q.    Did you counsel Ms. Jeter about
20  her handling of this episode and tell her that
21  you had an issue with it?
22    A.    I don't recall.
23    Q.    But do you have any memory of

Page 85

1  doing that?
2    A.    I don't.  I don't recall.
3          MR. DAVIS:  So we are literally at
4  10:59.  Why don't we stop at this point and
5  take a fifteen-minute break?
6          MR. MURRILL:  That's fine.
7          MR. RILEY:  Ten minutes is fine.
8          MR. DAVIS:  Ten minutes is
9  perfectly fine.
10          (Whereupon, a break was had from
11          11:00 a.m. until 11:17 a.m.)
12    Q.    (BY MR. DAVIS:)  Ms. Yates, we
13  were talking before the break about instances
14  where you believe Ms. Jeter engaged in
15  unprofessionalism.  And obviously we are going
16  to spend a lot of time today talking about
17  these attendance issues, but because in a sense
18  her whole job performance is somehow relevant
19  to this case and the memo that you submitted
20  terminating her you cited not just the
21  attendance but eleven other factors.  I do have
22  an obligation to sort of get into virtually
23  everything that I can so we have to take some

1 detail here.

2       You were giving examples, I

3 believe, in response to my question give

4 specific instances where you believe that she

5 was unprofessional, and I believe you gave me

6 this one example about this interaction you

7 observed, and we talked about that.

8       Are there other instances that you

9 can recall where you believe that Ms. Jeter

10 acted in an unprofessional manner?

11   A.   Yes.  And earlier the way I

12 answered that, because you said untrustworthy

13 to victims, but unprofessionalism and

14 trustworthiness in other situations that don't

15 deal directly with victims are -- and I did

16 talk to her about this, was, first of all, the

17 incident where she had asked to be off to --

18 because she was involved in a mediation in

19 domestic court for her husband's case and came

20 in the next day and told this story that

21 involved several different stories that were

22 not true.  She said that she had -- was

23 involved in mediation under Judge Stephens'

1 court with a mediator and that she and her

2 husband, the mediator, and I can't remember the

3 woman's name, but it was in a custody issue,

4 was there and that the woman kept saying things

5 that upset her to the point that LaNitra said

6 that she reached across the table, grabbed the

7 woman, drug her across the conference table and

8 threw her to the ground and then she said the

9 bailiff took and handcuffed her and made her

10 sit in a chair until she calmed down.  And, you

11 know, that involves quite a bit.

12       Now, I'm believing her when she

13 tells the story.  And so my first concern on

14 that was oh my goodness, you are going to be

15 arrested for assaulting someone.  So I go and

16 talk first to Michael McCurry about it because

17 he handled all of the support staff to see what

18 his suggestions were.  I tell Joe Roberts what

19 happened, and he told me to get with Michael

20 and for us to have a meeting with LaNitra about

21 that.  Michael does some follow-up work on

22 that, contacts Judge Stephens' courtroom and

23 discovers that not only was LaNitra not there

1 for mediation, there was no mediation that day.

2       So everything that she told me and

3 several other people in the office and had

4 posted it on social media the night before that

5 she had done all of these things as an employee

6 of the DA's office, I'm in total shock.  I've

7 never dealt with anything, to me, quite so

8 egregious.

9       So several days later, Michael

10 McCurry and I sat and met with her and he asked

11 her to just tell the story of what happened.

12 And she replayed the story to him exactly as

13 she had to everyone else and then he kept

14 asking questions and she finally said well, you

15 know -- she told several different versions on

16 that.  So I don't really know what the whole

17 truth was that day, but the bottom line was

18 there was no mediation, she didn't assault

19 anybody, but yet that story had been put out in

20 the universe and to me, and my trust of her was

21 totally, you know, destroyed.  And I asked her

22 that day how was she going to build trust back

23 up.

1       Other times that she was

2 untrustworthy was --

3   Q.   So let me show you a document that

4 deals with what you just related, Ms. Yates.

5 Let me show you a document that's Plaintiff's

6 Exhibit Number 19.  And I'll represent to you

7 it's a memo that's dated September 19th, 2019,

8 and it's sent from you to Danny Carr and Joe

9 Roberts, Michael McCurry is cc'd on it, and it

10 says subject LaNitra Jeter.  Would you take a

11 look at that document that I'm putting in front

12 of you right now?

13       (Whereupon, Plaintiff's Exhibit 19

14       was marked for identification

15       and a copy of same is attached

16       hereto.)

17   A.   I will.  But can I state that you

18 violated your own rules by interrupting me in

19 answering your question?

20   Q.   Well, I apologize for doing that.

21       And you can please look at the

22 document and tell me if it essentially

23 describes what you were just orally describing

Page 90

1 earlier.
2          MR. RILEY: And to the witness's
3 pointed, Artur, when she is saying there's
4 other times she was untrustworthy and you stop
5 her --
6          MR. DAVIS: Oh, I'm going to come
7 back to them, I promise.
8          MR. RILEY: Okay. I'm just saying
9 sometimes --
10         MR. DAVIS: I'm happy to come back
11 to them, but I don't want --
12         MR. RILEY: -- when she's in the
13 middle of answering --
14         MR. DAVIS: -- a ten-minute answer
15 either.
16         MR. RILEY: Yeah. But when she's
17 in the middle of answering your question and
18 you stop her, you know, I think you need to at
19 least explain to her you are going to let her
20 come back and finish her answer.
21     Q.   (BY MR. DAVIS:) Well, I'm going
22 to ask the question, Ms. Yates, and your
23 lawyers will have every opportunity to redirect

Page 91

1 and to follow up.
2     A.   Okay.
3          MR. RILEY: At this point, Artur,
4 if you are going to stop her from answering the
5 question, then we're going to stop this
6 deposition and we are going to write down some
7 ground rules. Now, I don't think it has come
8 to that with you and me, but it's not going to
9 be I'm going to let you answer half the
10 question and if I decide to stop you
11 mid-sentence, I have the right to do that,
12 because you and I know that is not right.
13         MR. DAVIS: Are you finished,
14 Counsel?
15         MR. RILEY: I am.
16     A.   Yes, I wrote that.
17     Q.   (BY MR. DAVIS:) Okay. And would
18 you just summarize what is written in this
19 document?
20     A.   I just did in my previous answer.
21     Q.   Okay. And I believe that was
22 actually my question to you. This document
23 essentially summarizes your previous answer,

Page 92

1 doesn't it?
2     A.   It does.
3     Q.   So let's talk about it.
4     A.   Well, it does as to one of the
5 reasons that I considered her unprofessional or
6 untrustworthy.
7     Q.   Okay. So let me ask you a series
8 of questions about this incident. Number one,
9 did you yourself talk to Judge Stephens?
10    A.   I was in the room with Michael
11 McCurry and he had her on speaker phone.
12    Q.   And what did -- first of all, who
13 is Judge Stephens, just so we're --
14    A.   Patricia Stephens. She is a judge
15 in domestic relations court.
16    Q.   So you would have been in a
17 position to listen in on the conversation
18 between Mr. McCurry and Judge Stephens,
19 correct?
20    A.   Yes.
21    Q.   What exactly did Mr. McCurry ask
22 Judge Stephens?
23    A.   He asked if they -- who was the

Page 93

1 mediator for that date for that particular
2 case.
3     Q.   So did Mr. McCurry ask who was the
4 mediator on what particular date?
5     A.   The date that was alleged that
6 there was mediation with Mr. Jeter and
7 Marquetta Murrell, if that's her last name.
8     Q.   So did Mr. McCurry ask Judge
9 Stephens if there was ever a mediation
10 involving LaNitra Jeter and her husband and
11 this person Marquetta?
12    A.   It got to that point. The answer
13 to what I heard -- he asked who the mediator
14 was. She went and found out, came back and he
15 said did they have a meeting on this day. The
16 -- Judge Stephens said that not only was there
17 no mediation that day, that that mediator had
18 never had mediation with the two of them and
19 when she did have one scheduled, Ms. Jeter
20 would not be present at it.
21    Q.   So the question -- and, again, I
22 know we are trying to reconstruct the
23 conversation about four years after it

24 (Pages 90 - 93)

Page 94

1  happened, but you recall Mr. McCurry asking if
2  on a particular day a mediation occurred
3  involving LaNitra Jeter, correct?  Was that how
4  the conversation started?
5      A.   It would have been in reference to
6  her husband's name because he was the party
7  with Marquetta, or ever how you pronounce her
8  name, and who was present at that mediation and
9  what took place at the mediation.
10     Q.   So I can clearly understand what
11  you remember Judge Stephens saying, did Judge
12  Stephens say that there was never a mediation
13  that she knew of involving LaNitra Jeter, or
14  did Judge Stephens say that the mediation did
15  not happen on a particular day?
16     A.   Both.  That not only had it not
17  happened that day, that there had not ever been
18  a mediation that took place yet between those
19  parties and that if they had or when they did
20  have one, Ms. Jeter would not be a party to it,
21  that she would not have been a party then if
22  there had been, but there had not been one.
23  That particular mediator wasn't -- if I

Page 95

1  remember correctly, may not have even been in
2  town.  She was not at work that day.
3      Q.   How did y'all know to call Judge
4  Stephens?
5      A.   LaNitra told us that Judge
6  Stephens was the judge over the case.
7      Q.   Did LaNitra Jeter regularly
8  interact with Judge Stephens in her role as a
9  victims services officer?
10     A.   No.
11     Q.   How many judges, just give me a
12  ballpark, are there in Jefferson County?
13     A.   I don't know.
14     Q.   It's actually around twenty some
15  people, isn't it?
16     A.   I don't know.  I would have
17  guessed thirty.  I don't know.  It's a lot if
18  you are including criminal and civil.
19     Q.   And Ms. Jeter's work as a VSO
20  would have put her in contact with the criminal
21  court judges, correct?
22     A.   Yes.
23     Q.   And Judge Stephens was a civil

Page 96

1  court judge, correct?
2      A.   Correct.
3      Q.   Do you require the victim services
4  officers to know the names of all thirty some
5  judges in Jefferson County?
6      A.   No.
7      Q.   And is it fair to say that of that
8  thirty some judges in Jefferson County, that
9  some are better known than others?
10     A.   I guess, depending on what your
11  work is or your interest is, I don't know.
12     Q.   I think that's a perfectly fair
13  distinction.  So going with that distinction,
14  you would agree with me that Ms. Jeter's
15  familiarity would have been principally with
16  the criminal court judges, correct?
17         MR. MURRILL:  Object to the form.
18     A.   No.
19     Q.   (BY MR. DAVIS:)  Do you know if
20  Ms. Jeter could have gotten the name of the
21  judge wrong?
22     A.   No, I don't believe that.  She had
23  -- prior to that day had asked me personally if

Page 97

1  I knew Judge Stephens because she was the
2  judge.  She's asked me about several judges
3  that were involved in cases involving her
4  husband in civil -- in family issues in
5  Bessemer and family court.
6      Q.   Do you happen to know how many
7  family court judges there are in Jefferson
8  County?
9      A.   No, I don't.
10     Q.   And if I asked you to name all the
11  family court judges in Jefferson County, could
12  you do it?
13     A.   No.
14     Q.   Can you name any of them?
15     A.   Right now, no, I can't.
16     Q.   Because they're not people that
17  you regularly deal with in the course of your
18  work, correct?
19     A.   Correct.
20     Q.   So let me hone in on this because
21  I do think this is actually a very interesting
22  topic, Ms. Yates, and I want to really explore
23  it with you.

25 (Pages 94 - 97)

Page 98

1       Are you saying that it's your
2 position that rather than being mistaken about
3 the name of the judge, that Ms. Jeter just made
4 up a whole series of events and a whole meeting
5 and a whole interaction?  Is that your
6 position?
7       A.   It is now.  Because at the time
8 she told me the story, no, I believed it.  When
9 Michael McCurry and I met with her, she
10 admitted she lied about the whole scenario.
11      Q.   When did Ms. Jeter admit to you
12 and Mr. McCurry that she quote, unquote, lied
13 about the whole scenario?
14      A.   When was that meeting?  The 25th
15 of September maybe.
16      Q.   I'm going to show you a document
17 that we discussed yesterday, so this should
18 already be an exhibit, let me find it.  It's
19 Plaintiff's Exhibit Number 3.
20           (Whereupon, Plaintiff's Exhibit 3,
21           having been previously marked for
22           identification in the deposition
23           of Danny Carr, was referenced in

Page 99

1           this deposition.)
2       Q.   Let me show you a document that's
3 dated September 30th, 2019, and I'll represent
4 to you that it's a memo from you to Danny Carr
5 and Joe Roberts, subject LaNitra Jeter, copied
6 Michael McCurry.  And I want you to take a look
7 at this document and tell me if you recognize
8 this memo.
9       A.   Yes.
10      Q.   You do recognize it?
11      A.   I do.
12      Q.   And do you recognize it as a memo
13 that you wrote that describes a conversation
14 with LaNitra Jeter?
15      A.   Yes.
16      Q.   What was the date of the
17 conversation described in that memo?
18      A.   The one with me and Mr. McCurry
19 was on September 25th, as I said.
20      Q.   And does it say September 25th or
21 September 23rd in that document?
22      A.   Well, on the 23rd is when she --
23 let's see.  No.  September 23rd was a separate

Page 100

1 issue.  And then -- this (indicating) was to
2 cover two issues.
3       Q.   So let's focus just for a moment.
4 Again, we are going to get to the other issues
5 that's an issue about leave time and comp time,
6 but I want to stay with your answer right now.
7       A.   Okay.  I thought you were going to
8 be sidetracking again.
9       Q.   I'm going to sometimes sidetrack
10 because that's what we lawyers have to do to
11 get our witnesses to answer, but right now the
12 only thing I want to focus on is this alleged
13 fabrication by Ms. Jeter of this mediation and
14 this judge and this incident.  And just so we
15 are clear, we are kind of talking a little bit
16 of shorthand because we know the documents and
17 we know the facts, but am I correct, Ms. Yates,
18 that Ms. Jeter said to you there was some sort
19 of physical confrontation with the ex-wife of
20 her husband during the mediation?
21      A.   Absolutely.  She not only said it,
22 she demonstrated how -- you know, the story, I
23 mean, she was (demonstrating), demonstrating

Page 101

1 it.
2           And I do want to add in here,
3 though, that I object to you saying that I'm
4 not answering your questions.  I am answering
5 your questions.
6           MR. RILEY:  I will join in that
7 objection.
8           MR. MURRILL:  Let's make it a
9 three-partner.
10      Q.   (BY MR. DAVIS:)  Well, Ms. Yates,
11 first of all --
12      A.   And, two, I also object to you
13 saying alleged because Ms. Jeter admitted to
14 making up the entire story as a joke to relieve
15 stress.
16      Q.   And, Ms. Yates, I will say to you
17 what I say to my very able lawyers when they
18 make objections, noted.
19           So let me ask you this question,
20 and, again, you tell me if I'm wrong.
21      A.   Okay.
22      Q.   Is it your belief -- and really
23 let me put today aside because I'm less

26 (Pages 98 - 101)

Page 102

1 concerned about today than frankly what you
2 felt four years ago, was it your belief in the
3 fall of 2019 that LaNitra Jeter had just
4 fabricated and made up an incident and repeated
5 that story to you on multiple occasions?  Was
6 that your belief?
7     A.   Yes.
8     Q.   That's a pretty serious thing to
9 believe, isn't it, Ms. Yates?
10    A.   Yes, it is.
11    Q.   If you have a VSO who is just
12 fabricating and making up stories, that's a
13 major problem, isn't it?
14    A.   Absolutely, it is.
15    Q.   And you told Mr. Carr in memo form
16 about this incident, correct?
17    A.   I did.
18    Q.   And that's in fact Plaintiff's
19 Exhibit Number 19, isn't it?
20    A.   It is.
21    Q.   And you told Mr. Roberts in memo
22 form about this incident.  Am I correct?
23    A.   Yes.

Page 103

1     Q.   Did you orally tell Mr. Carr about
2 this incident?
3     A.   Not Mr. Carr, no.
4     Q.   Did you orally tell Mr. Roberts
5 about this incident?
6     A.   I did.
7     Q.   Did Mr. Roberts tell you to fire
8 Ms. Jeter?
9     A.   That is not my job to fire them.
10 I can recommend it, but that's not my job.  If
11 it had been --
12         THE DEPONENT:  Can I say this?
13    Q.   (BY MR. DAVIS:)  You can say
14 whatever you want to say, Ms. Yates.
15    A.   I'll stop right there.
16         MR. RILEY:  Just answer his
17 question.
18         THE DEPONENT:  Okay.
19    Q.   (BY MR. DAVIS:)  Well, let me ask
20 you this question --
21    A.   That's not my job to fire anyone.
22 All I can do is give them the facts and let
23 them make their decision on it.

Page 104

1     Q.   And I'm happy to rephrase.
2          Did Joe Roberts after receiving
3 the memo that's Plaintiff's Exhibit 19 discuss
4 with you whether LaNitra Jeter should be fired?
5     A.   We did discuss that, yes.
6     Q.   And as a result of that
7 discussion, was LaNitra Jeter fired?
8     A.   No.  Because that's not his
9 decision either.
10    Q.   Whose decision would it have been?
11    A.   Mr. Carr.  He makes that decision.
12    Q.   To your knowledge, did Joe Roberts
13 discuss with Danny Carr whether or not LaNitra
14 Jeter should be fired after this alleged
15 fabrication?
16    A.   I don't know.
17    Q.   Have you seen any memo or any
18 documentation of Mr. Roberts describing this
19 incident to Danny Carr?
20    A.   No.
21    Q.   Did Mr. Roberts tell you that he
22 discussed with Danny Carr whether Ms. Jeter
23 should be fired?

Page 105

1     A.   I don't recall.
2     Q.   Do you have any reason to think
3 that Danny Carr did not get this memo that's
4 Plaintiff's Number 9?
5     A.   I -- I don't know.
6     Q.   But you sent it to him, didn't
7 you?
8     A.   I did.
9     Q.   And did at any point after
10 receiving this memo that is Plaintiff's 19
11 Danny Carr speak with you about whether LaNitra
12 Jeter should be fired?
13    A.   He did not.  He's busy.
14    Q.   At any point after receiving the
15 memo that's Plaintiff's 19 did Danny Carr send
16 you any kind of e-mail or correspondence asking
17 you your opinion on whether LaNitra Jeter
18 should be fired?
19    A.   Not that I recall.
20    Q.   And did Mr. Roberts discuss with
21 you suspending LaNitra Jeter after this
22 incident that you have described?
23    A.   Not that I recall.

27 (Pages 102 - 105)

Page 106

1    Q.   Was she suspended?
2    A.   No.
3    Q.   Do you recall Mr. Roberts
4  discussing placing Ms. Jeter on administrative
5  leave after this incident that we've talked
6  about?
7    A.   Not that I recall, no.
8    Q.   To your knowledge, was she placed
9  on any sort of administrative leave?
10   A.   No.
11   Q.   Did Mr. Roberts suggest to you
12  that Ms. Jeter should be written up for this
13  incident that we've been talking about?
14   A.   No.
15   Q.   Did you write her up for the
16  incident that we've been talking about?
17   A.   What do you mean by write her up?
18   Q.   Did you write a document and label
19  it reprimand or warning to Ms. Jeter?
20   A.   And give her documentation?
21   Q.   Yes, ma'am.
22   A.   No, I did not.
23   Q.   Did you tell Ms. Jeter that her

Page 107

1  job was in jeopardy after this incident that
2  we've been talking about for the last several
3  minutes?
4    A.   Michael McCurry and I when we had
5  our meeting, yes, we did, that this jeopardized
6  her job because of all of the implications
7  involved in telling the story.
8    Q.   And just so we are clear, this
9  thing that we're talking about, this alleged
10  fabrication, this incident that we have been
11  discussing for now the last fifteen minutes,
12  this all occurred in the September timeframe of
13  2019; is that correct?
14   A.   Yes.
15   Q.   Would you agree with me that
16  Ms. Jeter was not fired until March 16th of
17  2020?
18   A.   That's correct.
19   Q.   Would you agree with me that that
20  is about a seven month time lapse?
21   A.   Correct.
22   Q.   Were any of Ms. Jeter's job
23  responsibilities taken from her after the

Page 108

1  incident that we have been talking about for
2  the last fifteen minutes?
3    A.   No.
4    Q.   Was Ms. Jeter reassigned to do
5  different work after the incident we have been
6  talking about for the last fifteen minutes?
7    A.   No.
8    Q.   Was her job in any way modified or
9  changed after the incident we have been talking
10  about?
11   A.   No.
12   Q.   Did you limit her access to
13  victims after the incident we have been talking
14  about?
15   A.   No.
16   Q.   Did you limit her access to her
17  colleagues after the incident we have been
18  talking about?
19   A.   No.
20   Q.   Did you limit her access in any
21  way, shape, or form to her work after the
22  incident we have been talking about?
23   A.   No.

Page 109

1    Q.   And do you know -- and it may seem
2  like a trivial question, but unfortunately we
3  do have to sometimes ask those, do you know if
4  Judge Stephens was ever sent a picture of
5  Ms. Jeter and asked have you seen this person
6  before?
7    A.   No.  No, we did not.
8    Q.   And during the conversation that
9  you heard involving -- and just so we are
10  clear, you weren't eavesdropping, the
11  conversation was on speaker phone; is that
12  correct?
13   A.   That's correct.
14   Q.   So Judge Stephens knew you were in
15  the conversation, correct?
16   A.   Yes.
17   Q.   So during the conversation on
18  speaker phone between Judge Stephens,
19  Mr. McCurry, and yourself, at any point did you
20  hear Mr. McCurry say I'm going to send you a
21  picture, Judge, so you can see if you have seen
22  this person before?
23   A.   No.  There was no reason if the

Page 110

1 judge says there was no hearing.
2    Q.   Understood.
3    A.   So didn't see the need.
4    Q.   All right.  So we've talked about
5 a few examples, and I want to give you a chance
6 to talk about all of them, so I promise you I'm
7 going to ask you about all of them --
8    A.   Okay.
9    Q.   -- you've mentioned two examples
10 where you say that Ms. Jeter engaged in what
11 you felt were unprofessional behavior.  One of
12 them, if I recall correctly, was this falling
13 asleep incident.  Is that one of them?
14    A.   Yes.  Well, that falls under
15 unprofessional conduct.
16    Q.   Okay.  Well, so that's one
17 incident.  And I apologize if I've asked you
18 this earlier, I can't remember if I've asked
19 you or not, but do you know of any instances
20 other than this one allegation of her falling
21 asleep in the courtroom?
22    A.   No.
23    Q.   And you mentioned something about

Page 111

1 the individuals -- is it Watkins was the name
2 of the person who told you about this incident?
3 I can't remember the name.
4    A.   Walters.
5    Q.   Walters, I'm sorry, it was a W.
6        This incident involving what
7 Walters, who is a victims coordinator, I
8 believe, described to you --
9        MR. MURRILL:  Trial coordinator.
10    Q.   Trial coordinator -- did it
11 include something about her eating in the
12 courtroom?
13    A.   Yes.
14    Q.   Are you aware that she's diabetic?
15    A.   Yes.
16    Q.   And are you aware -- have you
17 known people who are diabetic in your life?
18    A.   Yes.  I have a brother -- had a
19 brother that was juvenile diabetic.
20    Q.   And are you aware that diabetics
21 as part of their regime have to eat on a fairly
22 regular basis?
23    A.   Yes.  And you are allowed to step

Page 112

1 out of a courtroom to do that.
2    Q.   And do you know of any instance of
3 -- who was the judge in the courtroom on the
4 day of the incident?
5    A.   I don't recall.  I would have to
6 see who she was assigned to, two different
7 judges, two or three.
8    Q.   Did the judge ever call your
9 office and say Ms. Yates, one of your VSOs fell
10 asleep in my courtroom?
11    A.   No.
12    Q.   Did the judge's clerk ever call
13 your office and say Ms. Yates, one of your VSOs
14 fell asleep in my courtroom?
15    A.   No.
16    Q.   Did Mr. Walters -- is it Mr. or
17 Ms.?
18    A.   Ms.
19    Q.   Did Ms. Walters suggest to you
20 that the judge reprimanded Ms. Jeter for
21 falling asleep in the courtroom?
22    A.   No.
23    Q.   Did Ms. Walters suggest that the

Page 113

1 judge reprimanded Ms. Jeter for eating in the
2 courtroom?
3    A.   No.
4    Q.   Did Ms. Walters suggest that a
5 bailiff reprimanded or called out Ms. Jeter for
6 eating in the courtroom?
7    A.   No.
8    Q.   Did Ms. Walters suggest that a
9 bailiff called out Ms. Jeter for falling asleep
10 in the courtroom?
11    A.   No.
12    Q.   Did Ms. Walters suggest that
13 Ms. Jeter caused any sort of disruption in the
14 courtroom that day?
15    A.   No.
16    Q.   All right.  So that's one
17 incident.
18    A.   Well, wait a minute.  Ask that
19 last question again.
20    Q.   Well, I think you've answered it.
21 So actually if you will allow me, I'm going to
22 ask you another question.  If your lawyers want
23 to ask the question again, I will let them do

29 (Pages 110 - 113)

Page 114

1 that.
2        MR. RILEY:  If she's asking you,
3 Artur, to be complete with her answer, the
4 opportunity to respond, in fairness to her, I
5 think you should allow her to do that.
6        MR. DAVIS:  Well, Rob, what I'm
7 doing right now is going through examples of
8 what she contends are unprofessional behavior.
9    Q.   (BY MR. DAVIS:)  And I'm happy to
10 have you cite as many as you want to, but we
11 can't do that unless I go through the list with
12 you.  So if you would like to add something to
13 any answer, Ms. Yates, you are perfectly free
14 to do that.
15    A.   Well, I think I might --
16    Q.   But I would like to finish my
17 question.
18    A.   Sure.  I'm sorry, I didn't mean to
19 interrupt.
20    Q.   Thank you.
21        So we've talked about the one
22 incident involving Walters.  We've talked about
23 a second incident involving this alleged

Page 115

1 fabrication.  Are there any other incidents
2 that you want to tell me about involving either
3 unprofessionalism or untrustworthiness?
4    A.   Yes, several.  One was one day she
5 called me when I was on my way to work.  She
6 was asking if she could have her real estate
7 agent meet with her in her office that morning.
8 And I said yes, just make sure you sign out
9 that you are on break or at lunch.  And when I
10 got to work she had not signed out to either,
11 so I asked her, I said, you know, you didn't
12 sign out.  And she said well, I didn't meet
13 with my real estate agent.
14    Q.   Did or didn't?
15    A.   Did not is what she told me.  But
16 Cheryl Black told me that she went outside the
17 courthouse and met with her real estate agent,
18 or someone, for quite a while talking to her
19 outside the courtroom -- I mean outside the
20 courthouse and didn't clock out to do it as
21 personal time.  So, yes, I assumed that it was
22 probably her real estate agent.  It was a
23 female, she said her real estate agent was a

Page 116

1 female, and that they were meeting outside the
2 courtroom and she thought that if she was
3 outside the courthouse meeting with her that
4 that would be okay because she didn't bring her
5 into her office.
6        Another incident was --
7    Q.   Let me ask you about that incident
8 for a moment.  Now, when did that happen?
9    A.   I don't have the date in front of
10 me.
11    Q.   Can you give me a ballpark?  Was
12 it early in her tenure, middle of her tenure,
13 or toward the end of her tenure?
14    A.   Toward the end.
15    Q.   So let me make sure I understand,
16 what you've just described to me, if I can put
17 it in my words and you can tell me if I'm
18 getting it right --
19    A.   Okay.
20    Q.   -- there was an incident where
21 Cheryl Black reported to you that Ms. Jeter
22 left the building to meet with her real estate
23 agent and in fact it would have been better

Page 117

1 practice for her to have gotten some sort of
2 comp time or leave time to do that meeting.  Is
3 that essentially what the issue is?
4    A.   That's correct.
5    Q.   And you don't recall exactly when
6 this happened?
7    A.   Not just sitting here, no, sir.
8    Q.   Did you write up Ms. Jeter for
9 this incident?
10    A.   No.  I talked to her about it.
11 And, you know, she's saying one thing and I
12 just reminded her that any time she is doing --
13 conducting any business that is not office
14 related, whether it's in her office or anywhere
15 else during work hours, that she's to clock
16 out.
17    Q.   So you started to say she was
18 saying one thing and Cheryl Black was saying
19 another thing, correct?
20    A.   Well, she's (indicating) denying
21 that she talked to her agent.
22    Q.   And Cheryl Black was suggesting
23 that she did, correct?

30 (Pages 114 - 117)

Page 118

1    A.   She was talking to someone during
2 the same length period of time that she had
3 told me she was going to meet with her real
4 estate agent.
5    Q.   And just so I'm clear, you weren't
6 physically present and you didn't observe
7 Ms. Jeter meeting with this person, correct?
8    A.   Correct.
9    Q.   So you have Ms. Black's version,
10 you have Ms. Jeter's version, correct?
11    A.   Correct.
12    Q.   And you had no way of knowing
13 which version was more accurate, did you?
14    A.   I can say that Cheryl Black, as
15 far as I know, has never lied to me.
16    Q.   Did you tell Ms. Jeter that you
17 didn't believe her when you were having this
18 conversation with her about this meeting
19 outside the building?
20    A.   I did not make her take her time
21 off for that, but I did tell her -- I mean --
22 did I tell her I didn't believe her?
23    Q.   Yes.

Page 119

1    A.   No.  But I did tell her that
2 someone had seen her outside talking to someone
3 that I believed was her agent.
4    Q.   And when she denied that, my
5 question was did you tell her, LaNitra, I think
6 you're lying or something to that effect?
7         MR. RILEY:  Object to the form.
8    A.   I would -- it's not like me to
9 call somebody a liar to their face.
10    Q.   (BY MR. DAVIS:)  Did you write up
11 Ms. Jeter for dishonesty after this
12 conversation with her about the meeting with
13 someone outside the building?
14    A.   Using your terms of write-up, no,
15 sir.
16    Q.   Did you report it to Danny Carr?
17    A.   No.
18    Q.   Did you report it to Joe Roberts?
19    A.   No.
20    Q.   Did you take any disciplinary
21 action against her based on this incident?
22    A.   No, I did not.
23    Q.   And, again, just so I'm clear, you

Page 120

1 really don't know when this incident happened,
2 do you?
3    A.   Not right at this moment, no.
4    Q.   So when you said earlier that it
5 was --
6    A.   I could go back and find the date,
7 though.
8    Q.   So when you said earlier you think
9 the incident was toward the end of her tenure,
10 that's really sort of a guess, isn't it?
11    A.   It was toward the end, so it was
12 probably, I mean, within the last three to four
13 months of her employment.
14    Q.   Okay.  So from a mathematical
15 standpoint, that's December to March?
16    A.   I would think so, yes.
17    Q.   All right.  So we now have three
18 incidents.  We have the eating and sleeping in
19 the courtroom and we have the alleged
20 fabrication of the incident with Judge
21 Stephens.  Now we have the meeting with a
22 mystery person outside the office who may or
23 may not have been a real estate agent.  That's

Page 121

1 three.  Are there other things that you want to
2 tell me about that fit the category of
3 unprofessionalism or untruthful conduct?
4    A.   Yes.
5    Q.   Tell me about it.
6    A.   There was a day that I believe --
7 well, I'm not going to guess.  She was signed
8 out to Judge May's courtroom one day, one
9 afternoon, and was signed out for quite some
10 time and I looked on our office status board,
11 and there were no DAs signed out to Judge May's
12 courtroom.  Because I had encouraged them to go
13 and sit in trials, so I was trying to figure
14 out what trial she was sitting in on.  And so I
15 called the DA that works in Judge May's court
16 and asked what was going on.  I said y'all got
17 a trial going on, what's going on up there.
18 And they are like nothing because Judge May is
19 not here today.  And so I asked -- I was busy
20 doing something and I asked Cheryl Black to go
21 up to that floor, Judge Jones is up there and
22 Judge May is up there, and Judge May's
23 courtroom was closed and lights turned off.

Page 122

1 And she came back down, Nitra still wasn't back
2 in.  And a little bit later, Nitra does sign
3 in.  I did not ask her about that situation.
4     Q.   Her being LaNitra?
5     A.   LaNitra, yes, I'm sorry.  But,
6 again, she's signed out somewhere where I know
7 that's not where she was.  I don't know where
8 she was that day, but she was not in the
9 courtroom that she was signed out to.
10    Q.   Did you confront Ms. Jeter about
11 this incident?
12    A.   No, I didn't.
13    Q.   Is it possible Ms. Jeter got the
14 name of the judge wrong?
15    A.   It's possible.
16    Q.   Did you ask Ms. Jeter -- I think I
17 used the phrase confront and that can be an
18 imprecise term, so I will ask the broader
19 question, did you discuss the incident you just
20 described with Ms. Jeter?
21    A.   No, I did not.
22    Q.   Did you ask Ms. Jeter for her side
23 of the story regarding the incident you just

Page 123

1 described?
2     A.   No.
3     Q.   Did you write up Ms. Jeter for
4 this incident?
5     A.   No.
6     Q.   Did you report this incident to
7 Joe Roberts?
8     A.   No.
9     Q.   Did you report this incident to
10 Danny Carr?
11    A.   No.
12    Q.   You did make a memo to file about
13 it, though, correct?
14    A.   Yes.
15    Q.   Did you discipline Ms. Jeter for
16 this incident?
17    A.   No.
18    Q.   Did you recommend that she be
19 disciplined for this incident?
20    A.   No, I did not.
21    Q.   And while we are on the subject,
22 do you have the authority to discipline people
23 yourself?

Page 124

1     A.   No, I did not.
2     Q.   But you can recommend discipline
3 to Joe Roberts, correct?
4     A.   No.  I can just make them aware of
5 situations.  That's their job to discipline,
6 not mine.
7     Q.   But with respect to this incident,
8 you didn't make Joe aware of it, did you?
9     A.   I don't recall doing that.
10    Q.   Okay.  So that's -- I think we are
11 up to now four.  Is there a fifth thing that
12 you want to tell me about where you believe
13 that Ms. Jeter was either unprofessional or
14 untruthful?
15    A.   Yes.
16    Q.   Tell me about that.
17    A.   There was a date, I believe it was
18 in February 2020, but I'm not totally sure of
19 the date, I was in my office.  Cheryl Black
20 walked in to ask me a question, and my office
21 has a whole row of windows that face the 2121
22 Building and Abraham Woods Street -- Boulevard,
23 and she goes oh, there's LaNitra.  And I looked

Page 125

1 and I saw LaNitra walking on the opposite side
2 where 2121 Building is.  She goes in the 2121
3 Building and she comes back out and she goes
4 south on 22nd Street.  A few minutes later, she
5 comes back, she goes back into the 2121
6 Building, and then later comes back to the
7 courthouse to her office.  She was not signed
8 out for anywhere.  So I did go into her office
9 that day and talk to her about that and asked
10 her why she had not clocked out.  You know, I
11 first asked if she was -- you know, was her
12 business work related.  And she said no, she
13 had gone to -- I believe she had said she was
14 going to a community meeting that was over
15 there.  And I told her, I said well, you know,
16 you are not supposed to leave the building or
17 go to other places -- you know, if you are
18 doing job-related work, you are supposed to
19 sign out, if you are in a meeting or if you go
20 to a judge's courtroom or district court or
21 whatever.  And if you are doing personal
22 business, you are -- first of all, you should
23 let me know that you are -- you know, at 2:30

Page 126

1  or 2:00 or 2:30, or whatever time it was in the
2  afternoon, if you are leaving the building for
3  personal business, then let me know that you
4  are going somewhere.  I don't have to know your
5  business; I need to know that you are leaving
6  the courthouse and you need to be signed out
7  for break or lunch or comp time or something
8  and people need to know that you are not in the
9  building.  Because if we have a bomb threat or
10 a fire, we are supposed to meet at a certain
11 location and, you know, that it created a
12 problem for us if we can't say where our
13 employees are.
14     Q.   Have you finished?
15     A.   Yes.
16     Q.   So with respect to the incident
17 that you just described, did you write her up?
18     A.   I didn't write her up.  I talked
19 to her.
20     Q.   Do you believe the incident you
21 just described is a serious incident?
22     A.   Yes.
23     Q.   Did you notify Danny Carr about

Page 127

1  it?
2      A.   Mr. Carr, no.
3      Q.   Did you notify Joe Roberts about
4  it?
5      A.   Yes.
6      Q.   Did Joe Roberts take any action
7  based on your conversation with him about this
8  incident?
9      A.   Well, within less than a month of
10 that, he asked me to write a memo outlining all
11 of my issues.
12     Q.   And I promise you we will get to
13 that, but let's just stay with this incident
14 itself, this her being outside the building for
15 some amount of time.  And what was the amount
16 of time, by the way?
17     A.   Pardon?
18     Q.   What was the amount of time that
19 she was outside the building?
20     A.   I have no idea.  I don't know when
21 she left the building originally.  I know from
22 the time that I saw her until the time she
23 returned.

Page 128

1      Q.   How much time was that?
2      A.   It was somewhere between fifteen
3  and thirty minutes.
4      Q.   Okay.  So it could have been as
5  little as fifteen minutes, correct?
6      A.   Well, she still would have had to
7  have walked to where she was.
8      Q.   Did you ask her how long she was
9  gone?
10     A.   No, I didn't.
11     Q.   So if you didn't see it and you
12 didn't ask her, can we agree that you don't
13 know how long she was gone?
14     A.   I already said that.  I don't know
15 how long she was gone.
16     Q.   So just so I'm clear, did Joe
17 Roberts tell you to take any action based on
18 this incident when you told him?
19     A.   No, he did not.
20     Q.   To your knowledge, after you told
21 Joe Roberts about this incident with Ms. Jeter
22 being missing from the building for an
23 undetermined period of time, did Joe Roberts

Page 129

1  take any disciplinary action against her?
2      A.   Not -- I don't know.  Not that I'm
3  aware of.
4      Q.   Did you make her take vacation
5  time for this incident?
6      A.   No.  But -- no, I did not.
7      Q.   All right.  So I think we are up
8  to number five.  Are there any other instances
9  of nonprofessionalism or untruthfulness that
10 you want to tell me about?
11     A.   I -- I can't think of any at this
12 moment.
13     Q.   All right.
14     A.   Well -- well, yes, I will.  I will
15 add one more thing --
16     Q.   Okay.
17     A.   -- in that it's a story that it
18 could be true.
19     Q.   I think that's the first -- I will
20 give you credit, Ms. Yates, I think that's the
21 first time I've heard a witness ever begin
22 their answer that it could be true.  So you've
23 given me a novel moment today, but go ahead.

33 (Pages 126 - 129)

1    A.   I'm good at that, things like
2 that.
3         But she had not been employed with
4 our office very long when she tells a story
5 about her husband driving down -- and her
6 husband has been a police officer.  And he was
7 driving down the interstate and for no reason,
8 this person in another car just starts shooting
9 at his car.  So he pulls out his gun and shoots
10 back at the other car.  I don't believe anybody
11 was hit, but no police reports were made,
12 according to her, and that's just, you know,
13 the kind of things that happened.  Those are --
14 it was one of those stories that makes you,
15 one, wonder -- you are working for the DA's
16 office, your husband's a police officer, why
17 wasn't this reported, you know, because
18 somebody is shooting at your car trying to kill
19 you obviously or a drive-by shooting.  It just
20 is one of those credibility stories that --
21    Q.   Have you finished?
22    A.   Yes.
23    Q.   So with respect to what you

1 described sitting here today, do you know for a
2 fact if this incident happened or not?
3    A.   I don't.  And, you know, it
4 doesn't matter whether it happened or not.  The
5 fact is if it did happen, why wouldn't you
6 report it.  And if it didn't happen, then why
7 would you tell it.
8    Q.   Her husband's name Kireem; is that
9 correct?
10    A.   I believe so.
11    Q.   Kireem Jeter is not a VSO, is he?
12    A.   Not that I know of.
13    Q.   So what you have just described to
14 me is an incident involving her husband.  And
15 you acknowledge her husband was a police
16 officer at some point, correct?
17    A.   Uh-huh.
18    Q.   You have to say yes.
19    A.   Yes.  I'm sorry, yes.
20    Q.   And, in fact, was he a police
21 officer at the time the incident occurred?
22    A.   No.
23    Q.   But at some point he was a police

1 officer, correct?
2    A.   Yes.  Yes.
3    Q.   Did you ever talk about this
4 incident with Mr. Jeter?
5    A.   No.
6    Q.   I believe you said this incident
7 happened early on in her tenure.  Am I right
8 about that?
9    A.   Yes.
10    Q.   Did you write her up for this
11 incident?
12    A.   No.
13    Q.   Would you have had a basis to
14 write her up for this incident?
15    Q.   Did you tell Danny Carr about this
16 incident?
17    A.   No.
18    Q.   Did you tell Joe Roberts about
19 this incident?
20    A.   I may have, but I don't recall.
21    Q.   And of course you wrote a number
22 of notes to file about various incidents.  Did

1 you write a note or memo to file about the
2 incident you just described?
3    A.   No.  I didn't know her well when
4 that story was told.  It was just one of --
5    Q.   Okay.  So we are up to six by my
6 count, and I apologize if it's seven or five,
7 but I think it's six by my count.  We are up to
8 six incidents of untrustworthy or allegedly
9 unprofessional conduct.  Is there anything else
10 you want to tell me about that you believe fits
11 the category of untrustworthy or unprofessional
12 conduct?
13         MR. RILEY:  And if you want to
14 look at the memo you wrote, you are welcome to.
15    Q.   (BY MR. DAVIS:)  Well, you are
16 actually welcome to answer my question.  Can
17 you think of any others?
18         MR. RILEY:  That's fine.  He's
19 mentioned he's getting to the memo, but if you
20 want to see it, there it is.
21    Q.   (BY MR. DAVIS:)  Well, actually
22 would you like to answer my question,
23 Ms. Yates?

1    A.   I believe -- at this moment, I
2 can't recall anything else.
3    Q.   All right.  Now, let's -- and from
4 a timing standpoint, it's a little bit after
5 12:00, Ms. Yates, I would envision probably
6 being done, at the pace we are going, around
7 1:00 or so, so I will leave it up to you as far
8 as your schedule goes.  I'm happy to keep going
9 and then have these gentlemen take a lunch
10 break, if they want to take it, at 1:00, so you
11 can go about your business, or I'm happy to go
12 until 12:30 and take a break.  Which would you
13 prefer?
14    A.   I'm going to leave it up to them
15 to make that decision.
16       MR. MURRILL:  I'm going to make
17 the decision we are going to take five minutes.
18    A.   I was going to say I do need
19 another --
20       MR. DAVIS:  We can take a
21 five-minute break right now.
22    A.   -- potty break.
23       (Whereupon, a break was had from

1       12:05 p.m. until 12:12 p.m.)
2    Q.   (BY MR. DAVIS:)  Your lawyers have
3 communicated to me that y'all's preference is
4 that we go to 1:00 instead of taking a break at
5 12:30.  Is that fine with you?
6    A.   Yes, that's fine.
7    Q.   All right.  It's 12:10 right now.
8 And of course, if for some reason in the next
9 fifty minutes you need to use the bathroom or
10 need to take a break, obviously feel free to
11 let me know.  Is that fair enough?
12    A.   That is fair.
13    Q.   Because you have had a lot of
14 water.
15    A.   I know.  My throat is getting --
16    Q.   That's okay.  I think you are
17 about halfway down on that bottle, aren't you?
18    A.   My throat is getting --
19    Q.   You have been talking a lot.
20    A.   Yes, I have.
21    Q.   All right.
22    A.   It's one of my --
23    Q.   Well, no, it's nothing to

1 apologize for.  This is a deposition and --
2    A.   That's why I'm here.  I'm here to
3 talk.
4    Q.   That's right.  There's nothing to
5 apologize for.
6    A.   Okay.
7    Q.   All right.  So let's -- we've
8 talked about the instances of unprofessionalism
9 and what you believe are untruthfulness.  So
10 let's talk for a moment about these issues of
11 comp time, vacation time, and leave time.
12 Because can we agree, Ms. Yates, that at some
13 point you developed a concern or you developed
14 issues regarding Ms. Jeter's use of comp,
15 leave, and vacation time?
16    A.   Comp time, yes.
17    Q.   All right.  And just so we are
18 clear, you've actually clarified something for
19 me, there are three kinds of time in the DA's
20 office as I understand it.  One of them is sick
21 leave time, correct?
22    A.   Correct.
23    Q.   One of them is vacation time,

1 correct?
2    A.   Yes.
3    Q.   And the other is time produced
4 through working extra hours better known as
5 comp time, correct?
6    A.   Correct.
7    Q.   So are those the three different
8 buckets of time in the DA's office?
9    A.   Yes.
10    Q.   So let's go one by one.  With
11 respect to vacation time, what is the DA's
12 office policy as you understand it regarding
13 vacation time for VSOs?
14    A.   They earn one vacation day per
15 month, eight hours vacation time per month.
16    Q.   Is it your opinion that Ms. Jeter
17 abused her vacation time?
18    A.   Time as a whole --
19    Q.   No.  Vacation time is what I was
20 asking about.
21    A.   Then, yes.
22    Q.   Tell me how Ms. Jeter abused her
23 vacation time.

1    A.   It was the manner in which it was
2  requested.  There's certain protocol that
3  employees are to take when requesting any time
4  off, and the more advanced notice you can give
5  in cases is preferred.  And you are supposed to
6  use our personnel database to specifically
7  request those so that a supervisor can approve
8  it in the system and she -- and the employee
9  would get an e-mail verifying that it's
10 approved for them to take it.  Sometimes
11 emergencies happen, you know, where you wake up
12 sick or something happens and you need to take
13 a vacation day, a whole day or half a day or
14 part of a day.  But when it is every week that
15 last minute time is taken that it becomes an
16 issue with you being there to perform your
17 duties in the office.  And oftentimes I was not
18 asked if they could take the time, I was told I
19 am taking this time, just a head being stuck in
20 my door and saying I'm taking off.  And you
21 know, I had told her, you know, that I would
22 work with her on taking time for doctor visits.
23    Q.   Ms. Yates, I asked you about

1  vacation time.
2    A.   Vacation time.
3         MR. MURRILL:  She's answering the
4  question.
5    Q.   (BY MR. DAVIS:)  Well, I'm asking
6  you only about vacation time right now.
7    A.   Well, if you only get -- well, I'm
8  not going to say anything else then.  That's
9  all.  That's my answer.
10    Q.   All right.  So with respect to
11 vacation time -- and, again, I'm going to give
12 you a chance to talk about each bucket, right
13 now we are talking about vacation time, do I
14 understand the policy right, everybody gets one
15 day a month?
16    A.   Well, it depends on how many years
17 you've been there.  I've been there long enough
18 I get two vacation days a month and one sick
19 day a month.
20    Q.   How many days did LaNitra Jeter as
21 a one-year employee get --
22    A.   One.
23    Q.   -- in terms of vacation time?

1         Please let me finish.
2         How many days did LaNitra Jeter
3  get in terms of vacation time in terms of a
4  one-year employee?  Was it just the one day a
5  month?
6    A.   Yes.
7    Q.   Did she ever attempt to take two
8  vacation days a month?
9    A.   Yes.
10    Q.   Was she ever given two vacation
11 days a month?
12    A.   Yes.
13    Q.   Was she --
14    A.   Oh, I'm sorry.  Was she given
15 it -- did she earn two vacation days in a
16 month?  Is that your question?
17    Q.   All I'm asking you is about the
18 vacation policy.  I promise we are going to
19 talk about all three.
20    A.   It's the way you asked the
21 question.
22    Q.   The only thing I'm asking you
23 about right now is vacation time.  So I will

1  repeat my question since you appear to have not
2  understood it.  Did LaNitra Jeter ever abuse
3  vacation time?
4    A.   Yes.
5    Q.   How so?
6    A.   I've already answered that.
7    Q.   Well, tell me again, how did she
8  abuse vacation time?
9         MR. MURRILL:  Object to the form.
10    Q.   (BY MR. DAVIS:)  Not sick leave
11 time, not comp time, but vacation time.  Can
12 you think of any examples?
13    A.   Well, it would be the same answer
14 to every other thing because they all worked
15 together, vacation, sick, and comp time in the
16 manner in which it was taken.
17    Q.   So I'm going to ask you again, can
18 you give me examples of Ms. Jeter abusing
19 vacation time?
20    A.   I'll change my prior answer and
21 I'll say no, she has not abused it.
22    Q.   Thank you.
23         So let's move to the second

Page 142
1 category, sick leave time.  Can you tell me if
2 in your opinion Ms. Jeter ever abused the --
3 let me use a better term than abuse.
4        Can you tell me in your opinion if
5 Ms. Jeter ever violated office policies
6 regarding sick leave time?
7    A.   No.
8    Q.   Did you ever report to Danny Carr
9 that Ms. Jeter abused vacation time?
10   A.   It was in combination with comp
11 time.
12   Q.   All right.  But to answer my
13 question, did you ever report to Danny Carr
14 that Ms. Jeter abused vacation time?
15   A.   I don't recall.
16   Q.   Did you ever report to Danny Carr
17 that Ms. Jeter abused sick leave time?
18   A.   By itself, no.
19   Q.   And you said that she didn't abuse
20 sick leave time.  So if she didn't abuse sick
21 leave time, you certainly wouldn't have
22 reported or alleged that she abused it, would
23 you?

Page 143
1    A.   Not in the way you're asking the
2 question, no.
3    Q.   So let's move to the topic that
4 you're eager to talk about, which is comp time.
5 I want you to tell me what you understand to be
6 the comp time policy in the Jefferson County
7 DA's office.
8    A.   For state employees?
9    Q.   Well, for VSOs like Ms. Jeter.
10   A.   Okay.  For VSOs.  When -- it is
11 not in writing because it's just never been --
12 at the time that she was working, it wasn't in
13 writing what the policies were toward comp
14 time.  But before I -- when I do the initial
15 interview, I explain sick time, vacation time,
16 and comp time to them.  I explain it again when
17 they are hired because we try and allow them to
18 make comp time, especially in the first year
19 that they are employed there, to take up -- to
20 make up for time that they may need for
21 emergencies or whatever.  Because when I was
22 hired, you had to work a year before you could
23 take any time.

Page 144
1        Comp time has always been
2 considered a privilege, but I allowed them if
3 they wanted to make comp time during their one
4 hour lunchtime -- the way our office does, you
5 get an hour for lunch and you get two fifteen
6 minute break times that you can put them
7 altogether and have an hour and a half.  But
8 you cannot make comp time during your
9 thirty-minute break time that you take.  Does
10 that make sense?  So for that one hour --
11   Q.   You asked me does it make sense.
12 Let me make sure I understand you.  You are
13 saying that you can't say I'm going to work
14 during my break and I want comp time for that?
15   A.   That's correct.
16   Q.   You can't say I'm going to work
17 during my lunchtime and get comp time for that?
18   A.   You can.
19   Q.   You can do that?
20   A.   If you are working, yes.  That's
21 what I'm saying is I would allow them just take
22 their thirty-minute break for their lunchtime
23 and the other hour, don't clock out --

Page 145
1    Q.   Or half hour?
2    A.   An hour.  They get an hour for
3 lunch.
4    Q.   Okay.
5    A.   And then -- there should be a
6 fifteen-minute in the morning break and a
7 fifteen-minute in the afternoon break, but they
8 can take that for their lunch break if they
9 want to and just combine the two fifteen-minute
10 breaks.
11   Q.   So you get an hour-and-a-half
12 lunch break?
13   A.   Correct.
14   Q.   Okay.
15   A.   Does that make -- okay.  But you
16 can't earn time during the thirty-minute break
17 time.  You cannot make comp time during the
18 thirty-minute break time.  But you can work an
19 hour and not clock out and only clock out for
20 thirty minutes for your break, your lunch.
21   Q.   Would you agree it's a somewhat
22 complicated policy?
23   A.   It is.  Well, trying -- for me to

37 (Pages 142 - 145)

1  explain it, yes.  But anyway, you work an hour
2  during your lunch, and you can make an hour
3  comp time.  And if you worked over forty hours,
4  then it becomes an hour and a half.  And I
5  encouraged them to do that when they first
6  start so that they can build up some comp time
7  in case they need to -- if they get sick or
8  they have a child that gets sick or they need
9  to go to a doctor's appointment.  I also, if
10  they asked in advance, would allow them to come
11  in -- if they had something to do in the
12  afternoon, they could come in at 7:00 and not
13  take a lunch and leave at 3:00 and not have to
14  take any time at all, but they had to ask in
15  advance was the policy so that I would know who
16  was there and make sure that people are doing
17  what they are supposed to do.
18      Q.    Okay.  Have you finished?
19      A.    No.  And they could also earn time
20  if they were working with a victim past their
21  time to get off work, which would be the more
22  legitimate comp time, but, you know, we worked
23  with the employees.

1      Q.    Have you finished?
2      A.    Yes.
3      Q.    That is awfully complicated, isn't
4  it?
5      A.    Not to me.
6      Q.    Well, I think you said yourself it
7  was complicated at one point.
8      A.    To explain.  I said it's difficult
9  for me to explain it, but --
10      Q.    So let me ask you this:
11  Acknowledging that it's difficult for you to
12  explain it, at some point you would have
13  attempted to explain it to Ms. Jeter, correct?
14      A.    Several times.
15      Q.    Did you ever take the explanation
16  you just gave me and reduce it to memo form?
17      A.    No, I did not.  Well, no, I don't
18  remember -- I don't recall.  I may have, but I
19  don't recall.
20      Q.    And I'll represent to you that in
21  all the thousands of pages of documents that
22  your able lawyers have produced to Mr. Noble
23  and myself, I have not seen any document that

1  has comp time policy written at the top of it.
2      A.    Right.
3      Q.    Does that surprise you?
4      A.    No, that does not surprise me.
5      Q.    Okay.  And I have not seen any
6  memo from Judy Yates to LaNitra Jeter or
7  anybody else that has the subject matter comp
8  time policy.  Does that surprise you?
9      A.    No.
10      Q.    The first time you would have
11  explained this policy to Ms. Jeter would have
12  been during her job interview or during her
13  orientation interview?
14      A.    Both.
15      Q.    And is it fair to say that during
16  a job interview and an orientation interview,
17  you are covering a lot of topics?
18      A.    Yes.  But -- I'm sorry, go ahead.
19      Q.    And let me talk about the policy a
20  little bit.  Are there any limits, as you
21  understand the policy in the office, on what
22  comp time can be used for?
23      A.    No.

1      Q.    So just so I'm clear, if I started
2  work tomorrow in the victim services office at
3  the DA's office and I earned my comp time and I
4  wanted to use my comp time to go see the
5  Atlanta Braves play at some point this summer,
6  could I do that if I earn the comp time?
7      A.    If you had the time in advance
8  when you requested it, yes.
9      Q.    So what I wanted to use my comp
10  time on is essentially my business and it's not
11  the DA's office's business.  Would you agree?
12      A.    As long as it wasn't illegal,
13  yeah.
14      Q.    All right.  And does someone have
15  to work a certain number of months to begin to
16  earn comp time, or, more accurately, does a VSO
17  have to work a certain number of months to earn
18  comp time?
19      A.    No.  They were encouraged to do
20  that to begin with.
21      Q.    So to make sure I understand that,
22  when you say they were encouraged that to begin
23  with --

Page 150

1    A.   I mean, they were -- I'm sorry, I
2 interrupted you.
3    Q.   No, no.  Please explain.  I'm
4 trying to understand, so please explain.
5    A.   I would tell each one when they
6 started you can start earning comp time now
7 during your lunch if you want.  I don't make
8 them earn it.  That's up to them whether they
9 want to do it or not.
10    Q.   All right.  So you would have told
11 LaNitra Jeter during your first discussion with
12 her about comp time if you want to start
13 earning comp time, the day you start you can do
14 it.  Fair?
15    A.   Absolutely.
16    Q.   And there's no policy and no rule
17 saying that you have got to wait a certain
18 number of months before you can begin to earn
19 comp time --
20    A.   No.
21    Q.   -- correct?
22    A.   No.
23        MR. RILEY:  Object to the form.

Page 151

1    Q.   (BY MR. DAVIS:)  You have to --
2 you have got to wait until I --
3    A.   Oh, I'm sorry.  I'm sorry.
4    Q.   And, Ms. Yates, just so I'm clear,
5 you mentioned that you can begin to earn the
6 comp time almost immediately.  Are there any
7 limits on when you can begin to use the comp
8 time to take time off?
9    A.   No.
10    Q.   So if I wanted to earn some comp
11 time the first day I started and I wanted to
12 use it the second day I started, is there any
13 rule prohibiting me from doing that if I was a
14 VSO?
15    A.   If you earned an hour and you
16 wanted to take an hour?
17    Q.   Yeah.  If I earned it, could I
18 take it the next day under the policies in
19 place?
20    A.   As long as there was nothing
21 scheduled that you needed to participate in or
22 work that you needed to do.
23    Q.   I understand.  And understood that

Page 152

1 there is always a discretionary element to comp
2 time --
3    A.   Also --
4    Q.   Again, you have to let me finish.
5        Do I understand correctly there's
6 always a discretionary element to comp time and
7 that a supervisor can say not today, we're too
8 busy or not today, you're too busy?
9    A.   Yes.  And there's also a
10 discretionary on allowing you to earn comp time
11 too.
12    Q.   Understood.  And that is an
13 important point.
14        So as the supervisor, you would
15 have the authority to say to Ms. Jeter, or any
16 of your other VSOs, no, I'm not going to let
17 you take comp time on this particular day
18 because I need you to do a task, correct?
19    A.   I could, yes.
20    Q.   And I want you to tell me over the
21 roughly one-year period that Ms. Jeter worked
22 under your supervision, how many times did you
23 deny her request for comp time?  Give me your

Page 153

1 best estimate.
2    A.   Zero.  I never denied her the
3 ability to take off.
4    Q.   Okay.  But just answer my precise
5 question.  Do you recall any instance when she
6 requested comp time and you told her, LaNitra,
7 you cannot take that comp time?
8    A.   Let me make sure I'm understanding
9 your question.
10    Q.   Okay.
11    A.   Because it's sort of a
12 double-edged question.  Are you asking did I
13 ever deny her the ability to earn it or the
14 ability to take it?
15    Q.   Well, let me ask you both of them.
16 Did you ever deny her the ability to earn comp
17 time?
18    A.   Yes.
19    Q.   And when did you deny her the
20 ability to earn comp time?
21    A.   There was a time in September --
22 well, let's see -- no.
23    Q.   And I'm just asking for your best

Page 154

1  recollection.
2      A.   In September of 2019.
3      Q.   And during this time in September
4  2019, how did you restrict Ms. Jeter's ability
5  to earn comp time?
6      A.   She was just told that during --
7  until further notice, she could not earn comp
8  time.
9      Q.   When you say she was told, meaning
10 you told her?
11     A.   I told Nitra -- well, actually --
12 yes, I did.
13     Q.   You told Ms. Jeter on a particular
14 point in September 2019 you can no longer earn
15 comp time, correct?
16     A.   Correct.
17     Q.   And I'll represent to you that
18 there has been testimony from Ms. Jeter and
19 there has also been an EEOC document filed that
20 dates that discussion as September 23rd.  Would
21 you challenge that or would you disagree with
22 that?
23     A.   No.

Page 155

1      Q.   So let's assume that September
2  23rd is accurate for when this conversation
3  occurred, tell me what your purpose was in
4  telling her that she -- let me ask that a
5  better way.
6           What was your reason or your
7  motive for telling her that from that point she
8  could no longer earn comp time?
9      A.   Well, it wasn't that she could no
10 longer, it was just for a certain period of
11 time.
12     Q.   How long?
13     A.   Well, I think it ended up being
14 about six weeks.  Initially it was a week and
15 then we would revisit whether she could earn it
16 or not.
17     Q.   Is that what you told her?
18     A.   Yes, it sure is.
19     Q.   So just so I'm clear, during this
20 conversation September 23rd, did you tell her,
21 LaNitra, for the next six weeks, you can't earn
22 comp time but we'll revisit this every few
23 weeks?

Page 156

1      A.   No.
2           MR. RILEY:  Object to the form.
3      A.   No.  That is not what I said.
4      Q.   (BY MR. DAVIS:)  So what did you
5  say?
6      A.   I told her that for the next --
7  for that week --
8      Q.   Okay.  Just for that week?
9      A.   Just for that week that she could
10 not earn comp time.
11     Q.   Okay.
12     A.   And she said when -- will I be
13 able to start back next week?  And I said I
14 don't know, I'll get with Michael McCurry and I
15 will get -- and I will get back with you on
16 that.  Because Michael McCurry is the one who
17 first brought it to my attention that there was
18 a problem.
19     Q.   All right.  So the initial
20 conversation is you would have said to
21 Ms. Jeter, LaNitra -- or words to the effect,
22 LaNitra, for the next week you can't take comp
23 time, no comp time for the next week?  You

Page 157

1  would have said something like that to her,
2  correct?
3      A.   No.
4           MR. MURRILL:  Object to the form.
5      A.   That's not correct.
6      Q.   (BY MR. DAVIS:)  So tell me again
7  what's correct.
8      A.   Well, the way you asked the
9  question is you said that I told her she
10 couldn't take it.  I told her --
11     Q.   Earn it.
12     A.   -- she could not earn it.
13     Q.   Okay.  Fair enough.  Fair enough.
14     A.   That was my issue before.
15     Q.   I understand.  And, again, I'm
16 literally listening to your answers and trying
17 to follow your answers.
18          So you would have told her that
19 for the next week, you can't earn comp time,
20 correct?
21     A.   Correct.
22     Q.   And you would have told her that
23 I'm going to revisit this and get back to you

Page 158

1 on when you can start earning again, correct?
2    A.   Correct.
3    Q.   Did you at some point revisit it
4 and get back to her on when she could start
5 earning time again?
6    A.   Yes.
7    Q.   When was that, approximately?
8    A.   Well, I think we discussed it --
9    Q.   Who is we?
10    A.   I'm sorry, Ms. Jeter and I would
11 have conversations every week or so until
12 Michael McCurry said -- and I told him that it
13 had been long enough when we got to six weeks,
14 that she could start earning comp time again.
15    Q.   Did Ms. Jeter explain to you in
16 the September 23rd meeting where you discussed
17 comp time why it was important to her to be
18 able to earn comp time?
19    A.   She told me that she had doctor's
20 appointments, and I told her that I would work
21 with her on that and make sure that she did not
22 miss a single appointment.  I -- even though I
23 had told her that day that I did not want her

Page 159

1 coming in at 7:00 anymore, that I wanted her to
2 work 7:30 to 4:30.  I still altered that during
3 the time that she could not earn comp time if
4 she needed to come in early because she had an
5 appointment or she needed to work through lunch
6 because she had doctors' appointments.  I made
7 allowances and worked with her so that she --
8 if she came to me and said she had an
9 appointment or she needed to be off for
10 whatever reason, I worked with her.  I never
11 told her during that time that she could not
12 take time off, and I allowed her to adjust her
13 schedule to accommodate her appointments or
14 whatever reason she needed to be off.
15    Q.   Between April 2019 when Ms. Jeter
16 started and September 23rd, 2019, is it your
17 position that Ms. Jeter abused comp time?
18    A.   Yes.
19    Q.   How so?
20    A.   Well, in earning it there were --
21 when you are earning comp time, you are to be
22 working, and she would be during many times
23 sitting at her desk on her cell phone and not

Page 160

1 doing any work.
2    Q.   So with respect to those times --
3 again, we are going to define that timeframe,
4 now we are talking between April --
5    A.   Right.
6    Q.   -- and this conversation
7 restricting time.  Do you understand our
8 timeframe?
9    A.   Yes.
10    Q.   Okay.  So in that timeframe, which
11 is roughly six months; is that fair?
12    A.   That's fair.
13    Q.   Within that roughly six-month
14 timeframe, I want you to tell me approximately
15 how many days you think you saw LaNitra Jeter
16 taking comp time but you observed that she was
17 not working -- or earning comp time but you
18 observed that she was not in fact working
19 during that particular chunk of time.  Tell me
20 how many times you observed that.
21    A.   I couldn't give you a number on
22 that.
23    Q.   Could you give me what ballpark?

Page 161

1    A.   No.
2    Q.   Did you -- again, just the
3 six-month timeframe, did you write her up at
4 any point in that six-month timeframe for not
5 working while she was purporting to earn comp
6 time?
7    A.   No.
8    Q.   Did you verbally counsel Ms. Jeter
9 during that six-month timeframe for not working
10 while she was purportedly building comp time?
11    A.   No.
12    Q.   Did you write a memo to file
13 during that six-month timeframe about LaNitra
14 Jeter purporting to build up time but not
15 actually working?
16    A.   No.
17    Q.   Did you write a memo to Danny Carr
18 during that six-month timeframe about LaNitra
19 Jeter purporting to take comp time but not
20 actually working?
21    A.   No.
22    Q.   Did you write a memo to that
23 effect to Joe Roberts during that timeframe?

41 (Pages 158 - 161)

Page 162

1   A.   No.
2   Q.   Did you write a memo to Tamika
3  Jackson during that timeframe?
4   A.   No.  I don't --
5   Q.   Did you make any written record of
6  any sort documenting the fact that in that
7  first six months you saw Ms. Jeter not working
8  while she was purporting to build comp time?
9   A.   No.
10   Q.   Did you verbally counsel Ms. Jeter
11  during that first six-month timeframe that she
12  was not working while she was purporting to
13  build comp time?
14   A.   There was probably -- I don't know
15  the date, but I gave her so that I knew she was
16  doing work -- did I counsel her?  No.  Did I
17  give her work to do so she would have something
18  to be working on during lunch?  Yes.
19   Q.   But to answer my question, did you
20  counsel her?
21   A.   No.  Other than to tell her that
22  she needed to, you know, be doing constructive
23  work during lunch.

Page 163

1   Q.   So you, in effect, explained --
2   A.   Well, that's true, yes, I did.
3   Q.   You, in effect, explained the
4  policy to her?
5   A.   Yes.
6   Q.   And that's okay for a supervisor
7  to explain a policy to a subordinate, correct?
8   A.   Yes.
9   Q.   So just so I'm clear, you
10  restricted Ms. Jeter's use of comp time based
11  on something that you had never documented.  Is
12  that fair?
13       MR. MURRILL:  Object to the form.
14   A.   No.
15   Q.   (BY MR. DAVIS:)  Is that fair?
16   A.   No, it's not.
17   Q.   All right.  So this conversation
18  happens on September 23rd, 2019.  And is
19  Mr. McCurry also present in this meeting?
20   A.   Not on the 23rd.
21   Q.   Is it just you and Ms. Jeter?
22   A.   It is.
23   Q.   Two days later Mr. McCurry is

Page 164

1  present; is that correct?
2   A.   Correct.
3   Q.   What was your purpose in having
4  Mr. McCurry present, or did she ask for
5  Mr. McCurry to be present?
6   A.   The purpose for having him was
7  because of the story that was told, I actually
8  wanted a witness in there with me.
9   Q.   Understood.
10       And you produced a memo that we
11  talked about earlier that's dated -- in fact,
12  it's sitting in front of you right now --
13  that's dated September 30th, 2019, to Mr. Carr
14  and Mr. Roberts in which you talk about the
15  conversation about comp time and you talk about
16  the alleged fabrication.  Do you recall --
17   A.   Yes.
18   Q.   Is it fair to say both of those
19  are captured in that memo?
20   A.   Yes.
21   Q.   Again, it's addressed to Carr and
22  it's addressed to Roberts, correct?
23   A.   Correct.

Page 165

1   Q.   Do you have any reason to think
2  that Carr did not receive this memo?
3   A.   No.
4   Q.   Did you ever discuss this memo
5  with Carr?  Or better question than that, did
6  you discuss this memo with Carr around
7  September 30th, 2019?
8   A.   No, I did not.
9   Q.   Did you discuss it with Carr soon
10  after September 30th, 2019?
11   A.   I did not.  He is not my next --
12  Joe Roberts is my chain of command, and that's
13  who I discussed it with.
14   Q.   But you addressed the memo to
15  Mr. Carr and Mr. Roberts, correct?
16   A.   Right.  Because Mr. Roberts asked
17  me to address him and Mr. Carr both in the
18  memo.  But as far as us sitting down and having
19  a meeting, we did not.
20   Q.   Okay.  So let's go to Mr. Roberts.
21  Are you comfortable and are you confident that
22  Mr. Roberts received the memo that was written
23  September 30th, 2019?

42 (Pages 162 - 165)

Page 166

1    A.    Yes, sir.
2    Q.    And, in fact, did you discuss it
3  with him?
4    A.    Yes.
5    Q.    Did Mr. Roberts tell you that he
6  was going to recommend to Danny Carr that
7  LaNitra Jeter be terminated after receiving
8  this memo?
9    A.    I don't -- I don't recall.
10   Q.    Now, the meeting with Jeter
11 happens or the one-on-one meeting with Jeter
12 happens on September 23rd, correct?
13   A.    Uh-huh.  Yes.
14   Q.    The meeting with Jeter and
15 yourself and McCurry happens on September 25th,
16 correct?
17   A.    Yes.
18   Q.    But the memo describing these
19 meetings is written on September 30th; is that
20 correct?
21   A.    That is correct.
22   Q.    Ms. Yates, did Joe Roberts ask you
23 to write the memo that is dated September 30th?

Page 167

1    A.    I believe -- I believe so.
2    Q.    Did Joe Roberts tell you why he
3  wanted you to write the memo that's dated
4  September 30th?
5    A.    Documentation.
6    Q.    For what purpose?
7    A.    I don't know.
8    Q.    He didn't explain to you?
9    A.    He did not.
10   Q.    Ms. Yates, did Joe Roberts tell
11 you prior to you writing the memo dated
12 September 30th that LaNitra Jeter had
13 complained to Danny Carr about her comp time
14 being taken away?
15         MR. MURRILL:  Object to the form.
16   A.    No.
17   Q.    (BY MR. DAVIS:)  You sure?
18   A.    I'm positive.
19   Q.    Did Joe Roberts give you any
20 explanation for why you should write the memo
21 that's dated September 30th?
22   A.    I don't recall a specific reason,
23 other than, you know, write me a memo outlining

Page 168

1  the meetings.
2    Q.    And I know it's been going on
3  three years, but try as best you can to answer
4  this question:  Did Joe Roberts ask you to
5  write this memo dated September 30th on
6  September 30th?
7    A.    Oh, I don't recall that.  I don't
8  know.
9    Q.    Do you remember how many days it
10 took you to write the memo dated September
11 30th?
12   A.    Well, two workdays and a weekend
13 and then on Monday, five days.
14   Q.    Do you think you worked on that
15 memo for five days?
16   A.    I may have.  I have other things
17 that I have to do in the office besides just
18 this (indicating).
19   Q.    But you don't really know for
20 sure, do you?
21   A.    I don't know.
22   Q.    Okay.  Where is the VSO office
23 located vis-a-vis where Mr. Carr's office is

Page 169

1  located?
2    A.    I don't know how to answer that.
3    Q.    Are you on the same floor?
4    A.    We are on the same floor, but the
5  hallway to his is -- you know, his office is
6  all the way down at the end of the hall.  And
7  then if you come from his office, then there is
8  Joe's and then it breaks into a space where you
9  can't see their doorways.  So if somebody goes
10 down the hallway where Mr. Roberts' or Mr.
11 Carr's office is, you can't see it.  I mean, I
12 can't see their hallway or anything from where
13 my office is.  I can't see LaNitra's office
14 from my office.
15   Q.    So if LaNitra Carr (sic) met with
16 Danny Carr between September 23rd and September
17 30th, you would not have necessarily observed
18 that, correct?
19   A.    That's correct.
20   Q.    And that could have easily
21 happened without your observing it, correct?
22   A.    Sure.
23   Q.    And you mentioned earlier that one

43 (Pages 166 - 169)

of the reasons the chain of command policy was adopted was Mr. Carr's tendency as a friendly guy to be very accessible. Do you recall our conversation about that a few hours ago?
A. I do.
Q. In September 2019 if a VSO officer had sent a request to April Roberts -- is that the name of the secretary for Mr. Carr?
A. April Smith.
Q. Smith, I'm sorry.
If a VSO had sent a message or a communication to April Smith in September 2019 asking for permission to meet with Danny Carr, do you believe it's likely that it would or would not have been granted?
A. I have no idea.
Q. Do you have any reason to think that it would not have been granted?
A. I don't know. I'm not Mr. Carr.
Q. I understand. But literally, my question was do you have any reason to think it wouldn't have been granted?
A. I don't -- I mean, I don't know.

Q. Okay. So you send the memo to Mr. Carr and to Mr. Roberts. Did you consider Ms. Jeter to be on some sort of a probationary period for the rest of 2019?
A. We -- I don't -- I don't know. I mean, no.
Q. Did Joe Roberts tell you something to the effect Judy, watch LaNitra Jeter closely for these next several months because we may have to make a decision to fire her, or anything even similar to that?
A. Oh, no. No.
Q. Did Joe Roberts tell you at any point to begin making notes to file about LaNitra Jeter?
A. No, he did not.
Q. But you did make several notes to file about Ms. Jeter, correct?
A. I did.
Q. Would you agree with me that most of those notes happened to all be after November 22nd, 2019, which is the day of the memo that is Plaintiff's Exhibit 18?

MR. MURRILL: Object to the form.
Q. (BY MR. DAVIS:) You can answer.
A. May I look at this?
Q. Yeah, absolutely.
A. (Reviewing document.) No.
Q. Well, let's do it this way.
A. That's November -- no. No, actually not.
Q. I'm actually going to show you some of the memos to file and they all have dates on them, so we'll do it the old-fashioned way.
Let me show you a memo to file that you wrote. I'm going to mark one as Plaintiff's Exhibit Number 20.
(Whereupon, Plaintiff's Exhibit 20 was marked for identification and a copy of same is attached hereto.)
Q. This is memo to file that you wrote that's written on September 23rd. Do you recognize the document that is Plaintiff's Exhibit Number 20?

A. Yes.
Q. Would you agree that it's a memo to file that you wrote about the conversation with Jeter on September 23rd, 2019?
A. Yes.
Q. May I see it back, Ms. Yates?
A. Yes, sir.
Q. One thing I forgot to ask you -- may I see the September 30th memo, please, ma'am?
A. Sure.
Q. In the September 30th memo there is a statement that you make. I'm going to read you a sentence that is listed here. Quote, Michael then discussed the problem -- and that's McCurry?
A. Yes.
Q. Michael then discussed the problem with her time, explaining how many weeks she has been here and how she had only two weeks that she worked forty-hour weeks and did not take time off. Do you remember writing that?
A. Yes.

Page 174

1    Q.   I want you to look at the memo to
2  file that you wrote on September 23rd.  Do you
3  have that in front of you?  Do you have that in
4  front of you, Ms. Yates?
5    A.   Yes, sir.
6    Q.   In that memo to file that you
7  wrote on September 23rd that describes the
8  conversation that you had with Jeter about her
9  time, do you state in that memo to file that
10  you wrote on September 23rd that Jeter had only
11  had two weeks where she worked forty hours?
12    A.   Well, I'm sorry, I was reading
13  this.  Can you ask the question again?
14    Q.   Yes.  The question is, in that
15  document that you have just been in reading in
16  front of you, do you make the representation
17  that Jeter only had two weeks where she worked
18  forty hours?
19    A.   Oh, do I make it in this?  No,
20  sir.  Is that the question, do I make a note in
21  here?
22    Q.   Yes.
23    A.   No, I did not.

Page 175

1    Q.   In fact, prior to you writing this
2  e-mail memo dated September 30th, did you write
3  any document that made the allegation that
4  LaNitra Jeter had only worked two forty-hour
5  weeks?  Did you make that representation --
6    A.   No.
7    Q.   Let me finish my question.
8         Did you make that representation
9  in any document prior to the September 30th
10  e-mail?
11    A.   No.
12    Q.   Now, I want to talk about that for
13  one second, Ms. Yates, because that is kind of
14  extraordinary to me.
15         From April to September we have
16  agreed is six months, right?
17    A.   Uh-huh.
18    Q.   You have to answer yes.
19    A.   Oh, I'm sorry, yes.
20    Q.   If I had an employee -- I think
21  all of us in this room have hired or supervised
22  people at some point.  If I had an employee who
23  worked for me for six months and over that

Page 176

1  six-month period -- and you agree six months is
2  twenty-six weeks?
3    A.   Yes, sir.
4    Q.   Over that twenty-six-week period
5  if they only gave me a forty-hour week twice in
6  that period of time, that would catch my
7  attention and I would notice that.  Do you
8  think that's fair?
9    A.   Yes.
10    Q.   If I had an employee who worked
11  for me for a month and for all of those weeks
12  or most of those weeks they didn't give a
13  forty-hour week, that would catch my attention.
14  Do you think that would be fair?
15    A.   That would be fair.
16    Q.   If it hit two months and I notice
17  that most of the time they weren't working a
18  forty-hour week, it would catch my attention.
19  Would that be fair?
20    A.   Yes.
21    Q.   If it hit the three-month point
22  and they were not working forty-hour weeks the
23  overwhelming majority of the time, I believe it

Page 177

1  would catch my attention.  Do you think that's
2  fair?
3    A.   Yes.
4    Q.   So let me ask you, then,
5  Ms. Yates, did you send any sort of a written
6  or did you create any sort of written document
7  after April 2019 in which you said LaNitra
8  Jeter has been here a month and she has not put
9  in a forty-hour week yet or most of the time
10  she has not put in a forty-hour week?  Any
11  formulation of that?
12    A.   I did not.
13    Q.   Did you write any document in May
14  2019 that said LaNitra has been here two months
15  and she has not consistently put in forty-hour
16  weeks?
17    A.   No.
18    Q.   Did you write in a document in
19  June of 2019 saying LaNitra has been here three
20  months and she has not consistently put in
21  forty-hour weeks?
22    A.   No.
23    Q.   Did you write any document to that

45 (Pages 174 - 177)

1 effect in July of 2019?
2     A.   No.
3     Q.   Did you write any document to that
4 effect in August of 2019?
5     A.   No.
6     Q.   Did you write any document to that
7 effect prior to the September 30th memo?
8     A.   No.
9     Q.   Did Tamika Roberts send you any
10 communication at any point between April and
11 September 2019 saying that you have an
12 employee, Judy, who the overwhelming majority
13 of the time is not putting in forty-hour weeks?
14     A.   She did not.
15     Q.   And did you see any memo from
16 Michael McCurry prior to September 2019 in
17 which he says to you, Judy, you got an employee
18 who is consistently not putting in forty-hour
19 weeks?
20     A.   Well, Michael McCurry did not send
21 me a memo, but for a couple of months he had
22 been talking to me about her time and that I
23 needed to do something about it.

1     Q.   Did you?
2     A.   Not the first time that he told me
3 or the second probably, but yes, eventually,
4 yes.
5     Q.   Eventually would be September
6 23rd, wouldn't it?
7     A.   Yes.
8     Q.   Okay.
9     A.   And --
10     Q.   All right.  We are approaching
11 1:00.  So unfortunately I won't be done with
12 you by 1:00, but I do want to try to slip in a
13 few questions to cover as much as possible
14 before we do take the break.
15     A.   Okay.
16     Q.   So let's go back to the line of
17 questions I was headed toward.  We have the
18 November 22nd communication in which you make a
19 reference to complaints about -- complaints
20 from Jeter about not being treated fairly.  I'm
21 going to show you several of your memos to file
22 and ask you to date some of them.
23         I'm going to show you what would

1 be Plaintiff's Exhibit Number 21.
2         (Whereupon, Plaintiff's Exhibit 21
3         was marked for identification
4         and a copy of same is attached
5         hereto.)
6     Q.   Do you agree this is a memo to
7 file about LaNitra Jeter?  And it's your memo
8 to file about LaNitra Jeter would be more
9 precise.
10     A.   Yes.
11     Q.   What's the date on it?
12     A.   January 10th, 2020, memo to file.
13         (Whereupon, Plaintiff's Exhibit 22
14         was marked for identification
15         and a copy of same is attached
16         hereto.)
17     Q.   I'm going to show you Plaintiff's
18 Exhibit Number 22.  Would you agree with me
19 it's another memo to file from you to file
20 about LaNitra Jeter?
21     A.   Yes.
22     Q.   What's the date on it?
23     A.   February the 25th, 2020.

1     Q.   I'm going to show you another memo
2 to file that we are going to make Plaintiff's
3 Exhibit Number 23.
4         (Whereupon, Plaintiff's Exhibit 23
5         was marked for identification
6         and a copy of same is attached
7         hereto.)
8     Q.   Would you agree it's another memo
9 to file from you regarding LaNitra Jeter?
10     A.   Yes.
11     Q.   What's the date on it?
12     A.   January 9th, 2020.
13         (Whereupon, Plaintiff's Exhibit 24
14         was marked for identification
15         and a copy of same is attached
16         hereto.)
17     Q.   Let me show you Plaintiff's
18 Exhibit Number 24.  Would you agree it's
19 another memo to file from Judy Yates regarding
20 LaNitra Jeter?
21     A.   Yes.
22     Q.   What's the date on it?
23     A.   January the 8th.

46 (Pages 178 - 181)

1    Q.   2020?
2    A.   I'm sorry, 2020, yes.
3    Q.   I'm going to show you one more
4  memo to file that's dated -- well, let me
5  actually label it.  What is that last exhibit
6  number I gave you?
7    A.   24.  And may I add something to
8  this question?
9    Q.   Well, my question was what's the
10  date.  Would you like to add something to that?
11    A.   Oh, no.  No.  If that's all your
12  question was.
13       (Whereupon, Plaintiff's Exhibit 25
14          was marked for identification
15          and a copy of same is attached
16          hereto.)
17    Q.   So I want to show you Plaintiff's
18  Exhibit 25.  Would you agree that's a memo to
19  file from Judy Yates?
20    A.   Yes.
21    Q.   Is the subject LaNitra Jeter?
22    A.   Yes.
23    Q.   Now, the date on this one is what?

1    A.   November the 18th, 2019.
2    Q.   So that's kind of close to
3  November 22nd, 2019, correct?
4    A.   Yes.
5    Q.   The November 22nd, 2019, memo that
6  says, quote, Joe had forwarded an e-mail Nitra
7  sent to him regarding not understanding the
8  chain of command and that she was not being
9  treated fairly, you wrote it on November 22nd.
10  Do you know when you learned that Jeter had
11  made a complaint that she was not being treated
12  fairly?
13    A.   I -- I don't recall right off the
14  top of my head, no, but --
15    Q.   Could it have been November 18th
16  or November 19th?
17    A.   It could have been, yes.
18    Q.   Would you agree, Ms. Yates, that
19  every note to file I've just put in front of
20  you either happened after the November 22nd
21  memo or a few days before?
22    A.   Yes.
23       MR. DAVIS:  Let's take our break.

1       (Whereupon, a lunch break was had
2          from 1:00 p.m. until 2:00 p.m.)
3    Q.   (BY MR. DAVIS:)  All right.  Ms.
4  Yates, are you ready?
5    A.   Yes.
6    Q.   So remember at the very beginning
7  of our conversation about the November 23rd
8  memo, I think I mentioned to you and to counsel
9  and our court reporter that I was not sure if I
10  had put this document in as an exhibit
11  yesterday?
12    A.   Yes.
13    Q.   And as we have gone through and
14  looked at documents, it turns out that yes, I
15  did.
16       MR. DAVIS:  So let me, Jay, sort
17  of figure out a way to correct that.  The
18  document that yesterday was marked as
19  Plaintiff's Exhibit 5 is the November 22nd memo
20  from Ms. Yates to her file.  Today I have
21  marked the same document as Plaintiff's Exhibit
22  18.
23    Q.   (BY MR. DAVIS:)  Ms. Yates, do you

1  agree these are identical documents?
2    A.   Yes.
3    Q.   So what I would propose, if we can
4  just reach a stipulation, that every time we
5  refer to Plaintiff's Exhibit 18 today we have
6  been referring to Plaintiff's Exhibit 5.  I
7  think that would correct it.
8       MR. MURRILL:  I think that's fine.
9  I think we can also point out they share the
10  same Bates number.
11       MR. DAVIS:  Yes.  Okay.
12    Q.   (BY MR. DAVIS:)  So do you agree,
13  Ms. Yates -- again, you agree these two
14  documents are identical, correct?
15    A.   Yes.
16    Q.   The Bates number on Plaintiff's
17  Exhibit 5 is 000338 and the Bates number on
18  Plaintiff's Exhibit 18 is 000338.  So going
19  forward we will call this Plaintiff's Exhibit
20  Number 5 and I will withdraw Number 18.  But
21  for sake of the record, every time that you and
22  I have used the term Plaintiff's Exhibit 18
23  today, we'll stipulate it's been a reference to

Page 186

1 Plaintiff's 5. Is that fair to you, Ms. Yates?
2     A.   It is.
3         MR. DAVIS:  Is that fair to you,
4 Mr. Murrill?
5         MR. MURRILL:  It is.
6         (Whereupon, Plaintiff's Exhibit 18
7         was withdrawn.)
8     Q.   (BY MR. DAVIS:)  All right.  So
9 let's talk for just a second -- if you would,
10 hand me the memos in front of you, Ms. Yates,
11 for just a second.
12     A.   Sure.
13     Q.   I think I have made my point about
14 the timing, but I just want to talk about
15 substance a little bit for one second.  We've
16 talked about September 23rd I think in great
17 detail.
18         There is a memo to file you wrote
19 on November 18th dealing with Ms. Jeter's
20 attendance at a domestic violence firearms
21 project.  Do you agree that's a fair
22 description of Plaintiff's Number 26 -- 25?
23 I'm sorry.

Page 187

1     A.   Yes.
2     Q.   Was there a requirement that VSOs
3 attend this meeting on domestic violence
4 firearms?
5     A.   No, sir.  No, sir.
6     Q.   And Ms. Jeter was asked if she
7 wanted to attend and she declined.  Is that
8 accurate?
9     A.   That's correct.
10     Q.   So if there is no requirement that
11 VSOs attend this domestic violence firearms
12 project, she certainly would have had a right
13 to decline, correct?
14     A.   Yes.
15     Q.   But yet you still wrote a memo to
16 file regarding this episode, correct?
17     A.   Yes.
18     Q.   So I'm going to show you
19 Plaintiff's Exhibit -- and I cannot read a six
20 and a five at my age and my eyesight but I
21 think I can tell a four -- Plaintiff's Exhibit
22 24 is a memo to file from you regarding
23 Ms. Jeter, and it says VSO Nashville trip to

Page 188

1 the Family Justice Center.  And would you just
2 read and just tell me in your own words -- I
3 mean, I recognize those are your words too, but
4 tell me in a succinct fashion what this memo to
5 file is about.
6     A.   Elise had requested permission to
7 go to Nashville to the FJC with One Place on
8 February 7th, 2020.  Before agreeing that she
9 could go, I asked LaNitra Jeter if -- I should
10 have put if she would like to go -- like to
11 attend, and she said that she was not
12 interested in going.  And then I put Cheryl
13 Black, Erin Barefield, and Elise Driskill said
14 they would like to go, and Joe Roberts approved
15 the request for them to go.
16         And you asked another question on
17 that?
18     Q.   No, my question was would you tell
19 me in your own words what this memo is about.
20     A.   What it's about, okay.  Well,
21 prior to that, there had been a domestic
22 violence conference -- meeting, it was a
23 one-day meeting, that Erin Barefield, Elise

Page 189

1 Driskill, and Cheryl Black were attending, and
2 LaNitra asked to go.  And I had already put
3 in -- it was on a Friday, I had already put in
4 to be off that day, and I told LaNitra because
5 she did not deal with domestic violence cases
6 that --
7     Q.   She being LaNitra?
8     A.   LaNitra, I'm sorry, that she
9 needed to stay and be in the office in case
10 someone needed a VSO, but that the next time
11 any training became available, I would let her
12 go and that if everyone else wanted to attend
13 also, I would stay in the office so that she
14 could attend.  And I just wanted to document
15 that I kept making training available to her,
16 and she denied every time that I made the offer
17 available to her.
18     Q.   Why did you feel the need to
19 document that you made training available to
20 Ms. Jeter?
21     A.   Because she was so upset when she
22 couldn't attend the first one that they were
23 having.

48 (Pages 186 - 189)

Page 190

1    Q.   Was there any requirement that
2  Ms. Jeter attend this trip to Nashville to the
3  Family Justice Center?
4    A.   No.
5    Q.   And Birmingham to Nashville is,
6  what, a four-and-a-half-hour drive; is that
7  right?
8    A.   I don't believe it's that far.
9    Q.   How far do you think it is?
10    A.   I was thinking about two and a
11  half.
12    Q.   Okay.  I haven't driven it in a
13  minute, so I will defer to you on that if you
14  have.  But was it an overnight trip?
15    A.   It was not.
16    Q.   But did the attendees have to
17  drive themselves?
18    A.   No, they did not.  One Place was
19  taking a couple of mini vans and people could
20  ride with them and return with them or they
21  could drive their own cars.  Now, the other
22  three VSOs, they all chose to drive separately
23  because they had different places to go

Page 191

1  afterwards, but they had the option of riding
2  with another VSO, driving themselves and
3  getting reimbursed for the travel, or riding in
4  a minivan with One Place.
5    Q.   Do you have any knowledge of why
6  Ms. Jeter was not interested in going?
7    A.   She did not tell me why.  She just
8  said she was not interested in attending.
9    Q.   And, again, there was no
10  requirement that she go, was there?
11    A.   There was none.  But, you know,
12  obtaining training goes to if someone wants to
13  be reassigned to do other types of victim work
14  within our group, that could have played a part
15  in a reassignment.  If you wanted to work
16  domestic violence, it would have been helpful
17  to have attended some of the training but not
18  all of them.
19    Q.   But that would really be at the
20  employee's discretion, depending on the
21  employee's career --
22    A.   That is true.  The only --
23    Q.   Let me finish my sentence again.

Page 192

1        That would be at the employee's
2  discretion depending on the employee's career
3  interest, correct?
4    A.   Yes.  With the exception under the
5  grant, every year we are required to attend a
6  week-long training and retraining session, and
7  that is a requirement to keep the job.
8    Q.   Did you notify Ms. Jeter that her
9  not attending this session was in any way
10  problematic?
11    A.   No.
12    Q.   Did you tell Ms. Jeter that her
13  not attending this session might in any way
14  affect the grant eligibility for the VSOs?
15    A.   No.  Because it did not affect the
16  grant eligibility, no.
17    Q.   Okay.  And we've talked about the
18  context of some of your other memos to file and
19  we've talked about the fact that you did not
20  write her up or did not discipline her or pass
21  them up the chain of command, so I won't
22  belabor that.
23        I will ask you about one area I

Page 193

1  don't believe we have covered.  Plaintiff's
2  Exhibit 21 is a memo that you wrote to file.
3  And just if you would, I don't need you to read
4  it, but if you would take a moment and
5  succinctly tell me in your own words what --
6  first of all, what's the date of that memo?
7    A.   January the 10th, 2020.
8    Q.   And what's the exhibit number on
9  it?
10    A.   21.
11    Q.   Just summarize for me in your own
12  words what this memo to file is about.
13    A.   She came by my -- Ms. Jeter came
14  by my office, stuck her -- well, she came by,
15  stuck her head in the door and just said I'm
16  going to be off on Tuesday because I have to go
17  to court and she didn't know how long she was
18  going to be gone.  And I told her to request
19  four hours and if it didn't take that long,
20  then it could be corrected so that she wasn't
21  charged more time than she was off.  And I did
22  ask if it was for court in Atlanta, and she
23  said yes, that was her son's case.

49 (Pages 190 - 193)

Page 194

1    Q.   What kind of time off did she want
2  to attend court in her son's case?
3    A.   She did not -- I didn't put in
4  here, I just put time, so I didn't know.  That
5  was her discretion as to whether she took
6  vacation or comp time for that, and I didn't
7  know which she was going to request at that
8  time.
9    Q.   Did you write up Ms. Jeter based
10 on the incident you just described?
11   A.   No, I did not.  And I will say all
12 these times you are asking, you know, did I
13 write her up, I didn't because I wanted her to
14 work out.  I didn't want to put anything in
15 writing in such a way that would be detrimental
16 to her.  I wanted her employment to work out.
17 I don't want anybody to not -- you know, she
18 had potential, as I've said, to be a very good
19 VSO and an asset to the office.
20   Q.   Let me ask you this question along
21 those lines, Ms. Yates:  In the twenty-six
22 years that you have supervised people, how many
23 of those employees have you kept a separate

Page 195

1  file on where you are writing memos about their
2  conduct or behavior in the office?
3    A.   I -- the minute I hire --
4  interview someone, I make a file for each
5  person.  And then once they are hired and they
6  are one of my employees, they have a file that
7  I maintain.
8    Q.   Did you maintain a file or have
9  you maintained a file on Cheryl Black?
10   A.   I have.
11   Q.   Does it have write-ups about
12 incidents involving her that have occurred in
13 the office?
14   A.   In the past, yes.
15   Q.   What's the most recent thing you
16 have written memo to file about involving
17 Cheryl Black?
18        MR. RILEY:  Time out.  Jay, I
19 think we have objected to this, haven't we?
20        MR. MURRILL:  We did object to the
21 production of employee personnel files outside
22 of their time records.  So that objection has
23 not been waived, so I would instruct the

Page 196

1  witness not to answer that question.
2        MR. DAVIS:  Well, that's -- it's a
3  relatively trivial topic, so I'm not going to
4  waste a lot of time on it, but that is a
5  completely foundationless basis for an
6  objection to an answer during a deposition.
7  And as you know, Mr. Murrill, the fact that
8  there may be an objection advanced to documents
9  during discovery is very different than the
10 standard raised to objections during
11 depositions.  There are relevance objections
12 that can be interposed to documents.  There are
13 proportionality objections that can be
14 interposed to documents.  Once we say usual
15 stipulations, there are no proportionality or
16 relevance exceptions or objections to questions
17 during depositions.
18        So obviously you are free to make
19 whatever objection you want, but to instruct
20 the witness not to answer is incorrect.
21        Now, candidly, I don't really care
22 what she wrote up about Cheryl Black, but I do
23 want to ask her the question again.

Page 197

1    Q.   (BY MR. DAVIS:)  Ms. Yates, when
2  is the last time you have written a memo to the
3  file about Cheryl Black?
4        MR. MURRILL:  I'm going to object
5  to the form and I'm also going to object to the
6  extent it can be seen or could be argued as a
7  waiver of the objection we have made to the
8  request for production.
9        MR. DAVIS:  Fair enough.
10        MR. RILEY:  And I think the
11 question was when was the last time you wrote
12 something.
13        MR. DAVIS:  I think my question
14 was --
15        MR. RILEY:  That was your
16 question.
17   Q.   (BY MR. DAVIS:)  Well, Ms. Yates,
18 do you understand the question?  I'm happy to
19 reask it if you don't understand it.  Again,
20 I'm more focused on you than I am your lawyers.
21        MR. MURRILL:  Do you understand --
22   A.   Do I understand the question?
23 Yes.

Page 198

1    Q.   (BY MR. DAVIS:)  Okay.  Would you
2  answer the question, then, please, ma'am?
3         MR. MURRILL:  Same objection.
4         MR. DAVIS:  All right.  The
5  objection is noted.
6         THE DEPONENT:  Do I still answer?
7         MR. MURRILL:  You can answer.
8         THE DEPONENT:  Okay.
9    A.   I don't recall.
10   Q.   (BY MR. DAVIS:)  Okay.
11   A.   It's been years, several years.
12   Q.   Okay.  In fact, it's been years,
13  hasn't it?
14   A.   Yes.  Because she corrected the
15  issue and haven't had a problem since.
16   Q.   So your point, Ms. Yates, of that
17  exchange is that the reason you didn't write up
18  Ms. Jeter was because you didn't want to create
19  a negative record for her and you wanted her to
20  succeed.  Is that a fair characterization of
21  what you just said?
22   A.   Say that again.
23   Q.   Sure.

Page 199

1         MR. DAVIS:  Would you please read
2  my question?
3         (Record read.)
4    A.   The fact that I wanted -- it's a
5  fair characterization that I wanted her to
6  succeed.
7    Q.   (BY MR. DAVIS:)  Did your mind
8  change at some point regarding your goal that
9  she succeed and remain an employee as a VSO?
10   A.   Yes.
11        (Whereupon, Plaintiff's Exhibit 7,
12        having been previously marked for
13        identification in the deposition
14        of Danny Carr, was referenced in
15        this deposition.)
16   Q.   I'm going to show you Plaintiff's
17  Exhibit Number 7, Ms. Yates, which is a
18  document that several times you've asked if you
19  can see and several times you've indicated that
20  you want to talk about.  So we've gotten to the
21  point you have been waiting for, do you
22  recognize Plaintiff's Exhibit Number 7?
23   A.   I do.  But I have not asked to see

Page 200

1  this nor have I specifically mentioned this at
2  all today.
3    Q.   Well, we'll let the record speak
4  for itself on that.  But several times one of
5  your lawyers has pointed it to you and asked
6  you would you like to see this.
7         MR. RILEY:  I have.
8    Q.   (BY MR. DAVIS:)  All right.  Would
9  you please look at it and tell me if you
10  recognize it?
11   A.   I do.
12   Q.   What is it?
13   A.   It's a document that Mr. Roberts
14  requested providing all of the issues that I
15  had had with Ms. Jeter.
16   Q.   What's the date on it?
17   A.   March the 13th, 2020.
18   Q.   Would you agree that this is a
19  list of bullet points regarding Ms. Jeter's
20  time at the DA's office?
21   A.   Yes.
22   Q.   And I say bullet points, literally
23  it's a set of points with a black dot next to

Page 201

1  each one of them.  Is that fair?
2    A.   Yes.
3    Q.   And do you use the term bullet
4  points to refer to that kind of a list?
5    A.   I don't know.  I just type it.  I
6  don't refer to them as anything in particular.
7    Q.   How would you describe the points
8  that are listed?  If you had to sort of put a
9  catch all phrase, how would you describe the
10  points that are contained on the page,
11  Plaintiff's Exhibit 7?  Are these allegations?
12  Are these -- how would you describe?  What word
13  would you use?
14   A.   Incidents.
15   Q.   Would you characterize them as
16  grounds for termination?
17   A.   I wasn't asked for that.  I was
18  asked to come up with issues and incidents that
19  I have had -- had had.
20   Q.   And Mr. Roberts made that request
21  of you.  When did Mr. Roberts make that request
22  of you?
23   A.   Probably that day or the day

51 (Pages 198 - 201)

Page 202

1 before. I don't know. I don't know when.
2     Q.   As a general principle --
3     A.   Oh, well -- I'm sorry. Perhaps
4 that day. I don't recall.
5     Q.   As a general principle, if the
6 chief deputy DA asks you to write a memo on
7 something, do you think that you likely would
8 have promptly responded to his request?
9     A.   Yes, I would think so.
10     Q.   And if he asked you on a
11 particular day, do you think you would have
12 made a good faith effort to respond within the
13 day?
14     A.   Yes.
15     Q.   No later than the next day?
16     A.   Correct.
17     Q.   So why did Joe Roberts tell you he
18 wanted you to write Plaintiff's Exhibit 7?
19     A.   Because he wanted to review the
20 issues with Mr. Carr to discuss termination.
21     Q.   Did he tell you why this was a
22 matter that needed to be handled right now as
23 opposed to at some other time?

Page 203

1     A.   I don't recall if he said
2 specifically.
3     Q.   Did he tell you there was an
4 urgency to you writing this memo, that he
5 needed you to do it quickly?
6     A.   I'm trying to think of what he
7 said. You are asking me to think back for a
8 couple of years here, but I believe --
9     Q.   Of course that would be pretty
10 much every question I've asked you today,
11 wouldn't it?
12     A.   That is true, and I have had to
13 think about some of them.
14         Due to the trust issues, I believe
15 it was going to be that she -- I mean, I don't
16 know. You are asking me to say something that
17 I'm guessing what his motives were.
18     Q.   No, I'm asking you what he said to
19 you.
20     A.   He asked me to write up a list of
21 incidents dealing with her so that he could
22 discuss with Danny termination.
23     Q.   So he specifically referenced

Page 204

1 termination as the context of --
2     A.   Well, he didn't -- he probably
3 didn't say termination. That probably wasn't
4 his words, but, you know, to go -- but in
5 essence, yes.
6     Q.   Did you understand him to be
7 asking about this memo in the context of
8 Ms. Jeter's termination?
9     A.   Yes.
10     Q.   Did you understand that the likely
11 purpose of this memo was Ms. Jeter's
12 termination?
13     A.   That it was possible, yes.
14     Q.   Do you have any recollection of
15 having a conversation with Danny Carr about the
16 March 13th memo?
17     A.   I did not talk to him about this.
18     Q.   And just so we're clear, are you
19 saying that you don't remember it, or are you
20 emphatically saying that I know I did not talk
21 with Danny Carr about the March 13th memo?
22     A.   I am emphatically stating I did
23 not have a conversation with Mr. Carr.

Page 205

1     Q.   How can you be so emphatic about
2 that?
3     A.   Because I so rarely talk to
4 Mr. Carr, except in passing to say hey, that I
5 would have remembered this conversation. This
6 was not -- I did not talk to him.
7     Q.   This was not what? What were you
8 about to say?
9     A.   This is not some casual incident
10 that was possibly going to take place. I would
11 have remembered talking to Mr. Carr.
12     Q.   Did Mr. Carr ask you by e-mail or
13 in any other fashion to send him documents
14 regarding the items listed in the March 13th
15 memo?
16     A.   No.
17     Q.   Did Mr. Roberts ask you to send
18 documents to Mr. Carr regarding the items
19 mentioned in the March 13th memo?
20     A.   Yes.
21     Q.   And what documents did Mr. Roberts
22 ask you to assemble for Mr. Carr?
23     A.   He didn't give any specification.

52 (Pages 202 - 205)

Page 206

1    Q.   Which documents, if any, did you
2 assemble?
3    A.   Probably the memos that I had
4 written for my file.
5    Q.   So you believe that the memos you
6 wrote to file were sent to Danny Carr along
7 with the March 13th memo?
8    A.   I gave them to Mr. Roberts.
9 That's who that's (indicating) directed to.
10    Q.   So your best recollection is that
11 you gave Mr. Roberts the various notes to file
12 that we've talked about today?
13    A.   Yes, sir.
14    Q.   Did you send -- or did you reach
15 out to Tamika Jackson for any information when
16 you prepared the memo that is written on March
17 13th, 2020?
18    A.   No, I did not.
19    Q.   Did you reach out to Mr. McCurry
20 for any information or any documents when you
21 wrote the memo on March 13th --
22    A.   I did not.
23    Q.   Let me finish the sentence.

Page 207

1    A.   I'm sorry.
2    Q.   Did you reach out to Mr. McCurry
3 for any information or for any documents
4 regarding the memo that you wrote on March
5 13th, 2020?
6    A.   I did not.
7    Q.   Did you assemble a list of comp
8 time requests that LaNitra Jeter had submitted
9 as an accompaniment to your memo on March 13th,
10 2020?
11    A.   I did not.
12    Q.   Did you review the list of comp
13 time requests she had submitted when you
14 prepared your memo on March 13th, 2020?
15    A.   No, I did not.
16    Q.   Did Mr. Roberts ask you to give
17 him a set of documents describing the comp time
18 that Ms. Jeter took and the comp time that her
19 fellow VSOs took at any point?
20    A.   No.
21    Q.   And, again, that's at any point,
22 not just in the context of the March 13th memo,
23 but at any point while Ms. Jeter worked for

Page 208

1 y'all, did Joe Roberts ever ask you to assemble
2 a list of comp time requests for Jeter and the
3 other VSOs?
4    A.   No.
5    Q.   Do you have any reason to believe
6 that Joe Roberts ever reviewed a list or a
7 printout of comp time requests from the VSOs?
8    A.   I have no idea.
9    Q.   And I'm going to show you some
10 documents that we're not going to talk about at
11 length for time sake, but I will show you
12 Plaintiff's Exhibit 15, if you will take that
13 in your hand.  And I will show you Plaintiff's
14 Exhibit Number 12, if you would take that in
15 your hand.  I will show you Plaintiff's Exhibit
16 13, if you will take that in your hand.  I will
17 show you Plaintiff's Exhibit Number 14, if you
18 will take that in your hand.  I'm going to show
19 you Plaintiff's Exhibit Number 11, if you would
20 take that in your hand as well.
21         MR. MURRILL:  Her hands are only
22 so big.
23    Q.   (BY MR. DAVIS:)  Plaintiff's

Page 209

1 Exhibit Number 10, if you would take that.
2 Plaintiff's Exhibit Number 9, if you would take
3 that, please, ma'am.
4         (Whereupon, Plaintiff's Exhibits
5          9 - 15, having been previously
6          marked for identification in the
7          deposition of Danny Carr, were
8          referenced in this deposition.)
9    Q.   All right.  Do you see all these
10 documents in front of you, Ms. Yates?
11    A.   Yes, sir.
12    Q.   Prior to my putting these
13 documents in front of you, have you seen any of
14 them?
15    A.   I have not seen these
16 (indicating).
17    Q.   When you say these, please give me
18 the exhibit number.
19    A.   I'm sorry, I have not seen the
20 attendance sheets, Exhibit 9, 13, and 14.  I
21 had not seen those.
22    Q.   All right.
23    A.   These approval e-mails that are

Page 210

1 from the district attorney's HR system, I
2 haven't specifically seen those pages, but I
3 approved them because it gets generated by my
4 approval inside our personnel system.
5    Q.   Understood.
6         But is it fair to say that you
7 have not seen the printouts from Tamika Jackson
8 granting the approval until I just put those in
9 front of you?
10   A.   Not -- that is correct.
11   Q.   So you agree with me that all of
12 these documents in front of you are attendance
13 records of VSOs, including LaNitra Jeter, and
14 they are records of comp time or leave time
15 requests of LaNitra Jeter and other VSOs.  Do
16 you agree with my characterization of these
17 documents in front of you?
18   A.   It appears so, yes.
19   Q.   Did you send or -- strike that.
20        To your knowledge, did Joe Roberts
21 see or review any of these documents before the
22 termination of LaNitra Jeter?
23   A.   I don't know.

Page 211

1    Q.   Do you remember any conversation
2 with Joe Roberts about any of the attendance
3 documents or leave or comp time request
4 documents in front of you?
5    A.   No, sir.
6    Q.   And let me widen my timeframe,
7 going beyond the March 13th preparation of this
8 memo, do you have any recollection of
9 discussing documents verifying the attendance
10 records of the VSOs with Joe Roberts?
11   A.   No.
12   Q.   At any timeframe prior to
13 Ms. Jeter's termination, do you have any
14 recollection of discussing with Joe Roberts
15 documents containing leave, comp, or vacation
16 time requests by VSOs?
17   A.   Not that I recall, no.
18   Q.   We talked about a text thread
19 yesterday or Mr. Carr and I talked yesterday
20 about a text thread of messages between you and
21 Ms. Jeter in which she was telling you in
22 effect that she was going to be taking time off
23 for medical reasons.  Let me just show you that

Page 212

1 exhibit, it is Plaintiff's Exhibit Number 17,
2 and I just ask you to look at 17.  Tell me,
3 first of all, as you thumb through that -- and
4 I'm not going to ask you about really very many
5 of these exchanges, but just tell me if you
6 agree Plaintiff's Exhibit 17 appears to be text
7 threads over a period of time between you and
8 LaNitra Jeter.
9         (Whereupon, Plaintiff's Exhibit
10        17, having been previously marked
11        for identification in the
12        deposition of Danny Carr, was
13        referenced in this deposition.)
14   A.   Yes, they are.
15   Q.   Would you agree with me that these
16 are text threads in which she is asking about
17 time off for medical reasons?
18   A.   Yes.
19   Q.   Do you have any reason to believe
20 that in any of these text messages from LaNitra
21 Jeter that she was in any way fabricating the
22 medical excuses that she was advancing to you?
23   A.   I have no idea.

Page 213

1    Q.   But do you have any -- my question
2 was do you have any reason to believe that she
3 was fabricating any of those medical excuses or
4 requests?
5    A.   No.  No, sir, I don't.
6    Q.   Let me show you another document,
7 Plaintiff's Exhibit 16, and ask you if you
8 remember Plaintiff's Exhibit 16.
9         (Whereupon, Plaintiff's Exhibit
10        16, having been previously marked
11        for identification in the
12        deposition of Danny Carr, was
13        referenced in this deposition.)
14   A.   Yes.
15   Q.   Would you agree it's an e-mail
16 from LaNitra Jeter to you?
17        MR. MURRILL:  No.
18   A.   No, I do not.
19   Q.   (BY MR. DAVIS:)  How would you
20 characterize it?  Remind me who that is written
21 to.
22   A.   To Michael McCurry.
23   Q.   So it's from Ms. Jeter to Michael

Page 214
1 McCurry, correct?
2    A.   Correct.
3    Q.   Would you agree in that e-mail
4 from Ms. Jeter to Michael McCurry that she
5 talks in detail about some medical issues that
6 she was having?
7    A.   Yes.
8    Q.   May I see it back?  She talks
9 about the fact that she's going to -- and the
10 date of this memo is November 6th, 2019.  Do
11 you agree?
12    A.   Yes.
13    Q.   She talks about needing invasive
14 surgery within a few months.  Do you have any
15 reason to question the fact that Ms. Jeter
16 needed invasive surgery within a few months of
17 November of 2019?
18    A.   Yes.
19    Q.   Tell me why you would question
20 that.
21    A.   Because the day before we had
22 talked about -- I had specifically had a
23 conversation with her asking her how she was

Page 215
1 doing and how her previous procedure was, and
2 she said it went great and she shouldn't have
3 to have anything else done.
4    Q.   And that conversation would have
5 been on November 5th, correct?
6    A.   Correct.
7    Q.   Do you have any idea whether she
8 talked to her doctor between the conversation
9 with you on the 5th and the e-mail to McCurry
10 on the 6th?
11    A.   I don't.
12    Q.   And Ms. Jeter makes the
13 representation, quote, When I had my surgery,
14 she found additional issues that she could not
15 fix or address because I did not have enough
16 time set aside for recovery.  I need to start
17 accruing comp time so I will be able to have
18 the surgery that I need.
19       Did Mr. McCurry suggest to you
20 that he believed that Ms. Jeter was being
21 dishonest or fraudulent in any way?
22    A.   He did not.  But if you will
23 notice, he told her to talk to me about it and

Page 216
1 she never did.
2    Q.   And do you know if she ended up
3 having any surgery in the months after November
4 2019?
5    A.   I don't recall.
6    Q.   So going back again to the
7 conversation with Joe Roberts about Ms. Jeter's
8 prospective termination -- I think I know your
9 answer to this, but just so the record is
10 clear, was there ever a meeting held between
11 you and Danny Carr and Joe Roberts to discuss
12 the subject of LaNitra Jeter's termination?
13    A.   No, there was not.
14    Q.   Do you know if there was ever a
15 meeting held between Joe Roberts and LaNitra
16 Jeter to discuss whether she would remain
17 employed in the office?
18    A.   I don't know.
19    Q.   How many VSOs have been terminated
20 in the last twenty-six years?
21    A.   One.
22    Q.   Who was that?
23    A.   LaNitra Jeter.  We had a secretary

Page 217
1 that was terminated.
2    Q.   But my question was about VSOs.
3    A.   Right.  But they were still under
4 my supervision.
5    Q.   I understand.  But my question was
6 about VSOs.
7    A.   Okay.
8    Q.   Do you know -- and I think you've
9 established in twenty-six years, the only VSO
10 that's been terminated in the Jefferson County
11 DA's office is the young lady seated next to
12 me; is that right?
13    A.   Yes.
14    Q.   When did you learn that Ms. Jeter
15 had filed a charge of discrimination with the
16 Equal Employment Opportunity Commission?
17    A.   Easter night of 2020 Mr. Carr or
18 Mr. Roberts, I'm not sure which one, I think it
19 was Mr. Carr, but I'm not sure, sent out an
20 e-mail letting us know -- letting me know,
21 letting -- I guess it was from Danny, I'm not
22 sure, but there were three or four of us on the
23 -- that received a message stating that they

Page 218

1 had received a complaint, and that was Easter
2 night.
3    Q.    And do you happen to have a
4 recollection -- Easter can fall different times
5 of the year. Do you have a recollection of
6 what the approximate date might have been?
7    A.   I don't know the date because it
8 can be in March or April. But that year it was
9 in April, but I don't know the date. I just
10 remember it was Easter because it was Easter
11 night and I'm like oh, this is great news on an
12 Easter.
13    Q.   Let me ask you about something
14 that's caught my attention from the moment I've
15 looked at the documents in this case,
16 Ms. Yates.
17    A.   Okay.
18    Q.   I want to show you Plaintiff's
19 Exhibit Number 6. Have you seen Plaintiff's
20 Exhibit Number 6 before?
21        (Whereupon, Plaintiff's Exhibit 6,
22        having been previously marked for
23        identification in the deposition

Page 219

1        of Danny Carr, was referenced in
2        this deposition.)
3    A.   No, I have not.
4    Q.   Would you hand it back, please,
5 ma'am? I'll represent to you there has been
6 testimony in Ms. Jeter's deposition that this
7 is a document that she sent to the EEOC in
8 which she lays out her allegations about the
9 DA's office. Would you agree the date on this
10 document is March 20th, 2020?
11    A.   Yes.
12    Q.   And would you agree it appears to
13 be stamped received by EEOC on that same day,
14 March 20th, 2020?
15    A.   Okay. Yes.
16    Q.   Would you agree that the DA's
17 office is copied on this document?
18    A.   Yes.
19    Q.   Would you agree that an e-mail
20 address for the DA's office is listed on this
21 document? (Indicating.)
22    A.   I can't see from here, even with
23 my glasses.

Page 220

1    Q.   I understand that.
2    A.   I see that Mr. Carr had that, yes.
3    Q.   So the e-mail address that's
4 listed here is Danny Carr's e-mail address,
5 correct?
6    A.   It is.
7    Q.   Do you know if Danny Carr received
8 Plaintiff's Exhibit 6 on March 20, 2020?
9    A.   I don't know.
10    Q.   Well, let me show you a document
11 you wrote, which is Plaintiff's Exhibit Number
12 5 that we have mistakenly called 18 earlier.
13 Do you agree that's a November 22nd memo that
14 you wrote to file, Ms. Yates?
15        (Whereupon, Plaintiff's Exhibit 5,
16        having been previously marked for
17        identification in the deposition
18        of Danny Carr, was referenced in
19        this deposition.)
20    A.   Yes.
21    Q.   Is there an addendum that you made
22 to that memo?
23    A.   Yes.

Page 221

1    Q.   Did you date the addendum?
2    A.   I did.
3    Q.   What is the date you put on the
4 addendum?
5    A.   March the 11th of 2020.
6    Q.   Can I see it back?
7    A.   (Witness complies.)
8    Q.   Who asked you to put an addendum
9 on this document that you initially wrote on
10 November 22nd?
11    A.   No one.
12    Q.   What made you decide to put an
13 addendum on it?
14    A.   I just wanted to add that on
15 there.
16    Q.   Why?
17    A.   Because I thought they were
18 related to one another.
19    Q.   Did Mr. Roberts ask you to add an
20 addendum to a document you had written months
21 earlier?
22    A.   Oh, no, he did not.
23    Q.   And going back to my questions

Page 222

1 about the March 20 document, search your memory
2 on this, Ms. Yates, and let me ask this again
3 and make sure I'm getting your best
4 recollection on it.
5    A.   Okay.
6    Q.   Did Joe Roberts tell you shortly
7 after LaNitra Jeter's termination that she has
8 filed an EEOC charge against us?
9    A.   No.
10    Q.   Did Joe Roberts tell you shortly
11 after LaNitra Jeter's termination that we think
12 LaNitra is going to file a lawsuit against us?
13    A.   No, he did not.
14    Q.   Or anything similar to that?
15    A.   No, he did not.
16    Q.   Did you believe that it was likely
17 that Ms. Jeter was going to file a lawsuit?
18    A.   No.
19    Q.   Did you believe it was likely that
20 Ms. Jeter was going to file any kind of a
21 charge of discrimination?
22    A.   No.
23    Q.   Do you know why Joe Roberts might

Page 223

1 have believed that?
2    A.   I have no idea why he would
3 believe that.
4    Q.   And I'll represent to you that we
5 talked about an e-mail yesterday in which
6 Mr. Roberts uses the phrase with Mr. McCurry:
7 As expected, there has been an EEOC charge
8 filed by LaNitra Jeter.  Do you have any reason
9 or any explanation as to why Mr. Roberts might
10 have said as expected, there has been an EEOC
11 charge filed?
12    A.   No.  You can ask him when he comes
13 in why he would do that.  I don't know.
14    Q.   And I will.  But I want to ask
15 you, did you have any conversation prior to
16 LaNitra Jeter's filing an EEOC charge about the
17 possibility that there could be a lawsuit
18 arising out of these circumstances?
19    A.   Okay.  That's a separate question
20 from what you asked earlier.
21    Q.   That was the point of my asking it
22 separately.
23    A.   Okay.  All right.  The day she was

Page 224

1 terminated, one of the investigators that
2 escorted her out, LaNitra told her, she said I
3 guess I got terminated because I had filed a
4 complaint.  That's -- that's the only thing I
5 know until we saw the papers.  And I didn't --
6 didn't believe it.  I just thought it was just
7 something being said.
8    Q.   But whether you believed it or
9 not, it's something that Ms. Jeter immediately
10 said in the aftermath of her termination; is
11 that correct?
12    A.   Yes.
13    Q.   As far as you know before she had
14 a chance to talk to a lawyer, correct?
15    A.   I had no -- I mean, I don't know.
16    Q.   Okay.  So let's move ahead just a
17 little bit.  You learned that there is an EEOC
18 charge that's been filed you said around Easter
19 2020.  You said that you believed that Mr. Carr
20 sent out some kind of message about the EEOC
21 charge?
22    A.   Yes, that he sent saying that he
23 had gotten word a complaint had been filed.

Page 225

1    Q.   I saw an e-mail from you in which
2 you expressed my word would be disappointment
3 that Ms. Jeter had filed a charge.  And you are
4 nodding your head.  Tell me how you would
5 characterize your reaction to knowing that she
6 filed a charge?
7    A.   It wasn't necessarily the -- well,
8 I guess it was the content of the charge and
9 the things that were said that, one, were not
10 done in the spirit that she claimed, and I was
11 hurt and I was shocked, and that was why I
12 reacted that way.
13    Q.   Were you hurt and shocked by the
14 idea that an employee would accuse you of
15 discrimination?
16    A.   Yes.
17    Q.   Were you hurt and shocked by the
18 idea that an employee might suggest that you
19 treated them unfairly?
20    A.   Yes.
21    Q.   Going forward over the last couple
22 of years as this case has developed and moved
23 through the system, has Mr. Carr from what

1 you've observed made any changes to the
2 termination process for VSOs?
3     A.   No.
4     Q.   What do you consider to be the
5 termination process for VSOs?
6     A.   I don't know because that's not my
7 decision.
8     Q.   Well, my question was what do you
9 consider to be the termination process for
10 VSOs?  Are you saying you don't have any
11 knowledge of the process that is followed when
12 VSOs are terminated or to be terminated?
13     A.   Well, when you say process, what
14 are you -- what are you asking?  The process
15 for termination?  I mean, I'm not
16 understanding, I guess, the question and what
17 exactly you are wanting answered.
18     Q.   Well, what I'm wanting answered --
19 well, first of all, let's set the context that
20 the only VSO that has been fired is LaNitra
21 Jeter.  Is that fair?
22     A.   That's fair.
23     Q.   So it's not as if we have a large

1 body of work here.
2     A.   Right.
3     Q.   But with respect to Ms. Jeter's
4 termination, let's start with her March 16th,
5 2020, termination -- again, the only VSO that's
6 been terminated in twenty-six years -- what did
7 you understand needed to be done for a VSO to
8 be fired or terminated?  Was there a process
9 that you thought needed to be followed?  Were
10 there procedures that you thought needed to be
11 implemented?  Was there a protocol that you
12 thought needed to be carried out?
13     MR. RILEY:  Object to the form.
14     Q.   (BY MR. DAVIS:)  I'm trying
15 different ways of seeing if I can get your
16 understanding of what I'm asking.
17     A.   I think I understand the question,
18 I just don't think that I have an answer for
19 you because I think that unlike if we were a
20 merit system job, it would be different.  And,
21 you know, our -- with Mr. Carr, his theory has
22 always been, you know, let's try and maintain
23 employment for people, you know, and he's

1 always gone beyond what other -- other
2 employers might do.  So I think it's just
3 documenting egregious behavior would be my
4 process for terminating.
5     Q.   Let me show you a document that
6 comes from Plaintiff's Exhibit 2 that we
7 discussed yesterday, and I'll represent to you
8 that it comes from the policies and procedure
9 manual for VSOs.  And this is Bates stamped DA
10 000016.  Would you look at the section labeled
11 termination, Ms. Yates, and tell me when you've
12 found that?
13         (Whereupon, Plaintiff's Exhibit 2,
14         having been previously marked for
15         identification in the deposition
16         of Danny Carr, was referenced in
17         this deposition.)
18     A.   Okay.
19     Q.   Would you just read that sentence
20 into the record?
21     A.   Under termination?
22     Q.   Yes.
23     A.   All employees serve by appointment

1 of the OPS executive director and district
2 attorney and are subject to termination at
3 their discretion.
4     Q.   In March 2020, did you have any
5 conversation with the executive director of OPS
6 about LaNitra Jeter's possible termination?
7     A.   And what was the date?
8     Q.   Well, around the time she was
9 terminated.
10     A.   No, I did not.
11     Q.   Well, going beyond --
12     A.   Well, wait a minute.  I did.  I
13 don't remember the date.
14     Q.   Was it before her termination or
15 after her termination?
16     A.   It was before.
17     Q.   Who was the head of OPS?
18     A.   It was not OPS's executive
19 director.  And it's changed now, and I cannot
20 tell you the name of the person who is there
21 now.  Tamara Martin is over the grant, and
22 she's the one that I discussed the matter with.
23     Q.   Was she the executive director of

Page 230

1  OPS?
2      A.   No, she was not.
3      Q.   And why would you have discussed
4  the termination with the individual who was
5  over the grant?
6      A.   Because she knows the rules for
7  the grant, I wanted to make sure that we were
8  going to be -- that she was aware of what we
9  were going to do possibly.
10     Q.   What did you tell her, as best you
11 recall it?
12     A.   That she was an untrustworthy
13 employee based on the not -- you know, not
14 knowing where she was at times when she was
15 supposed to be working and the story that she
16 told about the mediation.
17     Q.   Did you have that -- and what's
18 this lady's name again?
19     A.   Tamara Martin.
20     Q.   Did you have that conversation
21 with Tamara Martin close in time to when any of
22 the incidents you just described happened?
23     A.   I was -- I can't recall when that

Page 231

1  conversation was because I would have to -- I
2  really -- we never had phone conversations very
3  often.  It was always the few times that we
4  ever saw each other in person.
5      Q.   Just to be clear, do you have any
6  recollection of talking with the head of OPS
7  about LaNitra Jeter's -- do you have any
8  recollection of talking with the head of OPS
9  about LaNitra Jeter's termination prior to
10 March 20th, 2020?
11     A.   No.
12     Q.   Or March 16th, 2020?
13     A.   No.  I never spoke to the
14 executive director and -- I did not I'll just
15 say.
16     Q.   Do you have any reason to think
17 that Joe Roberts did?
18     A.   I don't know.
19     Q.   Did Joe Roberts ever mention to
20 you in your conversations about Jeter that we
21 need to talk to OPS?
22     A.   I don't know.
23     Q.   Well, I'm asking, do you remember

Page 232

1  Joe Roberts ever having a discussion with you
2  about talking to OPS?
3      A.   Oh, with me?  No, I do not.  I'm
4  sorry, my mind was trying to get ahead of you,
5  I guess.  I'm sorry.
6      Q.   The purpose is not to figure out
7  where I am going, it's --
8      A.   I know.  It's to listen.
9      Q.   -- just to truthfully answer the
10 questions.
11     A.   I'm sorry.
12          MR. MURRILL:  Let him finish.
13          THE DEPONENT:  I am so sorry.
14     Q.   (BY MR. DAVIS:)  So, Ms. Yates,
15 how did you prepare for your deposition today?
16     A.   I really looked through some of my
17 documents and met with my attorneys.
18     Q.   Did you talk with Danny Carr about
19 your testimony today?
20     A.   No, I have not.
21     Q.   Did you talk to Joe Roberts
22 about your testimony today?
23     A.   I have not.

Page 233

1      Q.   When is the last time you talked
2  about this case with Danny Carr?
3      A.   I have never talked to this --
4  about this with Mr. Carr.
5      Q.   Have you ever talked about this
6  case with Joe Roberts?
7      A.   Not really other than, I mean, in
8  passing that oh, you're going -- an e-mail that
9  says oh, you're going to need to meet with our
10 attorneys and you are going to have to do a
11 deposition.  That's it.
12     Q.   And just to be clear, has
13 Mr. Roberts discussed with you in any way,
14 shape, or form any of the factual issues that
15 might come up during your deposition?  Has that
16 conversation happened in the last several
17 months?
18     A.   Oh, not at all, no, sir.
19          MR. DAVIS:  I have no further
20 questions.
21          MR. MURRILL:  Let's take two
22 minutes.
23          (Whereupon, a break was had from

59 (Pages 230 - 233)

Page 234

```
1        2:52 P.M. until 2:58 p.m.)
2        MR. MURRILL:  I have no questions.
3
4        FURTHER THE DEPONENT SAITH NOT
5
6    (Deposition concluded at 2:58 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

Page 235

```
1        C E R T I F I C A T E
2
3  STATE OF ALABAMA
4  JEFFERSON COUNTY
5
6        I hereby certify that the above
7  and foregoing deposition was taken down by me
8  in stenotype, and the questions and answers
9  thereto were reduced to computer print under my
10 supervision, and that the foregoing represents
11 a true and correct transcript of the testimony
12 given by said witness upon said proceedings.
13       I further certify that I am
14 neither of counsel nor of kin to the parties to
15 the action, nor am I in anywise interested in
16 the result of said cause.
17
18
19
20
21     ACCR LICENSE NO. 278 - Expires 9/30/2022
22     Transcript Certified On 2/16/2022
23
```

60 (Pages 234 - 235)

**&**

**&**   2:14 7:9

**0**

**000016**   228:10
**000338**   185:17,18
**01863**   1:5

**1**

**1**   57:22
**10**   3:20 5:15 209:1
**10:59**   85:4
**10th**   180:12 193:7
**11**   5:16 208:19
**11:00**   81:17 85:11
**11:17**   85:11
**11th**   221:5
**12**   5:17 208:14
**12:00**   134:5
**12:05**   135:1
**12:10**   135:7
**12:12**   135:1
**12:30**   134:12 135:5
**13**   5:18 208:16
  209:20
**13th**   14:21 200:17
  204:16,21 205:14
  205:19 206:7,17,21
  207:5,9,14,22
  211:7
**14**   5:19 208:17
  209:20
**15**   5:20 208:12
  209:5
**16**   5:21 213:7,8,10
**16th**   30:21 31:2
  107:16 227:4
  231:12
**17**   5:22 212:1,2,6
  212:10
**172**   3:16

**18**   3:9 4:11,14 38:3
  38:4,10 171:23
  184:22 185:5,18,20
  185:22 186:6
  220:12
**180**   3:19,22
**181**   4:4,7
**182**   4:10
**18410**   235:20
**18th**   183:1,15
  186:19
**19**   3:12 89:6,13
  102:19 104:3
  105:10,15
**199**   5:13
**1996**   16:17,18
  19:15 23:21
**19th**   89:7 183:16
**1:00**   134:7,10 135:4
  179:11,12 184:2

**2**

**2**   5:9 228:6,13
**2/16/2022**   235:22
**20**   3:16 26:19
  172:15,16,23 220:8
  222:1
**2018**   29:17,17
**2019**   3:10,17 4:11
  29:9 39:18 41:5,12
  41:16 43:21 44:2
  45:3,12 57:21 89:7
  99:3 102:3 107:13
  154:2,4,14 159:15
  159:16 163:18
  164:13 165:7,10,23
  170:6,12 171:4,22
  173:4 177:7,14,19
  178:1,4,11,16
  183:1,3,5 214:10
  214:17 216:4

**2020**   3:20,23 4:5,8
  26:14 28:6 30:9,21
  31:2 32:12 107:17
  124:18 180:12,23
  181:12 182:1,2
  188:8 193:7 200:17
  206:17 207:5,10,14
  217:17 219:10,14
  220:8 221:5 224:19
  227:5 229:4 231:10
  231:12
**2021**   20:22 26:12
**2022**   1:19 7:11
**209**   5:14,15,16,17
  5:18,19,20
**20th**   219:10,14
  231:10
**21**   3:19 180:1,2
  193:2,10
**212**   5:22
**2121**   124:21 125:2
  125:2,5
**213**   5:21
**218**   5:12
**22**   3:10,22 180:13
  180:18
**220**   5:11
**228**   5:9
**22nd**   39:18 41:5,12
  41:16 43:20 45:3
  45:12 46:1 125:4
  171:22 179:18
  183:3,5,9,20
  184:19 220:13
  221:10
**23**   3:17 4:4 181:3,4
**23rd**   99:21,22,23
  154:20 155:2,20
  158:16 159:16
  163:18,20 166:12
  169:16 172:21

  173:4 174:2,7,10
  179:6 184:7 186:16
**24**   4:7 181:13,18
  182:7 187:22
**24/7**   72:9
**25**   3:23 4:10 182:13
  182:18 186:22
**25th**   98:14 99:19
  99:20 166:15
  180:23
**26**   186:22
**278**   235:21
**29th**   16:17
**2:00**   126:1 184:2
**2:20**   1:5
**2:52**   234:1
**2:58**   234:1,6

**3**

**3**   1:19 5:10 7:11
  98:19,20
**30326**   2:8
**30th**   99:3 164:13
  165:7,10,23 166:19
  166:23 167:4,12,21
  168:5,6,11 169:17
  173:9,12 175:2,9
  178:7
**3355**   2:7
**35209**   2:16 7:10
**3530**   2:15 7:9
**38**   3:9
**3:00**   146:13

**4**

**4:30**   159:2

**5**

**5**   5:11 184:19 185:6
  185:17,20 186:1
  220:12,15
**5th**   215:5,9

**6**

**6**  5:12 218:19,20,21
220:8
**6th**  214:10 215:10

**7**

**7**  5:13 199:11,17,22
201:11 202:18
**7:00**  146:12 159:1
**7:30**  159:2
**7th**  188:8

**8**

**8**  3:4 4:8
**89**  3:12
**8th**  181:23

**9**

**9**  4:5 5:14 105:4
209:2,5,20
**9/19/2019**  3:14
**9/30/2022**  235:21
**90s**  22:19
**96**  23:19
**98**  5:10
**9:30**  7:12
**9th**  181:12

**a**

**a.m.**  7:12 85:11,11
**abilities**  82:4
**ability**  153:3,13,14
153:16,20 154:4
**able**  53:10 63:6
101:17 147:22
156:13 158:18
215:17
**abraham**  124:22
**absolutely**  9:1
82:11,17 100:21
102:14 150:15
172:4

**abuse**  141:2,8
142:3,19,20
**abused**  137:17,22
141:21 142:2,9,14
142:17,22 159:17
**abusing**  61:22 62:2
62:5 141:18
**aca**  1:5
**accepts**  24:9
**access**  108:12,16,20
**accessible**  170:3
**accommodate**
159:13
**accompaniment**
207:9
**accounts**  63:21
**accr**  235:21
**accruing**  215:17
**accurate**  17:8,10
23:20 48:15 59:18
68:16 69:6,8 70:20
118:13 155:2 187:8
**accurately**  149:16
**accusatory**  23:15
84:9
**accuse**  225:14
**acknowledge**
131:15
**acknowledging**
147:11
**acted**  86:10
**acting**  7:4
**action**  1:5 59:1
119:21 127:6
128:17 129:1
235:15
**actions**  50:10 84:9
**activities**  9:22
**acts**  23:2
**actual**  57:13

**add**  25:19 69:12
101:2 114:12
129:15 182:7,10
221:14,19
**added**  79:12
**addendum**  220:21
221:1,4,8,13,20
**additional**  215:14
**address**  81:4
165:17 215:15
219:20 220:3,4
**addressed**  164:21
164:22 165:14
**addresses**  71:11
**adjust**  159:12
**administrative**
24:5 56:6 106:4,9
**admit**  98:11
**admitted**  98:10
101:13
**adopted**  170:2
**adult**  15:20
**advance**  77:10
146:10,15 149:7
**advanced**  138:4
196:8
**advancing**  212:22
**affect**  192:14,15
**affirmed**  7:18
**african**  20:11 21:3
21:9 22:17,18 23:2
23:11 25:12,15,21
26:1 34:4
**aftermath**  224:10
**afternoon**  121:9
126:2 145:7 146:12
**age**  187:20
**agency**  63:6 64:5
**agent**  115:7,13,17
115:22,23 116:23
117:21 118:4 119:3

120:23
**ago**  11:15 17:18
18:12,12 25:18
49:6,8,9 51:18
102:2 170:4
**agree**  20:23 22:8
30:10,18 35:10
38:12 39:23 42:17
54:12 67:2 96:14
107:15,19 128:12
136:12 145:21
149:11 171:20
173:2 176:1 180:6
180:18 181:8,18
182:18 183:18
185:1,12,13 186:21
200:18 210:11,16
212:6,15 213:15
214:3,11 219:9,12
219:16,19 220:13
**agreed**  6:2 23:3
175:16
**agreeing**  12:10
188:8
**ahead**  40:7 52:12
53:7 69:9 76:10
77:3 129:23 148:18
224:16 232:4
**alabama**  1:2 2:16
7:2,3,10 9:7 15:11
16:10 17:21 22:2
64:1 235:3
**alaysia**  20:19,20
27:15 33:12
**allegation**  110:20
175:3
**allegations**  201:11
219:8
**alleged**  93:5 100:12
101:13 104:14
107:9 114:23

120:19 142:22 164:16
**allegedly** 133:8
**allow** 113:21 114:5 143:17 144:21 146:10
**allowances** 159:7
**allowed** 13:16 68:13 73:21 83:23 111:23 144:2 159:12
**allowing** 152:10
**alluded** 76:19
**altered** 159:2
**altogether** 144:7
**american** 20:11 21:3,9 22:17,18 23:2,11 26:1 34:4
**americans** 25:12,15 25:21
**amount** 127:15,15 127:18
**ann** 8:12
**answer** 13:10,12 24:15 36:3,6,6,17 37:1,8,11,15 46:9 47:10 48:17 56:15 58:1 66:7 67:20,22 68:1,14 69:5,13,22 83:15,19 90:14,20 91:9,20,23 93:12 100:6,11 103:16 114:3,13 129:22 133:16,22 139:9 141:13,20 142:12 153:4 162:19 168:3 169:2 172:2 175:18 196:1,6,20 198:2,6 198:7 216:9 227:18 232:9

**answered** 26:8 37:5 37:13 39:1 86:12 113:20 141:6 226:17,18
**answering** 66:10 89:19 90:13,17 91:4 101:4,4 139:3
**answers** 71:2 157:16,17 235:8
**anybody** 13:19 14:17 48:4 61:5 78:2 88:19 130:10 148:7 194:17
**anymore** 75:17 159:1
**anyway** 146:1
**anywise** 235:15
**apologize** 54:8 89:20 110:17 133:6 136:1,5
**appear** 46:3,7 141:1
**appears** 59:15 210:18 212:6 219:12
**application** 63:5 64:3
**applied** 25:21
**applies** 57:1,3
**appointment** 77:3 146:9 158:22 159:5 159:9 228:23
**appointments** 158:20 159:6,13
**approach** 84:4
**approaching** 179:10
**appropriate** 27:2 79:17 84:11
**approval** 25:15 209:23 210:4,8

**approve** 138:7
**approved** 138:10 188:14 210:3
**approximate** 218:6
**approximately** 7:12 158:7 160:14
**april** 16:17 159:15 160:4 170:7,9,12 175:15 177:7 178:10 218:8,9
**area** 192:23
**argued** 197:6
**arising** 223:18
**arrangements** 63:10
**arrested** 87:15
**articulated** 33:21
**artur** 2:4 8:20 37:13 67:13 68:1 81:14 90:3 91:3 114:3
**aside** 81:22 101:23 215:16
**asked** 22:22 35:19 36:21 38:23 45:17 49:18 66:15 67:12 86:17 88:10,21 92:23 93:13 96:23 97:2,10 109:5 110:17,18 115:11 121:16,19,20 125:9 125:11 127:10 138:18,23 140:20 144:11 146:10 157:8 165:16 187:6 188:9,16 189:2 199:18,23 200:5 201:17,18 202:10 203:10,20 221:8 223:20

**asking** 12:10 26:3,4 37:14 44:22 46:15 48:8 88:14 94:1 105:16 114:2 115:6 137:20 139:5 140:17,22 143:1 153:12,23 170:13 194:12 203:7,16,18 204:7 212:16 214:23 223:21 226:14 227:16 231:23
**asks** 202:6
**asleep** 72:21 110:13,21 112:10 112:14,21 113:9
**assault** 88:18
**assaulting** 87:15
**assemble** 205:22 206:2 207:7 208:1
**asset** 82:2 194:19
**assign** 6:18
**assigned** 58:17 112:6
**assignment** 42:12
**assignments** 42:5 42:17 43:6
**assist** 62:20 63:6 64:3,8 70:19 84:14
**assistant** 15:17
**associations** 14:15
**assume** 57:2 67:2 155:1
**assumed** 115:21
**assumption** 46:19
**atlanta** 2:8 149:5 193:22
**attached** 89:15 172:18 180:4,15 181:6,15 182:15

**attempt** 12:7 140:7
**attempted** 147:13
**attend** 187:3,7,11
  188:11 189:12,14
  189:22 190:2 192:5
  194:2
**attendance** 58:13
  58:14 66:17,18,21
  81:21,21 83:3,4
  85:17,21 186:20
  209:20 210:12
  211:2,9
**attended** 191:17
**attendees** 190:16
**attending** 189:1
  191:8 192:9,13
**attention** 71:22
  156:17 176:7,13,18
  177:1 218:14
**attire** 72:10
**attorney** 1:11 2:5
  8:15 15:14 229:2
**attorney's** 9:8,17
  10:21 15:18 16:15
  17:20 210:1
**attorneys** 2:6,13
  15:6,19 232:17
  233:10
**august** 20:22 26:14
  26:18 28:7 178:4
**authority** 41:4
  123:22 152:15
**available** 189:11,15
  189:17,19
**avoid** 49:23
**aware** 9:3,12,14
  21:20 32:13 34:13
  34:17,22 35:14,17
  35:18 40:1 41:18
  43:7,10 50:22 51:2
  75:5,8 79:21

111:14,16,20 124:4
124:8 129:3 230:8
**awfully** 147:3

**b**

**baby** 25:4,5 76:2
**back** 24:14 45:23
  55:4 66:12 67:12
  67:19 69:21 77:13
  81:5 88:22 90:7,10
  90:20 93:14 120:6
  122:1,1 125:3,5,5,6
  130:10 156:13,15
  157:23 158:4 173:6
  179:16 203:7 214:8
  216:6 219:4 221:6
  221:23
**background** 14:1
  14:15 16:14 24:23
**backtrack** 58:7
**bad** 84:12
**bailiff** 87:9 113:5,9
**ballpark** 18:11,13
  19:18 95:12 116:11
  160:23
**barber** 24:18 49:18
**barefield** 29:6,7
  30:1 75:14,20 76:4
  76:13 188:13,23
**barefield's** 29:14
**base** 76:23
**based** 119:21 127:7
  128:17 163:10
  194:9 230:13
**basically** 64:7
**basing** 58:10
**basis** 111:22
  132:13 196:5
**bates** 185:10,16,17
  228:9
**bathroom** 135:9

**beginning** 14:3
  36:9 59:21 184:6
**behavior** 51:3 52:6
  52:23 72:10 73:4
  110:11 114:8 195:2
  228:3
**belabor** 192:22
**belief** 101:22 102:2
  102:6
**believe** 16:18 21:14
  26:14 29:8,12,18
  29:22 30:22 40:14
  41:11,15 45:3,12
  53:8,23 66:15
  69:22 72:16 83:22
  85:14 86:3,4,5,9
  91:21 96:22 102:9
  111:8 118:17,22
  121:6 124:12,17
  125:13 126:20
  130:10 131:10
  132:6 133:10 134:1
  136:9 167:1,1
  170:14 176:23
  190:8 193:1 203:8
  203:14 206:5 208:5
  212:19 213:2
  222:16,19 223:3
  224:6
**believed** 98:8 119:3
  215:20 223:1 224:8
  224:19
**believing** 87:12
**belong** 14:17
**bessemer** 97:5
**best** 18:13 32:19
  62:15,16 71:2
  153:1,23 168:3
  206:10 222:3
  230:10

**better** 56:10 96:9
  116:23 137:4 142:3
  155:5 165:5
**beyond** 211:7
  228:1 229:11
**big** 208:22
**biggest** 21:21 22:1
  22:11,13
**birmingham** 2:16
  7:2,10 14:7 15:12
  15:21 16:2 21:20
  21:21 22:10,16
  190:5
**bit** 14:15 42:14
  55:5 87:11 100:15
  122:2 134:4 148:20
  186:15 224:17
**black** 25:6 27:15
  44:10,13 115:16
  116:21 117:18,22
  118:14 121:20
  124:19 188:13
  189:1 195:9,17
  196:22 197:3
  200:23
**black's** 118:9
**blount** 15:17
**board** 121:10
**body** 227:1
**bomb** 126:9
**bothersome** 54:8
**bottle** 135:17
**bottom** 88:17
**boulevard** 124:22
**braves** 149:5
**break** 83:2 85:5,10
  85:13 115:9 126:7
  134:10,12,21,22,23
  135:4,10 144:6,9
  144:14,22 145:6,7
  145:8,12,16,18,20

179:14 183:23
184:1 233:23
**breaks** 37:23
145:10 169:8
**brian** 8:21
**bring** 63:11 71:21
116:4
**bringing** 75:10
76:6
**broader** 122:18
**brother** 111:18,19
**brothers** 15:23
16:1
**brought** 75:14
156:17
**bucket** 139:12
**buckets** 137:8
**build** 88:22 146:6
161:14 162:8,13
**building** 75:22
116:22 118:19
119:13 124:22
125:2,3,6,16 126:2
126:9 127:14,19,21
128:22 161:10
**built** 24:12
**bullet** 200:19,22
201:3
**bunch** 75:4
**business** 117:13
125:12,22 126:3,5
134:11 149:10,11
**busy** 105:13 121:19
152:8,8

**c**

**c** 2:1 235:1,1
**calculates** 59:23
**calendar** 30:7
**call** 61:13 84:14
95:3 112:8,12
119:9 185:19

**called** 9:10 55:13
71:5 113:5,9 115:5
121:15 220:12
**calm** 82:6
**calmed** 87:10
**candidate** 27:1
33:13,18
**candidates** 32:15
32:19,22 33:20
**candidly** 196:21
**capacity** 1:11 9:10
**capture** 11:16
**captured** 164:19
**car** 130:8,9,10,18
**care** 25:5 77:11
196:21
**career** 191:21
192:2
**carla** 27:16 33:8
**carr** 1:10 5:5 9:9
9:11,15 13:1,20
17:4 22:22 26:23
27:9,20 28:2,5 29:3
29:13,16,19,20,23
30:3,6,23 31:5,15
31:21 32:4 33:3
41:10,13,22 42:4,7
42:10,15 56:23
59:13 62:13 72:9
72:13 74:4,7 78:20
79:1,3,16,20,21
82:20 89:8 98:23
99:4 102:15 103:1
103:3 104:11,13,19
104:22 105:3,11,15
119:16 123:10
126:23 127:2
132:16 142:8,13,16
161:17 164:13,21
165:2,5,6,9,15,17
166:6 167:13

169:15,16 170:8,13
170:19 171:2
199:14 202:20
204:15,21,23 205:4
205:11,12,18,22
206:6 209:7 211:19
212:12 213:12
216:11 217:17,19
219:1 220:2,7,18
224:19 225:23
227:21 228:16
232:18 233:2,4
**carr's** 33:21 168:23
169:1 170:2 220:4
**carried** 227:12
**carry** 19:7,11
**cars** 190:21
**case** 9:11 11:13
13:15 14:7 57:1
64:10 83:23 85:19
86:19 93:2 95:6
146:7 189:9 193:23
194:2 218:15
225:22 233:2,6
**cases** 15:6 62:8,11
97:3 138:5 189:5
**casual** 205:9
**catch** 176:6,13,18
177:1 201:9
**categories** 52:21
**category** 121:2
133:11 142:1
**caught** 218:14
**cause** 7:13 63:15
235:16
**caused** 113:13
**cc'd** 89:9
**cell** 159:23
**center** 188:1 190:3
**certain** 52:22 58:16
58:19 126:10 138:2

149:15,17 150:17
155:10
**certainly** 23:3
142:21 187:12
**certified** 1:23 6:6
7:1 235:22
**certify** 7:4 235:6,13
**chain** 39:14 41:9
44:12 78:19 79:1
79:10,13,19 80:1
80:12 81:11 165:12
170:1 183:8 192:21
**chair** 87:10
**challenge** 21:16,18
22:19 154:21
**challenging** 11:19
**chance** 66:19 81:20
110:5 139:12
224:14
**change** 24:15 51:2
66:7 141:20 199:8
**changed** 108:9
229:19
**changes** 226:1
**characteristics**
64:13
**characterization**
50:1 198:20 199:5
210:16
**characterize**
201:15 213:20
225:5
**charge** 30:8,14
34:11 44:17 217:15
222:8,21 223:7,11
223:16 224:18,21
225:3,6,8
**charged** 193:21
**check** 37:22 63:12
**cheryl** 25:5 27:15
44:10,13,14,20

115:16 116:21
117:18,22 118:14
121:20 124:19
188:12 189:1 195:9
195:17 196:22
197:3
**chief** 202:6
**child** 75:10 76:6
146:8
**children** 15:20
75:16 76:1,2
**choice** 33:9,10
**chose** 190:22
**christian** 16:9
**chunk** 160:19
**church** 14:13,18
16:4,9
**circumstance** 10:9
**circumstances**
82:14 223:18
**cite** 72:15 114:10
**cited** 85:20
**city** 21:20,21 22:1
22:11,16
**civic** 16:12
**civil** 1:5 7:6 15:5,19
95:18,23 97:4
**civilly** 63:22
**claimed** 225:10
**clarification** 19:19
**clarified** 136:18
**clarify** 38:22 39:3
67:19,21
**clear** 17:14 25:11
29:16,20 34:9 40:1
43:4 48:11 100:15
107:8 109:10 118:5
119:23 128:16
136:18 149:1 151:4
155:19 163:9
204:18 216:10

231:5 233:12
**clearly** 94:10
**clerk** 12:4 112:12
**clock** 115:20
117:15 144:23
145:19,19
**clocked** 125:10
**close** 8:22 42:3
183:2 230:21
**closed** 121:23
**closely** 171:8
**colleagues** 108:17
**combination**
142:10
**combine** 145:9
**come** 43:1 51:14
73:9 77:13 79:15
80:21 81:7 90:6,10
90:20 91:7 146:10
146:12 159:4 169:7
201:18 233:15
**comes** 64:1 125:3,5
125:6 223:12 228:6
228:8
**comfortable**
165:21
**coming** 51:11 80:18
159:1
**command** 39:14
41:10 44:12 78:19
79:1,10,14,19 80:1
80:13 81:12 165:12
170:1 183:8 192:21
**commencing** 7:11
**commission** 64:2
217:16
**commissioner** 6:6
7:4
**commits** 55:21
**communicate**
65:19

**communicated**
135:3
**communication**
170:12 178:10
179:18
**communicator**
64:15 67:8 70:1
**community** 15:21
16:2 21:11 23:10
125:14
**comp** 59:23 62:2
80:21 100:5 117:2
126:7 136:11,14,16
137:5 141:11,15
142:10 143:4,6,13
143:16,18 144:1,3
144:8,14,17 145:17
146:3,6,22 148:1,7
148:22 149:3,4,6,9
149:16,18 150:6,12
150:13,19 151:6,7
151:10 152:1,6,10
152:17,23 153:6,7
153:16,20 154:5,7
154:15 155:8,22
156:10,22,23
157:19 158:14,17
158:18 159:3,17,21
160:16,17 161:5,10
161:19 162:8,13
163:10 164:15
167:13 194:6 207:7
207:12,17,18 208:2
208:7 210:14 211:3
211:15 215:17
**company** 58:18
**compassionate**
64:19 70:5,9,13
**compensation** 64:1
**competent** 60:13
81:23

**compiling** 71:13,18
**complained** 35:1
49:13 167:13
**complaining** 45:13
45:18 46:2 47:12
47:17
**complaint** 34:15,21
35:4,13,20 40:2
41:13,17 42:15
45:4 183:11 218:1
224:4,23
**complaints** 48:22
179:19,19
**complete** 12:6
114:3
**completely** 196:5
**compliance** 6:11
**complicated**
145:22 147:3,7
**complies** 221:7
**computer** 51:19
71:5 235:9
**concern** 87:13
136:13
**concerned** 102:1
**concerns** 48:3 61:1
**concluded** 234:6
**condemn** 84:11
**conduct** 49:23 72:5
110:15 121:3 133:9
133:12 195:2
**conducting** 117:13
**conference** 87:7
188:22
**confident** 57:23
165:21
**confront** 122:10,17
**confrontation**
100:19
**congressional** 16:8

consequences
  56:12
consider   60:12,15
  60:18 171:2 226:4
  226:9
considered   92:5
  144:2
consistently   177:15
  177:20 178:18
constructive
  162:22
consultant   15:4
contact   95:20
contacts   87:22
contained   57:9
  201:10
containing   211:15
contends   114:8
content   225:8
context   192:18
  204:1,7 207:22
  226:19
continue   13:7
continuing   4:1 5:1
conversation   12:1
  32:3 55:6 66:20
  92:17 93:23 94:4
  99:13,17 109:8,11
  109:15,17 118:18
  119:12 127:7 155:2
  155:20 156:20
  160:6 163:17
  164:15 170:4 173:3
  174:8 184:7 204:15
  204:23 205:5 211:1
  214:23 215:4,8
  216:7 223:15 229:5
  230:20 231:1
  233:16
conversations
  13:13,16,19 158:11

231:2,20
convicted   63:3
coordinator   73:2
  111:7,9,10
coordinator's   73:5
copied   99:5 219:17
copy   89:15 172:18
  180:4,15 181:6,15
  182:15
core   67:6
corporations   55:10
correct   8:13 18:19
  18:20,22,23 19:2,3
  19:6 20:16,17 21:5
  21:22 22:2,11,14
  23:12 24:7,13,14
  25:18,19 26:15
  28:8,9,12,13 29:17
  31:2 34:5 38:16,19
  38:20,21 39:21
  47:20,21 49:16
  50:23 51:20,21
  52:7 55:2 57:10,11
  67:6 71:1,2 76:7,8
  80:8,9 92:19 94:3
  95:21 96:1,2,16
  97:18,19 100:17
  102:16,22 107:13
  107:18,21 109:12
  109:13,15 117:4,19
  117:23 118:7,8,10
  118:11 123:13
  124:3 128:5 131:9
  131:16 132:1
  136:21,22 137:1,5
  137:6 144:15
  145:13 147:13
  150:21 152:18
  154:15,16 157:2,5
  157:7,20,21 158:1
  158:2 163:7 164:1

164:2,22,23 165:15
  166:12,16,20,21
  169:18,19,21
  171:18 183:3
  184:17 185:7,14
  187:9,13,16 192:3
  202:16 210:10
  214:1,2 215:5,6
  220:5 224:11,14
  235:11
corrected   193:20
  198:14
corrective   52:22
correctly   66:10
  95:1 110:12 152:5
correspondence
  105:16
counsel   4:15 6:4,15
  6:17 7:8 8:21 38:7
  68:20 84:19 91:14
  161:8 162:10,16,20
  184:8 235:14
counseled   56:1
counseling   82:4
counselor   25:3
count   80:16 133:6
  133:7
country   15:9
counts   27:16,23
  28:3 32:22 33:9
county   1:12 8:16
  9:16,22,23 10:21
  15:17 16:10 18:18
  21:7,14,22 22:23
  23:22 49:1 52:15
  55:18 56:17 59:5,8
  59:16,19 75:18,20
  76:5 95:12 96:5,8
  97:8,11 143:6
  217:10 235:4

couple   29:1 78:22
  178:21 190:19
  203:8 225:21
course   35:12 97:17
  132:22 135:8 203:9
court   1:1,23 6:6,12
  7:2,7,23 11:19 63:8
  72:7,20 73:1 86:19
  87:1 92:15 95:21
  96:1,16 97:5,7,11
  121:15 125:20
  184:9 193:17,22
  194:2
courthouse   115:17
  115:20 116:3 125:7
  126:6
courtroom   73:1
  87:22 110:21
  111:12 112:1,3,10
  112:14,21 113:2,6
  113:10,14 115:19
  116:2 120:19 121:8
  121:12,23 122:9
  125:20
cover   75:3 100:2
  179:13
covered   74:22 75:2
  193:1
covering   148:17
covid   60:9
coworkers   72:6
create   177:6
  198:18
created   126:11
credibility   130:20
credit   129:20
crime   64:1
crimes   23:8 62:20
  62:22 63:4
criminal   15:6,19
  23:2 62:21 64:8,16

95:18,20 96:16
**cullman** 16:10
**current** 27:14
**currently** 22:16
**custody** 10:11 87:3
**cv** 1:5

**d**

**d** 28:18
**da** 15:17 24:3,9,13
24:19 29:17,20,23
30:3 31:21 35:2
40:21 44:17 49:13
49:17 82:5 121:15
202:6 228:9
**da's** 9:22,23 13:1
13:22 17:23 18:18
35:3 40:21,22 44:2
48:5,13 49:1 52:15
55:18 56:17 59:5
88:6 130:15 136:19
137:8,11 143:7
149:3,11 200:20
217:11 219:9,16,20
**danny** 1:10 5:5
9:11 31:15 41:13
41:21 44:16 74:4
79:20 82:20 89:8
98:23 99:4 104:13
104:19,22 105:3,11
105:15 119:16
123:10 126:23
132:16 142:8,13,16
161:17 166:6
167:13 169:16
170:13 199:14
203:22 204:15,21
206:6 209:7 212:12
213:12 216:11
217:21 219:1 220:4
220:7,18 228:16
232:18 233:2

**das** 24:18 44:8
62:20 121:11
**data** 76:23
**database** 71:8
138:6
**date** 7:5 20:21 29:1
39:12 73:12 93:1,4
93:5 99:16 116:9
120:6 124:17,19
162:15 179:22
180:11,22 181:11
181:22 182:10,23
193:6 200:16
214:10 218:6,7,9
219:9 221:1,3
229:7,13
**dated** 3:10,13,17
3:20,23 4:5,8,11
89:7 99:3 164:11
164:13 166:23
167:3,11,21 168:5
168:10 175:2 182:4
**dates** 154:20
172:11
**daughter** 75:15
**davis** 2:4 3:4 8:3,5
8:20 22:6 30:13
35:8,18 36:2,8,13
36:16,20 37:1,7,10
37:14,18 45:16,22
46:6,9,13 53:9 54:6
54:11 66:14 67:14
67:21 68:4,9,15,19
69:1,6,8,10 76:12
81:16,18 85:3,8,12
90:6,10,14,21
91:13,17 96:19
101:10 103:13,19
114:6,9 119:10
133:15,21 134:20
135:2 139:5 141:10

151:1 156:4 157:6
163:15 167:17
172:2 183:23 184:3
184:16,23 185:11
185:12 186:3,8
196:2 197:1,9,13
197:17 198:1,4,10
199:1,7 200:8
208:23 213:19
227:14 232:14
233:19
**day** 44:17 58:15
59:21 75:11 77:7
86:20 88:1,17,22
93:15,17 94:2,15
94:17 95:2 96:23
112:4 113:14 115:4
121:6,8 122:8
125:9 137:14
138:13,13,13,14
139:15,19 140:4
150:13 151:11,12
151:18 152:17
158:23 171:22
188:23 189:4
201:23,23 202:4,11
202:13,15 214:21
219:13 223:23
**days** 77:13,17 88:9
139:18,20 140:2,8
140:11,15 160:15
163:23 168:9,13,15
183:21
**ddas** 63:14
**deal** 86:15 97:17
189:5
**dealing** 186:19
203:21
**deals** 57:16 58:3
89:4

**dealt** 83:22 88:7
**december** 14:21
74:22 120:15
**decide** 91:10
221:12
**decision** 24:19
25:14 27:3,13
32:17 103:23 104:9
104:10,11 134:15
134:17 171:10
226:7
**decisions** 23:17
84:13
**decline** 187:13
**declined** 187:7
**defendant** 1:13
2:10 9:11,15
**defer** 190:13
**define** 160:3
**deliverables** 67:4
**demeanor** 72:10
**demographics** 21:7
**demonstrated**
100:22
**demonstrating**
100:23,23
**denied** 119:4 153:2
189:16
**deny** 152:23 153:13
153:16,19
**denying** 117:20
**department** 15:11
15:15
**departure** 31:6,17
**depend** 54:22
**depending** 33:8
58:22 96:10 191:20
192:2
**depends** 42:18
139:16

**deponent** 36:1,7,23
40:5 66:11 103:12
103:18 198:6,8
232:13 234:4
**deposition** 1:16 5:5
5:6 6:4,9,10,19
8:18 10:4,7 67:15
67:16 91:6 98:22
99:1 136:1 196:6
199:13,15 209:7,8
212:12,13 213:12
213:13 218:23
219:2,6 220:17,19
228:15,17 232:15
233:11,15 234:6
235:7
**depositions** 6:13
11:6 196:11,17
**deputy** 24:3,9,13
35:2 44:8,17 62:20
202:6
**describe** 13:13
55:17 201:7,9,12
**described** 56:19
67:5 71:14,19
73:10 74:4,9 82:14
84:17 99:17 105:22
111:8 116:16
122:20 123:1
126:17,21 131:1,13
133:2 194:10
230:22
**describes** 57:17
89:23 99:13 174:7
**describing** 89:23
104:18 166:18
207:17
**description** 67:6
186:22
**designated** 18:2

**desk** 159:23
**destroyed** 88:21
**detail** 86:1 186:17
214:5
**details** 50:9 60:19
64:7
**determine** 37:23
**detrimental** 194:15
**developed** 136:13
136:13 225:22
**diabetic** 111:14,17
111:19
**diabetics** 111:20
**different** 17:23
24:18 33:4 79:8
86:21 88:15 108:5
112:6 137:7 190:23
196:9 218:4 227:15
227:20
**difficult** 147:8,11
**direct** 42:11 45:23
**directed** 51:6 206:9
**directly** 74:6,18
79:4,20 86:15
**director** 15:12 17:5
17:11 18:2 229:1,5
229:19,23 231:14
**disagree** 21:16
154:21
**disagreeing** 12:11
**disappointment**
225:2
**disciplinary** 52:21
57:17 59:1 119:20
129:1
**discipline** 55:14,15
55:19 57:17 58:4
123:15,22 124:2,5
192:20
**disciplined** 56:5
123:19

**discovers** 87:23
**discovery** 196:9
**discretion** 191:20
192:2 194:5 229:3
**discretionary**
152:1,6,10
**discrimination**
10:16 34:15,21
217:15 222:21
225:15
**discuss** 104:3,5,13
105:20 122:19
165:4,6,9 166:2
202:20 203:22
216:11,16
**discussed** 98:17
104:22 158:8,16
165:13 173:15,18
228:7 229:22 230:3
233:13
**discussing** 106:4
107:11 211:9,14
**discussion** 32:3
104:7 150:11
154:20 232:1
**discussions** 54:1
**dishonest** 215:21
**dishonesty** 119:11
**disruption** 113:13
**distinction** 96:13
96:13
**district** 1:1,2,11 7:6
8:15 9:8,17 10:21
15:17 16:15 17:20
125:20 210:1 229:1
**division** 1:3
**doctor** 138:22
215:8
**doctor's** 77:2 146:9
158:19

**doctors** 159:6
**document** 3:13
37:19,21 38:9,13
54:4 55:1 58:3,5
60:23 61:5,10
63:23 70:18 78:7
89:3,5,11,22 91:19
91:22 98:16 99:2,7
99:21 106:18
147:23 154:19
172:5,22 174:15
175:3,9 177:6,13
177:18,23 178:3,6
184:10,18,21
189:14,19 199:18
200:13 213:6 219:7
219:10,17,21
220:10 221:9,20
222:1 228:5
**documentation**
63:1,2,5 71:4
104:18 106:20
167:5
**documented**
163:11
**documenting** 162:6
228:3
**documents** 53:14
53:15 54:5,7 59:12
71:13,18,23 100:16
147:21 184:14
185:1,14 196:8,12
196:14 205:13,18
205:21 206:1,20
207:3,17 208:10
209:10,13 210:12
210:17,21 211:3,4
211:9,15 218:15
232:17
**doing** 36:14 49:11
51:18 62:13 65:12

[doing - established]

67:15 75:4,7 76:20
76:20 78:17,17
84:2 85:1 89:20
114:7 117:12
121:20 124:9
125:18,21 146:16
151:13 160:1
162:16,22 215:1
**dollars** 63:22
**domestic** 10:12
41:1 83:23 86:19
92:15 186:20 187:3
187:11 188:21
189:5 191:16
**door** 138:20 193:15
**doorways** 169:9
**dot** 200:23
**double** 38:1 153:12
**driskill** 28:14,15,22
30:4 188:13 189:1
**driskill's** 29:4
**drive** 2:15 7:10
130:19 190:6,17,21
190:22
**driven** 190:12
**driving** 130:5,7
191:2
**drug** 87:7
**due** 63:7 203:14
**duly** 7:18
**duties** 60:1 138:17

**e**

**e** 2:1,1,11 28:21,21
39:12 40:8,17
78:22 79:9 105:16
138:9 175:2,10
183:6 205:12
209:23 213:15
214:3 215:9 217:20
219:19 220:3,4
223:5 225:1 233:8

235:1,1
**eager** 143:4
**earlier** 38:23 86:11
90:1 110:18 120:4
120:8 164:11
169:23 220:12
221:21 223:20
**early** 73:15 116:12
132:7 159:4
**earn** 137:14 140:15
145:16 146:19
149:6,16,17 150:8
150:18 151:5,10
152:10 153:13,10
153:20 154:5,7,14
155:8,15,21 156:10
157:11,12,19
158:18 159:3 161:5
**earned** 149:3
151:15,17
**earning** 150:6,13
158:1,5,14 159:20
159:21 160:17
**easier** 12:17
**easily** 169:20
**easter** 217:17 218:1
218:4,10,10,12
224:18
**eat** 111:21
**eating** 72:21
111:11 113:1,6
120:18
**eavesdropping**
109:10
**edged** 153:12
**eeoc** 30:8,14 34:11
154:19 219:7,13
222:8 223:7,10,16
224:17,20
**effect** 6:10 9:15
18:2 119:6 156:21

161:23 163:1,3
171:8 178:1,4,7
211:22
**effort** 202:12
**egregious** 88:8
228:3
**eight** 21:15 137:15
**either** 90:15 104:9
115:2,10 124:13
183:20
**element** 152:1,6
**eleven** 85:21
**eligibility** 192:14
192:16
**elise** 28:15,19,20,21
188:6,13,23
**ellie** 1:22 6:5 7:1
**else's** 47:1
**emergencies**
138:11 143:21
**empathy** 82:13
**emphatic** 205:1
**emphatically**
204:20,22
**employed** 15:2
130:3 143:19
216:17
**employee** 49:21,21
51:9 55:21 56:1
59:16 88:5 138:8
139:21 140:4
175:20,22 176:10
178:12,17 195:21
199:9 225:14,18
230:13
**employee's** 59:17
191:20,21 192:1,2
**employees** 48:2
56:20,21 57:10
58:4 59:7,20
126:13 138:3 143:8

146:23 194:23
195:6 228:23
**employers** 55:11
228:2
**employment** 2:6
10:16 55:8 120:13
194:16 217:16
227:23
**encourage** 70:23
**encouraged** 121:12
146:5 149:19,22
**ended** 155:13 216:2
**engaged** 85:14
110:10
**engaging** 52:6
**english** 12:5
**ensley** 23:9
**entered** 71:8
**entering** 71:4,9
**entire** 48:14 53:16
101:14
**entirely** 23:11
**entities** 55:10 58:11
58:12,14
**entity** 18:4
**envision** 134:5
**episode** 73:20 74:1
74:3,8 84:17,20
187:16
**equal** 217:16
**erin** 28:14 29:6
75:14,20 76:4
188:13,23
**escalating** 56:12
**escorted** 224:2
**especially** 143:18
**essence** 204:5
**essentially** 89:22
91:23 117:3 149:10
**established** 217:9

**estate** 115:6,13,17
  115:22,23 116:22
  118:4 120:23
**estimate** 19:18
  153:1
**evaluation** 65:9
**evaluations** 65:4
**events** 98:4
**eventually** 179:3,5
**everybody** 77:6
  79:3 139:14
**evidence** 6:20
**evidently** 79:11
**ex** 100:19
**exact** 18:10 20:21
  29:1 60:2 78:14
  80:15
**exactly** 12:9 50:2
  62:16 88:12 92:21
  117:5 226:17
**examination** 3:1,4
  7:13 8:5
**examinations** 15:5
  15:13
**example** 48:7 86:6
**examples** 72:15
  86:2 110:5,9 114:7
  141:12,18
**exceeded** 58:19,22
**excellent** 82:12
**exception** 13:8,10
  192:4
**exceptions** 196:16
**exchange** 198:17
**exchanges** 212:5
**excuses** 212:22
  213:3
**executive** 229:1,5
  229:18,23 231:14
**exhibit** 3:9,12,16
  3:19,22 4:4,7,10,14

5:9,10,11,12,13,14
5:15,16,17,18,19
5:20,21,22 37:22
38:3,4,10 57:22
72:4 89:6,13 98:18
98:19,20 102:19
104:3 171:23
172:15,16,23 180:1
180:2,13,18 181:3
181:4,13,18 182:5
182:13,18 184:10
184:19,21 185:5,6
185:17,18,19,22
186:6 187:19,21
193:2,8 199:11,17
199:22 201:11
202:18 208:12,14
208:15,17,19 209:1
209:2,18,20 212:1
212:1,6,9 213:7,8,9
218:19,20,21 220:8
220:11,15 228:6,13
**exhibits** 3:6 4:1 5:1
  5:3 38:1 209:4
**expanded** 18:18
  19:2
**expectation** 13:8,9
**expected** 223:7,10
**expecting** 83:20
**expenses** 63:8
**expires** 235:21
**explain** 79:2 90:19
  143:15,16 146:1
  147:8,9,12,13
  150:3,4 158:15
  163:7 167:8
**explained** 31:21
  36:9 148:11 163:1
  163:3
**explaining** 64:16
  173:19

**explanation** 147:15
  167:20 223:9
**explore** 97:22
**expressed** 225:2
**extent** 197:6
**extra** 137:4
**extraordinary**
  175:14
**eyesight** 187:20

**f**

**f** 235:1
**fabricated** 102:4
**fabricating** 102:12
  212:21 213:3
**fabrication** 100:13
  104:15 107:10
  115:1 120:20
  164:16
**face** 119:9 124:21
**fact** 31:15 32:4
  57:7 102:18 116:23
  131:2,5,20 160:18
  162:6 164:11 166:2
  175:1 192:19 196:7
  198:12 199:4 214:9
  214:15
**factors** 85:21
**facts** 50:8,10
  100:17 103:22
**factual** 233:14
**fair** 12:19 24:10,11
  49:23 50:22 51:4
  52:10 69:19,20
  96:7,12 135:11,12
  148:15 150:14
  157:13,13 160:11
  160:12 163:12,15
  164:18 176:8,14,15
  176:19 177:2 186:1
  186:3,21 197:9
  198:20 199:5 201:1

210:6 226:21,22
**fairfield** 23:9
**fairly** 39:15 47:5
  111:21 179:20
  183:9,12
**fairness** 68:2 114:4
**faith** 202:12
**fall** 28:7 102:3
  218:4
**falling** 72:21
  110:12,20 112:21
  113:9
**falls** 110:14
**familiar** 80:4
**familiarity** 96:15
**family** 10:13 14:11
  14:16 97:4,5,7,11
  188:1 190:3
**far** 21:21 63:11
  64:10 118:15 134:7
  165:18 190:8,9
  224:13
**fashion** 188:4
  205:13
**fashioned** 172:11
**fast** 11:5
**fax** 49:10
**february** 1:19 3:23
  7:11 124:18 180:23
  188:8
**federal** 7:5 17:18
**feedback** 65:12
**feel** 57:22 135:10
  189:18
**fell** 112:9,14
**fellow** 207:19
**felt** 40:10,19 78:13
  79:4 102:2 110:11
**female** 33:22,23
  34:5 49:4 115:23
  116:1

**fifteen** 18:12 85:5
107:11 108:2,6
128:2,5 144:5
145:6,7,9
**fifth** 124:11
**fifty** 21:15 135:9
**figure** 121:13
184:17 232:6
**figured** 14:12
**file** 38:13,21 40:16
46:1 50:13,15
52:16 53:2,16
63:15 71:6 74:12
123:12 132:23
133:1 161:12
171:14,18 172:10
172:13,20 173:3
174:2,6,9 179:21
180:7,8,12,19,19
181:2,9,19 182:4
182:19 183:19
184:20 186:18
187:16,22 188:5
192:18 193:2,12
195:1,4,6,8,9,16
197:3 206:4,6,11
220:14 222:12,17
222:20
**filed** 9:3,4 30:9,14
34:11 64:5 154:19
217:15 222:8 223:8
223:11 224:3,18,23
225:3,6
**filemaker** 71:5
**files** 71:7 195:21
**filing** 55:9 223:16
**fill** 64:2
**filling** 70:19
**final** 24:19 25:14
27:3 32:10,17

**finally** 88:14
**find** 32:7 98:18
120:6
**fine** 8:2 20:6 54:10
67:17 69:3,7 81:17
85:6,7,9 133:18
135:5,6 185:8
**finish** 68:14 69:4
90:20 114:16 140:1
152:4 175:7 191:23
206:23 232:12
**finished** 66:6 91:13
126:14 130:21
146:18 147:1
**fire** 73:19 103:7,9
103:21 126:10
171:10
**firearms** 15:4,7,13
186:20 187:4,11
**fired** 74:1 104:4,7
104:14,23 105:12
105:18 107:16
226:20 227:8
**first** 7:17 8:11 10:3
10:15,19 28:17,20
33:9 39:5,10,11
51:12 69:17 70:19
79:15 86:16 87:13
87:16 92:12 101:11
125:11,22 129:19
129:21 143:18
146:5 148:10
150:11 151:11
156:17 162:7,11
179:2 189:22 193:6
212:3 226:19
**fit** 32:20 121:2
**fits** 133:10
**five** 15:10 18:12,14
18:16,21 19:1,4
63:22 64:13 65:3

81:15 129:8 133:6
134:17,21 168:13
168:15 187:20
**fix** 215:15
**fjc** 188:7
**floor** 121:21 169:3
169:4
**fly** 62:10
**focus** 100:3,12
**focused** 197:20
**folks** 13:17,21
19:18
**follow** 11:8 63:14
63:17 68:7,10
78:23 79:10 87:21
91:1 157:17
**followed** 226:11
227:9
**following** 5:3 7:14
52:21 79:11
**follows** 7:20 58:15
**force** 6:10
**foregoing** 7:7 235:7
235:10
**foremost** 69:17
**forensic** 15:3,11
**forget** 58:9
**forgot** 173:8
**form** 6:16 10:22
30:11 35:5,16,22
37:3 40:4 43:10
45:15,20 46:4,8
53:6 61:17 76:9
96:17 102:15,22
108:21 119:7 141:9
147:16 150:23
156:2 157:4 163:13
167:15 172:1 197:5
227:13 233:14
**formal** 17:5

**formally** 8:19 24:4
**forms** 62:23 71:2
**formulation** 177:11
**fortunate** 25:8
**forty** 146:3 173:21
174:11,18 175:4
176:5,13,18,22
177:9,10,15,21
178:13,18
**forward** 31:21
185:19 225:21
**forwarded** 39:12
183:6
**found** 93:14 215:14
228:12
**foundationless**
196:5
**four** 18:7 20:12,13
22:17 24:18 25:20
33:11 54:21 64:13
65:1 93:23 102:2
120:12 124:11
187:21 190:6
193:19 217:22
**fourth** 33:12 56:8
**frame** 60:9
**frankly** 102:1
**fraudulent** 215:21
**free** 57:22 114:13
135:10 196:18
**friday** 189:3
**friendly** 170:2
**front** 89:11 116:9
164:12 174:3,4,16
183:19 186:10
209:10,13 210:9,12
210:17 211:4
**full** 6:11 8:10
**funding** 18:4
**funeral** 63:8

**further** 154:7
233:19 234:4
235:13

**g**

**garner** 13:15,17
**gee** 47:3
**general** 21:10 78:3
202:2,5
**generally** 23:15
**generate** 54:5
**generated** 53:14,15
54:4,7 210:3
**gentlemen** 134:9
**georgia** 2:8
**getting** 28:15
116:18 133:19
135:15,18 191:3
222:3
**give** 18:11,13 19:17
24:22 32:20 42:11
42:17 43:5 48:7
65:4,8,11 66:19,19
69:16 86:3 95:11
103:22 106:20
110:5 116:11
129:20 138:4
139:11 141:18
152:23 160:21,23
162:17 167:19
176:12 205:23
207:16 209:17
**given** 56:7 129:23
140:10,14 235:12
**giving** 86:2
**glasses** 219:23
**go** 16:5 24:14 40:7
41:9 44:12,15,15
44:16 53:7 55:4
63:8 67:12,19 69:9
69:21 76:10 77:3
79:4,16 81:5,10,14

87:15 114:11 120:6
121:12,20 125:8,17
125:19 129:23
134:11,11 135:4
137:10 146:9
148:18 149:4
165:20 179:16
188:7,9,10,14,15
189:2,12 190:23
191:10 193:16
204:4
**goal** 199:8
**goes** 124:23 125:2,3
125:5 134:8 169:9
191:12
**going** 8:18 14:8,9
21:18 26:11 31:10
31:15,21,22 32:4,7
35:6 37:18,20 38:2
38:8 43:2 44:23
50:12 51:13 52:16
55:22 59:13 67:18
68:19 69:11,11
77:1,5,7,11,16 79:1
79:7,19 80:20,20
81:12,20 83:3,18
85:15 87:14 88:22
90:6,19,21 91:4,5,6
91:8,9 96:13 98:16
100:4,7,9 109:20
110:7 113:21 114:7
118:3 121:7,16,17
121:17 125:14
126:4 134:6,8,14
134:16,17,18 139:8
139:11 140:18
141:17 144:13,16
152:16 157:23
160:3 166:6 168:2
172:9,14 173:13
179:21,23 180:17

181:1,2 182:3
185:18 187:18
188:12 191:6
193:16,18 194:7
196:3 197:4,5
199:16 203:15
205:10 208:9,10,18
211:7,22 212:4
214:9 216:6 221:23
222:12,17,20
225:21 229:11
230:8,9 232:7
233:8,9,10
**good** 8:6,8 55:6
62:12 64:14,15
67:8 70:1 130:1
194:18 202:12
**goodness** 87:14
**gotten** 96:20 117:1
199:20 224:23
**government** 17:18
51:19,19 55:10
**grabbed** 87:6
**grant** 17:9,10,13,18
18:3 19:2 25:9 57:4
57:8 65:7 192:5,14
192:16 229:21
230:5,7
**granted** 170:15,18
170:22
**granting** 210:8
**great** 82:2 186:16
215:2 218:11
**ground** 11:4 12:20
87:8 91:7
**grounds** 6:18
201:16
**group** 20:8 191:14
**groups** 16:12
**grove** 16:8

**guess** 23:13 26:12
96:10 120:10 121:7
217:21 224:3 225:8
226:16 232:5
**guessed** 95:17
**guessing** 26:11
203:17
**guidance** 58:21
**guideposts** 11:7
**guilty** 63:3
**gun** 130:9
**guy** 170:3

**h**

**half** 91:9 138:13
144:7 145:1,11
146:4 190:6,11
**halfway** 135:17
**hall** 169:6
**hallway** 169:5,10
169:12
**hanceville** 16:9
**hand** 186:10
208:13,15,16,18,20
219:4
**handcuffed** 87:9
**handled** 87:17
202:22
**handling** 84:20
**hands** 208:21
**happen** 21:6 23:8
55:23 94:15 97:6
116:8 131:5,6
138:11 218:3
**happened** 18:1,10
74:13,17,20 87:19
88:11 94:1,17
117:6 120:1 130:13
131:2,4 132:7
169:21 171:21
183:20 230:22
233:16

**happens**  11:19
138:12 163:18
166:11,12,15
**happy**  35:8 46:13
57:20 68:4,9 90:10
104:1 114:9 134:8
134:11 197:18
**hard**  11:5 42:15
**head**  138:19 183:14
193:15 225:4
229:17 231:6,8
**headed**  179:17
**health**  82:7,10
**hear**  12:18 14:22
109:20
**heard**  12:12 13:4
55:14 74:4,9 93:13
109:9 129:21
**hearing**  11:14
110:1
**hearings**  63:9,18
63:18
**held**  25:16 216:10
216:15
**help**  64:2 81:5 82:6
**helpful**  191:16
**hereto**  89:16
172:19 180:5,16
181:7,16 182:16
**hey**  205:4
**higher**  35:2
**hire**  25:1,9 26:1,22
27:7,10 28:11 29:4
29:14 33:8,11 49:7
195:3
**hired**  15:5 19:15
20:1,2,20 23:19,23
24:22 25:5,12,14
25:18,22 26:10,21
27:4,17,23 28:14
28:22 29:1,7,21

30:1,4 33:14
143:17,22 175:21
195:5
**hires**  24:4,10 28:6
30:6,23
**hiring**  23:17 24:19
27:21 28:3 31:6,10
31:16,22 32:5
**history**  48:12
**hit**  130:11 176:16
176:21
**hkm**  2:6
**home**  25:4
**hone**  97:20
**honest**  52:1
**honestly**  49:6
**hour**  144:4,5,7,10
144:23 145:1,2,2
145:11,19 146:1,2
146:4 151:15,16
173:21 175:4 176:5
176:13,18,22 177:9
177:10,15,21
178:13,18 190:6
**hours**  8:19 69:15
76:3 117:15 137:4
137:15 146:3 170:4
174:11,18 193:19
**hr**  210:1
**huh**  12:2 48:16
52:8 56:14 66:22
131:17 166:13
175:17
**huntsville**  22:4
**hurt**  225:11,13,17
**husband**  10:10
11:14 14:20 15:1
87:2 93:10 97:4
100:20 130:5,6
131:14,15

**husband's**  86:19
94:6 130:16 131:8
**hypothetically**
54:21

**i**

**idea**  41:23 46:22
56:9 127:20 170:16
208:8 212:23 215:7
223:2 225:14,18
**identical**  185:1,14
**identification**  5:4
38:5 89:14 98:22
172:17 180:3,14
181:5,14 182:14
199:13 209:6
212:11 213:11
218:23 220:17
228:15
**illegal**  149:12
**immediately**  151:6
224:9
**implemented**
227:11
**implication**  54:3
**implications**  107:6
**important**  11:15
57:8 62:11 64:13
152:13 158:17
**imprecise**  122:18
**inadvertently**  12:7
12:14 13:11
**inappropriate**  84:6
**incarcerated**  63:21
**incident**  74:13,17
74:20 86:17 92:8
100:14 102:4,16,22
103:2,5 104:19
105:22 106:5,13,16
107:1,10 108:1,5,9
108:13,17,22
110:13,17 111:2,6

112:4 113:17
114:22,23 116:6,7
116:20 117:9
119:21 120:1,9,20
122:11,19,23 123:4
123:6,9,16,19
124:7 126:16,20,21
127:8,13 128:18,21
129:5 131:2,14,21
132:4,6,11,14,17
132:20 133:2
194:10 205:9
**incidents**  115:1
120:18 132:23
133:8 195:12
201:14,18 203:21
230:22
**include**  66:8
111:11
**includes**  13:20,20
13:21
**including**  95:18
210:13
**income**  63:7
**incorrect**  22:3
26:13 196:20
**independence**  2:15
7:10
**index**  3:1,6 4:1 5:1
**indicated**  17:4
199:19
**indicating**  100:1
117:20 168:18
206:9 209:16
219:21
**individual**  49:15
230:4
**individuals**  19:20
19:22 47:17 111:1
**information**  49:11
63:17,23 64:2 71:8

71:11 73:10 206:15
206:20 207:3
**infraction**  55:21
**initial**  16:19 143:14
  156:19
**initially**  155:14
  221:9
**injuries**  63:7
**input**  82:8
**inside**  210:4
**instance**  49:3,14
  71:16 112:2 153:5
**instances**  82:9
  85:13 86:4,8
  110:19 129:8 136:8
**instruct**  195:23
  196:19
**instructions**  52:22
**intend**  69:15
**interact**  41:21
  43:13 95:8
**interacted**  42:16
  43:22 44:1,3,6,7,8
  44:21
**interaction**  71:10
  86:6 98:5
**interest**  96:11
  192:3
**interested**  26:2
  69:17 188:12 191:6
  191:8 235:15
**interesting**  97:21
**interposed**  196:12
  196:14
**interrupt**  12:8
  114:19
**interrupted**  150:2
**interrupting**  36:12
  89:18
**interruption**  69:23

**interstate**  130:7
**interview**  32:10,14
  32:18 143:15
  148:12,13,16,16
  195:4
**interviewed**  27:1,4
**introduce**  8:20
**invasive**  14:5
  214:13,16
**investigators**  224:1
**involved**  15:7
  23:17 31:5,7,10,12
  31:16,18,22 32:4,8
  32:14 63:19 86:18
  86:21,23 97:3
  107:7
**involves**  10:20
  87:11
**involving**  93:10
  94:3,13 97:3 109:9
  111:6 114:22,23
  115:2 131:14
  195:12,16
**issue**  71:22 84:21
  87:3 100:1,5 117:3
  138:16 157:14
  198:15
**issued**  64:10
**issues**  78:12 81:21
  82:7,10 83:3,4
  85:17 97:4 100:2,4
  127:11 136:10,14
  200:14 201:18
  202:20 203:14
  214:5 215:14
  233:14
**items**  205:14,18

## j

**jackson**  2:14 7:9
  59:15,15 60:12,15
  60:18,23 61:5,12

61:16,21 62:1,4
  162:3 206:15 210:7
**jackson's**  60:2
**james**  2:11
**january**  3:20 4:5,8
  180:12 181:12,23
  193:7
**jay**  36:4,6 184:16
  195:18
**jefferson**  1:12 8:16
  9:16,22,23 10:21
  18:18 21:7,14,22
  22:23 23:21 49:1
  52:15 55:18 56:17
  59:5 95:12 96:5,8
  97:7,11 143:6
  217:10 235:4
**jeopardized**  107:5
**jeopardy**  107:1
**jeter**  1:7 2:19 8:22
  8:23 9:2 20:16 21:1
  25:1,23 28:12 29:2
  29:11,20 30:9
  34:20 35:1,10,13
  39:20 40:2 41:4,7
  41:12,16,19 43:6
  43:13,16,23 44:1
  45:4,13 47:12 48:2
  48:19 52:14,20
  53:5,18,21 60:21
  61:1,6,18,22 62:2,5
  65:8,20 67:2,8
  69:23 70:5,8,11
  71:12 72:16 73:19
  73:23 74:16 77:18
  77:22 78:7 79:18
  79:23 80:12 81:10
  81:19,23 83:6,16
  84:16,19 85:14
  86:9 89:10 93:6,10
  93:19 94:3,13,20

95:7 96:20 98:3,11
  99:5,14 100:13,18
  101:13 102:3 103:8
  104:4,7,14,22
  105:12,17,21 106:4
  106:12,19,23
  107:16 108:4 109:5
  110:10 112:20
  113:1,5,9,13
  116:21 117:8 118:7
  118:16 119:11
  122:10,13,16,20,22
  123:3,15 124:13
  128:21 131:11
  132:4 137:16,22
  139:20 140:2 141:2
  141:18 142:2,5,9
  142:14,17 143:9
  147:13 148:6,11
  150:11 152:15,21
  154:13,18 156:21
  158:10,15 159:15
  159:17 160:15
  161:8,14,19 162:7
  162:10 163:21
  166:7,10,11,14
  167:12 171:3,8,15
  171:18 173:4 174:8
  174:10,17 175:4
  177:8 179:20 180:7
  180:8,20 181:9,20
  182:21 183:10
  187:6,23 188:9
  189:20 190:2 191:6
  192:8,12 193:13
  194:9 198:18
  200:15 207:8,18,23
  208:2 210:13,15,22
  211:21 212:8,21
  213:16,23 214:4,15
  215:12,20 216:16

216:23 217:14
222:17,20 223:8
224:9 225:3 226:21
231:20
**jeter's** 27:10 30:14
31:6,17 43:9 53:16
66:16 73:15 95:19
96:14 107:22
118:10 136:14
154:4 163:10
186:19 200:19
204:8,11 211:13
216:7,12 219:6
222:7,11 223:16
227:3 229:6 231:7
231:9
**job** 16:19 25:21
26:2 49:11 60:2,13
60:16 62:9,12,19
65:16,22 66:16
67:1,3,6 73:22
82:13 83:6 84:2
85:18 103:9,10,21
107:1,6,22 108:8
124:5 125:18
148:12,16 192:7
227:20
**jobs** 59:17
**joe** 17:11 35:20
39:10,12 41:17
44:15 74:9 75:15
75:19 79:14,16
82:23 87:18 89:8
99:5 104:2,12
119:18 123:7 124:3
124:8 127:3,6
128:16,21,23
132:19 161:23
165:12 166:22
167:2,10,19 168:4
171:7,13 183:6

188:14 202:17
208:1,6 210:20
211:2,10,14 216:7
216:11,15 222:6,10
222:23 231:17,19
232:1,21 233:6
**joe's** 169:8
**join** 101:6
**joining** 21:1
**joke** 101:14
**jones** 121:21
**jr** 2:11,12
**judge** 12:3,4 13:3
14:17 86:23 87:22
92:9,13,14,18,22
93:8,16 94:11,11
94:14 95:3,5,6,8,23
96:1,21 97:1,2 98:3
100:14 109:4,14,18
109:21 110:1 112:3
112:8,20 113:1
120:20 121:8,11,15
121:18,21,22,22
122:14
**judge's** 112:12
125:20
**judges** 72:22 95:11
95:21 96:5,8,16
97:2,7,11 112:7
**judy** 1:18 6:5 7:12
7:16 8:12 14:13
38:18 61:13 148:6
171:8 178:12,17
181:19 182:19
**july** 178:1
**june** 177:19
**junior** 60:6
**jury** 14:6,8,11,16
**justice** 62:21 64:8
64:16 188:1 190:3

**juvenile** 111:19

**k**

**k** 28:18
**keep** 59:17 134:8
192:7
**kept** 87:4 88:13
189:15 194:23
**kill** 130:18
**kin** 235:14
**kind** 14:3 27:9 73:9
100:15 105:16
130:13 175:13
183:2 194:1 201:4
222:20 224:20
**kinds** 136:19
**kireem** 131:8,11
**knew** 83:21 84:1
94:13 97:1 109:14
162:15
**know** 8:9 12:5,9
14:11,11,14,18
26:7 30:12,14 31:4
42:4,13,18,21
43:19,22 44:11,11
45:6,7,21 46:10
48:3,20 52:2 53:20
57:19 58:1 59:8,9
60:3,4,9,10,11 61:8
67:10 70:23 71:15
71:16 75:3,9,11,16
75:23 76:14 77:2,4
77:6,10 79:2,5,7,8
79:15 80:4,5,10,15
84:3,6,7 87:11
88:15,16,21 90:18
91:12 93:22 95:3
95:13,16,17 96:4
96:11,19 97:6
100:16,17,22
104:16 105:5 109:1
109:3 110:19 112:2

115:11 117:11
118:15 120:1 122:6
122:7 125:10,11,15
125:17,23,23 126:3
126:4,5,8,11
127:20,21 128:13
128:14 129:2
130:12,17 131:1,3
131:12 133:3
135:11,15 138:11
138:21,21 146:15
146:22 156:14
162:14,22 167:7,23
168:2,8,19,21
169:2,5 170:19,23
171:5 183:10
191:11 193:17
194:4,7,12,17
196:7 201:5 202:1
202:1 203:16 204:4
204:20 210:23
216:2,8,14,18
217:8,20,20 218:7
218:9 220:7,9
222:23 223:13
224:5,13,15 226:6
227:21,22,23
230:13 231:18,22
232:8
**knowing** 118:12
225:5 230:14
**knowledge** 34:14
34:20,23 41:21
42:6,10 43:5,8,12
43:15,18 47:22
56:18 58:6 59:4
61:4 71:3 79:18,23
104:12 106:8
128:20 191:5
210:20 226:11

**known** 72:22 96:9
  111:17 137:4
**knows** 76:1 230:6

**l**

**l** 6:1 28:18,18,21
**lab** 15:12
**label** 106:18 182:5
**labeled** 228:10
**lady** 8:22 25:16,17
  217:11
**lady's** 230:18
**language** 12:5
  37:21
**lanitra** 1:7 2:19
  8:22 21:1 41:4,7
  43:23 45:4,12 46:2
  47:12,16 48:19
  52:13,20 53:5,18
  53:21 60:21 61:1,6
  61:13,18 81:11,22
  83:6 87:5,20,23
  89:10 93:10 94:3
  94:13 95:5,7 99:5
  99:14 102:3 104:4
  104:7,13 105:11,17
  105:21 119:5 122:4
  122:5 124:23 125:1
  139:20 140:2 141:2
  148:6 150:11 153:6
  155:21 156:21,22
  160:15 161:13,18
  166:7 167:12
  169:15 171:8,15
  175:4 177:7,14,19
  180:7,8,20 181:9
  181:20 182:21
  188:9 189:2,4,7,8
  207:8 210:13,15,22
  212:8,20 213:16
  216:12,15,23 222:7
  222:11,12 223:8,16

224:2 226:20 229:6
  231:7,9
**lanitra's** 169:13
**lapse** 107:20
**large** 7:4 23:6
  226:23
**largely** 23:11
**largest** 22:4
**late** 73:16
**latina** 33:23 34:2
**law** 2:5,13 7:8 9:6
  12:4 15:23 16:1
  63:19
**laws** 6:11
**lawsuit** 9:3,4,16
  10:1,17,20 54:22
  222:12,17 223:17
**lawsuits** 55:9
**lawyer** 13:15,18
  62:12 224:14
**lawyers** 12:23,23
  13:6 14:2 37:8
  53:10 54:4 69:18
  90:23 100:10
  101:17 113:22
  135:2 147:22
  197:20 200:5
**lays** 219:8
**leading** 6:16
**leap** 52:12
**learn** 217:14
**learned** 183:10
  224:17
**leave** 56:7 61:22
  78:9,12 100:5
  106:5,9 117:2
  125:16 134:7,14
  136:11,15,21
  141:10 142:1,6,17
  142:20,21 146:13
  210:14 211:3,15

**leaving** 83:11 126:2
  126:5
**left** 25:2,3 116:22
  127:21
**legitimate** 146:22
**length** 35:11 118:2
  208:11
**lenox** 2:7
**letter** 49:20 50:4
  63:4
**letters** 62:23
**letting** 67:16 75:11
  217:20,20,21
**liable** 75:21
**liaison** 62:19
**liar** 119:9
**license** 235:21
**lied** 98:10,12
  118:15
**life** 111:17
**light** 31:5
**lights** 121:23
**limit** 108:12,16,20
**limited** 19:9
**limits** 148:20 151:7
**line** 88:17 179:16
**lines** 194:21
**lisa's** 63:19
**list** 64:6 114:11
  200:19 201:4
  203:20 207:7,12
  208:2,6
**listed** 173:14 201:8
  205:14 219:20
  220:4
**listen** 92:17 232:8
**listening** 157:16
**literally** 11:10,11
  11:21 26:7 85:3
  157:16 170:20
  200:22

**little** 9:6 14:14
  42:14 55:5 100:15
  122:2 128:5 134:4
  148:20 186:15
  224:17
**live** 15:21 16:2
  63:10
**living** 21:11
**load** 19:7,11
**located** 168:23
  169:1
**location** 126:11
**lockhart** 44:20
**long** 8:14 17:7
  23:16 49:8,9 60:7
  69:13 128:8,13,15
  130:4 139:17
  149:12 151:20
  155:12 158:13
  192:6 193:17,19
**longer** 154:14
  155:8,10
**look** 12:16 15:6
  46:14 57:20 79:6
  89:11,21 99:6
  133:14 172:3 174:1
  200:9 212:2 228:10
**looked** 121:10
  124:23 184:14
  218:15 232:16
**looking** 19:23
**looks** 58:18
**loss** 63:7
**losses** 63:1,7 64:4
**lot** 11:4 12:17 23:8
  55:12,19 62:10
  85:16 95:17 135:13
  135:19 148:17
  196:4
**loud** 56:15

lucy   27:16 33:9
lunch   115:9 126:7
    134:9 144:5 145:3
    145:8,12,20 146:2
    146:13 150:7 159:5
    162:18,23 184:1
lunchtime   144:4,17
    144:22
lying   119:6

**m**

ma'am   39:11
    106:21 173:10
    198:2 209:3 219:5
mail   39:12 40:8,17
    79:9 105:16 138:9
    175:2,10 183:6
    205:12 213:15
    214:3 215:9 217:20
    219:19 220:3,4
    223:5 225:1 233:8
mails   78:22 209:23
maintain   71:7
    195:7,8 227:22
maintained   195:9
major   102:13
majority   24:21
    176:23 178:12
making   45:4 84:6,8
    101:14 102:12
    171:14 189:15
management   35:3
manager   17:6
manner   61:17
    72:12 84:5 86:10
    138:1 141:16
manual   57:1,3,10
    57:14,15 228:9
march   29:9 30:9,20
    31:1 107:16 120:15
    200:17 204:16,21
    205:14,19 206:7,16

206:21 207:4,9,14
207:22 211:7 218:8
219:10,14 220:8
221:5 222:1 227:4
229:4 231:10,12
mark   12:12 15:4
    172:14
marked   5:4 38:5
    89:14 98:21 172:17
    180:3,14 181:5,14
    182:14 184:18,21
    199:12 209:6
    212:10 213:10
    218:22 220:16
    228:14
marks   15:7,13
marquetta   93:7,11
    94:7
married   14:19
    28:23
martin   229:21
    230:19,21
matches   59:6
math   17:1
mathematical
    120:14
matter   9:18 10:13
    13:14 131:4 148:7
    202:22 229:22
may's   121:8,11,15
    121:22
mc   51:14
mccurry   44:19
    80:17 81:12 87:16
    88:10 89:9 92:11
    92:18,21 93:3,8
    94:1 98:9,12 99:6
    99:18 107:4 109:19
    109:20 156:14,16
    158:12 163:19,23
    164:4,5 166:15

173:16 178:16,20
206:19 207:2
213:22 214:1,4
215:9,19 223:6
mean   21:8 23:14
    49:20 54:7 60:10
    64:5 70:16 72:2
    81:2 100:23 106:17
    114:18 115:19
    118:21 120:12
    150:1 169:11
    170:23 171:6 188:3
    203:15 224:15
    226:15 233:7
meaning   154:9
means   13:5 72:9
media   88:4
mediation   86:18,23
    88:1,1,18 93:6,9,17
    93:18 94:2,8,9,12
    94:14,18 100:13,20
    230:16
mediator   87:1,2
    93:1,4,13,17 94:23
medical   211:23
    212:17,22 213:3
    214:5
meet   115:7,12
    116:22 118:3
    126:10 170:13
    233:9
meeting   32:3 35:19
    42:2 43:16 52:2,4
    74:21 75:1,2 77:22
    78:2,21 79:13
    87:20 93:15 98:4
    98:14 107:5 116:1
    116:3 117:2 118:7
    118:18 119:12
    120:21 125:14,19
    158:16 163:19

165:19 166:10,11
166:14 187:3
188:22,23 216:10
216:15
meetings   65:15,18
    166:19 168:1
member   8:14 16:12
memo   3:10,17,20
    3:23 4:5,8,11 31:20
    37:19 38:13,15
    39:16,23 42:22
    43:21 45:23 46:1,3
    46:5,7,14 47:9,11
    47:15,20 49:21
    50:7,9,11,14 56:4
    60:23 75:9 78:7
    80:8 81:1 85:19
    89:7 99:4,8,12,17
    102:15,21 104:3,17
    105:3,10,15 123:12
    127:10 133:1,14,19
    147:16 148:6
    161:12,17,22 162:2
    164:10,19 165:2,4
    165:6,14,18,22
    166:8,18,23 167:3
    167:11,20,23 168:5
    168:10,15 171:1,23
    172:13,20 173:2,9
    173:12 174:1,6,9
    175:2 178:7,15,21
    180:6,7,12,19
    181:1,8,19 182:4
    182:18 183:5,21
    184:8,19 186:18
    187:15,22 188:4,19
    193:2,6,12 195:16
    197:2 202:6 203:4
    204:7,11,16,21
    205:15,19 206:7,16
    206:21 207:4,9,14

207:22 211:8
214:10 220:13,22
**memory** 47:1,2
84:23 222:1
**memos** 52:16,19
53:1 172:10 179:21
186:10 192:18
195:1 206:3,5
**mendoza** 27:16,17
27:21 32:22 33:9
34:2
**mental** 82:7,10
**mention** 231:19
**mentioned** 40:10
45:11 110:9,23
133:19 151:5
169:23 184:8 200:1
205:19
**merit** 56:21 227:20
**message** 70:12 78:7
170:11 217:23
224:20
**messages** 211:20
212:20
**met** 88:10 98:9
115:17 169:15
232:17
**meticulous** 60:19
64:21 70:17,18
71:9,12,17
**meticulousness**
70:16
**metric** 70:15
**michael** 44:18
80:17 87:16,19,21
88:9 89:9 92:10
98:9 99:6 107:4
156:14,16 158:12
173:15,18 178:16
178:20 213:22,23
214:4

**mid** 91:11
**middle** 8:11 73:16
90:13,17 116:12
**mike** 81:12
**mind** 199:7 232:4
**mine** 124:6
**mini** 190:19
**minivan** 191:4
**minute** 14:13 85:5
90:14 113:18
134:21 138:15
144:6,9,22 145:6,7
145:9,16,18 190:13
195:3 229:12
**minutes** 81:15 85:7
85:8 107:3,11
108:2,6 125:4
128:3,5 134:17
135:9 145:20
233:22
**missing** 128:22
**mistake** 51:3
**mistaken** 98:2
**mistakenly** 220:12
**modified** 108:8
**moment** 13:9 52:13
52:17 66:19 81:22
100:3 116:8 120:3
129:12,23 134:1
136:10 193:4
218:14
**monday** 168:13
**month** 26:9,15
29:10 107:20 127:9
137:15,15 139:15
139:18,19 140:5,8
140:11,16 160:13
161:3,4,9,13,18
162:11 176:1,11,21
177:8

**months** 25:18 29:2
120:13 149:15,17
150:18 160:11
162:7 171:9 175:16
175:23 176:1,16
177:14,20 178:21
214:14,16 216:3
221:20 233:17
**morning** 8:6 35:12
115:7 145:6
**motion** 63:15
**motive** 155:7
**motives** 26:4
203:17
**mountain** 16:8
**move** 58:8 141:23
143:3 224:16
**moved** 225:22
**multiple** 102:5
**murrell** 93:7
**murrill** 2:11 8:2
13:14,18 22:3
30:11 35:5,16,22
36:14 37:3 40:4,6
45:15,20 46:4,8,11
53:6 54:2,10 66:5
68:2,6 76:9 85:6
96:17 101:8 111:9
134:16 139:3 141:9
157:4 163:13
167:15 172:1 185:8
186:4,5 195:20
196:7 197:4,21
198:3,7 208:21
213:17 232:12
233:21 234:2
**myles** 20:19,20
25:23 26:10,21
27:7,16,19 32:23
33:12 34:5,7,11,15

**mystery** 120:22

**n**

**n** 2:1 6:1
**name** 8:10,11,11,11
8:20 16:7 28:17,20
40:10 49:5,7 51:10
51:10,12,13,14
59:14 73:6 87:3
93:7 94:6,8 96:20
97:10,14 98:3
111:1,3 122:14
131:8 170:8 229:20
230:18
**named** 9:10,15
45:2
**names** 62:10 96:4
**nashville** 187:23
188:7 190:2,5
**natural** 13:12
**ne** 2:7
**necessarily** 169:17
225:7
**necessary** 6:14
**need** 63:11 69:13
77:5 79:6 80:21
90:18 110:3 126:5
126:6,8 134:18
135:9,10 138:12
143:20 146:7,8
152:18 189:18
193:3 215:16,18
231:21 233:9
**needed** 15:8 52:6
75:5,7 78:16
151:21,22 159:4,5
159:9,14 162:22
178:23 189:9,10
202:22 203:5
214:16 227:7,9,10
227:12

needing 214:13
needs 72:12
negative 198:19
neighborhoods
 23:9
neither 235:14
never 43:3 45:6
 61:9 74:6 80:22
 81:3 88:7 93:18
 94:12 118:15
 143:11 153:2
 159:10 163:11
 216:1 231:2,13
 233:3
news 218:11
nice 79:3
night 88:4 217:17
 218:2,11
nitra 39:12 122:1,2
 154:11 183:6
noble 8:21 14:9
 53:12,14 147:22
nodding 225:4
nonlawyer 13:5
nonprofessionali...
 129:9
nonprofits 55:11
northern 1:2
notary 1:23 6:7 7:3
note 4:14 56:3
 74:12 82:16 133:1
 174:20 183:19
noted 101:18 198:5
notes 132:23
 171:14,17,21
 206:11
notice 58:21 78:9
 138:4 154:7 176:7
 176:16 215:23
noticed 56:2

notify 126:23 127:3
 192:8
notifying 63:19
novel 129:23
november 3:10
 4:11 39:18 41:5,12
 41:16 43:20 44:2
 45:3,12 46:1 80:8
 171:22 172:7
 179:18 183:1,3,5,9
 183:15,16,20 184:7
 184:19 186:19
 214:10,17 215:5
 216:3 220:13
 221:10
number 11:14
 18:17,21 19:19,22
 23:4 38:3 47:17
 53:12 58:16,18,20
 58:22,23 89:6 92:8
 98:19 102:19 105:4
 129:8 132:22
 149:15,17 150:18
 160:21 172:15,23
 180:1,18 181:3,18
 182:6 185:10,16,17
 185:20,20 186:22
 193:8 199:17,22
 208:14,17,19 209:1
 209:2,18 212:1
 218:19,20 220:11
numbers 26:5 71:1

**o**

o 6:1
object 30:11 35:5
 35:16,22 36:5 37:3
 40:4 45:15,20 46:4
 46:8 53:6 67:11
 76:9 96:17 101:3
 101:12 119:7 141:9
 150:23 156:2 157:4

 163:13 167:15
 172:1 195:20 197:4
 197:5 227:13
objected 195:19
objection 46:12
 101:7 195:22 196:6
 196:8,19 197:7
 198:3,5
objections 6:15,18
 13:2,6 101:18
 196:10,11,13,16
obligation 11:12,17
 85:22
obligatory 14:2
observe 118:6
observed 70:4
 72:20 73:4 86:7
 160:16,18,20
 169:17 226:1
observing 169:21
obtaining 191:12
obviously 8:9 30:17
 35:11 70:4 85:15
 130:19 135:10
 196:18
occasional 76:17
occasionally 12:23
occasions 102:5
occurred 28:6
 32:12 40:17 47:6
 94:2 107:12 131:21
 155:3 195:12
odd 14:4
offender 63:3,16
offenders 63:20
offense 56:2,5,8
offer 189:16
offered 6:20
office 8:15 9:8,17
 9:22,23 10:21 13:1
 13:22 15:18 16:15

 17:20 18:5,6,18
 21:2 22:10 25:6
 35:3 40:21,23 42:3
 44:2,10 48:1,5,13
 49:1 51:17 52:15
 53:11 55:18 56:18
 59:5 72:8 73:2
 75:10 76:6 82:19
 88:3,6 112:9,13
 115:7 116:5 117:13
 117:14 120:22
 121:10 124:19,20
 125:7,8 130:4,16
 136:20 137:8,12
 138:17 142:5 143:7
 144:4 148:21 149:2
 149:3 168:17,22,23
 169:5,7,11,13,13
 169:14 189:9,13
 193:14 194:19
 195:2,13 200:20
 216:17 217:11
 219:9,17,20
office's 149:11
officer 16:21,23
 17:8 19:8 21:3
 23:21 35:14 39:20
 41:20 62:17 65:23
 67:1,3 72:17 81:23
 83:7 95:9 130:6,16
 131:16,21 132:1
 170:6
officers 17:19 18:8
 19:14 20:3,14
 23:18 65:5 96:4
offices 7:9 15:19
 17:23 55:7 75:17
official 1:10 9:10
 57:13
oftentimes 138:17

**oh** 9:1 40:5 48:6,10
67:21 87:14 90:6
124:23 140:14
151:3 168:7 171:12
174:19 175:19
182:11 202:3
218:11 221:22
232:3 233:8,9,18
**okay** 10:3 20:1,4,7
30:13 36:7 37:16
39:4 52:4 67:7
68:12,22 76:11
90:8 91:2,17,21
92:7 100:7 101:21
103:18 110:8,16
116:4,19 120:14
124:10 128:4
129:16 133:5
135:16 136:6
143:10 145:4,14,15
146:18 148:5 153:4
153:10 156:8,11
157:13 160:10
163:6 165:20
168:22 171:1 179:8
179:15 185:11
188:20 190:12
192:17 198:1,8,10
198:12 217:7
218:17 219:15
222:5 223:19,23
224:16 228:18
**old** 172:11
**olds** 11:23
**once** 15:15 17:10
18:1,3 26:9 65:7
80:15 195:5 196:14
**opinion** 32:20
80:12 81:3 105:17
137:16 142:2,4

**opportunity** 68:21
69:16 90:23 114:4
217:16
**opposed** 202:23
**opposite** 125:1
**ops** 229:1,5,17
230:1 231:6,8,21
232:2
**ops's** 229:18
**option** 191:1
**oral** 7:13
**orally** 89:23 103:1
103:4
**ordered** 63:13
**organizations**
16:11 55:12,20
**organized** 60:16
**orientation** 148:13
148:16
**originally** 127:21
**outlining** 127:10
167:23
**outside** 72:8 115:16
115:19,19 116:1,3
118:19 119:2,13
120:22 127:14,19
195:21
**overnight** 190:14
**overview** 62:18
**overwhelming**
176:23 178:12

**p**

**p** 2:1,1 6:1
**p.c.** 2:14 7:9
**p.m.** 135:1,1 184:2
184:2 234:1,1,6
**pace** 134:6
**page** 3:3,8 4:3 5:8
201:10
**pages** 53:12,13
147:21 210:2

**paid** 63:14
**papers** 224:5
**pardon** 63:18
127:17
**parole** 63:18
**part** 25:2 40:12
111:21 138:14
191:14
**partial** 39:7
**participate** 27:20
28:2 29:3,13
151:21
**participated** 28:5
28:11 30:7 31:1
**particular** 77:21
93:1,4 94:2,15,23
152:17 154:13
160:19 201:6
202:11
**parties** 6:3,17
94:19 235:14
**partner** 101:9
**parts** 23:10
**party** 94:6,20,21
**pass** 192:20
**passed** 14:21 15:3
**passing** 205:4
233:8
**patricia** 92:14
**paying** 63:16
**payment** 64:4
**people** 11:20,22
14:10,18 18:17
20:9 21:8,9 23:1
24:23 34:18 44:20
45:2,10 48:9 55:9
73:3 77:1 79:8,10
79:11 88:3 95:15
97:16 111:17
123:22 126:8
146:16 175:22

190:19 194:22
227:23
**percent** 21:15
22:17
**percentage** 21:8,9
22:23 23:1,7
**perfectly** 81:17
85:9 96:12 114:13
**perform** 42:5 67:2
72:16 138:16
**performance** 65:16
65:22 66:8,16,23
83:5 85:18
**period** 12:18 118:2
128:23 152:21
155:10 171:4 176:1
176:4,6 212:7
**permission** 170:13
188:6
**person** 27:3 33:14
41:3 44:18,19 56:3
56:5,10 57:7 60:5,6
62:13,15,16 79:3
84:1 93:11 109:5
109:22 111:2 118:7
120:22 130:8 195:5
229:20 231:4
**personal** 47:1,1,2
49:10 51:18 115:21
125:21 126:3
**personally** 23:22
27:1,5 96:23
**personnel** 48:21
50:12 53:16 57:1,3
57:9,14,15 76:23
138:6 195:21 210:4
**perspective** 23:5,16
33:4,21 42:19,20
76:5
**phone** 12:16 61:13
72:22,23 92:11

109:11,18 159:23
231:2
**phrase** 52:9 76:21
78:14 122:17 201:9
223:6
**physical** 100:19
**physically** 118:6
**pick** 61:12 64:12
**pickett** 1:22 6:5 7:1
**picture** 109:4,21
**place** 17:11 58:13
59:6 84:13 94:9,18
151:19 188:7
190:18 191:4
205:10
**placed** 106:8
**places** 125:17
190:23
**placing** 106:4
**plaintiff** 1:8 2:3
**plaintiff's** 3:8 4:3
4:14 5:9,10,11,12
5:13,14,15,16,17
5:18,19,20,21,22
38:3,4,9 55:7 57:21
89:5,13 98:19,20
102:18 104:3 105:4
105:10,15 171:23
172:15,16,22 180:1
180:2,13,17 181:2
181:4,13,17 182:13
182:17 184:19,21
185:5,6,16,18,19
185:22 186:1,6,22
187:19,21 193:1
199:11,16,22
201:11 202:18
208:12,13,15,17,19
208:23 209:2,4
212:1,6,9 213:7,8,9
218:18,19,21 220:8

220:11,15 228:6,13
**play** 27:9 149:5
**played** 191:14
**pleads** 63:3
**please** 39:11 49:22
49:23 54:16 89:21
140:1 150:3,4
173:9 198:2 199:1
200:9 209:3,17
219:4
**plenty** 68:11
**point** 35:12,19
47:16 55:2 57:2,23
60:21 78:6,15 85:4
87:5 91:3 93:12
105:9,14 109:19
131:16,23 136:13
147:7,12 149:5
152:13 154:14
155:7 158:3 161:4
171:14 175:22
176:21 178:10
185:9 186:13
198:16 199:8,21
207:19,21,23
223:21
**pointed** 90:3 200:5
**points** 58:16,18,20
58:22,23 75:1
200:19,22,23 201:4
201:7,10
**police** 130:6,11,16
131:15,20,23
**policies** 55:20,23
57:14,15 58:13,14
142:5 143:13
151:18 228:8
**policy** 55:14 56:18
59:5,10 137:12
139:14 140:18
143:6 145:22

146:15 148:1,8,11
148:19,21 150:16
163:4,7 170:1
**position** 25:16 27:2
92:17 98:2,6
159:17
**positions** 19:21
25:8 32:11 33:1
**positive** 167:18
**possibility** 223:17
**possible** 122:13,15
179:13 204:13
229:6
**possibly** 205:10
230:9
**postconviction**
63:17
**posted** 88:4
**potential** 194:18
**potty** 134:22
**power** 12:18
**practical** 9:17
**practice** 24:8 117:1
**precise** 153:4 180:9
**predominantly**
22:18
**prefer** 33:11
134:13
**preference** 135:3
**preferred** 32:16
33:5 138:5
**preliminary** 63:9
**preparation** 211:7
**prepare** 232:15
**prepared** 71:23
206:16 207:14
**preparing** 71:13,18
**present** 2:18 21:14
93:20 94:8 118:6
163:19 164:1,4,5

**presented** 72:11,12
**presumably** 50:20
**pretty** 16:23 71:6
102:8 203:9
**prevent** 12:13
**previous** 13:15,18
28:11 91:20,23
215:1
**previously** 5:4 31:7
31:11,17 71:19
98:21 199:12 209:5
212:10 213:10
218:22 220:16
228:14
**principally** 96:15
**principle** 202:2,5
**print** 235:9
**printout** 208:7
**printouts** 210:7
**prior** 6:20 15:9
21:1 25:1 77:12
78:21 96:23 141:20
167:11 175:1,9
178:7,16 188:21
209:12 211:12
223:15 231:9
**privilege** 144:2
**probably** 27:11
62:14 115:22
120:12 134:5
162:14 179:3
201:23 204:2,3
206:3
**probationary**
171:3
**problem** 76:15
102:13 126:12
156:18 173:15,18
198:15
**problematic**
192:10

**procedure** 7:6
215:1 228:8
**procedures** 57:14
57:15 227:10
**proceedings** 7:14
235:12
**process** 31:6,11,16
31:22 32:5 57:18
226:2,5,9,11,13,14
227:8 228:4
**produce** 11:12
**produced** 54:7
137:3 147:22
164:10
**production** 195:21
197:8
**professional** 64:23
72:5,12 84:4
**professionalism**
72:3,8
**professionally**
72:17
**progressive** 55:13
55:15,19
**prohibiting** 151:13
**project** 186:21
187:12
**promise** 66:18
81:19 90:7 110:6
127:12 140:18
**promptly** 202:8
**pronounce** 94:7
**proper** 24:22
**property** 62:22
**proportionality**
196:13,15
**propose** 185:3
**prosecution** 64:11
**prospective** 216:8
**protocol** 138:2
227:11

**provide** 17:19 63:2
**provided** 7:5 17:22
53:11
**providing** 78:8
200:14
**public** 1:23 6:7 7:3
72:7,11
**pulls** 130:9
**purportedly**
161:10
**purporting** 161:5
161:14,19 162:8,12
**purpose** 155:3
164:3,6 167:6
204:11 232:6
**purposes** 24:5
**put** 56:6 59:22 71:1
77:4,11 88:19
95:20 101:23
116:16 144:6 177:8
177:10,15,20
183:19 184:10
188:10,12 189:2,3
194:3,4,14 201:8
210:8 221:3,8,12
**putting** 40:15
81:21 89:11 178:13
178:18 209:12

**q**

**quality** 71:23
**question** 12:12
13:10 23:15 26:6
35:7 36:5,17,21,22
37:5,9 38:23 39:3
45:9 46:16 47:10
58:2 62:14 66:9,15
67:12 68:1 69:21
83:15,19 86:3
89:19 90:17,22
91:5,10,22 93:21
101:19 103:17,20

109:2 113:19,22,23
114:17 119:5
122:19 124:20
133:16,22 139:4
140:16,21 141:1
142:13 143:2 153:5
153:9,12 157:9
162:19 165:5 168:4
170:21 174:13,14
174:20 175:7 182:8
182:9,12 188:16,18
194:20 196:1,23
197:11,13,16,18,22
198:2 199:2 203:10
213:1 214:15,19
217:2,5 223:19
226:8,16 227:17
**questions** 6:16,17
14:2,4,14 68:20
69:11 88:14 92:8
101:4,5 179:13,17
196:16 221:23
232:10 233:20
234:2 235:8
**quibble** 22:19
**quickly** 203:5
**quirk** 9:6
**quite** 87:11 88:7
115:18 121:9
**quote** 98:12 173:15
183:6 215:13

**r**

**r** 2:1,12 28:18
235:1
**race** 33:17
**raise** 35:20
**raised** 48:3,22 61:1
196:10
**ranked** 33:20
**rarely** 11:2 42:16
205:3

**reach** 74:16 185:4
206:14,19 207:2
**reached** 87:6
**reacted** 225:12
**reaction** 225:5
**read** 11:21 36:20
36:23 39:5,9,11
47:9 66:11 173:14
187:19 188:2 193:3
199:1,3 228:19
**reading** 6:8 174:12
174:15
**ready** 184:4
**real** 115:6,13,17,22
115:23 116:22
118:3 120:23
**really** 60:11 88:16
97:22 101:22 120:1
120:10 168:19
191:19 196:21
212:4 231:2 232:16
233:7
**reask** 197:19
**reason** 27:13 34:10
36:11 41:11,15
45:3,11,18 50:20
83:5 105:2 109:23
130:7 135:8 155:6
159:10,14 165:1
167:22 170:17,21
198:17 208:5
212:19 213:2
214:15 223:8
231:16
**reasons** 77:9 92:5
170:1 211:23
212:17
**reassigned** 108:4
191:13
**reassignment**
191:15

**recall** 32:2 50:2,16
52:1,2 66:1 73:13
73:14,18 74:11,15
77:20 78:18 84:22
85:2 86:9 94:1
105:1,19,23 106:3
106:7 110:12 112:5
117:5 124:9 132:21
134:2 142:15
147:18,19 153:5
164:16 166:9
167:22 168:7 170:3
183:13 198:9 202:4
203:1 211:17 216:5
230:11,23
**receive** 56:3 63:4
165:2
**received** 165:22
217:23 218:1
219:13 220:7
**receiving** 64:4
104:2 105:10,14
166:7
**recognize** 99:7,10
99:12 172:22 188:3
199:22 200:10
**recollection** 28:10
154:1 204:14
206:10 211:8,14
218:4,5 222:4
231:6,8
**recommend** 32:23
73:23 103:10
123:18 124:2 166:6
**recommendation**
56:9
**recommendations**
24:10
**reconstruct** 93:22
**record** 17:14 47:10
54:3,14,18 68:13

68:17,22 69:4
162:5 185:21
198:19 199:3 200:3
216:9 228:20
**recording** 11:10
**records** 195:22
210:13,14 211:10
**recovery** 63:23
215:16
**redirect** 68:21
90:23
**reduce** 147:16
**reduced** 235:9
**refer** 185:5 201:4,6
**reference** 94:5
179:19 185:23
**referenced** 5:5
98:23 199:14
203:23 209:8
212:13 213:13
219:1 220:18
228:16
**referring** 185:6
**reflect** 68:13
**regarding** 39:13
122:23 136:14
137:12 142:6 181:9
181:19 183:7
187:16,22 199:8
200:19 205:14,18
207:4
**regardless** 25:13
**regards** 17:9 57:4
82:19
**regime** 111:21
**regular** 16:4 76:15
111:22
**regularly** 43:13
95:7 97:17
**reimbursed** 191:3

**related** 83:5 89:4
117:14 125:12,18
221:18
**relating** 6:12
**relations** 10:13
92:15
**relatively** 196:3
**relevance** 196:11
196:16
**relevant** 85:18
**relieve** 101:14
**remain** 199:9
216:16
**remarks** 84:8
**remember** 8:23
17:16 18:10 20:21
29:1 32:17 40:16
49:7 50:8 51:9,10
64:6 78:11,14 87:2
94:11 95:1 110:18
111:3 147:18 168:9
173:22 184:6
204:19 211:1 213:8
218:10 229:13
231:23
**remembered** 205:5
205:11
**remind** 26:7,9
76:22 78:4,23
79:13 213:20
**reminded** 117:12
**reminding** 78:20
**remove** 83:5
**repeat** 9:19 35:9
141:1
**repeated** 102:4
**repetitive** 53:13
**rephrase** 104:1
**replayed** 88:12
**report** 74:3,8
119:16,18 123:6,9

131:6 142:8,13,16
**reported** 1:22
116:21 130:17
142:22
**reporter** 1:23 6:6
7:2,23 11:9,20
184:9
**reporting** 77:16
**reports** 130:11
**represent** 8:21 9:2
21:13,19 22:15
30:16 53:10,17
72:9 89:6 99:3
147:20 154:17
219:5 223:4 228:7
**representation**
174:16 175:5,8
215:13
**representatives**
72:13
**representing** 13:1
55:9
**represents** 235:10
**reprimand** 106:19
**reprimanded**
112:20 113:1,5
**request** 49:17 63:1
63:2 77:12,14
138:7 152:23 170:7
188:15 193:18
194:7 197:8 201:20
201:21 202:8 211:3
**requested** 138:2
149:8 153:6 188:6
200:14
**requesting** 138:3
**requests** 207:8,13
208:2,7 210:15
211:16 213:4
**require** 13:12 96:3

**required** 65:10
67:6 192:5
**requirement** 187:2
187:10 190:1
191:10 192:7
**requires** 65:7
**respect** 16:14 32:21
45:1,10 51:8,16
81:18 124:7 126:16
130:23 137:11
139:10 160:2 227:3
**respective** 6:4
**respond** 114:4
202:12
**responded** 202:8
**response** 86:3
**responsibilities**
19:9 107:23
**responsibility**
19:17 48:14
**rest** 171:4
**restate** 66:13
**restitution** 63:2,13
63:16 71:1
**restrict** 154:4
**restricted** 163:10
**restricting** 160:7
**result** 104:6 235:16
**retired** 15:15
**retraining** 192:6
**return** 190:20
**returned** 127:23
**review** 202:19
207:12 210:21
**reviewed** 208:6
**reviewing** 58:5
172:5
**revisit** 155:15,22
157:23 158:3
**ride** 190:20

**riding** 191:1,3
**right** 11:18 13:2
19:5 21:17 22:12
24:5 28:19 29:11
30:21 36:11 40:6
46:18 51:12,16
52:18 53:19 66:17
66:20 74:23 89:12
91:11,12 97:15
100:6,11 103:15
110:4 113:16 114:7
116:18 120:3,17
129:7,13 132:7
134:3,21 135:7,7
135:21 136:4,7,17
139:6,10,12,14
140:23 142:12
148:2 149:14
150:10 156:19
160:5 163:17
164:12 165:16
175:16 179:10
183:13 184:3 186:8
187:12 190:7 198:4
200:8 202:22 209:9
209:22 217:3,12
223:23 227:2
**rigid** 11:5
**riley** 2:12,14 7:9
13:14,18 36:4 37:4
37:12,16 67:11,14
67:17,23 68:12,17
68:22 69:3,7,9
81:14 85:7 90:2,8
90:12,16 91:3,15
101:6 103:16 114:2
119:7 133:13,18
150:23 156:2
195:18 197:10,15
200:7 227:13

**road** 2:7
**rob** 114:6
**robert** 2:12
**roberts** 13:21
17:11 24:2 26:22
27:12 31:14 35:20
40:9,17 41:10,17
42:23 43:5,8,12,16
74:9 75:15,19
79:14,16 80:6
82:23 87:18 89:9
99:5 102:21 103:4
103:7 104:2,12,18
104:21 105:20
106:3,11 119:18
123:7 124:3 127:3
127:6 128:17,21,23
132:19 161:23
164:14,22 165:12
165:15,16,20,22
166:5,22 167:2,10
167:19 168:4
169:10 170:7 171:2
171:7,13 178:9
188:14 200:13
201:20,21 202:17
205:17,21 206:8,11
207:16 208:1,6
210:20 211:2,10,14
216:7,11,15 217:18
221:19 222:6,10,23
223:6,9 231:17,19
232:1,21 233:6,13
**role** 27:10 47:23
95:8
**room** 11:18 13:4
92:10 175:21
**roughly** 22:22 28:6
29:10 52:13 65:20
152:21 160:11,13

**row** 124:21
**rule** 150:16 151:13
**rules** 6:12 7:5 11:4
11:5 12:20 69:14
75:18,20 76:5 78:3
89:18 91:7 230:6

**s**

**s** 2:1 6:1 28:18,21
**saith** 234:4
**sake** 185:21 208:11
**salary** 17:22
**sat** 83:21 88:10
**saw** 125:1 127:22
160:15 162:7 224:5
225:1 231:4
**saying** 12:11 42:21
49:21 78:18 87:4
90:3,8 94:11 98:1
101:3,13 117:11,18
117:18 138:20
144:13,21 150:17
177:19 178:11
204:19,20 224:22
226:10
**says** 36:6 38:18,21
40:14 89:10 110:1
178:17 183:6
187:23 233:9
**scenario** 98:10,13
**schedule** 65:15,18
134:8 159:13
**scheduled** 93:19
151:21
**sciences** 15:11
**scientist** 15:3
**search** 222:1
**seated** 8:22 25:17
217:11
**second** 33:10 40:12
49:7 56:2 58:8
79:12 114:23

141:23 151:12
175:13 179:3 186:9
186:11,15
**secretaries** 20:4,5
**secretary** 170:8
216:23
**section** 18:4 57:13
57:16 58:3 228:10
**see** 13:3 20:12
31:20 42:1,7 43:2
43:16 55:20 58:6
58:11 63:14 75:9
87:17 99:23 109:21
110:3 112:6 128:11
133:20 149:4
153:22 169:9,11,12
169:13 173:6,9
178:15 199:19,23
200:6 209:9 210:21
214:8 219:22 220:2
221:6
**seeing** 227:15
**seen** 38:9 53:17
56:22 57:2 61:9
104:17 109:5,21
119:2 147:23 148:5
197:6 209:13,15,19
209:21 210:2,7
218:19
**self** 15:2
**send** 60:23 61:5
62:23 70:11 78:6
105:15 109:20
171:1 177:5 178:9
178:20 205:13,17
206:14 210:19
**senior** 17:7 60:5
**sense** 19:23 21:6,10
85:17 144:10,11
**sent** 39:13 40:9,18
42:22 49:20 78:22

79:9,9,12 89:8
105:6 109:4 170:7
170:11 183:7 206:6
217:19 219:7
224:20,22
**sentence** 12:19
39:6,7,10,11 64:11
91:11 173:14
191:23 206:23
228:19
**sentences** 12:6
40:13
**separate** 99:23
194:23 223:19
**separately** 190:22
223:22
**september** 3:17
26:15,16,19 28:7
89:7 98:15 99:3,19
99:20,21,23 107:12
153:21 154:2,3,14
154:20 155:1,20
158:16 159:16
163:18 164:13
165:7,10,23 166:12
166:15,19,23 167:4
167:12,21 168:5,6
168:10 169:16,16
170:6,12 172:21
173:4,9,12 174:2,7
174:10 175:2,9,15
178:7,11,16 179:5
186:16
**series** 55:22 92:7
98:4
**serious** 102:8
126:21
**serve** 228:23
**served** 24:17
**service** 16:21 17:19
18:8

**services** 8:15 16:22
17:5,6,8,12 18:3,17
19:8,14 20:3,14
21:2,3 22:10 23:18
23:21 35:14 39:20
41:20 48:1,21
62:17 65:5,23 67:1
67:3 72:17 81:23
83:6 95:9 96:3
149:2
**session** 192:6,9,13
**set** 12:19 14:14
200:23 207:17
215:16 226:19
**seven** 69:15 107:20
133:6
**seventy** 22:17
**shape** 10:22 43:10
108:21 233:14
**share** 185:9
**shear** 26:5
**shed** 31:4
**sheets** 59:22 209:20
**shifted** 68:6
**shock** 88:6
**shocked** 225:11,13
225:17
**shooting** 130:8,18
130:19
**shoots** 130:9
**short** 60:7
**shorthand** 100:16
**shortly** 222:6,10
**show** 37:19 63:15
68:17,23 69:4 89:3
89:5 98:16 99:2
172:9,13 179:21,23
180:17 181:1,17
182:3,17 187:18
199:16 208:9,11,13
208:15,17,18

211:23 213:6
218:18 220:10
228:5
**showing** 82:13
**sic** 169:15
**sick** 59:23 61:22
136:20 138:12
139:18 141:10,15
142:1,6,17,20,20
143:15 146:7,8
**side** 66:20 122:22
125:1
**sidestep** 79:5
**sidetrack** 100:9
**sidetracking** 100:8
**sign** 24:4 26:22
115:8,12 122:2
125:19
**signature** 6:8
235:20
**signed** 115:10
121:7,9,11 122:6,9
125:7 126:6
**similar** 56:19
171:11 222:14
**simple** 46:16
**simply** 46:15 47:9
**single** 45:13 53:17
77:22 78:2,4
158:22
**sir** 59:7 65:14,18
117:7 119:15 166:1
173:7 174:5,20
176:3 187:5,5
206:13 209:11
211:5 213:5 233:18
**sisters** 16:1,1
**sit** 63:9 76:2 87:10
121:13
**sitting** 48:20 117:7
121:14 131:1

159:23 164:12
165:18
**situation** 50:8
54:14,18 82:6
84:10 122:3
**situations** 84:10
86:14 124:5
**six** 17:1 24:9 34:19
48:12,15 60:10
133:5,7,8 155:14
155:21 158:13
160:11,13 161:3,4
161:9,13,18 162:7
162:11 175:16,23
176:1,1,2,4 187:19
194:21 216:20
217:9 227:6
**sixty** 21:15
**sleeping** 120:18
**slip** 179:12
**smith** 170:9,10,12
**social** 88:4
**solely** 19:9
**somebody** 77:7
119:9 130:18 169:9
**somewhat** 145:21
**son** 10:11
**son's** 193:23 194:2
**soon** 165:9
**sorry** 14:22 36:1,12
40:5 48:18 56:16
83:13 111:5 114:18
122:5 131:19
140:14 148:18
150:1 151:3,3
158:10 170:10
174:12 175:19
182:2 186:23 189:8
202:3 207:1 209:19
232:4,5,11,13

**sort** 11:6 12:14
31:20 32:2 34:11
34:16 42:11 55:4
55:11 65:11 76:15
76:16 85:22 100:18
106:9 113:13 117:1
120:10 153:11
162:6 171:3 177:5
177:6 184:16 201:8
**sound** 14:3,4 21:17
**sounds** 11:23
**south** 125:4
**southern** 1:3
**space** 169:8
**speak** 7:18 105:11
200:3
**speaker** 92:11
109:11,18
**speaks** 46:5
**specific** 48:7 58:12
66:15 72:14 83:16
86:4 167:22
**specifically** 49:15
58:2 138:6 200:1
203:2,23 210:2
214:22
**specification**
205:23
**speculate** 45:17
47:15
**speculating** 40:14
40:15
**spend** 55:8 85:16
**spirit** 225:10
**spoke** 231:13
**spoken** 11:17
**staff** 32:2 74:21
75:1,2 77:21 78:21
79:13 87:17
**stamped** 219:13
228:9

**standard** 196:10
**standpoint** 30:7
120:15 134:4
**start** 12:11 16:16
146:6 150:6,12,13
156:13 158:1,4,14
215:16 227:4
**started** 17:17 29:9
94:4 117:17 149:1
150:6 151:11,12
159:16
**starts** 39:10 130:8
**state** 7:3 8:10 9:7
15:10 17:20 22:2
22:11 45:23 47:11
47:14 54:16 56:20
59:7 63:6,11 89:17
143:8 174:9 235:3
**stated** 50:7
**statement** 173:13
**states** 1:1 7:6 17:21
**stating** 50:10
204:22 217:23
**status** 121:10
**stay** 25:4 100:6
127:13 189:9,13
**steadily** 56:11
**stemmed** 40:15
41:1
**stenotype** 235:8
**step** 111:23
**stephanie** 73:7,8
**stephens** 86:23
87:22 92:9,13,14
92:18,22 93:9,16
94:11,12,14 95:4,6
95:8,23 97:1 109:4
109:14,18 120:21
**stipulate** 185:23
**stipulated** 6:2

**stipulation** 7:7
185:4
**stipulations** 8:1
13:5 196:15
**stop** 52:6,22 85:4
90:4,18 91:4,5,10
103:15
**stopped** 36:11
**stories** 86:21
102:12 130:14,20
**story** 86:20 87:13
88:11,12,19 98:8
100:22 101:14
102:5 107:7 122:23
129:17 130:4 133:4
164:7 230:15
**street** 124:22 125:4
**stress** 101:15
**strike** 14:16 210:19
**struggling** 65:22
**stuck** 138:19
193:14,15
**subject** 9:23 89:10
99:5 123:21 148:7
182:21 216:12
229:2
**submitted** 85:19
207:8,13
**subordinate** 163:7
**substance** 186:15
**substantial** 23:4
**succeed** 198:20
199:6,9
**succinct** 188:4
**succinctly** 193:5
**sue** 9:8,9,9 55:12
58:11,12 63:23
**sufficiently** 70:12
71:17
**suggest** 33:4 61:17
61:21 62:1,4

106:11 112:19,23
113:4,8,12 215:19
225:18
**suggesting** 61:5
117:22
**suggestions** 87:18
**summarize** 91:18
193:11
**summarizes** 91:23
**summer** 28:7 149:5
**supervise** 43:9
**supervised** 19:13
20:9 34:19 41:7
48:9,22 175:21
194:22
**supervises** 57:8
**supervising** 19:12
**supervision** 19:10
52:14 60:22 65:21
152:22 217:4
235:10
**supervisor** 18:7
79:5 81:6 138:7
152:7,14 163:6
**supervisory** 19:17
41:4 47:23 48:14
**support** 87:17
**suppose** 55:3
**supposed** 125:16
125:18 126:10
138:5 146:17
230:15
**sure** 14:10 20:6
23:6 24:16 35:8
36:19 46:2 47:12
48:6 51:12 59:18
66:9 70:21,22
75:23 114:18 115:8
116:15 124:18
144:12 146:16
149:21 153:8

155:18 158:21
167:17 168:20
169:22 173:11
184:9 186:12
198:23 217:18,19
217:22 222:3 230:7
**surely** 22:13
**surgery** 80:20
214:14,16 215:13
215:18 216:3
**surprise** 148:3,4,8
**suspected** 62:14
**suspended** 56:6
106:1
**suspending** 105:21
**swipe** 59:20
**sworn** 7:18
**system** 56:21 59:19
62:21 64:9,17 71:5
84:15 138:8 210:1
210:4 225:23
227:20

**t**

**t** 6:1,1 235:1,1
**table** 87:6,7
**take** 25:5 69:15
77:1,6,8,11,13,16
81:16 82:16 84:4
85:5,23 89:10 99:6
118:20 119:20
127:6 128:17 129:1
129:4 134:9,10,12
134:17,20 135:10
138:3,10,12,18
140:7 143:19,23
144:9,21 145:8
146:13,14 147:15
151:8,16,18 152:17
153:3,7,14 156:22
157:10 159:12
161:19 173:22

179:14 183:23
193:4,19 205:10
208:12,14,16,18,20
209:1,2 233:21
**taken** 6:5 10:4,7
107:23 138:15
141:16 167:14
235:7
**talk** 11:20 13:6
31:9,14 35:11
52:16 59:13 65:16
66:18 70:5 81:20
86:16 87:16 92:3,9
110:6 125:9 132:3
136:3,10 139:12
140:19 143:4
148:19 164:14,15
175:12 186:9,14
199:20 204:17,20
205:3,6 208:10
215:23 224:14
231:21 232:18,21
**talked** 56:23 59:14
80:8 84:4 86:7
106:5 110:4 114:21
114:22 117:10,21
126:18 136:8
164:11 186:16
192:17,19 206:12
211:18,19 214:22
215:8 223:5 233:1
233:3,5
**talking** 11:22 12:14
17:3,14 18:11 27:7
52:15,19 53:1 62:9
66:17,21,23 85:13
85:16 100:15
106:13,16 107:2,9
108:1,6,9,13,18,22
115:18 118:1 119:2
135:19 139:13

160:4 178:22
205:11 231:6,8
232:2
**talks** 214:5,8,13
**tamara** 229:21
230:19,21
**tamika** 59:14,15
60:22 61:4,12,16
162:2 178:9 206:15
210:7
**tara** 51:13,17,20,22
52:5
**task** 152:18
**technically** 77:8
**tell** 14:5 32:15,16
49:3 50:18 55:18
57:12 72:19 79:6
80:19 82:20,23
83:12,14,16 84:20
87:18 88:11 89:22
99:7 101:20 103:1
103:4,7 104:21
106:23 115:2
116:17 118:16,21
118:22 119:1,5
121:2,5 124:12,16
128:17 129:10
131:7 132:16,19
133:10 137:22
141:7 142:1,4
143:5 150:5 152:20
155:3,20 157:6
160:14,19 162:21
166:5 167:2,10
171:7,13 187:21
188:2,4,18 191:7
192:12 193:5 200:9
202:17,21 203:3
212:2,5 214:19
222:6,10 225:4
228:11 229:20

230:10

**telling** 70:22 78:8
79:9 107:7 155:4,7
211:21

**tells** 87:13 130:4

**ten** 85:7,8 90:14

**tendency** 170:2

**tenure** 21:4 25:13
73:16,16,17 116:12
116:12,13 120:9
132:7

**term** 54:8 55:14
57:13 122:18 142:3
185:22 201:3

**terminated** 30:20
166:7 216:19 217:1
217:10 224:1,3
226:12,12 227:6,8
229:9

**terminating** 85:20
228:4

**termination** 30:17
56:9 201:16 202:20
203:22 204:1,3,8
204:12 210:22
211:13 216:8,12
222:7,11 224:10
226:2,5,9,15 227:4
227:5 228:11,21
229:2,6,14,15
230:4 231:9

**terms** 119:14
139:23 140:3,3

**testified** 7:20 15:8

**testify** 11:1

**testifying** 54:23

**testimony** 154:18
219:6 232:19,22
235:11

**text** 74:19 211:18
211:20 212:6,16,20

**texting** 72:21

**thank** 67:14 114:20
141:22

**theoretically** 69:14

**theory** 227:21

**thereto** 6:20 235:9

**thing** 11:19 12:22
33:7 47:5 58:9
76:16 100:12 102:8
107:9 117:11,18,19
124:11 129:15
140:22 141:14
173:8 195:15 224:4

**things** 26:9 36:9
55:22 62:7 64:6
67:5 75:4,6 76:18
76:20 77:10 78:16
87:4 88:5 121:1
130:1,13 168:16
225:9

**think** 12:4 22:1
26:18 34:10 37:5
37:12,21 45:18
47:3,6 49:5 62:11
62:15 66:5 82:12
83:14 84:8 90:18
91:7 96:12 97:21
105:2 113:20 114:5
114:15 119:5 120:8
120:16 122:16
124:10 129:7,11,19
129:20 133:7,17
135:16 141:12
147:6 155:13 158:8
160:15 165:1
168:14 170:17,21
175:20 176:8,14
177:1 184:8 185:7
185:8,9 186:13,16
187:21 190:9
195:19 197:10,13

202:7,9,11 203:6,7
203:13 216:8 217:8
217:18 222:11
227:17,18,19 228:2
231:16

**thinking** 26:8
190:10

**third** 33:12 56:4
70:15

**thirteen** 20:7,8

**thirty** 95:17 96:4,8
128:3 144:9,22
145:16,18,20

**thorough** 60:16

**thought** 27:2 32:19
36:12 37:4 41:1
45:7 84:5 100:7
116:2 221:17 224:6
227:9,10,12

**thousand** 63:22

**thousands** 53:11,13
147:21

**thread** 211:18,20

**threads** 212:7,16

**threat** 126:9

**three** 11:23 13:17
25:2 28:6 32:23
33:2,6,20 54:21
64:22 101:9 112:7
120:12,17 121:1
136:19 137:7
140:19 168:3
176:21 177:19
190:22 217:22

**threw** 87:8

**throat** 135:15,18

**thumb** 57:22 212:3

**time** 6:18,19 8:14
10:3,15,19 11:2,21
11:22 15:2 17:7
20:5 22:9 24:22

25:22 27:4,6,18
28:1 29:8 34:12
41:19 47:2,22 49:8
49:9,10 51:19 55:5
55:8 59:17,21,22
59:23 60:7,7,9 61:2
61:6,14,18,22 62:2
62:5 64:9 68:11
69:12 72:23 73:11
73:13 74:13 78:9
80:5,7,11,18,19,21
85:16 98:7 100:5,5
107:20 115:21
117:2,2,12 118:2
118:20 121:10
126:1,7 127:15,16
127:18,22,22 128:1
128:23 129:5,21
131:21 136:11,11
136:11,15,16,19,21
136:23 137:3,5,8
137:11,13,15,17,18
137:19,23 138:3,15
138:18,19,22 139:1
139:2,6,11,13,23
140:3,23 141:3,8
141:11,11,11,15,19
142:1,6,9,11,14,17
142:20,21 143:4,6
143:12,14,15,15,16
143:18,20,23 144:1
144:3,8,9,14,17
145:16,17,17,18
146:3,6,14,19,21
146:22 148:1,8,10
148:22 149:3,4,6,7
149:10,16,18 150:6
150:12,13,19 151:6
151:8,8,11 152:2,6
152:10,17,23 153:6
153:7,17,20,21

154:3,5,8,15 155:8
155:11,22 156:10
156:23,23 157:19
158:5,14,17,18
159:3,3,11,12,17
159:21 160:7,16,17
160:19 161:6,10,14
161:19 162:8,13
163:10 164:15
167:13 173:19,22
174:9 176:6,17,23
177:9 178:13,22
179:2 185:4,21
189:10,16 193:21
194:1,4,6,8 195:18
195:22 196:4 197:2
197:11 200:20
202:23 207:8,13,17
207:18 208:2,7,11
210:14,14 211:3,16
211:22 212:7,17
215:16,17 229:8
230:21 233:1
**timeframe**  28:7
44:2 107:12 160:3
160:8,10,14 161:3
161:4,9,13,18,23
162:3,11 211:6,12
**timely**  77:16 78:8
**times**  10:6 44:9
53:4 70:2,3 73:8
78:20 80:3,10,16
82:5,18 83:16 89:1
90:4 144:6 147:14
152:22 159:22
160:2,20 194:12
199:18,19 200:4
218:4 230:14 231:3
**timing**  134:4
186:14

**title**  17:5 60:3
**today**  12:7 36:10
38:10 48:20 77:3
85:16 101:23 102:1
121:19 129:23
131:1 152:7,8
184:20 185:5,23
200:2 203:10
206:12 232:15,19
232:22
**told**  32:9 36:15
43:1 49:12 50:21
51:22 52:5 73:3
75:15 77:7 80:21
81:5 82:17 86:20
87:19 88:2,15 95:5
98:8 102:15,21
111:2 115:15,16
118:3 125:15
128:18,20 133:4
138:18,21 150:10
153:6 154:6,9,10
154:11,13 155:17
156:6 157:9,10,18
157:22 158:12,19
158:20,23 159:11
164:7 179:2 189:4
193:18 215:23
224:2 230:16
**tomorrow**  149:2
**tool**  15:4,7,13
**top**  33:20 38:15
148:1 183:14
**topic**  97:22 143:3
196:3
**topics**  148:17
**total**  58:18 88:6
**totally**  88:21
124:18
**town**  63:12 95:2

**trail**  73:5
**training**  41:2 47:7
189:11,15,19
191:12,17 192:6
**transcript**  11:13,21
235:11,22
**transition**  55:6
**travel**  63:10 191:3
**treated**  35:21 39:15
40:11,20 43:1 45:8
47:4,4 48:4,23
179:20 183:9,11
225:19
**treating**  40:18
**trial**  6:19 14:6,8,12
63:12 72:21 73:1
111:9,10 121:14,17
**trials**  11:1 15:9
121:13
**trip**  187:23 190:2
190:14
**trivial**  109:2 196:3
**true**  52:11 86:22
129:18,22 163:2
191:22 203:12
235:11
**trust**  24:13 88:20
88:22 203:14
**trustworthiness**
86:14
**trustworthy**  65:2
83:10
**truth**  7:18,19,19
70:22 88:17
**truthfully**  232:9
**try**  40:16 56:10
62:7 143:17 168:3
179:12 227:22
**trying**  10:11 11:23
23:15 46:19 64:7
67:23 69:4 76:22

78:13,15 93:22
121:13 130:18
145:23 150:4
157:16 203:6
227:14 232:4
**tuesday**  193:16
**turned**  121:23
**turns**  184:14
**twenty**  15:10 16:23
17:1 24:9 25:7
34:19 48:12,15
49:5 51:18 95:14
176:2,4 194:21
216:20 217:9 227:6
**twice**  80:15 176:5
**two**  11:20,22 20:15
21:15 25:12,15
47:8 64:20 93:18
100:2 101:12 110:9
112:6,7 139:18
140:7,10,15 144:5
145:9 163:23
168:12 173:20
174:11,17 175:4
176:16 177:14
185:13 190:10
233:21
**type**  49:10 71:11
201:5
**types**  191:13
**typewritten**  3:13
**typing**  11:11

**u**

**u**  6:1
**uh**  12:2 48:16 52:8
56:14 66:22 131:17
166:13 175:17
**ultimately**  32:16
**understand**  9:21
18:9 24:2 35:7 36:5
39:6 46:21 48:8

51:9 53:3 56:12
57:9 59:1 62:8,12
94:10 116:15
136:20 137:12
139:14 143:5
144:12 148:21
149:21 150:4
151:23 152:5
157:15 160:7
170:20 197:18,19
197:21,22 204:6,10
217:5 220:1 227:7
227:17
**understanding**
39:13 60:19 153:8
183:7 226:16
227:16
**understood**  13:22
22:6,7 24:20 25:10
26:17 36:13 51:7
110:2 141:2 151:23
152:12 164:9 210:5
**undetermined**
128:23
**unfairly**  35:21
40:11,19,20 43:1
45:8 47:4 48:4,23
225:19
**unfortunately**
109:2 179:11
**united**  1:1 7:6
**universe**  48:9
88:20
**unprofessional**
86:5,10 92:5
110:11,15 114:8
124:13 133:9,11
**unprofessionalism**
85:15 86:13 115:3
121:3 136:8

**unquote**  98:12
**untrustworthiness**
115:3
**untrustworthy**
83:17 86:12 89:2
90:4 92:6 133:8,11
230:12
**untruthful**  121:3
124:14
**untruthfulness**
129:9 136:9
**updating**  71:10
**ups**  53:21 195:11
**upset**  87:5 189:21
**upsetting**  54:9
**urgency**  203:4
**use**  12:5 135:9
136:14 138:6 142:3
149:4,9 151:7,12
163:10 201:3,13
**uses**  223:6
**usual**  7:23 13:4
196:14

| v |
| --- |

**vacation**  44:9
59:23 62:5 129:4
136:11,15,23
137:11,13,14,15,17
137:19,23 138:13
139:1,2,6,11,13,18
139:23 140:3,8,10
140:15,18,23 141:3
141:8,11,15,19
142:9,14 143:15
194:6 211:15
**valuable**  82:18
**value**  82:8
**vans**  190:19
**various**  45:10
55:20 67:5 132:23
206:11

**vein**  14:19
**verbal**  54:1
**verbally**  56:1 161:8
162:10
**verifying**  138:9
211:9
**version**  57:21
118:9,10,13
**versions**  88:15
**victim**  8:14 16:21
16:22 17:5,6,7,11
17:19 18:3,7,17
19:8,14 20:3,13
21:1,3 22:9 23:18
23:21 35:14 39:20
41:20 48:1,21
62:17 65:5,22 67:1
67:3 70:13,19,22
71:10 72:17 81:23
83:6,20,22 84:3,9
84:12 96:3 146:20
149:2 191:13
**victims**  22:23 23:1
62:19,20,22 63:18
63:20,22 64:1,3,8
64:16 67:4,9 70:1,6
70:7,9,21 71:7 82:7
82:9,13 83:17
84:11 86:13,15
95:9 108:13 111:7
**view**  60:5
**violated**  79:19 80:1
80:12 81:11 89:18
142:5
**violating**  75:20
76:5
**violation**  75:18
**violence**  41:2 83:23
186:20 187:3,11
188:22 189:5
191:16

**violent**  63:4
**virtually**  85:22
**virtue**  54:13,14,17
**vis**  168:23,23
**visits**  138:22
**vitally**  11:15
**voice**  12:13
**vs**  1:9
**vso**  25:6 40:22 49:4
49:7 53:5 64:14
65:13,17 80:11
95:19 102:11
131:11 149:16
151:14 168:22
170:6,11 187:23
189:10 191:2
194:19 199:9 217:9
226:20 227:5,7
**vsos**  25:1,2,13
27:14 31:16,23
32:5 44:6 51:17
57:2,3,16 59:9 75:4
75:7 76:19 77:15
78:15 79:13 112:9
112:13 137:13
143:9,10 152:16
187:2,11 190:22
192:14 207:19
208:3,7 210:13,15
211:10,16 216:19
217:2,6 226:2,5,10
226:12 228:9

| w |
| --- |

**w**  111:5
**wait**  12:18 14:12
113:18 150:17
151:2 229:12
**waiting**  46:10 81:6
199:21
**waived**  6:9 195:23

**waiver** 197:7
**wake** 138:11
**walk** 11:3
**walked** 124:20
 128:7
**walking** 125:1
**walters** 73:7,9
 111:4,5,7 112:16
 112:19,23 113:4,8
 113:12 114:22
**want** 12:3,4 14:8
 14:10 26:1 38:1
 39:5,9 54:2 68:7,12
 68:20 69:12 75:3
 78:1 90:11 97:22
 99:6 100:6,12
 101:2 103:14 110:5
 113:22 114:10
 115:2 121:1 124:12
 129:10 133:10,13
 133:20 134:10
 143:5 144:14 145:9
 150:7,9,12 152:20
 158:23 160:14
 174:1 175:12
 179:12 182:17
 186:14 194:1,14,17
 196:19,23 198:18
 199:20 218:18
 223:14
**wanted** 25:4 32:9
 32:18 33:8,10
 50:22 51:1 144:3
 149:4,9 151:10,11
 151:16 159:1 164:8
 167:3 187:7 189:12
 189:14 191:15
 194:13,16 198:19
 199:4,5 202:18,19
 221:14 230:7

**wanting** 32:13
 226:17,18
**wants** 67:22 77:6
 191:12
**warning** 56:7 58:21
 106:19
**warrant** 64:9
**waste** 196:4
**watch** 171:8
**water** 135:14
**watkins** 111:1
**way** 9:20 10:22
 14:3 22:20 43:9
 61:17 86:11 108:8
 108:21 115:5
 118:12 127:16
 140:20 143:1 144:4
 155:5 157:8 169:6
 172:6,12 184:17
 192:9,13 194:15
 212:21 215:21
 225:12 233:13
**ways** 47:8 227:15
**we've** 66:2 106:5
 106:13,16 107:2
 110:4 114:21,22
 136:7 186:15
 192:17,19 199:20
 206:12
**week** 77:3 138:14
 155:14 156:7,8,9
 156:13,22,23
 157:19 158:11
 176:4,5,13,18
 177:9,10 192:6
**weekend** 168:12
**weeks** 155:14,21,23
 158:13 173:19,20
 173:21 174:11,17
 175:5 176:2,11,12
 176:22 177:16,21

 178:13,19
**weird** 60:9
**welcome** 133:14,16
**went** 17:10 74:6
 80:5,17,19 93:14
 115:16 215:2
**white** 21:10,15
 33:19,22 49:4
**widen** 211:6
**widowed** 14:20
**wife** 100:19
**windows** 124:21
**withdraw** 185:20
**withdrawn** 4:14
 38:6 186:7
**witness** 6:9 7:12,17
 10:16,20 67:16,18
 67:19 129:21 164:8
 196:1,20 221:7
 235:12
**witness's** 90:2
**witnessed** 70:2,3
**witnesses** 54:23
 100:11
**woman** 87:4,7
**woman's** 87:3
**wonder** 130:15
**woods** 124:22
**word** 11:17 38:15
 39:10 72:2 84:7
 201:12 224:23
 225:2
**words** 46:3,6
 116:17 156:21
 188:2,3,19 193:5
 193:12 204:4
**work** 11:7 13:21
 15:1,16 43:9 49:10
 51:18 55:8 56:11
 58:15,16 61:2,7,14
 61:19 67:4 75:12

 76:3,3 82:9 87:21
 95:2,19 96:11
 97:18 108:5,21
 115:5,10 117:15
 125:12,18 138:22
 143:22 144:13,16
 145:18 146:1,21
 149:2,15,17 151:22
 158:20 159:2,5
 160:1 162:16,17,23
 191:13,15 194:14
 194:16 227:1
**workdays** 168:12
**worked** 15:10,18
 19:20 51:17 52:14
 60:22 65:21 141:14
 146:3,22 152:21
 159:7,10 168:14
 173:21 174:11,17
 175:4,23 176:10
 207:23
**working** 16:16
 18:17 48:23 130:15
 137:4 143:12
 144:20 146:20
 159:22 160:17,18
 161:5,9,15,20
 162:7,12,18 176:17
 176:22 230:15
**works** 73:2 121:15
**write** 46:14 49:18
 50:11,14,15 53:4
 53:18,21 54:20
 56:4 66:4 70:8
 74:12 80:23 81:2,8
 84:16 91:6 106:15
 106:17,18 117:8
 119:10,14 123:3
 126:17,18 127:10
 132:10,14 133:1
 161:3,12,17,22

162:2 166:23 167:3
167:20,23 168:5,10
175:2 177:13,18,23
178:3,6 192:20
194:9,13 195:11
198:17 202:6,18
203:20
**writing**   54:13,15,17
143:11,13 167:11
173:22 175:1
194:15 195:1 203:4
**written**   55:1 56:3
65:12,14 91:18
106:12 148:1 162:5
165:22 166:19
172:21 177:5,6
195:16 197:2 206:4
206:16 213:20
221:20
**wrong**   96:21
101:20 122:14
**wrote**   37:20 38:13
39:17 40:13,23
43:21 47:16,20
49:12,15,19 50:5,7
50:17,18,21 51:20
51:22 52:10,20
53:2 81:1 91:16
99:13 132:22
133:14 172:14,21
173:3 174:2,7,10
183:9 186:18
187:15 193:2
196:22 197:11
206:6,21 207:4
220:11,14 221:9

**y**

**y'all**   95:3 121:16
208:1
**y'all's**   135:3

**yates**   1:18 6:5 7:12
7:16 8:6,12,13 37:2
37:8,11 38:18
39:17 48:1 54:12
55:12 62:8 64:14
69:12 72:14 74:14
81:22 85:12 89:4
90:22 97:22 100:17
101:10,16 102:9
103:14 112:9,13
114:13 129:20
133:23 134:5
136:12 138:23
148:6 151:4 166:22
167:10 173:6 174:4
175:13 177:5
181:19 182:19
183:18 184:4,20,23
185:13 186:1,10
194:21 197:1,17
198:16 199:17
209:10 218:16
220:14 222:2
228:11 232:14
**yeah**   39:8 81:16
90:16 149:13
151:17 172:4
**year**   11:23 14:7
17:17 18:10 48:12
52:13 58:17 65:7
65:20 78:23 139:21
140:4 143:18,22
152:21 192:5 218:5
218:8
**years**   11:15 15:10
15:16 17:1,17
18:12,12,15,16
19:13,16 20:9 24:9
25:7 34:19 48:15
49:6 51:18 54:21
60:10 93:23 102:2

139:16 168:3
194:22 198:11,11
198:12 203:8
216:20 217:9
225:22 227:6
**yesterday**   17:3
22:22 37:22 56:23
98:17 184:11,18
211:19,19 223:5
228:7
**young**   25:16,17
217:11

**z**

**zero**   153:2

Alabama Rules of Civil Procedure

Part V. Depositions and Discovery

Rule 30

(e) Submission to witness; changes; signing. When
the testimony is fully transcribed the deposition
shall be submitted to the witness for examination
and shall be read to or by the witness, unless such
examination and reading are waived by the witness
and by the parties. Any changes in form or
substance which the witness desires to make shall
be entered upon the deposition by the officer with
a statement of the reasons given by the witness for
making them. The deposition shall then be signed by
the witness, unless the parties by stipulation
waive the signing or the witness is ill or cannot
be found or refuses to sign. If the deposition is
not signed by the witness within thirty (30) days
of its submission to the witness, the officer shall
sign it and state on the record the fact of the
waiver or of the illness or absence of the witness
or the fact of the refusal to sign together with
the reason, if any, given therefor; the deposition
may then be used as fully as though signed unless
on a motion to suppress under Rule 32(d)(4) the

court holds that the reasons given for the refusal
to sign require rejection of the deposition in
whole or in part.

(F) Certification and filing by officer; exhibits;
copies; notice of filing.
(1) The officer shall certify on the deposition
that the witness was duly sworn by the officer and
that the deposition is a true record of the
testimony given by the witness. Unless otherwise
ordered by the court, the officer shall then
securely seal the deposition in an envelope
indorsed with the title of the action and marked
"Deposition of [here insert name of witness]" and
shall promptly file it with the court in which the
action is pending or send it by registered or
certified mail to the clerk thereof for filing.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.



09/19/2019

| TO: | DANNY CARR, JOE ROBERTS |
| --- | --- |
| FROM: | JUDY YATES |
| SUBJECT: | LANITRA JETER |
| CC: | MICHEAL MCCURRY |



PLAINTIFF'S
EXHIBIT
19

On Monday, September 16, 2019, Ms. Jeter asked to use comp time that day to attend a mediation session regarding her husband and the mother of his 13 year old daughter.

The next day, I asked how things went and she said it was a mess. I told her then 3 times, that she did not need to tell me anything, I just wanted to know if she was ok. She said she wanted to tell me, and the following is basically what she said.

The mediation took place in a small room with the female attorney/mediator, LaNitra and her husband, and Marquetta Murrell. She and Mr. Jeter were on one side of the table and Marquetta was on the other side. LaNitra said that Marquetta kept calling her a Mother F...ker. LaNitra said she told the mediator to tell Marquetta to stop calling her that or she was not going to be responsible for her actions. The mediator told Marquetta to stop calling LaNitra names, and Marquetta called her that name again. LaNitra said she lost it and reached across the table and pulled Marquetta across the table and onto the floor. She said she was detained by the security officer. I asked if by "detained" she meant handcuffed, she said yes. LaNitra said she told them to handcuff her hands behind her because she would not be responsible for what she might still do to Marquetta. LaNitra also said they were going to take the cuffs off if she could behave herself, and she said leave them on. I then asked her if she wasn't afraid that Marquetta would get a warrant for assault?, and LaNitra said, the mediator told everyone that she was not to be arrested, because she was provoked by Marquetta. LaNitra also said she told the mediator not to subpoena her to any more proceedings because she would dodge being served, because she would not come back.

Out of caution, and shock that an employee would react in such a manner, I told Joe Roberts about the incident, and also Micheal McCurry.



**VICTIM WITNESS**

# Memo

**To:** File
**From:** Judy Yates
**Date:** September 23, 2019
**CC:**

**Re:** LaNitra Jeter



---

I received an email from LaNitra telling me she was going to be leaving at 10:30 today for a dr's appt and to pick up Shuga. I talked to her before she left and asked her to bring a dr's excuse tomorrow, and that I wanted her to come to work at 7:30 a.m. this week, and to take her full lunch. She wanted to know what she was supposed to do or go during lunch, and I said she could sit at her desk like most people if she wanted. That Comp time is for completing work you could not do during normal hours, or extra work, but it was not for just sitting at your desk and not being productive. She asked what about next week, and I said we would discuss that before the end of the week.

1

**VICTIM WITNESS**

# Memo

**To:**       File

**From:**   Judy Yates

**Date:**    1/10/2020

**CC:**

**Re:**       **Nitra**   Time



Nitra stuck her head in my office today to tell me she would be late Tuesday because she had to go to court, and turned to walk away before I could say anything. I finally said ok, even though she had not asked if she could be off, just told me she was going to be off.  Later, I went to her office and told her to put in a request for the time, say 4 hours and if she didn't use that much, she would not be charged that amount of time.  I then asked if it was court in Atlanta.  She said yes, her son's, an eviction case. She had told her son not to pay his rent in November so they would evict him and then when she received the notice they answered and counter sued.

1

DA 000066

**VICTIM WITNESS**

# Memo

**To:**       FILE

**From:**    Judy Yates

**Date:**    February 25, 2020

**CC:**



PLAINTIFF'S
EXHIBIT
22

**Re:**       Leaving Building and not signing out or asking permission

---

Cheryl was in my office this day around 10:45 a.m., when she saw LaNitra crossing the street at 22nd and Rev. Abraham Woods, and she continued up the sidewalk. I continued watching outside, and she came back and went into the 2121 Building. She was back inside in about 20 minutes. I went into her office and told her in the future to either sign out for a break, or let me know she was going out of the building for a few minutes. If an emergency arose inside the building and we needed to account for all employees, it would be impossible.

1

**VICTIM WITNESS**

# Memo

| | |
|---|---|
| **To:** | *FILE* |
| **From:** | Judy Yates |
| **Date:** | 1/9/2020 |
| **CC:** | |
| | |
| **Re:** | Nitra    Jeter |



PLAINTIFF'S EXHIBIT
23

---

*Nitra had asked for 4 hours comp time in December* Nitra had asked for 4 hours comp time in December 2019 for today. This morning she texted asking if it was ok for her to have her real estate agent to come by at the office at 8:30. I said ok, but clock out for lunch. I had a Dr's appt, and when I arrived, Nitra had already left. She had clocked in at 7 a.m. today, but had not clocked out for lunch, and had not given me her time sheet. She returned to the office at 2:15, and clocked out for Mays court. At 3:25 she was not back, and I called Lauren to see what was going on and she said nothing. Cheryl had gone to Jones court, and both court rooms were empty. Cheryl and I had walked around to find her car, we did and when we returned she was here. I took her timesheet into her office to have her correct comp time, because she only took 1.5, so she could actually get time and a half on 2.5. I then told her she had not asked if she could come in at 7 am nor had she mentioned it to me. She said she assumed it would be ok, and I reminded her I had told them it probably would but only if they let me know. I told her I would approve it this time but not the next time.

1



# Memo



**To:**      File

**From:**    Judy Yates

**cc:**

**Date:**    January 8, 2020

**Re:**      VSO Nashville Trip to the Family Justice Center

Elise had requested permission to go to Nashville to the FJC with One Place on February 7, 2020. Before agreeing that she could go, I asked Lanitra Jeter is should would like to attend, and she said that she was not interested in going. Cheryl Black, Erin Barefield and Elise Driskill said they would like to go, and Joe Roberts approved the request for them to go.

**Victim Witness Office**

# Memo

**To:**      File

**From:**    Judy Yates

**cc:**

**Date:**    November 18, 2019

**Re:**      Domestic Violence Firearms Project



A meeting on the Domestic Violence Firearms Project was being held November 21, 2019, and Lanitra Jeter was asked if she would like to attend and she declined.

DA 000074