FILED
2022 May-31  PM 12:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT C

## Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ALABAMA

SOUTHERN DIVISION

CASE NO.: 2:20-CV-01863-ACA

LANITRA JETER,

    Plaintiff,

vs.

DANNY CARR, in his official

capacity as District Attorney

of Jefferson County,

    Defendant.

DEPOSITION

OF

LANITRA JETER

DECEMBER 10, 2021

TAKEN BY: Maya Rose

    Registered Professional Reporter

    and Notary Public

## Page 2

1      S T I P U L A T I O N S
2      IT IS STIPULATED AND AGREED, by and
3  between the parties, through their respective
4  counsel, that the deposition of LANITRA JETER
5  may be taken before MAYA ROSE, Commissioner,
6  Court Reporter and Notary Public, State at
7  Large;
8      That the signature to and the reading of
9  the deposition by the witness is NOT waived,
10 the deposition to have the same force and
11 effect as if full compliance had been had with
12 all laws and rules of Court relating to the
13 taking of depositions;
14     That it shall not be necessary for any
15 objections to be made by counsel to any
16 questions, except as to form or leading
17 questions, and that counsel for the parties
18 may make objections and assign grounds at the
19 time of trial, or at the time said deposition
20 is offered in evidence, or prior thereto;
21     That the notice of filing of the
22 deposition by the Commissioner is waived.
23

## Page 3

1      A P P E A R A N C E S
2
3  FOR THE PLAINTIFF:
4      Mr. Brian O. Noble
5      Attorney at Law
6      Capstone Law
7      2119 3rd Avenue North, Suite 202
8      Birmingham, Alabama  35203
9
10 FOR THE DEFENDANT:
11     Mr. Robert R. Riley, Jr.
12     Mr. James Edward Murrill, Jr.
13     Attorneys at Law
14     Riley & Jackson, P.C.
15     3530 Independence Drive
16     Birmingham, Alabama  35209
17
18
19
20
21
22
23

## Page 4

1      I N D E X
2
3      PAGE
4  EXAMINATION BY MR. MURRILL:................6
5  EXAMINATION BY MR. NOBLE:................149
6  REEXAMINATION BY MR. MURRILL:............223
7
8      E X H I B I T S
9  PLAINTIFF'S NO.        PAGE
10 Exhibit 1 - various documents   -147
11
12 DEFENDANT'S NO.        PAGE
13 Exhibit 1 - Response to Interrogatories -14
14    and Request for Production of Documents
15 Exhibit 2 - Notice of Depo and Production-19
16    Request
17 Exhibit 3 - March 20, 2020 fax  -46
18 Exhibit 4 - March 16, 2020 letter  -87
19
20
21
22
23

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Lanitra Jeter                                                    12/10/2021

Page 5

```
 1        I, Maya Rose, a Registered
 2   Professional Reporter of Birmingham, Alabama,
 3   and a Notary Public for the State of Alabama
 4   at Large, acting as Commissioner, certify that
 5   on this date, pursuant to the Federal Rules of
 6   Civil Procedure and the foregoing stipulations
 7   of counsel, there came before me at 3530
 8   Independence Drive, Birmingham, Alabama, on
 9   the 10th day of December, 2021, commencing at
10   9:36 a.m. and concluding at 3:07 p.m., LANITRA
11   JETER, witness in the above cause, for oral
12   examination, whereupon the following
13   proceedings were had and done:
14
15             LANITRA JETER,
16   being first duly sworn, was examined and
17   testified as follows:
18
19        THE REPORTER:  Usual stipulations?
20        MR. MURRILL:  Fine with me.
21        MR. NOBLE:  We'll read and sign.
22   Otherwise that's good with us.
23
```

Page 6

```
 1   EXAMINATION BY MR. MURRILL:
 2        Q.  Good morning, Ms. Jeter.
 3        A.  Good morning.
 4        Q.  I'm Jay Murrill.  You and I met
 5   briefly before we began this morning.  Have
 6   you ever given a deposition before?
 7        A.  No, sir.
 8        Q.  All right.  The rules are pretty
 9   simple and everybody's got a job to do in a
10   deposition.  My job is to ask questions.  Your
11   job is to answer the questions.  And Maya, our
12   court reporter's job is to take down
13   everything you and I and all the lawyers in
14   the room say.  So we can do some things to
15   make everybody's job a little easier today.
16   We can make Maya's job easier by not talking
17   over one another.  So if I ask you a question,
18   if you'd wait until I finish asking it before
19   answering so we're not speaking over one
20   another, can you do that for me?
21        A.  Yes.
22        Q.  Okay.  And you just did something
23   that I'm happy you did.  If I ask you a
```

Page 7

```
 1   question that calls for a yes or a no answer,
 2   if you could please say yes or no instead of
 3   uh-huh or huh-uh, that will make for a
 4   confusing record when we go back to read it.
 5   Can you do that for me?
 6        A.  Yes.
 7        Q.  Okay.  I want to make your job
 8   easier today, so if at any point you need to
 9   take a break, get some water, get soft drinks
10   or that great coffee I talked about earlier,
11   just let me know and I'm happy to accommodate
12   you; okay?
13        A.  Okay.
14        Q.  I see that you've injured your
15   arm.  Is your arm in any way going to affect
16   your ability to sit for a deposition or impact
17   your ability to sit for prolonged periods of
18   time?
19        A.  It should not, no.
20        Q.  Okay.  Great.  Another thing we
21   can do to make jobs easier is if I ask you a
22   question and you don't understand the
23   question, please let me know and I'll try to
```

Page 8

```
 1   ask it in a way that you do understand; okay?
 2        A.  Yes.
 3        Q.  All right.  If I ask you a
 4   question and you answer the question, I'll
 5   assume you understood it; is that fair?
 6        A.  Yes.
 7        Q.  Okay.  And to make my job easier
 8   today, I may use a few shorthand phrases.  If
 9   I say DA's office, I'm talking about the
10   Jefferson County DA's office; okay?
11        A.  Okay.
12        Q.  And if I say VSO, I'm talking
13   about a victim service officer; okay?
14        A.  Okay.
15        Q.  Perfect.  Would you give me your
16   full name, please?
17        A.  LaNitra Faye Jeter.
18        Q.  And where do you live, Ms. Jeter?
19        A.  The complete address?
20        Q.  Yes, please.
21        A.  ███████████████.
22        Q.  How long have you lived there?
23        A.  Since 2004.
```

                                    2  (Pages 5 to 8)

Lanitra Jeter                                                  12/10/2021

---

Page 9

1    Q.  Who lives with you?
2    A.  My husband.
3    Q.  What is his name?
4    A.  Kireem Jeter.
5    Q.  How do you spell Kireem?
6    A.  K-i-r-e-e-m.  Middle name Jacquez,
7    J-a-c-q-u-e-z.
8    Q.  How long have you and Mr. Jeter
9    been married?
10   A.  About nine years.
11   Q.  Have you ever been married to
12   anyone other than Mr. Jeter?
13   A.  Yes.
14   Q.  How many other times have you been
15   married?
16   A.  Once.
17   Q.  What is your former husband's
18   name?
19   A.  Michael McKinney, Sr.
20   Q.  And when were you and Mr. McKinney
21   married?
22   A.  1998, I believe.
23   Q.  And when did that marriage end?

---

Page 10

1    A.  If I can recall, it is I think
2    maybe 2000.  Don't quote me on that though.
3    Q.  Did you and Mr. McKinney get a
4    divorce?
5    A.  Yes.
6    Q.  Do you have any children?
7    A.  Yes.
8    Q.  How many?
9    A.  I have one biological son.
10   Q.  What is his name and age?
11   A.  Michael McKinney, Jr.,
12   twenty-seven.
13   Q.  Where does Michael live?
14   A.  Stone Mountain, Georgia.
15   Q.  Do you have any children by either
16   adoption or stepchildren?
17   A.  Yes, I do.
18   Q.  How many?
19   A.  In the household or altogether?
20   Q.  Let's start with the household.
21   A.  Okay.  Within the household it's
22   going to be two. ████████████

---

Page 11

1    Q.  How old is ████?
2    A.  Ten.
3    Q.  And how old is ███?
4    A.  Fifteen.
5    Q.  Who are ██████████'s
6    mother?
7    A.  ████'s mother is deceased.
8    Q.  Okay.
9    A.  Her name is Angelica Jones.
10   Q.  How about ████?
11   A.  Her mother is Marquetta Murrell.
12   Q.  Is that M-u-r-r-e-l-l?
13   A.  Yes.
14   Q.  All right.  Do you have any other
15   stepchildren?
16   A.  Yes.
17   Q.  How many?
18   A.  I think eleven.
19   Q.  Eleven?  I'll tell you what.  We
20   can spend the next hour going through that.
21   If you would give those names to your lawyer,
22   he can give them to me; is that fair with you?
23   A.  Yes.

---

Page 12

1    Q.  Okay.  I just need their names and
2    their ages and where they live, please.
3    A.  Okay.
4    Q.  Thanks.  Do you have any relatives
5    by blood or marriage that live in Blount,
6    Shelby or Jefferson County?
7    A.  Yes, I believe in Jefferson.
8    Q.  Do you have a lot of them?
9    A.  My mother, my father, aunts,
10   uncles, cousins, so, yeah.
11   Q.  Okay.  We could spend the next
12   thirty minutes going through that.  So if you
13   would give your lawyer those names and their
14   addresses, please.
15   A.  Okay.
16   Q.  Thank you.  Do you belong to any
17   clubs?  Do you belong to any clubs?
18   A.  Yes, I'm a member of Tau Beta
19   Sigma.
20   Q.  What is that?
21   A.  It is a band sorority for -- it's
22   a band sorority for HBCUs.
23   Q.  Any other clubs?

---

3  (Pages 9 to 12)

Lanitra Jeter                                                    12/10/2021

---

Page 13

1        A.  No.
2        Q.  Where did you go to college?
3        A.  Originally I went to Alabama State
4    University and then Faulkner University.
5        Q.  Okay.  Did you graduate from
6    Faulkner?
7        A.  Yes.
8        Q.  Are you a member of any other
9    organizations?
10       A.  No.
11       Q.  Do you belong to a church?
12       A.  No, not at the moment, no.
13       Q.  What's the highest level of
14   education you've completed?
15       A.  Two master's.
16       Q.  What are those in?
17       A.  Counseling and justice
18   administration.
19       Q.  Did you receive both of those at
20   the same university?
21       A.  Yes.
22       Q.  What university?
23       A.  Faulkner University.

---

Page 14

1        Q.  When did you receive those
2    master's?
3        A.  One was in 2015, I believe, and
4    the other is in 2017.
5        Q.  Which was in 2015?
6        A.  '15 was the counseling.
7        Q.  And justice administration was in
8    '17?
9        A.  Yes.
10       Q.  Okay.  Let me show you a document
11   I'm going to mark as Exhibit 1 to your
12   deposition.
13           (Whereupon, Defendant's
14           Exhibit 1 was marked
15           for identification.)
16       Q.  (BY MR. MURRILL:)  These are your
17   interrogatories in this case.  If you'll turn
18   to page 3 of Exhibit 1.
19       A.  (Reviewing document.)
20       Q.  All right.  You have Exhibit 1 in
21   front of you, and on page 3 it lists some
22   employers.  Is that a complete list of
23   employers that you've had since 2000?

---

Page 15

1        A.  At this present moment as I can
2    recall, yes.
3        Q.  Okay.  And were you working at
4    Birmingham Family Counseling and Remediation
5    Center at the same time you were working for
6    the DA's office?
7        A.  Yes.
8        Q.  Okay.  Did you have any other side
9    jobs when you worked at the DA's office?
10       A.  No.
11       Q.  Have you worked anywhere since you
12   left the DA's office?
13       A.  Yes.
14       Q.  Where did you work?
15       A.  Central Alabama Wellness.
16       Q.  When did you work there?
17       A.  August 31st of '20 until March of
18   '21.
19       Q.  What was your job there?
20       A.  Substance abuse therapist.
21       Q.  And why did you leave that job?
22       A.  My diabetes.
23       Q.  Have you worked anywhere since

---

Page 16

1    Central Alabama Wellness?
2        A.  Yes, I'm still at the Birmingham
3    Family Counseling and Mediation.
4        Q.  Are you currently involved in
5    litigation against Central Alabama Wellness?
6        A.  Yes.
7        Q.  Okay.  And you're also involved in
8    this litigation.  Have you ever been a
9    plaintiff or a defendant in any other
10   litigation besides this one and your current
11   one against Central Alabama Wellness?
12           MR. NOBLE:  Object to the form.
13   You can answer.
14       A.  At this present moment, I don't
15   recall, no.
16       Q.  (BY MR. MURRILL:)  Have you ever
17   filed for bankruptcy?
18       A.  Yes.
19       Q.  When did you file for bankruptcy?
20       A.  2015, I believe.
21       Q.  Is that case still ongoing or has
22   it been resolved?
23       A.  It's ongoing.

---

4  (Pages 13 to 16)

Lanitra Jeter                                                    12/10/2021

Page 17

1       Q.  Is that taking place here in
2   Birmingham?
3       A.  Yes.
4       Q.  Okay.  You filed an EEOC charge
5   against the DA's office; correct?
6       A.  Yes.
7       Q.  You filed an EEOC charge against
8   Central Alabama Wellness; correct?
9       A.  Yes.
10      Q.  Have you ever filed an EEOC charge
11  against any other employer?
12      A.  Yes.
13      Q.  Okay.  Which employer?
14      A.  I don't recall.
15      Q.  Is it one of the employers listed
16  on page 3 of Exhibit 1?
17      A.  At this moment, I really don't
18  know or remember which employer it is.
19      Q.  Do you believe it's an employer
20  before 2000?
21      A.  No.
22      Q.  Okay.  So, to the best of your
23  knowledge, it would be one of the employers

Page 18

1   listed on page 3 of Exhibit 1?
2       A.  Yes.
3       Q.  Other than the DA's office and
4   Central Alabama Wellness?
5       A.  Yes.
6       Q.  Okay.  How many other EEOC charges
7   have you filed?
8       A.  I'm not sure.
9       Q.  Do you believe it's more than one?
10      A.  As I can recall, I think yes.
11      Q.  Okay.  Do you believe it's more
12  than five?
13      A.  No.
14      Q.  So somewhere between one and
15  five --
16      A.  Yes.
17      Q.  -- or I guess somewhere between
18  two and five?
19      A.  Yes.
20      Q.  Did any of those EEOC charges
21  result in litigation?
22      A.  No.
23      Q.  I'll show you a document I'm going

Page 19

1   to mark as Exhibit 2 to your deposition.
2           (Whereupon, Defendant's
3            Exhibit 2 was marked
4            for identification.)
5       Q.  Exhibit 2 is the Notice of
6   Deposition and production request for you.
7   Could you turn to page 2 of Exhibit 2?  Thank
8   you.  Page 2 asked for you to bring some
9   recordings.  Did you bring any recordings with
10  you?
11      A.  No.
12      Q.  Okay.  Do you have or have you
13  ever had any recordings of Danny Carr?
14      A.  No.
15      Q.  Do you have or have you ever had
16  any recordings of Joe Roberts?
17      A.  No.
18      Q.  Do you have or have you ever had
19  any recordings of Michael McCurry?
20      A.  No.
21      Q.  Do you have or have you ever had
22  any recordings of Judy Yates?
23      A.  No.

Page 20

1       Q.  Do you have or have you ever had
2   any recordings of anyone who worked at the
3   DA's office?
4           MR. NOBLE:  Object to the form.
5   You can answer.
6       A.  No.
7       Q.  (BY MR. MURRILL:)  Okay.  Go back
8   to Exhibit 1, please, your interrogatory
9   responses.  If you'll turn to the last page of
10  Exhibit 1, is that your signature on the last
11  page of Exhibit 1?
12      A.  Yes.
13      Q.  Okay.  Did you sign the
14  interrogatory responses after reviewing the
15  answers to the interrogatories?
16      A.  Yes.
17      Q.  Okay.  Were the answers true and
18  accurate when you signed?
19      A.  Yes.
20      Q.  Okay.  Take a few minutes and the
21  interrogatory responses are at the beginning
22  of Exhibit 1.  Review those.  You don't have
23  to read them out loud.  But I want to ask you

Lanitra Jeter                                    12/10/2021

Page 21

1    if those responses are still true and accurate
2    today?
3        A.   (Reviewing document.)  In this
4    present moment, yes, all of these answers to
5    my knowledge are true.
6        Q.   Okay.  When did you start at the
7    DA's office?
8        A.   April 2019.
9        Q.   And were you hired to work for the
10   DA's office for any specific period of time?
11       A.   No.
12       Q.   And you worked as a VSO; correct?
13       A.   Yes.
14       Q.   Did you ever have any other
15   position with the DA's office?
16       A.   No.
17       Q.   How many other VSOs worked at the
18   DA's office while you were there?
19       A.   Four other white VSO officers
20   worked there.
21       Q.   So the four and you, there were a
22   total of five VSO officers --
23       A.   Yes.

Page 22

1        Q.   -- or VSOs?  Excuse me.  And what
2    were your job duties as a VSO?
3        A.   To my knowledge, advocate for
4    victims, send out packages referring to the
5    crime of the perpetrator to the victim, assist
6    victims in any way possible during the process
7    of the trial, assist the attorneys with cases,
8    remain in contact with victims when needed.
9    And any additional instruction given by upper
10   management.
11       Q.   Did you have any duties regarding
12   grand jury proceedings?
13       A.   Yes.
14       Q.   What were those duties?
15       A.   To help the victims any way
16   possible during that process of grand jury.
17       Q.   What would be an example of
18   helping a victim in the grand jury process?
19       A.   Helping a victim with anything
20   they particularly needed in a situation.  Each
21   situation could be different.  It could be
22   watching their child if they brought their
23   child with them, giving them emotional

Page 23

1    support, helping them fill out paperwork while
2    signing in for grand jury.
3        Q.   Did you have any duties regarding
4    non-grand jury court proceedings?
5        A.   No.
6        Q.   So did you only work on grand jury
7    court proceedings?
8        A.   No.  We worked on -- I worked on
9    whatever trial I was assigned to for that
10   victim.  My main focus was on property claims
11   and some DV cases.
12       Q.   What is DV?
13       A.   Domestic violence.
14       Q.   Were you the only VSO that handled
15   property crime cases?
16       A.   Yes.
17       Q.   Were you the only one that handled
18   DV cases?
19       A.   No.
20       Q.   Did you have any job duties
21   regarding police departments?
22       A.   Not particularly duties.  If a
23   police officer needed assistance with the

Page 24

1    victim, depended on what the victim needed, we
2    would assist then.
3        Q.   How often day-to-day would you
4    interact with victims?
5        A.   Some days it would be no victims
6    at all.  Some days we would have maybe two to
7    three, but I don't think it was ever over
8    three.
9        Q.   Did you have a particular number
10   of cases you were assigned?
11       A.   No.
12       Q.   Could the number of cases you were
13   assigned fluctuate?
14       A.   Yes.
15       Q.   Okay.  You told me you were the
16   only VSO that handled property crime cases;
17   correct?
18       A.   Yes.
19       Q.   Did you have any other job duties
20   where you were the only VSO that did those
21   duties?
22       A.   There were other cases that I
23   handled.  I cannot remember them right now.

6  (Pages 21 to 24)

Lanitra Jeter                                    12/10/2021

Page 25

1    It was actually written down on a piece of
2    paper I had in my office, but it was not
3    returned to me.
4        Q.  Okay.  And you were the only VSO
5    assigned to those particular cases?
6        A.  Yes, sir.
7        Q.  Okay.  Did other VSOs have job
8    duties that you did not have?
9        A.  Other VSOs were assigned
10   particular cases as well.  We had all
11   different cases that we would handle, so, yes.
12       Q.  Okay.  Other than handling a
13   specific case, did any other VSO have a job
14   duty that you did not have?
15       A.  I don't understand the question.
16       Q.  Sure.  It was probably a lousy
17   question.  Each VSO had a case that she was
18   assigned; is that correct?
19       A.  No.  Each VSO had a type of case
20   they were assigned.  So one VSO could just be
21   assigned domestic violence.  One VSO could be
22   assigned murder cases.  So that was separated
23   through categories.

Page 26

1        Q.  Okay.  Other than being on
2    different cases or being assigned different
3    cases, was there a VSO that did certain
4    things, certain job duties that you did not
5    have to do?
6        A.  No.
7        Q.  Okay.  I think you mentioned
8    working with attorneys.  Were those attorneys
9    at the DA's office?
10       A.  Yes.
11       Q.  Okay.  Did you work with specific
12   attorneys?
13       A.  No.
14       Q.  Would that depend on whatever case
15   you were assigned?
16       A.  Yes.
17       Q.  Did you work with any other
18   specific staff at the DA's office other than
19   attorneys?
20       A.  Yes.
21       Q.  What staff did you work with
22   besides attorneys?
23       A.  Administrative staff, police

Page 27

1    officers, the supply staff.  That's all I can
2    recall right now.
3        Q.  What would be an example of an
4    administrative staff?
5        A.  Receptionist.  That's it.
6        Q.  And what would be an example of a
7    supply staff?
8        A.  That would be staff that was over
9    the materials we would need, different
10   materials like folders, pamphlets, things like
11   that for our cases.
12       Q.  Did supply staff individuals have
13   a certain job title?
14       A.  Not that I recall.  I don't know.
15       Q.  Judy Yates was your immediate
16   supervisor; correct?
17       A.  Yes.
18       Q.  Was she your immediate supervisor
19   the entire time you were with the DA's office?
20       A.  Yes.
21       Q.  How much day-to-day interaction
22   would you have with Judy?
23       A.  It's hard to answer that question.

Page 28

1    It depends on the day, what was happening that
2    day.  Some days we didn't have absolutely
3    anything to do.  If there was no trial, no
4    court going on, no victims coming in, then
5    there was zero interaction.  Some days,
6    depending on what the trial is, like if it was
7    a murder trial or a high profile case, then,
8    you know, we would interact probably maybe
9    twenty percent of that day.
10       As my time at the office
11   progressed and certain things were happening
12   to me, I tried to limit my interaction with
13   several people in the office, so I just stayed
14   in my office.
15       Q.  Would limiting your interaction
16   with people include limiting your interaction
17   with Judy?
18       A.  Yes.
19       Q.  Did you ever socialize with Judy
20   outside of work?
21       A.  No.
22       Q.  Are you aware of Judy Yates ever
23   making any derogatory comments about black

                           7 (Pages 25 to 28)

Lanitra Jeter                                                    12/10/2021

Page 29

1    people?
2        A.  In my presence, no.
3        Q.  Are you aware of her making any
4    comments derogatory about black people outside
5    of your presence?
6        A.  In this moment, no.
7        Q.  Are you aware of Judy Yates ever
8    making any comments about preferring white
9    people?
10       A.  Not in this moment, no.
11       Q.  Was Joe Roberts your next level
12   supervisor above Judy?
13       A.  I'm not really sure.  I wasn't
14   sure if it was Joe Roberts or Michael McCurry,
15   so I'm really not sure.
16       Q.  Okay.  Assume with me that it's
17   Joe Roberts.
18       A.  Okay.
19       Q.  How much day-to-day interaction
20   did you have with Joe Roberts?
21       A.  Day-to-day would be zero,
22   depending on the day.
23       Q.  How often would you discuss work

Page 30

1    matters with Joe Roberts?
2        A.  Every day would be zero.  If I had
3    an issue, I would request to meet with him.  I
4    think I met with him during my time of
5    employment possibly no more than three times.
6        Q.  What did you meet with him about
7    on those three occasions?
8        A.  One, I met with him when they no
9    billed the grand jury case for my husband.
10   And the other two possibilities, I can't
11   remember at this moment.
12       Q.  Do you remember when they no
13   billed your husband's case?
14       A.  I do not.
15       Q.  Do you remember whether it was in
16   2019 or 2020?
17       A.  I do not.
18       Q.  Are you aware of Joe Roberts ever
19   making any derogatory comments about black
20   people?
21       A.  Not to my knowledge, no.
22       Q.  Are you aware of Joe Roberts ever
23   making any comments about preferring white

Page 31

1    people?
2        A.  In this moment, no.
3        Q.  Joe Roberts was the deputy
4    district attorney; correct?
5        A.  Yes.
6        Q.  So if Joe Roberts was your next
7    level supervisor above Judy, would your next
8    level supervisor above Joe be Danny Carr?
9        A.  Yes.
10       Q.  And Danny Carr was the district
11   attorney; correct?
12       A.  Yes.
13       Q.  And he was the district attorney
14   the entire time you were with the DA's office?
15       A.  Yes.
16       Q.  How much day-to-day interaction
17   did you have with Danny?
18       A.  Zero.
19       Q.  Did you ever discuss work matters
20   with Danny?
21       A.  Yes.
22       Q.  How many times did you discuss
23   work matters with Danny?

Page 32

1        A.  Once.
2        Q.  Okay.  What was that?
3        A.  I don't understand the question.
4        Q.  What was that one time you
5    discussed work matters with Danny?
6        A.  The time or what we talked about?
7        Q.  Let's go with the time first.
8        A.  Okay.  As I can recall, I think it
9    was 2019.  That was the only time.
10       Q.  And what did you discuss with
11   Danny in 2019 on that one occasion?
12       A.  I discussed the unfair treatment I
13   was receiving in the office, the
14   discrimination I was receiving with my comp
15   time being taken away, the unwanted phone
16   calls I was receiving and my husband was
17   receiving.  We talked about the cases that
18   involved myself and my husband.
19       Q.  And where did this -- oh, sorry.
20   Go ahead.
21       A.  Also I was -- we talked about the
22   allegations or rumors of us having a
23   relationship.

8  (Pages 29 to 32)

Lanitra Jeter                                                    12/10/2021

Page 33

1    Q.  Who is the "us"?
2    A.  Oh, myself and Danny Carr.
3    Q.  Did you discuss anything else with
4    Danny Carr?
5    A.  Not that I can remember right now,
6    no.
7    Q.  And when did this conversation
8    with Danny Carr take place?
9    A.  2019.
10   Q.  When in 2019?
11   A.  At this moment, I can't remember.
12   It was -- it was requested through an e-mail
13   through his receptionist, April Smith.
14   Q.  We'll talk about it later, but did
15   it occur before or after the black rat cutout
16   incident?
17   A.  I can't remember exactly, so I
18   can't -- to be honest, I cannot answer that
19   question.  I'm not sure.
20   Q.  Did it occur before or after you
21   were allowed to start earning comp time again
22   in November of 2019?
23   A.  Before.  The meeting was before

Page 34

1    that.
2    Q.  All right.  And what did you tell
3    Danny about unfair treatment in the office?
4    A.  My comp time being taken away.
5    Q.  What did you tell him?
6    A.  I was the only black VSO officer
7    in the office and my comp time was taken away
8    when no other VSO officers, which were white,
9    did not have their comp time taken away.
10   Q.  What did Danny say about that?
11   A.  He didn't know anything about it.
12   Q.  Did you discuss anything else
13   regarding comp time with Danny?
14   A.  No.
15   Q.  Okay.  What did you discuss about
16   your husband's cases with Danny?
17   A.  Actually he brought up the cases.
18   He had a folder belonging to Marquetta
19   Murrell, who was the defendant in the cases.
20   He stated that sometimes people don't
21   necessarily need to go to court.  Things can
22   be handled outside of court.  I took that to
23   say that he was asking me to drop the cases

Page 35

1    regarding Marquetta Murrell.
2    Q.  Did Danny ask you to drop the
3    cases?
4    A.  I assumed.
5    Q.  But did he ever say, I want you to
6    drop the cases, or words to that effect?
7    A.  No.
8    Q.  Did you and Danny discuss anything
9    else regarding the cases involving Marquetta
10   Murrell?
11   A.  Not that I can remember right now.
12   Q.  And for any of those cases, were
13   you a victim in those cases?
14   A.  Yes.
15   Q.  And what did you and Danny discuss
16   about the allegations or rumors about a
17   physical relationship?
18   A.  He never mentioned it.  He just --
19   he never responded.
20   Q.  Did you bring that up?
21   A.  In the meeting, yes.
22   Q.  Where had you heard those rumors?
23   A.  They were actually from the

Page 36

1    unwanted phone calls we were receiving.
2    Q.  Who was making unwanted phone
3    calls?
4    A.  We don't know who they were.
5    Q.  What were they saying?
6    A.  That me and Danny were walking
7    outside the building during lunchtime.  I was
8    spending time in his office, just things of
9    that nature.
10   Q.  Was any of that true?
11   A.  No.
12   Q.  Where were you receiving those
13   phone calls?
14   A.  On my husband's cell phone.
15   Q.  Did you ever hear any of the phone
16   calls?
17   A.  No.
18   Q.  Do you know if it was a male or a
19   female making the calls?
20   A.  I don't know.  He stated -- my
21   husband stated it was a female.
22   Q.  How long did your meeting with
23   Danny Carr last?

9  (Pages 33 to 36)

Lanitra Jeter                                          12/10/2021

---

Page 37

1    A. I don't recall.
2    Q. Do you think it lasted more than
3  an hour?
4    A. No.
5    Q. Do you think it lasted more than
6  thirty minutes?
7    A. No.
8    Q. Okay. Do you think it lasted more
9  than ten minutes?
10   A. Yes.
11   Q. You think it lasted somewhere
12  between ten and thirty minutes?
13   A. Yes.
14   Q. Was that the only time that you
15  e-mailed April Smith to request a meeting with
16  Danny?
17   A. Yes.
18   Q. Did you ever socialize with Danny
19  Carr outside of work?
20   A. No.
21   Q. Okay. Are you aware of Danny Carr
22  ever making any comments that were derogatory
23  about black people?

---

Page 38

1    A. Not to my knowledge, no.
2    Q. Are you aware of Danny Carr ever
3  making any comments about preferring white
4  people?
5    A. Not to my knowledge, no.
6    Q. And Danny Carr is a black man;
7  correct?
8    A. Yes.
9    Q. Were you an hourly employee with
10  the DA's office?
11   A. No.
12   Q. You were salaried?
13   A. Yes.
14   Q. Okay. What was your salary?
15   A. Forty thousand.
16   Q. How often were you paid?
17   A. Biweekly.
18   Q. Every two weeks?
19   A. Yes.
20   Q. Was your check always in the same
21  amount?
22   A. Yes.
23   Q. When you started work, were you

---

Page 39

1  given any vacation leave?
2    A. I don't understand the question.
3    Q. You began in April of 2019;
4  correct?
5    A. Yes.
6    Q. The day you started, were you
7  given any sort of vacation leave?
8    A. No. Not that I can remember, no.
9    Q. Did you earn vacation leave as you
10  worked?
11   A. Yes.
12   Q. All right. How often did you earn
13  vacation leave?
14   A. If I can recall, it was earned
15  every pay period.
16   Q. How much would you earn per pay
17  period?
18   A. I don't remember.
19   Q. Was it a set amount per pay
20  period?
21   A. Yes.
22   Q. And would your time records show
23  how much vacation leave you earned?

---

Page 40

1    A. The timecard?
2    Q. But would your time records at the
3  DA's office show how much vacation leave you
4  earned?
5    A. Yes.
6    Q. Okay. And would your time records
7  at the DA's office show the vacation leave
8  that you took?
9    A. Yes.
10   Q. When you started in April of 2019,
11  were you given any sick leave?
12   A. I earned it.
13   Q. So you started at zero?
14   A. Yes.
15   Q. And did that work the same way as
16  vacation leave? Did you earn sick leave per
17  pay period?
18   A. Yes.
19   Q. Did you earn a set amount per pay
20  period?
21   A. Yes.
22   Q. Okay. And would your time records
23  show the sick leave that you earned?

---

Lanitra Jeter                                              12/10/2021

Page 41

1     A.  Yes.
2     Q.  And would your time records also
3  show the sick leave that you used?
4     A.  Yes.
5     Q.  So if you were not earning comp
6  time, what were your normal working hours?
7     A.  7:30 to 4:30.
8     Q.  Were there any breaks during that
9  time period?
10     A.  Yes.
11     Q.  How many?
12     A.  Two 15-minute breaks, one-hour
13  lunch and they were combined.
14     Q.  So, in total, would it be an
15  hour-and-a-half break?
16     A.  Yes.
17     Q.  And did that start and stop at the
18  same time?
19     A.  I don't understand the question.
20     Q.  All right.  Would your
21  hour-and-a-half break begin at a certain
22  period of the day and end at a certain period
23  of the day?

Page 42

1     A.  No.  We were able to take our own
2  lunches and make our own times when we took
3  our lunch and break together.
4     Q.  Okay.  So if you wanted to, could
5  your hour-and-a-half break occur at the end of
6  the day?
7     A.  With supervisor approval, yes.
8     Q.  So if you're just working normal
9  hours, you would be working eight hours a day
10  and forty hours a week; correct?
11     A.  Yes.
12     Q.  Now, what is comp time?
13     A.  Compensatory time is any time that
14  you work extra over the forty hours.
15     Q.  And are you given a certain amount
16  of comp time for every hour you work over
17  forty hours?
18     A.  Yes.
19     Q.  And what is that?
20     A.  I don't remember.
21     Q.  Would your time records show when
22  you got to work?
23     A.  Time card clock-in, yes.

Page 43

1     Q.  And would your time records also
2  show when you left work?
3     A.  Yes.
4     Q.  Would your time records show when
5  you earned comp time?
6     A.  Yes.
7     Q.  Would your time records also show
8  when you used comp time?
9     A.  Yes.
10     Q.  Did you ever have any other type
11  of leave besides vacation leave, sick leave,
12  and comp time?
13     A.  I believe we had what is called
14  PTO, but I think it was actually included in
15  the vacation and sick, if I'm not mistaken.
16  I'm not really sure how that worked.
17     Q.  Okay.  Let's say you wanted to be
18  off of work and you had vacation leave
19  available, sick leave available and comp time
20  available.  Let's also assume that PTO is part
21  of one of those types of leave.  Who made the
22  choice on what type of leave you took to cover
23  the time you were going to be off?

Page 44

1     A.  Originally it would be the
2  employee, and then it would be approved by the
3  supervisor.
4     Q.  And in your case, would it have
5  been approved by Judy Yates?
6     A.  Yes.
7     Q.  Okay.  I'm going to grab some
8  water.
9        MR. RILEY:  Y'all want to take a
10  break?
11        MR. NOBLE:  Yeah, I appreciate it.
12        (Whereupon, a short break was
13        taken.)
14     Q.  (BY MR. MURRILL:)  Ms. Jeter,
15  before the break you were telling me about an
16  e-mail you had sent to April Smith to request
17  a meeting with Danny Carr; do you recall that?
18     A.  Yes.
19     Q.  Do you have a copy of that e-mail?
20     A.  I do not have a copy of that
21  e-mail.  April would actually have that copy.
22     Q.  Let's go to Exhibit 1.  If you'd
23  turn to page 4, please.  On page 4,

                               11  (Pages 41 to 44)

Lanitra Jeter                                                    12/10/2021

Page 45

1   interrogatory 6, it asked for the
2   discrimination and there's some bullet points
3   under the answer.  And what I'd like to do is
4   kind of use those bullet points to guide our
5   conversation; okay?
6       A.  Okay.
7       Q.  The first bullet point says, comp
8   time taken away while Caucasian victim service
9   officers retained their comp time.  My comp
10  time was taken away by Judy Yates and Michael
11  McCurry.  And even when I had comp time, I was
12  under different rules compared to my Caucasian
13  counterparts.  Did I read that correctly?
14      A.  Yes.
15      Q.  Okay.  What do you mean by "taken
16  away"?
17      A.  I was no longer given
18  authorization to accrue comp time.
19      Q.  And when did that occur?
20      A.  September 23rd, 2019.
21      Q.  What do you mean by "different
22  rules"?
23      A.  My comp time was taken away from

Page 46

1   me while the other white VSO officers were
2   allowed to accrue comp time and use their comp
3   time however they wanted to use it, whenever
4   they wanted to use it, which meant going to
5   get their hair done, leaving work early
6   because they didn't want to drive at night,
7   handling family issues and business, leaving
8   to handle personal issues whereas I had to
9   only use comp time when it was authorized by
10  Judy Yates and I was only allowed to accrue
11  comp time when it was approved by Judy Yates.
12      Q.  Were you under any other different
13  rules?
14      A.  As far as comp time, no.
15      Q.  When were you under the different
16  rules?
17      A.  From September 23rd, 2019, to
18  about the middle or end of November 2019.
19      Q.  Okay.  I'll show you a document
20  I'm going to mark as Exhibit 3 to your
21  deposition.
22          (Whereupon, Defendant's
23          Exhibit 3 was marked

Page 47

1           for identification.)
2       Q.  Is Exhibit 3 the fax you sent to
3   the EEOC in March of 2020?
4       A.  Yes.
5       Q.  Okay.  If you would go to the
6   second paragraph of page 2 of Exhibit 3, is
7   that talking about when your comp time was
8   taken away?
9       A.  (Reviewing document.)  Yes.
10      Q.  Okay.  Let's talk about the time
11  before September 23rd, 2019; okay?  So until I
12  tell you otherwise, all the questions I'm
13  going to be asking relate to the time period
14  from when you started until September 23rd of
15  2019; okay?
16      A.  Okay.
17      Q.  You started in April of 2019;
18  correct?
19      A.  Yes.
20      Q.  All right.  When did you first
21  start earning comp time?
22      A.  I do not know.
23      Q.  Did anyone -- go ahead.

Page 48

1       A.  I do know I wasn't even aware that
2   we could accrue comp time at that moment until
3   I was informed by another VSO officer who was
4   already accruing time -- comp time before I
5   was.
6       Q.  Who is the VSO officer?
7       A.  Elise Driskill and Erin Barefield.
8       Q.  So what did you do after talking
9   to Elise and Erin?
10      A.  I can't remember in that moment.
11  I do know I either -- well, I know I started
12  accruing comp time because I asked about it,
13  but I cannot remember who I spoke with or who
14  I asked about it.
15      Q.  Okay.  Do you think you spoke with
16  Judy?
17      A.  Possibility, yes.
18      Q.  Do you know if you spoke with
19  Michael McCurry?
20      A.  Possibly not, no.
21      Q.  Before September 23rd, did you
22  have to get anyone's permission to earn comp
23  time as you were earning it?

12  (Pages 45 to 48)

Lanitra Jeter                                    12/10/2021

Page 49

1      A.  Technically, yes.  Because, again,
2  I was not earning comp time at the same time
3  Erin and Elise were earning comp time.  It
4  wasn't until I inquired about it that I was
5  allowed to, you know, accrue comp time.
6      Q.  Okay.  After you started accruing
7  comp time, did you have to ask anyone's
8  permission to keep accruing it?
9      A.  No.
10     Q.  Okay.  Before September 23rd if
11  you wanted to use your comp time, what would
12  you have to do?
13     A.  I would have to put in a request.
14  That was all.
15     Q.  Request with whom?
16     A.  Judy Yates.
17     Q.  Would it be a written request?
18     A.  Some would be written.  Some would
19  be verbal.  Some could possibly be in a text
20  if I had to call in sick.
21     Q.  Would your request say why you
22  wanted to use your comp time?
23     A.  Not all.

Page 50

1      Q.  Would some say why you wanted to
2  use your comp time?
3      A.  Yes.
4      Q.  How far in advance of using your
5  comp time would you make those requests?
6      A.  It varied depending on the
7  situation and what's the reason for using the
8  comp time.  If it was a doctor's excuse, they
9  would get maybe a couple of days, depending on
10  if I had to get an emergency or a call-in
11  appointment.  If I had to call in sick, it
12  would be the day of that morning before work
13  starts.
14     Q.  If you were calling in sick, would
15  Judy then make the decision whether you were
16  going to use comp time or sick time to --
17     A.  No.
18     Q.  -- cover?
19     A.  I'm sorry.  Not at that moment,
20  no.
21     Q.  So tell me what happened on
22  September 23rd.
23         MR. NOBLE:  Object to the form.

Page 51

1  You can answer.
2         THE DEPONENT:  I can answer?
3         MR. NOBLE:  You can answer.
4      A.  I went to work.  I was able to get
5  a doctor's appointment because I was still
6  having a lot of medical issues.  The doctor
7  said he could fit me in that day because I
8  described to him the issues I was having.
9         I went to Judy to let her know I
10  had a doctor's appointment and I needed to
11  leave at a certain time.  I do not remember
12  the time I needed to leave.  I was informed
13  that day that I would need to bring a doctor's
14  excuse.  And at that time when she did say
15  that to me, it -- she was really -- like
16  really nasty toward me in the way she was
17  speaking to me.  And I just told her, okay,
18  I'll bring the doctor's excuse back because I
19  needed to get back -- I needed to get to the
20  doctor.
21     Q.  (BY MR. MURRILL:)  Did you have
22  this conversation with Judy in person?
23     A.  Yes.

Page 52

1      Q.  Was anyone else present?
2      A.  No.
3      Q.  What time that day did you have
4  the conversation with Judy?
5      A.  Early that morning.
6      Q.  Was it before work?
7      A.  No.
8      Q.  Okay.  What time was your doctor's
9  appointment that day?
10     A.  I don't remember what time it was
11  that day.
12     Q.  Was it going to be before 4:30?
13     A.  Yes.
14     Q.  Did you have any comp time you had
15  earned but not used as of September 23rd?
16     A.  Yes.
17     Q.  How much time did you have that
18  you had earned but not used?
19     A.  I don't know.
20     Q.  Was it enough time to cover the
21  doctor's appointment?
22     A.  Yes.
23     Q.  Did you use comp time to cover the

13  (Pages 49 to 52)

Page 53

1  doctor's appointment?
2       A.  Yes.
3       Q.  And Judy asked you to bring a
4  doctor's excuse back?
5       A.  Yes.
6       Q.  Did you bring the doctor's excuse
7  back?
8       A.  Yes.
9       Q.  Did she ever ask you for a
10  doctor's excuse on any other occasion?
11      A.  I can't recall.
12      Q.  But the only time you can recall
13  is her doing so on September 23rd, 2019;
14  correct?
15      A.  Yes.
16      Q.  The third paragraph of Exhibit 3
17  talks about a meeting you had with Judy Yates
18  and Michael McCurry.  Do you recall that
19  meeting?
20      A.  Yes.
21      Q.  When did that meeting take place?
22      A.  (Reviewing document.)  If I can
23  remember correctly in this moment, the meeting

Page 54

1  was about -- in October of 2019.
2       Q.  Okay.  So the meeting referenced
3  in paragraph 3 of Exhibit 3, to the best of
4  your recollection, took place in October of
5  2019?
6       A.  In this moment, I believe it's
7  going to be between September 2019 and October
8  2019.
9       Q.  Okay.  Between September 23rd,
10  2019, when Judy Yates told you about not
11  accruing any comp time, and the meeting with
12  Michael and Judy, between those two events,
13  did you complain to anyone about not being
14  able to earn comp time?
15      A.  Yes, I complained to two other VSO
16  officers that were white, which is Erin and
17  Elise.  I complained to the receptionist,
18  which was Edwina Johnson.  And this is within
19  the office or outside the office?
20      Q.  Either.
21      A.  Okay.  I also talked about it with
22  my husband -- no, not my husband, my -- a
23  friend of mine, which is Oddesty Langham.

Page 55

1  Monique Pierre-Louis, Denise Courier, and
2  possibly some more people.  I just can't
3  recall right now.
4       Q.  Did you complain to anyone in the
5  office other than the two VSOs you identified
6  and the receptionist?
7       A.  Possibly.  I just can't recall who
8  at this moment.
9       Q.  Did you complain to Judy Yates?
10      A.  Yes, because I had the meeting
11  with her and Michael McCurry complaining about
12  my comp time being taken away.
13      Q.  Okay.  Between September 23rd and
14  the meeting --
15      A.  Okay.  So you mean prior to the
16  meeting?
17      Q.  Yes.
18      A.  Well, yes, because in -- on
19  September 23rd when it was taken away, I was
20  complaining to Judy then because I was asking
21  for a reason why and asking why it was being
22  taken away and why I was the only one having
23  it being taken away.

Page 56

1       Q.  Okay.  Did you complain to Judy at
2  any other time between September 23rd and
3  prior to the meeting with Judy and Michael
4  McCurry?
5       A.  Not to my knowledge, no.
6       Q.  Did you complain to Michael
7  McCurry between September 23rd and prior to
8  the meeting with Judy and Michael McCurry?
9       A.  Not that I can recall, no.
10      Q.  Did you complain to Danny Carr
11  between September 23rd and prior to the
12  meeting with Judy and Michael McCurry?
13      A.  No.
14      Q.  Did you complain to Joe Roberts
15  between September 23rd and prior to the
16  meeting with Michael McCurry and Judy Yates?
17      A.  No.
18      Q.  What led to the meeting with
19  Michael and Judy Yates?
20      A.  I requested the meeting because I
21  did not agree with my comp time being taken
22  away and it being only me and I'm the only
23  African-American VSO officer in the office.

Lanitra Jeter                                      12/10/2021

Page 57

1    And all the other VSO officers who were white
2    were still getting to accrue their time to use
3    however they wanted to with no stipulations
4    and restrictions.  I wanted to have a clear
5    reason as to why it was being taken away.
6    And -- well, I just needed -- I wanted an
7    explanation and I wanted to kind of tell them
8    what was going on with me as far as to why I
9    was using my comp time the way I was using it,
10   which was dealing with my medical issues.
11          My husband had some medical issues
12   going on.  I needed to have surgery.  I was
13   sick a lot in the office throughout the day.
14   I was throwing up throughout the day.  I was
15   having, like, I'll call it flashes throughout
16   the day.  I would have to go into my office
17   maybe like twice throughout the day, close my
18   door.  Because when I had the hot flashes, I
19   would be, like, drenched whereas my work
20   attire would not be appropriate at that time
21   because it would become wet and I didn't like
22   the way it showed certain things in my front
23   area, so I would try to dry off and air out as

Page 58

1    much as I could.  Because of the treatment I
2    was getting with my comp time being taken
3    away, I started having some depression issues
4    because I was dealing with the issues at work.
5    And I was already dealing with medical issues,
6    and I did not know what was going on with me
7    and I couldn't get an answer.  I was going to
8    different doctors' appointments trying to find
9    out what the answers were and nobody could
10   find them out.  And I just needed to
11   understand why I was needing to use my comp
12   time the way that I was using it.
13          And so I just thought maybe I
14   could call a meeting.  And then also kind of
15   like make them aware, you know, that's not
16   fair to take away my comp time and I'm the
17   only black person in there and you're letting
18   everybody else that's white use theirs.
19   That's all.
20       Q.  You discussed all those things in
21   your meeting with Michael McCurry and Judy
22   Yates?
23       A.  Yes.

Page 59

1        Q.  Did you just have that one meeting
2    with Michael McCurry and Judy Yates?
3        A.  In reference to comp time, yes.
4        Q.  How long did the meeting last?
5        A.  I'm not even sure.
6        Q.  Did it last more than an hour?
7        A.  Possibly not, no.
8        Q.  Do you think it lasted more than
9    thirty minutes?
10       A.  It could possibly be.
11       Q.  So do you think it lasted
12   somewhere between thirty minutes and an hour?
13       A.  Yes.
14       Q.  Was anyone else present for the
15   meeting other than you, Michael McCurry and
16   Judy Yates?
17       A.  No.
18       Q.  Where did the meeting take place?
19       A.  In Michael McCurry's office.
20       Q.  Are you aware of Michael McCurry
21   ever making any derogatory comments about
22   black people.
23       A.  I'm sorry.  Excuse me.

Page 60

1        Q.  Do you need some water?
2        A.  No, I -- I get dry mouth, so I'm
3    fine.  I'm not aware of him saying it
4    personally to me, no.
5        Q.  Are you aware of Michael McCurry
6    making any derogatory comments about black
7    people to anyone?
8        A.  Possibly.
9        Q.  Who did he make -- well, tell me
10   what you mean.
11       A.  Okay.  So Michael McCurry, Judy
12   Yates and Cheryl Black, who were all white,
13   would sometimes meet up in either Judy's
14   office or in his office, you know, just having
15   conversations throughout the day.  Well, one
16   of those individuals, which is Cheryl Black,
17   is known for being a racist.  So in those
18   moments, it's possible that he could have made
19   some comments about black people, derogatory
20   comments in those meetings.
21       Q.  Okay.  Are you aware of any
22   derogatory comments about black people he made
23   in those meetings?

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Lanitra Jeter                                        12/10/2021

<table>
<tr><td>

Page 61

1    A.  No.
2    Q.  Okay.  Are you aware of any
3  comments that Judy Yates made derogatory to
4  black people in those meetings?
5    A.  No.
6    Q.  Are you aware of Michael McCurry
7  ever making any comments about preferring
8  white people?
9    A.  Not to me, no.
10    Q.  Are you aware of Michael McCurry
11  ever making any comments about preferring
12  white people to anyone?
13    A.  Again, it's a possibility because
14  of the relationship he had with Judy Yates and
15  Cheryl Black, so it's a possibility.
16    Q.  But you're not aware of any
17  comment Michael McCurry made regarding
18  preferring white people?
19    A.  No.
20    Q.  Let's go back to Exhibit 3.  The
21  fourth paragraph talks about you resuming
22  earning comp time again on November 12th,
23  2019.  Do you see that?

</td><td>

Page 63

1  regarding comp time on November 12th?
2    A.  If I can recall, she stated that I
3  could start accruing comp time again, but it
4  would be with restrictions.  That restriction
5  was I would have to work from 7:30 to 4:30,
6  whereas the other white VSO officers were
7  allowed to come in at seven o'clock and leave
8  at 4:30.  So that means they would approve
9  more comp time than I would accrue because
10  they were coming in thirty minutes earlier
11  than me.
12    Q.  Did Judy talk about any other
13  restrictions on November 12th?
14    A.  If I needed to use any additional
15  comp time or anything like that, I would have
16  to get approval from her.  And I believe
17  that's it.
18    Q.  Did you ever request to use
19  additional comp time from Judy after November
20  12th?
21    A.  Not from Judy.  She was out of the
22  office, so I ended up having to talk to
23  Michael McCurry.  We have a trial review board

</td></tr>
<tr><td>

Page 62

1    A.  (Reviewing document.)  Yes.
2    Q.  What led to the November 12th,
3  2019 meeting with Judy?
4    A.  I requested it.
5    Q.  How did you request it?
6    A.  I can't remember if it was
7  possibly just me going into her office, I
8  believe, or it could have been from an e-mail
9  that I originally sent to Michael McCurry
10  advising him of a surgery that I would
11  possibly -- that I would possibly need going
12  forward and I needed my comp time to be
13  reinstated so I'll be able to get the surgery
14  done.
15    Q.  Okay.  What did Michael McCurry
16  say to you or write to you in response to that
17  e-mail?
18    A.  That I needed to discuss it with
19  Judy Yates.
20    Q.  Okay.  And did you discuss it with
21  Judy Yates?
22    A.  Yes.
23    Q.  Okay.  And what did Judy say

</td><td>

Page 64

1  that we -- that I'm on, and we were working
2  through lunch.  And so one of the restrictions
3  was that I could not work, you know, through
4  lunch, so I had to go and hunt down Michael
5  McCurry.  I had to leave the meeting, hunt
6  down Michael McCurry to make sure it was okay
7  for me to work through the lunch.  I ended up
8  missing half of the lunch because I had to
9  find him first.  And that was very
10  embarrassing because none of the VSO officers
11  had to leave the meeting and they enjoyed
12  their lunch while I had to go hunt down
13  another person to see if it was okay for me to
14  work through my lunch.
15    Q.  Did Michael McCurry give you
16  permission to work through lunch?
17    A.  Yes.
18    Q.  Did you earn comp time for that
19  period through lunch?
20    A.  Yes.
21    Q.  Were there any other restrictions
22  placed on your ability to earn comp time on
23  November 12th?

</td></tr>
</table>

16  (Pages 61 to 64)

Lanitra Jeter                                                12/10/2021

Page 65

1    A.  Not that I can remember, no.
2    Q.  Would you ever get to the office
3  before 7:30 a.m. after November 12th?
4    A.  Honestly, I don't know.  It could
5  be a possibility there was one other time.
6  But I believe that one other time I did get
7  permission from Judy because I had to get
8  permission before I -- if I could come in
9  before 7:30.
10    Q.  Did you ever ask for permission to
11  come in before 7:30 to anyone other than Judy?
12    A.  No.
13    Q.  And did Judy give you permission
14  to come in before 7:30 when you would request
15  it?
16    A.  I can't remember.  To be honest
17  with you, I cannot remember.
18    Q.  You said you recall one time, it
19  may have been one time when you requested to
20  come in before 7:30; correct?  And --
21    A.  Yes.
22    Q.  And you requested that from Judy;
23  correct?

Page 66

1    A.  Yes.
2    Q.  Did Judy give you permission to
3  come in before 7:30 on that one occasion?
4    A.  I can't -- really honestly I can't
5  remember.
6       MR. NOBLE:  Let him finish his
7  question.
8    A.  I'm sorry.
9    Q.  (BY MR. MURRILL:)  Do you think
10  your time records would show that, if you came
11  in before 7:30?
12    A.  If they're truthful, yes.
13    Q.  Do you have any reason to believe
14  that they're not truthful?
15    A.  Yes, possibly.
16    Q.  What reason do you have to believe
17  that your time records are not truthful?
18    A.  Because of the treatment I
19  received, the discussions about me within the
20  office, and the fact that I have been lied on
21  in that office by other staff in that office
22  that I worked under.  It's a possibility that
23  they could be incorrect or not truthful.

Page 67

1    Q.  Okay.  Do you have any specific
2  knowledge of your time records being
3  inaccurate or untruthful?
4    A.  There were times where I had to
5  ask for corrections on my timecard because
6  they were not correct.  And that's -- that's
7  happened maybe like once or twice.  But that's
8  the only times that I know of.
9    Q.  Okay.  And on those one or two
10  occasions where you had to ask for
11  corrections, were the corrections made?
12    A.  Yes.
13    Q.  Okay.  Between your meeting with
14  Michael McCurry and Judy Yates, whenever that
15  meeting occurred, and November 12th, 2019 when
16  you were allowed to start earning comp time
17  again, did you complain to anybody at the DA's
18  office about earning comp time?
19    A.  Yes.  Again, I've had -- I
20  complained to Erin Barefield, Elise Driskill,
21  possibly Edwina Johnson.
22    Q.  Edwina is the receptionist?
23    A.  Receptionist, yes.  And I believe

Page 68

1  at this moment that's all I can recall.
2    Q.  The fifth paragraph of Exhibit 3
3  talks about you e-mailing a complaint to Joe
4  Roberts; do you see that?
5    A.  Yes.
6    Q.  What complaint did you e-mail to
7  Joe Roberts?
8    A.  The e-mail I was complaining to
9  Joe Roberts about the unfair treatment I was
10  receiving from my supervisor, Judy Yates, and
11  what I needed to do to see about getting that
12  rectified.  The unfair treatment consisted of,
13  again, my comp time being taken away.  And I'm
14  the only VSO officer having their comp time
15  taken away while the other white VSO officers
16  were able to still accrue their times with no
17  restrictions.
18    Q.  Is the complaint that you e-mailed
19  to Joe the only time you e-mailed him a
20  complaint?
21    A.  I believe so.  At this moment,
22  yes, sir, I believe so.
23    Q.  And what was Joe's response to

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Lanitra Jeter                                                    12/10/2021

Page 69

1    that complaint?
2        A.  That I would have to discuss it
3    with my supervisor.  And then after that, it
4    would be follow the chain of command.  And Joe
5    Roberts would only be met with in regards to
6    that after the chain of command is followed.
7        Q.  Did Joe send his response by
8    e-mail?
9        A.  Yes.
10       Q.  Did you ever talk to Joe Roberts
11   about your complaint?
12       A.  No.
13       Q.  Did you ever e-mail any other
14   complaint to Joe Roberts?
15       A.  No.
16       Q.  Did Joe Roberts ever tell you to
17   follow the chain of command on any other
18   occasion?
19       A.  No.
20       Q.  After November 12th, 2019 when you
21   started earning comp time again, did you
22   complain to anyone at the DA's office about
23   earning comp time?

Page 70

1        A.  There was no need after that
2    because I was -- it was reinstated, but it was
3    reinstated with restrictions.  I didn't want
4    to complain anymore because I didn't want to
5    have any other things taken away from me or be
6    mistreated unfairly in any other way.  So I
7    basically just kept everything else to myself
8    and didn't really communicate with anyone in
9    the office.
10       Q.  Okay.  Just to make sure I
11   understand, after November 12th, 2019, you
12   didn't complain to anyone at the DA's office
13   about earning comp time; correct?
14       A.  Incorrect.  I did complain, but it
15   was only, like I said, to Erin Barefield and
16   to Elise Driskill because I still had the
17   restrictions on me.
18       Q.  Okay.  Did you complain to anyone
19   else at the DA's office besides Elise and
20   Elaine [sic] after November 12th, 2019,
21   regarding your comp time?
22           MR. NOBLE:  Erin?
23       Q.  (BY MR. MURRILL:)  Erin.  Let's

Page 71

1    try this again.
2            MR. NOBLE:  Sorry.
3        Q.  (BY MR. MURRILL:)  After November
4    12th, 2019, you complained to two fellow VSOs
5    about your comp time; correct?
6        A.  Yes.
7        Q.  Did you complain to anyone else at
8    the DA's office after November 12th, 2019,
9    about earning comp time?
10       A.  In this moment, I don't believe I
11   did.
12       Q.  Okay.  I want to focus on the time
13   period between September 23rd, 2019, when your
14   comp time was taken away, and November 12th,
15   2019, when you were allowed to start earning
16   comp time again; okay?
17       A.  Okay.
18       Q.  All the questions I'm about to ask
19   you are for that time period, September 23rd,
20   2019 through November 12th, 2019.  During that
21   time did you take off of work?
22       A.  Yes.
23       Q.  Did you have some sort of leave to

Page 72

1    cover the time that you took off of work?
2        A.  Yes.
3        Q.  During that time, did you miss any
4    medical appointments?
5        A.  I'm not sure during that time.  I
6    did miss some appointments.  I don't know
7    exactly if it falls between that time frame.
8    I don't know.
9        Q.  Okay.  During that time frame if
10   you missed any medical appointments, were
11   those appointments rescheduled?
12       A.  It's a possibility they were
13   rescheduled.  I would not know exactly what
14   time they were rescheduled.
15       Q.  Okay.  Were all of those medical
16   appointments for you?
17       A.  I believe so.  In this moment, I
18   can't say.  Possibly yes, but it's a
19   possibility they could have been for my
20   husband as well so I'm not really sure.
21       Q.  Okay.  For the appointments that
22   you missed, were they rescheduled at some
23   point?

18  (Pages 69 to 72)

Lanitra Jeter                                          12/10/2021

---

Page 73

1      A.  I have one appointment that was
2  not rescheduled.  I do not know if it was
3  between that time frame though.  I believe it
4  was but that one was not rescheduled.
5      Q.  What was that appointment?
6      A.  That was for an orthopaedic.
7      Q.  Why was that appointment not
8  rescheduled?
9      A.  Because I decided that I didn't
10  need the follow-up.  The follow-up was for an
11  additional surgery.  I was not going to get
12  the surgery, so there was no need to follow
13  up.
14      Q.  Gotcha.  Now let's jump ahead.
15  The time period between November 12th, 2019,
16  when you were allowed to start earning comp
17  time again and your termination on March 16th,
18  2020, so all of my questions are for that time
19  period.  November 12th, 2019, when you were
20  allowed to start earning comp time again,
21  through your termination on March 16th of
22  2020, did you take off work during that time
23  period?

---

Page 74

1      A.  Yes.
2      Q.  And did you have some sort of
3  leave to cover the time that you took off?
4      A.  Yes.
5      Q.  Okay.  Did you earn comp time
6  during that period?
7      A.  I earned comp time with
8  restrictions, yes.
9      Q.  Okay.  But did you earn some sort
10  of comp time during that time period?
11      A.  Yes.
12      Q.  And did you use comp time during
13  that time period?
14      A.  I believe so, yes.
15      Q.  Okay.  Did you miss any medical
16  appointments during that time period?
17      A.  Yes.
18      Q.  Were those appointments
19  rescheduled?
20      A.  I'm not sure.  Most of my
21  appointments were rescheduled after I was
22  terminated because I knew I could keep those
23  because I no longer had a job.

---

Page 75

1      Q.  Okay.  The appointments that were
2  rescheduled for the time period that you were
3  still at work, were you able to go to those
4  rescheduled appointments?
5      A.  No.
6      Q.  Okay.  What appointments did you
7  miss that you were not able to reschedule?
8      A.  I missed a primary care
9  appointment.  I believe I missed, if I can
10  remember, it was an OB/GYN appointment.  And
11  that's all I can remember right now.
12      Q.  Who was your primary care
13  physician or your primary care appointment
14  with?
15      A.  My primary care doctor was Rick
16  Brown.
17      Q.  Who was your OB/GYN?
18      A.  I don't have her information in
19  front of me.  I don't know.  I know it's at
20  St. Vincent's.
21      Q.  Okay.  Do you know when the
22  primary care appointment was that you missed
23  and were not able to get rescheduled?

---

Page 76

1      A.  I do not, no.  I don't remember.
2      Q.  What about the OB/GYN appointment?
3  Do you recall when that was that you were not
4  able to get rescheduled?
5      A.  I don't remember.
6      Q.  Let's go back to Exhibit 1.
7      A.  Oh, 1.  I'm sorry.
8      Q.  Your interrogatory responses.  And
9  let's go back to page 4.  The second bullet
10  point says, made to bring doctor's excuse to
11  confirm I had an appointment, ordered by Judy
12  Yates and Michael McCurry.  Is that the event
13  that took place on September 23rd, 2019, we've
14  already discussed?
15      A.  Yes.
16      Q.  Were you ever made to bring in a
17  doctor's excuse at any other time period that
18  you can recall?
19      A.  Not that I can recall.
20      Q.  The third bullet point says, made
21  to request permission from Judy Yates and
22  Michael McCurry to work through lunch while
23  working a project.  No Caucasian victim

---

19  (Pages 73 to 76)

Lanitra Jeter                                          12/10/2021

Page 77

```
 1    service officer had to request permission.  Is
 2    that the event where you were trying to work
 3    through lunch on the project and you had to
 4    get with Michael McCurry to get permission
 5    that we've already discussed?
 6        A.  Yes.
 7        Q.  Did that happen on any other
 8    occasion?
 9        A.  Not that I can recall, no.
10        Q.  Okay.  Backing up to the doctor's
11    excuse, did you complain to anyone at the DA's
12    office about having to bring a doctor's
13    excuse?
14        A.  Yes.
15        Q.  Who did you complain to?
16        A.  Erin Barefield and Elise Driskill.
17        Q.  Okay.  Did you complain to anyone
18    at the DA's office about having to get
19    permission to work through lunch?
20        A.  Yes.
21        Q.  Who did you complain to?
22        A.  Erin Barefield and Elise Driskill.
23        Q.  The fourth bullet point says, the
```

Page 78

```
 1    only victim service officer who did not
 2    receive new office furniture by Michael
 3    McCurry even though I was hired before
 4    Caucasian victim service officer.  What are
 5    you referring to there?
 6        A.  That was the incident where the
 7    office was receiving new furniture.  Erin
 8    Barefield was hired first, I was hired second,
 9    Elise Driskill was hired third.  The protocol
10    was that you would receive new furniture in
11    the order that you were hired.  I did not
12    receive any new office furniture even though I
13    was hired prior to Elise Driskill.  But Elise
14    Driskill did receive office furn -- new office
15    furniture.
16        Q.  What did Elise receive?
17        A.  An entire complete set, office set
18    of furniture.
19        Q.  New desk?
20        A.  Yes.
21        Q.  New chair?
22        A.  No.
23        Q.  Anything else that she received
```

Page 79

```
 1    besides a new desk?
 2        A.  New desk.  I think you call it
 3    like a bookshelf or a hutch or something like
 4    that.  I believe she received new chairs, and
 5    that's all I can recall.
 6        Q.  Okay.  When did this occur?
 7        A.  I don't know the exact time.  I
 8    don't recall the exact time.
 9        Q.  Do you recall whether it was
10    before or after November 12th, 2019, when you
11    started earning comp time again?
12        A.  I'm not a hundred percent sure,
13    but I believe it was after.
14        Q.  Did you complain to anyone at the
15    DA's office about not receiving new furniture?
16        A.  I did not complain because I did
17    not want to have anything additional happen to
18    me, because I already had the black rat put on
19    my nameplate.  I already had comp time taken
20    away, and I was afraid it would be taken away
21    again.  I already had, you know, some things
22    with different cases that I was a victim in
23    and my husband was a victim in that were
```

Page 80

```
 1    already being mishandled or dismissed and no
 2    billed.  I was already, like I said, being
 3    watched, being followed, being monitored,
 4    micromanaged, just treated very disgustingly,
 5    and so I just decided why even make it -- my
 6    workplace even more hostile, so I did not say
 7    anything.
 8        Q.  The next bullet point says, on
 9    Exhibit 1, only victim service officer made by
10    Michael McCurry to ask Caucasian victim
11    service officer, Erin Barefield, if she wanted
12    the vacant office before I could have
13    permission to occupy the empty office.  What
14    are you referring to there?
15        A.  There was an incident where
16    another VSO officer had resigned.  She moved
17    to another location.
18        Q.  All right.  Let me stop you there.
19    Which VSO officer --
20            MR. NOBLE:  Go ahead.
21        Q.  -- resigned?
22            MR. NOBLE:  Let's let her finish
23    her answer, but fair enough, go ahead.
```

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Lanitra Jeter                                                    12/10/2021

Page 81

1      A.  Okay.  Racquel -- I don't remember
2  her last name.
3      Q.  (BY MR. MURRILL:)  Okay.  Please
4  continue.
5      A.  Okay.  So Racquel had resigned.
6  She left and moved.  I think her husband got a
7  new job and she moved away and so her office
8  was vacant.  Her office was a lot bigger than
9  the office that I was already in.  And because
10  it was vacant, I asked Michael McCurry if it
11  would be a problem if I moved into that
12  office.  He informed me that I needed to ask
13  Erin Barefield if she wanted the office first
14  before I would be able to occupy it.  And if
15  she did not want it, then I would be able to
16  move into that office.
17      Q.  Did you ask Erin whether she
18  wanted the office?
19      A.  Yes.
20      Q.  Did Erin want the office?
21      A.  No.
22      Q.  Were you able to move into the
23  office?

Page 82

1      A.  Yes.
2      Q.  Okay.  And when did this take
3  place?
4      A.  I can't remember the exact time.
5  In all honesty, I can't remember.
6      Q.  Do you think it was before or
7  after you started accruing comp time again on
8  November 12th, 2019?
9      A.  Honestly, I can't answer because I
10  don't know.
11      Q.  Okay.  Do you think it occurred in
12  2020?
13      A.  No.
14      Q.  So at some point in 2019; would
15  that be fair?
16      A.  Yes.
17      Q.  Did you complain to anyone about
18  having to ask Erin Barefield if she wanted the
19  vacant office?
20      A.  I complained to Erin Barefield.
21      Q.  Did you complain to anyone else?
22      A.  No.
23      Q.  The next bullet point, which is on

Page 83

1  page 5, says constantly being watched and
2  reported by Judy Yates, Michael McCurry,
3  Cheryl Black, Joe Roberts and various other
4  Caucasian staff, and in parenthesis, don't
5  know all their names.  What are you referring
6  to there?
7      A.  That was in reference to when I
8  had the meeting with Michael McCurry and Judy
9  Yates.  I was informed then that I was using
10  comp time as soon as it accrued and it was
11  being noticed by other coworkers in the
12  office.  And I guess, I can only assume that
13  they either complained or had something to say
14  about it.  I don't know.  So, in that
15  instance, that means I was being watched
16  because how would you know I'm using comp
17  time, how would you know I'm leaving, how
18  would you know what I'm trying to use it for
19  unless you're watching everything that I do.
20      Q.  Okay.  Who was it being reported
21  to?
22      A.  It was being reported that I knew
23  of to Judy Yates for sure.  And Judy Yates

Page 84

1  reported it to Joe Roberts and Michael
2  McCurry.
3      Q.  How do you know that Judy reported
4  it to Joe Roberts?
5      A.  Because that is the chain of
6  command that she normally follows for her.
7  She is my supervisor.  If it's anything that
8  she sees or -- sees any other VSO officers do,
9  she reports it to Joe Roberts because that is
10  her supervisor.
11      Q.  Okay.  But do you have any
12  specific knowledge of Judy reporting that to
13  Joe Roberts?
14      A.  I don't have specific knowledge,
15  no.
16      Q.  Okay.  The next bullet point --
17  well, let's back up.  With regard to the
18  watched and reported, did you complain about
19  that to anyone at the DA's office?
20      A.  Again, no, because I did not want
21  to have an even more hostile workplace, didn't
22  want to have, you know, something taken away
23  from me or be discriminated against more or

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Page 85

1    retaliated against even more, so I just kept
2    it to myself. Like I said, I already had
3    complained before and I come to work and
4    there's a black rat on my door. So I'm
5    already being labeled a black rat or a snitch
6    or anything like that for complaining about
7    unfair treatment, so I just didn't say
8    anything.
9        Q. Okay. The last bullet point says,
10   only victim service officer made by Judy Yates
11   to clock out or use time when someone visited
12   my office while Caucasian service officer --
13   victim service officer constantly had visitors
14   in her office without having to clock out or
15   use time. What are you referring to there?
16       A. Okay. So there were times where
17   VSO officers would have different people in
18   their office. They were not talking about
19   work-related things or anything like that.
20   They were just chitchatting. That officer,
21   VSO officer never had to clock out to chitchat
22   with another individual or anything like that.
23   There were VSO officers that had family

Page 86

1    members that came to visit them in the office,
2    they never had to clock out or do anything
3    like that. Judy Yates even had her children
4    come to the office and stay with her for a
5    couple of hours, she didn't have to clock out
6    for that as well. I was the only one that was
7    told I had to clock out if I had someone visit
8    me in my office.
9        Q. Did you ever have to clock out for
10   someone visiting you in your office?
11       A. I did not. When she told me that
12   she wanted me to clock out, I just told them
13   don't worry about it, don't come.
14       Q. Did you ever have to use leave,
15   any sort of comp leave to have somebody visit
16   you in your office?
17       A. No.
18       MR. MURRILL: We've been going
19   about another hour. Do you want to take five
20   minutes?
21       MR. NOBLE: Sure.
22       (Whereupon, a short break was
23           taken.)

Page 87

1        Q. (BY MR. MURRILL:) Before our
2    break we were talking about the bullet points
3    that are on page 4 and page 5 of Exhibit 1.
4    Do you also believe your termination was an
5    act of discrimination?
6        A. Yes.
7        Q. Okay. Were you told why you were
8    being terminated?
9        A. No, I was never told.
10       Q. Were you given a termination
11   letter?
12       A. Yes.
13       Q. Okay.
14           (Whereupon, Defendant's
15           Exhibit 4 was marked
16           for identification.)
17       Q. I will show you Exhibit 4 to your
18   deposition. Is Exhibit 4 the termination
19   letter you were given?
20       A. (Reviewing document.) Yes.
21       Q. That letter is signed by Danny
22   Carr; correct?
23       A. Yes.

Page 88

1        Q. Okay. Do you believe Danny Carr
2    discriminated against you regarding your
3    termination?
4        A. Yes.
5        Q. Do you believe that Danny Carr
6    retaliated against you regarding your
7    termination?
8        A. Yes.
9        Q. All right. What was he
10   retaliating for?
11       A. For complaining within the office
12   to the mistreatment that I was receiving, the
13   discrimination I was receiving, the
14   retaliation I was receiving, the report of the
15   black rat that was, you know, on my door. And
16   also I feel that he listened to things that
17   were being said that were actually false about
18   me from Judy Yates, Joe Roberts and Michael
19   McCurry.
20       Q. Okay. So you talked about
21   retaliation with the complaint you were making
22   in the office. What complaints are you
23   referring to?

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Lanitra Jeter                                               12/10/2021

Page 89

1     A.   The comp time complaints, the
2  harassment that I was receiving, the
3  mistreatment I was receiving, the impact that
4  those things were doing to me mentally and
5  physically, having to be restricted on certain
6  things where other people didn't have those
7  restrictions, just being all around mistreated
8  totally different from my other VSO officers
9  that were white and the way they treated me.
10    Q.   Okay.  Are those complaints the
11 ones you've told me about when we were talking
12 about the other acts of discrimination or are
13 we talking about something different?
14    A.   I don't understand the question.
15    Q.   Sure.  You told me about when I
16 would ask you on a specific matter who did you
17 complain to and you would tell me who you
18 complained to.  Are those the complaints you
19 think Danny Carr was retaliating against you
20 for?
21    A.   Yes.
22    Q.   Okay.  We've talked about your
23 termination.  We've also talked about the

Page 90

1  seven bullet points on pages 4 and 5 of
2  Exhibit 1.  Do you believe the DA's office
3  discriminated against you in any other way?
4     A.   I feel it was discrimination based
5  on my race, me being the only African-American
6  VSO officer.  I feel that when they mishandled
7  the cases that involved me, I felt like that
8  was part of discrimination.  That's what it
9  felt like to me.  When they made me ask
10 permission from the other VSO officer that was
11 white for an office before it would be given
12 to me, when they made me, you know, have to go
13 to ask to work through lunch when the other
14 VSO officers that were white didn't have to do
15 that.  You know, that was humiliating for me.
16 And I just felt like those were things of, you
17 know, discrimination.
18         And also, you know, when they -- I
19 feel like it was discrimination when, you
20 know, they put the rat on my door and it was
21 only on my door and I'm the only black VSO
22 officer.  And no other VSO officer had a rat
23 on their door.  Those are the only things I

Page 91

1  can think of, you know, right now.
2     Q.   All right.  Let's try to put some
3  boxes on this.  We've talked about the seven
4  bullet points in response to interrogatory 6
5  on Exhibit 1; do you see those?
6     A.   Okay.
7     Q.   And you believe those were
8  instances of discrimination; correct?
9     A.   Yes.
10    Q.   Okay.  We talked about your
11 termination and you believe that is
12 discrimination; correct?
13    A.   Yes.
14    Q.   You just told me about mishandling
15 cases.  Do you think that is discrimination?
16    A.   I think it could be discrimination
17 and it could also be a part of retaliation.  I
18 think it's kind of like borderline on both.
19    Q.   Okay.  You also told me about the
20 black rat on your door.  Do you think that was
21 discrimination?
22    A.   It's the same, yes, I feel like it
23 was borderline on both, discrimination and

Page 92

1  retaliation.
2     Q.   Okay.  So what I'm asking you is
3  other than the bullet points on pages 4 and 5
4  in response to interrogatory 6 and the
5  termination and the mishandling of the cases
6  and the black rat, do you think the DA's
7  office discriminated against you in any other
8  way?
9     A.   In this moment, I believe that
10 these are all the ones that I can recall in
11 this moment that I felt were discrimination.
12    Q.   Okay.  Let's talk about the black
13 rat.  If you'll go to page 6 of Exhibit 1,
14 response to interrogatory 9, the first bullet
15 point says, October 2019 cutout of a black rat
16 placed on my nameplate outside my office,
17 unknown party.  Tell me what happened.
18    A.   October 28, 2019 was a Monday.
19 The week prior I had had discussions with, I
20 believe it was -- I can't recall if it was
21 Judy Yates or Michael McCurry.  I can't
22 remember exactly who it was.  I left for work
23 that Friday.  Nothing was on my door.  Nothing

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Lanitra Jeter                                    12/10/2021

Page 93

1   was on anything in the hallway of where my
2   office is and the other VSO offices were.
3          All of the Halloween decorations
4   for the office had been put up the first
5   week -- towards the middle of the first week,
6   beginning of the second week of October.
7   Everything was already out.  That was all the
8   little -- these were plastic rat cutouts that
9   were already out and they were on the floor by
10  the printer.  You had like a picture of a
11  witch that was on the side of the wall.  No
12  decorations were near any of the offices where
13  I'm located, Erin is located, or Elise was
14  located on that Friday.  Everything was
15  located by the printer and the break room that
16  they used to keep the supplies and everything
17  in.  That's where everything was limited to as
18  far as decorations.
19         I come to work October 28, 2019,
20  which is that Monday.  I come around the
21  corner, the first thing I see is a cutout of a
22  black rat placed on my nameplate.  And I
23  stopped in mid-stride because I -- I -- I just

Page 94

1   stared at it because I was, like, I can't -- I
2   can't believe this.
3          And I looked at Elise's door.  I
4   looked at Erin's door.  I even walked around
5   the corner to look at Judy's door and Cheryl's
6   door.  No other VSO officer that was white had
7   a cutout of a black rat placed on their
8   nameplate.  It was only me, and I'm the only
9   African-American.  So it's either you're
10  calling me a black rat because I'm
11  complaining, you're calling me a black rat
12  because I am black, or you're calling me those
13  things because it's both.  Either way, it
14  was -- it was hurtful to me.
15         When I saw it, I put my stuff down
16  in my office and I went to the bathroom.  I
17  cried because I was tired, trying to do a job
18  while I'm being treated like crap by people
19  who don't even know me, haven't tried to get
20  to know me, don't even know anything about me.
21  I came back out -- no, I take that back.  In
22  the bathroom I had to fight off urges because
23  I was already going through depression because

Page 95

1   of this as well.  My medication had already
2   been up from a hundred -- from seventy-five to
3   a hundred.
4          Q.  You can keep going.
5          MR. NOBLE:  He's just getting you
6   a tissue.
7          A.  My medication had already been
8   increased to try to help me deal with it.
9   They even added a booster to it to try to help
10  me deal with it.  And it took me a while to
11  try to talk myself out of the urges I was
12  getting because I do self-harm myself.  And it
13  took everything I had not to self-harm myself
14  in the restroom at work.
15         And so after I finally got myself
16  together, I went back to my office and I took
17  a photo of it, and I just stayed in my office
18  the remainder of the day.
19         I promised myself then I'm not
20  going to say anything else to anybody,
21  complain or anything.  I'll just take whatever
22  they give me.  I only work an eight-hour
23  shift.  I work Monday through Friday, I'll

Page 96

1   just get through it and I'll deal with it.
2          I didn't want to ask Judy about it
3   because honestly I believe she's the one that
4   put it there.  Because when I left work
5   Friday, all the VSO officers, we walked out
6   together.  Judy, Joe, and I think Michael
7   McCurry were the only ones that were left in
8   that office at that time.  And like I said it
9   was a Friday.  I came back on that Monday and
10  it was sitting on my desk -- I mean, it was
11  sitting on my tag.
12         So, again, because I didn't want
13  to go through anything else, I didn't want to
14  harm myself again and I didn't want to make my
15  situation worse with my health physically and
16  mentally, and I was tired of getting reported
17  and watched and looked at and lied on, so I
18  just didn't say anything.  I just took the
19  photo and dealt with it.
20         Q.  (BY MR. MURRILL:)  All right.
21  Let's see if we can unpack that a little bit.
22  Where was the black rat cutout relative to
23  your nameplate?

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Lanitra Jeter                                          12/10/2021

Page 97

1    A.  It was sitting right on top.
2    Q.  Was it --
3    A.  Above my name.  It was a black rat
4  and then my nameplate.
5    Q.  Okay.  Let me show you a document.
6  I'm not going to mark it as an exhibit.  There
7  was a point in this lawsuit that you
8  represented yourself; correct?
9    A.  Yes.
10    Q.  Okay.  The document I've shown you
11  was filed by you when you represented
12  yourself.  And for clarity, it was part of
13  document 42, pages 33 through 36.  Do you see
14  that?
15    A.  Okay.  Yes.
16    Q.  Do you have color photographs of
17  what you filed with the Court as part of
18  document 42, pages 33 through 36?
19    A.  I don't have -- I have the color
20  photo of it, yes.
21    Q.  Okay.
22      MR. MURRILL:  I've not seen that
23  color photo.

Page 98

1      MR. NOBLE:  I'll get that to you.
2  I'm sorry.  I thought they had been produced.
3  I apologize.
4    Q.  (BY MR. MURRILL:)  What color
5  photos do you have?
6    A.  I have a color photo of this one
7  with the rat above my nameplate.
8    Q.  For reference, that's page 33 of
9  document 42?
10    A.  It says 33 of 36.
11      MR. NOBLE:  It's 33 of --
12      THE DEPONENT:  Okay.
13      MR. NOBLE:  -- document 42.
14      THE DEPONENT:  Oh, okay.  All
15  right.
16      MR. NOBLE:  He's correct.
17    A.  Okay.  So, yes, that's what I'm
18  talking about.
19    Q.  (BY MR. MURRILL:)  Do you have any
20  other photos in color?
21    A.  Yes.  I also have a photo of the
22  same day, the same time of Elise Driskill's
23  nameplate and Erin Barefield's nameplate that

Page 99

1  do not have a black rat on them.
2    Q.  If you'll flip over to page 35 of
3  document 42, is that the picture that you have
4  a color version of?
5    A.  Yes.
6    Q.  Okay.  Do you have any other color
7  photographs regarding the black rat?
8    A.  No, not that I recall, no.
9    Q.  Okay.  How long did the black rat
10  remain above your nameplate?
11    A.  That Monday when I first saw it,
12  the 28th, that Tuesday, the 29th, and I
13  believe -- I believe it was Wednesday as well,
14  because Thursday I ended up having surgery, so
15  I was out Thursday and Friday.  So I don't
16  know if it was still up those days as far as
17  Thursday or Friday.  I do know when I came
18  back to work after my surgery, it was gone.
19    Q.  When did you come back to work
20  after your surgery?
21    A.  That following Monday.
22    Q.  Okay.  So would that be the
23  following Monday after October 28th?

Page 100

1    A.  Yes.
2    Q.  Okay.  And I know you said there
3  were no black rat cutouts on any other VSO
4  office door; correct?
5    A.  Yes.
6    Q.  Were there any cutouts on any VSO
7  office door?
8    A.  No.
9    Q.  Were there any cutouts near any
10  VSO office door?
11    A.  No.
12    Q.  Were there any other decorations
13  on the wall in the VSO office suite?
14    A.  Yes.  There was a photo of a
15  witch.
16    Q.  Where was that located?
17    A.  By the printer, copier, the copy
18  machine, the break room.
19    Q.  Why didn't you take the black rat
20  down?
21    A.  In all honesty, I am forty-seven
22  years old.  In my forty-seven years I've only
23  been called out of my name, the N-word, twice.

Lanitra Jeter                                        12/10/2021

Page 101

1    And the reason why I didn't take it down
2    because that's exactly what I felt like I was
3    being called again outside of, you know, the
4    black rat.  I didn't put it there so I was not
5    going to take it down.  I wanted to see who
6    was going to take it down, that way I could
7    figure out who put it there because I wanted
8    to know.  I wanted stuff to be stopped being
9    done behind my back, stop talking about me
10   behind my back, stop reporting stuff about me
11   behind my back.  You know, I just wanted to
12   see if the person that put it up there was
13   going to be brave enough to be that person to
14   take it down, and they weren't.  They did it
15   the same way they did, they put it up while I
16   was gone and they took it down while I was
17   gone.
18       Q.  Did you ask anyone at the DA's
19   office who put it up?
20       A.  I did.
21       Q.  Who did you ask?
22       A.  I asked Erin Barefield if she knew
23   who put it up there and I asked Elise Driskill

Page 102

1    who put it up there.  And I decided to ask
2    those two because those are the only VSO
3    officers in that office that I did not have --
4    or they did not have problems with me.  I was
5    not going back to Judy Yates for anything.  I
6    wasn't going back to Michael McCurry for
7    anything.  And I definitely wasn't going back
8    to Joe Roberts for anything because I saw what
9    the results are.  You get absolutely nothing.
10   You get lied on.  You get discriminated
11   against.  You get retaliated against.  So why
12   would I even go back to them, so I could have
13   more stuff done to me.
14       Q.  Okay.  Let's go back to Exhibit 1,
15   page 6.  The second bullet point says,
16   November 2019, comp time purposely restricted
17   by Judy Yates and Michael McCurry.  Have we
18   already talked about that?
19       A.  Yes.
20       Q.  Okay.  The next bullet point says,
21   my husband's DV and harassing communication
22   cases purposely mishandled, dismissed and no
23   billed to retaliate against me by Attorney

Page 103

1    Warren Brooks, Attorney Joe Roberts and Judge
2    Katrina Ross.  First of all, how many cases
3    are we talking about?
4        A.  I believe I was the victim in one,
5    which was harassing communication.  My husband
6    was a victim in a harassing communication by
7    Marquetta Murrell.  And I think her name is
8    Angel Jones, I believe, which is Marquetta
9    Murrell's daughter.  And my husband had a DV
10   case against Marquetta Murrell.  My harassing
11   communication case was again Marquetta
12   Murrell.
13       Q.  So was it a total of three cases?
14       A.  Yes, I believe it was three.
15       Q.  And Marquetta Murrell was the
16   defendant in all three of those cases?
17       A.  Yes.
18       Q.  And for one of the cases, Angel
19   Jones was Marquetta's co-defendant?
20       A.  She had her own separate case.
21       Q.  Okay.  So would it be a total of
22   four cases?
23       A.  Yes, you're right.

Page 104

1        Q.  So there was one harassing
2    communications case involving Marquetta
3    Murrell where you were the victim; correct?
4        A.  Yes.
5        Q.  And there was a separate harassing
6    communication case where your husband was the
7    victim also involving Marquetta Murrell;
8    correct?
9        A.  Yes.
10       Q.  All right.  There was a domestic
11   violence case involving Marquetta Murrell
12   where your husband was the victim; correct?
13       A.  Yes.
14       Q.  And there was a harassing
15   communication case where your husband was the
16   victim, and did that involve Angel Jones?
17       A.  Yes.
18       Q.  Okay.  How were those cases
19   mishandled?
20       A.  My harassing communication case
21   and my husband's harassing communication case
22   were combined, and they were handled by an
23   outside district attorney.  Her name was Carol

26  (Pages 101 to 104)

Lanitra Jeter                                                12/10/2021

Page 105

1  Boone. Actually they're still being handled
2  by her.
3         At first they were before Judge
4  Katrina Ross, who then when I informed the
5  attorney who originally had the case, because
6  it was originally applied to an attorney in
7  the DA's office, Jefferson County DA's office.
8  I believe -- that attorney I think was Amanda
9  Wyman, I believe. I'm not sure, but I believe
10 it was Amanda.
11        When I informed her -- because she
12 knew I worked there, number one. And I also
13 informed her that my husband, Kireem Jeter,
14 was in a relationship previously before me
15 with Judge Katrina Ross, that it was a
16 conflict and she needed to recuse herself.
17 And so that's when they appointed the district
18 attorney from -- I think it's St. Clair
19 County, which is Carol Boone, to handle the
20 case. And the case was transferred over to
21 Judge Fortune to handle.
22        That case was tried, handled. Ms.
23 Murrell was found guilty. She's on probation

Page 106

1  for twenty-four months, I think. And I think
2  it was like -- I think it was like -- I'm not
3  good with that, I'm not an attorney.
4  Twenty-four months' probation, suspended
5  sentence I think for twelve months. I think
6  that's how they worded it. And she was
7  ordered to pay restitution on that case.
8         Q. That was the case that was the
9  combined harassing communication case
10 involving you and your husband; correct?
11        A. Yes.
12        Q. Okay.
13        A. The case with my husband where he
14 was a victim and the defendant was Angel
15 Jones, that case was handled by Warren Brooks.
16 I also informed Warren Brooks, who is the
17 attorney at the Jefferson County office, that
18 I am an employee there. My husband was in a
19 relationship with Katrina Ross because that
20 case was before Katrina Ross as well. He
21 never had her recused. She also would not and
22 did not recuse herself. That was a conflict.
23        That case was -- actually ended up

Page 107

1  being thrown out because Warren told my
2  husband that he did not have to be present for
3  the court date, he said because he's being
4  represented by the State. So the State is
5  actually the victim in the case. So he didn't
6  go to court. Judge Ross threw the case out
7  because he wasn't there.
8         In my practice, as a victim
9  service officer, when we've had victims that
10 did not show, normally the judge will do like
11 a continuance so either the person could be
12 notified of the court date, figure out what
13 happened. That didn't happen in this case.
14 She just automatically dismissed the charges.
15        Q. And we're talking about the
16 harassing communication case where your
17 husband was the victim and Angel Jones was the
18 defendant; correct?
19        A. Yes.
20        Q. Okay.
21        A. Now, with the DV case where my
22 husband was the victim, Marquetta Murrell was
23 the defendant, that one went to the grand

Page 108

1  jury. It is my practice when I was a VSO
2  officer, we accompanied the victims to the
3  grand jury. The victim would testify to the
4  grand jury to tell them exactly what happened,
5  how it happened, all of the things that led up
6  to that. My husband showed up for grand jury.
7  He was not allowed to testify. He never went
8  in front of the grand jury. He never was able
9  to speak to the grand jury.
10        My husband in that case was hit by
11 a car driven by Marquetta Murrell. Because of
12 being hit by a car, my husband has had a total
13 hip replacement. He is only forty years old.
14 He was hit with a car. We have video of him
15 being hit by the car driven by Marquetta
16 Murrell. So not only did he get hit by the
17 car, have video of him being hit by the car,
18 had to have surgery, a total hip replacement,
19 he didn't get to testify in front of the grand
20 jury and his case was no billed.
21        Q. What district attorney handled
22 that case?
23        A. Danny Carr went into that one.

Lanitra Jeter                                           12/10/2021

Page 109

1    Danny Carr, Carol Boone, and there was a
2    detective. And I don't know the detective's
3    name.
4        Q. And Carol Boone is with the St.
5    Clair County District Attorney's office?
6        A. Yes.
7        Q. You said that case was no billed?
8        A. Yes. And normally when a case is
9    no billed, you will get notification via
10   letter in the mail. We never received that.
11   I was called into Joe Roberts' office and he
12   verbally told me that the case was no billed.
13       Q. When were you called into Joe
14   Roberts' office?
15       A. I can't remember the date. So, in
16   that instance, we don't know what was said to
17   the grand jury. We don't even know if it was
18   brought before the grand jury in that room.
19   We don't know what they discussed. We don't
20   know anything because my husband was never in
21   there and never allowed to go in.
22       Q. And your husband was the victim in
23   that case?

Page 110

1        A. Yes.
2        Q. When Joe Roberts said it was no
3    billed, did your husband attend that meeting
4    with you?
5        A. No.
6        Q. He just told you -- Joe Roberts
7    just told you that it was no billed?
8        A. Yes, he called me to his office
9    and told me.
10       Q. Okay. Did he explain why it was
11   no billed?
12       A. No.
13       Q. Okay.
14       A. He didn't go into detail. I
15   became very upset, went back to my office,
16   cried, closed the door. Erin came and checked
17   on me to see if everything was okay. I just
18   told her I needed a minute. I told her that I
19   was tired, tired of dealing with it, tired of
20   dealing with everything here. I'm tired of
21   them trying to -- for them going through me or
22   going through my husband to get to me and vice
23   versa. And at that point, I actually did

Page 111

1    self-harm myself at work.
2        Q. What did you do at work to
3    self-harm?
4        A. I'm -- I'm -- I'm a cutter. And
5    so stuff -- when certain things get hard for
6    me, I cut myself.
7        Q. Did you tell anybody you had cut
8    yourself?
9        A. I informed Elise. I'm not sure if
10   I told Erin or not. Those are the people I
11   told in the office. I told a friend of mine,
12   who's a therapist, that -- outside of the
13   office because that's not something I share.
14       Q. Did you ever talk to Warren Brooks
15   about the harassing communication case he
16   handled --
17       A. Yes.
18       Q. -- involving your husband?
19       A. Yes, I did.
20       Q. And when was that case dismissed?
21       A. I can't remember.
22       Q. Do you know if it was in 2019 or
23   2020?

Page 112

1        A. To be honest, I don't remember.
2        Q. Okay.
3            MR. NOBLE: Do you want to take a
4    break?
5            THE DEPONENT: I'm good.
6        Q. (BY MR. MURRILL:) Other than
7    being the victim in the one case involving Ms.
8    Murrell where you were the victim, did you
9    participate in any aspects of the three cases
10   involving your husband?
11       A. I don't understand the question.
12       Q. Sure. Did you do anything
13   involving those cases? Did you have to go
14   to -- for example, did you testify regarding
15   those cases?
16       A. No. We ended up -- she ended up
17   pleading guilty, so I didn't have to testify,
18   neither did he, in the harassing communication
19   case.
20       Q. Okay. What about the case that
21   Warren Brooks handled? Did you have to
22   testify in that case?
23       A. We never got a chance. It was

28  (Pages 109 to 112)

Lanitra Jeter                                    12/10/2021

Page 113

1  dismissed before Judge Ross.
2      Q.  Did you ever talk to Judge Ross
3  about that case?
4      A.  No.
5      Q.  Is Judge Ross a circuit court
6  judge or district court judge, if you know?
7      A.  I don't know, but I believe it's
8  district.
9      Q.  Okay.  She's a judge?  She doesn't
10 work for the DA's office; correct?
11     A.  Correct.
12     Q.  All right.  Let's go back to
13 Exhibit 1, page 6.  The next bullet point,
14 March 16th, 2020, purposely humiliated by
15 Attorney Joe Roberts by two armed sheriff
16 officers.  Was this the day you were
17 terminated from the DA's office?
18     A.  Yes.
19     Q.  Okay.  And you were escorted out
20 of the building after you were terminated?
21     A.  Yes.
22     Q.  Okay.
23     A.  I think that was just the final

Page 114

1  straw, them retaliating and possibly just --
2  you know, just humiliating me because here I
3  am, I'm a female.  Why do I need two armed
4  sheriff officers to escort me out of a
5  building?  I never showed any sense of being
6  aggressive, violent, anything at work, so why
7  do I -- so why did I deserve that?  And then
8  you take my badge.  You take, like, my laptop,
9  the tablet and all those things.  You don't
10 even give me an opportunity to get my stuff
11 together and take it with me.  You tell me
12 that I can reach out to Sam Johnson to -- at a
13 later time to get my stuff out of my office.
14      And so I reach out, I reach out, I
15 reach out, we could never meet.  The next
16 thing I know when I do go and finally meet
17 him, I'm thinking I'm finally going to get my
18 stuff out of my office, they've already packed
19 up my stuff and it's in a box.  And they
20 didn't care.
21      They didn't even give me all of my
22 stuff back.  I still don't have all of my
23 belongings.  I had things that were damaged in

Page 115

1  the box because you just threw stuff in there.
2  I had books.  I had my degrees in there.  I
3  had all those things in there.  What you
4  thought about me and my stuff was absolutely
5  nothing.  So that was like -- you know, like,
6  okay, one more thing that you can do to
7  LaNitra Jeter.
8      Q.  And that all occurred after your
9  termination; correct?
10     A.  Yes.
11     Q.  Okay.  The next bullet point, page
12 6, only victim service officer that did not
13 receive new office furniture by Michael
14 McCurry even though I was hired before the
15 Caucasian victim service officer that did
16 receive new office furniture.  Is that the new
17 office furniture matter we previously
18 discussed?
19     A.  Yes.
20     Q.  All right.  So we've talked about
21 the things laid out in the six bullet points
22 in response to interrogatory number 9.  Are
23 there any other ways that you claim the DA's

Page 116

1  office retaliated against you?
2      A.  At this moment, this is all I can
3  recall at this present time.
4      Q.  Okay.  Let's go back to Exhibit 3.
5  Did you fax Exhibit 3 in the EEOC?
6      A.  Yes.
7      Q.  When did you do that?
8      A.  March 20th.  March 20th, 2020.
9      Q.  Did you also send a copy to the
10 DA's office?
11     A.  No.
12     Q.  Did you send anything in writing
13 to the EEOC before March 20th, 2020?
14     A.  I did the online intake.  I think
15 it's called like an inquiry, I believe.  I'm
16 not really sure exactly what they're called,
17 but I did the initial complaint online.  And
18 then I spoke -- then I sent this.  And then I
19 ended up talking with an investigator.  And
20 then I got the dismissal, right to sue letter.
21 And then I had noticed that they had dated it
22 incorrectly.  So I did contact the
23 investigator and made him aware of that.  And

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Lanitra Jeter                                                    12/10/2021

Page 117

1    he sent it over to his supervisor, who then
2    sent a letter to me and a letter to the
3    district attorney's office. I think it was
4    cc'd to Joe Roberts to let him know that
5    the -- I guess the -- I want to call it like
6    the charge date, interview date or something
7    like, that was incorrect. So the only thing I
8    ever sent was this fax and the online
9    application.
10        Q.  Okay. When did you send the
11   online application?
12        A.  I think the inquiry was done
13   November 2019. I don't know the exact date,
14   but I think it was in November 2019.
15        Q.  Do you have a copy of that
16   inquiry?
17        A.  I do not have a copy. It would
18   actually be on the EEOC portal or it would be
19   in the EEOC file.
20        Q.  Okay. So anything you would have
21   filled out with the EEOC prior to March 20th,
22   2020, should be in the EEOC file; is that
23   correct?

Page 118

1        A.  Yes.
2        Q.  Okay. All right. Let's switch
3    gears. You've told me about the
4    discrimination with the DA's office. You've
5    told me about the retaliation at the DA's
6    office. Did any of that discrimination or
7    retaliation cause you any physical injuries?
8        A.  Yes.
9        Q.  What physical injuries did the
10   retaliation and discrimination cause you?
11        A.  Because my comp time was taken
12   away and because I missed certain doctors'
13   appointments that I actually needed, my
14   diagnosis was extended out longer because I
15   could have found out what was actually wrong.
16   I didn't find out what was wrong with me until
17   after I was terminated because I was able to
18   make my doctors' appointments and get to that
19   doctor's appointment. I have Type Two
20   diabetes. Because it went on so long
21   undetected, I have nerve damage now.
22        I have -- my vision is not good
23   because at first I had 20/20 vision. I had

Page 119

1    Lasix surgery. I had 20/20 vision. My vision
2    is not what it was. You see I'm wearing
3    glasses. Even with glasses I have days where
4    my prescription doesn't work, and so I have to
5    just wait for my eyesight to clear up, it's
6    going to be blurry and things like that.
7        I have nerve damage in my -- in my
8    feet, so my circulation is not good anymore.
9    I actually don't have feeling in my right foot
10   on the right side. So if I actually hit it,
11   step on something, cut it, I would not know,
12   and it's happened. And I didn't realize it
13   until I look down and I'm bleeding.
14        My anxiety state, my depression
15   state, all of that has increased while I was
16   working there. Some of it escalated even
17   after that because of the termination,
18   retaliation, being walked out and humiliated
19   because, again, I'm forty-seven years old.
20   That's my first time ever being fired in my
21   life. I've never been fired in my life like
22   that before that.
23        I had stopped cutting. The stress

Page 120

1    from working there and dealing with that and
2    having things taken away from me and missing
3    doctors' appointments and not being treated
4    like the other white VSO officers or having
5    things retaliated against me. My husband is
6    missing appointments. My husband is getting
7    hit by cars and things getting no bills.
8    They're trying to convince us to drop cases
9    against Marquetta Murrell, and I'm telling
10   them different things. I'm telling Danny
11   Carr, hey, I'm getting this done to me. I'm
12   being discriminated against. And he even --
13   it looked at the point where he didn't even
14   want to have a meeting with me. It wasn't
15   even his problem. He didn't care. Because
16   even when I told him those things and we're
17   sitting in the meeting, he had a nonchalant
18   attitude, like what are you even telling me
19   for, what's the big deal. And I guess it
20   didn't bother him because it's not happening
21   to him.
22        So all of those things have
23   affected me. Every day I have to take

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Lanitra Jeter                                            12/10/2021

Page 121

1    antianxiety medicine.  I have to take
2    depression medicine.  I started cutting myself
3    again.  I had stopped doing that.
4         So now I'm trying to get myself
5    back to at least some form of normalcy with my
6    diabetes, because when I first found out, I
7    was at a nine.  I was almost -- I was almost
8    on my way out of here.  It was just lucky that
9    I was able to get an appointment and he was
10   able to get me on medication.  I'm on insulin
11   now.  I'll never be able to go back to a
12   hundred percent like I was before.
13        I go downtown to try to go pay
14   stuff at the bank.  I can't even pass by the
15   district attorney's office without having a
16   nervous breakdown.
17        Q.  All right.  I had asked you about
18   the physical injuries that you say the
19   depression -- excuse me, the discrimination
20   and retaliation has caused.  Are there any
21   other physical injuries that you claim the
22   discrimination and retaliation caused?
23        A.  Well, I consider the depression

Page 122

1    and the anxiety to be physical because those
2    are the things that caused me to cause
3    physical harm to myself with the cutting, so
4    that's why I considered that to be physical.
5    A lot of people don't understand.  Stress,
6    mental illness, mental health, anxiety, all of
7    those things, those are physical because those
8    things can take a toll on your body when
9    you're going through those things.  It causes
10   you to have high blood pressure.  It can cause
11   you to have heart disease, all those things.
12   Those are physical things, you know.  I no
13   longer have, like I said, feeling in my -- in
14   my right foot because I didn't know I had
15   diabetes.  I didn't know.  If I had known and
16   caught it in time, I wouldn't have these
17   physical ailments now.  I'm forever on
18   insulin.  I have to take a shot every Sunday
19   the rest of my life.  This is not going away.
20   So that's physical to me.
21        You know, and a lot of people
22   don't think depression and mental health is
23   physical, but it is.  It takes a toll on your

Page 123

1    body.  So those things are physical to me.
2         Q.  Okay.  So if I understand you
3    correctly, the physical injuries you claim
4    that the retaliation and discrimination caused
5    are your Type Two diabetes, your anxiety and
6    your depression.  Is there anything else?
7         MR. NOBLE:  Object to the form.
8    You can answer.
9         A.  Okay.  Because I'm not a doctor
10   and I don't really know what other
11   possibilities can arise, because like I said,
12   I still go back and forth to the doctor.  At
13   this time those are the only things that I can
14   recall because I don't know.  I really don't
15   know.
16        Q.  (BY MR. MURRILL:)  Okay.  Who has
17   provided treatment for you for your Type Two
18   diabetes?
19        A.  I see Dr. Michael Putman.  I have
20   to see -- he's my primary care --
21        Q.  Let me stop you there.  Was he
22   your primary care physician while you were
23   working at the DA's office?

Page 124

1         A.  I actually had a primary care that
2    was Rick Brown, and then he stopped
3    practicing.  So then I went to Michael
4    Putman --
5         Q.  Okay.
6         A.  -- but they're both at St.
7    Vincent's.  I have to see a neurologist who
8    kind of monitors my nerve damage.  I have to
9    see a --
10        Q.  Let me stop you there for a
11   second.
12        A.  Okay.
13        Q.  Who's the neurologist?
14        A.  Oh, Dr. Newton.
15        Q.  Do you know Dr. Newton's first
16   name?
17        A.  I do not.
18        Q.  Do you know where Dr. Newton
19   practices?
20        A.  It's going to be St. Vincent's.
21   I've had to go to an orthopaedic specialist
22   because the diabetes has caused me to have a
23   frozen shoulder.  I originally saw Dr. Buggay.

Page 125

1    Q.  Is he the orthopaedic specialist?
2    A.  Yes, he's my first orthopaedic
3  specialist.
4    Q.  How do you spell Buggay?
5    A.  It's B-u-g-g-a-y.
6    Q.  What is his first name?
7    A.  I don't know, but they're all at
8  St. Vincent's.  He was my first ortho.  I
9  recently had to see another ortho.  His name
10  is Dr. Kissel.  I believe his first name is
11  Edward.  He's an orthopaedic.  He's the one --
12    Q.  Is he at St. Vincent's?
13    A.  Yes.
14    Q.  Okay.
15    A.  He's the one that actually did my
16  surgery that I just had to have.  Dr. -- I
17  believe her name is Sara Mullins.  She's my
18  ophthalmologist.  She tries to make sure I
19  don't have diabetic neuropathy because my
20  eyesight goes in and out.
21    Q.  Where does she practice?
22    A.  She has two offices.  I believe I
23  saw her at her office on the South Side.  And

Page 126

1  I haven't started yet, but I'm supposed -- I'm
2  waiting on a referral from my primary care
3  doctor so I can go see an endocrinologist, but
4  I don't know who that's going to be.  And an
5  endocrinologist is a person that specializes
6  in diabetes and hormone diseases and things
7  like that.
8    Q.  And will that referral come from
9  Dr. Putman?
10    A.  Yes.
11    Q.  Have you received treatment from
12  anyone else regarding your diabetes?
13    A.  Not treatment.  I was diagnosed by
14  Dr. Edward Kim at St. Vincent's on March 19th,
15  2020.
16    Q.  How long had you been treating
17  with Dr. Kim?
18    A.  I had not.  That was the first
19  person, because like I said, I missed
20  appointments.  And I was like, it doesn't
21  matter who I see.  My primary care doctor had
22  stopped practicing.  I said, I don't care who
23  I see.  I just need to see somebody because I

Page 127

1  was not feeling good.  I was always nauseated.
2  I was always sick.  So Dr. Kim was the first
3  one I could see.  And he did all the blood
4  work and did everything.  I mean, I stayed
5  there all day.  I said, you have to figure out
6  what's wrong with me.
7    Q.  And prior to that, Dr. Rick Brown
8  was your primary care physician?
9    A.  Yes.
10    Q.  When did Dr. Brown retire?
11    A.  I believe his last practicing
12  month was December of 2019.
13    Q.  Okay.  Has anyone else treated you
14  or diagnosed you regarding your diabetes?
15    A.  I did want to get a second opinion
16  because I did not want to accept the fact that
17  I'm only forty-something years old and
18  diabetic, so I did go to Med Help.  That was
19  in Trussville.  I saw Dr. Yu and he confirmed
20  I do have Type Two diabetes.  And that's all.
21    Q.  Okay.  Who has provided treatment
22  or diagnosis regarding your anxiety?
23    A.  That was done -- Dr. Putman has

Page 128

1  prescribed medication for me.  Dr. Adeel
2  Rabbani.
3    Q.  I think I actually have that.
4    A.  Okay.  And because I have friends
5  who are therapists, they don't necessarily
6  treat me, but I'm able to discuss certain
7  things with them.  And they give me different
8  types of coping skills, CPT and DBT techniques
9  to try to keep me from becoming overwhelmed
10  and going into self-harm.
11    Q.  But have you seen or had any
12  treatment by anyone other than Dr. Rabbani and
13  Dr. Putman regarding your anxiety?
14    A.  Huh-uh, no.
15    Q.  Okay.
16    A.  No.  Not that I can recall today,
17  no.
18    Q.  Who has provided you treatment or
19  diagnosis regarding your depression?
20    A.  It's going to be the same, Dr.
21  Putman and Dr. Rabbani.
22    Q.  Okay.  Other than your anxiety and
23  your depression, has the discrimination and

Lanitra Jeter                                                    12/10/2021

Page 129

1   retaliation caused you any other mental health
2   effects?
3       A.  It is a term that I don't know
4   what it's called, because like I said, I'm not
5   a doctor, is when a person does self-harm.  I
6   don't know the official medical diagnosis for
7   that.  I don't know what that is, but I just
8   know it's self-harm.  Because like I said, I
9   had stopped doing it for years.  And then when
10  I started going through the things at the DA's
11  office, it started back.
12      Q.  Have you received any treatment or
13  diagnosis regarding your self-harm?
14      A.  Well, it's no treatment that you
15  can get for that.  The only thing you can do
16  is, like I said, coping skills, CBT or DBT
17  because there's no pill you can take that will
18  make you stop self-harm.  It's really just
19  about how you can manage the stress or the
20  stressful situation that's causing you to do
21  that.
22      Q.  Have you seen any mental health
23  providers for those coping skills?

Page 130

1       A.  Yes, I see Dr. Rabbani.  He's
2   given me some.  And like I said, I have
3   friends who are therapists and counselors
4   that, you know, give me some other than the
5   ones that I know myself.
6       Q.  And your discussions with your
7   friends, that's not in a doctor-patient
8   context, is it?
9       A.  No.
10      Q.  Any other effects on your mental
11  health other than your depression, your
12  anxiety and the self-harm?
13      A.  Not -- like I said, because I'm
14  not a doctor, I don't know offhand so I can't
15  really answer that.
16      Q.  Did the discrimination and
17  retaliation cost you any money?
18      A.  Yes, I was terminated so I lost my
19  income.
20      Q.  Did it cost you any other money?
21      A.  No.  Money that I had to spend out
22  for the prescriptions for the depression and
23  anxiety, co-pays.  I had to pay, you know, Dr.

Page 131

1   Rabbani, co-pays I had to pay, you know, for
2   the primary care doctors.  All the
3   prescriptions I had to, you know, get billed
4   because of the diabetes, the insulin and all
5   of that.
6           The only thing I cannot -- I can't
7   put a monetary amount on my emotional state
8   that I went through.  I don't know how to put
9   a monetary amount on that because I -- I -- I
10  was affected emotionally.
11      Q.  You talked about your co-pays.
12  Who was your insurer?
13      A.  At the time I was insured through
14  the State, which is going to be Blue
15  Cross/Blue Shield.  Once I was terminated, I
16  had to pay out of pocket for my insurance,
17  still Blue Cross/Blue Shield.
18          In order for me to keep up or try
19  not to lose my house after being terminated, I
20  had to do like mortgage assistance.  I was on
21  that for maybe like six months where I did not
22  have to pay my mortgage, but they tacked it on
23  to the end of my loan.  And then a part of it

Page 132

1   was sent over as a second claim to a different
2   mortgage company, so now I have two
3   separate -- I have my mortgage payment, then I
4   have -- if I ever sell my house, I have that
5   other payment that needs to be repaid back for
6   the months I did not make my mortgage payment
7   in order for me to not lose my house.
8       Q.  Who's your mortgage holder?
9       A.  At the time, it is Carrington
10  Mortgage.
11      Q.  Was Carrington Mortgage the
12  mortgage holder when you were terminated from
13  the DA's office?
14      A.  I believe so because originally I
15  was with Chase but they were bought out -- not
16  bought out.  My loan was sold, and I don't
17  know exactly when.  So it could have changed
18  while I was there, but I'm not -- I'm really
19  not sure when exactly it changed.  But I know
20  now I'm with Carrington and I had to get the
21  assistance through Carrington Mortgage
22  Company.
23      Q.  Okay.  We talked about your

33  (Pages 129 to 132)

Lanitra Jeter                                                    12/10/2021

Page 133

1    physical injuries, your mental health issues.
2    We talked about the money that you say the
3    discrimination and retaliation caused you.
4    Has the discrimination and retaliation
5    affected you in any other ways besides the
6    physical injuries, the mental health issues,
7    and the money it has cost you?
8         A.  I don't even know how to answer
9    that because I really don't know.  Because
10   it's like -- just like with the diabetes, if I
11   was allowed to go to my doctor's appointments,
12   I would have found it out earlier.  I don't
13   know what other issues can arise just out of
14   that part.  I don't know.  So I can't really
15   say at this time.
16        Q.  Sitting here today, do you know of
17   any other ways it has affected you?
18        A.  Not as of today, no.  Not as of
19   today, this present moment, no.
20        Q.  All right.  Earlier in the case
21   when the attorney general was involved, your
22   lawyer sent over some initial disclosures and
23   those disclosures listed a bunch of names,

Page 134

1    many of them I don't know so I'd like to ask
2    you about those people.  And when I say your
3    claims, I'm referring to your claims in this
4    lawsuit; okay?
5         A.  Okay.
6         Q.  All right.  Who is Chad Harris?
7         A.  He's my supervisor at my job at
8    Birmingham Family Counseling and Mediation
9    Center.
10        Q.  And why do you think Mr. Harris
11   might know something about your claims?
12        A.  Because I do supervision, which is
13   part of me having my license, and I discuss
14   certain things with him within my supervision
15   to get some insight, like again coping skills,
16   insight on how to minimize, you know, some of
17   my stress because I was going through -- I was
18   having supervision while I was employed there
19   at the district attorney's office.
20        Q.  Okay.  Who is Reverend Dr.
21   Gwendolyn Pierce?
22        A.  That's my mother-in-law.
23        Q.  And why do you think she might

Page 135

1    know something about your claims?
2         A.  Because I also talk to her about
3    things.  You know, she's a pastor.  She has a
4    doctorate.  I was looking -- if you want to
5    say spiritual aspect of it, I guess, just some
6    guidance on things I could kind of deal with.
7    She gave me Bible verses to read and things
8    like that to try to help me cope with some
9    things.
10        Q.  And I believe you mentioned her
11   earlier but who is Monique Pierre-Louis?
12        A.  She's a good friend of mine.
13   She's an also a therapist.  Same thing, talk
14   with her, let her know what was going on in
15   the office, what I was going through in the
16   office.
17        Q.  And who is Oddesty Langham?
18        A.  Another therapist.  Same thing as,
19   you know, Monique Pierre-Louis.  Well, Oddesty
20   is actually the one that I confined in about
21   the self-harm.
22        Q.  Who is Takia Adams?
23        A.  She's a former coworker from Blue

Page 136

1    Cross/Blue Shield.  We remained close friends
2    even after I left.  She's a good friend, you
3    know, just as you would talk to any other
4    friend that you've known for over twelve years
5    about things that I was going through while at
6    work.
7         Q.  Okay.  Who is Denise Courrier?
8         A.  Denise is a friend of mine.  She
9    is actually -- she's actually an individual
10   that wanted to come see me at work one day.
11   And that's when I was like, no, don't even
12   worry about coming because there was an issue
13   with me having to clock in and clock out of
14   with that.  But she's also a good acquaintance
15   of Danny Carr.  They've been in an on-and-off
16   kind of like if you want to say relationship.
17   So she's just -- they're very well acquainted.
18        Q.  Okay.  And Edwina Johnson is the
19   receptionist; correct --
20        A.  Yes.
21        Q.  -- at the DA's office?  Who is
22   Willie Chamblin, Sr.?
23        A.  That's my father.

Lanitra Jeter                                                    12/10/2021

---

Page 137

1     Q.   And what would he know about your
2  claims?
3     A.   Everything.  You know, we always
4  just go to Daddy, so I talk to him a lot.
5     Q.   Okay.  And who is Carolyn
6  Chamblin?
7     A.   My mother.
8     Q.   Same?
9     A.   Same.
10    Q.   You've told me about Warren
11 Brooks.  Who is Darius Crayton?
12    A.   Darius Crayton is an attorney that
13 used to work at the DA's office.  He's
14 actually no longer there.  He's at a different
15 law firm.  I don't know which law firm it is.
16 I actually saw him on TV a couple of days ago,
17 but I don't remember the law firm he's at.
18         He was the individual that would
19 be in the office with the other VSO officers
20 discussing certain things.  I would go in that
21 office sometimes and, you know, talk about
22 things that were going on in the office and
23 things like that.  It's funny because they --

---

Page 138

1  when I say "they", you know, Judy Yates and
2  Michael McCurry and Joe Roberts are all
3  watching me trying to see what I'm doing wrong
4  and you don't even realize that you have a VSO
5  officer that is married that's having an
6  affair with an attorney that's engaged to a
7  judge.
8     Q.   Who is the VSO who was married to
9  an attorney having an affair with a judge?
10    A.   She's married to a -- she was
11 married to her husband.  The fiancé is Darius,
12 who is dating a judge, which is Judge Patton.
13    Q.   Okay.  Why do you think Darius
14 might know something about your claims?
15    A.   Because, you know, I discuss
16 certain things in the office and he would be
17 in the office with Erin.
18    Q.   Was he present for those
19 conversations?
20    A.   Yes.
21    Q.   Did he ever say anything about
22 what you were complaining about?
23    A.   He said that that is one of the

---

Page 139

1  reasons he's leaving because he doesn't like
2  the office politics when it comes to not being
3  white.
4     Q.   Who is Diedre Keener?
5     A.   She's a friend of mine.  She's a
6  therapist as well.  I talked to her again
7  about coping skills.  I've known her for over
8  fourteen years.  And those are people that I
9  felt like I could talk to about certain things
10 and they will keep it private.
11    Q.   Who is Kenya Delaney?
12    A.   That's my hairdresser, you know.
13 That's my hairdresser.  Just like when you're
14 sitting in a chair at the barbershop, you talk
15 about certain things and it's just me talking
16 with my beautician about certain things that
17 were going on as well.
18    Q.   And was Samuel Johnson one of the
19 deputies who escorted you out on March 16th,
20 2020?
21    A.   Yes, he's the -- and he was also
22 the one that I was supposed to get in contact
23 with to get my belongings.

---

Page 140

1         MR. MURRILL:  Okay.  Why don't we
2  take five?
3         (Whereupon, a short break was
4           taken.)
5     Q.   (BY MR. MURRILL:)  Ms. Jeter, you
6  were telling me earlier about some EEOC
7  charges you had filed against employers other
8  than the DA's office and Central Alabama
9  Wellness; do you remember that?
10    A.   Yes.
11    Q.   Okay.  Did anyone help you prepare
12 those EEOC charges?
13    A.   No.  But I -- they were actually
14 inquiries.  I never got to the -- I don't
15 believe I ever got to the charge stage of it.
16 I just got to the part where we did the online
17 part on some, and then some I was able to talk
18 to an investigator.  And then they didn't go
19 any further than that.
20    Q.   And do you recall which employers
21 or which employer those were regarding?
22    A.   No, I don't recall.
23    Q.   Okay.  There was a point in time

---

35  (Pages 137 to 140)

Lanitra Jeter                                          12/10/2021

Page 141

1    in this case where you represented yourself.
2    How did you find your counsel in this case?
3        A.  What do you mean "counsel"?  I
4    don't understand.
5        Q.  How did you find your attorneys in
6    this case?
7        A.  I don't understand your question.
8        Q.  You represented yourself in this
9    lawsuit for a period of time; correct?
10       A.  Yes.
11       Q.  How did you find the attorneys who
12   are currently representing you?
13       A.  Oh, Google.
14       Q.  Okay.  What did you Google?
15       A.  Top Birmingham attorneys in
16   Birmingham, Alabama.
17       Q.  Riley & Jackson didn't come up?
18       A.  Well, the thing was I looked
19   for -- it was discrimination.  And it was like
20   top discrimination attorneys or something like
21   that I Googled, I think.
22       Q.  Did you have any issues with
23   depression before you started with the DA's

Page 142

1    office?
2        A.  Yes.
3        Q.  Were you on any medication for
4    depression before you started at the DA's
5    office?
6        A.  Not that I can recall, no.
7        Q.  Did you have any issues with
8    anxiety before you started with the DA's
9    office?
10       A.  Not that I can recall, no.
11       Q.  You weren't taking any medication
12   for anxiety before you started at the DA's
13   office?
14       A.  Not for anxiety, no.
15       Q.  Did you have any issues with
16   self-harm before starting at the DA's office?
17       A.  It's hard to answer that question.
18   Like I stated before, when you're a cutter,
19   you're always going to be that.  It just
20   depends on what triggers you.  I had not done
21   that for years and when I mean years, it had
22   been like over ten.
23       Q.  Who has provided mental health

Page 143

1    treatment to you over the last ten years?
2        A.  Oh, gosh, most recent that I can
3    remember is going to be Dr. Adeel Rabbani.
4    I -- it's not necessarily treatment, I would
5    talk to individuals that I know who are
6    licensed professional counselors because I
7    have plenty of friends that are.  I would, you
8    know, discuss things with them.  Going back as
9    far as you want me to go back, I can't
10   remember who all provided me treatment though
11   as far as for my --
12       Q.  Do you remember where you received
13   treatment?
14       A.  I remember having treatment at
15   Alabama Psychiatry but they're no longer in
16   business.  That was when I was employed with
17   Blue Cross/Blue Shield of Alabama because we
18   were contracted with them for all employees to
19   go to them if they had, you know, a mental
20   illness or things like that.  There's others
21   that I have seen.  I can't recall their names
22   though because it's been a while.
23       Q.  Were all of those mental health

Page 144

1    treatments here in Birmingham?
2        A.  Yes.
3        Q.  Were you referred to any mental
4    health treatments by Dr. Rick Brown when he
5    was your primary care physician?
6        A.  I was not referred.  He actually
7    prescribed me some as my primary care.  I was
8    prescribed Wellbutrin, I believe Effexor as
9    well.  I think it's Effexor.  Those are the
10   two I can remember and recall right offhand.
11       Q.  How long was Dr. Brown your
12   primary care physician?
13       A.  Approximately about -- I want to
14   say maybe three -- three, maybe four years, I
15   think.
16       Q.  Who was your primary care
17   physician before Dr. Brown?
18       A.  I did not have one.
19       Q.  Where else did you receive medical
20   care over the last ten years other than Dr.
21   Brown and the places you've told me about with
22   regard to your diabetes?
23       A.  Oh, well, it's not regarding my

36  (Pages 141 to 144)

Lanitra Jeter                                                    12/10/2021

Page 145

1    diabetes.  I wasn't diagnosed until 2020.
2         Q.  No.  My question was, where else
3    have you had medical care over the last ten
4    years other than Dr. Brown and the places
5    you've told me about regarding your diabetes?
6         A.  Okay.  Because I did not have a
7    primary care, if I did get sick, I just went
8    to the emergency room and that would be the
9    emergency room like at St. Vincent's East
10   that's near my home.  That's it.
11        Q.  So the only medical care you've
12   received over the last ten years, other than
13   what you've told me about including your
14   diabetes, would be Dr. Rick Brown and the ER
15   at St. Vincent's East?
16        A.  Yes, that I can recall.
17        Q.  I don't think I have anything
18   further for you right now.
19        A.  Okay.
20        MR. NOBLE:  Okay.  Can we take a
21   few minutes?
22        MR. MURRILL:  You want to take a
23   break?

Page 146

1         MR. NOBLE:  Yeah, just a couple of
2    minutes.
3         (Whereupon, a short break was
4          taken.)
5         MR. MURRILL:  Can we agree that
6    for the purposes of the deposition, we'll use
7    these in Bates order?
8         MR. NOBLE:  No.  Because they
9    all --
10        MR. MURRILL:  No, I'm not asking
11   you to question her in Bates order, but
12   ultimately when they -- when we go back to put
13   this together, it will just be cleaner if we
14   can say, all right, it begins with whatever
15   the lowest Bates number is and it goes to the
16   top.
17        MR. NOBLE:  Yeah, it's in
18   chronological order.  You're welcome to
19   read -- I mean, if you catch it --
20        MR. MURRILL:  Reverse
21   chronological order.
22        MR. RILEY:  Just let him identify
23   each document by the Bates number.

Page 147

1         MR. MURRILL:  That's fine.
2         MR. NOBLE:  Yeah.  And you can
3    just call out and say, what Bates are you
4    talking about?  Because our paralegal is very,
5    very upset that she had to go through and,
6    like, make it line up.  So that's why it's not
7    in --
8         MR. MURRILL:  That's fine.
9         MR. NOBLE:  -- Bates number order.
10        MR. MURRILL:  No, that's fine.
11        MR. NOBLE:  But I will try to -- I
12   was primarily a brief writer.  I understand
13   the Bates thing.  I'll try to do that.
14        MR. MURRILL:  I'm primarily OCD.
15        MR. NOBLE:  I'm sorry, man.  I get
16   it.  I'll just make this one big -- unless you
17   have a -- if your OCD wants something else on
18   that, I can do that.
19        MR. MURRILL:  That's fine.
20        (Whereupon, Plaintiff's
21         Exhibit 1 was marked
22          for identification.)
23        MR. RILEY:  The key is just to

Page 148

1    make sure you identify all the Bates numbers
2    that are in the composite exhibit so we --
3         MR. MURRILL:  Why don't we do that
4    at the beginning?
5         MR. NOBLE:  Okay.
6         MR. RILEY:  Yeah.  Just go through
7    it and call it out, and that way we aren't one
8    day wondering -- somebody saying, oh, yeah, I
9    think there was another document that was in
10   that exhibit.
11        MR. NOBLE:  It's going to be in
12   the exhibit though; right?
13        MR. MURRILL:  You would be
14   surprised what we've run into.
15        MR. NOBLE:  So off the record,
16   71 --
17        MR. RILEY:  Well --
18        MR. NOBLE:  Do you want to do it
19   on the record?
20        MR. RILEY:  Yeah.
21        MR. NOBLE:  Okay.
22        MR. RILEY:  Just say, you know,
23   this is exhibit whatever.

37  (Pages 145 to 148)

Lanitra Jeter                                          12/10/2021

Page 149

1          MR. NOBLE: Sure.
2          MR. RILEY: It's comprised of the
3    following Bates stamp numbers.
4          MR. NOBLE: Sure. And we'll just
5    go through them and --
6          MR. RILEY: Yeah.
7          MR. NOBLE: -- make sure that
8    they're in order. I'm marking for
9    identification Plaintiff's Exhibit Number 1,
10   which is a composite exhibit. And Counsel and
11   I will go through it together because the
12   Bates numbers can be confusing. So we're
13   going page by page. So Bates 71 is the first
14   page. Bates 67 -- these are all DA Bates.
15   Bates 66, Bates 57, Bates 74, Bates 338, Bates
16   85, Bates 318, Bates 319, Bates 1111, Bates
17   1112, Bates 82, Bates 80, Bates 78, and Bates
18   79 and then Bates 55. We're all on the same
19   page?
20         MR. MURRILL: Yes.
21         MR. NOBLE: All right.
22
23

Page 150

1    EXAMINATION BY MR. NOBLE:
2          Q. Ms. Jeter, I will try to be brief.
3    There was some testimony you've given about
4    your husband; do you recall that?
5          A. Yes.
6          Q. At some point you had mentioned
7    that your husband and the State had swapped
8    roles as victim; is that right?
9          A. Yes.
10         Q. Can you explain more about that?
11         A. Okay. My husband was told that he
12   is the victim because he originally was the
13   plaintiff in the case. And so once it goes
14   before a judge, that means that the State is
15   representing him in that case, so it's
16   actually going to be the State versus whoever
17   is the defendant. So it was our understanding
18   that that means that the State represents my
19   husband.
20         Q. Okay. So it doesn't have anything
21   to do with your husband's history in law
22   enforcement?
23         A. No.

Page 151

1          Q. Did he have a history in law
2    enforcement?
3          A. Yes.
4          Q. Can you tell me about that?
5          A. Yes. He started out as a
6    corrections officer, then went to the academy,
7    became a police officer for Birmingham and
8    then became a police officer with Brighton.
9          Q. Okay. So about how many years
10   total did he have in law enforcement?
11         A. If I had to guess an estimate, it
12   would be about -- maybe about twelve possibly.
13         Q. Earlier you were asked about
14   individuals on what we call, as lawyers, your
15   initial disclosures, and Tan or Denise
16   Courrier's name came up. And I noticed that
17   you shrugged your shoulders and said
18   relationship, and I was confused about that.
19   I wondered if you could explain a little bit
20   more about that.
21         A. Tan, my friend, has been in kind
22   of a -- it's not a relationship, if you want
23   to call it friendship with benefits, if that's

Page 152

1    what you want to call it -- off and on with
2    Danny Carr for a number of years. They know
3    each other very well. He's even had her over
4    to the DA's office at one particular point. I
5    actually -- it was a time that she came to
6    visit and she was telling me she was coming.
7    And she said to let, I guess Mr. Carr know she
8    was coming. And when I did let him know, he
9    was like, well, she can stay in my office and
10   she can do this and just let her know I'll be
11   there after a while.
12         Okay. Fine. So, you know, again,
13   everybody else can have people in their office
14   and it's not a problem, but me myself I have
15   to clock out every time somebody wants to
16   visit me or come to my office or anything like
17   that. I just know for a fact, because I have
18   been friends with her for a number of years,
19   that they have had an off-and-on kind of
20   relationship.
21         Q. And just help me understand, you
22   said friends with benefits, what does that
23   mean?

                        38  (Pages 149 to 152)

Lanitra Jeter                                          12/10/2021

Page 153

1      A.  That means sexual.
2      Q.  And you testified at length about
3  various complaints you've made to various
4  people at the DA's office.  And in one of
5  those complaints you mentioned race
6  discrimination; did I recall that correctly?
7      A.  Yes.
8      Q.  And that was a complaint to the
9  DA; is that right?
10      A.  It was a complaint to the DA, yes.
11      Q.  Okay.  Before you complained to
12  the DA about experiencing race discrimination,
13  had you encountered any black rats at work?
14      A.  No.
15      Q.  Do you consider a black rat to be
16  a racist symbol?
17      A.  Yes.
18      Q.  So before you complained about
19  race discrimination, you had not encountered
20  racist symbols at work; is that right?
21          MR. MURRILL:  Object to the form.
22  You can answer.
23      A.  Oh, no, I hadn't experienced

Page 154

1  anything like that.
2      Q.  (BY MR. NOBLE:)  Okay.  I just
3  want to look at some documents with you that
4  we've marked as Plaintiff's Exhibit 1.  And
5  we're just going to go through them.  I'm
6  going to ask you a few questions and we're
7  going to try to talk about the Bates number
8  that we're looking at here.  So we're starting
9  at Bates number 71, and I'm going to ask you
10  if you've seen this document before.  Have you
11  seen this document before?
12      A.  Yes.
13      Q.  Okay.  And when did you see it?
14      A.  When it was presented to me by my
15  attorney.
16      Q.  Okay.  You didn't see it when you
17  worked at -- worked for the DA; correct?
18      A.  Correct.  Yes, I did not see it.
19      Q.  Take a look at the document and
20  tell us what it is.  And we're looking at
21  Bates 71.
22      A.  Okay.  It is a memo.  It looks
23  like it's directed to my file from Judy Yates,

Page 155

1  dated January the 8th of 2020.  And it's
2  referencing VSO Nashville trip to the Family
3  Justice Center.
4      Q.  Okay.  Go ahead and read what it
5  says there and let me know --
6      A.  Okay.
7      Q.  -- when you're done.
8      A.  (Reviewing document.)  Okay.
9      Q.  Is the information reflected on
10  Bates 71 truthful information?
11      A.  Not a hundred percent truthful,
12  no.
13      Q.  What on there is false?
14      A.  It is false that I said that I was
15  not interested in going.  That was not the
16  response I gave her.  The fact of the matter
17  is, I had been going through a lot of medical
18  things at work.  Like I stated before, I would
19  be nauseated.  I would be dry mouth, sweating,
20  aching, you know, throwing up, and those
21  things I couldn't control.  And what I did not
22  want to do is be out especially with other
23  officers or upper management and have one of

Page 156

1  those episodes.  So that is why I decided to
2  just stay in the office and just do VSO work
3  there instead of going out.
4      Q.  Do you recall what you said, if
5  anything, to Judy when she asked you if you'd
6  like to attend?
7      A.  I told her I was just going to --
8  I'm going to stay in the office and do some
9  VSO work.
10      Q.  Okay.  Let's move to -- well, let
11  me ask you real quick.  Is there anything else
12  that's false on Bates 71?
13      A.  (Reviewing document.)  No.
14      Q.  Okay.  Let's move to the next
15  page, which is Bates 67.  Take a look at that,
16  please --
17      A.  Okay.
18      Q.  -- Ms. Jeter, and let me know what
19  that document is.
20      A.  Okay.  It is a memo to my file, my
21  employee file, from Judy Yates, dated January
22  the 9th, 2020.  And the subject, in reference
23  to LaNitra Jeter.

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Lanitra Jeter                                    12/10/2021

---

Page 157

1      Q.  Okay.  And we're going to do the
2  same thing with Bates 67, which is I'm going
3  to ask you to read that.  I want you to tell
4  me if anything in there is false.
5      A.  (Reviewing document.)  Okay.
6      Q.  You've had an opportunity to read
7  Bates 67.  What, if anything, on Bates 67 is
8  false, Ms. Jeter?
9      A.  I'm not a hundred percent sure,
10  but I'm not a hundred percent -- that she's
11  saying when -- Judy Yates is saying when she
12  got to the office that I had already left.  I
13  wasn't sure -- I really can't say whether or
14  not -- if I clocked in at 7:00 but I think I
15  did.  She said, she returned to the office at
16  2:15, I had clocked out for May's court.  She
17  states in here that she and Cheryl went
18  looking for me because -- they went looking
19  for me and also called Lauren in Judge May's
20  court because I had clocked out saying I was
21  at May's court.  And I was in Judge May's
22  court.  We was actually in his court chambers,
23  so they would not have seen me in the

---

Page 158

1  courtroom.  There was nowhere for me to clock
2  out and say I'm in Judge's chambers.  I can
3  only say I'm in the judge's courtroom, so that
4  is not true.
5      As I stated before, here it is
6  again, Cheryl and Judy are out walking around
7  looking for my car, looking for me, and
8  they're only doing that to me.  They're not
9  doing that for anybody else.  They're not
10  checking up on anybody else.  So, again,
11  that's harassment.  That's the discrimination
12  I'm talking about.  Judy never asked me if I
13  was in May's court, if I was in May's chamber.
14  She just assumed that I had left the office
15  and that's not true.
16      Q.  What, if anything, else is untrue
17  about the information on Bates 67?
18      A.  That's all that's untrue.
19      Q.  Okay.  Let's move to the next page
20  which is Bates 66.  Would you tell me what
21  that document is, please, ma'am?
22      A.  This is another memo to my file,
23  my employee file from Judy Yates, dated

---

Page 159

1  January the 10th, 2020, in reference to Nitra
2  time.
3      Q.  Okay.  Take a minute, please,
4  ma'am, read over that document as we've been
5  doing.  Read over Bates 66 and let us know if
6  there's anything in there that is false, if
7  anything at all.
8      A.  (Reviewing document.)  Some of it
9  is true, some of it is false.
10      Q.  Okay.  Tell us what's false in
11  that document.
12      A.  Where she said I just stuck my
13  head in her office today and I told her that I
14  would be late on Tuesday.  No, I actually
15  informed her if it was okay for me to come in
16  late on Tuesday because I was going to have to
17  be out of the office.  So I never did just
18  tell her anything.  I actually asked her if it
19  was going to be okay.
20      And in this situation again, like
21  I said before, when we are requesting time
22  off, it's policy that all we have to do is
23  request.  It's not necessarily required for us

---

Page 160

1  to tell them why we need to be off.  I just
2  did -- I just do that as a courtesy just so
3  they'll know what I'm trying to do, and it's
4  very important.  That way they'll approve it
5  instead of trying to take it away from me and
6  tell me that I could not go.  It was a very
7  important situation that was going on at that
8  time.  I had to go all the way to Atlanta to
9  handle something that was for my son.
10      My son has ADHD.  Even though he's
11  grown, there's certain things he can't do on
12  his own because of his ADHD, and so I have to
13  help him in certain instances.  And that
14  instance was going to be him having to go to
15  court over something that was going on with
16  his apartment.
17      Q.  Okay.  I understand.  Thank you.
18  Is there anything else other than what we've
19  just talked about that's false about Bates 66?
20      A.  No.
21      Q.  Okay.  Let's move to Bates 57.
22  And would you please tell me what that
23  document is?

---

Lanitra Jeter                                              12/10/2021

Page 161

1      A.  Okay.  It's another memo to my
2  employee file from Judy Yates, dated February
3  the 25th of 2020.  And this is in reference to
4  leaving building and not signing out or asking
5  permission.
6      Q.  Okay.  Like we've been doing, go
7  ahead and read through there --
8      A.  Okay.
9      Q.  -- and tell us if anything in
10  there is false on Bates 57.
11      A.  (Reviewing document.)  Again, some
12  of this is true and some of this is partially
13  false.
14      Q.  Okay.  What's false on Bates 57?
15      A.  Okay.  I did go out of the
16  building.  And like I stated before, in the
17  instances where I have the hot flashes, on
18  this particular day I had on a blouse.  It's
19  made out of like the nylon material.  It's
20  kind of like -- it's not very thick.  But in
21  this particular instance, I had a hot flash to
22  the point it went through my whole shirt.
23      I went to the bathroom inside of

Page 162

1  the DA's office trying to, you know, dry off
2  or whatever and it wasn't going as well.  I
3  went outside because it was, you know, a
4  little bit windier outside so it could try to
5  get that done.  It would not have been a
6  problem about the hot flash but it wasn't
7  appropriate again and I felt uncomfortable
8  because, again, certain things in the front
9  were showing.  And I felt like I could go
10  outside and get it dried off and I was walking
11  like this (indicating) so I could get it done.
12  And I walked up the street, I came back down
13  and I went back in the bathroom of the 2121
14  Building to try to, you know, wipe some more
15  off before I went back into the building.
16      Now, when we take breaks, it's not
17  required for us to take a break.  I was not
18  gone twenty minutes.  If anything, it was ten
19  minutes and we get 15-minute breaks.  We don't
20  have to clock out for a break.  So I didn't
21  feel like -- well, I didn't have to clock out
22  for that.  And also Judy Yates was not in her
23  office and nowhere to be found for me to even

Page 163

1  try to inform her of what I needed to do.  So
2  there was nowhere -- no one for me to inform
3  what I needed to do, what I was going through
4  and how to try to fix this problem.  So I had
5  to fix it the best way I knew how.
6      Q.  Okay.  Anything else false about
7  Bates 57?
8      A.  No.
9      Q.  Let's move to Bates 74.  Would you
10  tell us what that document is?
11      A.  Another memo to my employee file
12  from Judy Yates, dated November 18, 2019,
13  referencing domestic violence firearms
14  project.
15      Q.  Okay.  Is the information
16  reflected on Bates 74 true?
17      A.  Partially true.  What is missing
18  is the explanation given as to why I declined.
19  The domestic violence firearms project was
20  being held, however, like I stated before to
21  Judy, I've had several surgeries on my ankles.
22  I'm not able to stand for long periods of
23  time.  I'm not able to walk for long periods

Page 164

1  of time.  There was no way I was going to be
2  able to attend that and be comfortable and be
3  able to stand and walk if I needed to be in
4  the capacity of a VSO officer.  So that is why
5  I declined not to go.  And on top of the fact
6  of still I'm having medical issues, and I
7  don't know what's wrong with me as far as my
8  medical issues.
9      Q.  To your knowledge, was Ms. Yates
10  aware of your reason for declining?
11      A.  She was aware.
12      Q.  Did you make her aware?
13      A.  Not verbally at that particular
14  time.  I have had discussions with her before
15  where she has known that I cannot walk for
16  long periods of time or stand for long periods
17  of time.  I informed her of this when I first
18  started working at the DA's office.  I even
19  told her about the surgeries that I had.
20      Q.  Anything else false we need to
21  talk about on 74?
22      A.  No.
23      Q.  Okay.  Let's look at Bates 338.

41  (Pages 161 to 164)

Lanitra Jeter                                           12/10/2021

Page 165

1    Can you tell me what that document is?
2         A.   This is a memo to my employee file
3    from Judy Yates, November 22nd -- well, dated
4    November 22nd, 2019, referencing chain of
5    command.
6         Q.   All right.  Read over that and let
7    me know if there's anything in there that's
8    false.
9         A.   (Reviewing document.)  Okay.  So,
10   again, partially true, partially false.
11        Q.   Could you explain, please, ma'am?
12        A.   Yes.  In this particular memo,
13   Judy states that she believes that the e-mail
14   that I sent to Joe Roberts is from -- sorry,
15   Judy Yates states the e-mail that I sent to
16   Joe Roberts is stemming from the point of
17   Cheryl, Erin and Elise being allowed to attend
18   a domestic violence seminar and that I was not
19   asked to work -- and that I was asked to work
20   in the office and I was not allowed to go.
21   That is not what the e-mail was in reference
22   to.
23             The e-mail to Joe Roberts was in

Page 166

1    reference to the unfair treatment I was
2    receiving from having my comp time taken away
3    from me and not being taken away from any
4    other white VSO officers.  Also it was in
5    reference to the treatment I was receiving
6    from Judy Yates, because in there I said I was
7    treated unfairly by Judy Yates in that e-mail.
8    And I was asking him what is the chain of
9    command when you have a problem with your
10   supervisor.  I mean, I don't want to talk to
11   my supervisor if I have a problem with my
12   supervisor.  So that's why I was asking what
13   is the chain of command in that instance.
14             On here also there is an addendum
15   where she says that she also asked me another
16   time to go to Nashville with the other VSO
17   officers and I declined.  She didn't put in
18   here why I declined.  We had to drive
19   ourselves to Nashville that morning.  The
20   facility we were going to was over a hundred
21   thousand square feet and it was a tour.  I
22   cannot walk that, so why would I go to that?
23   And then why would you even ask me to go to

Page 167

1    that knowing I could not go, and then put it
2    in my file to make it seem like I'm not
3    interested in any type of training.
4             Also when the training -- when the
5    conference was over at three or maybe four
6    o'clock, we would have to drive back from
7    Nashville back to Birmingham in my own
8    vehicle.  I don't want to put all those miles
9    on my personal vehicle.
10            Also at that time I was still
11   having problems with my eyesight.  I cannot
12   drive when it gets dark at night.  But that's
13   not the concern because Cheryl Black gets to
14   leave work early because she doesn't want to
15   drive home in the dark at night, but you want
16   me to drive all the way from Nashville in the
17   dark a hundred and something miles to do that.
18   And instead of putting that in my employee
19   file the way it should have been done, she
20   made it seem like I'm not interested in any
21   type of training in that office, which is not
22   true.
23        Q.   Were you ever counseled while you

Page 168

1    worked for the DA's office for declining
2    training?
3         A.   No.
4         Q.   Were you ever spoken to about
5    someone in your chain of command having a
6    problem with you declining some sort of
7    training?
8         A.   No.
9         Q.   Were you ever counseled for not
10   attending events while you worked for the DA?
11        A.   No.
12        Q.   Did anyone in your chain of
13   command express an issue they had with you
14   regarding not attending events?
15        A.   No.
16        Q.   You mentioned Cheryl Black, and so
17   I'm going to go back to Bates 338 real quick.
18   You testified earlier something about Ms.
19   Black being a known racist; did I get that
20   right?
21        A.   Yes.
22        Q.   Could you explain that?
23        A.   Cheryl Black is known for making

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Lanitra Jeter                                    12/10/2021

Page 169

1  racist remarks to other employees and about
2  other employees and in front of other
3  employees.  That is why other employees within
4  the district attorney's office, that could be
5  admin, that could be supply, they kind of just
6  keep their distance from her especially the
7  African-American ones.  So basically if you
8  stay out of her way, she won't have anything
9  to say about you or anything like that.  So
10  she's known for that, and that's why I felt
11  like it was discrimination because Cheryl
12  Black and Judy Yates, they're best friends.
13  They've been working that program for over
14  twenty something years.  It was just those two
15  in that program before the other VSO officers
16  were hired.
17      Q.  When you say it was just known
18  that Cheryl Black was racist, how do you know
19  that?
20      A.  I was informed of that by another
21  African-American employee that's in the
22  district attorney's office that worked in
23  admin that has been there for years, that has

Page 170

1  known Cheryl Black since she had been there.
2  She has had her own experience with Cheryl
3  Black herself, and she was just telling me
4  about that when I had walked to the front desk
5  one day and she was there.
6      Q.  What is her name?
7      A.  I can't recall.
8      Q.  Was it --
9      A.  Because -- oh, I'm sorry.
10      Q.  Was it just the one conversation
11  you had with her about Cheryl Black?
12      A.  Yes.
13      Q.  Did you have any other
14  conversations about Cheryl Black having an
15  alleged racist attitude at all?
16      A.  No, not that I can remember at
17  this time, no.
18      Q.  Okay.  Let's go back to 338.  Have
19  you identified everything on Bates 338,
20  Plaintiff's Exhibit 1, that is false?
21      A.  Yes.  I'll say yes.
22      Q.  Okay.  I am now moving to Bates
23  85, and 85 has a couple of documents that go

Page 171

1  with it.  That would be Bates 85 and then
2  Bates 318 and 319, I believe.
3      A.  Okay.
4      Q.  So that's the three that we're
5  looking at right now --
6      A.  Okay.
7      Q.  -- just to be clear.  Bates 85,
8  Bates 318 and 319.
9      A.  Okay.
10      Q.  So look over those documents, Ms.
11  Jeter, and tell me what they are.
12      A.  (Reviewing documents.)  Okay.
13  Same response, partially true, partially
14  false.
15      Q.  Okay.  Explain that for us.
16      A.  Okay.  So this is a memo to Danny
17  Carr and Joe Roberts --
18      Q.  And by "this", you're touching
19  Bates 85.
20      A.  Okay.  From Judy Yates, subject is
21  LaNitra Jeter, and it was cc'd to Michael
22  McCurry.  So in this one, she's saying that --
23  well, let me start it this way.  This memo, or

Page 172

1  however you want to say it, is in reference to
2  what I told two different VSO officers and
3  Judy Yates at work.  Like I stated before, my
4  husband and I have had cases.  We also have a
5  case across the street that involved Judge
6  Stephens and we had a different case across
7  the other way that involved Judge Patton.
8      As I stated before, Erin also has
9  Darius Crayton in her office the majority of
10  the time, who is the fiancé of Judge Patton,
11  who has one of my husband's cases for one of
12  his children that we have custody of.  A lot
13  of information from my work was getting
14  transferred and transmitted from someone in
15  the office, and I did not know who it was,
16  into the cases.  Because those cases, the
17  judge would bring up certain things that were
18  out of the office.  I didn't like that,
19  because, number one, they were not true.
20      This happened in Patton's
21  courtroom.  This happened in Stephens's
22  courtroom.  So what I wanted to do was find
23  out who exactly is submitting or giving out

43  (Pages 169 to 172)

Lanitra Jeter                                                12/10/2021

Page 173

1    information -- well, especially false
2    information about me and what was going on in
3    the cases.
4         So I informed Judy of a situation
5    that I said happened in the courtroom because
6    I'm trying to figure out, is she going to go
7    back and tell it or is Erin going to go back
8    and tell it or is Elise going to go back and
9    tell it, because I'm trying to figure out who
10   is leaking my information.
11        Well, nobody said anything except
12   for Judy Yates, who then went and told Michael
13   McCurry.  And what she told Michael McCurry
14   was not even close to what I said to her or
15   whatever happened, because her statement is
16   totally different from Elise's and Erin's
17   statement.  So this is when we ended up having
18   a meeting about the situation and I told her
19   exactly what happened and why it was like that
20   and she didn't have anything to say.  It was
21   kind of like, you know, no big deal, no big
22   problem, and nobody ever confirmed to me who
23   was saying what about me and why was my

Page 174

1    information getting put into cases that had
2    nothing to do with the district attorney's
3    office.
4         Q.  I'll confess, I'm confused.
5         A.  Okay.
6         Q.  So are you saying that information
7    from your workplace was leaking into
8    courtrooms in matters you were involved
9    about -- involved in?
10        A.  Yes.
11        Q.  Could you give us an example?
12        A.  Okay.  In one particular case, it
13   was brought up about what I did at the DA's
14   office, what was my initial goal at the DA's
15   office, what I did in a capacity at the DA's
16   office, would I be able to have access to
17   certain files within the DA's office.  And if
18   I had those -- access to those files, what
19   files did I have access to.
20        And so that was going back to -- I
21   just know in the DA's office, you have a -- we
22   have a confidentiality.  So it's kind of like
23   I'm breaking confidentiality, so you're trying

Page 175

1    to say that I'm giving out information from my
2    job to other people and I'm breaking
3    confidentiality.  That's what I was saying.
4    So I'm trying to figure out who was saying
5    that I'm doing those things, because that's
6    not what I'm doing.
7         Even my husband's cases that I
8    have access to look up on the system, I never
9    touched.  I didn't want to read them.  I
10   didn't want to have access to them because I
11   did not want it to be a conflict of interest
12   and his cases get messed up.
13        So that was my issue.  I'm trying
14   to figure out again who was trying to watch
15   over me, who's trying to tell, you know, lies
16   about me or trying to kind of subsequently get
17   me fired saying I am giving confidential
18   information out when I was not.
19        Q.  Did I understand you correctly,
20   when you said that you had planted some
21   information to several people to kind of
22   figure that out?
23        A.  Yes.

Page 176

1         Q.  Could you explain that a little
2    better?
3         A.  Okay.  So we have a case that was
4    going on in Judge Stephens's courtroom.  This
5    case is again dealing with Marquetta Murrell,
6    the same Marquetta Murrell that Danny Carr was
7    trying to, you know, tell me I needed to let
8    the cases go.  Don't go to court.  Court is
9    not a place to handle these things.
10        So in this particular case, you
11   know, Marquetta Murrell brought up things in
12   the courtroom about what I had access to.  And
13   I'm trying to figure out, what do you mean?
14   And how would you even know what I do?  You're
15   not even in a capacity to know what I do at
16   the DA's office.  So, again, I figured -- and
17   plus, keep in mind, at that particular point
18   in time, we were still getting -- well, my
19   husband was getting calls from a private
20   number to a number that he doesn't even have
21   listed, to a cell phone he had just, you know,
22   recently got so nobody had the number.  That
23   number was in his file that's in the system at

Lanitra Jeter                                          12/10/2021

---

Page 177

1    the DA's office.  So I'm trying to figure out
2    what is going on.
3            So basically what I said, in that
4    particular one, we had a court case.  In that
5    court case, Marquetta Murrell is bringing up
6    certain things, you know, in that court case
7    about what I do in the DA's office, how my
8    employment at the DA's office is making it be
9    like against her in this particular case, you
10   know what I mean?  And information was being
11   given out by me regarding cases in the DA's
12   office, again, going back to me personally
13   giving out information on cases, which is
14   breaking confidentiality.  Because like I
15   said, that's the number thing in the DA's
16   office.
17           And so again I told Judy Yates,
18   Erin Barefield and Elise Driskill.  And no one
19   said anything to anybody except for Judy
20   Yates.  Judy Yates went to Erin Barefield and
21   Elise Driskill and requested they do a
22   statement and sign it.  Other than that, they
23   didn't mention anything.

---

Page 178

1        Q.  How do you know that Judy Yates
2    went to Erin and Elise?
3        A.  I have two statements that are
4    attached.
5        Q.  So you're pointing to Bates 318
6    and 319?
7        A.  Yes.
8        Q.  Okay.  So back on 85, Bates 85, is
9    there anything specifically false in there
10   that we haven't talked about that we need to
11   talk about?
12       A.  No, we've touched on everything in
13   there.
14       Q.  Okay.  Let's look at Bates 318
15   which is one of the statements you've
16   identified.  Tell me about that document.
17       A.  On here, this is Elise Driskill's
18   statement.  She said that I texted her and
19   Erin about the court date that I had as far
20   as -- in Judge Stephens's courtroom.  I stated
21   to them that certain things happened within
22   the court date -- I mean -- sorry, the court
23   appearance.  And again I informed -- I

---

Page 179

1    actually texted both of them at the same time.
2    It was a group text.  I informed them the same
3    thing that I informed Judy Yates.  The only
4    difference is what Judy Yates stated to
5    Michael McCurry is totally different from what
6    was stated by Elise Driskill and Erin
7    Barefield.  But I told all of them the same
8    exact story.
9            So, again, like I said, that makes
10   me believe again that it was Judy Yates that
11   has been, you know, reporting things on me
12   that were false and untrue.  As far as in a
13   form of retaliation and discrimination against
14   me.
15       Q.  Let's look at Bates 319 real
16   quick, and we're still on this Plaintiff's
17   Exhibit 1, which is in this little
18   three-document subset 85 and 318 and 319.
19   What is 319?
20       A.  319 is a statement from Erin
21   Barefield about the same text message
22   conversation that I had with Elise Driskill
23   and Judy Yates.  Again, basically the

---

Page 180

1    statements between Elise Driskill and Erin
2    Barefield are majorly the same, which is
3    different from what Judy Yates verbalized to
4    Michael McCurry and possibly, you know, Joe
5    Roberts since it's listed to him and Danny
6    Carr in that memo.
7        Q.  And I'm looking at Bates 318 and
8    319, the two statements.  Do you have any idea
9    what date those statements were written on?
10       A.  I have no idea.
11       Q.  Is Elise and Erin's version, is
12   that truthful and accurate, to your knowledge?
13       A.  It's truthful to my knowledge
14   about what I said.  Even though the incident
15   didn't occur, it's accurate in what I said.
16       Q.  And you did have an opportunity to
17   discuss this incident that is made the basis
18   of Bates 85 with some people in your chain of
19   command; right?
20       A.  Yes.
21       Q.  We just looked at a number of
22   memos to file; do you recall that?
23       A.  Yes.

---

Lanitra Jeter                                    12/10/2021

---

Page 181

1    Q.  Did you have an opportunity to
2  discuss any of the issues raised, whether they
3  were true or not, in the memos to file that we
4  just looked at?
5    A.  No, I did not.
6    Q.  So no one in your chain of command
7  ever talked to you about any of those issues
8  and the memos to the file that we just looked
9  at?
10    A.  No one talked to me about
11  attending any training sessions, it was a
12  problem that I did not attend any training
13  sessions.  I was not told that it was
14  mandatory that I attend any training sessions.
15  I was not asked why I had to leave the
16  building.  I was not asked if there was
17  anything -- a problem why I needed to leave
18  the building.  Nobody asked me why or where I
19  was when they were looking for me throughout
20  the building when I was in actually in May's
21  chambers and they said I wasn't there, but I
22  was.  Nobody asked me why I did not want to
23  drive to Nashville and attend those different

Page 182

1  trainings.  And the response where she said I
2  wasn't interested in going is not correct.
3    Q.  Okay.  And for the record, you've
4  been flipping through Plaintiff's Exhibit 1,
5  Bates 71, Bates 67, Bates 66, Bates 57, Bates
6  74, Bates 338 as you just gave that prior
7  testimony; correct?
8    A.  Correct.
9    Q.  And so I'm just going to ask
10  again, those memos to file, were you given an
11  opportunity to correct any of those issues
12  whether they were true or not?
13    A.  No, I was not given the
14  opportunity.
15    Q.  Okay.  Still on Plaintiff's
16  Exhibit 1, let's move to Bates 1111.  Take a
17  look at that, Ms. Jeter, and let me know what
18  that document is.
19    A.  This is a -- it looks like an
20  e-mail from Joe Roberts to Michael McCurry.
21      MR. MURRILL:  No.
22    A.  No?
23    Q.  (BY MR. NOBLE:)  And skip down

Page 183

1  actually.
2    A.  Okay.
3    Q.  It looks like an e-mail from --
4  I'm going to lead -- from Michael McCurry
5  to --
6    A.  Danny Carr.
7    Q.  And Joe Roberts --
8    A.  Okay.
9    Q.  -- is that right?
10    A.  Okay.  Yes.  So it's from Michael
11  McCurry sent September 19 to Danny Carr and
12  Joe Roberts.  Subject is LaNitra Jeter and
13  importance was put as high.  And this is the
14  same situation I'm talking about in the
15  previous document that we just discussed.
16  It's the same -- it's part of that particular
17  situation.
18    Q.  Okay.  So is there anything false
19  on 1111 that we haven't already discussed?
20    A.  It's the same falseness that were
21  in the previous documents.
22    Q.  And 1112 is part of 1111.  Same
23  question, anything false in there that we

Page 184

1  haven't already discussed?
2    A.  It's just part -- same thing
3  that's false in the other documents.
4    Q.  Let's go off the record real
5  quick.
6      (Off-the-record discussion.)
7    Q.  (BY MR. NOBLE:)  Okay.  So we're
8  now looking at Bates 82.  Would you tell me
9  what that is, please, ma'am?
10    A.  Okay.  This is another memo to my
11  employee file from Judy Yates, dated September
12  20th, 2019, and this is regarding VSO DV
13  training.
14    Q.  Okay.  If you would, please,
15  ma'am, read the information there on Bates 82
16  and let us know what, if anything, there is
17  false.
18    A.  Okay.  (Reviewing document.)
19  Again, same partly true, partly false.
20    Q.  Could you explain for us, please?
21    A.  Okay.  In this particular memo, it
22  says that I only worked with property crimes.
23  That's not true.  I also worked with DV cases.

---

46  (Pages 181 to 184)

Lanitra Jeter                                    12/10/2021

Page 185

1    All of the VSO officers worked with DV cases
2    because sometimes an officer may be out.  Like
3    Erin has been out and I've had to actually go
4    and handle the case and handle victims, talk
5    to the attorney and do an informal intake and
6    give my opinion on should the charges be
7    dropped or should the charges stay, depending
8    on whether the defendant had prior charges or
9    anything like that.
10          So in this particular one, she
11   says that I only worked property crimes and
12   that's not true.  And if I'm part of the
13   ones -- if I'm part of the office and I do DV
14   training just like the other VSOs do DV
15   training, I needed to be in that domestic
16   violence training.  Now, this is the one that
17   I needed to be in instead of the ones that she
18   offered to me to go to.  That didn't have
19   anything to do with the VSO and what I do in
20   my job.
21          Q.  Is there anything else false about
22   82?
23          A.  No.

Page 186

1          Q.  Moving to Bates 80, could you
2    please look at that document and tell me what
3    it is?
4          A.  This is a memo to my employee file
5    from Judy Yates, dated September 23rd, 2019,
6    and the reference to LaNitra Jeter.
7          Q.  Okay.  Read over Bates 80.  Read
8    that information, if you will, please, ma'am
9    and tell us if anything on Bates 80 is false.
10         A.  (Reviewing document.)  It's partly
11   true again and partly false.
12         Q.  Could you please explain?
13         A.  In here she states that I wanted
14   to know -- she says I wanted to know what I
15   was supposed to do during my lunch.  And she
16   stated that I should sit at my desk like most
17   people if I wanted to.  That's not the only
18   thing I asked her.  I also asked her why was
19   my comp time being taken away and why do I
20   have to come in at 7:30 and 4:30 and everybody
21   else can come in at 7:00 and accrue comp time
22   and I could not.
23         And then in here she did put that

Page 187

1    she would be discussing -- no.  Wait.  I asked
2    her about what about next week, because I was
3    trying to figure out if this was something
4    that was going to be permanent or not, and she
5    said that we would discuss that before the end
6    of the week.
7          Q.  And you say whether this is going
8    to be permanent or not, you're talking about
9    restrictions on comp time?
10         A.  Correct.  Yes.
11         Q.  And I recall you giving testimony
12   today in response to questions about -- before
13   your comp time was reinstated in November of
14   2019, et cetera; do you recall that?
15         A.  Yes.
16         Q.  Did you ever have unconventional
17   comp time while you worked for the DA's
18   office?
19         A.  I don't understand the question.
20   What do you mean?
21         Q.  So did you ever have comp time
22   available to you in the same way it was
23   available to the white VSOs while you worked

Page 188

1    at the DA's office?
2          A.  Yes.
3          Q.  When was that?
4          A.  Possibly about the second to third
5    week after I started when I officially was
6    informed that we could accrue comp time,
7    because at first I did not know.  Nobody told
8    me.  All the other VSO officers were accruing
9    comp time.  I was the only one that was not
10   because nobody told me.
11         Now, once I was able to accrue
12   comp time, I accrued comp time the same way
13   that they did.  You could come in at 7:00 and
14   leave at 4:30.  You could work through your
15   hour-and-a-half lunch, no problem.
16         Q.  Did that end for you at some
17   point?
18         A.  Yes.
19         Q.  And when was that again?
20         A.  The 23rd of September, 2019.
21         Q.  For the remainder of your
22   employment with the DA, did it ever go back
23   like it was in the beginning where you just

47  (Pages 185 to 188)

Lanitra Jeter                                    12/10/2021

Page 189

1  could take comp time equal to any VSO officer?
2        A.  No.
3        Q.  All right.  Let's look -- is there
4  anything on Bates 80 that's false that we
5  haven't talked about?
6        A.  No.
7        Q.  All right.  Let's look now at
8  Bates 78, which is a two-part part.  It has 79
9  after that.  So would you please look over
10  that document and let us know what it is?
11        A.  This is actually in reference to
12  the previous kind of memo.  I guess it's going
13  to be a memo itself to Danny Carr and Joe
14  Roberts from Judy Yates.  Again, LaNitra Jeter
15  is the subject, and they cc'd Mike McCurry.
16  This is Judy Yates stating how she took away
17  my comp time on September the 23rd.
18        Q.  And this memo, Bates 78, does it
19  have a date on it?
20        A.  It's dated September 30th, 2019.
21        Q.  Go ahead.  I'm sorry, I didn't
22  mean to interrupt.
23        A.  Okay.  (Reviewing document.)

Page 190

1  Okay.  Again partly true, partly false.  So in
2  this memo, this is actually a two-part memo.
3  In this memo, she is referencing -- I'm sorry,
4  Monday, September the 23rd, 2019, where she
5  took away comp time.  And again I asked her,
6  you know, why it's being taken away from me
7  and I'm the only person it's being taken away
8  from.  And everybody else that's in the office
9  is being able to accrue their comp time and
10  not have it taken away.
11        And that's when she said that, you
12  know, we'll discuss it by the end of the week.
13  Well, we ended up having a discussion on the
14  second part on September the 25th, Wednesday,
15  2019.  That meeting was with Judy Yates and
16  Michael McCurry.
17        Also to go back, on the one on
18  September 23rd, she also states in here that
19  she told me that I would have to bring a
20  doctor's excuse, you know, for that day.  At
21  this particular time, I didn't mention
22  anything about the doctor's excuse.  I was
23  more concerned of the fact of my health

Page 191

1  problems and I won't be having any comp time
2  to accrue to make my doctors' appointments.
3        On the meeting for Wednesday,
4  September 25th, 2019, which consisted of
5  Michael McCurry and Judy Yates, in this
6  particular meeting, we went into depth of why
7  about the comp time and the incident that
8  occurred within those two witness statements
9  from Erin and Elise.
10        In this particular section of it,
11  she states that I stated that I said those
12  things to relieve stress because of the things
13  going on in my life and that I thought working
14  here would help me get justice in all my cases
15  involving I guess me and myself, and that's
16  not true.  I made sure I kept myself as far
17  distanced from my husband's cases.  The only
18  case I was involved in was the case that
19  pertained to me.  I talked to my attorney that
20  was appointed to me, which is Carol Boone, in
21  reference to my case.  I never looked at my
22  husband's cases.  I never read up on his
23  cases.  I don't even know the narrative of his

Page 192

1  case.  I couldn't even tell you his case
2  number.
3        If you go to the system and put in
4  my number, it will show you that I never
5  pulled up any of his cases, because you can
6  tell by the employee number who looks at what,
7  and so that's not true.  I never thought I
8  could use my job or my job title to get
9  justice in a case.  I thought that justice
10  came from the system that was supposed to work
11  that was in place anyway.
12        In here she also states that I
13  never apologized for anything that happened.
14  I don't know if I did or did not, but in this
15  instance, I don't feel like there was nothing
16  for me to apologize, because like I said, all
17  of my information was being put out there as
18  if I was doing things that were against
19  company policy and they were actually against
20  the law for me to do.
21        Oh, in the memo it also stated
22  that Michael discussed with me the problem
23  with my time, which --

48  (Pages 189 to 192)

Lanitra Jeter                                                    12/10/2021

Page 193

1        Q.   For the record, you're pointing to
2   Bates 79.  Keep going.
3        A.   In the second part of the memo,
4   referring to Wednesday, September 25th of
5   2019, within the meeting with Michael McCurry
6   and Judy Yates, Michael states in here that he
7   went into detail as to why my comp time was
8   taken away.  In there they're saying that I
9   could not grasp the problem of how much time I
10  was taking.  If it's time that I worked --
11  like I stated to them, if it's time that I
12  worked for and it's time that I earned, it's
13  my time.  It's not a company policy to
14  determine how or when I use my comp time.  And
15  also again you have other VSO officers that
16  are using comp time to get their hair done and
17  leave work early because they can't see.
18       So if I'm trying to get to a
19  doctor's appointment because I'm having
20  medical issues, how is that any less important
21  of a person who's leaving to go get their hair
22  done.  And so that's when they disclosed that
23  it was people who had noticed me leaving.  So,

Page 194

1   again, that goes to a point of people watching
2   me, reporting me and things like that.  And,
3   like I said, if you was watching everybody
4   like you're supposed to watch all the VSO
5   officers, you'll know you have the one VSO
6   officer that's over there in the office during
7   VSO time studying for the LSAT that's now in
8   law school.  And you've got the other one over
9   there that's leaving on days to go be with
10  whoever she had to be with, but you're
11  watching me.
12       And so at that particular point in
13  time, I just got really upset.  I cried.  I
14  think I -- at that particular point in time I
15  just zoned everybody out.  I sat in there for
16  twenty minutes and I didn't say a word because
17  I was tired, I was disgusted with the
18  situation, I was hurt.  And after that
19  particular point in time, I did go to my
20  office and sat for a while to try to get
21  myself together.  And after that meeting, I
22  did self-harm myself again at work.
23       Q.   While you were employed with the

Page 195

1   DA, did you ever see Bates 78 or 79?
2        A.   No, I did not.
3        Q.   Did you ever discuss your comp
4   time issues with Erin or Elise?
5        A.   Yes, I did.
6        Q.   Do you recall any of those
7   conversations?
8        A.   One conversation I had was in my
9   office.  It was actually both with Erin and
10  Elise.  They came to come see how I was doing
11  that day because a lot of stuff had been going
12  on and they could see for themselves it was
13  going on.  And like I said, they were calling
14  to check on me.  And the first thing I said
15  was, it's not fair.  I said, do they not
16  realize they're taking the comp time away from
17  the only African-American VSO officer and
18  everybody else gets to accrue time?  Do they
19  not realize that's discrimination?  I said, if
20  that's what they want to do, then that's what
21  they're going to do.  I said, but what I'm
22  going to do is just keep my mouth shut and
23  just try to do what I need to do.

Page 196

1        Q.   Did either of them respond to that
2   statement?
3        A.   They did.
4        Q.   Do you --
5        A.   Um --
6        Q.   Go ahead.  Sorry.
7        A.   Erin was stating it was not fair.
8   I don't want to curse, but --
9        Q.   Go ahead.
10       A.   She basically said it's not fair
11  about all this shit they were putting me
12  through in the office.  She said, if there's
13  anything she can do to help me as far as, I
14  guess like moral support, she was there.  She
15  also said if I ever needed her to, you know,
16  vouch for that, she would.
17       Elise agreed with her about the
18  shit I was going through at work, but Elise
19  did not say that she would back me on those
20  things, because she said -- like she said
21  before, she's going to law school.  She'll
22  possibly need to work in the DA's office as an
23  attorney and she doesn't want to be retaliated

49  (Pages 193 to 196)

Lanitra Jeter                                              12/10/2021

Page 197

1    against or be having that held against her for
2    helping me and -- from that office.
3        Q.  Elise said that?
4        A.  Yes.
5        Q.  Just so I understand, is it your
6    testimony that Elise said she wouldn't support
7    you in a lawsuit?
8        A.  Well, Elise said she has to be
9    careful in what she can and cannot help me
10   with because she studied for the LSAT.  She's
11   going to, you know, be an attorney.  And it's
12   a possibility she'll still be living here and
13   she'll be working -- trying to get a job at
14   the DA's office and they possibly would not
15   hire her if she testified or supported me if I
16   filed anything or went after the DA's office.
17       Q.  Did Elise mention the word
18   "retaliation" in her communication with you?
19       A.  I can't recall at the moment if
20   she did.  I do recall though that she said
21   that she has to be careful because when she
22   goes to law school and completes law school
23   and passes the bar, she will want to work at

Page 198

1    the DA's office and they will possibly not
2    hire her.
3        Q.  Do you know if Elise went to law
4    school?
5        A.  She's currently in law school.
6        Q.  Do you know where?
7        A.  I believe Cumberland.
8        Q.  Do you know if she's a first year,
9    second year or third year?
10       A.  I don't know, only because right
11   after I was terminated, I think Elise left
12   first, maybe a month after, and then Erin left
13   right after that.  Now, in our discussions in
14   my office, they did say if I ever left, that
15   they're leaving, too.
16       Q.  Did Erin or Elise ever express an
17   opinion to you about race discrimination at
18   the DA's office?
19       A.  I can only say I assume that to be
20   as part of the retaliation based on the
21   statement Erin made about the shit that
22   they're putting me through and the way that
23   they're treating me.  The way that they, you

Page 199

1    know, showed favoritism towards them and not
2    to me.  So I can assume in that instance that
3    is what she was meaning about the
4    discrimination and retaliation.
5        Q.  Is it your testimony that Erin and
6    Elise acknowledged that they were treated more
7    favorably, is that what you're saying?
8            MR. MURRILL:  Object to the form.
9        Q.  (BY MR. NOBLE:)  You can answer.
10       A.  Okay.  Again, I'm assuming that
11   because they -- again, she confirmed they saw
12   for a fact the shit that they put me through.
13       Q.  And I'm sorry to interrupt.  She,
14   who is she?
15       A.  I'm sorry.  Erin and Elise.
16       Q.  So both of them, okay.
17       A.  Okay.
18       Q.  Continue.
19       A.  I can only assume that Erin and
20   Elise did agree with that because of the
21   statements that Erin made referring to the
22   shit that Judy puts me through, and she
23   specifically named Judy Yates.  And Elise

Page 200

1    again kind of cosigned on that.  But also in
2    her statement she said that she couldn't be a
3    part of anything as far as a lawsuit.
4        Q.  Do you have any idea why you had
5    all those memos in your file?
6        A.  I can give you an idea of what I
7    have.
8        Q.  Based on your knowledge, do you
9    have any idea?
10       A.  Oh, my knowledge, no, I don't know
11   why they put those things in my file.
12       Q.  Are you familiar with the policy
13   at the DA's office regarding memos to file?
14       A.  Yes.  If I'm familiar -- what I
15   know is if there is an issue with an employee,
16   there should be a discussion with the employee
17   referring to that incident.  The response
18   should be given to the chain of command.  The
19   chain of command should then make a decision
20   on, I guess, the discipline or the outcome of
21   that employee.  Each employee should be aware
22   of any incident that they're being mentioned
23   in or being accused of or any accusation.

                              50  (Pages 197 to 200)

Lanitra Jeter                                        12/10/2021

Page 201

1      Q.   That was DA policy based on your
2   knowledge; is that right?
3      A.   Correct, that is -- yes.
4      Q.   And you said that employee issues
5   go up the chain of command; did I hear that
6   right?
7      A.   Yes.
8      Q.   How far up the chain of command do
9   they go, if you know?
10      A.   From my knowledge, it should be to
11   your supervisor.  And in -- I guess, the admin
12   or HR, which is going to be Michael McCurry.
13   Then next would be Joe Roberts.  And then
14   final would be Danny Carr.
15      Q.   So if I understand correctly, help
16   me understand it, is it your testimony that it
17   was the policy at the DA's office that these
18   memos to file should have gone all the way up
19   as high as to Danny Carr?
20      A.   Yes.
21      Q.   And if they did not, that would be
22   a deviation from policy, is that what you're
23   saying?

Page 202

1      A.   Yes.
2      Q.   Do you know if the DA had
3   employment policies governing things like race
4   discrimination and retaliation?
5      A.   Yes, I believe so, yes, in policy.
6      Q.   Were you ever given those
7   policies?
8      A.   I was not given those policies,
9   no.
10      Q.   Were you ever trained on those
11   policies?
12      A.   No, I was never trained on those
13   policies.
14      Q.   Sitting here today, do you have
15   any idea what those policies even were?
16      A.   No.
17      Q.   You mentioned just a minute ago
18   various steps in employee discipline; did I
19   hear that right?
20      A.   Yes.
21      Q.   Okay.  So the DA's office did have
22   policies regarding how employees should be
23   disciplined?

Page 203

1      A.   Yes.
2      Q.   Could you tell me those policies
3   as specifically as you know them based on your
4   personal knowledge?
5      A.   Okay.  Well, based on my personal
6   knowledge, like I said, I never saw them in
7   writing.  I just assumed as with any
8   employment it would be verbal -- well, yeah,
9   verbal warning, written.  Some businesses do
10   suspension.  Some businesses do -- depending
11   on how many written and verbals you get.
12   Everything should go through the chain of
13   command.  An employee is to be aware of a
14   report.  The employee is supposed to be given
15   the opportunity to say yes or no if those
16   things are accurate or correct or false in
17   that report.  If the employee agrees, they
18   normally get a signature from the employee
19   either agreeing with what the discipline
20   determination is going to be.  That's --
21   that's basically, you know, what I would think
22   the policy would be.
23      Q.   Sure.  So, and you're saying you

Page 204

1   assume.  So am I correct in understanding that
2   it's your testimony that you don't know what
3   the policy was regarding employee discipline?
4      A.   Correct.  Yes.
5      Q.   Did you see employees disciplined
6   at all while you were employed at the DA's
7   office?
8      A.   Not -- not myself, no.
9      Q.   Okay.  Did you hear about
10   employees being disciplined while you were at
11   the DA's office?
12      A.   Not that I can recall at this
13   present moment, no.
14      Q.   Do you know of any employees being
15   written up while you worked for the DA's
16   office?
17      A.   Not at this moment, no.
18      Q.   Okay.  Were you ever given a
19   verbal warning about anything during your
20   employment?
21      A.   No.
22      Q.   Were you ever given a write-up
23   during your employment?

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Lanitra Jeter                                                    12/10/2021

Page 205

1      A.  No.
2      Q.  Were you ever given a performance
3  improvement plan?
4      A.  No.
5      Q.  Were you ever given a final
6  warning?
7      A.  No.
8      Q.  Were you ever coached in any way?
9      A.  No.
10     Q.  Was there any investigation at all
11  to your knowledge about your claims of race
12  discrimination?
13     A.  No.
14     Q.  On the day that you were fired,
15  did you have any reason to believe that your
16  job was in jeopardy?
17     A.  Absolutely not.
18     Q.  How did it feel when you were
19  fired?
20     A.  It was a bunch of different
21  emotions.  Shock was one, because like I said,
22  didn't know anything about it.  Hurt,
23  humiliated because that was my first time ever

Page 206

1  being terminated in my life.  Even more
2  humiliated when I was escorted out of the
3  building by two armed sheriff officers.  And
4  then as I was let out of the gate and I walked
5  across the street, I got madder and madder.
6  And finally when I got to my vehicle, I was
7  angry.
8      Q.  Before this litigation, do you
9  have any idea why the DA's office fired you?
10     A.  No.
11     Q.  Did you ask?
12     A.  In this moment I really can't
13  remember.  I believe I asked why when Joe
14  Roberts handed me the letter, and he didn't
15  even tell me what it was.  He just handed it
16  to me and I opened it and I read it and I was
17  shocked.  And then, you know, he was like turn
18  in all of your stuff, grab your things and get
19  in contact with Sam Johnson when -- and set up
20  a time to get your other belongings.
21         So I can't really say if I did.  I
22  just know the explanation that was given in
23  the letter of my termination.

Page 207

1      Q.  And remind us what that was.
2      A.  They gave me a rule of law and
3  said that it was -- and that the district
4  attorney's office is able to hire as a
5  pleasure and it's no longer their pleasure
6  that I be an employee of that office.  And
7  effective immediately I am terminated.  I am
8  to turn in my badge and any other equipment
9  that I have.  Turn it in.  I will be able to
10  get in contact with Sam Johnson to set up a
11  time to get my other belongings.  I was given
12  maybe a couple of minutes to get my purse and
13  get other things like my satchel and stuff
14  like that.  All my other things, my personal
15  belongings, paperwork that was in my desk that
16  was my own personal stuff I was not able to
17  get and it was never returned to me.
18         I still have items that are mine
19  that have not been returned to me by the DA's
20  office even after I've let them know that they
21  didn't give me all of my belongings.
22     Q.  Did you make efforts to appeal
23  your termination?

Page 208

1      A.  I did.  I contacted -- I believe
2  it was Tamara, I believe it's Tamara at -- in
3  Montgomery at the -- I think it's called OPS
4  office.  I informed her of what just happened.
5  I said, I was not given any explanation.  I
6  asked her if there is a policy in place for a
7  grievance or anything like that, and Tamara
8  did not e-mail me back.  An attorney for the
9  office e-mailed me back and said basically it
10  is at the discretion of the DA's office to
11  hire whoever they want to hire.  If they have
12  terminated me, then that's the termination.
13  There is no grievance.  There is no appeal.
14  There's no -- there's no nothing for me to do.
15     Q.  Did you have a hard time getting a
16  lawyer?
17     A.  It was past hard.  It was
18  extremely difficult for me to find an
19  attorney.
20     Q.  Do you have an opinion as to why
21  that is?
22     A.  I have the exact fact.  Every time
23  I would do the intake -- you know, you do the

                                52  (Pages 205 to 208)

Lanitra Jeter                                          12/10/2021

Page 209

1    intake online, you tell them everything, tell
2    them what the case is about and they tell you
3    to list the defendant.  And I would get a call
4    back from the attorney that says either it is
5    a conflict of interest because they either
6    have cases that they have to try in that
7    office.  They have either cases now or future
8    cases they could have in that office.  And the
9    main reason was that they didn't take the
10   cases is because they did not want to be
11   retaliated against by the DA's office.
12        Q.  Did you ever get any examples of
13   what retaliation might look like?
14        A.  Retaliation could be -- could
15   happen to me.  It could happen to my family.
16   It could happen to the attorney, which could
17   be you get tickets on your car, you get your
18   car towed.  You get pulled over for no
19   apparent reason, because, you know, once you
20   run your tag, my tag is going to come back
21   under my name.  That's one reason I told my
22   son, he has my other vehicle and that's
23   registered in my name.  I told him do not come

Page 210

1    back to the State of Alabama unless it is
2    absolutely necessary.  He lives in Georgia.  I
3    said, do not come here because I don't want
4    anything to happen to you.
5         Again, like I said, you can get
6    false police reports put on you.  You can have
7    police officers pull you over for no apparent
8    reason.  You can get harassed and hassled by
9    the police.  It's just a -- it's a -- it's a
10   list of things that could possibly happen.
11        Q.  And are you -- is it your
12   testimony that attorneys told you various
13   worst case scenarios that might happen to them
14   and these are some examples?
15        A.  Yes, that's correct.
16        Q.  And among those examples were like
17   parking tickets?
18        A.  Yes.
19        Q.  And you did find an attorney?
20        A.  I did.
21        Q.  Okay.  Did any of the items that
22   you just named come to fruition, to your
23   knowledge?

Page 211

1         A.  Yes, they did.
2         Q.  What happened?
3         A.  You got your car towed yesterday.
4         Q.  Do you know about when?
5         A.  I don't know exactly when.  I just
6    know it got towed.  You was only in the office
7    maybe, what, five, ten minutes and came back
8    and your car was gone.
9         MR. NOBLE:  Let the record reflect
10   we're smiling.
11        Q.  (BY MR. NOBLE:)  Let's talk about
12   your -- you were asked some questions about
13   your bankruptcy.
14        MR. RILEY:  Was that true or not?
15        MR. NOBLE:  It's true.
16        MR. RILEY:  Okay.
17        MR. MURRILL:  Where were you?
18   Where was your car?
19        MR. NOBLE:  We can talk about it
20   when I'm a witness.
21        MR. RILEY:  Well, y'all brought it
22   up.  I'm just curious.  Oh, I'm sure this is a
23   story that was like another fabrication.

Page 212

1         MR. NOBLE:  No, no, it's true.  I
2    have no evidence linking anything.  It's just
3    ironic or coincidence, I'm sure.  And let the
4    record reflect I'm smiling.
5         Q.  (BY MR. NOBLE:)  You were asked
6    some questions about your bankruptcy; is that
7    right?
8         A.  Yes.
9         Q.  Is the bankruptcy court aware of
10   this lawsuit?
11        A.  Yes.
12        Q.  Is your bankruptcy attorney aware
13   of this lawsuit?
14        A.  Yes.
15        Q.  Where are you in the bankruptcy
16   process?
17        A.  At the end stage.  I'm actually
18   going to be making my last payment probably
19   within maybe the next two months depending.
20   It's going to be paid off early.
21        Q.  Let's look real quick at
22   Defendant's Exhibit 1, which are your
23   interrogatory responses.  I'm going to show

53  (Pages 209 to 212)

Lanitra Jeter                                      12/10/2021

Page 213

1   them to you real quick before we wrap up.  You
2   were asked about the very last page; do you
3   see that, on Defendant's Exhibit 1?
4        A.  Yes.
5        Q.  And that's your signature; is that
6   right?
7        A.  Yes.
8        Q.  And what's the date there?
9        A.  November 24th, 2021.
10       Q.  And as of that date, I believe
11  it's your testimony that you had reviewed your
12  answers; correct?
13       A.  Yes.
14       Q.  Had you reviewed the objections at
15  that point?
16       A.  No.
17       Q.  Okay.  Let's turn to Bates 55.
18  And this is back to Plaintiff's Exhibit 1, the
19  very last document.  And take a look at that
20  and tell us what it is.
21       A.  Okay.  This is a memo to Joe
22  Roberts from Judy Yates, dated March 13th,
23  2020, referencing LaNitra Jeter.

Page 214

1        Q.  Okay.  And I'm going to read here,
2   it says, as requested below is a condensed
3   list of issues that have come up since LaNitra
4   Jeter began her employment here April 16th,
5   2019.  Did I read that right?
6        A.  Yes.
7        Q.  Okay.  What I'd like to do now is
8   I'm going to go through each of these
9   bullets -- bullet points here, and I'm going
10  to ask you if this is true or false; okay?
11       A.  Okay.
12       Q.  The first bullet point says, abuse
13  of earning time and taking time away from
14  work.  She is more interested in being away
15  from work than being present and contributing
16  to the office.  Is that true?
17       A.  No.
18       Q.  Is any part of that true?
19       A.  No.
20       Q.  The second bullet says, failure to
21  follow chain of command.  Is that true?
22       A.  No.
23       Q.  Is any part of that true?

Page 215

1        A.  No.
2        Q.  The third bullet says, repeatedly
3   has told stories that turned out to be --
4   turned out to untrue, so there's a typo there,
5   so loss of credibility and being trustworthy.
6   Based on your knowledge, is that true?
7        A.  No.
8        Q.  The next bullet point says, has
9   posted on social media stories that were
10  untrue just for the shock value.  Is that
11  true?
12       A.  No.
13       Q.  Do you have any idea what that is
14  referring to?
15       A.  I have no idea only because I
16  don't know which social media they're talking
17  about.  I have absolutely no idea.  And also I
18  am friends with Erin Barefield and Elise
19  Driskill, who are VSO officers, and they -- we
20  basically kind of post the same thing on our
21  social media.  So I'm trying to figure out if
22  you saw my social media, did you see theirs
23  and do they have the same thing in their

Page 216

1   employee files?
2        Q.  Did anyone ever talk to you about
3   your social media while you worked at the DA's
4   office?
5        A.  No.
6        Q.  Were you friends with anyone in
7   your chain of command on social media?
8        A.  No.
9        Q.  Are you aware of a social media
10  account that was used by the DA's office to
11  check out other profiles?
12       A.  I'm not sure.
13       Q.  Okay.  All right.  So I'm going to
14  move to the next bullet point on Bates 55, has
15  used office time to deal with issues that are
16  her husband's or her adult son's legal issues.
17  Is that true?
18       A.  No.
19       Q.  Is there any part of that that is
20  true?
21       A.  No.
22       Q.  The next bullet point says,
23  repeatedly talks about filing judicial

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Lanitra Jeter                                    12/10/2021

Page 217

1    complaints against various judges her husband
2    has to deal with.  Is that true?
3        A.  No.
4        Q.  Is any part of that true?
5        A.  No.
6        Q.  The next bullet says, has been
7    repeatedly counseled about the constant abuse
8    of her time, ex.  I'm assuming that means
9    example.  Asking to come in early, to leave
10   early, leaving early, has rarely worked an
11   entire five-day workweek.  Is that true?
12       A.  No.
13       Q.  Is there anything in that bullet
14   point we just read that's true?
15       A.  No.
16       Q.  It says you were repeatedly
17   counseled, doesn't it?
18       A.  Yes.
19       Q.  Is that true?
20       A.  No.
21       Q.  Were you counseled even once?
22       A.  No.
23       Q.  The next bullet point says, has

Page 218

1    fallen asleep while observing a trial.  Do you
2    know -- well, is that true?
3        A.  No.
4        Q.  Do you know anything about that
5    bullet point?
6        A.  No.  Because if the judge saw you
7    sleeping in his courtroom, he's going to
8    actually put you out.
9        Q.  Or she?
10       A.  Or she.  Sorry.
11       Q.  Leaves the building without
12   signing -- I'm reading the next bullet point
13   on 55, leaves the building without signing out
14   or letting someone know she will be
15   unavailable.  Is that true?
16       A.  No.
17       Q.  Is that partially true?
18       A.  No.
19       Q.  The next bullet point, signs out
20   to a court that is empty and cannot be found.
21   Is that true?
22       A.  No.
23       Q.  Do you have any idea what that is

Page 219

1    referring to?
2        A.  Possibly that memo that was in
3    there where Cheryl Black and Judy Yates was
4    combing the office looking for me, and I was
5    actually signed out to Judge May's office and
6    I was actually in Judge May's chambers.
7        Q.  The next bullet says, has no
8    credibility with her coworkers and is
9    compromising the grant report we submit to
10   OPS.  Based on your knowledge, is that true?
11       A.  No.
12       Q.  Do you have any idea what that's
13   referring to?
14       A.  I do not.  The only thing I can
15   tell you is, I actually have a lot of
16   credibility with my coworkers, which is -- and
17   I consider my coworkers to be Erin Barefield
18   and Elise Driskill.  And they communicated
19   with me often during work, after work, even
20   after they left the DA's office.
21           Now, the only issue was when I was
22   let go and terminated from there, they were
23   told that they could not contact me in any

Page 220

1    shape, form or fashion.  They only reached out
2    to me after they left the DA's office and they
3    told me that they were told that they could
4    not contact me.
5        Q.  Did they tell you anything else
6    when they reached out to you at that time?
7        A.  They said I -- Judy -- the stuff
8    that Judy did was unfair.  She put me through
9    a lot of stuff.  They felt bad for me.  They
10   missed me.  When I left, everything was just
11   not the same.  That's why they put in their
12   notices and left as well.
13       Q.  Have you ever seen any document
14   that would indicate to you that your coworkers
15   distrusted you?
16       A.  No.
17       Q.  Final bullet point, during a
18   meeting with the YWCA advocate director, she
19   asked questions about her husband's case where
20   he is a defendant of a PFA and how to get the
21   judge to allow them to speak and let her know
22   the PFA was vindictive.  Is that true?
23       A.  No.

Lanitra Jeter                                                    12/10/2021

Page 221

1    Q.  Is there any part of that's
2 true at all?
3    A.  No.
4    Q.  Did you ask any questions of a
5 YWCA advocate director?
6    A.  I did ask questions during that
7 meeting and also other VSOs asked questions.
8 We were getting information on how PFAs
9 worked.  And she stated that one known fact
10 is -- one unknown fact is when you have a PFA,
11 the person who is the -- I guess, the PFA is
12 against, they're supposed to surrender all
13 firearms.  And as a DV worker, case worker, I
14 did not know that.  Even Erin said she was not
15 aware of that.
16         And so that was like, well, that's
17 something that we need to make sure we're
18 putting in effect and how do we do that?  Do
19 we contact the police officers?  Do we contact
20 the attorney to make sure they are turning in
21 the firearms?  What do we do?  And so she said
22 basically it's required, but there's no way to
23 actually enforce it.

Page 222

1    Q.  And this memo is -- has a date on
2 it; correct?
3    A.  Yes.
4    Q.  Do you know if that's before or
5 after you were fired?
6    A.  That was before.
7    Q.  And it is written by who?
8    A.  Judy Yates.
9    Q.  And to who?
10    A.  Joe Roberts.
11    Q.  Okay.  And based on what we've
12 just discussed, is it your testimony that this
13 is -- everything here in Bates 55 is patently
14 false?
15    A.  Yes.
16    Q.  Okay.
17       MR. NOBLE:  I have no questions as
18 of right now.
19       MR. RILEY:  Let's take a break for
20 a second.
21       MR. NOBLE:  Sure.
22       (Whereupon, a short break was
23        taken.)

Page 223

1 REEXAMINATION BY MR. MURRILL:
2    Q.  Okay.  Ms. Jeter, just a few.  You
3 had mentioned having surgery on your ankle.
4 Who performed that surgery?
5    A.  That was Dr. Ashish Shah.
6    Q.  How do you spell Shah?
7    A.  S-h-a-h.
8    Q.  Where is Dr. Shah?
9    A.  UAB Highlands.
10    Q.  You had testified about the DA
11 policy regarding memos to file; do you recall
12 that testimony?
13    A.  Yes.
14    Q.  Did you ever see that policy in
15 writing?
16    A.  No, I did not.
17    Q.  Go to Plaintiff's Exhibit 1 and
18 page -- Bates label page 78, which is the memo
19 of September the 30th, 2019, from Judy Yates
20 to Danny Carr and Joe Roberts.  You had
21 testified about the story that you had put out
22 as an attempt to try to figure out which
23 information was leaking out of the DA's

Page 224

1 office; do you recall that testimony?
2    A.  Yes.
3    Q.  And the story involved a mediation
4 where you were called a name and then had a
5 physical altercation with Ms. Murrell;
6 correct?
7    A.  Yes.
8    Q.  Okay.  In the second paragraph of
9 the memo, Bates labeled DA 78, midway through
10 that paragraph Judy wrote, she started to tell
11 the story, then she said she wasn't there for
12 a mediation because they would not let her be
13 involved.  Did you tell Judy that?
14    A.  No, I don't recall telling her
15 that.
16    Q.  Okay.  Judy goes on to write, she
17 said she left and went to see her attorney in
18 Bessemer.  Did you tell Judy that?
19    A.  Hold on.  I'm trying to read the
20 whole thing.  Hold on.  I'm sorry.  (Reviewing
21 document.)  No, I didn't tell Judy Yates that.
22    Q.  Judy goes on to write, she said
23 the incident took place at a private location.

56  (Pages 221 to 224)

Lanitra Jeter                                    12/10/2021

Page 225

1   Did you tell Judy that?
2       A.  No.
3       Q.   When asked where, she finally said
4   it was just a joke, said she had put it on
5   Facebook and social media, that she likes to
6   joke about things and that everyone knew that.
7   Did you tell Judy that?
8       A.  No, not in those words, no.
9       Q.  Okay.  Did you tell Judy anything
10  about putting the story on Facebook or social
11  media?
12      A.  No.
13      Q.  Did you put the story on Facebook
14  or social media?
15      A.  No.
16      MR. MURRILL:  Okay.  Nothing
17  further.
18      FURTHER THE DEPONENT SAITH NOT
19
20
21
22
23

Page 226

1           DEPONENT'S CERTIFICATE
2
3
4       I, LANITRA JETER, the witness herein,
5   have read the transcript of my testimony and
6   the same is true and correct, to the best of
7   my knowledge.  Any corrections and/or
8   additions, if any, are listed separately.
9
10
11
12          LANITRA JETER
13
14
15      Sworn to and subscribed before me, this
16  the     day of     , 2022, to certify which
17  witness my hand and seal of office.
18
19
20
21
22          NOTARY PUBLIC IN AND FOR
23          THE STATE OF ALABAMA

Page 227

1           C E R T I F I C A T E
2
3   STATE OF ALABAMA)
4   COUNTY OF SHELBY)
5       I hereby certify that the above
6   proceedings were taken down by me and
7   transcribed by me using computer-aided
8   transcription and that the above is a true and
9   correct transcript of said proceedings taken
10  down by me and transcribed by me.
11      I further certify that I am neither of
12  kin nor of counsel to any of the parties nor
13  in anywise financially interested in the
14  outcome of this case.
15      I further certify that I am duly licensed
16  by the Alabama Board of Court Reporting as a
17  Certified Court Reporter as evidenced by the
18  ACCR number following my name found below.
19      /s/Maya Rose
20      Maya Rose, ACCR#242
21      Expires 9/30/22
22      State of Alabama at Large
23      Commission Expires 1/15/25

57  (Pages 225 to 227)

**A**

**a.m** 5:10 65:3
**ability** 7:16,17
  64:22
**able** 42:1 51:4
  54:14 62:13
  68:16 75:3,7
  75:23 76:4
  81:14,15,22
  108:8 118:17
  121:9,10,11
  128:6 140:17
  163:22,23
  164:2,3 174:16
  188:11 190:9
  207:4,9,16
**absolutely** 28:2
  102:9 115:4
  205:17 210:2
  215:17
**abuse** 15:20
  214:12 217:7
**academy** 151:6
**accept** 127:16
**access** 174:16,18
  174:19 175:8
  175:10 176:12
**accommodate**
  7:11
**accompanied**
  108:2
**account** 216:10
**ACCR** 227:18
**ACCR#242**
  227:20
**accrue** 45:18
  46:2,10 48:2
  49:5 57:2 63:9
  68:16 186:21
  188:6,11 190:9
  191:2 195:18
**accrued** 83:10
  188:12
**accruing** 48:4
  48:12 49:6,8

54:11 63:3
  82:7 188:8
**accurate** 20:18
  21:1 180:12,15
  203:16
**accusation**
  200:23
**accused** 200:23
**aching** 155:20
**acknowledged**
  199:6
**acquaintance**
  136:14
**acquainted**
  136:17
**act** 87:5
**acting** 5:4
**acts** 89:12
**Adams** 135:22
**added** 95:9
**addendum**
  166:14
**additional** 22:9
  63:14,19 73:11
  79:17
**additions** 226:8
**address** 8:19
**addresses** 12:14
**Adeel** 128:1
  143:3
**ADHD** 160:10
  160:12
**admin** 169:5,23
  201:11
**administration**
  13:18 14:7
**administrative**
  26:23 27:4
**adoption** 10:16
**adult** 216:16
**advance** 50:4
**advising** 62:10
**advocate** 22:3
  220:18 221:5
**affair** 138:6,9
**affect** 7:15

**afraid** 79:20
**African-Amer...**
  56:23 90:5
  94:9 169:7,21
  195:17
**age** 10:10
**ages** 12:2
**aggressive** 114:6
**ago** 137:16
  202:17
**agree** 56:21
  146:5 199:20
**agreed** 2:2
  196:17
**agreeing** 203:19
**agrees** 203:17
**ahead** 32:20
  47:23 73:14
  80:20,23 155:4
  161:7 189:21
  196:6,9
**ailments** 122:17
**air** 57:23
**Alabama** 1:2 3:8
  3:16 5:2,3,8
  13:3 15:15
  16:1,5,11 17:8
  18:4 140:8
  141:16 143:15
  143:17 210:1
  226:23 227:3
  227:16,22
**allegations**
  32:22 35:16
**alleged** 170:15
**allow** 220:21
**allowed** 33:21
  46:2,10 49:5
  63:7 67:16
  71:15 73:16,20
  108:7 109:21
  133:11 165:17
  165:20
**altercation**
  224:5
**altogether** 10:19

**Amanda** 105:8
  105:10
**amount** 38:21
  39:19 40:19
  42:15 131:7,9
**and/or** 226:7
**Angel** 103:8,18
  104:16 106:14
  107:17
**Angelica** 11:9
**angry** 206:7
**ankle** 223:3
**ankles** 163:21
**answer** 6:11 7:1
  8:4 16:13 20:5
  27:23 33:18
  45:3 51:1,2,3
  58:7 80:23
  82:9 123:8
  130:15 133:8
  142:17 153:22
  199:9
**answering** 6:19
**answers** 20:15
  20:17 21:4
  58:9 213:12
**antianxiety**
  121:1
**anxiety** 119:14
  122:1,6 123:5
  127:22 128:13
  128:22 130:12
  130:23 142:8
  142:12,14
**anybody** 67:17
  95:20 111:7
  158:9,10
  177:19
**anymore** 70:4
  119:8
**anyone's** 48:22
  49:7
**anyway** 192:11
**anywise** 227:13
**apartment**
  160:16

**apologize** 98:3
  192:16
**apologized**
  192:13
**apparent** 209:19
  210:7
**appeal** 207:22
  208:13
**appearance**
  178:23
**application**
  117:9,11
**applied** 105:6
**appointed**
  105:17 191:20
**appointment**
  50:11 51:5,10
  52:9,21 53:1
  73:1,5,7 75:9
  75:10,13,22
  76:2,11 118:19
  121:9 193:19
**appointments**
  58:8 72:4,6,10
  72:11,16,21
  74:16,18,21
  75:1,4,6
  118:13,18
  120:3,6 126:20
  133:11 191:2
**appreciate**
  44:11
**appropriate**
  57:20 162:7
**approval** 42:7
  63:16
**approve** 63:8
  160:4
**approved** 44:2,5
  46:11
**Approximately**
  144:13
**April** 21:8 33:13
  37:15 39:3
  40:10 44:16,21
  47:17 214:4

area 57:23
arm 7:15,15
armed 113:15
  114:3 206:3
Ashish 223:5
asked 19:8 45:1
  48:12,14 53:3
  81:10 101:22
  101:23 121:17
  151:13 156:5
  158:12 159:18
  165:19,19
  166:15 181:15
  181:16,18,22
  186:18,18
  187:1 190:5
  206:13 208:6
  211:12 212:5
  213:2 220:19
  221:7 225:3
asking 6:18
  34:23 47:13
  55:20,21 92:2
  146:10 161:4
  166:8,12 217:9
asleep 218:1
aspect 135:5
aspects 112:9
assign 2:18
assigned 23:9
  24:10,13 25:5
  25:9,18,20,21
  25:22 26:2,15
assist 22:5,7
  24:2
assistance 23:23
  131:20 132:21
assume 8:5
  29:16 43:20
  83:12 198:19
  199:2,19 204:1
assumed 35:4
  158:14 203:7
assuming
  199:10 217:8
Atlanta 160:8

attached 178:4
attempt 223:22
attend 110:3
  156:6 164:2
  165:17 181:12
  181:14,23
attending
  168:10,14
  181:11
attire 57:20
attitude 120:18
  170:15
attorney 1:11
  3:5 31:4,11,13
  102:23 103:1
  104:23 105:5,6
  105:8,18 106:3
  106:17 108:21
  113:15 133:21
  137:12 138:6,9
  154:15 185:5
  191:19 196:23
  197:11 208:8
  208:19 209:4
  209:16 210:19
  212:12 221:20
  224:17
attorney's 109:5
  117:3 121:15
  134:19 169:4
  169:22 174:2
  207:4
attorneys 3:13
  22:7 26:8,8,12
  26:19,22 141:5
  141:11,15,20
  210:12
August 15:17
aunts 12:9
authorization
  45:18
authorized 46:9
automatically
  107:14
available 43:19
  43:19,20

187:22,23
Avenue 3:7
aware 28:22
  29:3,7 30:18
  30:22 37:21
  38:2 48:1
  58:15 59:20
  60:3,5,21 61:2
  61:6,10,16
  116:23 164:10
  164:11,12
  200:21 203:13
  212:9,12 216:9
  221:15

                B
B 4:8
B-u-g-g-a-y
  125:5
back 7:4 20:7
  51:18,19 53:4
  53:7 61:20
  76:6,9 84:17
  94:21,21 95:16
  96:9 99:18,19
  101:9,10,11
  102:5,6,7,12
  102:14 110:15
  113:12 114:22
  116:4 121:5,11
  123:12 129:11
  132:5 143:8,9
  146:12 162:12
  162:13,15
  167:6,7 168:17
  170:18 173:7,7
  173:8 174:20
  177:12 178:8
  188:22 190:17
  196:19 208:8,9
  209:4,20 210:1
  211:7 213:18
Backing 77:10
bad 220:9
badge 114:8
  207:8

band 12:21,22
bank 121:14
bankruptcy
  16:17,19
  211:13 212:6,9
  212:12,15
bar 197:23
barbershop
  139:14
Barefield 48:7
  67:20 70:15
  77:16,22 78:8
  80:11 81:13
  82:18,20
  101:22 177:18
  177:20 179:7
  179:21 180:2
  215:18 219:17
Barefield's
  98:23
based 90:4
  198:20 200:8
  201:1 203:3,5
  215:6 219:10
  222:11
basically 70:7
  169:7 177:3
  179:23 196:10
  203:21 208:9
  215:20 221:22
basis 180:17
Bates 146:7,11
  146:15,23
  147:3,9,13
  148:1 149:3,12
  149:13,14,14
  149:15,15,15
  149:15,15,16
  149:16,16,16
  149:17,17,17
  149:17,18
  154:7,9,21
  155:10 156:12
  156:15 157:2,7
  157:7 158:17
  158:20 159:5

160:19,21
161:10,14
163:7,9,16
164:23 168:17
170:19,22
171:1,2,7,8,19
178:5,8,14
179:15 180:7
180:18 182:5,5
182:5,5,5,6,16
184:8,15 186:1
186:7,9 189:4
189:8,18 193:2
195:1 213:17
216:14 222:13
223:18 224:9
bathroom 94:16
  94:22 161:23
  162:13
beautician
  139:16
becoming 128:9
began 6:5 39:3
  214:4
beginning 20:21
  93:6 148:4
  188:23
begins 146:14
believe 9:22
  12:7 14:3
  16:20 17:19
  18:9,11 43:13
  54:6 62:8
  63:16 65:6
  66:13,16 67:23
  68:21,22 71:10
  72:17 73:3
  74:14 75:9
  79:4,13 87:4
  88:1,5 90:2
  91:7,11 92:9
  92:20 94:2
  96:3 99:13,13
  103:4,8,14
  105:8,9,9
  113:7 116:15

125:10,17,22
127:11 132:14
135:10 140:15
144:8 171:2
179:10 198:7
202:5 205:15
206:13 208:1,2
213:10
**believes** 165:13
**belong** 12:16,17
13:11
**belonging** 34:18
**belongings**
114:23 139:23
206:20 207:11
207:15,21
**benefits** 151:23
152:22
**Bessemer**
224:18
**best** 17:22 54:3
163:5 169:12
226:6
**Beta** 12:18
**better** 176:2
**Bible** 135:7
**big** 120:19
147:16 173:21
173:21
**bigger** 81:8
**billed** 30:9,13
80:2 102:23
108:20 109:7,9
109:12 110:3,7
110:11 131:3
**bills** 120:7
**biological** 10:9
**Birmingham**
3:8,16 5:2,8
15:4 16:2 17:2
134:8 141:15
141:16 144:1
151:7 167:7
**bit** 96:21 151:19
162:4
**Biweekly** 38:17

**black** 28:23 29:4
30:19 33:15
34:6 37:23
38:6 58:17
59:22 60:6,12
60:16,19,22
61:4,15 79:18
83:3 85:4,5
88:15 90:21
91:20 92:6,12
92:15 93:22
94:7,10,11,12
96:22 97:3
99:1,7,9 100:3
100:19 101:4
153:13,15
167:13 168:16
168:19,23
169:12,18
170:1,3,11,14
219:3
**bleeding** 119:13
**blood** 12:5
122:10 127:3
**Blount** 12:5
**blouse** 161:18
**Blue** 131:14,17
135:23 143:17
**blurry** 119:6
**board** 63:23
227:16
**body** 122:8
123:1
**books** 115:2
**bookshelf** 79:3
**Boone** 105:1,19
109:1,4 191:20
**booster** 95:9
**borderline**
91:18,23
**bother** 120:20
**bought** 132:15
132:16
**box** 114:19
115:1
**boxes** 91:3

**brave** 101:13
**break** 7:9 41:15
41:21 42:3,5
44:10,12,15
86:22 87:2
93:15 100:18
112:4 140:3
145:23 146:3
162:17,20
222:19,22
**breakdown**
121:16
**breaking** 174:23
175:2 177:14
**breaks** 41:8,12
162:16,19
**Brian** 3:4
**brief** 147:12
150:2
**briefly** 6:5
**Brighton** 151:8
**bring** 19:8,9
35:20 51:13,18
53:3,6 76:10
76:16 77:12
172:17 190:19
**bringing** 177:5
**Brooks** 103:1
106:15,16
111:14 112:21
137:11
**brought** 22:22
34:17 109:18
174:13 176:11
211:21
**Brown** 75:16
124:2 127:7,10
144:4,11,17,21
145:4,14
**Buggay** 124:23
125:4
**building** 36:7
113:20 114:5
161:4,16
162:14,15
181:16,18,20

206:3 218:11
218:13
**bullet** 45:2,4,7
76:9,20 77:23
80:8 82:23
84:16 85:9
87:2 90:1 91:4
92:3,14 102:15
102:20 113:13
115:11,21
214:9,12,20
215:2,8 216:14
216:22 217:6
217:13,23
218:5,12,19
219:7 220:17
**bullets** 214:9
**bunch** 133:23
205:20
**business** 46:7
143:16
**businesses** 203:9
203:10

---

**C**

**C** 3:1 227:1,1
**call** 49:20 50:11
57:15 58:14
79:2 117:5
147:3 148:7
151:14,23
152:1 209:3
**call-in** 50:10
**called** 43:13
100:23 101:3
109:11,13
110:8 116:15
116:16 129:4
157:19 208:3
224:4
**calling** 50:14
94:10,11,12
195:13
**calls** 7:1 32:16
36:1,3,13,16
36:19 176:19

**capacity** 1:11
164:4 174:15
176:15
**Capstone** 3:6
**car** 108:11,12,14
108:15,17,17
158:7 209:17
209:18 211:3,8
211:18
**card** 42:23
**care** 75:8,12,13
75:15,22
114:20 120:15
123:20,22
124:1 126:2,21
126:22 127:8
131:2 144:5,7
144:12,16,20
145:3,7,11
**careful** 197:9,21
**Carol** 104:23
105:19 109:1,4
191:20
**Carolyn** 137:5
**Carr** 1:10 19:13
31:8,10 33:2,4
33:8 36:23
37:19,21 38:2
38:6 44:17
56:10 87:22
88:1,5 89:19
108:23 109:1
120:11 136:15
152:2,7 171:17
176:6 180:6
183:6,11
189:13 201:14
201:19 223:20
**Carrington**
132:9,11,20,21
**cars** 120:7
**case** 1:5 14:17
16:21 25:13,17
25:19 26:14
28:7 30:9,13
44:4 103:10,11

103:20 104:2,6
104:11,15,20
104:21 105:5
105:20,20,22
106:7,8,9,13
106:15,20,23
107:5,6,13,16
107:21 108:10
108:20,22
109:7,8,12,23
111:15,20
112:7,19,20,22
113:3 133:20
141:1,2,6
150:13,15
172:5,6 174:12
176:3,5,10
177:4,5,6,9
185:4 191:18
191:18,21
192:1,1,9
209:2 210:13
220:19 221:13
227:14
**cases** 22:7 23:11
23:15,18 24:10
24:12,16,22
25:5,10,11,22
26:2,3 27:11
32:17 34:16,17
34:19,23 35:3
35:6,9,12,13
79:22 90:7
91:15 92:5
102:22 103:2
103:13,16,18
103:22 104:18
112:9,13,15
120:8 172:4,11
172:16,16
173:3 174:1
175:7,12 176:8
177:11,13
184:23 185:1
191:14,17,22
191:23 192:5

209:6,7,8,10
**catch** 146:19
**categories** 25:23
**Caucasian** 45:8
45:12 76:23
78:4 80:10
83:4 85:12
115:15
**caught** 122:16
**cause** 5:11 118:7
118:10 122:2
122:10
**caused** 121:20
121:22 122:2
123:4 124:22
129:1 133:3
**causes** 122:9
**causing** 129:20
**CBT** 129:16
**cc'd** 117:4
171:21 189:15
**cell** 36:14
176:21
**Center** 15:5
134:9 155:3
**Central** 15:15
16:1,5,11 17:8
18:4 140:8
**certain** 26:3,4
27:13 28:11
41:21,22 42:15
51:11 57:22
89:5 111:5
118:12 128:6
134:14 137:20
138:16 139:9
139:15,16
160:11,13
162:8 172:17
174:17 177:6
178:21
**CERTIFICA...**
226:1
**Certified** 227:17
**certify** 5:4
226:16 227:5

227:11,15
**cetera** 187:14
**Chad** 134:6
**chain** 69:4,6,17
84:5 165:4
166:8,13 168:5
168:12 180:18
181:6 200:18
200:19 201:5,8
203:12 214:21
216:7
**chair** 78:21
139:14
**chairs** 79:4
**chamber** 158:13
**chambers**
157:22 158:2
181:21 219:6
**Chamblin**
136:22 137:6
**chance** 112:23
**changed** 132:17
132:19
**charge** 17:4,7,10
117:6 140:15
**charges** 18:6,20
107:14 140:7
140:12 185:6,7
185:8
**Chase** 132:15
**check** 38:20
195:14 216:11
**checked** 110:16
**checking** 158:10
**Cheryl** 60:12,16
61:15 83:3
157:17 158:6
165:17 167:13
168:16,23
169:11,18
170:1,2,11,14
219:3
**Cheryl's** 94:5
**child** 22:22,23
**children** 10:6,15
86:3 172:12

**chitchat** 85:21
**chitchatting**
85:20
**choice** 43:22
**chronological**
146:18,21
**church** 13:11
**circuit** 113:5
**circulation**
119:8
**Civil** 5:6
**claim** 115:23
121:21 123:3
132:1
**claims** 23:10
134:3,3,11
135:1 137:2
138:14 205:11
**Clair** 105:18
109:5
**clarity** 97:12
**cleaner** 146:13
**clear** 57:4 119:5
171:7
**clock** 85:11,14
85:21 86:2,5,7
86:9,12 136:13
136:13 152:15
158:1 162:20
162:21
**clock-in** 42:23
**clocked** 157:14
157:16,20
**close** 57:17
136:1 173:14
**closed** 110:16
**clubs** 12:17,17
12:23
**co-defendant**
103:19
**co-pays** 130:23
131:1,11
**coached** 205:8
**coffee** 7:10
**coincidence**
212:3

**college** 13:2
**color** 97:16,19
97:23 98:4,6
98:20 99:4,6
**combined** 41:13
104:22 106:9
**combing** 219:4
**come** 63:7 65:8
65:11,14,20
66:3 85:3 86:4
86:13 93:19,20
99:19 126:8
136:10 141:17
152:16 159:15
186:20,21
188:13 195:10
209:20,23
210:3,22 214:3
217:9
**comes** 139:2
**comfortable**
164:2
**coming** 28:4
63:10 136:12
152:6,8
**command** 69:4
69:6,17 84:6
165:5 166:9,13
168:5,13
180:19 181:6
200:18,19
201:5,8 203:13
214:21 216:7
**commencing** 5:9
**comment** 61:17
**comments** 28:23
29:4,8 30:19
30:23 37:22
38:3 59:21
60:6,19,20,22
61:3,7,11
**Commission**
227:23
**Commissioner**
2:5,22 5:4
**communicate**

70:8
**communicated** 219:18
**communication** 102:21 103:5,6 103:11 104:6 104:15,20,21 106:9 107:16 111:15 112:18 197:18
**communicatio...** 104:2
**comp** 32:14 33:21 34:4,7,9 34:13 41:5 42:12,16 43:5 43:8,12,19 45:7,9,9,11,18 45:23 46:2,2,9 46:11,14 47:7 47:21 48:2,4 48:12,22 49:2 49:3,5,7,11,22 50:2,5,8,16 52:14,23 54:11 54:14 55:12 56:21 57:9 58:2,11,16 59:3 61:22 62:12 63:1,3,9 63:15,19 64:18 64:22 67:16,18 68:13,14 69:21 69:23 70:13,21 71:5,9,14,16 73:16,20 74:5 74:7,10,12 79:11,19 82:7 83:10,16 86:15 89:1 102:16 118:11 166:2 186:19,21 187:9,13,17,21 188:6,9,12,12 189:1,17 190:5 190:9 191:1,7

193:7,14,16 195:3,16
**company** 132:2 132:22 192:19 193:13
**compared** 45:12
**Compensatory** 42:13
**complain** 54:13 55:4,9 56:1,6 56:10,14 67:17 69:22 70:4,12 70:14,18 71:7 77:11,15,17,21 79:14,16 82:17 82:21 84:18 89:17 95:21
**complained** 54:15,17 67:20 71:4 82:20 83:13 85:3 89:18 153:11 153:18
**complaining** 55:11,20 68:8 85:6 88:11 94:11 138:22
**complaint** 68:3 68:6,18,20 69:1,11,14 88:21 116:17 153:8,10
**complaints** 88:22 89:1,10 89:18 153:3,5 217:1
**complete** 8:19 14:22 78:17
**completed** 13:14
**completes** 197:22
**compliance** 2:11
**composite** 148:2 149:10
**comprised** 149:2

**compromising** 219:9
**computer-aided** 227:7
**concern** 167:13
**concerned** 190:23
**concluding** 5:10
**condensed** 214:2
**conference** 167:5
**confess** 174:4
**confidential** 175:17
**confidentiality** 174:22,23 175:3 177:14
**confined** 135:20
**confirm** 76:11
**confirmed** 127:19 173:22 199:11
**conflict** 105:16 106:22 175:11 209:5
**confused** 151:18 174:4
**confusing** 7:4 149:12
**consider** 121:23 153:15 219:17
**considered** 122:4
**consisted** 68:12 191:4
**constant** 217:7
**constantly** 83:1 85:13
**contact** 22:8 116:22 139:22 206:19 207:10 219:23 220:4 221:19,19
**contacted** 208:1
**context** 130:8

**continuance** 107:11
**continue** 81:4 199:18
**contracted** 143:18
**contributing** 214:15
**control** 155:21
**conversation** 33:7 45:5 51:22 52:4 170:10 179:22 195:8
**conversations** 60:15 138:19 170:14 195:7
**convince** 120:8
**cope** 135:8
**copier** 100:17
**coping** 128:8 129:16,23 134:15 139:7
**copy** 44:19,20 44:21 100:17 116:9 117:15 117:17
**corner** 93:21 94:5
**correct** 17:5,8 21:12 24:17 25:18 27:16 31:4,11 38:7 39:4 42:10 47:18 53:14 65:20,23 67:6 70:13 71:5 87:22 91:8,12 97:8 98:16 100:4 104:3,8 104:12 106:10 107:18 113:10 113:11 115:9 117:23 136:19 141:9 154:17 154:18 182:2,7

182:8,11 187:10 201:3 203:16 204:1,4 210:15 213:12 222:2 224:6 226:6 227:9
**corrections** 67:5 67:11,11 151:6 226:7
**correctly** 45:13 53:23 123:3 153:6 175:19 201:15
**cosigned** 200:1
**cost** 130:17,20 133:7
**counsel** 2:4,15 2:17 5:7 141:2 141:3 149:10 227:12
**counseled** 167:23 168:9 217:7,17,21
**counseling** 13:17 14:6 15:4 16:3 134:8
**counselors** 130:3 143:6
**counterparts** 45:13
**County** 1:12 8:10 12:6 105:7,19 106:17 109:5 227:4
**couple** 50:9 86:5 137:16 146:1 170:23 207:12
**Courier** 55:1
**Courrier** 136:7
**Courrier's** 151:16
**court** 1:1 2:6,12 6:12 23:4,7 28:4 34:21,22

107:12 113:5,6
157:16,20,21
157:22,22
158:13 160:15
176:8,8 177:4
177:5,6 178:19
178:22,22
212:9 218:20
227:16,17
**courtesy** 160:2
**courtroom**
158:1,3 172:21
172:22 173:5
176:4,12
178:20 218:7
**courtrooms**
174:8
**cousins** 12:10
**cover** 43:22
50:18 52:20,23
72:1 74:3
**coworker**
135:23
**coworkers**
83:11 219:8,16
219:17 220:14
**CPT** 128:8
**crap** 94:18
**Crayton** 137:11
137:12 172:9
**credibility** 215:5
219:8,16
**cried** 94:17
110:16 194:13
**crime** 22:5
23:15 24:16
**crimes** 184:22
185:11
**Cross/Blue**
131:15,17
136:1 143:17
**Cumberland**
198:7
**curious** 211:22
**current** 16:10
**currently** 16:4

141:12 198:5
**curse** 196:8
**custody** 172:12
**cut** 111:6,7
119:11
**cutout** 33:15
92:15 93:21
94:7 96:22
**cutouts** 93:8
100:3,6,9
**cutter** 111:4
142:18
**cutting** 119:23
121:2 122:3

---

### D

**D** 4:1
**DA** 149:14
153:9,10,12
154:17 168:10
188:22 195:1
201:1 202:2
223:10 224:9
**DA's** 8:9,10 15:6
15:9,12 17:5
18:3 20:3 21:7
21:10,15,18
26:9,18 27:19
31:14 38:10
40:3,7 67:17
69:22 70:12,19
71:8 77:11,18
79:15 84:19
90:2 92:6
101:18 105:7,7
113:10,17
115:23 116:10
118:4,5 123:23
129:10 132:13
136:21 137:13
140:8 141:23
142:4,8,12,16
152:4 153:4
162:1 164:18
168:1 174:13
174:14,15,17

174:21 176:16
177:1,7,8,11
177:15 187:17
188:1 196:22
197:14,16
198:1,18
200:13 201:17
202:21 204:6
204:11,15
206:9 207:19
208:10 209:11
216:3,10
219:20 220:2
223:23
**Daddy** 137:4
**damage** 118:21
119:7 124:8
**damaged** 114:23
**Danny** 1:10
19:13 31:8,10
31:17,20,23
32:5,11 33:2,4
33:8 34:3,10
34:13,16 35:2
35:8,15 36:6
36:23 37:16,18
37:21 38:2,6
44:17 56:10
87:21 88:1,5
89:19 108:23
109:1 120:10
136:15 152:2
171:16 176:6
180:5 183:6,11
189:13 201:14
201:19 223:20
**Darius** 137:11
137:12 138:11
138:13 172:9
**dark** 167:12,15
167:17
**date** 5:5 107:3
107:12 109:15
117:6,6,13
178:19,22
180:9 189:19

213:8,10 222:1
**dated** 116:21
155:1 156:21
158:23 161:2
163:12 165:3
184:11 186:5
189:20 213:22
**dating** 138:12
**daughter** 103:9
**day** 5:9 28:1,2,9
29:22 30:2
39:6 41:22,23
42:6,9 50:12
51:7,13 52:3,9
52:11 57:13,14
57:16,17 60:15
95:18 98:22
113:16 120:23
127:5 136:10
148:8 161:18
170:5 190:20
195:11 205:14
226:16
**day-to-day** 24:3
27:21 29:19,21
31:16
**days** 24:5,6 28:2
28:5 50:9
99:16 119:3
137:16 194:9
**DBT** 128:8
129:16
**deal** 95:8,10
96:1 120:19
135:6 173:21
216:15 217:2
**dealing** 57:10
58:4,5 110:19
110:20 120:1
176:5
**dealt** 96:19
**deceased** 11:7
**December** 1:18
5:9 127:12
**decided** 73:9
80:5 102:1

156:1
**decision** 50:15
200:19
**declined** 163:18
164:5 166:17
166:18
**declining** 164:10
168:1,6
**decorations**
93:3,12,18
100:12
**defendant** 1:13
3:10 16:9
34:19 103:16
106:14 107:18
107:23 150:17
185:8 209:3
220:20
**Defendant's**
4:12 14:13
19:2 46:22
87:14 212:22
213:3
**definitely** 102:7
**degrees** 115:2
**Delaney** 139:11
**Denise** 55:1
136:7,8 151:15
**departments**
23:21
**depend** 26:14
**depended** 24:1
**depending** 28:6
29:22 50:6,9
185:7 203:10
212:19
**depends** 28:1
142:20
**Depo** 4:15
**DEPONENT**
51:2 98:12,14
112:5 225:18
**DEPONENT'S**
226:1
**deposition** 1:15
2:4,9,10,19,22

6:6,10 7:16
14:12 19:1,6
46:21 87:18
146:6
depositions 2:13
depression 58:3
94:23 119:14
121:2,19,23
122:22 123:6
128:19,23
130:11,22
141:23 142:4
depth 191:6
deputies 139:19
deputy 31:3
derogatory
28:23 29:4
30:19 37:22
59:21 60:6,19
60:22 61:3
described 51:8
deserve 114:7
desk 78:19 79:1
79:2 96:10
170:4 186:16
207:15
detail 110:14
193:7
detective 109:2
detective's
109:2
determination
203:20
determine
193:14
deviation
201:22
diabetes 15:22
118:20 121:6
122:15 123:5
123:18 124:22
126:6,12
127:14,20
131:4 133:10
144:22 145:1,5
145:14

diabetic 125:19
127:18
diagnosed
126:13 127:14
145:1
diagnosis
118:14 127:22
128:19 129:6
129:13
Diedre 139:4
difference 179:4
different 22:21
25:11 26:2,2
27:9 45:12,21
46:12,15 58:8
79:22 85:17
89:8,13 120:10
128:7 132:1
137:14 172:2,6
173:16 179:5
180:3 181:23
205:20
difficult 208:18
directed 154:23
director 220:18
221:5
discipline
200:20 202:18
203:19 204:3
disciplined
202:23 204:5
204:10
disclosed 193:22
disclosures
133:22,23
151:15
discretion
208:10
discriminated
84:23 88:2
90:3 92:7
102:10 120:12
discrimination
32:14 45:2
87:5 88:13
89:12 90:4,8

90:17,19 91:8
91:12,15,16,21
91:23 92:11
118:4,6,10
121:19,22
123:4 128:23
130:16 133:3,4
141:19,20
153:6,12,19
158:11 169:11
179:13 195:19
198:17 199:4
202:4 205:12
discuss 29:23
31:19,22 32:10
33:3 34:12,15
35:8,15 62:18
62:20 69:2
128:6 134:13
138:15 143:8
180:17 181:2
187:5 190:12
195:3
discussed 32:5
32:12 58:20
76:14 77:5
109:19 115:18
183:15,19
184:1 192:22
222:12
discussing
137:20 187:1
discussion 184:6
190:13 200:16
discussions
66:19 92:19
130:6 164:14
198:13
disease 122:11
diseases 126:6
disgusted
194:17
disgustingly
80:4
dismissal 116:20
dismissed 80:1

102:22 107:14
111:20 113:1
distance 169:6
distanced
191:17
district 1:1,2,11
31:4,10,13
104:23 105:17
108:21 109:5
113:6,8 117:3
121:15 134:19
169:4,22 174:2
207:3
distrusted
220:15
DIVISION 1:3
divorce 10:4
doctor 51:6,20
75:15 123:9,12
126:3,21 129:5
130:14
doctor's 50:8
51:5,10,13,18
52:8,21 53:1,4
53:6,10 76:10
76:17 77:10,12
118:19 133:11
190:20,22
193:19
doctor-patient
130:7
doctorate 135:4
doctors 131:2
doctors' 58:8
118:12,18
120:3 191:2
document 14:10
14:19 18:23
21:3 46:19
47:9 53:22
62:1 87:20
97:5,10,13,18
98:9,13 99:3
146:23 148:9
154:10,11,19
155:8 156:13

156:19 157:5
158:21 159:4,8
159:11 160:23
161:11 163:10
165:1,9 178:16
182:18 183:15
184:18 186:2
186:10 189:10
189:23 213:19
220:13 224:21
documents 4:10
4:14 154:3
170:23 171:10
171:12 183:21
184:3
doing 53:13 89:4
121:3 129:9
138:3 158:8,9
159:5 161:6
175:5,6 192:18
195:10
domestic 23:13
25:21 104:10
163:13,19
165:18 185:15
door 57:18 85:4
88:15 90:20,21
90:23 91:20
92:23 94:3,4,5
94:6 100:4,7
100:10 110:16
downtown
121:13
Dr 123:19
124:14,15,18
124:23 125:10
125:16 126:9
126:14,17
127:2,7,10,19
127:23 128:1
128:12,13,20
128:21 130:1
130:23 134:20
143:3 144:4,11
144:17,20
145:4,14 223:5

223:8
drenched 57:19
dried 162:10
drinks 7:9
Driskill 48:7
    67:20 70:16
    77:16,22 78:9
    78:13,14
    101:23 177:18
    177:21 179:6
    179:22 180:1
    215:19 219:18
Driskill's 98:22
    178:17
drive 3:15 5:8
    46:6 166:18
    167:6,12,15,16
    181:23
driven 108:11
    108:15
drop 34:23 35:2
    35:6 120:8
dropped 185:7
dry 57:23 60:2
    155:19 162:1
duly 5:16 227:15
duties 22:2,11
    22:14 23:3,20
    23:22 24:19,21
    25:8 26:4
duty 25:14
DV 23:11,12,18
    102:21 103:9
    107:21 184:12
    184:23 185:1
    185:13,14
    221:13
_____
            E
E 3:1,1 4:1,8
    227:1,1
e-mail 33:12
    44:16,19,21
    62:8,17 68:6,8
    69:8,13 165:13
    165:15,21,23

166:7 182:20
    183:3 208:8
e-mailed 37:15
    68:18,19 208:9
e-mailing 68:3
earlier 7:10
    63:10 133:12
    133:20 135:11
    140:6 151:13
    168:18
early 46:5 52:5
    167:14 193:17
    212:20 217:9
    217:10,10
earn 39:9,12,16
    40:16,19 48:22
    54:14 64:18,22
    74:5,9
earned 39:14,23
    40:4,12,23
    43:5 52:15,18
    74:7 193:12
earning 33:21
    41:5 47:21
    48:23 49:2,3
    61:22 67:16,18
    69:21,23 70:13
    71:9,15 73:16
    73:20 79:11
    214:13
easier 6:15,16
    7:8,21 8:7
East 145:9,15
education 13:14
Edward 3:12
    125:11 126:14
Edwina 54:18
    67:21,22
    136:18
EEOC 17:4,7,10
    18:6,20 47:3
    116:5,13
    117:18,19,21
    117:22 140:6
    140:12
effect 2:11 35:6

221:18
effective 207:7
effects 129:2
    130:10
Effexor 144:8,9
efforts 207:22
eight 42:9
eight-hour
    95:22
either 10:15
    48:11 54:20
    60:13 83:13
    94:9,13 107:11
    196:1 203:19
    209:4,5,7
Elaine 70:20
eleven 11:18,19
Elise 48:7,9 49:3
    54:17 67:20
    70:16,19 77:16
    77:22 78:9,13
    78:13,16 93:13
    98:22 101:23
    111:9 165:17
    173:8 177:18
    177:21 178:2
    178:17 179:6
    179:22 180:1
    180:11 191:9
    195:4,10
    196:17,18
    197:3,6,8,17
    198:3,11,16
    199:6,15,20,23
    215:18 219:18
Elise's 94:3
    173:16
embarrassing
    64:10
emergency
    50:10 145:8,9
emotional 22:23
    131:7
emotionally
    131:10
emotions 205:21

employed
    134:18 143:16
    194:23 204:6
employee 38:9
    44:2 106:18
    156:21 158:23
    161:2 163:11
    165:2 167:18
    169:21 184:11
    186:4 192:6
    200:15,16,21
    200:21 201:4
    202:18 203:13
    203:14,17,18
    204:3 207:6
    216:1
employees
    143:18 169:1,2
    169:3,3 202:22
    204:5,10,14
employer 17:11
    17:13,18,19
    140:21
employers 14:22
    14:23 17:15,23
    140:7,20
employment
    30:5 177:8
    188:22 202:3
    203:8 204:20
    204:23 214:4
empty 80:13
    218:20
encountered
    153:13,19
ended 63:22
    64:7 99:14
    106:23 112:16
    112:16 116:19
    173:17 190:13
endocrinologist
    126:3,5
enforce 221:23
enforcement
    150:22 151:2
    151:10

engaged 138:6
enjoyed 64:11
entire 27:19
    31:14 78:17
    217:11
episodes 156:1
equal 189:1
equipment
    207:8
ER 145:14
Erin 48:7,9 49:3
    54:16 67:20
    70:15,22,23
    77:16,22 78:7
    80:11 81:13,17
    81:20 82:18,20
    93:13 98:23
    101:22 110:16
    111:10 138:17
    165:17 172:8
    173:7 177:18
    177:20 178:2
    178:19 179:6
    179:20 180:1
    185:3 191:9
    195:4,9 196:7
    198:12,16,21
    199:5,15,19,21
    215:18 219:17
    221:14
Erin's 94:4
    173:16 180:11
escalated 119:16
escort 114:4
escorted 113:19
    139:19 206:2
especially
    155:22 169:6
    173:1
estimate 151:11
et 187:14
event 76:12 77:2
events 54:12
    168:10,14
everybody
    58:18 152:13

186:20 190:8
194:3,15
195:18
**everybody's** 6:9
6:15
**evidence** 2:20
212:2
**evidenced**
227:17
**ex** 217:8
**exact** 79:7,8
82:4 117:13
179:8 208:22
**exactly** 33:17
72:7,13 92:22
101:2 108:4
116:16 132:17
132:19 172:23
173:19 211:5
**examination** 4:4
4:5 5:12 6:1
150:1
**examined** 5:16
**example** 22:17
27:3,6 112:14
174:11 217:9
**examples**
209:12 210:14
210:16
**excuse** 22:1 50:8
51:14,18 53:4
53:6,10 59:23
76:10,17 77:11
77:13 121:19
190:20,22
**exhibit** 4:10,13
4:15,17,18
14:11,14,18,20
17:16 18:1
19:1,3,5,7 20:8
20:10,11,22
44:22 46:20,23
47:2,6 53:16
54:3 61:20
68:2 76:6 80:9
87:3,15,17,18

90:2 91:5
92:13 97:6
102:14 113:13
116:4,5 147:21
148:2,10,12,23
149:9,10 154:4
170:20 179:17
182:4,16
212:22 213:3
213:18 223:17
**experience**
170:2
**experienced**
153:23
**experiencing**
153:12
**Expires** 227:21
227:23
**explain** 110:10
150:10 151:19
165:11 168:22
171:15 176:1
184:20 186:12
**explanation**
57:7 163:18
206:22 208:5
**express** 168:13
198:16
**extended** 118:14
**extra** 42:14
**extremely**
208:18
**eyesight** 119:5
125:20 167:11

_____
**F**
_____
**F** 227:1
**fabrication**
211:23
**Facebook** 225:5
225:10,13
**facility** 166:20
**fact** 66:20
127:16 152:17
155:16 164:5
190:23 199:12

208:22 221:9
221:10
**failure** 214:20
**fair** 8:5 11:22
58:16 80:23
82:15 195:15
196:7,10
**fallen** 218:1
**falls** 72:7
**false** 88:17
155:13,14
156:12 157:4,8
159:6,9,10
160:19 161:10
161:13,14
163:6 164:20
165:8,10
170:20 171:14
173:1 178:9
179:12 183:18
183:23 184:3
184:17,19
185:21 186:9
186:11 189:4
190:1 203:16
210:6 214:10
222:14
**falseness** 183:20
**familiar** 200:12
200:14
**family** 15:4 16:3
46:7 85:23
134:8 155:2
209:15
**far** 46:14 50:4
57:8 93:18
99:16 143:9,11
164:7 178:19
179:12 191:16
196:13 200:3
201:8
**fashion** 220:1
**father** 12:9
136:23
**Faulkner** 13:4,6
13:23

**favorably** 199:7
**favoritism** 199:1
**fax** 4:17 47:2
116:5 117:8
**Faye** 8:17
**February** 161:2
**Federal** 5:5
**feel** 88:16 90:4,6
90:19 91:22
162:21 192:15
205:18
**feeling** 119:9
122:13 127:1
**feet** 119:8
166:21
**fellow** 71:4
**felt** 90:7,9,16
92:11 101:2
139:9 162:7,9
169:10 220:9
**female** 36:19,21
114:3
**fiancé** 138:11
172:10
**Fifteen** 11:4
**fifth** 68:2
**fight** 94:22
**figure** 101:7
107:12 127:5
173:6,9 175:4
175:14,22
176:13 177:1
187:3 215:21
223:22
**figured** 176:16
**file** 16:19 117:19
117:22 154:23
156:20,21
158:22,23
161:2 163:11
165:2 167:2,19
176:23 180:22
181:3,8 182:10
184:11 186:4
200:5,11,13
201:18 223:11

**filed** 16:17 17:4
17:7,10 18:7
97:11,17 140:7
197:16
**files** 174:17,18
174:19 216:1
**filing** 2:21
216:23
**fill** 23:1
**filled** 117:21
**final** 113:23
201:14 205:5
220:17
**finally** 95:15
114:16,17
206:6 225:3
**financially**
227:13
**find** 58:8,10
64:9 118:16
141:2,5,11
172:22 208:18
210:19
**fine** 5:20 60:3
147:1,8,10,19
152:12
**finish** 6:18 66:6
80:22
**firearms** 163:13
163:19 221:13
221:21
**fired** 119:20,21
175:17 205:14
205:19 206:9
222:5
**firm** 137:15,15
137:17
**first** 5:16 32:7
45:7 47:20
64:9 78:8
81:13 92:14
93:4,5,21
99:11 103:2
105:3 118:23
119:20 121:6
124:15 125:2,6

125:8,10
126:18 127:2
149:13 164:17
188:7 195:14
198:8,12
205:23 214:12
**fit** 51:7
**five** 18:12,15,18
21:22 86:19
140:2 211:7
**five-day** 217:11
**fix** 163:4,5
**flash** 161:21
162:6
**flashes** 57:15,18
161:17
**flip** 99:2
**flipping** 182:4
**floor** 93:9
**fluctuate** 24:13
**focus** 23:10
71:12
**folder** 34:18
**folders** 27:10
**follow** 69:4,17
73:12 214:21
**follow-up** 73:10
73:10
**followed** 69:6
80:3
**following** 5:12
99:21,23 149:3
227:18
**follows** 5:17
84:6
**foot** 119:9
122:14
**force** 2:10
**foregoing** 5:6
**forever** 122:17
**form** 2:16 16:12
20:4 50:23
121:5 123:7
153:21 179:13
199:8 220:1
**former** 9:17

135:23
**forth** 123:12
**Fortune** 105:21
**forty** 38:15
42:10,14,17
108:13
**forty-seven**
100:21,22
119:19
**forty-something**
127:17
**forward** 62:12
**found** 105:23
118:15 121:6
133:12 162:23
218:20 227:18
**four** 21:19,21
103:22 144:14
167:5
**fourteen** 139:8
**fourth** 61:21
77:23
**frame** 72:7,9
73:3
**Friday** 92:23
93:14 95:23
96:5,9 99:15
99:17
**friend** 54:23
111:11 135:12
136:2,4,8
139:5 151:21
**friends** 128:4
130:3,7 136:1
143:7 152:18
152:22 169:12
215:18 216:6
**friendship**
151:23
**front** 14:21
57:22 75:19
108:8,19 162:8
169:2 170:4
**frozen** 124:23
**fruition** 210:22
**full** 2:11 8:16

**funny** 137:23
**furn** 78:14
**furniture** 78:2,7
78:10,12,15,18
79:15 115:13
115:16,17
**further** 140:19
145:18 225:17
225:18 227:11
227:15
**future** 209:7

### G

**gate** 206:4
**gears** 118:3
**general** 133:21
**Georgia** 10:14
210:2
**getting** 57:2
58:2 68:11
95:5,12 96:16
120:6,7,11
172:13 174:1
176:18,19
208:15 221:8
**give** 8:15 11:21
11:22 12:13
64:15 65:13
66:2 95:22
114:10,21
128:7 130:4
174:11 185:6
200:6 207:21
**given** 6:6 22:9
39:1,7 40:11
42:15 45:17
87:10,19 90:11
130:2 150:3
163:18 177:11
182:10,13
200:18 202:6,8
203:14 204:18
204:22 205:2,5
206:22 207:11
208:5
**giving** 22:23

172:23 175:1
175:17 177:13
187:11
**glasses** 119:3,3
**go** 7:4 13:2 20:7
32:7,20 34:21
44:22 47:5,23
57:16 61:20
64:4,12 75:3
76:6,9 80:20
80:23 90:12
92:13 96:13
102:12,14
107:6 109:21
110:14 112:13
113:12 114:16
116:4 121:11
121:13,13
123:12 124:21
126:3 127:18
133:11 137:4
137:20 140:18
143:9,19
146:12 147:5
148:6 149:5,11
154:5 155:4
160:6,8,14
161:6,15 162:9
164:5 165:20
166:16,22,23
167:1 168:17
170:18,23
173:6,7,8
176:8,8 184:4
185:3,18
188:22 189:21
190:17 192:3
193:21 194:9
194:19 196:6,9
201:5,9 203:12
214:8 219:22
223:17
**goal** 174:14
**goes** 125:20
146:15 150:13
194:1 197:22

224:16,22
**going** 7:15 10:22
11:20 12:12
14:11 18:23
28:4 43:23
44:7 46:4,20
47:13 50:16
52:12 54:7
57:8,12 58:6,7
62:7,11 73:11
86:18 94:23
95:4,20 97:6
101:5,6,13
102:5,6,7
110:21,22
114:17 119:6
122:9,19
124:20 126:4
128:10,20
129:10 131:14
134:17 135:14
135:15 136:5
137:22 139:17
142:19 143:3,8
148:11 149:13
150:16 154:5,6
154:7,9 155:15
155:17 156:3,7
156:8 157:1,2
159:16,19
160:7,14,15
162:2 163:3
164:1 166:20
168:17 173:2,6
173:7,8 174:20
176:4 177:2,12
182:2,9 183:4
187:4,7 189:12
191:13 193:2
195:11,13,21
195:22 196:18
196:21 197:11
201:12 203:20
209:20 212:18
212:20,23
214:1,8,9

216:13 218:7
**good** 5:22 6:2,3
106:3 112:5
118:22 119:8
127:1 135:12
136:2,14
**Google** 141:13
141:14
**Googled** 141:21
**gosh** 143:2
**Gotcha** 73:14
**governing** 202:3
**grab** 44:7
206:18
**graduate** 13:5
**grand** 22:12,16
22:18 23:2,6
30:9 107:23
108:3,4,6,8,9
108:19 109:17
109:18
**grant** 219:9
**grasp** 193:9
**great** 7:10,20
**grievance** 208:7
208:13
**grounds** 2:18
**group** 179:2
**grown** 160:11
**guess** 18:17
83:12 117:5
120:19 135:5
151:11 152:7
189:12 191:15
196:14 200:20
201:11 221:11
**guidance** 135:6
**guide** 45:4
**guilty** 105:23
112:17
**Gwendolyn**
134:21

**H**
**H** 4:8
**hair** 46:5 193:16

193:21
**hairdresser**
139:12,13
**half** 64:8
**Halloween** 93:3
**hallway** 93:1
**hand** 226:17
**handed** 206:14
206:15
**handle** 25:11
46:8 105:19,21
160:9 176:9
185:4,4
**handled** 23:14
23:17 24:16,23
34:22 104:22
105:1,22
106:15 108:21
111:16 112:21
**handling** 25:12
46:7
**happen** 77:7
79:17 107:13
209:15,15,16
210:4,10,13
**happened** 50:21
67:7 92:17
107:13 108:4,5
119:12 172:20
172:21 173:5
173:15,19
178:21 192:13
208:4 211:2
**happening** 28:1
28:11 120:20
**happy** 6:23 7:11
**harassed** 210:8
**harassing**
102:21 103:5,6
103:10 104:1,5
104:14,20,21
106:9 107:16
111:15 112:18
**harassment**
89:2 158:11
**hard** 27:23

111:5 142:17
208:15,17
**harm** 96:14
122:3
**Harris** 134:6,10
**hassled** 210:8
**HBCUs** 12:22
**head** 159:13
**health** 96:15
122:6,22 129:1
129:22 130:11
133:1,6 142:23
143:23 144:4
190:23
**hear** 36:15
201:5 202:19
204:9
**heard** 35:22
**heart** 122:11
**held** 163:20
197:1
**help** 22:15 95:8
95:9 127:18
135:8 140:11
152:21 160:13
191:14 196:13
197:9 201:15
**helping** 22:18,19
23:1 197:2
**hey** 120:11
**high** 28:7 122:10
183:13 201:19
**highest** 13:13
**Highlands** 223:9
**hip** 108:13,18
**hire** 197:15
198:2 207:4
208:11,11
**hired** 21:9 78:3
78:8,8,9,11,13
115:14 169:16
**history** 150:21
151:1
**hit** 108:10,12,14
108:15,16,17
119:10 120:7

**Hold** 224:19,20
**holder** 132:8,12
**home** 145:10
167:15
**honest** 33:18
65:16 112:1
**honestly** 65:4
66:4 82:9 96:3
**honesty** 82:5
100:21
**hormone** 126:6
**hostile** 80:6
84:21
**hot** 57:18 161:17
161:21 162:6
**hour** 11:20 37:3
42:16 59:6,12
86:19
**hour-and-a-half**
41:15,21 42:5
188:15
**hourly** 38:9
**hours** 41:6 42:9
42:9,10,14,17
86:5
**house** 131:19
132:4,7
**household** 10:19
10:20,21
**HR** 201:12
**huh-uh** 7:3
128:14
**humiliated**
113:14 119:18
205:23 206:2
**humiliating**
90:15 114:2
**hundred** 79:12
95:2,3 121:12
155:11 157:9
157:10 166:20
167:17
**hunt** 64:4,5,12
**hurt** 194:18
205:22
**hurtful** 94:14

**husband** 9:2
30:9 32:16,18
36:21 54:22,22
57:11 72:20
79:23 81:6
103:5,9 104:6
104:12,15
105:13 106:10
106:13,18
107:2,17,22
108:6,10,12
109:20,22
110:3,22
111:18 112:10
120:5,6 138:11
150:4,7,11,19
172:4 176:19
217:1
**husband's** 9:17
30:13 34:16
36:14 102:21
104:21 150:21
172:11 175:7
191:17,22
216:16 220:19
**hutch** 79:3

**I**
**idea** 180:8,10
200:4,6,9
202:15 206:9
215:13,15,17
218:23 219:12
**identification**
14:15 19:4
47:1 87:16
147:22 149:9
**identified** 55:5
170:19 178:16
**identify** 146:22
148:1
**illness** 122:6
143:20
**immediate**
27:15,18
**immediately**

207:7
**impact** 7:16
  89:3
**importance**
  183:13
**important** 160:4
  160:7 193:20
**improvement**
  205:3
**inaccurate** 67:3
**incident** 33:16
  78:6 80:15
  180:14,17
  191:7 200:17
  200:22 224:23
**include** 28:16
**included** 43:14
**including**
  145:13
**income** 130:19
**incorrect** 66:23
  70:14 117:7
**incorrectly**
  116:22
**increased** 95:8
  119:15
**Independence**
  3:15 5:8
**indicate** 220:14
**indicating**
  162:11
**individual** 85:22
  136:9 137:18
**individuals**
  27:12 60:16
  143:5 151:14
**inform** 163:1,2
**informal** 185:5
**information**
  75:18 155:9,10
  158:17 163:15
  172:13 173:1,2
  173:10 174:1,6
  175:1,18,21
  177:10,13
  184:15 186:8

192:17 221:8
  223:23
**informed** 48:3
  51:12 81:12
  83:9 105:4,11
  105:13 106:16
  111:9 159:15
  164:17 169:20
  173:4 178:23
  179:2,3 188:6
  208:4
**initial** 116:17
  133:22 151:15
  174:14
**injured** 7:14
**injuries** 118:7,9
  121:18,21
  123:3 133:1,6
**inquired** 49:4
**inquiries** 140:14
**inquiry** 116:15
  117:12,16
**inside** 161:23
**insight** 134:15
  134:16
**instance** 83:15
  109:16 160:14
  161:21 166:13
  192:15 199:2
**instances** 91:8
  160:13 161:17
**instruction** 22:9
**insulin** 121:10
  122:18 131:4
**insurance**
  131:16
**insured** 131:13
**insurer** 131:12
**intake** 116:14
  185:5 208:23
  209:1
**interact** 24:4
  28:8
**interaction**
  27:21 28:5,12
  28:15,16 29:19

31:16
**interest** 175:11
  209:5
**interested**
  155:15 167:3
  167:20 182:2
  214:14 227:13
**interrogatories**
  4:13 14:17
  20:15
**interrogatory**
  20:8,14,21
  45:1 76:8 91:4
  92:4,14 115:22
  212:23
**interrupt**
  189:22 199:13
**interview** 117:6
**investigation**
  205:10
**investigator**
  116:19,23
  140:18
**involve** 104:16
**involved** 16:4,7
  32:18 90:7
  133:21 172:5,7
  174:8,9 191:18
  224:3,13
**involving** 35:9
  104:2,7,11
  106:10 111:18
  112:7,10,13
  191:15
**ironic** 212:3
**issue** 30:3
  136:12 168:13
  175:13 200:15
  219:21
**issues** 46:7,8
  51:6,8 57:10
  57:11 58:3,4,5
  133:1,6,13
  141:22 142:7
  142:15 164:6,8
  181:2,7 182:11

193:20 195:4
  201:4 214:3
  216:15,16
**items** 207:18
  210:21

───────────
           **J**
**J-a-c-q-u-e-z**
  9:7
**Jackson** 3:14
  141:17
**Jacquez** 9:6
**James** 3:12
**January** 155:1
  156:21 159:1
**Jay** 6:4
**Jefferson** 1:12
  8:10 12:6,7
  105:7 106:17
**jeopardy** 205:16
**Jeter** 1:7,17 2:4
  5:11,15 6:2
  8:17,18 9:4,8
  9:12 10:22,23
  44:14 105:13
  115:7 140:5
  150:2 156:18
  156:23 157:8
  171:11,21
  182:17 183:12
  186:6 189:14
  213:23 214:4
  223:2 226:4,12
**job** 6:9,10,11,12
  6:15,16 7:7 8:7
  15:19,21 22:2
  23:20 24:19
  25:7,13 26:4
  27:13 74:23
  81:7 94:17
  134:7 175:2
  185:20 192:8,8
  197:13 205:16
**jobs** 7:21 15:9
**Joe** 19:16 29:11
  29:14,17,20

30:1,18,22
  31:3,6,8 56:14
  68:3,7,9,19
  69:4,7,10,14
  69:16 83:3
  84:1,4,9,13
  88:18 96:6
  102:8 103:1
  109:11,13
  110:2,6 113:15
  117:4 138:2
  165:14,16,23
  171:17 180:4
  182:20 183:7
  183:12 189:13
  201:13 206:13
  213:21 222:10
  223:20
**Joe's** 68:23
**Johnson** 54:18
  67:21 114:12
  136:18 139:18
  206:19 207:10
**joke** 225:4,6
**Jones** 11:9 103:8
  103:19 104:16
  106:15 107:17
**Jr** 3:11,12 10:11
**judge** 103:1
  105:3,15,21
  107:6,10 113:1
  113:2,5,6,6,9
  138:7,9,12,12
  150:14 157:19
  157:21 172:5,7
  172:10,17
  176:4 178:20
  218:6 219:5,6
  220:21
**judge's** 158:2,3
**judges** 217:1
**judicial** 216:23
**Judy** 19:22
  27:15,22 28:17
  28:19,22 29:7
  29:12 31:7

46:10,11 48:16
49:16 50:15
51:9,22 52:4
53:3,17 54:10
54:12 55:9,20
56:1,3,8,12,16
56:19 58:21
59:2,16 60:11
61:3,14 62:3
62:19,21,23
63:12,19,21
65:7,11,13,22
66:2 67:14
68:10 76:11,21
83:2,8,23,23
84:3,12 85:10
86:3 88:18
92:21 96:2,6
102:5,17 138:1
154:23 156:5
156:21 157:11
158:6,12,23
161:2 162:22
163:12,21
165:3,13,15
166:6,7 169:12
171:20 172:3
173:4,12
177:17,19,20
178:1 179:3,4
179:10,23
180:3 184:11
186:5 189:14
189:16 190:15
191:5 193:6
199:22,23
213:22 219:3
220:7,8 222:8
223:19 224:10
224:13,16,18
224:21,22
225:1,7,9
**Judy's** 60:13
94:5
**jump** 73:14
**jury** 22:12,16,18

23:2,4,6 30:9
108:1,3,4,6,8,9
108:20 109:17
109:18
**justice** 13:17
14:7 155:3
191:14 192:9,9

**K**

**K** 10:22,23
**K-i-r-e-e-m** 9:6
**Kameron** 10:22
11:1,5
**Kameron's** 11:7
**Katrina** 103:2
105:4,15
106:19,20
**Kayla** 10:23
11:3,10
**Kayla's** 11:5
**Keener** 139:4
**keep** 49:8 74:22
93:16 95:4
128:9 131:18
139:10 169:6
176:17 193:2
195:22
**Kenya** 139:11
**kept** 70:7 85:1
191:16
**key** 147:23
**Kim** 126:14,17
127:2
**kin** 227:12
**kind** 45:4 57:7
58:14 91:18
124:8 135:6
136:16 151:21
152:19 161:20
169:5 173:21
174:22 175:16
175:21 189:12
200:1 215:20
**Kireem** 9:4,5
105:13
**Kissel** 125:10

**knew** 74:22
83:22 101:22
105:12 163:5
225:6
**know** 7:11,23
17:18 27:14
28:8 34:11
36:4,18,20
47:22 48:1,11
48:11,18 49:5
51:9 52:19
58:6,15 60:14
64:3 65:4 67:8
72:6,8,13 73:2
75:19,19,21
79:7,21 82:10
83:5,14,16,17
83:18 84:3,22
88:15 90:12,15
90:17,18,20
91:1 94:19,20
94:20 99:16,17
100:2 101:3,8
101:11 109:2
109:16,17,19
109:20 111:22
113:6,7 114:2
114:16 115:5
117:4,13
119:11 122:12
122:14,15,21
123:10,14,15
124:15,18
125:7 126:4
129:3,6,7,8
130:4,5,14,23
131:1,3,8
132:17,19
133:8,9,13,14
133:16 134:1
134:11,16
135:1,3,14,19
136:3 137:1,3
137:15,21
138:1,14,15
139:12 143:5,8

143:19 148:22
152:2,7,8,10
152:12,17
155:5,20
156:18 159:5
160:3 162:1,3
162:14 164:7
165:7 169:18
172:15 173:21
174:21 175:15
176:7,11,14,15
176:21 177:6
177:10 178:1
179:11 180:4
182:17 184:16
186:14,14
188:7 189:10
190:6,12,20
191:23 192:14
194:5 196:15
197:11 198:3,6
198:8,10 199:1
200:10,15
201:9 202:2
203:3,21 204:2
204:14 205:22
206:17,22
207:20 208:23
209:19 211:4,5
211:6 215:16
218:2,4,14
220:21 221:14
222:4
**knowing** 167:1
**knowledge**
17:23 21:5
22:3 30:21
38:1,5 56:5
67:2 84:12,14
164:9 180:12
180:13 200:8
200:10 201:2
201:10 203:4,6
205:11 210:23
215:6 219:10
226:7

**known** 60:17
122:15 136:4
139:7 164:15
168:19,23
169:10,17
170:1 221:9

**L**

**L** 2:1
**label** 223:18
**labeled** 85:5
224:9
**laid** 115:21
**Langham** 54:23
135:17
**LaNitra** 1:7,17
2:4 5:10,15
8:17 115:7
156:23 171:21
183:12 186:6
189:14 213:23
214:3 226:4,12
**laptop** 114:8
**Large** 2:7 5:4
227:22
**Lasix** 119:1
**lasted** 37:2,5,8
37:11 59:8,11
**late** 159:14,16
**Lauren** 157:19
**law** 3:5,6,13
137:15,15,17
150:21 151:1
151:10 192:20
194:8 196:21
197:22,22
198:3,5 207:2
**laws** 2:12
**lawsuit** 97:7
134:4 141:9
197:7 200:3
212:10,13
**lawyer** 11:21
12:13 133:22
208:16
**lawyers** 6:13

151:14
lead 183:4
leading 2:16
leaking 173:10
174:7 223:23
leave 15:21 39:1
39:7,9,13,23
40:3,7,11,16
40:16,23 41:3
43:11,11,11,18
43:19,21,22
51:11,12 63:7
64:5,11 71:23
74:3 86:14,15
167:14 181:15
181:17 188:14
193:17 217:9
leaves 218:11,13
leaving 46:5,7
83:17 139:1
161:4 193:21
193:23 194:9
198:15 217:10
led 56:18 62:2
108:5
left 15:12 43:2
81:6 92:22
96:4,7 136:2
157:12 158:14
198:11,12,14
219:20 220:2
220:10,12
224:17
legal 216:16
length 153:2
let's 10:20 32:7
43:17,20 44:22
47:10 61:20
70:23 73:14
76:6,9 80:22
84:17 91:2
92:12 96:21
102:14 113:12
116:4 118:2
156:10,14
158:19 160:21

163:9 164:23
170:18 178:14
179:15 182:16
184:4 189:3,7
211:11 212:21
213:17 222:19
letter 4:18 87:11
87:19,21
109:10 116:20
117:2,2 206:14
206:23
letting 58:17
218:14
level 13:13
29:11 31:7,8
license 134:13
licensed 143:6
227:15
lied 66:20 96:17
102:10
lies 175:15
life 119:21,21
122:19 191:13
206:1
likes 225:5
limit 28:12
limited 93:17
limiting 28:15
28:16
line 147:6
linking 212:2
list 14:22 209:3
210:10 214:3
listed 17:15 18:1
133:23 176:21
180:5 226:8
listened 88:16
lists 14:21
litigation 16:5,8
16:10 18:21
206:8
little 6:15 93:8
96:21 151:19
162:4 176:1
179:17
live 8:18,21

10:13 12:2,5
lived 8:22
lives 9:1 210:2
living 197:12
loan 131:23
132:16
located 93:13,13
93:14,15
100:16
location 80:17
224:23
long 8:22 9:8
36:22 59:4
99:9 118:20
126:16 144:11
163:22,23
164:16,16
longer 45:17
74:23 118:14
122:13 137:14
143:15 207:5
look 94:5 119:13
154:3,19
156:15 164:23
171:10 175:8
178:14 179:15
182:17 186:2
189:3,7,9
209:13 212:21
213:19
looked 94:3,4
96:17 120:13
141:18 180:21
181:4,8 191:21
looking 135:4
154:8,20
157:18,18
158:7,7 171:5
180:7 181:19
184:8 219:4
looks 154:22
182:19 183:3
192:6
lose 131:19
132:7
loss 215:5

lost 130:18
lot 12:8 51:6
57:13 81:8
122:5,21 137:4
155:17 172:12
195:11 219:15
220:9
loud 20:23
lousy 25:16
lowest 146:15
LSAT 194:7
197:10
lucky 121:8
lunch 41:13 42:3
64:2,4,7,8,12
64:14,16,19
76:22 77:3,19
90:13 186:15
188:15
lunches 42:2
lunchtime 36:7

───────────
## M
M-u-r-r-e-l-l
11:12
ma'am 158:21
159:4 165:11
184:9,15 186:8
machine 100:18
madder 206:5,5
mail 109:10
main 23:10
209:9
majority 172:9
majorly 180:2
making 28:23
29:3,8 30:19
30:23 36:2,19
37:22 38:3
59:21 60:6
61:7,11 88:21
168:23 177:8
212:18
male 36:18
man 38:6 147:15
manage 129:19

management
22:10 155:23
mandatory
181:14
March 4:17,18
15:17 47:3
73:17,21
113:14 116:8,8
116:13 117:21
126:14 139:19
213:22
mark 14:11 19:1
46:20 97:6
marked 14:14
19:3 46:23
87:15 147:21
154:4
marking 149:8
Marquetta
11:11 34:18
35:1,9 103:7,8
103:10,11,15
104:2,7,11
107:22 108:11
108:15 120:9
176:5,6,11
177:5
Marquetta's
103:19
marriage 9:23
12:5
married 9:9,11
9:15,21 138:5
138:8,10,11
master's 13:15
14:2
material 161:19
materials 27:9
27:10
matter 89:16
115:17 126:21
155:16
matters 30:1
31:19,23 32:5
174:8
May's 157:16,19

157:21,21
158:13,13
181:20 219:5,6
**Maya** 1:21 2:5
5:1 6:11
227:20
**Maya's** 6:16
**McCurry** 19:19
29:14 45:11
48:19 53:18
55:11 56:4,7,8
56:12,16 58:21
59:2,15,20
60:5,11 61:6
61:10,17 62:9
62:15 63:23
64:5,6,15
67:14 76:12,22
77:4 78:3
80:10 81:10
83:2,8 84:2
88:19 92:21
96:7 102:6,17
115:14 138:2
171:22 173:13
173:13 179:5
180:4 182:20
183:4,11
189:15 190:16
191:5 193:5
201:12
**McCurry's**
59:19
**McKinney** 9:19
9:20 10:3,11
**mean** 45:15,21
55:15 60:10
96:10 127:4
141:3 142:21
146:19 152:23
166:10 176:13
177:10 178:22
187:20 189:22
**meaning** 199:3
**means** 63:8
83:15 150:14

150:18 153:1
217:8
**meant** 46:4
**Med** 127:18
**media** 215:9,16
215:21,22
216:3,7,9
225:5,11,14
**mediation** 16:3
134:8 224:3,12
**medical** 51:6
57:10,11 58:5
72:4,10,15
74:15 129:6
144:19 145:3
145:11 155:17
164:6,8 193:20
**medication** 95:1
95:7 121:10
128:1 142:3,11
**medicine** 121:1
121:2
**meet** 30:3,6
60:13 114:15
114:16
**meeting** 33:23
35:21 36:22
37:15 44:17
53:17,19,21,23
54:2,11 55:10
55:14,16 56:3
56:8,12,16,18
56:20 58:14,21
59:1,4,15,18
62:3 64:5,11
67:13,15 83:8
110:3 120:14
120:17 173:18
190:15 191:3,6
193:5 194:21
220:18 221:7
**meetings** 60:20
60:23 61:4
**member** 12:18
13:8
**members** 86:1

**memo** 154:22
156:20 158:22
161:1 163:11
165:2,12
171:16,23
180:6 184:10
184:21 186:4
189:12,13,18
190:2,2,3
192:21 193:3
213:21 219:2
222:1 223:18
224:9
**memos** 180:22
181:3,8 182:10
200:5,13
201:18 223:11
**mental** 122:6,6
122:22 129:1
129:22 130:10
133:1,6 142:23
143:19,23
144:3
**mentally** 89:4
96:16
**mention** 177:23
190:21 197:17
**mentioned** 26:7
35:18 135:10
150:6 153:5
168:16 200:22
202:17 223:3
**message** 179:21
**messed** 175:12
**met** 6:4 30:4,8
69:5
**Michael** 9:19
10:11,13 19:19
29:14 45:10
48:19 53:18
54:12 55:11
56:3,6,8,12,16
56:19 58:21
59:2,15,19,20
60:5,11 61:6
61:10,17 62:9

62:15 63:23
64:4,6,15
67:14 76:12,22
77:4 78:2
80:10 81:10
83:2,8 84:1
88:18 92:21
96:6 102:6,17
115:13 123:19
124:3 138:2
171:21 173:12
173:13 179:5
180:4 182:20
183:4,10
190:16 191:5
192:22 193:5,6
201:2
**micromanaged**
80:4
**mid-stride**
93:23
**middle** 9:6
46:18 93:5
**midway** 224:9
**Mike** 189:15
**miles** 167:8,17
**mind** 176:17
**mine** 54:23
111:11 135:12
136:8 139:5
207:18
**minimize**
134:16
**minute** 110:18
159:3 202:17
**minutes** 12:12
20:20 37:6,9
37:12 59:9,12
63:10 86:20
145:21 146:2
162:18,19
194:16 207:12
211:7
**mishandled**
80:1 90:6
102:22 104:19

**mishandling**
91:14 92:5
**missed** 72:10,22
75:8,9,22
118:12 126:19
220:10
**missing** 64:8
120:2,6 163:17
**mistaken** 43:15
**mistreated** 70:6
89:7
**mistreatment**
88:12 89:3
**moment** 13:12
15:1 16:14
17:17 21:4
29:6,10 30:11
31:2 33:11
48:2,10 50:19
53:23 54:6
55:8 68:1,21
71:10 72:17
92:9,11 116:2
133:19 197:19
204:13,17
206:12
**moments** 60:18
**Monday** 92:18
93:20 95:23
96:9 99:11,21
99:23 190:4
**monetary** 131:7
131:9
**money** 130:17
130:20,21
133:2,7
**Monique** 55:1
135:11,19
**monitored** 80:3
**monitors** 124:8
**Montgomery**
208:3
**month** 127:12
198:12
**months** 106:1,5
131:21 132:6

212:19
**months'** 106:4
**moral** 196:14
**morning** 6:2,3,5
50:12 52:5
166:19
**mortgage**
131:20,22
132:2,3,6,8,10
132:11,12,21
**mother** 11:6,7
11:11 12:9
137:7
**mother-in-law**
134:22
**Mountain** 10:14
**mouth** 60:2
155:19 195:22
**move** 81:16,22
156:10,14
158:19 160:21
163:9 182:16
216:14
**moved** 80:16
81:6,7,11
**moving** 170:22
186:1
**Mullins** 125:17
**murder** 25:22
28:7
**Murrell** 11:11
34:19 35:1,10
103:7,10,12,15
104:3,7,11
105:23 107:22
108:11,16
112:8 120:9
176:5,6,11
177:5 224:5
**Murrell's** 103:9
**Murrill** 3:12 4:4
4:6 5:20 6:1,4
14:16 16:16
20:7 44:14
51:21 66:9
70:23 71:3

81:3 86:18
87:1 96:20
97:22 98:4,19
112:6 123:16
140:1,5 145:22
146:5,10,20
147:1,8,10,14
147:19 148:3
148:13 149:20
153:21 182:21
199:8 211:17
223:1 225:16

**N**

**N** 2:1 3:1 4:1
**N-word** 100:23
**name** 8:16 9:3,6
9:18 10:10
11:9 81:2 97:3
100:23 103:7
104:23 109:3
124:16 125:6,9
125:10,17
151:16 170:6
209:21,23
224:4 227:18
**named** 199:23
210:22
**nameplate**
79:19 92:16
93:22 94:8
96:23 97:4
98:7,23,23
99:10
**names** 11:21
12:1,13 83:5
133:23 143:21
**narrative**
191:23
**Nashville** 155:2
166:16,19
167:7,16
181:23
**nasty** 51:16
**nature** 36:9
**nauseated** 127:1

155:19
**near** 93:12
100:9 145:10
**necessarily**
34:21 128:5
143:4 159:23
**necessary** 2:14
210:2
**need** 7:8 12:1
27:9 34:21
51:13 60:1
62:11 70:1
73:10,12 114:3
126:23 160:1
164:20 178:10
195:23 196:22
221:17
**needed** 22:8,20
23:23 24:1
51:10,12,19,19
57:6,12 58:10
62:12,18 63:14
68:11 81:12
105:16 110:18
118:13 163:1,3
164:3 176:7
181:17 185:15
185:17 196:15
**needing** 58:11
**needs** 132:5
**neither** 112:18
227:11
**nerve** 118:21
119:7 124:8
**nervous** 121:16
**neurologist**
124:7,13
**neuropathy**
125:19
**never** 35:18,19
85:21 86:2
87:9 106:21
108:7,8 109:10
109:20,21
112:23 114:5
114:15 119:21

121:11 140:14
158:12 159:17
175:8 191:21
191:22 192:4,7
192:13 202:12
203:6 207:17
**new** 78:2,7,10
78:12,14,19,21
79:1,2,4,15
81:7 115:13,16
115:16
**Newton** 124:14
124:18
**Newton's**
124:15
**night** 46:6
167:12,15
**nine** 9:10 121:7
**Nitra** 159:1
**Noble** 3:4 4:5
5:21 16:12
20:4 44:11
50:23 51:3
66:6 70:22
71:2 80:20,22
86:21 95:5
98:1,11,13,16
112:3 123:7
145:20 146:1,8
146:17 147:2,9
147:11,15
148:5,11,15,18
148:21 149:1,4
149:7,21 150:1
154:2 182:23
184:7 199:9
211:9,11,15,19
212:1,5 222:17
222:21
**non-grand** 23:4
**nonchalant**
120:17
**normal** 41:6
42:8
**normalcy** 121:5
**normally** 84:6

107:10 109:8
203:18
**North** 3:7
**NORTHERN**
1:2
**Notary** 1:23 2:6
5:3 226:22
**notice** 2:21 4:15
19:5
**noticed** 83:11
116:21 151:16
193:23
**notices** 220:12
**notification**
109:9
**notified** 107:12
**November**
33:22 46:18
61:22 62:2
63:1,13,19
64:23 65:3
67:15 69:20
70:11,20 71:3
71:8,14,20
73:15,19 79:10
82:8 102:16
117:13,14
163:12 165:3,4
187:13 213:9
**number** 24:9,12
105:12 115:22
146:15,23
147:9 149:9
152:2,18 154:7
154:9 172:19
176:20,20,22
176:23 177:15
180:21 192:2,4
192:6 227:18
**numbers** 148:1
149:3,12
**nylon** 161:19

**O**

**O** 2:1 3:4
**o'clock** 63:7

167:6
**Oak** 8:21
**OB/GYN** 75:10
75:17 76:2
**Object** 16:12
20:4 50:23
123:7 153:21
199:8
**objections** 2:15
2:18 213:14
**observing** 218:1
**occasion** 32:11
53:10 66:3
69:18 77:8
**occasions** 30:7
67:10
**occupy** 80:13
81:14
**occur** 33:15,20
42:5 45:19
79:6 180:15
**occurred** 67:15
82:11 115:8
191:8
**OCD** 147:14,17
**October** 54:1,4
54:7 92:15,18
93:6,19 99:23
**Oddesty** 54:23
135:17,19
**off-and-on**
152:19
**Off-the-record**
184:6
**offered** 2:20
185:18
**offhand** 130:14
144:10
**office** 8:9,10
15:6,9,12 17:5
18:3 20:3 21:7
21:10,15,18
25:2 26:9,18
27:19 28:10,13
28:14 31:14
32:13 34:3,7

36:8 38:10
40:3,7 54:19
54:19 55:5
56:23 57:13,16
59:19 60:14,14
62:7 63:22
65:2 66:20,21
66:21 67:18
69:22 70:9,12
70:19 71:8
77:12,18 78:2
78:7,12,14,14
78:17 79:15
80:12,13 81:7
81:8,9,12,13
81:16,18,20,23
82:19 83:12
84:19 85:12,14
85:18 86:1,4,8
86:10,16 88:11
88:22 90:2,11
92:7,16 93:2,4
94:16 95:16,17
96:8 100:4,7
100:10,13
101:19 102:3
105:7,7 106:17
109:5,11,14
110:8,15
111:11,13
113:10,17
114:13,18
115:13,16,17
116:1,10 117:3
118:4,6 121:15
123:23 125:23
129:11 132:13
134:19 135:15
135:16 136:21
137:13,19,21
137:22 138:16
138:17 139:2
140:8 142:1,5
142:9,13,16
152:4,9,13,16
153:4 156:2,8

157:12,15
158:14 159:13
159:17 162:1
162:23 164:18
165:20 167:21
168:1 169:4,22
172:9,15,18
174:3,14,15,16
174:17,21
176:16 177:1,7
177:8,12,16
185:13 187:18
188:1 190:8
194:6,20 195:9
196:12,22
197:2,14,16
198:1,14,18
200:13 201:17
202:21 204:7
204:11,16
206:9 207:4,6
207:20 208:4,9
208:10 209:7,8
209:11 211:6
214:16 216:4
216:10,15
219:4,5,20
220:2 224:1
226:17
**officer** 8:13
23:23 34:6
48:3,6 56:23
68:14 77:1
78:1,4 80:9,11
80:16,19 85:10
85:12,13,20,21
90:6,10,22,22
94:6 107:9
108:2 115:12
115:15 138:5
151:6,7,8
164:4 185:2
189:1 194:6
195:17
**officers** 21:19,22
27:1 34:8 45:9

46:1 54:16
57:1 63:6
64:10 68:15
84:8 85:17,23
89:8 90:14
96:5 102:3
113:16 114:4
120:4 137:19
155:23 166:4
166:17 169:15
172:2 185:1
188:8 193:15
194:5 206:3
210:7 215:19
221:19
**offices** 93:2,12
125:22
**official** 1:10
129:6
**officially** 188:5
**oh** 32:19 33:2
76:7 98:14
124:14 141:13
143:2 144:23
148:8 153:23
170:9 192:21
200:10 211:22
**okay** 6:22 7:7,12
7:13,20 8:1,7
8:10,11,13,14
10:21 11:8
12:1,3,11,15
13:5 14:10
15:3,8 16:7
17:4,13,22
18:6,11 19:12
20:7,13,17,20
21:6 24:15
25:4,7,12 26:1
26:7,11 29:16
29:18 32:2,8
34:15 37:8,21
38:14 40:6,22
42:4 43:17
44:7 45:5,6,15
46:19 47:5,10

47:11,15,16
48:15 49:6,10
51:17 52:8
54:2,9,21
55:13,15 56:1
60:11,21 61:2
62:15,20,23
64:6,13 67:1,9
67:13 70:10,18
71:12,16,17
72:9,15,21
74:5,9,15 75:1
75:6,21 77:10
77:17 79:6
81:1,3,5 82:2
82:11 83:20
84:11,16 85:9
85:16 87:7,13
88:1,20 89:10
89:22 91:6,10
91:19 92:2,12
97:5,10,15,21
98:12,14,17
99:6,9,22
100:2 102:14
102:20 103:21
104:18 106:12
107:20 110:10
110:13,17
112:2,20 113:9
113:19,22
115:6,11 116:4
117:10,20
118:2 123:2,9
123:16 124:5
124:12 125:14
127:13,21
128:4,15,22
132:23 134:4,5
134:20 136:7
136:18 137:5
138:13 140:1
140:11,23
141:14 145:6
145:19,20
148:5,21

150:11,20
151:9 152:12
153:11 154:2
154:13,16,22
155:4,6,8
156:10,14,17
156:20 157:1,5
158:19 159:3
159:10,15,19
160:17,21
161:1,6,8,14
161:15 163:6
163:15 164:23
165:9 170:18
170:22 171:3,6
171:9,12,15,16
171:20 174:5
174:12 176:3
178:8,14 182:3
182:15 183:2,8
183:10,18
184:7,10,14,18
184:21 186:7
189:23 190:1
199:10,16,17
202:21 203:5
204:9,18
210:21 211:16
213:17,21
214:1,7,10,11
216:13 222:11
222:16 223:2
224:8,16 225:9
225:16
**old** 11:1,3
100:22 108:13
119:19 127:17
**on-and-off**
136:15
**once** 9:16 32:1
67:7 131:15
150:13 188:11
209:19 217:21
**one-hour** 41:12
**ones** 89:11 92:10
96:7 130:5

169:7 185:13
185:17
**ongoing** 16:21
16:23
**online** 116:14,17
117:8,11
140:16 209:1
**opened** 206:16
**ophthalmologist**
125:18
**opinion** 127:15
185:6 198:17
208:20
**opportunity**
114:10 157:6
180:16 181:1
182:11,14
203:15
**OPS** 208:3
219:10
**oral** 5:11
**order** 78:11
131:18 132:7
146:7,11,18,21
147:9 149:8
**ordered** 76:11
106:7
**organizations**
13:9
**originally** 13:3
44:1 62:9
105:5,6 124:23
132:14 150:12
**ortho** 125:8,9
**orthopaedic**
73:6 124:21
125:1,2,11
**outcome** 200:20
227:14
**outside** 28:20
29:4 34:22
36:7 37:19
54:19 92:16
101:3 104:23
111:12 162:3,4
162:10

**overwhelmed**
128:9

---

**P**

**P** 2:1 3:1,1
**P.C** 3:14
**p.m** 5:10
**packages** 22:4
**packed** 114:18
**page** 4:3,9,12
14:18,21 17:16
18:1 19:7,8
20:9,11 44:23
44:23 47:6
76:9 83:1 87:3
87:3 92:13
98:8 99:2
102:15 113:13
115:11 149:13
149:13,14,19
156:15 158:19
213:2 223:18
223:18
**pages** 90:1 92:3
97:13,18
**paid** 38:16
212:20
**pamphlets**
27:10
**paper** 25:2
**paperwork** 23:1
207:15
**paragraph** 47:6
53:16 54:3
61:21 68:2
224:8,10
**paralegal** 147:4
**parenthesis** 83:4
**parking** 210:17
**part** 43:20 90:8
91:17 97:12,17
131:23 133:14
134:13 140:16
140:17 183:16
183:22 184:2
185:12,13

189:8 190:14
193:3 198:20
200:3 214:18
214:23 216:19
217:4 221:1
**partially** 161:12
163:17 165:10
165:10 171:13
171:13 218:17
**participate**
112:9
**particular** 24:9
25:5,10 152:4
161:18,21
164:13 165:12
174:12 176:10
176:17 177:4,9
183:16 184:21
185:10 190:21
191:6,10
194:12,14,19
**particularly**
22:20 23:22
**parties** 2:3,17
227:12
**partly** 184:19,19
186:10,11
190:1,1
**party** 92:17
**pass** 121:14
**passes** 197:23
**pastor** 135:3
**patently** 222:13
**Patton** 138:12
172:7,10
**Patton's** 172:20
**pay** 39:15,16,19
40:17,19 106:7
121:13 130:23
131:1,16,22
**payment** 132:3
132:5,6 212:18
**people** 28:13,16
29:1,4,9 30:20
31:1 34:20
37:23 38:4

55:2 59:22
60:7,19,22
61:4,8,12,18
85:17 89:6
94:18 111:10
122:5,21 134:2
139:8 152:13
153:4 175:2,21
180:18 186:17
193:23 194:1
**percent** 28:9
79:12 121:12
155:11 157:9
157:10
**Perfect** 8:15
**performance**
205:2
**performed**
223:4
**period** 21:10
39:15,17,20
40:17,20 41:9
41:22,22 47:13
64:19 71:13,19
73:15,19,23
74:6,10,13,16
75:2 76:17
141:9
**periods** 7:17
163:22,23
164:16,16
**permanent**
187:4,8
**permission**
48:22 49:8
64:16 65:7,8
65:10,13 66:2
76:21 77:1,4
77:19 80:13
90:10 161:5
**perpetrator**
22:5
**person** 51:22
58:17 64:13
101:12,13
107:11 126:5

126:19 129:5
190:7 193:21
221:11
**personal** 46:8
167:9 203:4,5
207:14,16
**personally** 60:4
177:12
**pertained**
191:19
**PFA** 220:20,22
221:10,11
**PFAs** 221:8
**phone** 32:15
36:1,2,13,14
36:15 176:21
**photo** 95:17
96:19 97:20,23
98:6,21 100:14
**photographs**
97:16 99:7
**photos** 98:5,20
**phrases** 8:8
**physical** 35:17
118:7,9 121:18
121:21 122:1,3
122:4,7,12,17
122:20,23
123:1,3 133:1
133:6 224:5
**physically** 89:5
96:15
**physician** 75:13
123:22 127:8
144:5,12,17
**picture** 93:10
99:3
**piece** 25:1
**Pierce** 134:21
**Pierre-Louis**
55:1 135:11,19
**pill** 129:17
**place** 17:1 33:8
53:21 54:4
59:18 76:13
82:3 176:9

192:11 208:6
224:23
**placed** 64:22
92:16 93:22
94:7
**places** 144:21
145:4
**plaintiff** 1:8 3:3
16:9 150:13
**Plaintiff's** 4:9
147:20 149:9
154:4 170:20
179:16 182:4
182:15 213:18
223:17
**plan** 205:3
**planted** 175:20
**plastic** 93:8
**pleading** 112:17
**please** 7:2,23
8:16,20 12:2
12:14 20:8
44:23 81:3
156:16 158:21
159:3 160:22
165:11 184:9
184:14,20
186:2,8,12
189:9
**pleasure** 207:5,5
**plenty** 143:7
**plus** 176:17
**pocket** 131:16
**point** 7:8 45:7
72:23 76:10,20
77:23 80:8
82:14,23 84:16
85:9 92:15
97:7 102:15,20
110:23 113:13
115:11 120:13
140:23 150:6
152:4 161:22
165:16 176:17
188:17 194:1
194:12,14,19

213:15 214:12
215:8 216:14
216:22 217:14
217:23 218:5
218:12,19
220:17
**pointing** 178:5
193:1
**points** 45:2,4
87:2 90:1 91:4
92:3 115:21
214:9
**police** 23:21,23
26:23 151:7,8
210:6,7,9
221:19
**policies** 202:3,7
202:8,11,13,15
202:22 203:2
**policy** 159:22
192:19 193:13
200:12 201:1
201:17,22
202:5 203:22
204:3 208:6
223:11,14
**politics** 139:2
**portal** 117:18
**position** 21:15
**possibilities**
30:10 123:11
**possibility** 48:17
61:13,15 65:5
66:22 72:12,19
197:12
**possible** 22:6,16
60:18
**possibly** 30:5
48:20 49:19
55:2,7 59:7,10
60:8 62:7,11
62:11 66:15
67:21 72:18
114:1 151:12
180:4 188:4
196:22 197:14

198:1 210:10
219:2
**post** 215:20
**posted** 215:9
**practice** 107:8
108:1 125:21
**practices** 124:19
**practicing** 124:3
126:22 127:11
**preferring** 29:8
30:23 38:3
61:7,11,18
**prepare** 140:11
**prescribed**
128:1 144:7,8
**prescription**
119:4
**prescriptions**
130:22 131:3
**presence** 29:2,5
**present** 15:1
16:14 21:4
52:1 59:14
107:2 116:3
133:19 138:18
204:13 214:15
**presented**
154:14
**pressure** 122:10
**pretty** 6:8
**previous** 183:15
183:21 189:12
**previously**
105:14 115:17
**primarily**
147:12,14
**primary** 75:8,12
75:13,15,22
123:20,22
124:1 126:2,21
127:8 131:2
144:5,7,12,16
145:7
**printer** 93:10,15
100:17
**prior** 2:20 55:15

56:3,7,11,15
78:13 92:19
117:21 127:7
182:6 185:8
**private** 139:10
176:19 224:23
**probably** 25:16
28:8 212:18
**probation**
105:23 106:4
**problem** 81:11
120:15 152:14
162:6 163:4
166:9,11 168:6
173:22 181:12
181:17 188:15
192:22 193:9
**problems** 102:4
167:11 191:1
**Procedure** 5:6
**proceedings**
5:13 22:12
23:4,7 227:6,9
**process** 22:6,16
22:18 212:16
**produced** 98:2
**production** 4:14
19:6
**Production-19**
4:15
**professional**
1:22 5:2 143:6
**profile** 28:7
**profiles** 216:11
**program** 169:13
169:15
**progressed**
28:11
**project** 76:23
77:3 163:14,19
**prolonged** 7:17
**promised** 95:19
**property** 23:10
23:15 24:16
184:22 185:11
**protocol** 78:9

Lanitra Jeter                                    12/10/2021

| | | | | |
|---|---|---|---|---|
| **provided** 123:17 | 25:15,17 27:23 | 99:7,9 100:3 | 32:8 37:1 | 182:3 184:4 |
| 127:21 128:18 | 32:3 33:19 | 100:19 101:4 | 39:14 44:17 | 193:1 211:9 |
| 142:23 143:10 | 39:2 41:19 | 153:15 | 53:11,12,18 | 212:4 |
| **providers** | 66:7 89:14 | **rats** 153:13 | 55:3,7 56:9 | **recordings** 19:9 |
| 129:23 | 112:11 141:7 | **reach** 114:12,14 | 63:2 65:18 | 19:9,13,16,19 |
| **Psychiatry** | 142:17 145:2 | 114:14,15 | 68:1 76:3,18 | 19:22 20:2 |
| 143:15 | 146:11 183:23 | **reached** 220:1,6 | 76:19 77:9 | **records** 39:22 |
| **PTO** 43:14,20 | 187:19 | **read** 5:21 7:4 | 79:5,8,9 92:10 | 40:2,6,22 41:2 |
| **Public** 1:23 2:6 | **questions** 2:16 | 20:23 45:13 | 92:20 99:8 | 42:21 43:1,4,7 |
| 5:3 226:22 | 2:17 6:10,11 | 135:7 146:19 | 116:3 123:14 | 66:10,17 67:2 |
| **pull** 210:7 | 47:12 71:18 | 155:4 157:3,6 | 128:16 140:20 | **rectified** 68:12 |
| **pulled** 192:5 | 73:18 154:6 | 159:4,5 161:7 | 140:22 142:6 | **recuse** 105:16 |
| 209:18 | 187:12 211:12 | 165:6 175:9 | 142:10 143:21 | 106:22 |
| **purposely** | 212:6 220:19 | 184:15 186:7,7 | 144:10 145:16 | **recused** 106:21 |
| 102:16,22 | 221:4,6,7 | 191:22 206:16 | 150:4 153:6 | **REEXAMIN...** |
| 113:14 | 222:17 | 214:1,5 217:14 | 156:4 170:7 | 4:6 223:1 |
| **purposes** 146:6 | **quick** 156:11 | 224:19 226:5 | 180:22 187:11 | **reference** 59:3 |
| **purse** 207:12 | 168:17 179:16 | **reading** 2:8 | 187:14 195:6 | 83:7 98:8 |
| **pursuant** 5:5 | 184:5 212:21 | 218:12 | 197:19,20 | 156:22 159:1 |
| **put** 49:13 79:18 | 213:1 | **real** 156:11 | 204:12 223:11 | 161:3 165:21 |
| 90:20 91:2 | **quote** 10:2 | 168:17 179:15 | 224:1,14 | 166:1,5 172:1 |
| 93:4 94:15 | | 184:4 212:21 | **receive** 13:19 | 186:6 189:11 |
| 96:4 101:4,7 | | 213:1 | 14:1 78:2,10 | 191:21 |
| 101:12,15,19 | **R** | **realize** 119:12 | 78:12,14,16 | **referenced** 54:2 |
| 101:23 102:1 | **R** 3:1,11 227:1 | 138:4 195:16 | 115:13,16 | **referencing** |
| 131:7,8 146:12 | **Rabbani** 128:2 | 195:19 | 144:19 | 155:2 163:13 |
| 166:17 167:1,8 | 128:12,21 | **really** 17:17 | **received** 66:19 | 165:4 190:3 |
| 174:1 183:13 | 130:1 131:1 | 29:13,15 43:16 | 78:23 79:4 | 193:23 |
| 186:23 192:3 | 143:3 | 51:15,16 66:4 | 109:10 126:11 | **referral** 126:2,8 |
| 192:17 199:12 | **race** 90:5 153:5 | 70:8 72:20 | 129:12 143:12 | **referred** 144:3,6 |
| 200:11 210:6 | 153:12,19 | 116:16 123:10 | 145:12 | **referring** 22:4 |
| 218:8 220:8,11 | 198:17 202:3 | 123:14 129:18 | **receiving** 32:13 | 78:5 80:14 |
| 223:21 225:4 | 205:11 | 130:15 132:18 | 32:14,16,17 | 83:5 85:15 |
| 225:13 | **racist** 60:17 | 133:9,14 | 36:1,12 68:10 | 88:23 134:3 |
| **Putman** 123:19 | 153:16,20 | 157:13 194:13 | 78:7 79:15 | 193:4 199:21 |
| 124:4 126:9 | 168:19 169:1 | 206:12,21 | 88:12,13,14 | 200:17 215:14 |
| 127:23 128:13 | 169:18 170:15 | **reason** 50:7 | 89:2,3 166:2,5 | 219:1,13 |
| 128:21 | **Racquel** 81:1,5 | 55:21 57:5 | **receptionist** | **reflect** 211:9 |
| **puts** 199:22 | **raised** 181:2 | 66:13,16 101:1 | 27:5 33:13 | 212:4 |
| **putting** 167:18 | **rarely** 217:10 | 164:10 205:15 | 54:17 55:6 | **reflected** 155:9 |
| 196:11 198:22 | **rat** 33:15 79:18 | 209:9,19,21 | 67:22,23 | 163:16 |
| 221:18 225:10 | 85:4,5 88:15 | 210:8 | 136:19 | **regard** 84:17 |
| | 90:20,22 91:20 | **reasons** 139:1 | **recollection** | 144:22 |
| **Q** | 92:6,13,15 | **recall** 10:1 15:2 | 54:4 | **regarding** 22:11 |
| **question** 6:17 | 93:8,22 94:7 | 16:15 17:14 | **record** 7:4 | 23:3,21 34:13 |
| 7:1,22,23 8:4,4 | 94:10,11 96:22 | 18:10 27:2,14 | 148:15,19 | 35:1,9 61:17 |
| | 97:3 98:7 99:1 | | | |

63:1 70:21
88:2,6 99:7
112:14 126:12
127:14,22
128:13,19
129:13 140:21
144:23 145:5
168:14 177:11
184:12 200:13
202:22 204:3
223:11
**regards** 69:5
**registered** 1:22
5:1 209:23
**reinstated** 62:13
70:2,3 187:13
**relate** 47:13
**relating** 2:12
**relationship**
32:23 35:17
61:14 105:14
106:19 136:16
151:18,22
152:20
**relative** 96:22
**relatives** 12:4
**relieve** 191:12
**remain** 22:8
99:10
**remainder**
95:18 188:21
**remained** 136:1
**remarks** 169:1
**Remediation**
15:4
**remember**
17:18 24:23
30:11,12,15
33:5,11,17
35:11 39:8,18
42:20 48:10,13
51:11 52:10
53:23 62:6
65:1,16,17
66:5 75:10,11
76:1,5 81:1

82:4,5 92:22
109:15 111:21
112:1 137:17
140:9 143:3,10
143:12,14
144:10 170:16
206:13
**remind** 207:1
**repaid** 132:5
**repeatedly**
215:2 216:23
217:7,16
**replacement**
108:13,18
**report** 88:14
203:14,17
219:9
**reported** 83:2
83:20,22 84:1
84:3,18 96:16
**Reporter** 1:22
2:6 5:2,19
227:17
**reporter's** 6:12
**reporting** 84:12
101:10 179:11
194:2 227:16
**reports** 84:9
210:6
**represented**
97:8,11 107:4
141:1,8
**representing**
141:12 150:15
**represents**
150:18
**request** 4:14,16
19:6 30:3
37:15 44:16
49:13,15,17,21
62:5 63:18
65:14 76:21
77:1 159:23
**requested** 33:12
56:20 62:4
65:19,22

177:21 214:2
**requesting**
159:21
**requests** 50:5
**required** 159:23
162:17 221:22
**reschedule** 75:7
**rescheduled**
72:11,13,14,22
73:2,4,8 74:19
74:21 75:2,4
75:23 76:4
**resigned** 80:16
80:21 81:5
**resolved** 16:22
**respective** 2:3
**respond** 196:1
**responded**
35:19
**response** 4:13
62:16 68:23
69:7 91:4 92:4
92:14 115:22
155:16 171:13
182:1 187:12
200:17
**responses** 20:9
20:14,21 21:1
76:8 212:23
**rest** 122:19
**restitution**
106:7
**restricted** 89:5
102:16
**restriction** 63:4
**restrictions** 57:4
63:4,13 64:2
64:21 68:17
70:3,17 74:8
89:7 187:9
**restroom** 95:14
**result** 18:21
**results** 102:9
**resuming** 61:21
**retained** 45:9
**retaliate** 102:23

**retaliated** 85:1
88:6 102:11
116:1 120:5
196:23 209:11
**retaliating**
88:10 89:19
114:1
**retaliation**
88:14,21 91:17
92:1 118:5,7
118:10 119:18
121:20,22
123:4 129:1
130:17 133:3,4
179:13 197:18
198:20 199:4
202:4 209:13
209:14
**retire** 127:10
**returned** 25:3
157:15 207:17
207:19
**Reverend**
134:20
**Reverse** 146:20
**review** 20:22
63:23
**reviewed** 213:11
213:14
**reviewing** 14:19
20:14 21:3
47:9 53:22
62:1 87:20
155:8 156:13
157:5 159:8
161:11 165:9
171:12 184:18
186:10 189:23
224:20
**Rick** 75:15
124:2 127:7
144:4 145:14
**right** 6:8 8:3
11:14 14:20
24:23 27:2
33:5 34:2

35:11 39:12
41:20 47:20
55:3 75:11
80:18 88:9
91:1,2 96:20
97:1 98:15
103:23 104:10
113:12 115:20
116:20 118:2
119:9,10
121:17 122:14
133:20 134:6
144:10 145:18
146:14 148:12
149:21 150:8
153:9,20 165:6
168:20 171:5
180:19 183:9
189:3,7 198:10
198:13 201:2,6
202:19 212:7
213:6 214:5
216:13 222:18
**Riley** 3:11,14
44:9 141:17
146:22 147:23
148:6,17,20,22
149:2,6 211:14
211:16,21
222:19
**Robert** 3:11
**Roberts** 19:16
29:11,14,17,20
30:1,18,22
31:3,6 56:14
68:4,7,9 69:5
69:10,14,16
83:3 84:1,4,9
84:13 88:18
102:8 103:1
110:2,6 113:15
117:4 138:2
165:14,16,23
171:17 180:5
182:20 183:7
183:12 189:14

201:13 206:14
213:22 222:10
223:20
**Roberts'** 109:11
109:14
**roles** 150:8
**room** 6:14 93:15
100:18 109:18
145:8,9
**Rose** 1:21 2:5
5:1 227:19,20
**Ross** 103:2
105:4,15
106:19,20
107:6 113:1,2
113:5
**rule** 207:2
**rules** 2:12 5:5
6:8 45:12,22
46:13,16
**rumors** 32:22
35:16,22
**run** 148:14
209:20

**S**

**S** 2:1,1 3:1 4:8
**S-h-a-h** 223:7
**s/Maya** 227:19
**SAITH** 225:18
**salaried** 38:12
**salary** 38:14
**Sam** 114:12
206:19 207:10
**Samuel** 139:18
**Sara** 125:17
**sat** 194:15,20
**satchel** 207:13
**saw** 94:15 99:11
102:8 124:23
125:23 127:19
137:16 199:11
203:6 215:22
218:6
**saying** 36:5 60:3
148:8 157:11

157:11,20
171:22 173:23
174:6 175:3,4
175:17 193:8
199:7 201:23
203:23
**says** 45:7 76:10
76:20 77:23
80:8 83:1 85:9
92:15 98:10
102:15,20
155:5 166:15
184:22 185:11
186:14 209:4
214:2,12,20
215:2,8 216:22
217:6,16,23
219:7
**scenarios**
210:13
**school** 194:8
196:21 197:22
197:22 198:4,5
**seal** 226:17
**second** 47:6 76:9
78:8 93:6
102:15 124:11
127:15 132:1
188:4 190:14
193:3 198:9
214:20 222:20
224:8
**section** 191:10
**see** 7:14 61:23
64:13 68:4,11
91:5 93:21
96:21 97:13
101:5,12
110:17 119:2
123:19,20
124:7,9 125:9
126:3,21,23,23
127:3 130:1
136:10 138:3
154:13,16,18
193:17 195:1

195:10,12
204:5 213:3
215:22 223:14
224:17
**seen** 97:22
128:11 129:22
143:21 154:10
154:11 157:23
220:13
**sees** 84:8,8
**self-harm** 95:12
95:13 111:1,3
128:10 129:5,8
129:13,18
130:12 135:21
142:16 194:22
**sell** 132:4
**seminar** 165:18
**send** 22:4 69:7
116:9,12
117:10
**sense** 114:5
**sent** 44:16 47:2
62:9 116:18
117:1,2,8
132:1 133:22
165:14,15
183:11
**sentence** 106:5
**separate** 103:20
104:5 132:3
**separated** 25:22
**separately** 226:8
**September**
45:20 46:17
47:11,14 48:21
49:10 50:22
52:15 53:13
54:7,9 55:13
55:19 56:2,7
56:11,15 71:13
71:19 76:13
183:11 184:11
186:5 188:20
189:17,20
190:4,14,18

191:4 193:4
223:19
**service** 8:13
45:8 77:1 78:1
78:4 80:9,11
85:10,12,13
107:9 115:12
115:15
**sessions** 181:11
181:13,14
**set** 39:19 40:19
78:17,17
206:19 207:10
**seven** 63:7 90:1
91:3
**seventy-five**
95:2
**sexual** 153:1
**Shah** 223:5,6,8
**shape** 220:1
**share** 111:13
**she'll** 196:21
197:12,13
**Shelby** 12:6
227:4
**sheriff** 113:15
114:4 206:3
**Shield** 131:15,17
136:1 143:17
**shift** 95:23
**shirt** 161:22
**shit** 196:11,18
198:21 199:12
199:22
**shock** 205:21
215:10
**shocked** 206:17
**short** 44:12
86:22 140:3
146:3 222:22
**shorthand** 8:8
**shot** 122:18
**shoulder** 124:23
**shoulders**
151:17
**show** 14:10

18:23 39:22
40:3,7,23 41:3
42:21 43:2,4,7
46:19 66:10
87:17 97:5
107:10 192:4
212:23
**showed** 57:22
108:6 114:5
199:1
**showing** 162:9
**shown** 97:10
**shrugged**
151:17
**shut** 195:22
**sic** 70:20
**sick** 40:11,16,23
41:3 43:11,15
43:19 49:20
50:11,14,16
57:13 127:2
145:7
**side** 15:8 93:11
119:10 125:23
**Sigma** 12:19
**sign** 5:21 20:13
177:22
**signature** 2:8
20:10 203:18
213:5
**signed** 20:18
87:21 219:5
**signing** 23:2
161:4 218:12
218:13
**signs** 218:19
**simple** 6:9
**sir** 6:7 25:6
68:22
**sit** 7:16,17
186:16
**sitting** 96:10,11
97:1 120:17
133:16 139:14
202:14
**situation** 22:20

Lanitra Jeter                                          12/10/2021

Page 250

22:21 50:7
96:15 129:20
159:20 160:7
173:4,18
183:14,17
194:18
**six** 115:21
131:21
**skills** 128:8
129:16,23
134:15 139:7
**skip** 182:23
**sleeping** 218:7
**smiling** 211:10
212:4
**Smith** 33:13
37:15 44:16
**snitch** 85:5
**social** 215:9,16
215:21,22
216:3,7,9
225:5,10,14
**socialize** 28:19
37:18
**soft** 7:9
**sold** 132:16
**somebody** 86:15
126:23 148:8
152:15
**son** 10:9 160:9
160:10 209:22
**son's** 216:16
**soon** 83:10
**sorority** 12:21
12:22
**sorry** 32:19
50:19 59:23
66:8 71:2 76:7
98:2 147:15
165:14 170:9
178:22 189:21
190:3 196:6
199:13,15
218:10 224:20
**sort** 39:7 71:23
74:2,9 86:15

168:6
**South** 125:23
**SOUTHERN**
1:3
**speak** 108:9
220:21
**speaking** 6:19
51:17
**specialist** 124:21
125:1,3
**specializes**
126:5
**specific** 21:10
25:13 26:11,18
67:1 84:12,14
89:16
**specifically**
178:9 199:23
203:3
**spell** 9:5 125:4
223:6
**spend** 11:20
12:11 130:21
**spending** 36:8
**spiritual** 135:5
**spoke** 48:13,15
48:18 116:18
**spoken** 168:4
**square** 166:21
**Sr** 9:19 136:22
**St** 75:20 105:18
109:4 124:6,20
125:8,12
126:14 145:9
145:15
**staff** 26:18,21,23
27:1,4,7,8,12
66:21 83:4
**stage** 140:15
212:17
**stamp** 149:3
**stand** 163:22
164:3,16
**stared** 94:1
**start** 10:20 21:6
33:21 41:17

47:21 63:3
67:16 71:15
73:16,20
171:23
**started** 38:23
39:6 40:10,13
47:14,17 48:11
49:6 58:3
69:21 79:11
82:7 121:2
126:1 129:10
129:11 141:23
142:4,8,12
151:5 164:18
188:5 224:10
**starting** 142:16
154:8
**starts** 50:13
**state** 2:6 5:3
13:3 107:4,4
119:14,15
131:7,14 150:7
150:14,16,18
210:1 226:23
227:3,22
**stated** 34:20
36:20,21 63:2
142:18 155:18
158:5 161:16
163:20 172:3,8
178:20 179:4,6
186:16 191:11
192:21 193:11
221:9
**statement**
173:15,17
177:22 178:18
179:20 196:2
198:21 200:2
**statements**
178:3,15 180:1
180:8,9 191:8
199:21
**states** 1:1 157:17
165:13,15
186:13 190:18

191:11 192:12
193:6
**stating** 189:16
196:7
**stay** 86:4 152:9
156:2,8 169:8
185:7
**stayed** 28:13
95:17 127:4
**stemming**
165:16
**step** 119:11
**stepchildren**
10:16 11:15
**Stephens** 172:6
**Stephens's**
172:21 176:4
178:20
**steps** 202:18
**STIPULATED**
2:2
**stipulations** 5:6
5:19 57:3
**Stone** 10:14
**stop** 41:17 80:18
101:9,10
123:21 124:10
129:18
**stopped** 93:23
101:8 119:23
121:3 124:2
126:22 129:9
**stories** 215:3,9
**story** 179:8
211:23 223:21
224:3,11
225:10,13
**straw** 114:1
**street** 162:12
172:5 206:5
**stress** 119:23
122:5 129:19
134:17 191:12
**stressful** 129:20
**stuck** 159:12
**studied** 197:10

**studying** 194:7
**stuff** 94:15
101:8,10
102:13 111:5
114:10,13,18
114:19,22
115:1,4 121:14
195:11 206:18
207:13,16
220:7,9
**subject** 156:22
171:20 183:12
189:15
**submit** 219:9
**submitting**
172:23
**subscribed**
226:15
**subsequently**
175:16
**subset** 179:18
**Substance** 15:20
**sue** 116:20
**suite** 3:7 100:13
**Sunday** 122:18
**supervision**
134:12,14,18
**supervisor**
27:16,18 29:12
31:7,8 42:7
44:3 68:10
69:3 84:7,10
117:1 134:7
166:10,11,12
201:11
**supplies** 93:16
**supply** 27:1,7,12
169:5
**support** 23:1
196:14 197:6
**supported**
197:15
**supposed** 126:1
139:22 186:15
192:10 194:4
203:14 221:12

**sure** 18:8 25:16
29:13,14,15
33:19 43:16
59:5 64:6
70:10 72:5,20
74:20 79:12
83:23 86:21
89:15 105:9
111:9 112:12
116:16 125:18
132:19 148:1
149:1,4,7
157:9,13
191:16 203:23
211:22 212:3
216:12 221:17
221:20 222:21
**surgeries** 163:21
164:19
**surgery** 57:12
62:10,13 73:11
73:12 99:14,18
99:20 108:18
119:1 125:16
223:3,4
**surprised**
148:14
**surrender**
221:12
**suspended**
106:4
**suspension**
203:10
**swapped** 150:7
**sweating** 155:19
**switch** 118:2
**sworn** 5:16
226:15
**symbol** 153:16
**symbols** 153:20
**system** 175:8
176:23 192:3
192:10

———————
**T**
**T** 2:1,1 4:8

227:1,1
**tablet** 114:9
**tacked** 131:22
**tag** 96:11 209:20
209:20
**take** 6:12 7:9
20:20 33:8
42:1 44:9
53:21 58:16
59:18 71:21
73:22 82:2
86:19 94:21
95:21 100:19
101:1,5,6,14
112:3 114:8,8
114:11 120:23
121:1 122:8,18
129:17 140:2
145:20,22
154:19 156:15
159:3 160:5
162:16,17
182:16 189:1
209:9 213:19
222:19
**taken** 1:21 2:5
32:15 34:4,7,9
44:13 45:8,10
45:15,23 47:8
55:12,19,22,23
56:21 57:5
58:2 68:13,15
70:5 71:14
79:19,20 84:22
86:23 118:11
120:2 140:4
146:4 166:2,3
186:19 190:6,7
190:10 193:8
222:23 227:6,9
**takes** 122:23
**Takia** 135:22
**talk** 33:14 47:10
63:12,22 69:10
92:12 95:11
111:14 113:2

135:2,13 136:3
137:4,21 139:9
139:14 140:17
143:5 154:7
164:21 166:10
178:11 185:4
211:11,19
216:2
**talked** 7:10 32:6
32:17,21 54:21
88:20 89:22,23
91:3,10 102:18
115:20 131:11
132:23 133:2
139:6 160:19
178:10 181:7
181:10 189:5
191:19
**talking** 6:16 8:9
8:12 47:7 48:8
85:18 87:2
89:11,13 98:18
101:9 103:3
107:15 116:19
139:15 147:4
158:12 183:14
187:8 215:16
**talks** 53:17
61:21 68:3
216:23
**Tamara** 208:2,2
208:7
**Tan** 151:15,21
**Tau** 12:18
**Technically**
49:1
**techniques**
128:8
**tell** 11:19 34:2,5
47:12 50:21
57:7 60:9
69:16 89:17
92:17 108:4
111:7 114:11
151:4 154:20
157:3 158:20

159:10,18
160:1,6,22
161:9 163:10
165:1 171:11
173:7,8,9
175:15 176:7
178:16 184:8
186:2,9 192:1
192:6 203:2
206:15 209:1,1
209:2 213:20
219:15 220:5
224:10,13,18
224:21 225:1,7
225:9
**telling** 44:15
120:9,10,18
140:6 152:6
170:3 224:14
**ten** 11:2 37:9,12
142:22 143:1
144:20 145:3
145:12 162:18
211:7
**term** 129:3
**terminated**
74:22 87:8
113:17,20
118:17 130:18
131:15,19
132:12 198:11
206:1 207:7
208:12 219:22
**termination**
73:17,21 87:4
87:10,18 88:3
88:7 89:23
91:11 92:5
115:9 119:17
206:23 207:23
208:12
**testified** 5:17
153:2 168:18
197:15 223:10
223:21
**testify** 108:3,7

108:19 112:14
112:17,22
**testimony** 150:3
182:7 187:11
197:6 199:5
201:16 204:2
210:12 213:11
222:12 223:12
224:1 226:5
**text** 49:19 179:2
179:21
**texted** 178:18
179:1
**Thank** 12:16
19:7 160:17
**Thanks** 12:4
**theirs** 58:18
215:22
**therapist** 15:20
111:12 135:13
135:18 139:6
**therapists** 128:5
130:3
**thereto** 2:20
**thick** 161:20
**thing** 7:20 93:21
114:16 115:6
117:7 129:15
131:6 135:13
135:18 141:18
147:13 157:2
177:15 179:3
184:2 186:18
195:14 215:20
215:23 219:14
224:20
**things** 6:14 26:4
27:10 28:11
34:21 36:8
57:22 58:20
70:5 79:21
85:19 88:16
89:4,6 90:16
90:23 94:13
108:5 111:5
114:9,23 115:3

115:21 119:6
120:2,5,7,10
120:16,22
122:2,7,8,9,11
122:12 123:1
123:13 126:6
128:7 129:10
134:14 135:3,6
135:7,9 136:5
137:20,22,23
138:16 139:9
139:15,16
143:8,20
155:18,21
160:11 162:8
172:17 175:5
176:9,11 177:6
178:21 179:11
191:12,12
192:18 194:2
196:20 200:11
202:3 203:16
206:18 207:13
207:14 210:10
225:6
**think** 10:1 11:18
18:10 24:7
26:7 30:4 32:8
37:2,5,8,11
43:14 48:15
59:8,11 66:9
79:2 81:6 82:6
82:11 89:19
91:1,15,16,18
91:20 92:6
96:6 103:7
105:8,18 106:1
106:1,2,5,5
113:23 116:14
117:3,12,14
122:22 128:3
134:10,23
138:13 141:21
144:9,15
145:17 148:9
157:14 194:14

198:11 203:21
208:3
**thinking** 114:17
**third** 53:16
76:20 78:9
188:4 198:9
215:2
**thirty** 12:12
37:6,12 59:9
59:12 63:10
**thought** 58:13
98:2 115:4
191:13 192:7,9
**thousand** 38:15
166:21
**three** 24:7,8
30:5,7 103:13
103:14,16
112:9 144:14
144:14 167:5
171:4
**three-document**
179:18
**threw** 107:6
115:1
**throwing** 57:14
155:20
**thrown** 107:1
**Thursday** 99:14
99:15,17
**tickets** 209:17
210:17
**time** 2:19,19
7:18 15:5
21:10 27:19
28:10 30:4
31:14 32:4,6,7
32:9,15 33:21
34:4,7,9,13
36:8 37:14
39:22 40:2,6
40:22 41:2,6,9
41:18 42:12,13
42:13,16,21,23
43:1,4,5,7,8,12
43:19,23 45:8

45:9,10,11,18
45:23 46:2,3,9
46:11,14 47:7
47:10,13,21
48:2,4,4,12,23
49:2,2,3,5,7,11
49:22 50:2,5,8
50:16,16 51:11
51:12,14 52:3
52:8,10,14,17
52:20,23 53:12
54:11,14 55:12
56:2,21 57:2,9
57:20 58:2,12
58:16 59:3
61:22 62:12
63:1,3,9,15,19
64:18,22 65:5
65:6,18,19
66:10,17 67:2
67:16,18 68:13
68:14,19 69:21
69:23 70:13,21
71:5,9,12,14
71:16,19,21
72:1,3,5,7,9,14
73:3,15,17,18
73:20,22 74:3
74:5,7,10,10
74:12,13,16
75:2 76:17
79:7,8,11,19
82:4,7 83:10
83:17 85:11,15
89:1 96:8
98:22 102:16
114:13 116:3
118:11 119:20
122:16 123:13
131:13 132:9
133:15 140:23
141:9 152:5,15
159:2,21 160:8
163:23 164:1
164:14,16,17
166:2,16

167:10 170:17
172:10 176:18
179:1 186:19
186:21 187:9
187:13,17,21
188:6,9,12,12
189:1,17 190:5
190:9,21 191:1
191:7 192:23
193:7,9,10,11
193:12,13,14
193:16 194:7
194:13,14,19
195:4,16,18
205:23 206:20
207:11 208:15
208:22 214:13
214:13 216:15
217:8 220:6
**timecard** 40:1
67:5
**times** 9:14 30:5
31:22 42:2
67:4,8 68:16
85:16
**tired** 94:17
96:16 110:19
110:19,19,20
194:17
**tissue** 95:6
**title** 27:13 192:8
**today** 6:15 7:8
8:8 21:2
128:16 133:16
133:18,19
159:13 187:12
202:14
**told** 24:15 51:17
54:10 86:7,11
86:12 87:7,9
89:11,15 91:14
91:19 107:1
109:12 110:6,7
110:9,18,18
111:10,11,11
118:3,5 120:16

137:10 144:21
145:5,13
150:11 156:7
159:13 164:19
172:2 173:12
173:13,18
177:17 179:7
181:13 188:7
188:10 190:19
209:21,23
210:12 215:3
219:23 220:3,3
**toll** 122:8,23
**top** 97:1 141:15
141:20 146:16
164:5
**total** 21:22
41:14 103:13
103:21 108:12
108:18 151:10
**totally** 89:8
173:16 179:5
**touched** 175:9
178:12
**touching** 171:18
**tour** 166:21
**towed** 209:18
211:3,6
**Trace** 8:21
**trained** 202:10
202:12
**training** 167:3,4
167:21 168:2,7
181:11,12,14
184:13 185:14
185:15,16
**trainings** 182:1
**transcribed**
227:7,10
**transcript** 226:5
227:9
**transcription**
227:8
**transferred**
105:20 172:14
**transmitted**

172:14
**treat** 128:6
**treated** 80:4
  89:9 94:18
  120:3 127:13
  166:7 199:6
**treating** 126:16
  198:23
**treatment** 32:12
  34:3 58:1
  66:18 68:9,12
  85:7 123:17
  126:11,13
  127:21 128:12
  128:18 129:12
  129:14 143:1,4
  143:10,13,14
  166:1,5
**treatments**
  144:1,4
**trial** 2:19 22:7
  23:9 28:3,6,7
  63:23 218:1
**tried** 28:12
  94:19 105:22
**tries** 125:18
**triggers** 142:20
**trip** 155:2
**true** 20:17 21:1
  21:5 36:10
  158:4,15 159:9
  161:12 163:16
  163:17 165:10
  167:22 171:13
  172:19 181:3
  182:12 184:19
  184:23 185:12
  186:11 190:1
  191:16 192:7
  211:14,15
  212:1 214:10
  214:16,18,21
  214:23 215:6
  215:11 216:17
  216:20 217:2,4
  217:11,14,19

218:2,15,17,21
219:10 220:22
221:2 226:6
227:8
**Trussville**
127:19
**trustworthy**
215:5
**truthful** 66:12
66:14,17,23
155:10,11
180:12,13
**try** 7:23 57:23
71:1 91:2 95:8
95:9,11 121:13
128:9 131:18
135:8 147:11
147:13 150:2
154:7 162:4,14
163:1,4 194:20
195:23 209:6
223:22
**trying** 58:8 77:2
83:18 94:17
110:21 120:8
121:4 138:3
160:3,5 162:1
173:6,9 174:23
175:4,13,14,15
175:16 176:7
176:13 177:1
187:3 193:18
197:13 215:21
224:19
**Tuesday** 99:12
159:14,16
**turn** 14:17 19:7
20:9 44:23
206:17 207:8,9
213:17
**turned** 215:3,4
**turning** 221:20
**TV** 137:16
**twelve** 106:5
136:4 151:12
**twenty** 28:9

162:18 169:14
194:16
**twenty-four**
106:1,4
**twenty-seven**
10:12
**twice** 57:17 67:7
100:23
**two** 10:22 13:15
18:18 24:6
30:10 38:18
41:12 54:12,15
55:5 67:9 71:4
102:2 113:15
114:3 118:19
123:5,17
125:22 127:20
132:2 144:10
169:14 172:2
178:3 180:8
191:8 206:3
212:19
**two-part** 189:8
190:2
**type** 25:19 43:10
43:22 118:19
123:5,17
127:20 167:3
167:21
**types** 43:21
128:8
**typo** 215:4

— U —

**U** 2:1
**UAB** 223:9
**uh-huh** 7:3
**ultimately**
146:12
**Um** 196:5
**unavailable**
218:15
**uncles** 12:10
**uncomfortable**
162:7
**unconventional**

187:16
**understand** 7:22
8:1 25:15 32:3
39:2 41:19
58:11 70:11
89:14 112:11
122:5 123:2
141:4,7 147:12
152:21 160:17
175:19 187:19
197:5 201:15
201:16
**understanding**
150:17 204:1
**understood** 8:5
**undetected**
118:21
**unfair** 32:12
34:3 68:9,12
85:7 166:1
220:8
**unfairly** 70:6
166:7
**UNITED** 1:1
**university** 13:4
13:4,20,22,23
**unknown** 92:17
221:10
**unpack** 96:21
**untrue** 158:16
158:18 179:12
215:4,10
**untruthful** 67:3
**unwanted** 32:15
36:1,2
**upper** 22:9
155:23
**upset** 110:15
147:5 194:13
**urges** 94:22
95:11
**use** 8:8 45:4
46:2,3,4,9
49:11,22 50:2
50:16 52:23
57:2 58:11,18

63:14 74:12
83:18 85:11,15
86:14 146:6
192:8 193:14
**Usual** 5:19

— V —

**vacant** 80:12
81:8,10 82:19
**vacation** 39:1,7
39:9,13,23
40:3,7,16
43:11,15,18
**value** 215:10
**varied** 50:6
**various** 4:10
83:3 153:3,3
202:18 210:12
217:1
**vehicle** 167:8,9
206:6 209:22
**verbal** 49:19
203:8,9 204:19
**verbalized**
180:3
**verbally** 109:12
164:13
**verbals** 203:11
**versa** 110:23
**verses** 135:7
**version** 99:4
180:11
**versus** 150:16
**vice** 110:22
**victim** 8:13 22:5
22:18,19 23:10
24:1,1 35:13
45:8 76:23
78:1,4 79:22
79:23 80:9,10
85:10,13 103:4
103:6 104:3,7
104:12,16
106:14 107:5,8
107:17,22
108:3 109:22

112:7,8 115:12
115:15 150:8
150:12
**victims** 22:4,6,8
22:15 24:4,5
28:4 107:9
108:2 185:4
**video** 108:14,17
**Vincent's** 75:20
124:7,20 125:8
125:12 126:14
145:9,15
**vindictive**
220:22
**violence** 23:13
25:21 104:11
163:13,19
165:18 185:16
**violent** 114:6
**vision** 118:22,23
119:1,1
**visit** 86:1,7,15
152:6,16
**visited** 85:11
**visiting** 86:10
**visitors** 85:13
**vouch** 196:16
**vs** 1:9
**VSO** 8:12 21:12
21:19,22 22:2
23:14 24:16,20
25:4,13,17,19
25:20,21 26:3
34:6,8 46:1
48:3,6 54:15
56:23 57:1
63:6 64:10
68:14,15 80:16
80:19 84:8
85:17,21,23
89:8 90:6,10
90:14,21,22
93:2 94:6 96:5
100:3,6,10,13
102:2 108:1
120:4 137:19

138:4,8 155:2
156:2,9 164:4
166:4,16
169:15 172:2
184:12 185:1
185:19 188:8
189:1 193:15
194:4,5,7
195:17 215:19
**VSOs** 21:17
22:1 25:7,9
55:5 71:4
185:14 187:23
221:7

_____
**W**
**wait** 6:18 119:5
187:1
**waiting** 126:2
**waived** 2:9,22
**walk** 163:23
164:3,15
166:22
**walked** 94:4
96:5 119:18
162:12 170:4
206:4
**walking** 36:6
158:6 162:10
**wall** 93:11
100:13
**want** 7:7 20:23
35:5 44:9 46:6
70:3,4 71:12
79:17 81:15,20
84:20,22 86:19
96:2,12,13,14
112:3 117:5
120:14 127:15
127:16 135:4
136:16 143:9
144:13 145:22
148:18 151:22
152:1 154:3
155:22 157:3
166:10 167:8

167:14,15
172:1 175:9,10
175:11 181:22
195:20 196:8
196:23 197:23
208:11 209:10
210:3
**wanted** 42:4
43:17 46:3,4
49:11,22 50:1
57:3,4,6,7
80:11 81:13,18
82:18 86:12
101:5,7,8,11
136:10 172:22
186:13,14,17
**wants** 147:17
152:15
**warning** 203:9
204:19 205:6
**Warren** 103:1
106:15,16
107:1 111:14
112:21 137:10
**wasn't** 29:13
48:1 49:4
102:6,7 107:7
120:14 145:1
157:13 162:2,6
181:21 182:2
224:11
**watch** 175:14
194:4
**watched** 80:3
83:1,15 84:18
96:17
**watching** 22:22
83:19 138:3
194:1,3,11
**water** 7:9 44:8
60:1
**way** 7:15 8:1
22:6,15 40:15
51:16 57:9,22
58:12 70:6
89:9 90:3 92:8

94:13 101:6,15
121:8 148:7
160:4,8 163:5
164:1 167:16
167:19 169:8
171:23 172:7
187:22 188:12
198:22,23
201:18 205:8
221:22
**ways** 115:23
133:5,17
**we'll** 5:21 33:14
146:6 149:4
190:12
**we're** 6:19
107:15 120:16
149:12,18
154:5,6,8,8,20
157:1 171:4
179:16 184:7
211:10 221:17
**we've** 76:13 77:5
86:18 89:22,23
91:3 107:9
115:20 148:14
154:4 159:4
160:18 161:6
178:12 222:11
**wearing** 119:2
**Wednesday**
99:13 190:14
191:3 193:4
**week** 42:10
92:19 93:5,5,6
187:2,6 188:5
190:12
**weeks** 38:18
**welcome** 146:18
**Wellbutrin**
144:8
**Wellness** 15:15
16:1,5,11 17:8
18:4 140:9
**went** 13:3 51:4,9
94:16 95:16

107:23 108:7
108:23 110:15
118:20 124:3
131:8 145:7
151:6 157:17
157:18 161:22
161:23 162:3
162:13,15
173:12 177:20
178:2 191:6
193:7 197:16
198:3 224:17
**weren't** 101:14
142:11
**wet** 57:21
**white** 21:19 29:8
30:23 34:8
38:3 46:1
54:16 57:1
58:18 60:12
61:8,12,18
63:6 68:15
89:9 90:11,14
94:6 120:4
139:3 166:4
187:23
**Willie** 136:22
**windier** 162:4
**wipe** 162:14
**witch** 93:11
100:15
**witness** 2:9 5:11
191:8 211:20
226:4,17
**wondered**
151:19
**wondering**
148:8
**word** 194:16
197:17
**worded** 106:6
**words** 35:6
225:8
**work** 15:14,16
21:9 23:6
26:11,17,21

28:20 29:23
31:19,23 32:5
37:19 38:23
40:15 42:14,16
42:22 43:2,18
46:5 50:12
51:4 52:6
57:19 58:4
63:5 64:3,7,14
64:16 71:21
72:1 73:22
75:3 76:22
77:2,19 85:3
90:13 92:22
93:19 95:14,22
95:23 96:4
99:18,19 111:1
111:2 113:10
114:6 119:4
127:4 136:6,10
137:13 153:13
153:20 155:18
156:2,9 165:19
165:19 167:14
172:3,13
188:14 192:10
193:17 194:22
196:18,22
197:23 214:14
214:15 219:19
219:19
**work-related**
85:19
**worked** 15:9,11
15:23 20:2
21:12,17,20
23:8,8 39:10
43:16 66:22
105:12 154:17
154:17 168:1
168:10 169:22
184:22,23
185:1,11
187:17,23
193:10,12
204:15 216:3

217:10 221:9
**worker** 221:13
221:13
**working** 15:3,5
26:8 41:6 42:8
42:9 64:1
76:23 119:16
120:1 123:23
164:18 169:13
191:13 197:13
**workplace** 80:6
84:21 174:7
**workweek**
217:11
**worry** 86:13
86:12
**worse** 96:15
**worst** 210:13
**wouldn't** 122:16
197:6
**wrap** 213:1
**write** 62:16
224:16,22
**write-up** 204:22
**writer** 147:12
**writing** 116:12
203:7 223:15
**written** 25:1
49:17,18 180:9
203:9,11
204:15 222:7
**wrong** 118:15
118:16 127:6
138:3 164:7
**wrote** 224:10
**Wyman** 105:9

___ X ___

**X** 4:1,8

___ Y ___

**y'all** 44:9 211:21
**Yates** 19:22
27:15 28:22
29:7 44:5
45:10 46:10,11

49:16 53:17
54:10 55:9
56:16,19 58:22
59:2,16 60:12
61:3,14 62:19
62:21 67:14
68:10 76:12,21
83:2,9,23,23
85:10 86:3
88:18 92:21
102:5,17 138:1
154:23 156:21
157:11 158:23
161:2 162:22
163:12 164:9
165:3,15 166:6
166:7 169:12
171:20 172:3
173:12 177:17
177:20,20
178:1 179:3,4
179:10,23
180:3 184:11
186:5 189:14
189:16 190:15
191:5 193:6
199:23 213:22
219:3 222:8
223:19 224:21
**yeah** 12:10
44:11 146:1,17
147:2 148:6,8
148:20 149:6
203:8
**year** 198:8,9,9
**years** 9:10
100:22,22
108:13 119:19
127:17 129:9
136:4 139:8
142:21,21
143:1 144:14
144:20 145:4
145:12 151:9
152:2,18
169:14,23

**yesterday** 211:3
**Yu** 127:19
**YWCA** 220:18
221:5

___ Z ___

**zero** 28:5 29:21
30:2 31:18
40:13
**zoned** 194:15

___ 0 ___

___ 1 ___

**1** 4:10,13 14:11
14:14,18,20
17:16 18:1
20:8,10,11,22
44:22 76:6,7
80:9 87:3 90:2
91:5 92:13
102:14 113:13
147:21 149:9
154:4 170:20
179:17 182:4
182:16 212:22
213:3,18
223:17
**1/15/25** 227:23
**10** 1:18
**10th** 5:9 159:1
**1111** 149:16
182:16 183:19
183:22
**1112** 149:17
183:22
**12th** 61:22 62:2
63:1,13,20
64:23 65:3
67:15 69:20
70:11,20 71:4
71:8,14,20
73:15,19 79:10
82:8
**13th** 213:22
**14** 4:13

**147** 4:10
**149** 4:5
**15** 14:6
**15-minute** 41:12
162:19
**16** 4:18
**16th** 73:17,21
113:14 139:19
214:4
**17** 14:8
**18** 163:12
**19** 183:11
**1916** 8:21
**1998** 9:22
**19th** 126:14

___ 2 ___

**2** 4:15 19:1,3,5,7
19:7,8 47:6
**2:15** 157:16
**2:20-CV-0186...**
1:5
**20** 4:17 15:17
**20/20** 118:23
119:1
**2000** 10:2 14:23
17:20
**2004** 8:23
**2015** 14:3,5
16:20
**2017** 14:4
**2019** 21:8 30:16
32:9,11 33:9
33:10,22 39:3
40:10 45:20
46:17,18 47:11
47:15,17 53:13
54:1,5,7,8,10
61:23 62:3
67:15 69:20
70:11,20 71:4
71:8,13,15,20
71:20 73:15,19
76:13 79:10
82:8,14 92:15
92:18 93:19

Lanitra Jeter                                              12/10/2021

102:16 111:22
117:13,14
127:12 163:12
165:4 184:12
186:5 187:14
188:20 189:20
190:4,15 191:4
193:5 214:5
223:19
**202** 3:7
**2020** 4:17,18
30:16 47:3
73:18,22 82:12
111:23 113:14
116:8,13
117:22 126:15
139:20 145:1
155:1 156:22
159:1 161:3
213:23
**2021** 1:18 5:9
213:9
**2022** 226:16
**20th** 116:8,8,13
117:21 184:12
**21** 15:18
**2119** 3:7
**2121** 162:13
**223** 4:6
**22nd** 165:3,4
**23rd** 45:20
46:17 47:11,14
48:21 49:10
50:22 52:15
53:13 54:9
55:13,19 56:2
56:7,11,15
71:13,19 76:13
186:5 188:20
189:17 190:4
190:18
**24th** 213:9
**25th** 161:3
190:14 191:4
193:4
**28** 92:18 93:19

**28th** 99:12,23
**29th** 99:12

---
**3**
---

**3** 4:17 14:18,21
17:16 18:1
46:20,23 47:2
47:6 53:16
54:3,3 61:20
68:2 116:4,5
**3:07** 5:10
**30th** 189:20
223:19
**318** 149:16
171:2,8 178:5
178:14 179:18
180:7
**319** 149:16
171:2,8 178:6
179:15,18,19
179:20 180:8
**31st** 15:17
**33** 97:13,18 98:8
98:10,11
**338** 149:15
164:23 168:17
170:18,19
182:6
**35** 99:2
**35203** 3:8
**35209** 3:16
**3530** 3:15 5:7
**36** 97:13,18
98:10
**3rd** 3:7

---
**4**
---

**4** 4:18 44:23,23
76:9 87:3,15
87:17,18 90:1
92:3
**4:30** 41:7 52:12
63:5,8 186:20
188:14
**42** 97:13,18 98:9
98:13 99:3

**46** 4:17

---
**5**
---

**5** 83:1 87:3 90:1
92:3
**55** 149:18
213:17 216:14
218:13 222:13
**57** 149:15
160:21 161:10
161:14 163:7
182:5

---
**6**
---

**6** 4:4 45:1 91:4
92:4,13 102:15
113:13 115:12
**66** 149:15
158:20 159:5
160:19 182:5
**67** 149:14
156:15 157:2,7
157:7 158:17
182:5

---
**7**
---

**7:00** 157:14
186:21 188:13
**7:30** 41:7 63:5
65:3,9,11,14
65:20 66:3,11
186:20
**71** 148:16
149:13 154:9
154:21 155:10
156:12 182:5
**74** 149:15 163:9
163:16 164:21
182:6
**78** 149:17 189:8
189:18 195:1
223:18 224:9
**79** 149:18 189:8
193:2 195:1

---
**8**
---

**80** 149:17 186:1
186:7,9 189:4
**82** 149:17 184:8
184:15 185:22
**85** 149:16
170:23,23
171:1,7,19
178:8,8 179:18
180:18
**87** 4:18
**8th** 155:1

---
**9**
---

**9** 92:14 115:22
**9/30/22** 227:21
**9:36** 5:10
**9th** 156:22



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

LANITRA JETER,                          )
                                        )
    Plaintiff,                          )
                                        )
v.                                      )   Case No. 2:20-CV-01863-ACA
                                        )
DANNY CARR, in his official             )
capacity as District Attorney           )
of Jefferson County,                    )
                                        )
    Defendant.                          )

## PLAINTIFF'S RESPONSE TO DEFENDANT DANNY CARR'S FIRST INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS

COMES NOW Plaintiff LaNitra Jeter ("Plaintiff" or "Jeter") and responds to the Interrogatories and Requests for Production of Documents propounded by Defendant Danny Carr in his official capacity as District Attorney of Jefferson County ("Defendant" or "the DA"):

### Objections to Definitions Section

Plaintiff objects to the Definitions section of the DA's First Interrogatories and Requests for Production of Documents (and the instructions therein) on the grounds that parts of this section are inconsistent with and/or seek to impose obligations on Plaintiff which are greater than those imposed by the Federal Rules of Civil Procedure. Additionally, Plaintiff objects to this section because parts are vague, ambiguous,

1

overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff's responses, which follow, are made subject to and without waiving these objections.

## Plaintiff's Response to the DA's Interrogatories

1.  Please identify the person(s) answering these interrogatories.

**RESPONSE**: Like any prudent party to a lawsuit, Plaintiff LaNitra Jeter answered these interrogatories with the assistance of her attorneys.

2.  Other than the above-styled lawsuit, please identify each and every lawsuit to which you have been a party, the nature of the lawsuit, and the disposition of the lawsuit.

**RESPONSE**: Plaintiff objects to this interrogatory on the grounds that it seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, it is overbroad in subject matter and temporal scope, and it contains compound, conjunctive, and/or disjunctive questions. Subject to and without waiving her objections, as her answer, Plaintiff refers the DA to EM/ECF Documents 7, 7-1, and 7-2, which Plaintiff has produced along with these responses.

3.  Please identify each and every time that you have been arrested, the charges brought against you for said arrests, and the disposition of said charges.

**RESPONSE**: Plaintiff objects to this interrogatory on the grounds that it seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, it is overbroad in subject matter and temporal scope, and it contains compound, conjunctive, and/or disjunctive questions. Subject to and without waiving these objections, Plaintiff states that she has a clean arrest record.

4.  Please identify each and every employer you have had, the dates of your employment, the position in which you were employed, your supervisor for each

2

such employment, and the reason you left such employment.

**RESPONSE:** Plaintiff objects to this interrogatory on the grounds that it seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, it is overbroad in subject matter and temporal scope, it contains compound, conjunctive, and/or disjunctive questions, and it is unduly burdensome. Plaintiff further objects to the extent the interrogatory calls for legal analyses and conclusions (*e.g.*, requiring Plaintiff to state the reason for an involuntary separation that is now the basis of a legal action). Subject to and without waiving her objections, as her answer, Plaintiff refers the DA to EM/ECF Documents 7, 7-1, and 7-2, which Plaintiff has produced along with these responses. In addition, Plaintiff answers as follows:

- 2000-2005 Blue Cross Blue Shield of Alabama, Inquiry Analyst, Human Resources, promoted;
- 2005-2012 Blue Cross Blue Shield of Alabama, Subrogation Analyst, Human Resources, resigned for a position at a different agency;
- 2012-2013 Viva Health, Claims Analyst, Human Resources, resigned for a position in a different field of work;
- 2012-2013 Glenwood Autism and Behavioral Health Center, Mental Health Associate, resigned for a position in a different field of work;
- 2012-2013 Alabama Clinical Schools, Human Resources, resigned for a position in a different field of work;
- 2013-2019 Infinity Insurance, Claims Adjuster II, Human Resources, resigned for a position in a different field of work;
- 2016 – present Birmingham Family Counseling and Mediation Center, Human Resources, employed as part time therapist;
- 2019 – 2020 Jefferson County District Attorney Office, Victim Service Officer, Human Resources, unlawfully fired. I stood up for myself and reported the race discrimination I experienced, among other things. I guess this made me a "black rat," and that's exactly what I found waiting for me at work: a black rat. I refused to be quieted. I was fired and filed this lawsuit.

5.    Please identify each and every employment position you have held with

District Attorney Carr. Please include in your answer the dates on which you held

3

each position.

**RESPONSE**: April 16, 2019 – March 16, 2020, Jefferson County District Attorney Office, Victim Service Officer.

6.   Please identify each and every time that District Attorney Carr discriminated against you on the basis of your race. Please include in your answer the date(s) of the alleged discrimination and the person(s) who allegedly discriminated against you.

**RESPONSE**: Plaintiff objects to this interrogatory because it asks her to make definitive legal conclusions before discovery has been completed (or barely even begun), and it seeks information better obtained by deposition.  Plaintiff has no obligation to write myriad paragraphs for the DA here, or to answer at all. Nonetheless, subject to and without waiving her objections — in the spirit of cooperation but without limiting her claims in this lawsuit in any way — Plaintiff, as her answer, refers the DA to the pleadings and exhibits thereto, her EEOC charge and related documents, the parties' document production, her initial disclosures, and these responses. In addition, Plaintiff states as follows:

- Comp time taken away while Caucasian Victim Service Officers retained their comp time. My Comp time was taken away by Judy Yates and Michael McCurry. And even when I had Comp time, it was under different "rules" compared to my Caucasian counterparts.
- Made to bring doctor's excuse to confirm I had an appointment. Ordered by Judy Yates and Michael McCurry.
- Made to request permission from Judy Yates and or Michael McCurry to work through lunch while working a project. No Caucasian Victim Service Officer had to request permission.
- Only Victim Service officer who did not receive new office furniture by Michal McCurry even though I was hired before Caucasian Victim Service Officer.
- Only Victim Service officer made by Michael McCurry to ask Caucasian Victim Service Officer Erin Barefield if she wanted the vacant office before I could have permission to occupy the empty office.

4

- Constantly being watched and reported by Judy Yates, Michael McCurry, Cheryl Black, Joe Roberts and various other Caucasian staff (don't know all their names).
- Only Victim Service officer made by Judy Yates to clock out or use time when someone visited my office, while Caucasian Victim Service officer constantly had visitors in her office without having to clock out or use time.

7.    Please identify your immediate supervisor(s) during your employment with District Attorney Carr, and the date(s) said person was your immediate supervisor.

**RESPONSE**: Judy Yates, April 2019 to March 2020.

8.    Please identify each and every time that you reported any discrimination you identified in your response to Interrogatory Number 6 to District Attorney Carr or any employee of District Attorney Carr. Please include in your answer the name of the person to whom you made the report and the date of said report.

**RESPONSE**: In my office, on or around the end of September 2019 and the middle of October 2019 to Erin Barefield; In my office, on or around the end of September 2019 and the middle of October 2019 to Elise Driskill; At the receptionist desk on or around middle of October 2019 to Edwina Johnson; In the office of District Attorney Danny Carr to District Attorney Danny Carr in or around October 2019 (April Smith should have the exact date of that event). There are (or should be) emails related to my meeting and reporting discrimination.

9.    Please identify each and every act of retaliation that District Attorney Carr allegedly took against you. Please include in your answer the date(s) that the retaliation allegedly took place and the person(s) who allegedly retaliated against

you.

**RESPONSE**: Plaintiff incorporates her objections in response to Interrogatory No. 6 as part of her answer to this interrogatory. Subject to and without waiving her objections, Plaintiff, as her answer, refers the DA to the pleadings and exhibits thereto, her EEOC charge and related documents, the parties' document production, her initial disclosures, and these responses. In addition, Plaintiff states as follows:

- October 2019, cut out of black rat placed on my name plate outside my office, unknown party;
- November 2019, comp time purposely restricted by Judy Yates and Michael McCurry;
- My husband's DV and harassing communication cases purposely mishandled, dismissed and no billed to retaliate against me by Atty Warren Brooks, Atty Joe Roberts and Judge Katrina Ross;
- March 16, 2020, purposely humiliated by Atty Joe Roberts by having me escorted out of the building by two-armed Sheriff Officers;
- March 16, 2020, purposely wrongfully terminating me for my race and retaliation for reported race discrimination by Atty Joe Roberts and Judy Yates;
- Only Victim Service officer that did not receive new office furniture by Michal McCurry even though I was hired before the Caucasian Victim Service Officer that did receive new office furniture.

10.    Please identify each and every time that you reported any retaliation you identified in your response to Interrogatory Number 9 to District Attorney Carr or any employee of District Attorney Carr. Please include in your answer the name of the person to whom you made the report and the date of said report.

**RESPONSE**: I did not report retaliation to anyone in the District Attorney's Office due to the mistreatment I was presently going through. I thought reporting the retaliation would make the work environment more hostile for me.

11.    Please identify the "similarly situated employees who are outside

6

Plaintiff[']s protected class" whom you claim District Attorney Carr treated more favorably. *See* Third Am. Compl. [Doc. 61] at ¶ 17.

**RESPONSE**: Plaintiff incorporates her objections in response to Interrogatory No. 6 as part of her answer to this interrogatory. Subject to and without waiving her objections, Plaintiff, as her answer, refers the DA to the pleadings and exhibits thereto, her EEOC charge and related documents, the parties' document production, and these responses. In addition, Plaintiff states as follows: (1) Judy Yates; (2) Cheryl Black; (3) Erin Barefield; (4) Elise Driskell; and (5) any other individual(s) made known through the discovery process.[1]

12.    Please identify the "Caucasian Victim Service Officer [who] was allowed to leave the office early for her routine hair appointments with no repercussions to her compensatory time." *See* Third Am. Compl. [Doc. 61] at ¶ 20.

**RESPONSE**: Cheryl Black.

13.    Please identify the "Caucasian Victim Service Officer [who] was allowed to leave the office early almost every day[, who] did not want to drive when it started to get dark[, and who] did not have any repercussions to her compensatory time." *See* Third Am. Compl. [Doc. 61] at ¶ 21.

**RESPONSE**: Cheryl Black.

---

[1] Plaintiff had no attorney when she filed this lawsuit; accordingly, her complaint (including her use of legal terms) is imprecise. Even so, the Court denied the DA's attempts to have this case dismissed and concluded that Plaintiff has meritorious claims. (Doc. 47) ("Because Ms. Jeter has alleged facts that, taken as true and construed in her favor, state claims for race discrimination and retaliation, the court DENIES the motion to dismiss.").To be clear, Plaintiff is not required to identify a comparator to establish her discrimination claim. She may do so (and she intends to do so) by presenting evidence that a reasonable juror could conclude that the challenged employment decisions (*e.g.*, the termination) were motivated by Plaintiff's race. *See* 42 U.S.C. § 2000e-2(m); *Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227 (11th Cir. 2016) (addressing mixed-motive claims under Title VII).

14.    Please identify the "Caucasian Victim Service Officer [who] utilized company time to study for the LSAT during work hours." *See* Third Am. Compl. [Doc. 61] at ¶ 24.

**RESPONSE**: Elise Driskill.

15.    Please identify each and every amount of economic damage, if any, you claim that you sustained as a result of the incidents made the basis of the Third Amended Complaint.

**RESPONSE**: Plaintiff objects to this interrogatory because it asks her to make definitive legal conclusions before discovery has been completed (or barely even begun), and her damages are ongoing. Further, Plaintiff objects to the term "economic damage" as vague and ambiguous; she is not entirely sure what information the DA wants. Subject to and without waiving her objections, Plaintiff, as her answer, refers the DA to her initial disclosures and supplements thereto. In addition, Plaintiff states that she has lost her income ($40,000 annual) and benefits, and she has incurred costs for treatment due to Defendant's unlawful actions.

16.    Please identify each and every medical provider (including any mental healthcare provider) that you have seen related to any injuries that you claim that you sustained as a result of the incidents made the basis of the Third Amended Complaint.

**RESPONSE**:  Plaintiff refers the DA to her document production and states as follows: Dr. Rick Brown; Dr. Edward Kim; Dr. Mallory Scoggins; Dr. Michael Putman; Dr. Adeel Rabbani.

17.    Please identify any and all of your proposed expert witnesses (including medical experts), the field in which you claim that they are experts, and the subject matter on which the expert is expected to testify.

**RESPONSE**: None at present.

18.    Please identify each and every person from whom you have obtained, or from whom you plan to obtain, a written or oral statement regarding their knowledge of the matters relevant to this lawsuit.

**RESPONSE**: Plaintiff objects to this interrogatory to the extent it seeks privileged attorney-client and/or work product information. Plaintiff further objects on the basis that the interrogatory is overbroad, it contains compound, conjunctive, and/or disjunctive questions, and it calls for legal analyses and conclusions (*e.g.*, "relevant to this lawsuit"). Further, Plaintiff objects to the term "oral statement" as vague and ambiguous. Subject to and without waiving her objections, Plaintiff states that she is unsure of her "plans," but she has good reason to believe that Elise Driskell (and likely Erin Barefield as well) would provide testimony corroborating some of her allegations. Plaintiff has no statements at this time.

## Plaintiff's Response to the DA's Requests for Production

1.    Please produce any and all documents referenced in your answers to the above-stated interrogatories.

**RESPONSE**: Plaintiff objects to this request because it could conceivably be construed as seeking documents privileged by the attorney-client and/or attorney work product doctrines. Subject to and without waiving this objection, Plaintiff states that she will produce responsive documents.

2.    Please produce any and all documents relied upon in formulating your answers to the above-stated interrogatories.

**RESPONSE**: Plaintiff objects to this request because it seeks documents protected by the attorney-client and/or work product doctrines. Subject to and without waiving this objection, Plaintiff states that she will produce responsive documents.

3.    Please produce each and every document identified by you in your Initial Disclosures.

**RESPONSE**: Plaintiff will produce documents responsive to this request.

    4.    Please produce all written communications you had with District Attorney Carr, or any employee of District Attorney Carr, about any of the alleged discrimination you identified in your response to Interrogatory Number 6.

**RESPONSE**: Plaintiff incorporates her objections in response to Interrogatory No. 6, *supra*, as part of her answer to this request. Subject to and without waiving her objections, Plaintiff states she will produce documents responsive to this request.

    5.    Please produce all written communications you had with District Attorney Carr, or any employee of District Attorney Carr, about any of the alleged retaliation you identified in your response to Interrogatory Number 9.

**RESPONSE**: *See* response to Request 4.


*As to Objections and Requests for Production*:


                          */s/ Brian O. Noble*
                          Brian O. Noble
                          Co-counsel for Plaintiff

**OF COUNSEL**:

**CAPSTONE LAW, LLC**
2119 3rd Ave N, Ste 202
Birmingham, Alabama 35203
Phone: (205) 578-1210
brian.noble@caplawllc.com

**HKM EMPLOYMENT ATTORNEYS LLP**
Artur Davis
3355 Lenox Rd. NE, Suite 705

Atlanta, GA 30326
Phone: (404) 220-9165
adavis@khm.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of November, 2021, I emailed the

foregoing Plaintiff's Response to Defendant's First Interrogatories and Requests for

Production to:

Robert R. Riley, Jr.
rob@rileyjacksonlaw.com
James E. Murrill, Jr.
jay@rileyjacksonlaw.com
RILEY & JACKSON, P.C.
3530 Independence Drive
Birmingham, Alabama 35209
(205) 879-5000 telephone
(205) 879-5901 facsimile

*/s/ Brian O. Noble*
OF COUNSEL

## VERIFICATION OF INTERROGATORY RESPONSES

STATE OF ALABAMA    )
COUNTY JEFFERSON    )


Before me, a notary public in and for said county in said state, personally appeared LaNitra Jeter, who being by me first duly sworn, deposes and says on oath that she has beliefs and avers that the facts alleged in the foregoing interrogatory responses are true and correct.

LaNitra Jeter

_11/24/21_
Date


Subscribed and sworn to me this 24th day of November, 2021.

[NOTARY SEAL]

Notary Public

My Commission Expires on:
My Commission Expires January 15, 2023



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

LANITRA JETER,                          )
                                        )
          Plaintiff,                    )
                                        )
v.                                      )  Case No. 2:20-CV-01863-ACA
                                        )
DANNY CARR, in his official             )
capacity as District Attorney           )
of Jefferson County,                    )
                                        )
          Defendant.                    )

## NOTICE OF DEPOSITION
## WITH PRODUCTION REQUEST

**PLEASE TAKE NOTICE THAT,** at the time, date and place indicated below, Defendant will take the testimony by deposition upon oral examination of Lanitra Jeter. Such deposition shall be taken for the purpose of discovery or for use as evidence in this action pursuant to the Federal Rules of Civil Procedure, and shall be taken before a court reporter authorized to administer oaths under the laws of the State of Alabama.

| | | |
|---|---|---|
| **DEPONENT** | : | Lanitra Jeter |
| **DATE** | : | December 10, 2021 |
| **TIME** | : | 9:30 AM |
| **LOCATION** | : | Riley & Jackson, PC<br>3530 Independence Drive<br>Birmingham, Alabama 35209 |
| **COURT REPORTER** | : | Birmingham Court Reporting |

## Items to be Produced

Pursuant to Fed. R. Civ. P. 30(b)(2) and Fed. R. Civ. P. 34, the deponent shall produce the following documents or tangible things at the above-described deposition:

1.    All audio recordings and/or video recordings Plaintiff made of Danny Carr, District Attorney.

2.    All audio recordings and/or video recordings Plaintiff made of Joe Roberts, Chief Deputy District Attorney.

3.    All audio recordings and/or video recordings Plaintiff made of Michael McCurry.

4.    All audio recordings and/or video recordings Plaintiff made of Judy Yates.

5.    All audio recordings and/or video recordings Plaintiff claims support her allegations that she was subjected to discrimination as alleged in the Third Amended Complaint [Doc. 61].

6.    All audio recordings and/or video recordings Plaintiff claims support her allegations that she was subjected to retaliation as alleged in the Third Amended Complaint [Doc. 61].

Respectfully submitted,

/s/ James E. Murrill, Jr.
Robert R. Riley, Jr. (ASB-0909-168A)
James E. Murrill, Jr. (ASB-4329-A57M)

OF COUNSEL:
**RILEY & JACKSON, P.C.**
3530 Independence Drive
Birmingham, Alabama 35209
(205) 879-5000 *telephone*
(205) 879-5901 *facsimile*

2

## CERTIFICATE OF SERVICE

I hereby certify that on November 12, 2021, a copy of the foregoing was emailed to the following counsel of record in this cause:

Brian O Noble
CAPSTONE LAW, LLC
3105 Sunview Drive
P.O. Box 43888
Vestavia, AL 35243
brian.noble@caplawllc.com

Artur Davis
HKM EMPLOYMENT ATTORNEYS
3355 Lenox Road, NE
Atlanta, GA 30326
adavis@hkm.com

/s/ James E. Murrill, Jr.
OF COUNSEL

3

02:04:41 p.m. 20-03-2020 | 1 |



# FAX



RECEIVED
U.S. EEOC

MAR 2 0 2020

Birmingham District Office

From: LaNitra Jeter

To: Intake Unit

Fax:

Fax (205) 212-2105

Phone:

Phone: (205) 212-2074

Date: March 20, 2020

Subject: Inquiry Case 420-2020-00512

Comments: My inquiry expires 3/21/20. I would like to file a charge of discrimination on the above case.

Thanks



March 20, 2020

La Nitra Jeter
lanitramckinney@yahoo.com

RECEIVED
U.S. EEOC

MAR 20 2020

Birmingham District Office

The Office of The District Attorney Office
carrd@jccal.org
801 Richard Arrington Jr. Blvd North
Birmingham, AL 35203
(205) 325-5252

Date of Incident: September 23, 2019

RE: Case 420-2020-00512

To Whom it May Concern,

I want to file a charge of discrimination against The District Attorney Office of Danny
Carr. While employed under the District Attorney I was the only African American Victim
Service Officer in the office, and I was treated very differently than my Caucasian coworkers. I
experienced discrimination based on race, color, religion and retaliation on a constant basis. I
was harassed by my Supervisor Judy Yates in various ways off and on during my employment.
Having to deal with the discrimination caused me to have increased anxiety, depression, suicidal
thoughts and isolation from some coworkers.

On September 23, 2019, I was informed by my supervisor Judy Yates that I was no
longer allowed to accrue comp time as my fellow coworkers did. I asked why, but no reason was
given at that time. I advised Ms. Yates that I had a doctor's appointment that afternoon that I
could not miss. I was informed by Ms. Yates that I would need to bring an excuse back to the
office in order to go to my appointment. I followed the directions given to me and brought an
excuse back to Ms. Yates.

I later met with Ms. Judy Yates and Michael McCurry in reference to me being
prohibited from accruing comp time. At the meeting I was advised I am no longer allowed to
receive comp time because it appeared as soon as I accrued the comp time, I utilized it for
whatever reason and other employees, within the office, had noticed. I asked, "if I have
legitimately accrued comp time and it is available to me to use why am I being penalized for
using it?" I received no answer from either party. I advised both Judy and Michael that my

DA 000025

husband has medical issues which sometimes prohibits him from driving so I must take him to his appointments. I myself have a medical issue I am trying to rectify with my provider along with upcoming court dates, I attempted to explain the circumstances to Michael McCurry and Judy Yates but was advised it is my business the reasons I use my comp time. After becoming very frustrated and upset I went back to my office unable to accrue comp time with no legitimate reason given. The other four Caucasian victim service officers in the office could accrue comp time and leave the office for hair appointments, because it gets dark outside and other reasons with no consequences.

During the time I could not accrue comp time I missed several doctor's appointments that I needed to go to. My husband missed doctor's appointments as well. On November 12, 2019 I met with Judy Yates and informed her that I followed to have my comp time reinstated. I advised her that my husband has an upcoming surgery and I did not have any time accrued for his procedure or if an emergency arose and I needed to be off. After being prohibited to accrue comp time for over a month's time Judy Yates granted my request but with restrictions. I was only allowed to come into the office from 7:30am to 4:30pm, whereas another officer, who is Caucasian, could come into the office from 7:00am to 4:30pm and accrue additional comp time.

I emailed a complaint to the Assistant District Attorney, Joe Roberts, with no resolution. Joe Roberts informed me to follow the chain of command and to only utilize the Assistant and District Attorney after that has been done. I followed the chain of command as instructed and discussed my issues and concerns with my Supervisor. A few days later I came to work, and a cut out of a large black rat had been placed on my name place by my officer door. This upset me tremendously and I took a photo of the image. I asked my coworkers who placed the rat on my name plate but received no response. The black rat remained on my name plate for weeks and was eventually removed by an unknown individual. I was being called a black rat as retaliation and harassment because I submitted a complaint against my supervisor to her supervisor.

I have endured discriminated against me in my office because I am African American, I reported my supervisor for misconduct and I reported inaccuracies of my supervisor. I have been stripped of employment privileges, constantly harassed by management and forced to work in a hostile environment. I 'm sure I left out pertinent information and details so If you have additional questions or need additional information I can be reached at (205) 876-7782 and lanitramckinney@yahoo.com.

Respectfully,

LaNitra Jeter

# OFFICE OF THE DISTRICT ATTORNEY





**DANNY CARR**
District Attorney
Tenth Judicial Circuit

TELEPHONE
(205) 325-5252

FAX
(205) 325-5266

801 RICHARD ARRINGTON, JR. BLVD. N.
BIRMINGHAM, ALABAMA 35203-2320

March 16, 2020

LaNitra Jeter
801 Richard Arrington Jr. Blvd. N.
Birmingham, AL 35203

Dear Ms. Jeter,

Pursuant to Section 12-17-220(a) of the <u>Code of Alabama, 1975</u>, all employees of the District Attorney of each judicial circuit serve at the pleasure of the District Attorney.   It is no longer the pleasure of the District Attorney that you continue to serve as an employee of this office.  You are hereby terminated immediately.

Please relinquish all badges, identification cards, card keys, and any other items that are the property of this office.  You may schedule an appointment with Investigator Sam Johnson to meet so he can return to you any additional belongings from your office.

Sincerely,

Danny Carr
District Attorney

cc: Employee's Personnel File

DA000096

**Victim Witness Office**

# Memo

**To:**   File

**From:**   Judy Yates

**cc:**

**Date:**   January 8, 2020

**Re:**   VSO Nashville Trip to the Family Justice Center

Elise had requested permission to go to Nashville to the FJC with One Place on February 7, 2020. Before agreeing that she could go, I asked Lanitra Jeter is should would like to attend, and she said that she was not interested in going. Cheryl Black, Erin Barefield and Elise Driskill said they would like to go, and Joe Roberts approved the request for them to go.



PLAINTIFF'S
EXHIBIT
Jeter

**VICTIM WITNESS**

# Memo

**To:**     FILE

**From:**   Judy Yates

**Date:**   1/9/2020

**CC:**

**Re:**     Nitra   Jeter

---

Nitra had asked for 4 hours comp time in December Nitra had asked for 4 hours comp time in December 2019 for today. This morning she texted asking if it was ok for her to have her real estate agent to come by at the office at 8:30. I said ok, but clock out for lunch. I had a Dr's appt, and when I arrived, Nitra had already left. She had clocked in at 7 a.m. today, but had not clocked out for lunch, and had not given me her time sheet. She returned to the office at 2:15, and clocked out for Mays court. At 3:25 she was not back, and I called Lauren to see what was going on and she said nothing. Cheryl had gone to Jones court, and both court rooms were empty. Cheryl and I had walked around to find her car, we did and when we returned she was here. I took her timesheet into her office to have her correct comp time, because she only took 1.5, so she could actually get time and a half on 2.5. I then told her she had not asked if she could come in at 7 am nor had she mentioned it to me. She said she assumed it would be ok, and I reminded her I had told them it probably would but only if they let me know. I told her I would approve it this time but not the next time.

1

DA 000067

**VICTIM WITNESS**

# Memo

| | |
|---|---|
| **To:** | File |
| **From:** | Judy Yates |
| **Date:** | 1/10/2020 |
| **CC:** | |
| | |
| **Re:** | **Nitra** Time |

Nitra stuck her head in my office today to tell me she would be late Tuesday because she had to go to court, and turned to walk away before I could say anything. I finally said ok, even though she had not asked if she could be off, just told me she was going to be off. Later, I went to her office and told her to put in a request for the time, say 4 hours and if she didn't use that much, she would not be charged that amount of time. I then asked if it was court in Atlanta. She said yes, her son's, an eviction case. She had told her son not to pay his rent in November so they would evict him and then when she received the notice they answered and counter sued.

1

**VICTIM WITNESS**

# Memo

**To:**         FILE

**From:**     Judy Yates

**Date:**     February 25, 2020

**CC:**

**Re:**         Leaving Building and not signing out or asking permission

---

Cheryl was in my office this day around 10:45 a.m., when she saw LaNitra crossing the street at 22nd and Rev. Abraham Woods, and she continued up the sidewalk.  I continued watching outside, and she came back and went into the 2121 Building.  She was back inside in about 20 minutes.  I went into her office and told her in the future to either sign out for a break, or let me know she was going out of the building for a few minutes.  If an emergency arose inside the building and we needed to account for all employees, it would be impossible.

1

**Victim Witness Office**

# Memo

**To:**      File

**From:**    Judy Yates

**cc:**

**Date:**    November 18, 2019

**Re:**      Domestic Violence Firearms Project

A meeting on the Domestic Violence Firearms Project was being held November 21, 2019, and Lanitra Jeter was asked if she would like to attend and she declined.

DA 000074

**VICTIM WITNESS**

# Memo

| To: | File |
| --- | --- |
| From: | Judy Yates |
| Date: | November 22, 2019 |
| CC: | |
| Re: | Chain of Command |

Joe had forwarded an email Nitra had sent to him and

Joe had forwarded an email Nitra had sent to him regarding not understanding the chain of command and that she was not being treated fairly. I believe this stemmed from Cheryl, Erin and Elise being allowed to attend a Domestic Violence Seminar and I asked Nitra to work in the office that day because I would be out of the office. I explained that someone needed to be here in case a VSO was needed. I also told her she would be able to attend the next training available.

Addendum March 11, 2020: A two day seminar came up and I offered it to all the VSO's who wanted could attend as I would be staying at the office. I asked Nitra first, and she declined going. Elise and Erin attended. Then an invitation to go to Nashville was sent to us, and I asked Nitra first if she wanted to go, and again she declined, so I allowed Cheryl, Elise and Erin to attend. I have made training opportunities available and she has shown no interest in attending.

1

DA000338



09/19/2019

**TO:**      DANNY CARR, JOE ROBERTS

**FROM:**    JUDY YATES

**SUBJECT:** LANITRA JETER

**CC:**      MICHEAL MCCURRY

On Monday, September 16, 2019, Ms. Jeter asked to use comp time that day to attend a mediation session regarding her husband and the mother of his 13 year old daughter.

The next day, I asked how things went and she said it was a mess. I told her then 3 times, that she did not need to tell me anything, I just wanted to know if she was ok. She said she wanted to tell me, and the following is basically what she said.

The mediation took place in a small room with the female attorney/mediator, LaNitra and her husband, and Marquetta Murrell. She and Mr. Jeter were on one side of the table and Marquetta was on the other side. LaNitra said that Marquetta kept calling her a Mother F...ker. LaNitra said she told the mediator to tell Marquetta to stop calling her that or she was not going to be responsible for her actions. The mediator told Marquetta to stop calling LaNitra names, and Marquetta called her that name again. LaNitra said she lost it and reached across the table and pulled Marquetta across the table and onto the floor. She said she was detained by the security officer. I asked if by "detained" she meant handcuffed, she said yes. LaNitra said she told them to handcuff her hands behind her because she would not be responsible for what she might still do to Marquetta. LaNitra also said they were going to take the cuffs off if she could behave herself, and she said leave them on. I then asked her if she wasn't afraid that Marquetta would get a warrant for assault?, and LaNitra said, the mediator told everyone that she was not to be arrested, because she was provoked by Marquetta. LaNitra also said she told the mediator not to subpoena her to any more proceedings because she would dodge being served, because she would not come back.

Out of caution, and shock that an employee would react in such a manner, I told Joe Roberts about the incident, and also Micheal McCurry.



DA 000085

Late in the evening, Nitra texted Erin and I saying she was finally done [with mediation] and out of handcuffs. We were surprised by her text, but agreed to talk about it the following day at work. The next morning, Nitra told Erin and I that she went to mediation with her husband, Jeter, and the woman who had previously hit Jeter with a car. At mediation, the woman kept saying things that were angering Nitra, so Nitra reached over the table, grabbed the woman and slung her on the ground. Nitra was then put in handcuffs and sat in another room until she calmed down.

Erin Driskill

Nitra text Elise and myself Monday evening (9/16) to say mediation had not gone well. Tuesday morning (9/17) she told us that her husband, her, and the ex-girlfriend were ordered to go to mediation over the ongoing custody issues. Once in mediation the ex-girlfriend became belligerent and continuously insulted Nitra and her husband. Nitra asked her repeatedly to stop calling her things, but she refused. After continued aggression on the part of the ex-girlfriend, Nitra reached across the table and yanked the woman to the ground. Security was called in and Nitra was placed in handcuffs and held in another room to calm down.

| From: | Roberts, Joe |
|---|---|
| To: | McCurry, Micheal |
| Subject: | FW: LaNitra Jeter |
| Date: | Monday, November 1, 2021 10:20:35 AM |
| Attachments: | VoiceMessage.wav |
| | LaNitra_Jeter.pdf |
| Importance: | High |

**From:** McCurry, Micheal <mccurrym@jccal.org>
**Sent:** Thursday, September 19, 2019 5:28 PM
**To:** Carr, Danny <carrd@jccal.org>; Roberts, Joe <robertsjo@jccal.org>
**Subject:** LaNitra Jeter
**Importance:** High

Danny/Joe,

LaNitra left Monday afternoon to go to court (Domestic Relations, Judge Stephens).   Attached are there statements from Judy, Erin, and Elise as to what she told them happened.  It is my understanding that she texted Erin and Elise the evening it happened.  She talked verbally to them and Judy the next day.

I talked with Judge Stephens and she did not have any knowledge of this happening and was going to speak with her bailiff to see what she could find out.  Attached is a voice mail from Judge (Pat) Stephens confirming that this **did not** happen.  I was also able to speak with the mediator and confirm that this story is false. The mediator in Judge Stephens courtroom is Jameria Moore. Her contact number is (205) 868-3016.

I am perplexed as to why she would lie about this, I don't know what benefit it is to her.   Whether or not the story is true the action (truth or not) is unbecoming of an employee of this office.

Before the aforementioned happed I was getting information together on her attendance.   She started on 04/16/2019 and has abused her vacation, sick and comp time.  In total she has earned 40.00 of vacation AND sick time and has earned 66.75 hours of comp time since she's been with the office.  That is a total of 23 working weeks.  That is approximately 18 days she has been off, 3 ½

DA001111

weeks.  Not to mention all of the holidays we've had off since starting (which equates to about a week all together).

Judy has plenty of other strange things that LaNitra has told her, but has brushed it off.  I think the concern is now, if she is willing to lie about something like this what else would she lie about.  If the altercation did happen then what happens if she gets upset with a Victim or witness on a case.

We can talk tomorrow or Monday.  Just giving ya'll a heads up.

Micheal

DA001112

**Victim Witness Office**

# Memo

**To:**      File

**From:**    Judy Yates

**cc:**

**Date:**    September 20, 2019

**Re:**      VSO DV Training

A free Domestic Violence training conference was scheduled for October 3, 2019, and I had requested permission for everyone to go but Lanitra Jeter because she worked with property crimes and someone needed to remain in the office. I explained to Lanitra that the next available training she would be given first choice to attend and I would stay in the office.

DA 000082

**VICTIM WITNESS**

# Memo

| | |
|---|---|
| **To:** | File |
| **From:** | Judy Yates |
| **Date:** | September 23, 2019 |
| **CC:** | |
| **Re:** | LaNitra Jeter |

I received an email from LaNitra telling me she was going to be leaving at 10:30 today for a dr's appt and to pick up Shuga.  I talked to her before she left and asked her to bring a dr's excuse tomorrow, and that I wanted her to come to work at 7:30 a.m. this week, and to take her full lunch.  She wanted to know what she was supposed to do or go during lunch, and I said she could sit at her desk like most people if she wanted.  That Comp time is for completing work you could not do during normal hours, or extra work, but it was not for just sitting at your desk and not being productive.  She asked what about next week, and I said we would discuss that before the end of the week.

1



9/30/2019

---

TO:        DANNY CARR, JOE ROBERTS

FROM:      JUDY YATES

SUBJECT:   LANITRA JETER

CC:        MICHEAL MCCURRY

---

On Monday, September 23, 2019, I received a text from LaNitra that she was at work but needed to leave at 10:30 a.m. to go to a Dr.'s appointment and to pick up her puppy from the vet. When I arrived at work, she had requested the time off using filemaker, however, I did not approve until I had spoken to Micheal McCurry. He said to let her know she needed to bring a Dr.'s excuse when she returned to work, and that since that would essentially use all of her time, that for the remainder of the week, and until further notice, she was to work 7:30 a.m. to 4:30 p.m., and to take her lunch hour and 30 minute break time, because she would not be able to earn comp time. Her question was not why, but when could she begin making time again, would it be the next week? I told her I would probably have the answer by the end of the week.

On Wednesday, September 25, 2019, Micheal McCurry and I had a meeting with her regarding two issues: the court story and her time. Micheal led the meeting, and for the most part, I observed. Micheal began by asking her to tell him about the incident that had occurred the previous Monday. She was asked where the altercation occurred, who was present, who was the judge. She started to tell the story, then she said, she wasn't there for the mediation because they would not let her be involved (keep in mind that the mediation never took place that day). She said she left and went to see her attorney in Bessemer. She said the incident took place at a private location. When asked where, she finally said it was just a joke that she had put out on facebook and social media, that she likes to joke around about things, and that everyone knew that. When told by Micheal that a joke like that could be jeopardizing her job, she said it was told to relieve stress because of all the things going on in her life, and that she thought working here would help her to get justice in all the cases she is involved in, but they have only gotten worse, and she began to go over a lifetime of tragedies and difficulties. I asked her how she was going to repair the damage she had created with me trusting her to tell me the truth, and her response that being a hard worker with initiative should take care of that. She never really apologized for what had happened.



Page Two

Memo regarding L. Jeter meeting

Judy Yates

Micheal then discussed the problem with her time, explaining how many weeks she has been here, and how she had only two weeks that she worked 40 hour weeks and did not take time off.  She really could not grasp that taking so much time in such a short period of time was an issue, and she just kept wanting to know when she could begin making comp time again.

I should state that she was crying through the  interview, and we actually had ended the discussion and sat there for 20 minutes at least, while she tried to compose herself.

For me, this has really affected my ability to trust any of the wild stories that she has told us since she has been here, but more importantly, it has affected my ability to trust her from now on.  LaNitra is a likable person, she could be a good worker, and an asset to the office, but for me, truth and trust are key for anyone working in the District Attorney's Office.

**VICTIM WITNESS**

# Memo

**To:**      Joe Roberts

**From:**    Judy Yates

**Date:**    March 13, 2020

**Re:**      LaNitra Jeter

As requested, below is a condensed list of issues that have come up since LaNitra Jeter began her employment here April 16, 2019.

- Abuse of earning time and taking time away from work. She is more interested in being away from work than being present and contributing to the office

- Failure to follow chain of command

- Repeatedly has told stories that turned out to untrue, so loss of credibility and being trustworthy

- Has posted on social media stories that were untrue, just for the shock value

- Has used office time to deal with issues that are her husband's or her adult son's legal issues

- Repeatedly talks about filing Judicial complaints against various judges her husband has to deal with

- Has been repeatedly counseled about the constant abuse of her time, ex. Asking to come in early to leave early, leaving early, has rarely worked an entire five day work week

- Has fallen asleep while observing a trial

- Leaves the building without signing out or letting someone know she will be unavailable

- Signs out to a court that is empty and cannot be found

- Has no credibility with her co-workers, and is compromising the Grant Report we submit to OPS

- During a meeting with the YWCA Advocate Director, she asked questions about her husband's case where he is the defendant of a PFA and how to get the judge to allow them to speak and let her know the PFA was vindictive

1