FILED

2022 May-31  PM 12:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT D
# (PART 1)

```
                                                   Page 1

 1      IN THE UNITED STATES DISTRICT COURT FOR THE

 2             NORTHERN DISTRICT OF ALABAMA

 3                 SOUTHERN DIVISION

 4

 5    CIVIL ACTION NO.:  2:20-CV-01863-ACA

 6

 7    LANITRA JETER,

 8                Plaintiff,

 9    vs.

10    DANNY CARR, in his official

11    capacity as District Attorney

12    of Jefferson County,

13                Defendant.

14

15

16                 DEPOSITION

17                    OF

18                 DANNY CARR

19              February 2, 2022

20

21

22    REPORTED BY:

          Ellie Pickett,

23        Certified Court Reporter and

          Notary Public
```

Page 2

```
 1       A P P E A R A N C E S
 2
 3  FOR THE PLAINTIFF:
 4       Mr. Artur Davis
 5       Attorney at Law
 6       HKM Employment Attorneys
 7       3355 Lenox Road NE
 8       Atlanta, Georgia 30326
 9
10  FOR THE DEFENDANT:
11       Mr. James E. Murrill, Jr.
12       Mr. Robert R. Riley, Jr.
13       Attorneys at Law
14       Riley & Jackson, P.C.
15       3530 Independence Drive
16       Birmingham, Alabama 35209
17
18  OTHERS PRESENT:
19       LaNitra Jeter
20
21
22
23
```

Page 4

```
 1       INDEX OF EXHIBITS (Continuing)
 2
 3  PLAINTIFF'S                    PAGE:
 4  Exhibit 4              114
 5       Staff Meeting December 12, 2019
 6
 7  Exhibit 5              129
 8       Memo dated November 22, 2019
 9
10  Exhibit 6              131
11       Typewritten letter dated March
12  20, 2020
13
14  Exhibit 7              135
15       Memo dated March 13, 2020
16
17  Exhibit 8              137
18       Typewritten document dated
19  March 16, 2020
20
21  Exhibit 9              152
22       Attendance record
23
```

Page 3

```
 1       INDEX OF EXAMINATION
 2
 3                     PAGE:
 4  EXAMINATION BY MR. DAVIS         9
 5  EXAMINATION BY MR. MURRILL     234
 6  REEXAMINATION BY MR. DAVIS     241
 7  REEXAMINATION BY MURRILL       251
 8  REEXAMINATION BY MR. DAVIS     252
 9
10       INDEX OF EXHIBITS
11
12  PLAINTIFF'S              PAGE:
13  Exhibit 1              45
14       Personnel Policies and
15  Procedures Manual
16
17  Exhibit 2              48
18       Personnel Policies and
19  Procedures Manual
20
21  Exhibit 3              94
22       Typewritten document dated
23  9/30/2019
```

Page 5

```
 1       INDEX OF EXHIBITS (Continuing)
 2
 3  PLAINTIFF'S                    PAGE:
 4  Exhibit 10             158
 5       Multiple e-mails
 6
 7  Exhibit 11             162
 8       Multiple e-mails
 9
10  Exhibit 12             163
11       Multiple e-mails
12
13  Exhibit 13             169
14       Attendance record
15
16  Exhibit 14             173
17       Attendance record
18
19  Exhibit 15             174
20       Multiple e-mails
21
22  Exhibit 16             226
23       E-mail chain
```

2 (Pages 2 - 5)

1    INDEX OF EXHIBITS (Continuing)
2
3    PLAINTIFF'S                    PAGE:
4    Exhibit 17                    228
5        Text messages
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

1        S T I P U L A T I O N
2        IT IS STIPULATED AND AGREED, by
3    and between the parties, through their
4    respective counsel, that the deposition of
5    DANNY CARR may be taken before Ellie Pickett,
6    Commissioner, Certified Court Reporter and
7    Notary Public;
8        That the signature to and reading
9    of the deposition by the witness is waived, the
10   deposition to have the same force and effect as
11   if full compliance had been had with all laws
12   and rules of Court relating to the taking of
13   depositions;
14       That it shall not be necessary for
15   any objections to be made by counsel to any
16   questions, except as to form or leading
17   questions, and that counsel for the parties may
18   make objections and assign grounds at the time
19   of trial, or at the time said deposition is
20   offered in evidence, or prior thereto.
21
22
23

1        I, Ellie Pickett, a Certified
2    Court Reporter of Birmingham, Alabama, and a
3    Notary Public for the State of Alabama at
4    Large, acting as Commissioner, certify that on
5    this date, as provided by the Federal Rules of
6    Civil Procedure of the United States District
7    Court, and the foregoing stipulation of
8    counsel, there came before me at the law
9    offices of Riley & Jackson, P.C., 3530
10   Independence Drive, Birmingham, Alabama 35209,
11   on February 2, 2022, commencing at
12   approximately 9:30 a.m., DANNY CARR, witness in
13   the above cause, for oral examination,
14   whereupon the following proceedings were had:
15
16       DANNY CARR,
17       The witness, having first been
18   duly sworn or affirmed to speak the truth, the
19   whole truth and nothing but the truth,
20   testified as follows:
21
22
23       THE COURT REPORTER:  Usual

1    stipulations?
2        MR. DAVIS:  Yes.
3        MR. MURRILL:  That's fine with us.
4
5    EXAMINATION BY MR. DAVIS:
6        Q.    All right.  Good morning,
7    Mr. Carr, how are you doing today?
8        A.    Good morning.  Good morning, Mr.
9    Davis, I'm doing fine, how about you?
10       Q.    Very nice to see you.
11       A.    You too, sir.
12       Q.    I know you and I have met each
13   other and crossed paths over the years --
14       A.    Yes, sir.
15       Q.    -- but you had arrived on the
16   scene officially after I left the scene.
17       A.    That's right.
18       Q.    So let me belatedly congratulate
19   you on your accomplishment --
20       A.    Thank you.
21       Q.    -- of being the first
22   African-American DA in Jefferson County.
23       A.    Yes, sir.  Thank you.

3 (Pages 6 - 9)

1    Q.   So let me sort of go over just a
2 few ground rules before we get into things
3 today.
4    A.   Okay.
5    Q.   This, as you know, is a deposition
6 in a lawsuit filed by my client, LaNitra Jeter.
7    A.   Yes.
8    Q.   And Ms. Jeter, as is her right, is
9 present today.
10    A.   Yes.
11    Q.   Her deposition was taken
12 approximately close to two months ago on
13 December 10th.
14        MR. DAVIS:  Is that right?
15        MR. MURRILL:  December 10th, yes.
16    Q.   (BY MR. DAVIS:)  December 10th.
17    A.   Okay.
18    Q.   And I will be taking your
19 deposition today, and I will be deposing a
20 couple of other folks in this case tomorrow.
21    A.   Okay.
22    Q.   Primarily today what I want to
23 talk about, Mr. Carr, is the DA's office in

1 Jefferson County.
2    A.   Yes, sir.
3    Q.   I want to get a little bit of a
4 sense of how things operate there as affects
5 this case.  And obviously we want to get into
6 Ms. Jeter's situation, her time of employment
7 there and circumstances of her leaving and
8 issues around that.
9    A.   Okay.
10    Q.   So I would envision in terms of
11 time, let's see, it's around 9:40 now, let's
12 plan to go until about 11:30 and we'll see
13 where we are at that point.  It's my hope that
14 we might be finished.
15    A.   All right.
16    Q.   I'm sure you have got other things
17 to do today, like running the DA's office.
18    A.   All right.
19    Q.   If for some reason we are not
20 finished, we might take a short break.
21    A.   Okay.
22    Q.   And there is one other short break
23 I need to take just to get something set up on

1 my computer to talk about with you.
2    A.   All right.
3        MR. RILEY:  And before you get
4 started, I know Danny has some other things
5 that are happening right now that are breaking
6 regarding an issue where he may have to step
7 out and take a couple of calls, and I told him
8 he could.
9        MR. DAVIS:  Understood.
10 Understood.
11        MR. RILEY:  It's a story that's
12 somewhat time sensitive.
13        THE DEPONENT:  Yeah.
14        MR. RILEY:  Do you think
15 everything is under control?
16        THE DEPONENT:  Everything is under
17 control right now.
18        MR. RILEY:  Okay.
19    Q.   (BY MR. DAVIS:)  Well, that's my
20 timeline.  I would envision that if we go
21 straight through with just the one break I need
22 to set up on my computer that we should be able
23 to handle our business by 11:30 to 12:00.

1    A.   All right.
2    Q.   We'll get to that point and if
3 it's a matter of being only ten or fifteen
4 minutes, we'll keep going until you can leave.
5    A.   Okay.
6    Q.   If for some reason things take
7 longer than I think, you know, we'll just
8 reassess where we are.
9    A.   Sounds good.
10    Q.   Fair enough?
11    A.   Fair enough.
12    Q.   So just a few grounds rules I'm
13 sure your very able lawyers have talked about
14 with you, during this deposition, it is vitally
15 important that this young lady be able to hear
16 both of us and each of us.  And what that means
17 is that both of us need to speak up and try to
18 project.  I'm doubly vaccinated and boosted.
19    A.   Okay.
20    Q.   That's why I'm not wearing my mask
21 because she needs to clearly hear me.  The
22 biggest challenge that reporters sometimes have
23 in these depositions is when people

Page 14

1 inadvertently talk at the same time and it's
2 not out of argument or rudeness, it's out of
3 all of us being used to a dynamic in
4 conversation where when you know where I'm
5 going, you start to answer or you are agreeing
6 with me and saying yes. Let's try to not do
7 that today. Let's try, as best we can, to work
8 in this fashion: Let me, even if you are a
9 hundred percent sure of what I'm asking and if
10 you are ready to answer, let me finish and get
11 to the question mark inflection in my sentence,
12 and, in turn, I will let you finish. And since
13 we are across from each other and not on the
14 phone, hopefully it's a little bit easier in
15 terms of knowing who is starting and stopping
16 when. But that's really the most important
17 ground rule in the next several areas. So is
18 that clear?
19      A.   Fine. Perfect.
20      Q.   Also it's very important you give
21 verbal answers. Nodding is something that she
22 can't catch. So if for some reason you answer
23 by nodding or saying uh-huh, I'll ask you is

Page 15

1 your answer yes or something like that. I'm
2 not doing that to be rude or to be a jerk, I'm
3 just trying to make sure that our record is
4 clear. Fair enough?
5      A.   Totally understand.
6      Q.   The other ground rule is every now
7 and then your lawyers may make objections, and
8 they have a right to do that. When you heard
9 us say at the beginning usual stipulations,
10 that means that, as you see, there is no judge
11 here to rule on objections, so the objection is
12 essentially noted, which means it's preserved
13 if the lawyer wants to make it, but the
14 expectation is that you will still answer the
15 question. There is one exception to that. If
16 I inadvertently ask you a question that calls
17 for you to answer by referring to conversations
18 you've had with your lawyers, either your past
19 lawyers or your current lawyers, that is
20 privileged, and it's not my business to know
21 that, as you understand very well yourself as a
22 long time member of the bar. Sometimes,
23 though, I don't know if the answer I'm looking

Page 16

1 for calls for a privileged answer. In that
2 circumstance, either one of your lawyers will
3 make that objection, and I'll respect that.
4 But other than that, even if they make an
5 objection, the expectation is that you still
6 answer the question. Fair enough?
7      A.   Fair.
8      Q.   All right. So let me just get a
9 few background things out of the way. As I
10 mentioned at the beginning, you are the
11 district attorney in Jefferson County, correct?
12      A.   Correct.
13      Q.   And would you distinguish for me,
14 I always got confused on the difference in the
15 Bessemer Cutoff and the Jefferson County DA's
16 office. Just for a moment explain that
17 distinction to me.
18      A.   The distinction is as the DA of
19 Jefferson County, you run countywide obviously
20 in Bessemer and in the Birmingham division.
21 Based on the law, on the new Supreme Court case
22 that dealt with, I think, Bill Veitch who
23 recently sued in his quest to run four years

Page 17

1 ago, the Supreme Court actually came out and
2 clarified what we already knew in old law that
3 basically stated the DA of Jefferson County is
4 the DA of the county, the DA in Bessemer is the
5 elected assistant, and it went into things like
6 budget, but it essentially said that if you are
7 present, even in Bessemer, you have the
8 authority to convene a grand jury in Bessemer
9 and do whatever just like you would in the
10 Birmingham division, which means that the
11 voters in Bessemer should have had the ability
12 to vote for you as well. So -- which basically
13 is a roundabout way of saying, I guess, based
14 on that decision and what we knew that I'm the
15 DA of the county.
16      Q.   I will pretend that I understand
17 that answer for purposes of today.
18      A.   Right.
19      Q.   So you have been -- I know a
20 little bit about your background, and I will
21 try to race through that quickly to get us to
22 the substance, but you have been a licensed
23 member of the Alabama Bar for about twenty-six

1 years; is that correct?
2     A.   Twenty.
3     Q.   And is the DA's office in
4 Jefferson County the first place you worked
5 once you got licensed as a lawyer?
6     A.   Yes, sir.
7     Q.   And is it also a fact that you've
8 worked continuously at the DA's office for the
9 last twenty years?
10     A.   Yes, sir.
11     Q.   Walk me through your career path
12 there.  You would have started as a young baby
13 DA as they call it?
14     A.   Right.
15     Q.   Take me from there.
16     A.   I started out of law school.
17 David Barber was the elected district attorney
18 at the time.  Roger Brown was the chief deputy.
19 I was hired, I think, in 2000 and -- or 2000,
20 2001, maybe 2001, and started off as a baby DA,
21 just a second chair guy in a circuit courtroom.
22 Kind of worked my way through that for several
23 years.  Maybe after about three years, I

1 started trying some cases, some class As and
2 doing things like that, and for the next
3 seventeen years, I kind of worked within all
4 realms of the DA's office, whether it's as a
5 baby DA ultimately becoming one of the senior
6 trial attorneys in the circuit court, and then
7 ultimately being placed in our screening
8 division where we talk to law enforcement about
9 charges and then ultimately doing a term in
10 district court doing preliminary hearings.
11 After that, after about seventeen years,
12 obviously there was an election.  Brandon Falls
13 -- well, not election, Brandon Falls was
14 appointed district attorney.  So I worked under
15 his administration as well.  And then there was
16 an election that subsequently occurred and a
17 guy won, beat Brandon Falls.  I think -- Todd
18 Henderson beat Brandon Falls.  Todd Henderson
19 was immediately indicted for perjury.  Judge
20 Joseph Boohaker, who was the judge at the time,
21 appointed me.  Of course kind of unbeknownst to
22 me but beknownst to me, I didn't know that was
23 going to happen, appointed me.  I served for a

1 year as DA pro tem.  Then I was removed.  Mike
2 Anderton was placed in the office.  And then I
3 qualified and ran against Mike Anderton and
4 won, and I have been there for four years as
5 the elected DA.  And I did do a term as the
6 chief deputy for a year as well, maybe eight
7 months.
8     Q.   And when you were chief deputy,
9 what DA did you serve under?
10     A.   Anderton was the DA at the time.
11     Q.   What were your job
12 responsibilities as chief deputy DA?
13     A.   Honestly, just make sure that the
14 district attorneys who had questions about
15 whether they can reduce a charge, what charge
16 should happen from the screening division, how
17 the flow chart look as far as what DA is
18 assigned to what court based on experience,
19 things of that nature.  It wasn't a typical
20 situation because at the time, Anderton and I
21 was about to run against each other.  So in all
22 honesty, you know, it wasn't a typical
23 regularly kind of setup chief deputy because

1 there wasn't -- truth be told, at that time
2 there wasn't a lot of trust there, so yeah.
3     Q.   So he didn't select you as the
4 chief deputy, correct?
5     A.   Kind of yes and no.  It's strange.
6 He -- after he was appointed, I had made the
7 decision to leave.  And I was just going to
8 leave and stay gone without pay, run for DA,
9 and then come back.  That was the plan.  Then
10 ultimately as I'm cleaning out my office, he
11 come in, we talked, and, you know, he said hey,
12 you know, you did a great job as DA pro tem,
13 you know, would you consider staying.  And I
14 said I will but I'm not going to stay and not
15 run against you.  That was our conversation.
16 If that required me to stay, then I'm going to
17 leave.  And he said hey, you know, that's fine.
18 And during that time, we were still in the
19 primary mode.  It hadn't really -- the general
20 hadn't occurred yet.  He hadn't won his
21 primary, and I hadn't won my primary.  And a
22 couple of months later once I won my primary,
23 things kind of, you know, changed.  The

Page 22

1 dynamics changed. There wasn't a lot of
2 conversation between us. And then ultimately I
3 left a little early just because the tension
4 was there.
5    Q.   Understood.
6    A.   Yeah.
7    Q.   And I understand it was a very
8 atypical situation.
9    A.   Right.
10    Q.   But when you were chief deputy DA,
11 did you have any responsibilities over hiring
12 personnel or firing personnel?
13    A.   When I was chief deputy DA, we --
14 I don't know if we even had anybody come in,
15 but probably I would assume I would have been
16 involved as far as lawyers are concerned. Any
17 deputy DA, I'm assuming I would have been. It
18 was not a typical situation. It wasn't. So
19 typically the chief deputy DA is not directly
20 involved in it. There is a group of lawyers
21 who is a hiring committee that does the
22 interviews, and then they recommend three names
23 out of interviews of ten or fifteen people, and

Page 23

1 then the DA talks to those individuals and then
2 makes a decision. That's typically how it
3 works.
4    Q.   So let's shift a little bit to how
5 you handled the deputy's position in the four
6 years you have been the DA in your own right.
7 Do you have a chief deputy DA?
8    A.   I do, yes, sir.
9    Q.   And who is that chief deputy DA?
10    A.   Joe Roberts.
11    Q.   How would you describe Joe
12 Roberts' job responsibilities under you?
13    A.   Okay. His job responsibilities under me
14 is to make sure that he handle a lot of the
15 responsibilities as far as day-to-day office
16 stuff as relates to grand jury, along with
17 myself, as relates to disputes amongst lawyers,
18 whether or not a case can be reduced from a
19 class A to a class C, all the things that,
20 because I'm in more of an administrative role,
21 he kind of takes on. If there is a
22 conversation about whether or not a case should
23 be charged a certain way or not and why, a

Page 24

1 screening DA with less experience may come talk
2 to Joe about it. You know, it's kind of a jack
3 of all trades. But one thing he is not
4 involved in directly is the hiring of lawyers.
5 As I said, we have a division that does that or
6 a group that we kind of rely on for DAs. They
7 go through the resumes, they interview the
8 lawyers. And then after they interview them,
9 they give -- send me the top three if we have
10 two positions. If we only have one position,
11 they send me two people, and then I make a
12 decision.
13    Q.   Does your chief deputy DA, Joe
14 Roberts, have any responsibility for dealing
15 with internal personnel issues such as disputes
16 between employees?
17    A.   Yes, he does.
18    Q.   And how would you describe his
19 responsibilities in that regard?
20    A.   His responsibility is to basically
21 try to figure out and hear both sides but at
22 the same time talk with whoever the supervisor
23 is in that division, whether it's the screening

Page 25

1 supervisor, whether it's the VSO supervisor,
2 whether it's our grants people, whoever,
3 because we have a chain of command. The
4 supervisor should intervene, have a
5 conversation. If they can't work it out, then
6 it goes to Joe. And then ultimately if it
7 can't be worked out, then they submit -- come
8 and talk to me about it to make a decision on
9 things.
10    Q.   And in the course of the morning,
11 we will talk in more detail about Mr. Roberts'
12 specific roles --
13    A.   Okay.
14    Q.   -- involving matters in this
15 lawsuit, but let me generally ask you a couple
16 of questions based on what you just said.
17       If an employee makes an internal
18 complaint about another employee or about a
19 supervisor, does Mr. Roberts have any
20 responsibility in investigating that complaint?
21    A.   Yes. Mr. Roberts -- if they make
22 a complaint, typically it should go to the
23 supervisor, and then it goes to Mr. Roberts,

7 (Pages 22 - 25)

Page 26

1 and then Mr. Roberts will talk with that
2 supervisor.  And after talking with that
3 supervisor, then he will ultimately talk to the
4 parties, if possible, and see if something can
5 be resolved, and, if not, then ultimately it
6 will come to me.
7      Q.   What if an employee is complaining
8 about her supervisor, what would be the process
9 in that scenario?
10      A.   The same process.
11      Q.   Well, would you expect an employee
12 who had concerns about the supervisor to go to
13 that supervisor?
14      A.   What I would expect that employee
15 first to notify that supervisor that there is
16 an issue and then if it persists, then to go to
17 Joe, yes.
18      Q.   So hypothetically, if an employee
19 felt that she was being unfairly treated by her
20 supervisor, the process you just described is
21 that she should notify that supervisor of that
22 concern, correct?
23      A.   Correct.

Page 27

1      Q.   And can that employee then go
2 directly to Joe Roberts and say I've done my
3 notification but I now want to talk to you?
4      A.   Yes.
5      Q.   Is there any circumstance if an
6 employee believed that she was being unfairly
7 treated by a supervisor in which that employee
8 would be precluded from talking to Joe Roberts?
9      A.   No.
10      Q.   So everything you've just said to
11 me -- I've asked you present tense questions,
12 but let me go back.  Is everything you just
13 said to me accurate as far as you understand it
14 for the whole length of the time you've been
15 DA?
16      A.   Yes.
17      Q.   So during the whole four years
18 you've been district attorney of Jefferson
19 County, the process should have been that if an
20 employee has a concern with her supervisor, she
21 notices the supervisor, correct?
22      A.   Correct.
23      Q.   And then she can go directly --

Page 28

1 she, the employee, can go directly to Joe
2 Roberts; is that right?
3      A.   She can go to Joe Roberts, yes.
4      Q.   Okay.  And in the entirety of the
5 time you've been DA, has Joe Roberts ever had
6 discretion to say to an employee don't talk to
7 me about your concern, deal with your
8 supervisor?
9      A.   Yes.  He has the authority to say
10 did you go through the chain of command, have
11 you addressed it with the supervisor first.
12 And if you addressed it with your supervisor
13 and it's not handled, then you can come to me,
14 yes.
15      Q.   Are employees briefed on the
16 process you just described?
17      A.   They should be, yes.
18      Q.   Who should brief them?  Who should
19 brief them?
20      A.   When they are hired, their
21 supervisor should tell them if there's an
22 issue, you come to me and then you can go to
23 your chief deputy, or there should be a -- I

Page 29

1 don't know if we had a direct policy or
2 anything, but yeah, they should be notified
3 that if you have a problem, let me know what it
4 is, and then you can go to your -- the chief
5 deputy, or whatever, afterwards, or the DA --
6 not the DA, but the employee himself or herself
7 can go to the chief deputy and let him know
8 that there is a problem that can't be
9 rectified.
10      Q.   Does Joe Roberts, under your
11 leadership as DA, have any responsibility for
12 conducting internal investigations if there are
13 personnel issues within the DA's office?
14      A.   Does he have -- say that again.
15      Q.   Does he have any authority when it
16 comes to conducting internal investigations if
17 there are personnel issues?
18      A.   Yes.
19      Q.   And how would you describe his
20 authority?
21      A.   His authority is to talk with
22 individuals who's making the complaint after
23 they've notified the supervisor, talk with that

Page 30

1 supervisor as well, compile the information,
2 and then if it can't be rectified between
3 individuals, then let me know.
4    Q.   So you're a DA's office and you
5 have access to your own investigative unit; is
6 that correct?
7    A.   Yes.
8    Q.   If an employee complains about an
9 event in the workplace -- and I'm not talking
10 about a relationship now, but an event, if an
11 employee says that I was the subject or the
12 target of some event, my office was vandalized
13 or someone spiked my tire, some event as
14 opposed to a relationship, what should Joe
15 Roberts do when that employee reports an
16 incident or an event in the office?
17    A.   Someone's spiked my -- you say
18 spiked my tires?
19    Q.   I'm giving an example of an
20 incident or an event.  Obviously people can
21 have two sources of concerns.
22    A.   Right.
23    Q.   It can be a relationship, this

Page 31

1 person just doesn't treat me fairly.
2    A.   Right.
3    Q.   Or it can be something happened to
4 me, some event or incident happened.
5    A.   Right.
6    Q.   So I'm trying to hone -- you
7 talked about what might happen if a
8 relationship goes awry.  I'm honing in now on
9 an event or incident.
10    A.   Right.
11    Q.   If an employee were to go to Joe
12 Roberts and said an event or incident happened,
13 what should Joe Roberts do next?
14    A.   An event happened?  That's a
15 general -- an event like -- that's a general --
16 be more specific.
17    Q.   I will give you a very specific
18 one.  If an employee says that my office was
19 defaced in some way --
20    A.   Uh-huh.
21    Q.   -- what should Joe Roberts do in
22 that circumstance?
23    A.   Well, if she says -- he or she,

Page 32

1 whoever, an employee says it was defaced, get
2 the information that he can and try to get to
3 the bottom of whatever it is.
4    Q.   What techniques would you expect
5 Mr. Roberts to use to get to the bottom of what
6 happened?
7    A.   I don't know about techniques.  I
8 mean, I would expect him to talk to people that
9 was involved.
10    Q.   Would you expect him to do a
11 formal interview of the complaining employee?
12    A.   I would expect him to do a formal
13 interview of the complaining employee and the
14 supervisor as well.
15    Q.   And by formal interview, can we
16 agree that means getting someone to sit down
17 and you explain to them that this is an
18 internal investigation, what you're saying
19 needs to be truthful, would that be an aspect
20 of a formal interview in your opinion?
21    A.   Yeah.  I think there are various
22 ways, but I think that could be one way.
23    Q.   What do you believe is the best

Page 33

1 process to conduct a formal interview in the
2 DA's office in an internal investigation
3 context?
4    A.   Get information from all parties
5 involved.
6    Q.   And part of getting information
7 from all parties involved is talking to the
8 party making the complaint.  We agree?
9    A.   Yes.
10    Q.   And should in your opinion,
11 assessing best practices, should that employee
12 be asked to write out a statement of what
13 happened?
14    A.   Should they be?
15    Q.   Yes.
16    A.   If that's what they want to do.
17 If that's what they want to do, sure.  I mean,
18 but I think having a conversation or having
19 some way to initiate something within whatever
20 form and whether that was initiated or not,
21 yeah, I think either way.  I mean, it could be
22 a conversation.  It could be a statement if
23 they write a statement out and present it to

9 (Pages 30 - 33)

1 them.
2    Q.   The virtue of writing a statement
3 out is it creates a record of what the person
4 said, correct?
5    A.   It creates a record of what the
6 person alleges.
7    Q.   And if three or four years later
8 there is litigation, there is a dispute over
9 what somebody said, the virtue of a written
10 statement is we know what they said in
11 realtime, correct?
12    A.   Yes.
13    Q.   And you said that in your
14 assessment of what a good internal
15 investigation would look like, that the
16 supervisor should also be interviewed, correct?
17    A.   Correct.
18    Q.   And would you agree with me that
19 if an employee says there was an incident or
20 event, that even if that employee is not
21 accusing the supervisor, it would still be a
22 good investigative tool to talk to the
23 supervisor about the incident and what

1 knowledge they have.  Can we agree on that?
2    A.   Yes.
3    Q.   And, again, that's even if the
4 supervisor is not named or the subject of the
5 complaint, good practice to talk to the
6 supervisor and say hey, what's going on in your
7 shop, what are you seeing, what do you think of
8 this.  All that is fair, correct?
9    A.   Correct.
10    Q.   And everything you've just said to
11 me about what you believe is the proper and
12 correct investigative process for an internal
13 investigation, is that process written down
14 anywhere in the DA's office?
15    A.   I don't think it's written down,
16 no.
17    Q.   And have you ever thought about
18 memorializing it or producing a document that
19 says this is our process for internal
20 investigations?
21    A.   Yes.  We are working on a handbook
22 as we speak, yes.
23    Q.   But as we speak means it's not

1 been done yet, correct?
2    A.   Correct.
3    Q.   So in the last four years
4 Mr. Roberts' understanding of how to do an
5 internal investigation would be based on --
6 would be derived from what?
7    A.   Would be derived from just being
8 in a position of leadership and understanding
9 that if there is a disagreement, based on the
10 fact that there is knowledge that there is a
11 chain of command that you have to go through,
12 that ultimately he need to get information from
13 the complainant and information from the other
14 side, the supervisor, and then talk to both of
15 them to see if it can be rectified, and if not,
16 then it comes to me.
17    Q.   Do you remember ever sitting down
18 in the last four years with Joe Roberts and
19 having a dedicated conversation with him about
20 what the internal investigation process needs
21 to look like?
22    A.   No.
23    Q.   Do you remember at any point

1 thinking there's an issue with how we do
2 internal investigations so we need to really
3 think about this process?
4    A.   I thought about making sure there
5 is a handbook so people can know what steps to
6 take, yes.
7    Q.   I'm sure this is simply a ballpark
8 that you can give me as opposed to a precise
9 number but I'm happy to take a precise number
10 if you know it.  During the time you have been
11 DA and Joe Roberts has been your chief deputy,
12 what's your best estimate of how many internal
13 investigations Joe Roberts has supervised or
14 conducted?
15    A.   I have no idea.
16    Q.   Would it be closer to five?  Ten?
17 Fifty?  Just your best approximation.
18    A.   I don't want to speculate on it.
19 I don't know honestly, I don't.
20    Q.   Would he have the obligation of
21 producing any kind of a written report after he
22 conducts internal investigations?
23    A.   No.

Page 38

1    Q.   Would he have the obligation of
2  making an oral report to you as the DA after he
3  conducts an internal investigation?
4    A.   Yes, sir.
5    Q.   So based on the fact that he would
6  have the obligation of making an oral report to
7  you, let me get your best guess and let me get
8  your best speculation of how many internal
9  investigations you think Joe Roberts has
10  conducted.
11    A.   Probably -- probably thirty,
12  forty.  Maybe more than that.  But internal
13  investigation can go from the gamut of why was
14  this case reduced, why is this family saying
15  that nobody ever talked to them before a plea
16  agreement was finalized, I mean, things of that
17  nature as well.  So it can run a full gamut of
18  a lot of things, but that's my best guess.
19    Q.   Do you consider him to be an
20  experienced internal investigator?
21    A.   I consider him to be an
22  experienced lawyer and -- yes, I do.
23    Q.   All right.  Let me talk about this

Page 39

1  case in a very direct sort of way.
2    A.   Okay.
3    Q.   You are aware that Ms. Jeter filed
4  a lawsuit and over the course of the last year
5  and a half, that suit has been amended several
6  times.  Are you aware of that?
7    A.   Yes, sir.
8    Q.   And you are aware as a lawyer that
9  once the amended complaint is filed, that
10  becomes the operative legal complaint in a
11  case, correct?
12    A.   I'm not versed in civil stuff, I'm
13  a criminal person, but I can imagine if it's a
14  complaint and it's been amended, then that
15  becomes something else litigated, yes.
16    Q.   Much as if there is a superseding
17  indictment --
18    A.   Correct.
19    Q.   -- that --
20    A.   Right.  I understand.  I'm sorry,
21  I didn't mean to talk over you.
22    Q.   A superseding indictment -- I used
23  to be a prosecutor too -- a superseding

Page 40

1  indictment is you do the original indictment,
2  you want to fix something, strengthen
3  something, or correct something and you go back
4  and make changes to it, that would be parallel
5  to an amended complaint.  Can we agree on that?
6    A.   We can agree, yes.
7    Q.   All right.  Do you remember when
8  you first became aware of this lawsuit?
9    A.   I don't remember the exact date.
10  I remember receiving a copy of it.  I think my
11  executive assistant, April, received a copy of
12  it and then I think may have given it to me.  I
13  don't know if -- I think it may have been in
14  paper form, yes.  I don't remember the exact
15  date, though.
16    Q.   And I understand you're a criminal
17  guy and not a civil guy, but at some point in
18  the last year or so, the life of this lawsuit,
19  you've read the lawsuit and you've looked at it
20  yourself, correct?
21    A.   I've glanced at it, yes, I have.
22    Q.   What do you understand her
23  allegations to be?

Page 41

1    A.   I understand it to be, I guess,
2  several allegations actually, and I don't know
3  all of them.  I don't remember all of them.
4    Q.   Understood.
5    A.   I do think the basis and the
6  genesis of it is that she was terminated
7  because she was African-American.
8    Q.   Are you aware that she also has
9  brought what we civil lawyers call a
10  retaliation complaint?
11    A.   Yes.  Yes.  Yes.
12    Q.   What do you understand a
13  retaliation complaint to be?
14    A.   To be where someone makes an
15  allegation against a person and then because of
16  that allegation, basically you are punished for
17  that allegation.
18    Q.   And would you agree with me, based
19  on your understanding of this case and the law
20  in general, that if someone makes a complaint
21  of discrimination and that someone believes
22  that she is then mistreated, that that can be a
23  form of illegal retaliation?

11 (Pages 38 - 41)

Page 42

1      MR. MURRILL:  Object to the form.
2  You can answer.
3      A.   Depending on the circumstances, it
4  depends on circumstances.  I don't have enough
5  facts to say that, but it depends on the
6  circumstances.
7      Q.   (BY MR. DAVIS:)  Understood.
8  Understood.
9        But putting circumstances aside,
10  would you agree that it's just a legal matter
11  that if someone says I complained about
12  discrimination and I was eventually fired, that
13  that could make out the basis for a retaliation
14  claim, correct?
15      MR. MURRILL:  Object to the form.
16      A.   You can make an allegation based
17  on that.
18      Q.   (BY MR. DAVIS:)  Yes.
19        And the law would recognize that
20  is a cognizable allegation, correct?
21      MR. MURRILL:  Object to the form.
22      MR. RILEY:  Object to the form.
23      A.   Once you flush out the facts, the

Page 43

1  law will make that decision.
2      Q.   (BY MR. DAVIS:)  Understood.
3  Understood.
4      A.   Okay.
5      Q.   And I recognize that you have not
6  had any experience in civil law yourself at
7  all, have you?
8      A.   None.
9      Q.   You've never handled a civil case,
10  employment or otherwise, correct?
11      A.   Not at all.
12      Q.   And it's also my understanding
13  from my days that elected officials in Alabama
14  are famously exempt from CLE requirements.  Is
15  that still the case?
16      A.   That's still the case.
17      Q.   Now, some DAs that I know because
18  of the administrative responsibilities and some
19  probate judges I know because of the
20  administrative responsibilities involved do
21  decide to take CLEs in employment law just so
22  they better understand the topic.
23        Have you taken during the time you

Page 44

1  have been DA any CLEs in employment law just to
2  understand the topic?
3      A.   No, haven't taken any CLEs, as far
4  as employment law, I'm sorry.
5      Q.   All right.  And in that same vein,
6  have you attempted to get any sort of training
7  from any source on employment law to help you
8  do your job better as DA?
9      A.   At this point, no, I haven't.
10      Q.   How many people -- again, I'm sure
11  you don't know the exact number unless you have
12  had a payroll briefing in the last week, but
13  what's your best estimate of how many folks
14  work for the Jefferson County DA's office?
15      A.   About a hundred and -- maybe a
16  hundred and twenty-one, a hundred and twenty.
17  If you count grant employees and people that's
18  coming and going, about a hundred and twenty.
19      Q.   So as DA, you are the chief
20  responsible officer for the DA's office,
21  correct?
22      A.   Yes, sir.
23      Q.   And Joe Roberts is the number two

Page 45

1  chief responsible officer for the DA's office,
2  correct?
3      A.   Yes.
4      Q.   So the two of you, in effect, have
5  supervisory authority broadly speaking, you
6  have leadership or management authority broadly
7  speaking of a hundred and twenty some
8  employees; is that correct?
9      A.   Correct.
10      Q.   And HR issues do come in a hundred
11  and twenty employee organization, correct?
12      A.   Correct.
13      Q.   And let me show you a document
14  that I'm going to make Plaintiff's Exhibit 1.
15        (Whereupon, Plaintiff's Exhibit 1
16        was marked for identification
17        and a copy of same is attached
18        hereto.)
19      Q.   All right.  We are going to make
20  this document Plaintiff's Exhibit 1.  Tell me
21  if you have seen Plaintiff's Exhibit 1 before
22  and please let your lawyer, Mr. Murrill, look
23  at it with you.

12 (Pages 42 - 45)

1    A.   (Reviewing document.)
2         MR. MURRILL:  And for the record,
3  Plaintiff's Exhibit 1 is Bates labeled DA
4  000002 through DA 000009.
5    A.   Yes, I have.  Yes, sir.
6    Q.   (BY MR. DAVIS:)  And would you
7  just identify Plaintiff's Exhibit 1?
8    A.   This is a policy and procedure
9  manual, I think, that was put out by the Office
10 of Prosecution Services out of Montgomery based
11 on the grant that was received for victim
12 service officers.
13   Q.   And does it say Personnel Policies
14 and Procedures Manual on the first page?
15   A.   Yes, it does.
16   Q.   And would you look toward the end
17 of that document and tell me the date, if you
18 see a date, on the signature page at the end of
19 that document?
20   A.   Signed by Ms. Jeter on August
21 26th, 2019.
22   Q.   Okay.  So would you agree with me
23 that when an employee starts in the DA's office

1  that they are given a personnel policies and
2  procedures manual?
3    A.   Not all employees, no.
4    Q.   All right.  But you would agree
5  that this document, Plaintiff's Exhibit 1, on
6  page eight reflects Ms. Jeter's signature,
7  correct?
8    A.   Yes, sir.
9    Q.   And the date on here appears to be
10 8/26/2019, correct?
11   A.   Yes, sir.
12   Q.   And it not only has her name
13 printed, but it's also signed by her, correct?
14   A.   Correct.
15   Q.   So it would appear at some point
16 that Ms. Jeter was given a copy of this
17 personnel manual and asked to sign it, correct?
18   A.   Yes, sir.
19   Q.   And this one again is for --
20 actually on the very first page, your signature
21 is on here, correct?
22   A.   Yes, sir.
23   Q.   What is the date of your

1  signature?
2    A.   December 17th, 2018.
3    Q.   So would you agree with me that
4  Plaintiff's Exhibit 1 appears to have been the
5  personnel policies and procedures manual that
6  Ms. Jeter was governed by during her first year
7  of employment?
8    A.   Yes, sir.
9    Q.   I want to show you Plaintiff's
10 Exhibit Number 2.
11        (Whereupon, Plaintiff's Exhibit 2
12        was marked for identification
13        and a copy of same is attached
14        hereto.)
15   Q.   And I'm going to ask you if you
16 have seen a document such as Plaintiff's
17 Exhibit 2 before today.
18   A.   Likes like the same document as
19 Plaintiff's 1.
20        MR. MURRILL:  And for the record,
21 it's DA 000010 through DA 000018.
22   Q.   (BY MR. DAVIS:)  And with respect
23 to Plaintiff's Exhibit 2, you are correct,

1  Mr. Carr, that it's very similar to Plaintiff's
2  Exhibit 1, except at the very bottom right of
3  the first page there is a notation.  Would you
4  read the notation at the very bottom right of
5  the first page on Plaintiff's 2?
6    A.   Updated.
7    Q.   Yes.  Please read that.
8    A.   Updated February 1st looks like
9  2020.
10   Q.   All right.
11   A.   Okay.
12   Q.   And this document also contains
13 Ms. Jeter's signature, correct?
14   A.   Yes, it does.
15   Q.   And what is the date of
16 Ms. Jeter's signature in Plaintiff's Exhibit 2?
17   A.   February 13, 2020.
18   Q.   So would you agree it appears that
19 at some point on or around February 13th, 2020,
20 that Ms. Jeter was presented a copy of
21 Plaintiff's Exhibit 2 and asked to sign it?
22   A.   Yes.  It looks like she signed it,
23 yes.

1    Q.   And I'll invite you to look in
2  both these documents, but it may be that you
3  know the answer to the question, is there any
4  difference in Plaintiff's Exhibit 1 and 2 in
5  terms of substance?
6    A.   I don't think so, yeah.
7    Q.   I will have you look at it.
8    A.   (Reviewing document.)
9    Q.   Sitting here, based on your best
10 recollection, do you believe that essentially
11 the policies and procedures manual for 2020 is
12 the same for the one for 2019?
13        MR. MURRILL:  Object to the form.
14 And the documents speak for themselves in terms
15 of what's in them.
16        MR. DAVIS:  Understood.
17   A.   I'm sorry, ask it again.  I was
18 looking at this.
19   Q.   (BY MR. DAVIS:)  Plaintiff's
20 Exhibit 1 has your signature on the first page,
21 correct?
22   A.   Correct.
23   Q.   And presumably that signature

1  reflects that you are familiar with the
2  document and you're adopting the document and
3  saying these are our policies and procedures
4  for certain employees, correct?
5        MR. MURRILL:  Object to the form.
6    A.   Yes, for grant employees.
7    Q.   (BY MR. DAVIS:)  And just so we
8  are clear, and let me see those two documents
9  again, this is a personnel policies and
10 procedure manual that applies to certified
11 victim services officers.  Am I right?
12   A.   Right.
13   Q.   And is it the intent of the
14 Jefferson County DA's office that personnel who
15 work as victim services officers have the same
16 rights and privileges as regular DA's
17 employees?
18   A.   Yes.
19   Q.   So to your knowledge, is there any
20 difference in the rights and terms and
21 privileges available to rank-and-file Jefferson
22 County DA's office employees and the terms and
23 privileges available to VSOs?

1    A.   No.
2    Q.   And when I say VSOs, I mean victim
3  services officers.
4    A.   Victim service officers.
5    Q.   So for shorthand I will use the
6  term VSO today and I will mean victim services
7  officer.  Is that fair?
8    A.   That's fair.
9    Q.   So a VSO such as Ms. Jeter would
10 have had, in your belief, the same
11 responsibilities as every employee in the DA's
12 office, correct?
13   A.   Correct.
14   Q.   And she would have had the same
15 rights as every employee in the DA's office?
16   A.   Correct.
17   Q.   And she would have been entitled
18 to the same benefits as every employee in the
19 DA's office?
20   A.   Correct.
21   Q.   And she would be entitled to the
22 same procedures that you described earlier with
23 respect to internal investigations as any

1  employee of the DA's office?
2    A.   Correct.
3    Q.   And everything that you have said
4  about Joe Roberts' responsibilities for
5  internal investigations with respect to DA's
6  office employees, would all of that equally
7  apply to matters related to victim services
8  officers?
9    A.   Yes.
10   Q.   Who has the responsibility in your
11 office, Mr. Carr, for making sure that the
12 personnel policies and procedures are enforced?
13   A.   The immediate supervisor.
14   Q.   What do you consider your
15 responsibility to be in that regard, if any?
16   A.   My responsibility would be the
17 person that, if matters can't be resolved, is
18 to make the ultimate decisions based on
19 information that's provided to me.
20   Q.   And what responsibility, if any,
21 does Joe Roberts have with respect to making
22 sure that the policies and procedures manuals
23 are followed?

14 (Pages 50 - 53)

1    A.   That if there is a dispute, to get
2  information, talk to the parties involved,
3  gather that information, and if it can't be
4  resolved, then report it to me.
5    Q.   Now, would you agree, Mr. Carr,
6  that the policies and procedures manual deals
7  with a lot more than resolving disputes?
8    A.   It does, yes.
9    Q.   Would you agree that the policies
10 and procedures manual contains a general
11 section involving equal employment opportunity
12 and nondiscrimination?
13   A.   Yes.
14   Q.   Would you agree that the policies
15 and procedures says, and I'm going to quote,
16 OPS, and that's a reference to Office of
17 Prosecution Services, mandates that all hiring,
18 promotions, and other terms, conditions and
19 privileges of employment shall be conducted in
20 a manner that does not discriminate on the
21 basis of any protection afforded by applicable
22 state and federal law.  Would you agree it's a
23 part of this manual?

1    A.   Yes.
2    Q.   Who has the responsibility in your
3  office of making sure that guarantee that I've
4  just read is carried out?
5    A.   Ultimately the rank and file.
6  Ultimately -- I mean, ultimately me.
7    Q.   The next sentence, quote,
8  Employment decisions at OPS will be based on
9  distinction, qualifications, and abilities.  Do
10 you agree with that?
11   A.   Yes, I do.
12   Q.   Who has the ultimate
13 responsibility in the DA's office in Jefferson
14 County for making sure that when it comes to
15 VSO's employment decisions, hirings, and
16 firings will be based on distinction,
17 qualifications, and abilities?
18   A.   Ultimately, me.
19   Q.   Does the Jefferson County DA's
20 office have leave policies?
21   A.   Have leave policies, yes.
22   Q.   Does the Jefferson County DA's
23 office permit employees, including VSOs, to

1  take personal leave?
2    A.   Yes.
3    Q.   What is the personal leave policy
4  in place in your office?
5    A.   I don't know it specifically, but
6  the personal leave policy, whether it's leave
7  because there is -- you're pregnant or
8  something like that or there is an issue with
9  family or something where you have to be gone,
10 you know, that decision is made based upon a
11 case-by-case basis or situation-by-situation
12 basis, depending on what the leave is.
13   Q.   In most offices, there are two
14 forms of leave?
15   A.   Right.
16   Q.   There is personal leave or
17 personal time off and there is sick leave.
18 Does the Jefferson County DA's office broadly
19 have those two types of leaves?
20   A.   Yes.
21   Q.   Are there limits on the number of
22 personal leave days people can take in the
23 Jefferson County DA's office?

1    A.   There are limits.  I don't know --
2  there are limits.  I don't know exactly what
3  they are, but there are limits as far as
4  personal leave.  Obviously we accrue sick time
5  like any other place, and I think we also
6  accrue vacation time as well, but personal
7  leave is sort of like depending on your
8  situation, depending on whether you may be
9  abusing it or fudging something, but it is
10 available, yes.
11   Q.   And I understand you haven't been
12 a first-year employee in about twenty-one
13 years.
14   A.   Right.
15   Q.   But do you happen to know for a
16 first-year employee, and for that matter a
17 second-year employee, what their available
18 number of personal leave days would be?
19   A.   I don't know exactly.
20   Q.   Who would know that?
21   A.   Michael McCurry.
22   Q.   And what is Michael McCurry's
23 title?

Page 58

1    A.   He is the office administrator.
2    Q.   Would you expect Joe Roberts to
3 know the amount of personal leave days that
4 would be available to a first- or second-year
5 employee?
6    A.   I would expect Joe Roberts to
7 ultimately talk to someone that does if there
8 is a complaint about personal leave being
9 abused.
10    Q.   If there was an issue around
11 personal leave being abused, Joe Roberts would
12 have ready access to information about the
13 personal leave policies in the office, correct?
14    A.   No, he wouldn't. He would have
15 information from people that he would rely on
16 to provide that information and provide
17 documentation or provide something to indicate
18 that there is a reason why there is an issue
19 with personal leave for this particular person.
20    Q.   Fair enough. Let me ask a better
21 question than the one I asked.
22         If the issue came up of whether an
23 employee was taking too much leave or excessive

Page 59

1 leave, presumably part of resolving that issue
2 would require determining how much leave they
3 were eligible for. Do you agree?
4    A.   Yes.
5    Q.   And in determining how much leave
6 an employee was eligible for, would Joe Roberts
7 have had the ability to talk to multiple people
8 to get an answer to that question?
9    A.   He would be able to talk to
10 Michael McCurry, and he would have been able to
11 talk to Judy Yates as well.
12    Q.   And are you confident that Joe
13 Roberts knows that?
14    A.   Yes.
15    Q.   Would you expect that Judy Yates
16 who was -- who is the person who supervises the
17 VSOs, am I correct?
18    A.   Correct.
19    Q.   What is her exact title?
20    A.   She is victim service officers --
21 she's a victim service officer. That's her
22 title. She's the longest serving one. As a
23 matter of fact, she was there before I got to

Page 60

1 the DA's office. But, yeah, she is the
2 supervisor. As a matter of fact, she was the
3 supervisor before I became DA.
4    Q.   Is her title chief victim services
5 officer?
6    A.   Yes, indirectly. I mean, you
7 know, she's recognized as that, yes.
8    Q.   So she's treated as a supervisory
9 figure over the VSOs, correct?
10    A.   Yes.
11    Q.   And even though she may not have
12 the title head of the VSO unit, is she in
13 effect the head of the VSO unit?
14    A.   She is, yes, sir.
15    Q.   Do you believe that Judy Yates is
16 fully knowledgeable about the personnel
17 policies and procedures manuals for VSOs that
18 we've talked about today?
19    A.   I think she's knowledgeable about,
20 yes, about the manual, yes, I do.
21    Q.   It would be part of her job to be
22 knowledgeable about it, wouldn't it?
23    A.   Yes.

Page 61

1    Q.   Do you believe that Judy Yates is
2 knowledgeable about the personal leave policies
3 for VSOs?
4    A.   I think she's knowledgeable --
5 yes, I think she has knowledge about the
6 personal leave, yes.
7    Q.   Because if someone who is a VSO
8 wanted to take personal leave, they would need
9 to let Judy Yates know about it, wouldn't they?
10    A.   Yes.
11    Q.   And they would need to get
12 authorization from Judy Yates, correct?
13    A.   Yes.
14    Q.   And to give authorization, you
15 need to know what the rules are, correct?
16    A.   Correct.
17    Q.   To decide if someone is going to
18 get leave, you need to know how much leave they
19 are available for, correct?
20    A.   Correct.
21    Q.   So Ms. Yates should know all of
22 that, shouldn't she?
23    A.   Yes.

16 (Pages 58 - 61)

1      Q.   And she should understand those
2  policies thoroughly?
3      A.   Yes.
4      Q.   With respect to sick leave,
5  everything we've just said about personal
6  leave, would you agree that Judy Yates should
7  know and should understand what the sick leave
8  policies are in the DA's office?
9      A.   She would know what the sick leave
10  policies are and Michael McCurry who is right
11  next to her would know as well.  And if there
12  is a question, just like if I have a question
13  about it, I would go to the source who knows
14  it, and that is Michael McCurry, office
15  administrator.
16      Q.   So if for some reason Judy Yates
17  was momentarily forgetful or momentarily
18  confused about the sick leave policies, Michael
19  McCurry would be right there to straighten her
20  out, correct?
21      A.   Yes.  Had she talked to him, he
22  would give her the information that she need.
23  If she had talked to him, Michael McCurry, I'm

1  sorry, then he would be able to provide her the
2  information that she need.
3      Q.   As a supervisory figure, do you
4  know if Judy Yates has ever received any
5  briefing or training on how to administer leave
6  policies?
7      A.   I don't know if she received
8  briefing or training before I got there.  I
9  don't know.
10      Q.   Since you've been there, do you
11  have -- which is four years now?
12      A.   Right.
13      Q.   Do you have any knowledge of Judy
14  Yates receiving --
15      A.   Briefing or training?
16      Q.   -- yes, briefing or training about
17  the administration of leave policies?
18      A.   I'm not sure.
19      Q.   Do you think it would be a good
20  idea if maybe she did at some point get that
21  training?
22      A.   I think it would be a good idea
23  for her to understand the policy and the days

1  and availability and all that.  And let me say
2  she very well may know that.
3      Q.   I've touched on this, but I do
4  want to make a hundred percent sure, and as I'm
5  sure your lawyers have explained to you, this
6  is the one time I get to talk about this case
7  with you.  So everything that might affect how
8  we brief this case or how we try this case, I
9  have to get it all today.  And I want to be
10  respectful of your time, but this is my one
11  shot.
12      A.   I understand.
13      Q.   So some DAs that I know in Alabama
14  have a law firm that's on retainer to advise
15  their office about legal issues involving
16  personnel and they do that for conflict of
17  interest reasons, they do it because they want
18  to have civil lawyers dealing with these issues
19  and not criminal lawyers, and some just want an
20  extra set of ears.
21          During the time you have been
22  district attorney, have you retained an outside
23  law firm to act as the legal advisor for

1  Jefferson County on a regular -- for the
2  Jefferson County DA's office on sort of a
3  regular ongoing basis?
4      A.   I wish I could afford to do that.
5      Q.   So that means you haven't done it?
6      A.   I haven't.
7      Q.   And some DAs that I know happen to
8  know a lot of lawyers.
9      A.   I understand.
10      Q.   And they will draw on those
11  personal relationships with lawyers to have an
12  informal sort of advisor that they talk to
13  about legal issues or personnel issues that
14  come up in their office.  Do you have a
15  personal relationship -- and by personal I mean
16  professional really, professional relationship
17  with some attorney that you talk with about
18  personnel issues that come up in the office?
19      A.   Yeah.  We rely and talk to Office
20  of Prosecution Services a lot who is down in
21  Montgomery, Barry Matson and those individuals
22  who have people there about issues.  Obviously
23  we talk to the Attorney General's office

Page 66

1 sometimes about issues as well. You know, I
2 don't recall ever having -- well, this issue
3 hadn't come up before.
4     Q.   When you say this issue, what do
5 you mean?
6     A.   I mean an employment issue dispute
7 per se or mistreatment dispute or whatever as
8 far as during my tenure. So there are lawyers
9 that I talk to about a lot of things, and I may
10 have talked to some about, you know, how can we
11 put a manual together or does this sound right
12 in the manual or not, this is something that we
13 are working on, but no, we haven't retained
14 anybody or have somebody that we consistently
15 call, no.
16     Q.   Initially the Attorney General's
17 office represented you and the DA's office in
18 this case. Am I right?
19     A.   Yes.
20     Q.   And my recollection generally when
21 a DA's office or sheriff's office is sued, it's
22 the Attorney General's office who represents
23 them. Is that also your experience?

Page 67

1     A.   In some instances, yes.
2     Q.   During Ms. Jeter's deposition,
3 Mr. Murrill asked her how she found her lawyers
4 in this case. So in the spirit of fair play,
5 what led you to drop the DA's office and move
6 to these very able gentlemen?
7     A.   I knew Mr. Riley and Jay and I
8 knew their acumen as far as the work product
9 that they would put out and obviously I
10 wanted -- I was comfortable with them. I don't
11 necessarily know at the time if I was
12 comfortable with the work that the AG's office
13 was doing on this case, so we made that
14 decision -- I made that decision, I'm sorry.
15     Q.   And as former prosecutors, we
16 learn to put two and two together sometimes,
17 don't we?
18     A.   Yes.
19     Q.   So you started with the AG's
20 office and they did handle some of the motions
21 in this case; is that correct?
22     A.   Yes.
23     Q.   And they did initially handle this

Page 68

1 case. In fact, they talked with and had
2 meetings with Ms. Jeter in this case; is that
3 correct?
4     A.   I'm not sure. I think so.
5     Q.   But at some point, you made the
6 determination that frankly you weren't
7 satisfied with the representation you were
8 getting from them, correct?
9     A.   Correct.
10     Q.   And the reason you weren't
11 satisfied with the representation was what?
12     A.   Just the availability of the
13 person that was handling the case and the
14 responses and updates and things of that
15 nature, so we just felt like we wanted to go in
16 another direction based on that.
17     Q.   And when you say "we," is that the
18 politician's royal "we" meaning "I"?
19     A.   Well, me. I'm sorry. I. Yes.
20 I. Correct.
21     Q.   Let me ask you this question,
22 Mr. Carr, about these policies and procedures
23 that apply to the VSOs as they apply to other

Page 69

1 employees. What do you consider to be the
2 single most important right that an employee
3 has in the Jefferson County DA's office?
4     A.   Single most important right that
5 an employee has?
6     Q.   Yes.
7     A.   To be treated fairly.
8     Q.   What does that mean to you?
9     A.   That means to be not singled out
10 or discriminated against but to be treated just
11 like any other person.
12     Q.   Would you agree that one important
13 element of fairness is that if some employees
14 are given privileges and benefits, that all
15 employees ought to have access to the same
16 privileges and benefits?
17     A.   Yes. If they are all doing the
18 same value of work and all, yes, I do.
19     Q.   Would you agree that as an element
20 of the fairness you describe, that if some
21 victim services officers are given privileges
22 and benefits, that all victim services officers
23 ought to be given those same privileges and

1 benefits?
2     A.   Yes.
3     Q.   Would you agree that if some
4 victim services officers can take advantage of
5 a privilege such as comp time, which we are
6 going to get to in a moment, that all victim
7 services officers should be able to benefit
8 from the privilege of comp time?
9     A.   Map -- oh, you said comp time, I'm
10 sorry, comp time.  Yes.
11     Q.   What is comp time?
12     A.   My understanding is that comp time
13 is where you have exhausted time in some
14 instances and then you work overtime to
15 basically bank some time or to gather some
16 time.
17     Q.   I never understood it perfectly.
18     A.   That's all I understand about it.
19     Q.   I never understood it personally
20 myself.  But my understanding, and tell me if
21 I'm right or wrong, but my understanding of
22 comp time has always been that you have your
23 number of leave days, but if you work some

1 extra hours, to use your phrase, that you get
2 to bank that additional time; is that correct?
3     A.   Correct.
4     Q.   And that you can therefore expand
5 the number of leave days you have with some
6 extra days, and that's the whole principle and
7 benefit of comp time, correct?
8     A.   Correct.
9     Q.   And your office does have comp
10 time?
11     A.   Yes, sir.
12     Q.   Some don't, but the DA's office --
13 when I say some, some political governmental
14 offices don't have comp time.  My congressional
15 office doesn't have comp time.  But the DA's
16 office has comp time, correct?
17     A.   Yes.
18     Q.   And would you agree that comp time
19 should be administered fairly in all
20 circumstances?
21     A.   Yes.
22     Q.   And employees in your office do
23 have a right to comp time.  Do you agree with

1 that?
2     A.   They have a right to collect comp
3 time, yes.
4     Q.   And it's not a matter that they
5 apply for comp time or they want to receive the
6 benefit of comp time, if you're an employee in
7 the Jefferson County district attorney's
8 office, and we have agreed that includes VSOs,
9 you are entitled to the privilege and the
10 concept of comp time; is that right?
11         MR. MURRILL:  Object to the form.
12     A.   Yeah.  I mean, privilege -- you're
13 entitled to comp time.  I guess I'm --
14     Q.   (BY MR. DAVIS:)  Yes, that's all
15 I'm asking.
16     A.   Okay.
17     Q.   In your opinion, Mr. Carr, should
18 an employee ever be punished for taking leave
19 time to which they are entitled?
20     A.   Depending on the circumstances.
21     Q.   Well, work with me on my premise.
22 I said to which they are entitled.
23     A.   Oh, which they are entitled.

1     Q.   If they are entitled to leave
2 time, if they have the days, should an employee
3 be punished for taking leave time if they have
4 the days to take that time?
5     A.   Again, depends on the
6 circumstance.
7     Q.   Tell me a circumstance in which
8 you think it would be fair to punish an
9 employee for taking days that she has.
10     A.   I don't think it's punishment when
11 you are given the days and you are given that
12 luxury of having comp time but then you turn
13 around the very next day and use the comp time
14 when -- and it's consistent and now you are not
15 available to the office, we can't operate, we
16 want you to be present.  You have that comp
17 time, but I also think that if you have comp
18 time and there are people there that have comp
19 time who are also VSOs and they bank that comp
20 time, then I do think that you should be able
21 to use it.  But I also think there should be a
22 point where, you know, you should be available
23 to the office and not necessarily just take

Page 74

1 that comp time and use it and abuse it. That's
2 just my thoughts. Now, I don't know if that's
3 punishment, but --
4     Q.   Well, let me ask you this: That's
5 a good articulation of your philosophy about
6 comp time. Let me ask you if that philosophy
7 is contained in either of the policies and
8 procedures manuals.
9     A.   I don't think it is in the Office
10 of Prosecution policies -- policy manual.
11     Q.   And that would be the manual that
12 applied to LaNitra Jeter, correct?
13     A.   This would be the policy that
14 applied to LaNitra Jeter, yes, it would.
15     Q.   And I'm happy to let you look at
16 it.
17     A.   Oh, okay.
18     Q.   But if you will agree with me, I
19 will represent to you that I don't see anything
20 in those policies and procedures manuals --
21     A.   Yes.
22     Q.   -- that remotely describes the
23 principles and the limiting principles on comp

Page 75

1 time you just described. Do you agree with me?
2     A.   Agreed.
3         MR. MURRILL: Object to the form.
4 And the document speaks for itself.
5     Q.   (BY MR. DAVIS:)  All right. Since
6 we agree on that, what you've described as
7 Danny Carr's vision of comp time, do you know
8 if it's ever been communicated to LaNitra
9 Jeter?
10     A.   I don't know if it has.
11     Q.   Have you ever personally
12 communicated that view of comp time to LaNitra
13 Jeter?
14     A.   Nobody has ever asked me about my
15 view about comp time during that time in the
16 office.
17     Q.   And have you ever communicated
18 your view or vision of comp time to Judy Yates?
19     A.   No, I haven't.
20     Q.   So I'm the first person to ever
21 really ask you that?
22     A.   Yes.
23     Q.   Has Joe Roberts ever asked you

Page 76

1 your vision of comp time?
2     A.   No, sir.
3     Q.   So the Danny Carr philosophy of
4 how comp time should be used is not something
5 that's memorialized in any way in the DA's
6 office, is it?
7     A.   Correct.
8     Q.   And it's not something that's been
9 announced as a policy, is it?
10     A.   Correct.
11     Q.   And the whole point of writing
12 policies down is to put the employee on notice
13 as to their rights, correct?
14     A.   Correct.
15     Q.   So if Ms. Jeter is not given a
16 written document explaining her rights, she
17 doesn't have any way of knowing what they are,
18 correct?
19         MR. MURRILL: Object to the form.
20     A.   No. Correct.
21     Q.   (BY MR. DAVIS:)  So if there is
22 some vision or theory in the office as to how
23 comp time should work, if that's never

Page 77

1 communicated to Ms. Jeter, she can't know that,
2 can she?
3     A.   Correct.
4     Q.   If there are some informal limits
5 on how comp time can be used but they are never
6 written down, she can't be held accountable for
7 that, can she?
8     A.   No.
9     Q.   And it wouldn't be very fair to
10 hold Ms. Jeter accountable for unwritten rules
11 about comp time that aren't written down, would
12 it?
13     A.   No.
14         MR. RILEY: Artur, we have been
15 going about an hour.
16         MR. DAVIS: Okay. If we'd like to
17 take a break, that's perfectly fine.
18         MR. RILEY: I don't want to cut
19 you off. If you are at a good stopping place,
20 that's good.
21         MR. DAVIS: I will leave it to
22 Mr. Carr because I want to be mindful of your
23 time. If for the sake of getting you out of

Page 78

1 here earlier you want to keep going -- now, at
2 some point, we will need to take a break for me
3 to set something up.
4        THE DEPONENT:  Okay.
5        MR. DAVIS:  So we can either keep
6 going or we can stop, a hundred percent your
7 call.
8        MR. RILEY:  Why don't you check in
9 with your guy.
10        THE DEPONENT:  Okay.
11        MR. RILEY:  Why don't you go ahead
12 and set up if this is a good time to set up.
13        MR. DAVIS:  Okay.  I can certainly
14 do it now.
15        MR. RILEY:  Let's take five
16 minutes.
17        MR. DAVIS:  Okay.
18        (Whereupon, a break was had from
19        10:43 a.m. until 11:01 a.m.)
20    Q.   (BY MR. DAVIS:)  All right.  Let
21 me pick up on one point.  I've been asking you
22 a number of questions about leave policies and
23 who has responsibility for this and that, let

Page 79

1 me ask you for a moment about the concept of
2 retaliation.
3        We've talked a little bit about
4 retaliation in the context of the lawsuit, so
5 let's kind of get off the thirty thousand foot
6 level and put it in the context of running an
7 office.
8        Do you agree with me that it's
9 important that supervisors understand that they
10 are not to retaliate against people who make
11 complaints against them?
12    A.   Yes.
13    Q.   And do you expect every line
14 supervisor in your office to understand that
15 they cannot retaliate against people who make
16 complaints against them?
17    A.   I do.
18    Q.   Do you expect every line
19 supervisor to understand that if somebody
20 complains about me, supervisor, I can't then
21 decide to go out and make that person's life
22 difficult?  Should every supervisor understand
23 that?

Page 80

1    A.   Yes, they should.
2    Q.   Does your office conduct any sort
3 of training for supervisors about how they
4 should handle a situation when an employee
5 makes a complaint about them?
6    A.   Not nothing -- I don't think
7 anything formal.  There have been conversations
8 in general about just general responses.
9 Again, the chain of command is the way we
10 approach it.
11    Q.   But putting aside the chain of
12 command stuff, and we'll talk about that more
13 in a moment and we talked about it a little bit
14 already, again this is a point I want to drill
15 down on because this is my one chance to talk
16 to you.  If a supervisor in your office is the
17 subject of a complaint by an employee, first of
18 all, is it the practice in your office to
19 notify that supervisor that they have been the
20 subject of a complaint?
21    A.   Is it the practice to notify the
22 supervisor?
23    Q.   If the supervisor has been the

Page 81

1 subject of a complaint.
2    A.   Is it the practice that the
3 complainant notify the supervisor?
4    Q.   No.  Is it the practice that the
5 office -- let me give you an example.  If I'm
6 supervising the --
7    A.   Oh, I got you, I'm sorry.
8    Q.   -- the violent crimes unit and one
9 of the folks working under my leadership
10 complains about my supervision of them but they
11 don't complain to me, they go to somebody else,
12 is it the policy in your office that the person
13 who is the subject of the complaint be
14 notified?
15    A.   Yes.  The person that's the
16 subject of the complaint be notified that an
17 employee has complained about them?
18    Q.   Yes.
19    A.   Yes, they would be contacted.
20    Q.   And --
21    A.   I'm sorry.
22    Q.   No, go ahead.
23    A.   I want to make sure -- they would

21 (Pages 78 - 81)

Page 82

1 be contacted if that person has notified
2 someone, a superior -- someone to then relay
3 that message. In other words, if it's just
4 between those two, then nobody else would know.
5    Q.   Sure.
6    A.   Yeah. Yeah. So if that person
7 notified someone, then there should be a
8 conversation at some point, yes.
9    Q.   So if an employee goes to someone
10 higher up in the organization and says to
11 someone higher up that I think I've been
12 discriminated against and they mention the
13 person who they think did it, should the higher
14 up notify the person who's accused of the
15 discrimination?
16    A.   The higher up should have a
17 conversation with that person ultimately, yes.
18    Q.   And that would be only fair
19 because if people are accused of something,
20 they should have a chance to respond, correct?
21    A.   Yes. If the employer or the
22 higher up is accused, then they should have a
23 chance to respond just like the person that's

Page 83

1 making the allegation.
2    Q.   And if a supervisor is accused,
3 that supervisor should have an opportunity to
4 give her side of the story to management,
5 correct?
6    A.   Yes.
7    Q.   And management would need to know
8 the supervisor's side of the story to know if
9 there is a real issue here, correct?
10    A.   Correct.
11    Q.   With respect to retaliation, again
12 I'm not talking legal terms now, I'm talking
13 about just how Danny Carr's DA's office runs,
14 if you found out that a supervisor was
15 literally keeping a file on an employee,
16 literally keeping a file of negative things
17 about that employee and you knew that the
18 employee they were keeping the file on had made
19 a complaint about that person and you knew the
20 supervisor knew that the person had made a
21 complaint about them, would it be suspect to
22 you if that supervisor then started keeping a
23 file on that employee?

Page 84

1    MR. MURRILL: Object to the form.
2    A.   Not necessarily. I mean, I need
3 to know more information about it. I think
4 that's kind of in a vacuum, the question you
5 provided. It's a lot of layers to that
6 question you provided as well. But no, I think
7 documenting things is important. I think if
8 there is an issue, I don't know if there is
9 anything wrong with documenting things, I
10 don't.
11    Q.   (BY MR. DAVIS:) Would it be
12 suspect to you, though, if a supervisor --
13 during the course of a year if you learned the
14 supervisor kept a file, quote, unquote, on only
15 one person and it turned out that one person
16 was the one who had made a complaint against
17 them, would that be suspect to you?
18    A.   If they are not having problems
19 with the other people, I wouldn't say it would
20 be.
21    Q.   Okay. Fair enough.
22    Let's transition now to the
23 substance of this case. Do you have a

Page 85

1 recollection in the fall of 2019 of meeting
2 with LaNitra Jeter?
3    A.   I do not.
4    Q.   And did you know who LaNitra Jeter
5 was?
6    A.   Before I was at the DA's office?
7    Q.   Yes.
8    A.   Not specifically. I think I
9 knew -- no, I didn't.
10    Q.   Once she came to the DA's office,
11 did you know who she was?
12    A.   Yes, sir.
13    Q.   You mentioned you have a hundred
14 and twenty some employees. Do you know all
15 hundred and twenty some employees?
16    A.   Honestly, no.
17    Q.   How many victim services officers
18 are there?
19    A.   There are five.
20    Q.   Do you know all five at any given
21 time?
22    A.   Yes.
23    Q.   And how is that? How is it that

1 you would know the victim services officers?

2    A.   Because they are pretty much on

3 the same floor, and it's easy to know five

4 versus knowing, you know, grant people that's

5 in another building, people that's assigned to

6 family court building that come and go.  So I

7 know most of the people when I see them.  But

8 when you say know, I know the victim service

9 officers because, I mean, they are literally on

10 the same floor.

11    Q.   When you say literally on the same

12 floor, you mean the same floor you are located

13 on?

14    A.   Yes.  They are down the hall, but

15 they are on the same floor versus another

16 building like some people or another location

17 or even another entire floor.

18    Q.   So just as a practical matter, you

19 would run into the VSOs just in the course of a

20 day, correct?

21    A.   Just walking through sometime or

22 seeing them going out the back door where my

23 office is as well.

1    Q.   Would you ever interact with the

2 VSOs in your capacity as DA?

3    A.   Not a lot.  I mean, I would speak

4 to them as I walk by as a courtesy obviously,

5 but no.  No.

6    Q.   But you knew who LaNitra Jeter

7 was?

8    A.   Yes.

9    Q.   And under the protocols in place

10 in the DA's office, if a VSO wanted to meet

11 with Danny Carr, the DA, would there be any

12 prohibition against that?

13    A.   No.

14    Q.   So if a VSO reached out to your

15 secretary -- and what's her name, by the way?

16    A.   April Smith.

17    Q.   Does she know your schedule?

18    A.   Yes, she does.

19    Q.   If a VSO reached out to April

20 Smith to say can I meet with Mr. Carr, would

21 there have been any office policy in place in

22 2019 that would have prevented that meeting

23 from happening?

1    A.   No.

2    Q.   Would April Smith have understood

3 that?

4    A.   Yes.

5    Q.   And if a VSO employee reached out

6 to April Smith and said I would like to meet

7 with Danny Carr, would you have expected April

8 Smith to schedule the meeting?

9    A.   I would have expected her to

10 notify me and then schedule the meeting.

11    Q.   And if you took a meeting with a

12 VSO in 2019, would you be comfortable meeting

13 with the person one on one, or would you

14 typically have a third party present?

15    A.   Typically if it's in a day -- I

16 mean, if it's -- if I don't know exactly what

17 it's about, I mean, it was just a meeting, it

18 could be about anything.  If I don't know that

19 it's a complaint or something or if somebody

20 just want to come by and ask a question, all

21 the meetings are not with a third person.  Some

22 may be one on one and some may not be.

23    Q.   And if someone wants to have a

1 meeting, you don't necessarily know the subject

2 of the meeting, do you?

3    A.   Correct.

4    Q.   And you don't have a policy -- you

5 didn't have a policy in 2019 that to meet with

6 Danny Carr someone had to specify the subject

7 of the meeting, did you?

8    A.   That wasn't a policy, but April

9 made it a habit to at least sometimes say hey,

10 is this something I can let him know about.  If

11 it's something that he needs to know before

12 this meeting so you won't have to reschedule,

13 if it's something he needs to look at a docket

14 for -- so I mean, but yeah.

15    Q.   But if an employee responded to

16 that inquiry by April with saying it's a

17 sensitive subject or something I just want to

18 talk about with Danny, in your expectation

19 would April still have likely scheduled the

20 meeting?

21    A.   My expectation that she would

22 have.

23    Q.   And, again, these contexts, what

Page 90

1 we are talking about, is not random folks on
2 the street.
3     A.   Right.
4     Q.   It's not people who have cases in
5 front of the court.
6     A.   Right.
7     Q.   These are colleagues and coworkers
8 who are down the hall from you, correct?
9     A.   Correct.
10    Q.   And you certainly pride yourself
11 in being an accessible DA to your staff,
12 correct?
13    A.   I do.
14    Q.   And you pride yourself in being a
15 mentor figure to your staff, correct?
16    A.   I do.
17    Q.   So if a VSO or any DA's office
18 employee reached out to April and said I would
19 like to meet with Danny or Mr. Carr, nothing
20 unusual about that, correct?
21    A.   No.
22    Q.   And April would not have seen it
23 as unusual, correct?

Page 91

1     A.   Correct.
2     Q.   So we plaintiffs' lawyers always
3 find ourselves asking some version of this
4 question, so let me do that.  Are you saying
5 that you did not meet with LaNitra Jeter or
6 that you don't remember if you met with LaNitra
7 Jeter?
8     A.   I did not meet with LaNitra Jeter.
9 I will say I've seen LaNitra passing in the
10 hallway, but we did not have a formal meeting,
11 yes.
12    Q.   So, again, it's not that it's a
13 matter of recollection, you are affirmatively
14 saying that you did not have a one-on-one
15 meeting with LaNitra Jeter in your office in
16 the fall of 2019?
17    A.   I don't recall having a meeting
18 with LaNitra Jeter in the fall of 2019.  I do
19 not.
20    Q.   Just so we are clear, do you have
21 a memory of having a one-on-one meeting with
22 LaNitra Jeter at any point?
23    A.   I wouldn't say it was a meeting.

Page 92

1 I think she had come to my office before just
2 in general like other people did, people walked
3 out that back door, she may have stopped by
4 there, but I don't think there was a formal
5 meeting with LaNitra Jeter.  I don't recall
6 that, no.
7     Q.   Well, again, you know, we lawyers
8 have to be precise in our words.
9     A.   Right.
10    Q.   You just said I don't recall it.
11    A.   I don't recall it.
12    Q.   But very important for this case
13 and for all cases --
14    A.   Okay.
15    Q.   -- are you saying that I, Danny
16 Carr, am confident that I did not meet with
17 this person or I don't remember if I met with
18 this person?
19    A.   I'm saying I, Danny Carr, don't
20 recall meeting with LaNitra Jeter.
21    Q.   Okay.  So if LaNitra Jeter says
22 that she did meet with you and if she testified
23 under oath that she did meet with you, what

Page 93

1 would your recollection of that be?
2     A.   It would be that I have no
3 recollection of it at all.
4     Q.   So if LaNitra Jeter says that she
5 met with you and told you that she believed
6 that Judy Yates was treating her unfairly,
7 would it be your position that LaNitra Jeter is
8 making that up or that you don't recall?
9     A.   I would say that I do not recall
10 that at all.
11    Q.   If LaNitra Jeter testified under
12 oath in her deposition that she told you that
13 she believed her comp time was being unfairly
14 restricted or taken away, is it your
15 recollection that LaNitra Jeter -- or is it
16 your position that LaNitra Jeter is lying about
17 that or that you don't recall if it happened?
18    A.   I do not recall that happening.
19    Q.   If LaNitra Jeter testified under
20 oath that she felt she was being not given the
21 same treatment as white victim services
22 officers, are you saying that LaNitra Jeter --
23 are you saying that Ms. Jeter is making that up

24 (Pages 90 - 93)

1 or that you don't remember it?
2    A.   I'm saying she's making that up.
3 She didn't have that conversation with me.
4    Q.   Now, what's the difference between
5 that question that I just asked you where you
6 are saying she's making it up and the previous
7 ones where you say you don't remember?
8    A.   Now I'm thinking I don't remember
9 any of it.  I don't recall any of it, none.
10    Q.   If LaNitra Jeter testified under
11 oath that she believed that Judy Yates was
12 discriminating against her, would you say that
13 LaNitra Jeter is making that up or that you
14 don't recall it?
15    A.   I would say that -- again, I would
16 say that she's making it up.  I don't recall
17 having that conversation with her.
18    Q.   I'm going to show you a document
19 that we'll label Plaintiff's Exhibit Number 3.
20       (Whereupon, Plaintiff's Exhibit 3
21       was marked for identification
22       and a copy of same is attached
23       hereto.)

1    Q.   And I'm going to ask you if you --
2 first of all, have you ever seen Plaintiff's
3 Exhibit 3 before today?
4    A.   I think I do recall seeing this,
5 yes.
6    Q.   Mr. Carr, this appears to be a
7 memorandum from Judy Yates to you and Joe
8 Roberts and the subject is LaNitra Jeter and
9 it's cc'd to the office administrator Michael
10 McCurry, correct?
11    A.   Yes, sir.
12    Q.   And you say that you do remember
13 seeing this document before?
14    A.   I don't know when, but I do
15 remember seeing it.
16    Q.   Do you think you saw it in the
17 course of the discovery or investigation of
18 this lawsuit?
19    A.   Yes.
20    Q.   Or do you think you saw it in real
21 time?
22       MR. MURRILL:  By real time, do you
23 mean the date of the memo?

1       MR. DAVIS:  Yes, the date the memo
2 was generated.
3    A.   I know I didn't see it the date
4 the memo was generated.  I don't think I saw it
5 that particular day or that moment she did it,
6 but I do recall seeing it.  I just remember the
7 flowers more than anything, but I do remember
8 seeing it.
9    Q.   (BY MR. DAVIS:)  Just so we are
10 clear, the date on this memo is 9/30/2019,
11 correct?
12    A.   Right.
13    Q.   And I understand you are saying
14 that you don't know if you saw it on 9/30?
15    A.   On 9/30, correct.
16    Q.   But you think you saw it close to
17 9/30?
18    A.   I saw it at some point, yes.
19    Q.   And you think you saw it at some
20 point before this lawsuit was filed, correct?
21    A.   I think -- I think so, yes.
22    Q.   Did Judy Yates have the authority
23 to write memos to you?

1    A.   Yes.
2    Q.   Did she have to go through any
3 process or did she have to go through a
4 gatekeeper to write a memo to you?
5    A.   No.  Some people wrote memo to
6 file and they kept them, and some people wrote
7 memos and they e-mailed them, yeah.
8    Q.   So if Judy Yates wrote a memo to
9 you on September 30th, 2019, there's every
10 reason to assume you got this memo pretty
11 quickly, correct?
12    A.   If she e-mailed it to me, yes.
13    Q.   And you say you do remember the
14 flowers?  There are flowers at the bottom.
15    A.   I do remember the flowers, yes.
16    Q.   Was that something that was a
17 signatory of hers on all of her memos, the
18 flowers?
19    A.   I'm not sure.
20    Q.   Do you remember any other memos
21 from Judy Yates that had flowers at the bottom?
22    A.   I don't remember any other memos
23 from Judy specifically.  E-mails maybe, but not

1 necessarily memos.
2     Q.   Now, I'm happy to have you look at
3 it and read it to yourself, but I want you to
4 just tell me what is this memo about if you had
5 to characterize it?
6     A.   It's about LaNitra, Ms. Jeter, I'm
7 sorry.  It's about Ms. Jeter.
8     Q.   And what is Judy Yates in
9 substance saying about LaNitra Jeter in this
10 memo?
11     A.   First part is talking about comp
12 time.
13     Q.   And what is Ms. Yates saying about
14 comp time in the context of Ms. Jeter?
15     A.   She's saying that in this
16 particular thing -- I mean this particular
17 paragraph anyway, the first part is all I've
18 read, it's talking about comp time and using
19 comp time.  It's talking about -- well, usage
20 of comp time.  It's talking about at some point
21 not being able to earn comp time and -- yeah,
22 not being able to earn comp time.
23     Q.   Is it a fair characterization of

1 this memo that Judy Yates is complaining about
2 Ms. Yates' use of comp time?
3     A.   Ms. Yates?
4     Q.   Mr. Jeter, I'm sorry.
5     A.   Okay.  Yes.
6     Q.   Do rank-and-file supervisors
7 normally bring to the attention of the DA
8 issues around comp time for employees?
9     A.   Never had this issue before.
10     Q.   So prior to 9/30/2019, you had
11 been DA for about roughly a year at that point?
12     A.   About a year.
13     Q.   Over the whole four years you have
14 been DA, how many memos have you gotten from
15 any supervisors about a rank-and-file
16 employee's use of comp time?
17     A.   Comp time specifically?
18     Q.   Yes.
19     A.   I don't know if I've gotten any
20 specifically about comp time.
21     Q.   Are you suggesting that in the
22 four years you've been DA, the only employee
23 who has been accused of abusing comp time is

1 LaNitra Jeter?
2     A.   No, I'm not saying that.  I'm just
3 saying that I don't know how -- if I have
4 gotten any other -- I remember that
5 specifically.  But I'm also saying that I don't
6 know if any other employee abused comp time.  I
7 don't know.
8     Q.   But your memory sitting here today
9 is you don't remember getting a memo from a
10 line supervisor --
11     A.   Right.
12     Q.   -- about any other employee's use
13 or misuse of comp time, correct?
14     A.   I'm saying I do not.  I do not,
15 no.
16     Q.   Continue looking at this document,
17 Mr. Carr, and let me --
18     A.   Okay.
19     Q.   Do you agree with me, as you read
20 through the document, that Judy Yates is
21 raising concerns about whether LaNitra Jeter is
22 a fit employee for the DA's office?  Tell me if
23 that's a fair characterization.

1     A.   I don't know.  I mean, I would be
2 honestly speculating of what her thoughts were.
3 I can tell you -- and I haven't read the
4 rest of the -- I mean, I haven't read the --
5     Q.   Go to the second page, turn to the
6 second page of that document --
7     A.   Okay.
8     Q.   -- and let's share the document
9 together.  That's quicker than me fishing
10 through my copy.
11     A.   Right.
12     Q.   I want you to read the last
13 paragraph out loud.
14     A.   Okay.  For me, this has really
15 affected my ability to trust any of the wild
16 stories that she has told us since she's been
17 here, but more importantly, it has affected my
18 ability to trust her from now on.  LaNitra is a
19 likable person, she could be a good worker and
20 an asset to the office, but, for me, truth and
21 trust are key for anyone working in the
22 district attorney's office.
23     Q.   So we don't have to really

26 (Pages 98 - 101)

1 speculate what Judy Yates thought about LaNitra
2 Jeter. Judy Yates says in this memo what she
3 thought, correct?
4    A.   She said she's a likeable person,
5 she said but trust, and basically trust is a
6 big factor for her, yes.
7    Q.   Do you remember what you did after
8 you got this e-mail?
9    A.   I don't. And, again, I don't know
10 if that came to me -- if she wrote that memo
11 and gave it to us or e-mailed it to us, I
12 really don't know how. You know, was it
13 electronically done or hey, this is who I'm
14 giving it to, I'm just not sure.
15    Q.   But irrespective of whether it was
16 handed to you or e-mailed to you, you are not
17 challenging the fact that you received it, are
18 you?
19    A.   I'm not challenging at some point
20 I saw that, yes, I'm not challenging that.
21    Q.   Do you remember taking any action
22 item based on this 9/30/19 memo?
23    A.   I don't recall.

1    Q.   Does this memo ask you to take any
2 action item?
3    A.   Not to my knowledge. Again, I'll
4 have to read it.
5    Q.   What do you think was the purpose
6 of Judy Yates writing you a memo that said that
7 she questioned whether she could trust LaNitra
8 Jeter?
9        MR. MURRILL: Object to the form.
10   A.   I -- I don't know.
11   Q.   (BY MR. DAVIS:) Was she seeking
12 permission to fire Jeter?
13   A.   I don't know.
14   Q.   Do you think that would be a fair
15 reading of that memo?
16   A.   I don't know.
17   Q.   She certainly wasn't praising her,
18 was she?
19   A.   I don't think she was technically
20 throwing her -- she said she's a likeable
21 person. So, I mean, I don't know what she was
22 speculating. I think Judy would be the better
23 person to answer that question.

1    Q.   And I'll give her a chance to do
2 that tomorrow.
3    A.   Yes, sir, I'm sure you will.
4    Q.   Here's what I'm wondering about.
5 I don't hide the ball during these depositions,
6 Mr. Yates (sic), I like to tell you what I'm
7 thinking and I like to tell my witnesses what
8 I'm thinking and you tell me if I'm barking up
9 a tree or not. Did LaNitra Jeter -- let me
10 rephrase that.
11       The evidence in this case or the
12 testimony from LaNitra Jeter is that she met
13 with you to complain about the comp time policy
14 and Yates' use of the comp time policy. That's
15 her testimony in this case under oath from
16 LaNitra Jeter. We have a document in this case
17 that at some point in the fall of 2019, Judy
18 Yates writes a memo to you saying that she
19 can't trust LaNitra Jeter and raising an issue
20 around LaNitra Jeter abusing comp time.
21       To me, one reading of that
22 evidence is that LaNitra Jeter went to you to
23 complain, that consistent with the policy you

1 described, you notified Judy Yates of that
2 complaint, that Judy Yates then turned around
3 and wrote LaNitra Jeter up. That's one way to
4 read the evidence in this case. How do you
5 respond to that?
6    A.   That didn't happen.
7        MR. RILEY: I don't think that's a
8 question, Artur.
9        MR. DAVIS: Well, it's just a
10 thought. I asked him to --
11       MR. RILEY: It's a statement.
12 It's your opinion.
13       MR. DAVIS: And I asked him to
14 respond to it.
15       MR. RILEY: It's a statement. It
16 takes a lot of liberty to what the evidence is.
17   Q.   (BY MR. DAVIS:) Well, my question
18 is, how do you respond to that? Not how does
19 your lawyer respond; how do you respond?
20       MR. RILEY: And I'm going to
21 object to the form.
22       MR. DAVIS: Understood. Noted.
23       MR. RILEY: Like here is some

27 (Pages 102 - 105)

Page 106

1 thought I have --
2       MR. DAVIS:  Noted.
3       MR. RILEY:  -- and how do you
4 respond to my thought.
5       MR. DAVIS:  It's noted, Counsel.
6    Q.   (BY MR. DAVIS:)  What's your
7 response to that?
8       A.   I don't have a response.  It
9 didn't happen that way.
10    Q.   (BY MR. DAVIS:)  Do you have any
11 recollection in the fall of 2019 of having a
12 conversation with Joe Roberts about whether
13 LaNitra Jeter should be terminated?
14       MR. MURRILL:  In the fall of 2019?
15    A.   In the fall?
16    Q.   (BY MR. DAVIS:)  Yes, fall of
17 2019.
18    A.   I know at some point we had a
19 conversation, but I don't know -- I mean, the
20 fall?  I don't know the date.
21    Q.   Well, jumping way ahead, we know
22 that she was terminated in March of 2020.  When
23 do you recall the first conversations about

Page 107

1 terminating LaNitra Jeter?
2    A.   I don't have -- I don't know.  We
3 had that conversation, I just don't know the
4 dates.
5    Q.   Do you have a recollection of
6 whether there was an ongoing recurring
7 conversation about whether to terminate LaNitra
8 Jeter?
9    A.   There wasn't an ongoing -- not
10 with me it wasn't, no.
11    Q.   When is the first time you
12 remember someone coming to you, Danny Carr, and
13 saying I think we need to let LaNitra go or
14 something to that effect?
15    A.   There was a conversation with me
16 and Joe about all the information we received
17 from Judy.  And we talked about it.  I don't
18 think we made -- I don't know exactly the date
19 that occurred, I don't, but I do know after
20 listening to all the information, getting all
21 the information from Judy, we made the
22 determination that we were going to let her go.
23 I made the determination, I'm sorry, not we.  I

Page 108

1 made the determination.  But I don't have
2 specific dates.
3    Q.   So let me try to get your best
4 sense again of timeline.  I think it's
5 undisputed because we have a termination letter
6 --
7    A.   Right.
8    Q.   -- that's dated March of 2020.
9    A.   Right.
10    Q.   So it's undisputed she was fired
11 in March of 2020, correct?
12    A.   Yes, sir.  Yes, sir.
13    Q.   Is it your best recollection that
14 the conversation you've just described with Joe
15 Roberts about information from Judy Yates and
16 her perspective about LaNitra Jeter, is it your
17 best recollection that that conversation
18 happened close in time to her termination or
19 notably in advance of her termination?
20    A.   I'll be guessing and speculating.
21    Q.   Well, I'm asking you for your best
22 recollection.
23    A.   I -- I don't want to guess.  I'm

Page 109

1 not sure.  I don't want to guess.
2    Q.   Could there have been multiple
3 conversations between you and Joe Roberts about
4 whether LaNitra Jeter should be terminated?
5    A.   There were -- there was a
6 conversation.  I just -- like I said, I just
7 don't know the date.
8    Q.   But to my question, could there
9 have been multiple conversations?
10    A.   I know there were conversations
11 possibly -- maybe Judy and Joe had a
12 conversation, maybe even Michael, but not with
13 me, no.
14    Q.   How do you know that Judy and Joe
15 had a conversation about terminating LaNitra
16 Jeter?
17    A.   Well, again, because I think Joe
18 and Judy would have at least had a conversation
19 at some point.  I'm not saying how many.  I
20 know they would have had a conversation about
21 what's been going on, why this issue has arisen
22 and everything involved in it.  I know they
23 had -- I'm sure they had a conversation.

Veritext Legal Solutions
877-373-3660                                                            800.808.4958

Page 110

1    Q.   How do you know that?
2    A.   It's just my gut feeling.  I think
3  they had a conversation.
4    Q.   Why is that your gut feeling?
5    A.   Just because I've been knowing
6  them both for a long time.
7    Q.   So based on your knowing Joe
8  Roberts and Judy Yates for a long time, you
9  believe that at some point if Judy Yates felt
10  that LaNitra Jeter should be terminated that
11  she would have talked about it with Joe
12  Roberts, correct?
13    A.   Correct.
14    Q.   And based on your knowing these
15  folks for a long time, if LaNitra Jeter
16  developed -- I'm sorry, if Judy Yates developed
17  the view that LaNitra Jeter should go, you
18  believe that she would have shared that view
19  with Joe Roberts, correct?
20    A.   I believe she would have shared
21  the issues with LaNitra with Joe, yes.
22    Q.   And you believe that Joe and Judy
23  would have talked about those issues, correct?

Page 111

1    A.   Yes.
2    Q.   Do you believe that Joe would have
3  given Judy guidance on how to deal with LaNitra
4  Jeter?
5         MR. MURRILL:  Object to the form.
6    A.   I'm not sure.
7    Q.   (BY MR. DAVIS:)  Do you believe
8  that Joe would have talked with Judy about what
9  would need to happen for LaNitra to be
10  terminated?
11    A.   I'm not sure.
12    Q.   Could that have happened?
13    A.   That Joe -- could that have
14  happened?  I'm not sure.  I don't know.
15    Q.   Do you know of any other VSO being
16  terminated during the four years you've been
17  DA?
18    A.   VSO?  I don't recall, no.
19    Q.   To your recollection, with respect
20  to Judy Yates, is LaNitra Jeter the only person
21  that Judy Yates supervised who's been fired
22  during your tenure?
23    A.   During my tenure, I think so.

Page 112

1    Q.   So the only firing decision, to
2  your knowledge, involving Judy Yates in the
3  last four years has been LaNitra Jeter; is that
4  correct?
5    A.   The only firing decision that Judy
6  made?
7    Q.   Yes, or has been involved in.
8    A.   Okay.  Oh, the information
9  compiled, I think yes.  Yes.
10    Q.   Let's go back to the fall of 2019,
11  and again I want to be crystal clear and
12  understand your answer on this, I've asked you
13  about whether you had a conversation with
14  LaNitra Jeter.  Do you have any knowledge
15  whether LaNitra Jeter had a conversation with
16  Joe Roberts about her treatment by Judy Yates?
17    A.   I do not.
18    Q.   Do you have any knowledge of
19  whether LaNitra Jeter had a conversation with
20  Joe Roberts about whether she felt she was
21  being discriminated against by Judy Yates?
22    A.   I do not.
23    Q.   And just so we are clear, are you

Page 113

1  saying that you affirmatively know that such a
2  conversation did not happen or you are not sure
3  and don't know?
4    A.   I'm not sure and don't know.
5    Q.   So if LaNitra Jeter testified
6  under the same oath that you took today in her
7  deposition --
8    A.   Yes, sir.
9    Q.   -- that she discussed with Joe
10  Roberts her concerns about Judy Yates'
11  administration of leave policy, would you say
12  that she's lying or that you don't know?
13         MR. MURRILL:  Object to the form.
14  And mischaracterizes the evidence.  That's not
15  what she testified to in her deposition.
16         MR. DAVIS:  Well, I'm happy to
17  have counsel and I debate on summary judgment
18  about what the evidence said.
19    Q.   (BY MR. DAVIS:)  But let me ask
20  you the question just so I'm clear.  Do you
21  have any knowledge of LaNitra Jeter making a
22  complaint to Joe Roberts in the fall of 2019
23  about Judy Yates?

29 (Pages 110 - 113)

Page 114

1    A.   I do not.
2    Q.   Let me show you a document that we
3 are going to make Plaintiff's Exhibit Number 4.
4 And what I'm looking for, Mr. Carr -- and I
5 apologize, I don't have an assistant or a
6 paralegal here to quickly zip through the
7 documents for me, but I'm trying to find the
8 chain of command policy that was instituted in
9 your office.  And I apologize that it's not
10 here -- oh, I just found it.  All right.  I'm
11 going to make this Plaintiff's Exhibit Number 4
12 and I'm going to ask you if you have seen this
13 document before.
14         (Whereupon, Plaintiff's Exhibit 4
15         was marked for identification
16         and a copy of same is attached
17         hereto.)
18         MR. MURRILL:  Do you know what
19 that is?
20    Q.   (BY MR. DAVIS:)  My first question
21 is, have you seen this document before I handed
22 it to you?
23    A.   I don't recall seeing it, but I do

Page 115

1 know there is a chain of command policy, yeah.
2    Q.   Would you agree with me that
3 Plaintiff's Exhibit 4 is labeled Staff Meeting
4 December 12th, 2019?
5    A.   Yes.
6    Q.   Do you know who generated this
7 document?
8    A.   Can I see it and read it real
9 quick?
10    Q.   Sure.
11    A.   Thank you.  (Reviewing document.)
12    Q.   As Mr. Murrill has pointed out,
13 the documents speak for themselves.  There is
14 no signature on this document and it's not in
15 memo form, so I can't tell from looking at it
16 who wrote it.  Can you tell from reading it who
17 wrote it?
18    A.   I don't recall who wrote it.
19    Q.   Did you write it?
20    A.   I did not.
21    Q.   Do you have an opinion based on
22 the content of the document of who wrote it?
23    A.   I do not.

Page 116

1    Q.   It says Staff Meeting December
2 12th, 2019.  Would you agree with me that the
3 content of this document suggests that this is
4 about the victim services office?
5    A.   I'm not sure.
6    Q.   Well, one of the things in here is
7 the statement:  Court - Remember you represent
8 the DA's office and Mr. Carr.  Always wear
9 appropriate attire to work.  The demeanor in
10 court must be solemn.  No eating or drinking or
11 texting on phones.
12         That doesn't sound like a
13 description that would go to assistant DAs,
14 does it?
15    A.   It needs to to some, but just --
16 but I will say it doesn't sound like it, but
17 I'm not sure.
18    Q.   But if I were to represent to you
19 that this was a document disseminated to the
20 VSO staff, would you challenge that?
21         MR. MURRILL:  If you have
22 knowledge one way or the other.
23    A.   I just don't have knowledge one

Page 117

1 way or the other, I just don't.
2    Q.   (BY MR. DAVIS:)  All right.  But
3 would you read out loud the first number,
4 communication, labeled communication, would you
5 read what's written there?
6    A.   The entire thing?
7    Q.   Just the one labeled
8 communication, number one.
9    A.   Okay.  Labeled communication, I'm
10 sorry.
11         Communication - Chain of command,
12 please understand that I am your supervisor.
13 If you have any complaints, you must come to
14 me, give me an opportunity to rectify the
15 problem and if not satisfied, come back to me
16 and I will go to Joe Roberts for him to attempt
17 to rectify the problem.
18    Q.   Okay.  That kind of suggests that
19 Joe Roberts didn't write that memo, doesn't it?
20    A.   He didn't write it, correct.
21 Correct.
22    Q.   So this is a memo that I'll
23 represent appears to be written by Judy Yates.

Page 118

1    A.   Okay.

2    Q.   Do you challenge or disagree?

3    A.   I don't have any knowledge, no
4 reason -- I don't have any knowledge of it.

5    Q.   So it says Chain of command,
6 please understand that I am your supervisor.
7 If you have any complaints, you must come to
8 me.  And this is dated December 12th, 2019.

9         You've referred several times to
10 the chain of command.  What do you understand
11 the chain of command to mean with respect to
12 the victim services office?

13   A.   That they go to their supervisor
14 if they have an issue and if they can't get it
15 resolved, then they go to Joe.  And if they
16 can't get it resolved, then Joe will come to me
17 and or I'll be notified about the issue that it
18 can't be resolved and then I will get involved
19 one way or the other.

20   Q.   Earlier I asked you a series of
21 questions about a hypothetical employee who
22 complained about discrimination in the office,
23 and do you remember saying to me earlier that

Page 119

1 if an employee felt that her supervisor was
2 discriminating against her, that she could go
3 to Joe Roberts and tell him?

4    A.   Yes.

5    Q.   She has to notice the supervisor,
6 but she can go to Joe Roberts and report the
7 problem.  Is that what you told me earlier?

8    A.   She can go to Joe Roberts after
9 noticing with the supervisor.

10   Q.   Do you believe that this chain of
11 command policy articulated by Judy Yates is
12 consistent with what you just said?

13        MR. MURRILL:  Object to the form.

14   A.   I think it's articulated
15 ultimately that Joe would get involved, yes.

16   Q.   (BY MR. DAVIS)  Well, what is
17 written here is, quote, give me, Judy --

18   A.   Right.

19   Q.   -- an opportunity to rectify the
20 problem and if not satisfied, come back to me.

21   A.   Right.

22   Q.   So she's saying to a rank-and-file
23 employee if you feel I discriminated against

Page 120

1 you, give me a chance to rectify the problem,
2 come back to me, and I will go -- not you will
3 go, I will go to Joe Roberts for him to attempt
4 to rectify the problem.

5         That is not what you described as
6 the process for an internal complaint of
7 discrimination, is it?

8         MR. MURRILL:  Object to the form.

9    A.   I mean, that's not what I
10 described, but there is an opportunity to go to
11 Joe Roberts, there is.

12   Q.   (BY MR. DAVIS)  Right.  But what
13 is written here is not what you articulated as
14 the policy for an employee to report
15 discrimination, is it?

16   A.   No, it's not.

17   Q.   Do you know if Judy Yates was ever
18 corrected that the policy that she articulated
19 in this memo is actually not Danny Yates'
20 policy -- or Danny Carr's policy when it comes
21 to employee complaints of discrimination?

22   A.   I don't know if she was
23 articulating or not.  Number one, I think

Page 121

1 that -- like I said, I just saw that.  But,
2 again, I do know that there are several ways to
3 get information out, whether it's in writing,
4 whether it's having conversation with
5 individuals --

6    Q.   Do you know if Joe Roberts ever
7 saw this memo?

8    A.   I don't know if he has.

9    Q.   And when I say this memo, I mean
10 Plaintiff's Exhibit 4 dated December 12th,
11 2019.

12   A.   Yeah.

13   Q.   You don't know if he ever saw it?

14   A.   I don't know.

15   Q.   And while you can't talk about
16 what you and your lawyers have discussed, I can
17 certainly ask you about what you and Joe
18 Roberts have discussed around this case, and I
19 will be before I'm done today.  But while we
20 are on the topic, have you discussed this
21 (indicating) document with Joe Roberts --

22   A.   No.

23   Q.   -- in preparation for this case?

31 (Pages 118 - 121)

Page 122

1    A.   No.

2    Q.   Does it concern you that Judy
3 Yates gave a memo to her staff, described chain
4 of command, and that she gave them an
5 instruction that is not consistent with your
6 own policy about how employees should report
7 discrimination internally?

8    A.   No.  No.

9    Q.   Why doesn't that concern you?

10    A.   Because I know Judy and she
11 wouldn't do anything maliciously to try to
12 usurp my authority or circumvent any type of
13 policy or anything like that, so no, I don't.

14    Q.   And you base that on your personal
15 feeling about Judy Yates?

16    A.   It's not personal feelings.  It's
17 just the fact I have known her for years
18 working in that office.

19    Q.   How many times -- first of all,
20 how many years have you known Judy Yates?

21    A.   Probably twenty-five.

22    Q.   Over that twenty-five years, are
23 there times other than this when you've known

Page 123

1 her to be accused of discrimination by
2 employees?

3    A.   No.

4    Q.   So you don't have a context, other
5 than this, for knowing how she would react to
6 an employee accusing her of discrimination?

7         MR. MURRILL:  Object to the form.

8    A.   I don't have a context, no.

9    Q.   (BY MR. DAVIS:)  And you never
10 know how somebody will react to something until
11 it happens.  Do you agree with that?

12    A.   That's a true statement.

13    Q.   The timing of this chain of
14 command policy is December 12th, 2019, so
15 obviously later in time from the September 30th
16 memo from Judy Yates, correct?

17    A.   Correct.

18    Q.   There is a text thread in this
19 case, Mr. Carr, that I'm primarily going to ask
20 Mr. Roberts and Ms. Yates about this because
21 understandably they were the people involved in
22 the text thread.  But there is a text thread in
23 which Judy Yates and Joe Roberts are

Page 124

1 communicating about LaNitra Jeter wanting to
2 talk to Joe Roberts, and Joe Roberts sends a
3 text that I'm going to tell her to talk to you
4 and I'm going to tell her to go back to you.
5 And my recollection is that that text thread
6 happened either in October or November of 2019.
7 Have you seen that text thread?

8    A.   I don't think so.

9    Q.   And, once again, we have evidence
10 in the case of Mr. Roberts and Ms. Yates
11 e-mailing, or texting, rather, about LaNitra
12 Jeter wanting to talk to Joe Roberts and then a
13 month or two months after that text thread, we
14 have a memo from Judy Yates instituting this
15 chain of command.  What's your reaction to
16 that?

17    A.   I don't have one.

18    Q.   Does it suggest to you that some
19 point in the fall of 2019 something happened
20 that led Judy Yates to think that she needed to
21 clarify the chain of command?

22    A.   I don't know.  I would be
23 speculating.  I don't know.

Page 125

1    Q.   All right.  Are you aware that at
2 some point in the fall of '19, very
3 specifically post-Halloween, that LaNitra Jeter
4 believed that some kind of insignia or symbol
5 that we are going to talk about in a moment was
6 placed on her office door?

7    A.   Yes.  I've heard about that.

8    Q.   And just so we are clear, to strip
9 aside the fancy word insignia, there has been
10 testimony in this case under oath by Ms. Jeter
11 that a cutout of a black rat was placed on her
12 office door above her name tag around Halloween
13 in 2019.  Are you aware of that?

14    A.   Yes.

15    Q.   When did you become aware that
16 Ms. Jeter is making that allegation?

17    A.   I think when the -- maybe the --
18 truly aware when the EEOC stuff was filed.

19    Q.   Now, you say truly aware, when did
20 you --

21    A.   Well, let me say this:  I don't
22 know exactly when.  But I know when the EEOC
23 stuff was filed, that's when I can

32 (Pages 122 - 125)

1 affirmatively say I was made aware.  I mean, I
2 knew about it.  I was aware about it at that
3 time.
4      Q.   Have you reviewed the
5 interrogatory responses that your lawyers
6 submitted in this case?
7      A.   I looked at them briefly, yes.
8      Q.   So are you aware that one of the
9 questions that my co-counsel, Mr. Noble, and I
10 asked was whether or not steps were taken to
11 investigate Ms. Jeter's complaint about the
12 black rat cutout?
13      A.   Yes.
14      Q.   Are you aware that the answer that
15 your lawyers prepared was that an investigation
16 was conducted?
17      A.   Yes.
18      Q.   Are you aware of that?
19      A.   Yes.
20      Q.   And my reading of the
21 interrogatory response was that investigation
22 was conducted close in time to when Ms. Jeter
23 made the complaint, which would have been

1 October 2019.  Do you disagree with that?
2           MR. MURRILL:  Do you have the
3 interrogatory responses?  Because I don't think
4 that was the response.
5           MR. DAVIS:  I don't have them in
6 front of me.  If you would like to bring them
7 out, I would be happy to look at them.
8           MR. MURRILL:  Yeah, let's take a
9 break.
10          MR. DAVIS:  Okay.  Sure.
11 Absolutely.
12          (Whereupon, a break was had from
13          11:48 a.m. until 11:54 a.m.)
14     Q.   (BY MR. DAVIS:)  So before the
15 break that we took, Mr. Carr, we were talking
16 about the interrogatory responses in this case
17 and I was asking you about a question that my
18 colleague and I posed about this allegation
19 about some sort of black rat insignia being
20 placed on Ms. Jeter's door.  And I asked you --
21 I was about to ask you a line of questions
22 about an investigation that may or may not have
23 been done around Ms. Jeter's allegations and

1 Mr. Murrill made the representation that the
2 responses that he prepared said that there was
3 no investigation because it's their position
4 that Ms. Jeter did not complain in realtime.
5 And he's correct that in reviewing the
6 document, that it says, quote, Plaintiff did
7 not complain to any of her supervisors about a
8 black rat cutout.  And that's not to say that's
9 Ms. Jeter's position, but that is the position
10 of your office and that is the position of
11 Mr. Murrill, so I accept that clarification.
12          MR. MURRILL:  It was actually her
13 testimony too.
14          MR. DAVIS:  Understood.
15 Understood.
16     Q.   (BY MR. DAVIS:)  So let me pick up
17 on one point.  I had asked you if you knew
18 whether or not Judy Yates was aware in the fall
19 of 2019 that LaNitra Jeter had made complaints
20 against her, and I believe your recollection is
21 that you just don't know or you are not sure.
22 Am I right?
23     A.   Correct.

1      Q.   So I'm going to show you a
2 document that we will make Plaintiff's Exhibit
3 Number 5.
4          (Whereupon, Plaintiff's Exhibit 5
5          was marked for identification
6          and a copy of same is attached
7          hereto.)
8      Q.   And have you seen Plaintiff's
9 Exhibit Number 5 before?
10     A.   (Reviewing document.)  I have not.
11     Q.   I will represent to you that
12 Plaintiff's Exhibit Number 5 is a memo to file.
13 Is that a fair description on my part?
14     A.   Yes.
15     Q.   And it literally has the word memo
16 written on it and it literally says to file; is
17 that correct?
18     A.   Yes.
19     Q.   And it says from Judy Yates,
20 correct?
21     A.   Correct.
22     Q.   Would you read the first sentence
23 of this memo to file out loud?

1     A.   Joe had forwarded an e-mail Nitra
2 had sent to him regarding not understanding the
3 chain of command and that she was not being
4 treated fairly.
5     Q.   You can stop.
6     A.   Okay.
7     Q.   Does that sentence suggest to you
8 -- and the date on this memo is November 22nd,
9 2019, correct?
10     A.   Correct.
11     Q.   Does that sentence suggest to you
12 that at least as of November 22nd, 2019, that
13 Judy Yates was aware that LaNitra Jeter had
14 complained she was not being treated fairly?
15     A.   Yes.
16     Q.   I'm going to show you another
17 document, Mr. Carr, and I'll represent to you
18 that this is a document that Ms. Jeter composed
19 and it is a document she sent to the EEOC.  And
20 you're aware that in these types of
21 discrimination cases, the EEOC gets the first
22 crack at looking at the evidence.  Are you
23 aware of that now?

1     A.   I am now, yes.
2     Q.   I'm going to mark this Plaintiff's
3 Exhibit Number 6.
4         (Whereupon, Plaintiff's Exhibit 6
5         was marked for identification
6         and a copy of same is attached
7         hereto.)
8     Q.   I assume at some point you've seen
9 this document, correct?
10         MR. MURRILL:  While he's reviewing
11 it, I will state for the record it is Bates
12 labeled DA 000025 and DA 000026.
13     A.   Okay.  Yes.  This -- if this is
14 the one from the EEOC.
15     Q.   (BY MR. DAVIS)  Yes.
16     A.   Okay.
17     Q.   Okay.  And this says to whom it
18 may concern, and it's literally signed by
19 Ms. Jeter; is that correct?
20     A.   Correct.
21     Q.   I'm going to read to you just a
22 limited part of it.  The second paragraph
23 begins on September 23rd, 2019, I was informed

1 by my supervisor, Judy Yates, that I was no
2 longer allowed to accrue comp time as my fellow
3 coworkers did.
4         Do you agree with me that's the
5 sentence?  Did I read that correctly?
6     A.   I agree that's on this document,
7 yes.
8     Q.   All right.  So -- and work with me
9 on this, Ms. Jeter reported to the EEOC that on
10 September 23rd she was given information by
11 Judy Yates about her comp time.
12         And is it fair to say that
13 Ms. Jeter believed that that information was
14 hurtful to her in some way and that she felt it
15 was an act of discrimination?  Is that a fair
16 reading of this complaint?
17         MR. MURRILL:  Object to the form.
18     A.   I -- Ms. Jeter will probably be
19 the best person to answer that.
20     Q.   (BY MR. DAVIS:)  But this is
21 Jeter's letter, correct?
22     A.   Yes.  She signed it, yes.
23     Q.   So Jeter says on September 23rd

1 Judy Yates informed her that her comp time was
2 being restricted, correct?
3     A.   Yes.
4     Q.   Earlier today I showed you a memo
5 that is dated September 30th, seven days later,
6 that Judy Yates wrote to you and Joe Roberts in
7 effect complaining about LaNitra Jeter; is that
8 correct?
9     A.   Yes.  That date is correct.
10     Q.   I will ask you this one more time,
11 Mr. Carr.
12     A.   Okay.
13     Q.   Did LaNitra Jeter meet with you
14 between September 23rd and September 30th,
15 2019?
16     A.   I do not recall meeting with
17 Ms. Jeter.
18     Q.   You are not saying it didn't
19 happen, you are saying you don't remember it?
20     A.   I do not remember.  I --
21         MR. RILEY:  Object to the form.
22 It's been asked and answered.
23     Q.   (BY MR. DAVIS:)  Now, I asked you

Page 134

1 earlier about the concept of a supervisor
2 keeping a file on an employee. I would rather
3 use the time asking Ms. Yates about her memos
4 and not asking you about Ms. Yates memos, but
5 let me just ask you to be clear. I'll
6 represent to you in the discovery process your
7 attorneys have provided several documents that
8 are memos to file that Judy Yates wrote about
9 LaNitra Jeter. Did you see any of those
10 documents when they were written in the fall of
11 2019 or the winter of 2020?
12    A.   No.
13    Q.   And you're confident of that?
14    A.   I'm pretty confident of that.
15    Q.   And do you know whether or not Joe
16 Roberts would have seen any of those memos to
17 file that Yates wrote about Ms. Jeter?
18    A.   I don't know. I wouldn't know if
19 he saw them or not.
20    Q.   Have you ever asked him?
21    A.   No.
22    Q.   And just so we are crystal clear,
23 you never instructed Judy Yates to keep any

Page 135

1 sort of a file on LaNitra Jeter. Am I correct
2 on that?
3    A.   You are correct.
4    Q.   And you don't know whether or not
5 Joe Roberts gave her any such instruction,
6 correct?
7    A.   Correct.
8    Q.   Let me show you a document that we
9 are going to make Plaintiff's Exhibit Number 7.
10         (Whereupon, Plaintiff's Exhibit 7
11         was marked for identification
12         and a copy of same is attached
13         hereto.)
14    Q.   And I'll ask you if you have seen
15 Plaintiff's Exhibit before today.
16    A.   Yes, I have.
17    Q.   How would you describe it?
18    A.   It's a memo at some point
19 notifying Joe of all the issues that have
20 compiled relative to Ms. Jeter.
21    Q.   What's the date on it?
22    A.   March 13th, 2020.
23    Q.   And as you've said, it's a memo to

Page 136

1 Roberts from Yates. Do you know who, if
2 anyone, instructed Yates to prepare this memo?
3    A.   I do not know.
4    Q.   Did you ask Yates to prepare this
5 memo?
6    A.   I don't -- no, I don't recall
7 doing that.
8    Q.   During the four years you have
9 been DA, have you been presented any other
10 memos from Judy Yates that are laying out a
11 bill of particulars or a series of incidents
12 around an employee?
13    A.   Surrounding a VSO, I don't recall.
14    Q.   The first line in this memo says
15 as requested, below is a condensed list of
16 issues that have come up since LaNitra Jeter
17 began her employment here April 16th, 2019.
18 Does that suggest to you that someone asked
19 Judy Yates to prepare this memo?
20    A.   Yes. I'm sure it -- yeah.
21    Q.   When do you think you first saw
22 this memo?
23    A.   I'm not sure. Probably a little

Page 137

1 after it was probably prepared.
2    Q.   So it was prepared on March 13th,
3 according to the date, correct?
4    A.   According to the date, yes.
5    Q.   And I'll represent to you that the
6 termination letter in this case that was given
7 to Ms. Jeter is dated -- and we'll go ahead and
8 make that Plaintiff's Exhibit 8.
9         (Whereupon, Plaintiff's Exhibit 8
10         was marked for identification
11         and a copy of same is attached
12         hereto.)
13    Q.   Would you agree with me that's the
14 termination letter to Ms. Jeter?
15    A.   Yes, sir.
16    Q.   And what's the date on it?
17    A.   March 16th.
18    Q.   So obviously the memo from Yates
19 to Roberts was three days before the
20 termination of Jeter, correct?
21    A.   Correct.
22    Q.   Is it fair to say that this memo
23 (indicating) appears to have influenced the

Page 138

1 termination decision?
2      A.   It's fair to say that that memo
3 was a list of all the issues that she's had
4 with Ms. Jeter to memorialize those issues
5 obviously and for us to make a determination on
6 whether or not Ms. Jeter should remain employed
7 or not.
8      Q.   Who would have been the
9 responsible decision-maker who would make a
10 determination as to whether Ms. Jeter remained
11 employed?
12      A.   I would.
13      Q.   Did you in fact make that decision
14 to terminate Ms. Jeter?
15      A.   Yes, sir.
16      Q.   Did you obtain a recommendation
17 from anyone before you made that decision?
18      A.   I wouldn't say I obtained a
19 recommendation. I retained -- or obtained
20 information about Ms. Jeter's employment and
21 issues that were going on with her employment.
22 I wouldn't say I obtained a recommendation per
23 se.

Page 139

1      Q.   What was the information that you
2 obtained regarding her employment?
3      A.   The information, probably some of
4 it, some of it I obtained orally from talking
5 with Joe about the issues that maybe him and
6 Judy have talked about with Ms. Jeter relative
7 to some of those line items right there
8 (indicating) --
9      Q.   So you --
10      A.   -- that's contained in this memo.
11 I'm sorry.
12           MR. MURRILL:  And you are
13 referring to Plaintiff's Exhibit 7.
14      A.   Plaintiff's Exhibited 7, yes.
15 Yes.
16      Q.   (BY MR. DAVIS)  Do you recall
17 seeing any memo other than Plaintiff's Exhibit
18 7 written by Judy Yates referring to issues
19 that LaNitra Jeter had?
20      A.   I do not.
21      Q.   And I've noticed that on
22 Plaintiff's Exhibit 7, the March 13th memo,
23 there is a page one that's at the bottom. Do

Page 140

1 you see that?
2      A.   Yes.
3      Q.   I'll represent to you that we've
4 not been given a page two. Do you happen to
5 know if there is a page two?
6      A.   I don't know.
7      Q.   And do you have any explanation
8 for why a one-page document would have a page
9 one on it if there is no page two?
10      A.   Could be a typo. I mean, could be
11 a typo. Could be plenty of reasons. Could be
12 a typo, but I don't know.
13      Q.   Well, that wouldn't be a typo.
14 That would be auto-generated, wouldn't it?
15      A.   Yeah, auto-generated. Right.
16      Q.   And if a document generates a one,
17 that's usually because there is a sequence and
18 there is a two, correct?
19           MR. MURRILL:  Object to the form.
20      A.   I'm not sure. Probability is the
21 computer thinks it's a two, but a two is never
22 formalized.
23      Q.   (BY MR. DAVIS)  But just so we

Page 141

1 are clear, I have not been given -- Mr. Murrill
2 and Mr. Noble and I have not been given a page
3 two. So can we assume there is no page two?
4           MR. MURRILL:  I think we can
5 assume that. That's a fair assumption.
6      Q.   (BY MR. DAVIS)  And you have no
7 recollection of there being a second page of
8 incidents?
9      A.   No recollection, no, sir.
10      Q.   So just so we are clear, when you
11 made the decision to terminate Ms. Jeter, the
12 information you had in hand would be the
13 information contained in Plaintiff's Exhibit 7,
14 correct?
15      A.   Correct.
16      Q.   Oral information given to you by
17 Joe Roberts, correct?
18      A.   Joe Roberts and Judy.
19      Q.   So both Judy Yates and Joe Roberts
20 engaged in conversation with you about whether
21 LaNitra Jeter should be terminated as an
22 employee. Am I right?
23      A.   Right.

Page 142

1    Q.   During the conversations -- first
2  of all, how many conversations do you think --
3  and I know you may not remember the exact
4  number, but I want your best estimate, how many
5  conversations do you think you had with Joe
6  Roberts and/or Judy Yates about whether LaNitra
7  Jeter should be terminated?
8    A.   I don't think we had many.  I
9  think ultimately all the information that's
10 contained in that memo, in Plaintiff's Exhibit
11 7, was all the information compiled by Judy
12 over a period of time of her employment there
13 and ultimately Judy and Joe contacted me, we
14 conversed about it, and the decision was made
15 to let her go.
16   Q.   When Judy and Joe contacted you,
17 did they come in your office and have a
18 conversation with you about the subject of
19 whether Jeter should be fired?
20   A.   I think it may have happened -- it
21 may have even been in Joe's office.  I mean,
22 that's -- but ultimately, yes, we had a
23 conversation, they provided the information to

Page 143

1  me, mainly the information that was compiled by
2  Judy, and a decision was made.
3    Q.   Is it fair to say that you relied
4  on the information that Joe Roberts and Judy
5  Yates gave you?
6    A.   Yes, sir.
7    Q.   Is it fair to say that you would
8  not have terminated LaNitra Jeter but for the
9  information that Joe Roberts and Judy Yates
10 provided?
11   A.   Yes, sir.
12   Q.   Is it fair to say that during your
13 conversations with Joe Roberts and Judy Yates
14 about LaNitra Jeter's fate at the DA's office,
15 is it fair to say that they expressed a
16 viewpoint that she should be terminated?
17   A.   They -- I don't know if they
18 expressed a viewpoint.  I mean, I think they
19 said listen, here's all the issues we've been
20 having, here's all the things that has
21 occurred, you know, what do you think, and we
22 conversed about it.  And I don't want to
23 speculate and say that somebody came and said I

Page 144

1  think she should be fired.  I don't really
2  think that occurred.
3    Q.   So one of the things we learn in
4  our work as prosecutors --
5    A.   Right.
6    Q.   -- is the sequence of events
7  matters a lot; is that correct?
8    A.   Correct.
9    Q.   What came first?  There are two
10 scenarios.  Did you go to Roberts and Yates --
11   A.   Right --
12   Q.   -- and say give me information
13 about LaNitra Jeter, or did Roberts and Yates
14 come to you and say we have information about
15 LaNitra Jeter?
16   A.   They came to me and said we have
17 information.  This has been going on for a long
18 period of time.  We want to update you on
19 everything that's been going on.
20   Q.   You agree that they initiated the
21 conversations about Jeter's future, correct?
22   A.   Correct.
23   Q.   You didn't initiate those?

Page 145

1    A.   Correct.
2    Q.   They initiated them?
3    A.   Correct.
4    Q.   And but for Roberts and Yates
5  coming to you and initiating these
6  conversations, you would not on your own have
7  fired LaNitra Jeter, would you?
8    A.   No.
9    Q.   You wouldn't have had a reason to,
10 would you?
11   A.   I wouldn't have had information.
12   Q.   So you agree that not only did you
13 have the information, you had this (indicating)
14 document, Plaintiff's Exhibit 7, before you
15 made the decision, correct?
16   A.   Yes, sir.
17   Q.   When you looked at this document,
18 whether it was handed to you or e-mailed to
19 you, when you received this document on or
20 about March 13th, 2020, I want you to tell me
21 each and every step you took to verify the
22 statements made in this document.
23   A.   I relied on information that they

37 (Pages 142 - 145)

Page 146

1 provided, and based on that information, I had
2 no reason to think that it was made up or that
3 they did anything malicious. And because of
4 that information, I made the decision to
5 terminate her.
6    Q.   There are multiple bullets listed
7 on this document, correct?
8    A.   Several.
9    Q.   Count for me the number of bullets
10 you see.
11    A.   Twelve.
12    Q.   Did you take any steps on your own
13 to verify or corroborate any of the twelve
14 bullets contained in Plaintiff's Exhibit Number
15 7?
16    A.   I don't recall investigating them
17 myself, no.
18    Q.   Well, let me take the loaded word
19 investigate out and ask you a different
20 question. Tell me every step, if any, that you
21 took to corroborate or confirm bullets one
22 through twelve.
23    A.   The steps would have been to

Page 147

1 investigate it. What I did was relied on
2 information provided to me and made the
3 decision based on that information.
4    Q.   So does that mean that you did not
5 on your own attempt to verify any of this
6 information?
7    A.   That means I did not individually
8 investigate it.
9    Q.   You relied on Yates and Roberts?
10    A.   Correct.
11    Q.   Did you talk to Jeter?
12    A.   Did I talk to Jeter?
13    Q.   About the allegations --
14    A.   No.
15    Q.   -- in Plaintiff's Exhibit Number
16 7.
17    A.   No.
18    Q.   Did you talk to the people who are
19 in charge of keeping records for leave time and
20 comp time in the office after reading this
21 memo, Plaintiff's Exhibit 7?
22    A.   No.
23    Q.   Who are the people in your office

Page 148

1 who keep records and data regarding employees'
2 use of leave and comp time?
3    A.   Michael McCurry would be that
4 person.
5    Q.   Did you talk with Michael McCurry
6 after you received Plaintiff's Exhibit 7?
7    A.   No.
8    Q.   Why not?
9    A.   Because the information, again,
10 that I relied on from Judy who got the
11 information from Michael I'm sure, I felt was
12 reliable, had no reason to think that it was
13 made up or fudged in any way.
14    Q.   So it's your belief that in
15 constructing this memo that Judy Yates received
16 information from McCurry in his capacity as
17 administrator, correct?
18    A.   And that Judy had firsthand
19 knowledge about the time and the information in
20 that memo as well.
21    Q.   So let's go one by one.
22    A.   Okay.
23    Q.   And I hate to be tedious about it.

Page 149

1    A.   I got it.
2    Q.   But since your lawyers are taking
3 the position that all of these reasons informed
4 her termination, it's my obligation to get into
5 them.
6    A.   I understand.
7    Q.   The very first bullet listed on
8 here, I want you to read it out loud.
9    A.   Okay. Abuse of earning time and
10 taking time away from work. She is more
11 interested in being away from work than being
12 present and contributing to the office.
13    Q.   Can we agree that you took no
14 steps on your own to confirm the amount of time
15 that Ms. Jeter took away from work?
16    A.   We can agree that I did not
17 investigate her time sheets myself. I received
18 information about her time sheets based on this
19 memo from Judy, yes.
20    Q.   Time sheets can be printed?
21    A.   I mean not time sheets, but the
22 use of time I should say.
23    Q.   Time sheets can be printed out,

Page 150

1 correct?
2     A.    Yes.
3     Q.    Comp leave requests can be printed
4 out, correct?
5     A.    If there is a vehicle to do it,
6 yes, it can.
7     Q.    And in fact, your attorneys have
8 provided copies of all the comp time requests
9 that LaNitra Jeter submitted.  Are you aware of
10 that?
11    A.    No, I am not.
12    Q.    Are you aware that Mr. Noble and I
13 also asked for records of all the comp time
14 requests that other VSOs submitted.  Were you
15 aware of that?
16    A.    No.
17    Q.    If someone wanted to determine
18 whether or not LaNitra Jeter abused comp time
19 and took too much time away from work, what
20 documents do you think they would need to look
21 at to verify that sentence?
22    A.    I don't think that's all document
23 related.  I think it's on a situation by

Page 151

1 situation and moment by moment and on a need
2 situation as well.
3     Q.    Well, there is a statement in
4 bullet one she is more interested in being away
5 from work than being present and contributing
6 to the office.
7     A.    Right.
8     Q.    Does that suggest to you that
9 someone is a frequent absentee?
10    A.    Oh, it does, yes.
11    Q.    And if one wanted to measure
12 whether someone was a frequent absentee, that
13 would be as basic as looking at their
14 attendance records, correct?
15    A.    Possibly.  But it also could be a
16 frequent absentee as I'm leaving earlier today
17 or I'm going to take this time, these next four
18 hours after lunch I got something to do.  It
19 could be several different ways.  I don't think
20 it's just document driven in my opinion.
21    Q.    But would you agree that all of
22 those ways --
23    A.    Yes.

Page 152

1     Q.    -- would leave a documentary paper
2 trail?
3     A.    Possibly.
4     Q.    I'm going to show you an item that
5 is Plaintiff's Exhibit Number 9.
6         (Whereupon, Plaintiff's Exhibit 9
7          was marked for identification
8          and a copy of same is attached
9          hereto.)
10    Q.    I'm going to ask you if you have
11 ever seen Plaintiff's Exhibit Number 9 before
12 today.
13    A.    No, I have not.  Both of these are
14 9?  They both go together in 9, right?
15    Q.    Yes.
16        MR. MURRILL:  What's the Bates
17 number on these, Artur?
18        MR. DAVIS:  000127 and 000128.
19    Q.    (BY MR. DAVIS:)  Would you agree
20 with me, Mr. Carr, that Plaintiff's Exhibit 9
21 at the bottom says 2019 attendance?
22    A.    Oh, yes, yes.  Yes.
23    Q.    And does it say District Attorney,

Page 153

1 10th Judicial Circuit?
2     A.    It does.
3     Q.    Is that your circuit?
4     A.    Yes.
5     Q.    And does it say LaNitra Jeter at
6 the top?
7     A.    It does.
8     Q.    And does it list months and dates
9 ranging from her start in April 2019 until
10 December 2019?  Would you agree that's fair?
11    A.    That's fair.  I mean, I --
12    Q.    This document appears to be a time
13 sheet of attendance for LaNitra Jeter.  Is that
14 fair?
15    A.    That's what it appears to be, yes.
16    Q.    Did you review this document
17 before you made the decision to terminate
18 LaNitra Jeter?
19    A.    I did not.
20    Q.    Do you know if Joe Roberts
21 reviewed this document before the decision was
22 made to terminate LaNitra Jeter?
23    A.    I'm not sure if he did.

39 (Pages 150 - 153)

Page 154

1    Q.   Do you know if Judy Yates reviewed
2  this document before the decision was made to
3  terminate LaNitra Jeter?
4    A.   I'm not sure if she did.
5    Q.   Do you think this document might
6  shed light on the question of whether she was a
7  frequent absentee employee?
8    A.   I don't.
9    Q.   Why not?
10    A.   Because, again, there are other
11  ways that you can be absent from work and
12  affect the ability for an office to run,
13  whether it's a full day or whether it's four
14  hours.
15    Q.   From looking at this document, do
16  you agree that it appears to measure exactly
17  what you just said, the number of hours she
18  worked?
19    A.   It probably does.
20    Q.   Okay.  So if you define
21  absenteeism as something that can be measured
22  in terms of number of hours one worked, would
23  you agree that this document, Plaintiff's 9,

Page 155

1  speaks to that question and provides detailed
2  information?
3    A.   I think I will say not knowing
4  totally about that document and seeing it, I
5  would say that it does speak to a portion of
6  it.  I don't think it speaks to the totality of
7  it.
8    Q.   Well, again, the judge and the
9  clerk will have a chance to see the document,
10  but it certainly appears to me from looking at
11  it that this document in elaborate detail tells
12  you the number of hours that she would have
13  worked on every day.  Does that sound fair?
14    A.   Sounds fair to me.
15    Q.   So, again, if someone wanted to
16  determine whether or not LaNitra Jeter was more
17  interested in being off than coming into work,
18  this document would shed real light on that
19  question, wouldn't it?
20    A.   It would shed some light.
21    Q.   Do you know of a document that
22  would shed more light than this one?
23    A.   No.  I think some testimony from

Page 156

1  people that's directly related to her comings
2  and goings would shed some light as well.
3    Q.   But when people testify about
4  comings and goings, that's inherently subject
5  to memory problems, isn't it?  We know that as
6  prosecutors, don't we?
7    A.   I think all testimony is subject
8  to memory problems.
9    Q.   So that's the value of having
10  day-by-day records, isn't it?
11    A.   For the most part, yes.
12    Q.   And as a prosecutor if you were
13  trying a case and you were trying to determine
14  if a purp was a regular absentee or not, you
15  would rely more on a document like Number 9
16  than testimony, wouldn't you?
17    A.   Number 9 would carry some weight,
18  yes.
19    Q.   Carry more weight than testimony,
20  wouldn't it?
21         MR. MURRILL:  Object to the form.
22    A.   I don't know about that.  It would
23  carry some.

Page 157

1    Q.   (BY MR. DAVIS:)  Okay.  I think we
2  understand each other.
3         I'm going to show you some more
4  documents.  And with any of this, I don't mean
5  to belabor, Mr. Carr, but this is all important
6  --
7    A.   I understand.
8    Q.   -- frankly to the argument that
9  your side is making, and I have the obligation
10  of being responsive to those arguments.
11  Candidly, if your side narrowed it down to only
12  a few reasons, then I can narrow my questions
13  down to only a few things.
14    A.   Okay.
15    Q.   But they didn't, so I have to be
16  methodical.
17    A.   Okay.
18    Q.   I'm going to show you a set of
19  pages, we are not going to talk about them all
20  in detail, that's not the purpose, but I'll
21  show you a set of pages that my paralegal and I
22  picked out, and I'm going to collectively label
23  these Plaintiff's Exhibit Number 10.

Page 158

1        (Whereupon, Plaintiff's Exhibit 10
2        was marked for identification
3        and a copy of same is attached
4        hereto.)
5     Q.   I'm going to show you what we are
6  going to mark as one collective exhibit,
7  Plaintiff's Number 10, and I'll represent to
8  you, Mr. Carr, that these are documents that
9  were provided by your lawyers to Mr. Noble and
10  myself and that we've requested documents about
11  all leave time or comp time or vacation time,
12  any requests for leave or time off that were
13  submitted by Ms. Jeter, and we also made the
14  same request of some of the other individuals
15  she worked with.
16        Let me ask one contextual
17  question, first of all, was she the only black
18  victim services officer?
19     A.   At that time, I think so, yes.
20     Q.   Now, help me understand that a
21  little before we go into these documents.  Your
22  office is known for being very diverse.  Am I
23  right?

Page 159

1     A.   Yeah.  We're trying to make it
2  more diverse, yes.
3     Q.   And a number of your assistants
4  are African-American and a number of your
5  assistant DAs are African-American, correct?
6     A.   Right.  Yes.
7     Q.   A number of your administrative
8  people are African-American, correct?
9     A.   Yes.
10     Q.   Can you shed some light on how in
11  an office that has a high level of diversity
12  before LaNitra Jeter was hired there were only
13  white victim services officers?
14     A.   Well, we only had two.  We only
15  had two victim service officers for years.
16     Q.   But that expanded at some point,
17  didn't it?
18     A.   That expanded when they came on
19  board, yes.
20     Q.   So when you say expanded when they
21  came on board --
22     A.   When Ms. Jeter and them came on
23  board, it expanded with this grant through OPS.

Page 160

1     Q.   Okay.  So when the grant expanded,
2  you went from two to having about five, didn't
3  you?
4     A.   Went from two to having five, if
5  my recollection recall me, yes.
6     Q.   And four of them were white,
7  correct?
8     A.   The three that were hired, two
9  were white and one was black, right.
10     Q.   And Jeter was the one who's black?
11     A.   Correct.
12     Q.   And I don't want to spend an
13  exquisite amount of time on this, but it is
14  fair to say that most of the victims your
15  office works with are African-Americans just
16  statistically?
17     A.   I would probably say yes.
18     Q.   Now, Plaintiff's Exhibit 10, I
19  want you to actually -- there is one document I
20  think that should not be in here because it is
21  a different type of document, so let me take
22  that out.  All of these pages --
23        MR. MURRILL:  Why don't you

Page 161

1  identify the pages for the record?
2        MR. DAVIS:  Sure.  000144, 000145,
3  000146, 000147, 000148, unfortunately my
4  eyesight is not good enough to read the next
5  one, 000151, 000157, 000161, 000164, 000172,
6  000177, 000179.  There appear to be two 000179s
7  -- no.  000179 and 000178.  I'm sorry.  I don't
8  have my glasses on so I'm not going to say
9  that's perfect.
10     Q.   (BY MR. DAVIS:)  I want you to
11  take these pages -- and I'll represent to you
12  these are not in order, there are some numbers
13  that are missing because there were a number of
14  duplicate pages that we were provided, and
15  there are some pages that are not of the same
16  nature of this document but just happened to be
17  in the same sequence.  So I want you to look at
18  these documents and, first of all, I want you
19  to tell me if you agree with me that all of
20  these are documents that LaNitra Jeter
21  suggested that asked for comp time, personal
22  time, or vacation time.  Just tell me if you
23  think that's a fair characterization of these

41 (Pages 158 - 161)

Page 162

1 documents as you look through them.
2    A.   (Reviewing document.)  That's what
3 it appears to be, yes.
4    Q.   And would you agree that calendar
5 year, all those documents appear to be in 2019?
6    A.   Yes.
7    Q.   Would you count the number of
8 pages I just handed you and tell me how many
9 pages you see?
10    A.   Fourteen.
11    Q.   I'm going to show you a document
12 that we are going to make Plaintiff's Exhibit
13 Number 11.
14       (Whereupon, Plaintiff's Exhibit 11
15       was marked for identification
16       and a copy of same is attached
17       hereto.)
18    Q.   And I'm going to represent to you
19 that these are -- let's actually go ahead and
20 do it this way:  Let me make another
21 document -- actually, we'll make this
22 Plaintiff's 12 because it doesn't really
23 matter.

Page 163

1       (Whereupon, Plaintiff's Exhibit 12
2       was marked for identification
3       and a copy of same is attached
4       hereto.)
5    Q.   Let me show you Plaintiff's
6 Exhibit Number 12, and I will represent these
7 are all documents from 2020 that are leave
8 requests by Ms. Jeter.  Take a look at that.
9    A.   (Reviewing document.)
10    Q.   Would you agree those all appear
11 to be 2020 leave requests submitted by LaNitra
12 Jeter?
13    A.   (Reviewing document.)
14       MR. MURRILL:  000273 is not.
15       MR. DAVIS:  What is 000273?
16       MR. MURRILL:  It's not a leave
17 request.
18       MR. DAVIS:  Well, page 000273 is a
19 March 13th, 2020, note from LaNitra Jeter to
20 Tamika Jackson.  Tamika Jackson says this is
21 your early day and you came in at 7:11 instead
22 of 7:00 a.m.  Will you be staying over to make
23 up time, or will you use time from vac, sic, or

Page 164

1 comp?
2       It's a comp time request, isn't
3 it?
4    A.   I think that's a request to see
5 what she want to do.  I don't know if it's her
6 saying I want to use comp time.
7    Q.   Well, she's asking can I use
8 vacation, sick, or comp time.  So it's one of
9 those three, right?
10    A.   Well, it's mentioned in there,
11 yeah.  This looks like it's an e-mail from
12 Tamika Jackson.  Is that right?
13       MR. MURRILL:  To LaNitra Jeter.
14    Q.   (BY MR. DAVIS:)  To LaNitra Jeter.
15 Okay.
16    A.   Okay.  So LaNitra is not
17 requesting it.
18    Q.   But it suggests that LaNitra
19 Jackson (sic) is being responsive to a request.
20 Isn't that fair?
21    A.   Yes.
22    Q.   All right.  So, again, remember
23 how I defined these documents, all these

Page 165

1 documents are requests for comp time, vacation
2 time, or sick time.  I understand this document
3 in effect reflects to an inquiry as to which
4 one of those, but I'm still going to include it
5 in the inquiry because it appears to be
6 responsive to request for time.
7       So how many pages are in front of
8 you right now?
9    A.   Five.
10    Q.   I'm going to show you Plaintiff's
11 Exhibit Number 11.  And I will represent to you
12 that this is leave request from Erin Barefield
13 for, again, same category; comp, vacation, or
14 leave time.  Let me make sure I'm correct on
15 the name here.
16       These appear to be one from 2019
17 and appears to be several from 2020.  Look
18 through those and tell me if you agree that
19 those are all comp, vacation, or leave time
20 requests for Erin Barefield for 2020.
21    A.   Okay.  Yes.
22    Q.   And I'm going to add another batch
23 of documents that are also going to be added to

Page 166

1 -- what is that exhibit number, Mr. Carr?
2     A.    Number 11.
3     Q.    All right.  Add this to
4 Plaintiff's Exhibit Number 11.  This is going
5 to be another set of documents that pertain to
6 Erin Barefield.  And would you agree as you
7 look through those documents that they fit one
8 of three categories; vacation time, comp time
9 or leave time requests?
10     A.    Yes.
11     Q.    It appears to cover a two-year
12 period, '19 and '20, correct?
13     A.    Yes.
14     Q.    How many pages total of comp,
15 leave, or vacation time requests from Erin
16 Barefield?
17     A.    Total, I count nineteen.
18     Q.    It's more than Jeter, correct?
19     A.    These sheets, yes.
20     Q.    Okay.  Do you remember what the
21 number was for Jeter?  I can ask the reporter
22 if you don't.
23     A.    I want to say fourteen.

Page 167

1     Q.    All right.  So you recall seeing
2 fourteen comp leave -- and just so we are
3 clear, each one of these pages, each page
4 reflects an individualized request for leave,
5 comp, or vacation time?
6     A.    Right.
7     Q.    All right.  So there were fourteen
8 individualized requests for Jeter over '19 and
9 '20, correct?
10     A.    Correct.
11     Q.    There were nineteen for Barefield
12 over '19 and '20, correct?
13     A.    Correct.
14     Q.    We agree nineteen is more than
15 fourteen?
16     A.    Yes.
17     Q.    Have you ever seen any memo from
18 Judy Yates that complains that Ms. Barefield
19 was abusing time and taking time away from
20 work?
21     A.    I have not.
22     Q.    Have you ever seen any memo from
23 Judy Yates suggesting that Ms. Barefield, who

Page 168

1 took more leave, comp, and vacation time
2 requests than LaNitra Jeter, was more
3 interested in being away from work than
4 contributing to the office?
5     A.    I have not.
6     Q.    Do you have any knowledge of Judy
7 Yates ever raising concerns that Barefield was
8 abusing leave time although she took more time
9 or requested more time than Jeter did?
10         MR. MURRILL:  Object to the form.
11     A.    No, I have not.
12     Q.    (BY MR. DAVIS:)  How would you
13 explain that?
14     A.    I would explain that by you have
15 to have the total picture.
16     Q.    Well, let's focus on this part of
17 the total picture.  We have more leave requests
18 for a white colleague than we do for Jeter?
19     A.    Right.
20     Q.    But Jeter is the one who ends up
21 getting terminated and written up.  Is that
22 part of the picture?
23         MR. MURRILL:  Object to the form.

Page 169

1     A.    No.  That's not the total picture.
2     Q.    (BY MR. DAVIS:)  That's part of
3 the picture, isn't it?
4     A.    A small portion.
5     Q.    Well, the other portion would be
6 the other eleven bullets, correct?
7     A.    A small portion, correct.
8     Q.    That's why we are going to talk
9 about those.  But before we do that, let me
10 also show you a document that we are going to
11 make Plaintiff's Exhibit Number 13.
12         (Whereupon, Plaintiff's Exhibit 13
13         was marked for identification
14         and a copy of same is attached
15         hereto.)
16     Q.    Have you ever seen Plaintiff's 13
17 before?
18     A.    I have not.
19     Q.    I will represent to you that
20 Plaintiff's 13 at the bottom it says 2020
21 Attendance, District Attorney, 10th Judicial
22 Circuit.  That's you, right?
23     A.    That's me.

43 (Pages 166 - 169)

Page 170

1    Q.    Person listed at the top is Erin
2 Barefield, correct?
3    A.    Correct.
4    Q.    And we have just been talking
5 about all of Ms. Barefield's leave, comp, or
6 vacation time requests, correct?
7    A.    Correct.
8    Q.    And Ms. Barefield left at some
9 point in 2020.  Am I right?
10    A.    She burned her time so she could
11 leave, yes.  Moved to Memphis.
12    Q.    So before she moved to Memphis, it
13 appears she worked about six months in 2020,
14 correct?
15    A.    I don't know exactly how long, but
16 she worked -- I don't know how long she was
17 there.
18    Q.    Earlier I showed you Ms. Jeter's
19 attendance record for 2019, Plaintiff's Exhibit
20 9; now I'm showing you Ms. Barefield's
21 attendance record for in effect 2020.  Just so
22 we are fair about our math, Jeter started in
23 April, so the document, Plaintiff's 9,

Page 171

1 essentially reflects about seven months for
2 her.  Is that fair?
3    A.    For?
4    Q.    Jeter.
5    A.    Okay.
6    Q.    And is it fair that the document
7 for Barefield appears to reflect about six
8 months for her?
9    A.    Yeah, I guess.
10    Q.    It's comparable, six months and
11 seven months, right?
12    A.    Roughly.  I don't know how long
13 she worked there.
14    Q.    All right.  But the document
15 carries time of about six months, doesn't it?
16    A.    It looks like it does, yes.
17    Q.    Okay.  So Barefield six months,
18 Jeter seven months.  We agree that's
19 comparable?
20    A.    Right.
21    Q.    Did you or, to your knowledge,
22 Judy Yates ever look at these two attendance
23 records and compare them prior to LaNitra Jeter

Page 172

1 being terminated?
2    A.    I did not, no.
3    Q.    But if someone wanted to gauge the
4 question of who came to work more and who
5 contributed to work more, would you agree that
6 Plaintiff's Exhibit 9 and Plaintiff's Exhibit
7 13 would be two documents that could help
8 inform that inquiry?
9    A.    I think it can be a small portion
10 of that inquiry.
11    Q.    Well, if someone literally wanted
12 to know the hours that they worked, Plaintiff's
13 Exhibit 9 and 13 would be very helpful,
14 wouldn't they?
15    A.    Yes, as long as you know the whole
16 story behind it.
17    Q.    But if one wanted to literally
18 know the days and hours they worked --
19    A.    Oh, now, I agree with that, yes.
20 Yes.
21    Q.    All right.  So with respect to if
22 someone wanted to know who took off more days
23 and who worked more, Plaintiff's Exhibit 9 and

Page 173

1 13 would be a great way to start, correct?
2    A.    Yes.  I have no argument with
3 that.
4    Q.    But do you have any belief that
5 Yates or Roberts ever compared Jeter's records
6 to Barefield's records prior to Jeter's
7 termination?
8    A.    I don't have any recollection of
9 it.
10    Q.    I'm going to show you Plaintiff's
11 Exhibit 14.
12        (Whereupon, Plaintiff's Exhibit 14
13        was marked for identification
14        and a copy of same is attached
15        hereto.)
16    Q.    Plaintiff's Exhibit 14 is an
17 attendance record for Cheryl Black.  Do you
18 agree with that?
19    A.    Yes.
20    Q.    It's an attendance record for 2019
21 for Cheryl Black.  And she's another VSO,
22 correct?
23    A.    Yes.

44 (Pages 170 - 173)

1    Q.   She was a white VSO like
2 Ms. Barefield, correct?
3    A.   Yes.
4    Q.   Would you agree that the
5 attendance record that is Plaintiff's 14 shows
6 in detail the hours and days worked by Cheryl
7 Black?
8    A.   Yeah, I would agree that it shows
9 the hour and days.
10    Q.   And do you know if prior to
11 Ms. Jeter's termination Mr. Roberts or
12 Ms. Yates ever compared LaNitra Jeter's
13 attendance record to Cheryl Black?
14    A.   I have no idea.
15    Q.   Do you have any reason to think
16 they did?
17    A.   No.  No idea.
18    Q.   Let me show you a set of documents
19 that are attendance and leave requests for
20 Ms. Cheryl Black.  Let me get them all
21 together.  We'll make this Plaintiff's Exhibit
22 Number 15.
23        (Whereupon, Plaintiff's Exhibit 15

1        was marked for identification
2        and a copy of same is attached
3        hereto.)
4    Q.   I'll represent to you Plaintiff's
5 Exhibit 15 is a collective series of pages that
6 are all comp, vacation time, or leave requests
7 from Ms. Cheryl Black.  Ms. Cheryl Black is a
8 white person as well, correct?
9    A.   Correct.
10    Q.   VSO, correct?
11    A.   Correct.
12    Q.   VSO the same time as Jeter,
13 correct?
14    A.   What you mean same time?
15    Q.   So same timeframe as Jeter, VSO at
16 the same timeframe '19, '20 -- or '18 and '19.
17    A.   Oh, I thought you were talking
18 overall time.  Yeah, she was working there at
19 the same time.
20    Q.   All right.  I want you to take a
21 look and again tell me, first of all, looking
22 through that if you agree that all these
23 documents appear to be separate vacation, comp,

1 or leave time or sick leave requests for Cheryl
2 Black during the years 2019 and 2020.
3    A.   (Reviewing document.)  Yes.
4    Q.   How many documents do you count?
5    A.   Thirty-one.
6    Q.   That's more than fourteen,
7 correct?
8    A.   Correct.
9    Q.   That's more than nineteen,
10 correct?
11    A.   Correct.
12    Q.   That's a lot more than fourteen?
13    A.   Yes.
14    Q.   Have you ever seen a memo from
15 Judy Yates saying that Cheryl Black abused
16 time?
17    A.   No, I haven't.
18    Q.   Have you ever seen a memo from
19 Judy Yates saying that Cheryl Black took too
20 much time off work?
21    A.   I haven't seen a memo, no.
22    Q.   Have you ever seen a memo from
23 Judy Yates saying that Cheryl Black was more

1 interested being away from work than being
2 present in the office?
3    A.   I have not.
4    Q.   Can you give me an explanation of
5 how somebody with fourteen times gets written
6 up for excessive use of leave, vacation, or
7 comp time and someone with thirty-one instances
8 does not get written up?  Can you explain that
9 to me?
10        MR. MURRILL:  Object to the form.
11    A.   No.  I can tell you that
12 everybody's situation is different.  Cheryl
13 Black has been there probably twenty-three
14 years.  I think the fact that a person comes
15 there, starts working, starts using comp time
16 immediately after obtaining comp time versus a
17 person who has been there, who has banked it,
18 and a person -- again, I think you have to take
19 all the circumstances and situation.  Even in
20 some of those papers, I saw where there was eye
21 surgery, things like that.
22        I'm just saying there are so many
23 different situations where you can look at it

45 (Pages 174 - 177)

1 and say -- there is not one instance where you
2 can say that this person because of their time
3 and this person because of their time was
4 treated differently.  There are other issues
5 other than comp time.
6      Q.   Would you hand me the pile with
7 Ms. Jeter again.
8      A.   It may be both of them.
9      Q.   Okay.  I don't want to belabor,
10 but would you agree that some of Ms. Jeter's
11 requests were also medical related?  And I'm
12 happy to let you look through them.
13      A.   It probably was.  I don't know.
14      Q.   So you said something about one --
15      A.   I was giving examples.  I was
16 giving examples.
17      Q.   All right.  But you could give
18 that same example for Ms. Jeter that she had
19 sick time off too, correct?
20      A.   Yes.
21      Q.   She had medical issues that she
22 was taking time off for too, correct?
23      A.   I guess.  I mean, Possibly.

1 Possibly.
2      Q.   Well, you can look through it.
3      A.   Possibly.  (Reviewing document.)
4 Right, it's indicated.
5      Q.   I will represent to you that some
6 of her requests were medical.
7      A.   Right.
8      Q.   All right.  Fair enough.
9      A.   Right.
10      Q.   So you are not saying that Jeter's
11 instances were all nonmedical and some of --
12      A.   No.
13      Q.   -- Black's are medical, are you?
14      A.   No.
15      Q.   Okay.  So when I asked you to
16 explain the difference in an employee with
17 fourteen instances of comp, vacation, or leave
18 time getting fired and someone with thirty-one
19 instances not getting written up, your answer
20 to that was well, Cheryl Black had been there a
21 long time.
22           Is there any written policy in the
23 DA's office that creates a separate leave or

1 comp time policy for long-term employees?
2      A.   No.  My answer was that she had
3 been there a long time, but my answer was also
4 you have to know the whole story between all
5 the individuals.
6      Q.   Okay.  But I just want to ask you,
7 just as you used to tell folks to do when you
8 were questioning them at trial --
9      A.   Right.
10      Q.   -- is there a written policy in
11 the DA's office that says that there is a
12 different rule for leave and vacation and comp
13 time for long-term employees?
14      A.   No, there is not.
15      Q.   And when we talked earlier about
16 the personnel manual that was presented to
17 Ms. Jeter in the '19 and '20 iterations, is
18 there anything in that personnel manual that
19 suggests there is a different comp, vacation,
20 or leave policy for long-term employees?
21      A.   No, it's not.
22      Q.   Do you have any reason to believe
23 that Ms. Jeter was ever told or communicated to

1 that there was a different leave policy for
2 long-term employees?
3      A.   I don't have any reason to believe
4 she was told that, no.
5      Q.   Do you have any reason to believe
6 Ms. Jeter was ever told there is a different
7 comp time policy for long-term employees?
8      A.   No.
9      Q.   Do you have any reason to believe
10 that Judy Yates was ever told there was a
11 different comp time policy for long-term
12 employees?
13      A.   No, I don't think she was told
14 there was a different comp time policy, no.
15      Q.   Do you know if Joe Roberts was
16 ever told that?
17      A.   Not to my knowledge.
18      Q.   So, again, that's a belief and
19 opinion of Danny Carr that is not codified in
20 policy, is it?
21      A.   It's not codified, no.  Everything
22 is not codified in policy.
23      Q.   All right.  So you are correct

Page 182

1 that there are eleven more bullets, but would
2 you -- I'm just asking for your opinion at this
3 point.
4     A.   Okay.
5     Q.   Would you agree that of all of
6 these twelve bullets, the most serious one is
7 the allegation that Ms. Jeter was abusing leave
8 time?
9     A.   No.  I think they are all compiled
10 together is what made the decision, not one
11 over the other.
12     Q.   Fair enough.
13           Second bullet says failure to
14 follow chain of command.  What is that talking
15 about?
16     A.   That's talking about properly
17 notifying your supervisor if there is an issue,
18 properly notifying your supervisor if you are
19 going to take however longer than authorized to
20 do certain things, properly notifying your
21 supervisor if you are going to go and do
22 something during work time.  Just general
23 stuff.  But notifying your supervisor and then

Page 183

1 it going up the chain of command versus just
2 kind of, I guess -- I'll leave it there.  Just
3 notifying your supervisor.  That answers your
4 question.  Just notifying your supervisor
5 basically.
6     Q.   Are you guessing that's what Judy
7 Yates meant or do you know that's what Judy
8 Yates meant?
9     A.   I don't know exactly what she
10 meant.
11     Q.   Did you ask Judy Yates, Judy, what
12 do you mean by failure to follow chain of
13 command?
14     A.   I asked her about -- I'm sure we
15 had that conversation, yes.  I'm sure we had
16 that conversation.
17     Q.   And how many times, to your
18 knowledge, was LaNitra Jeter accused of not
19 following the chain of command?
20     A.   I don't know specific.
21     Q.   Was it one time?
22     A.   I'm sure it was.  I just don't
23 know the number.

Page 184

1     Q.   Would a one-time failure to follow
2 the chain of command be a firing offense in
3 your opinion?
4     A.   I'm not saying it was just one
5 time.  I don't know how many times it was.
6     Q.   Did you make any attempt to
7 ascertain how many times LaNitra Jeter had
8 quote, unquote, failed to follow the chain of
9 command?
10     A.   I relied on that information, all
11 those different bullet points.
12     Q.   So to answer my question, did you
13 make any attempt to ascertain how many times
14 she failed to follow chain of command?
15     A.   Not specific, no.
16     Q.   You just relied on the bullet
17 point failure to follow chain of command?
18     A.   I relied on that information in
19 that memo.
20     Q.   You didn't follow up with Yates
21 and say how persistent a problem was this and
22 frequent a problem was this?  You didn't ask
23 that, did you?

Page 185

1     A.   I don't think I did.
2     Q.   And that would be important
3 information whether or not somebody ignored the
4 chain of command every day, some days, or one
5 time.  That would be important to know,
6 wouldn't it?
7     A.   I mean, I would think it would.
8     Q.   But you didn't make an attempt to
9 find out, did you?
10     A.   I didn't investigate it.
11     Q.   Bullet number three.
12           MR. MURRILL:  Hey, Artur, I'm not
13 trying to cut you off, but if you think you are
14 going to go for a while, I'm going to have some
15 lunch brought in for my client.
16           MR. DAVIS:  I'm actually -- once I
17 get through these bullets, I'm close to being
18 done.
19           MR. MURRILL:  Okay.  Well, give me
20 an idea.
21           MR. DAVIS:  Well, there are eight
22 more bullets to go.
23     Q.   (BY MR. DAVIS:)  But I would say

Page 186
1 to you, Mr. Carr, and to Rob, I think these can
2 be disposed of much quicker because there is no
3 documentary evidence as there was with one.
4        MR. MURRILL:  Okay.
5        MR. DAVIS:  I think in realtime --
6 I'll tell you what, why don't we go fifteen
7 more minutes, and then I'll let you make your
8 judgment at that point.  Fair enough?
9        MR. RILEY:  Well, it's really up
10 to you and Danny.
11        THE DEPONENT:  I'm good.
12        MR. RILEY:  I mean, if you want to
13 get some lunch or if you want to have somebody
14 bring something in.
15        THE DEPONENT:  I'm fine.
16        MR. DAVIS:  Okay.
17        MR. RILEY:  Okay.  We'll go
18 fifteen minutes.
19        MR. DAVIS:  Okay.
20        MR. RILEY:  And do you need to
21 stand up and stretch, Danny?
22        MR. DAVIS:  Let's go fifteen
23 minutes and see where we were.

Page 187
1        THE DEPONENT:  That's fine.
2        Q.   (BY MR. DAVIS:)  All right.
3 Bullet number three, why don't you read bullet
4 number three.
5        A.   Repeatedly has told stories that
6 turned out to be untrue, so loss of credibility
7 and being trustworthy.
8        Q.   What does repeatedly mean?
9        A.   Doing it more than one time.
10        Q.   Did you ask Judy Yates how many
11 times LaNitra Jeter told stories that turned
12 out to be untrue?
13        A.   Specifically how many times, no,
14 but I've heard about stories that turned out to
15 be untrue.
16        Q.   When did you hear about her
17 telling stories that were untrue?
18        A.   Something about what happened in
19 court somewhere and other things in passing.  I
20 didn't, you know -- that I did hear about.
21        Q.   So let me ask you this:  Was it
22 Judy Yates that you heard these hints about
23 these incidents from?

Page 188
1        A.   I don't know if it was Judy or
2 Joe.  I'm not sure.
3        Q.   It was one of the two?
4        A.   It may have been Judy, Joe, or --
5 I'm not sure which one it was honestly.
6        Q.   So when Judy or Joe were at some
7 point giving you anecdotes about LaNitra Jeter,
8 quote, unquote, telling stories, did you
9 discipline LaNitra Jeter --
10        A.   No.
11        Q.   -- after you heard about these
12 incidents?
13        A.   At that time, no.
14        Q.   After any of the times when
15 Roberts or Yates told you that they said Jeter
16 was, quote, unquote, making up stories with
17 respect to any one of those instances, did you
18 discipline Jeter?
19        A.   At the time that was not on top of
20 the food chain.  There was so much other stuff
21 going on in the office, I can't say that I sat
22 down and said oh, she told one story, okay, no.
23        Q.   It says loss of credibility and

Page 189
1 being trustworthy.
2        What evidence did you have on
3 March 16th, 2020, which is the date of the
4 termination, what evidence did you have on
5 March 16th, 2020, that LaNitra Jeter had told
6 stories, was untrustworthy, or lacked
7 credibility?  What evidence did you have?
8        A.   That there may have been times
9 that she was reported in the office but not in
10 the office.
11        Q.   Who told you that?
12        A.   That was reported to me by Judy.
13        Q.   Tell me --
14        A.   And about the court, whatever
15 stuff happened with that as well, those are all
16 information I received from her.  That's all
17 information I received from her.  I'm sorry.
18        Q.   Tell me any and all steps you took
19 to independently corroborate.
20        A.   I did not.
21        Q.   So you took no steps to
22 independently corroborate?
23        A.   I did not.

Page 190

1    Q.   That's a serious allegation saying
2 that an employee has no credibility and is not
3 trustworthy, isn't it?  That's a very serious
4 allegation, correct?
5    A.   It's a serious statement.
6    Q.   Because all of us have to trust
7 the people who work under us, correct?
8    A.   Correct.
9    Q.   If you have got an employee who is
10 not trustworthy, that is a big deal, isn't it?
11    A.   It is.
12    Q.   And if there is an allegation that
13 an employee is not trustworthy, it's important
14 to know what it is they are untrustworthy
15 about.  Do you agree?
16    A.   Yes.
17    Q.   And do you agree that for someone
18 in LaNitra Jeter's position that she has access
19 to all kinds of sensitive information?
20    A.   While being in the DA's office?
21    Q.   Yes.
22    A.   Sure.
23    Q.   Did you make any attempt to find

Page 191

1 out what the subjects were that she was
2 supposedly untruthful about?
3    A.   I think some of the subjects were
4 the reporting of being at work while on the
5 clock but not being there, things of that
6 nature.  I don't know if -- if you are saying
7 uses of the computer or something like that, I
8 don't know anything about that.
9    Q.   Did Judy Yates tell you at any
10 point that LaNitra Jeter had been untruthful in
11 the course of doing her job as a victim
12 services officer?
13    A.   Not to my knowledge.
14    Q.   So your understanding was that
15 these supposed instances of making up stories
16 had nothing to do with her actual work as a
17 victim services officer.  Am I right?
18        MR. MURRILL:  Object to the form.
19    A.   My position is that not being
20 truthful is also being able to rely on you
21 during your course of being at work being
22 available so we can keep the office running and
23 having a victim services officer there when you

Page 192

1 are on the clock and other things as well.
2    Q.   But your source for that
3 conclusion was Judy Yates, correct?
4    A.   The information was provided by
5 Judy, yes.
6    Q.   The next bullet, quote, has posted
7 on social media stories that were untrue, just
8 for the shock value.
9        Have you ever been to LaNitra
10 Jeter's Facebook page?
11    A.   I haven't.
12    Q.   Have you ever seen a Twitter
13 account that she has?
14    A.   I'm not on -- no.
15    Q.   Have you ever seen an Instagram
16 account that she has?
17    A.   No.
18    Q.   Have you ever seen a LinkedIn
19 account that she has?
20    A.   No.
21    Q.   All those are social media sites
22 where one can post stories, correct?
23    A.   Correct.

Page 193

1    Q.   So do you know if Joe Roberts has
2 ever been to her social media sites to see if
3 she was posting untrue facts?
4    A.   I don't know.  I don't know if he
5 has or not.
6    Q.   Did you ask Judy Yates for
7 screenshots of the untrue things she was
8 posting on social media?
9    A.   I did not.
10    Q.   Do you know if Joe Roberts ever
11 asked for screenshots of these untrue things
12 she was posting?
13    A.   I did not.
14    Q.   Did they give you any specific
15 example of these untrue things she was posting?
16    A.   I don't recall that they did.
17    Q.   Next bullet, has used office time
18 to deal with issues that are her husband's or
19 her adult son's legal issues.
20        Do you know what that was
21 referring to?
22    A.   Not specifically, no.
23    Q.   Do you have any idea what it was

49 (Pages 190 - 193)

Page 194

1 referring to?
2    A.   No, not specifically.  Just
3 here -- not specifically, no.
4    Q.   Did you ask Judy Yates what do you
5 mean by using office time to deal with issues
6 that are her husband's or her adult son's legal
7 issues?
8    A.   Well, my understanding from
9 talking -- from the information that I -- that
10 I guess I could retrieve is that during office
11 time while being logged in, that she was going
12 to court settings or going here and going
13 there.  And I don't know why, I don't know if
14 it was her son's case or whatever the case was,
15 but I did -- that's the information that I
16 gathered.  But I don't know if it was her son's
17 case or what case it was.
18    Q.   And the information you gathered
19 all came from Judy Yates, correct?
20    A.   Yes.
21    Q.   Do you know of Judy Yates ever
22 disciplining LaNitra Jeter for taking work time
23 to deal with her husband's legal issues?

Page 195

1    A.   I don't know.  She may have talked
2 to her about it, but I don't know if she
3 disciplined her.
4    Q.   Have you ever seen a disciplinary
5 write-up to that effect?
6    A.   No.
7    Q.   And disciplinary write-ups are
8 important in office culture because they put an
9 employee on notice that they need to change
10 their behavior.  Do you agree?
11         MR. MURRILL:  Object to the form.
12    A.   Also telling them can put them on
13 notice as well.  So it can be disciplinary
14 write-up or telling them.
15    Q.   (BY MR. DAVIS:)  But just to be
16 clear, when you were presented this memo, did
17 you ask Judy Yates how many times LaNitra Jeter
18 used official time to work on her husband's
19 business?
20    A.   I didn't ask her to give me a
21 number of times, no.
22    Q.   Did you ask Judy Yates how many
23 times or how often LaNitra Jeter took work time

Page 196

1 to deal with her son's legal issues?
2    A.   I did not.
3    Q.   Next bullet, read me the next
4 bullet, begins with the word repeatedly.
5    A.   Repeatedly talks about filing
6 judicial complaints against various judges her
7 husband has to deal with.
8    Q.   How many times, to your knowledge,
9 did LaNitra Jeter talk about filing judicial
10 complaints against judges?
11    A.   I have no idea.
12    Q.   Did you ask Judy Yates how often
13 does Jeter talk about filing judicial
14 complaints?
15    A.   I don't recall us talking about
16 that.
17    Q.   Did you ask Joe Roberts how often
18 does LaNitra Jeter talk about filing judicial
19 complaints?
20    A.   I don't recall, no.
21    Q.   Do you have any proof that LaNitra
22 Jeter ever talked about filing judicial
23 complaints?

Page 197

1    A.   Me personally, no.
2    Q.   So when you made the termination
3 decision, you had no personal corroboration in
4 this claim that Jeter went around talking about
5 complaining about judges, correct?
6    A.   At that time, I don't recall
7 having -- I don't recall hearing -- I don't
8 recall having a conversation with them about
9 it.
10    Q.   Next bullet, quote, has been
11 repeatedly counseled about the constant abuse
12 of her time; example, asking to come in early,
13 to leave early, leaving early, has rarely
14 worked an entire five-day workweek.
15         And I apologize for laughing at
16 that, but it does strike me as somewhat amusing
17 because you counted fourteen pages of leave
18 requests or vacation time or comp time requests
19 from LaNitra Jeter between April '19 and the
20 end of her tenure.
21         How do you get from fourteen comp,
22 vacation, or leave time requests to the
23 assertion that she has rarely worked a five-day

50 (Pages 194 - 197)

1 workweek?
2     A.   I'm sure Judy can answer that
3 better than me.
4     Q.   That's pretty hard to imagine if
5 there is any answer to that, though, isn't
6 there, Mr. Carr?
7     A.   I don't know.  I'm sure she can
8 answer it better than me.
9     Q.   That is a factual assertion that
10 she has rarely worked an entire five-day
11 workweek.
12         I'll ask it this way:  If the
13 evidence and documents I've shown you today
14 from her attendance record to her records of
15 leave, comp, and vacation time requests, do you
16 believe that those documents support the
17 assertion that Jeter rarely worked a five-day
18 workweek?
19         MR. MURRILL:  Object to the form.
20     A.   I don't know.
21     Q.   (BY MR. DAVIS:)  If you had an
22 employee who starts in April 2019, do you
23 believe that employee would make it to March

1 2020, a year, if in fact they rarely worked a
2 five-day workweek?
3     A.   It's possible, yes.
4     Q.   Do you know of any employees who
5 worked for you for a year and have rarely
6 worked a five-day week?
7     A.   No.
8     Q.   You would expect to hear about
9 that, wouldn't you?
10    A.   I would.
11    Q.   That would be excessive
12 absenteeism, wouldn't it?
13    A.   I would expect to hear about it.
14    Q.   Did Judy Yates ever come to you
15 prior to March 13th, 2020, and say LaNitra
16 Jeter hardly ever comes to work?
17    A.   She didn't come to me
18 specifically, no.
19    Q.   Prior to March 13th, 2020, did
20 Judy Yates ever say the sentence or something
21 similar to the sentence that LaNitra Jeter
22 rarely works a five-day workweek?
23    A.   I don't recall her saying it to me

1 specifically.
2     Q.   Do you know of her saying it to
3 anybody else?
4     A.   Not to my knowledge.
5     Q.   When you saw this sentence -- and
6 you did read this memo?
7     A.   I looked at it, yes, yes, I did.  I
8 read it.
9     Q.   And, in fact, for you to make a
10 weighted decision like firing someone, it would
11 have been incumbent on you to read this and
12 think about it, correct?
13    A.   I read it and relied on it, yes.
14    Q.   And you're not saying that you
15 skimmed it.  You read it and thought about it
16 and internalized it.  Is that fair?
17    A.   I read it, yes.
18    Q.   So when you read it and you
19 internalized it and you saw the sentence has
20 rarely worked an entire five-day workweek, did
21 you say to Joe, Joe, can y'all pull her
22 attendance records?
23    A.   No.

1     Q.   Did you say to Judy, Judy, can we
2 pull her attendance records?
3     A.   I did not.
4     Q.   Did you say go get McCurry and
5 pull her attendance records?
6     A.   I did not.
7     Q.   Did you say we need to
8 substantiate this and see if this is true,
9 let's pull her attendance records?  Did you say
10 that?
11    A.   I did not.
12    Q.   Next bullet, has fallen asleep
13 while observing a trial.
14         Full confession, I did that as a
15 law clerk.
16         Have you ever seen any evidence
17 that LaNitra Jeter ever fell asleep while
18 attending a trial?
19    A.   I have never been in court with
20 her.
21    Q.   Did Judy Yates say I got a photo
22 of LaNitra sleeping during trial?
23    A.   She didn't say that to me, no.

51 (Pages 198 - 201)

Page 202

1    Q.   Did you ask Judy Yates, Judy,
2  what's your proof that she fell asleep while
3  observing a trial?
4    A.   I did not.
5    Q.   Did you ask Joe Roberts, Joe,
6  what's your proof that she fell asleep while
7  observing a trial?
8    A.   I did not.
9    Q.   Did you attempt to independently
10 corroborate that statement in any way, shape,
11 or form?
12   A.   No.
13   Q.   And all humor aside, that is not
14 an appropriate thing if someone who is a
15 judicial official fell asleep while observing a
16 trial, correct?
17   A.   Correct.
18   Q.   But it has happened to folks
19 working for Jefferson County DA's office,
20 hasn't it?
21   A.   I don't recall that happening.
22   Q.   Okay.  All right.  Next bullet,
23 leaves the building without signing out or

Page 203

1  letting someone know she will be available.
2        How many times did LaNitra Jeter
3  leave the building without signing out or
4  letting someone know she would be unavailable?
5    A.   Judy would be the best person to
6  answer that.  I don't know.
7    Q.   Did you ask Judy how many times
8  Jeter had left the building without signing
9  out?
10   A.   I recall just in conversation her
11 saying it happened several times, but none
12 specific, no.
13   Q.   When Yates said to you in
14 conversations that Jeter left the building
15 without authorization, did she ever tell you
16 she had written up Jeter for that?
17   A.   I don't recall if she did, no.
18   Q.   Do you recall telling her well,
19 you need to write her up for that?
20   A.   I did not.
21   Q.   Did you take steps to terminate
22 Jeter after Yates made those comments to you
23 about Jeter leaving the building without

Page 204

1  permission?
2    A.   I did not at the time, no.
3    Q.   And sometimes when people are
4  working in your office, they will sometimes
5  leave the building to go out and make a
6  personal call; is that correct?
7    A.   I'm sure people leave for a
8  variety of reasons, yes.
9    Q.   And without evidence or proof,
10 it's hard to know if the instances in which
11 Jeter left the building were inappropriate or
12 problematic.  Do you agree?
13   A.   Say that again, I'm sorry.
14   Q.   Without evidence as to the details
15 of when and why she left, it's impossible to
16 make a judgment of whether that was a fair
17 grounds for terminating her.  Don't you agree?
18       MR. MURRILL:  Object to the form.
19   A.   Well, I agree that -- I would
20 agree to that, but I would also say that Judy
21 would be the best person to answer the question
22 as relates to why she was leaving the building.
23   Q.   (BY MR. DAVIS:)  So, once again,

Page 205

1  you just relied on Judy?
2    A.   Correct.
3    Q.   Next bullet, signs out to a court
4  that is empty and cannot be found.  What does
5  that mean?
6    A.   That means that we have a system
7  called -- it's a system where you just let
8  people know where you are.  I'm going to
9  Bahakel's court or I'm going to so and so's
10 court or I'm going to a victim's house or I'm
11 going to the police department, and you put
12 that up there for a lot of reasons, safety
13 reasons as well, and people will know where you
14 are if somebody call and ask for you.  People
15 will know how to get in touch with you.  But
16 clearly, that means that if you read that, she
17 was signed out to a courtroom that would have
18 been nobody was in that courtroom in the
19 criminal courthouse, which means it was empty.
20 If you read that, that's what it means.
21   Q.   How many times did she do that?
22   A.   I don't know.
23   Q.   Did you ask Yates how many times

52 (Pages 202 - 205)

Page 206

1 she did it?
2    A.   No.
3    Q.   Did you ask Roberts how many times
4 she did it?
5    A.   I did not.
6    Q.   Did you make any effort to
7 corroborate whether or not she signed out to a
8 court that was empty and how many times she did
9 so?
10    A.   I did not.
11    Q.   Next bullet, has no credibility
12 with her coworkers and is compromising the
13 grant report we submit to OPS.
14        How was LaNitra Jeter compromising
15 the grant report?
16    A.   Judy would have to answer that
17 question.
18    Q.   Did you ask Judy what she meant by
19 that?
20    A.   Probably meant reporting the time
21 that you have to report to OPS as relates to
22 the timeframe, just like any other grant, you
23 have to make reports, you have to make filings.

Page 207

1 But, again, I'm assuming that's what she meant,
2 but I don't know.
3    Q.   How would LaNitra Jeter have
4 impacted the submissions that had to be made by
5 VSO to OPS?
6    A.   I don't know.
7    Q.   Did you ask Judy Yates how LaNitra
8 Jeter might have been compromising the grant
9 report?
10    A.   I do not have that information,
11 no.
12    Q.   Did you ask for it?
13    A.   No.
14    Q.   Did you ask Joe Roberts how Jeter
15 was compromising the grant report?
16    A.   I did not.
17    Q.   That's a pretty serious
18 allegation --
19    A.   Right.
20    Q.   -- albeit vague, it's a pretty
21 serious allegation.  Do you agree?
22    A.   And I don't know how they do the
23 reports.  But, I mean, again, I think Judy

Page 208

1 would be the person -- without the information,
2 it's hard for me to answer that question.
3    Q.   But you didn't -- just to be
4 clear, you didn't make any effort to determine
5 what Yates meant by that broad statement that
6 she was compromising the grant report?
7    A.   I did not.
8    Q.   Has no credibility with her
9 coworkers.
10        Did you talk with any of LaNitra
11 Jeter's coworkers other than Judy Yates about
12 her work performance?
13    A.   I didn't.
14    Q.   Did you ask any of LaNitra Jeter's
15 coworkers, the other VSOs like some of these
16 ladies we talked about that took more leave
17 time than she did, did you ask any of them what
18 they thought about LaNitra Jeter?
19    A.   I did not.
20    Q.   Did you see any statements or
21 affidavits from them saying that LaNitra Jeter
22 has no credibility with us?
23    A.   I did not.

Page 209

1    Q.   Have you seen any affidavits from
2 them saying we don't want to work with LaNitra
3 Jeter?
4    A.   I haven't talked to anybody about
5 that.
6    Q.   All right.  So did you ask Judy
7 Yates, Judy, what do you mean by she has no
8 credibility with her coworkers?
9    A.   I did not.
10    Q.   Did you ask Joe Roberts, Joe, what
11 do you mean she has no credibility with her
12 coworkers?
13    A.   I didn't ask him.
14    Q.   Last bullet, during a meeting with
15 the YWCA advocate director, she asked questions
16 about her husband's case where he is the
17 defendant of a PFA and how to get the judge to
18 allow them to speak and let her know the PFA
19 was vindictive.
20        Can you translate that into plain
21 English for me?
22    A.   I can't, but I'm sure Judy can.
23    Q.   Do you even understand what that

53 (Pages 206 - 209)

1 bullet is saying? I don't. Do you happen to
2 understand?
3    A.   A little bit, I do.
4    Q.   Okay. Then tell me what it's
5 any sort of it saying.
6    A.   It's saying that obviously there
7 is a PFA out.
8    Q.   What is a PFA?
9    A.   Protection from abuse order,
10 meaning that you're not to have any contact.
11 Just like if you have got a domestic violence
12 case, inherently the two people cannot contact
13 in any form, shape, or fashion.
14    Q.   It appears to be some reference to
15 her husband being the defendant of a PFA,
16 meaning that someone filed a protective order
17 or that he filed a protective order, correct?
18    A.   Yeah. Somebody filed one,
19 correct.
20    Q.   And the point of this bullet is
21 not that the husband was the defendant of a
22 PFA. The point of this bullet is that during
23 the conversation with the YWCA, she asked

1 questions about this. Do you agree that's the
2 point of that bullet?
3       MR. MURRILL:  Object to the form.
4    A.   I'm not sure. The point could be
5 that she asked the question about how to get
6 around the PFA and the no contact or whatever
7 as well. So I'm not really sure. I think you
8 can interpret that several different ways.
9    Q.   (BY MR. DAVIS:)  Fair enough.
10       Did you ask Judy to interpret it
11 for you?
12    A.   I did not.
13    Q.   Did you ask Joe to interpret this
14 last bullet about the PFA?
15    A.   No, sir.
16    Q.   Do you think it might have been
17 important to have context around this
18 observation before it was used as a basis to
19 fire her?
20    A.   I think I used the information in
21 the memo and I relied on it to make a decision.
22    Q.   Did you see any kind of a written
23 statement from the YWCA advocate director

1 regarding inappropriate conversations with
2 Jeter?
3    A.   I did not see one.
4    Q.   Did Yates tell you that there was
5 any sort of a document from the YWCA advocate
6 director regarding inappropriate conversations
7 with Jeter?
8    A.   I'm not sure if she did or didn't.
9    Q.   Do you have any memory of it?
10    A.   At this point, I don't, no.
11    Q.   Did you ask Judy or Joe do y'all
12 have any proof for that allegation involving
13 the PFA and the advocate?
14    A.   I don't recall asking them that.
15    Q.   How many people have you fired
16 during the four years you've been a DA?
17    A.   Probably four.
18    Q.   And Jeter is one of the four?
19    A.   Probably five then.
20       MR. RILEY:  Hey, Artur, we have
21 been going about thirty minutes since the last
22 time we spoke.
23       MR. DAVIS:  Okay. Well, why don't

1 we take --
2       MR. RILEY:  Why don't we take just
3 a minute or two?
4       MR. DAVIS:  Let's take a
5 fifteen-minute break.
6       (Whereupon, a break was had from
7       1:29 p.m. until 1:38 p.m.)
8    Q.   (BY MR. DAVIS:)  Mr. Carr, not to
9 cover old ground, but just to get some
10 perspective because regardless of what happens
11 in this case, you are the DA, a very important
12 position in this community, a historic position
13 in this community, you are the chief
14 administrator of a large agency and I respect
15 that, have you learned anything from this case
16 about how to handle terminations?
17    A.   Well, I've decided to figure out a
18 way to educate myself on different aspects of
19 it.
20    Q.   And what do you mean by that?
21    A.   Just -- just overall, just looking
22 at overall departments, looking at overall --
23 the way things operate, nothing specific at

Page 214

1 this point, but you can always learn something
2 from every situation.
3     Q.   You've mentioned that you've made
4 five termination decisions.  I know those are
5 all tough for someone who's at the head of an
6 organization, at least if they are a good
7 person, it's tough.
8     A.   Right.
9     Q.   Has this case and the progression
10 of this case taught you anything about the
11 processes of the DA's office for terminating
12 folks?
13     A.   It's taught me to just look at
14 things differently generally as it relates to
15 the overall process period.
16     Q.   Has this case taught you anything
17 about frankly your level of confidence in Joe
18 Roberts?
19     A.   No.
20     Q.   Has this case taught you anything
21 regarding your level of confidence in Judy
22 Yates?
23     A.   No, sir.

Page 215

1     Q.   And do you still retain full
2 confidence in those folks?
3     A.   One hundred percent.
4     Q.   When did you learn there was an
5 EEOC charge in this case?
6     A.   I don't recall the date, but, like
7 I said, I think I -- I don't recall if it was
8 electronic or they mailed it to the office, but
9 I did receive a copy of it.
10     Q.   Did your office expect an EEOC
11 charge in this case?
12     A.   I think we expected something.
13     Q.   Why?
14     A.   I don't know, just the overall
15 tenor of the termination, I just think we just
16 expected something.  No reason specific.
17     Q.   What was there about the tenor of
18 the termination that led you to think there
19 would be a lawsuit?
20     A.   Well, I mean, we just felt like,
21 you know, that we wouldn't be surprised if
22 there was one any time someone is terminated,
23 not specific to this one.  Any time somebody is

Page 216

1 terminated, we feel like, you know, there is
2 always the possibility someone wants to file a
3 lawsuit.
4     Q.   How many of the other four people
5 you've fired have filed lawsuits?
6     A.   That I fired filed lawsuits?  I
7 don't think any of them.
8     Q.   So it's not commonplace during
9 your tenure for fired employees to file
10 lawsuits, is it?
11     A.   I wouldn't say -- no, it's not
12 commonplace during my tenure that someone file
13 one, no.
14     Q.   I wasn't going to even bother to
15 make this an exhibit, but I have in front of me
16 an e-mail from Joe Roberts to Patrick Lamb
17 dated April 12th, 2020.  Who is Patrick Lamb?
18     A.   Patrick Lamb is -- at the time, he
19 was the -- he worked at Office of Prosecution
20 Services.  He was general counsel for the
21 Office of Prosecution Services, which is kind
22 of our lobbyist there in Montgomery, but he was
23 general counsel but he was a former prosecutor

Page 217

1 as well.
2     Q.   Subject line in this Roberts to
3 Lamb e-mail is notice of charge of
4 discrimination, and the first line from Roberts
5 is hey Patrick, as expected, former VSO grant
6 employee LaNitra Jeter filed a claim with the
7 EEOC claiming discrimination, her termination.
8         Do you know why Joe Roberts said
9 as expected?
10     A.   I don't know.
11     Q.   I want you to help me understand
12 that because you said that the tenor of this
13 termination, to use your word, led you all to
14 think there would be a lawsuit.  Joe Roberts
15 says in writing to Patrick Lamb as expected,
16 there is an EEOC claim.
17     A.   Uh-huh.
18     Q.   But yet y'all hadn't had any other
19 lawsuits or EEOC claims filed during your
20 tenure.
21     A.   Right.
22     Q.   So I'm trying to genuinely get you
23 to explain to me why -- I can understand if

55 (Pages 214 - 217)

Page 218

1 y'all were Walmart and got sued every hour of
2 the day.
3    A.   Right.
4    Q.   I think at one time we had ten
5 Walmart intakes in our system. I don't
6 understand how an entity that is not being
7 regularly sued all of a sudden believes this
8 termination is going to lead to a lawsuit.
9    A.   Well, I think every person is
10 different. Every response is different. I
11 have fired other people. Obviously they were
12 free to file a lawsuit. They didn't.
13    Q.   Again, I'm digging in on a
14 particular thing.
15    A.   You asked me to think about Joe's
16 state of mind at the time he sent that. I
17 don't know. I can't answer that.
18    Q.   I'm asking about your state of
19 mind too because you said based on the tenor of
20 the termination --
21    A.   Right.
22    Q.   -- that you expected there to be a
23 suit.

Page 219

1    A.   Well, that may have been a play on
2 words. But what I'm saying is I believe
3 everything that went on, all the bullet points
4 in there, the other people who were terminated
5 may not have been similarly situated, and I
6 think each individual is different. Just like
7 the old saying every case stand on its own
8 merits, every situation is different. And why
9 he put as expected, I don't know, but I'm sure,
10 you know, that is something he can answer.
11    Q.   Let me go back to Plaintiff's
12 Exhibit 1 and 2. And just to refresh,
13 Plaintiff's 1 and 2 were the personnel manuals.
14    A.   Right.
15    Q.   And we agreed that essentially
16 Plaintiff's 1 and 2 appear to be identical
17 documents, correct?
18    A.   They appear to be.
19    Q.   On Bates stamp DA 000008 in
20 Plaintiff's 1, there is a section of this
21 policy manual contained termination. I want
22 you to read to me what is written under
23 termination.

Page 220

1    A.   All employees serve by appointment
2 of the Office of Prosecution Services executive
3 director and district attorney and are subject
4 to termination at their discretion.
5    Q.   Do you agree that this says that
6 employees are appointed by and subject to
7 termination by collectively the OPS executive
8 director and district attorney?
9    A.   I wouldn't say that, no.
10    Q.   What would you say?
11    A.   I would say that this document --
12 this document says appointment of OPS director
13 and district attorney and subject to
14 termination at their discretion. That's what
15 it says.
16    Q.   It doesn't say "or" does it?
17    A.   It doesn't say "or".
18    Q.   It says "and"?
19    A.   Yeah, it doesn't say "or".
20    Q.   Who hired LaNitra Jeter?
21    A.   Judy Yates.
22    Q.   When the discussion happened
23 around LaNitra Jeter's termination, did you at

Page 221

1 any point communicate with the OPS executive
2 director about that decision?
3    A.   About terminating?
4    Q.   Yes.
5    A.   No, I did not.
6    Q.   When I say communicate, I mean the
7 whole gamut, pick up the phone, text message,
8 e-mail. I assume you have multiple ways of
9 communicating with the executive director,
10 correct?
11    A.   Yes.
12    Q.   And you know this person and you
13 interact with them regularly?
14    A.   Correct.
15    Q.   Who was the OPS executive director
16 in '20?
17    A.   Barry Matson.
18    Q.   And that's Barry that used to be
19 in the DA's office, correct?
20    A.   Yes.
21    Q.   He and I negotiated something
22 together three years ago. Good guy.
23    A.   Yes.

Page 222

1    Q.   Did you reach out to Barry in any
2 way to discuss the termination of LaNitra
3 Jeter?
4    A.   I did not.
5    Q.   Do you know if Joe Roberts knows
6 Barry Matson?
7    A.   He does.
8    Q.   Does he know him well?
9    A.   Yes.
10    Q.   And do you know if Joe ever
11 reached out to Barry to talk about Jeter's
12 termination?
13    A.   He did not.
14    Q.   Does Judy know Barry?
15    A.   Probably not.
16    Q.   But the two of you who do know
17 Barry Matson did not reach out to him to
18 discuss Jeter's termination, correct?
19    A.   Correct.
20    Q.   Is there a reason why not?
21    A.   She was an employee of the
22 district attorney's office, I had information I
23 relied on, and I made a decision as the DA.

Page 223

1    Q.   But do you agree with me that the
2 personnel manual for VSO employees says that
3 the OPS executive director and district
4 attorney make this appointment?
5    A.   That's what it says in there, yes.
6    Q.   And this is a document given to
7 employees like Jeter, correct?
8    A.   From OPS, yes.  Crafted/created by
9 OPS, yes.
10    Q.   Should Jeter have reasonably
11 expected that the personnel manual generated by
12 OPS would be followed?
13    A.   I would say she probably should,
14 but also the policies of the district
15 attorney's office as well.
16    Q.   That's why it's a joint reference
17 to both of you, the OPS executive director and
18 district attorney, correct?
19    A.   That's what it says on there, yes.
20    Q.   Do you have any explanation for
21 why neither you nor Joe Roberts reached out to
22 Barry Matson despite the language under the
23 termination section of the policy and procedure

Page 224

1 manual?
2    A.   Yeah.  We didn't feel we needed
3 to.
4       MR. DAVIS:  Let me take a quick
5 look back at my notes, Mr. Carr.
6       THE DEPONENT:  Okay.
7    Q.   (BY MR. DAVIS:)  How many black
8 VSOs do you have now?
9    A.   One black, one Hispanic, and one
10 white.
11    Q.   I have one more set of questions
12 for you, I apologize.
13       Earlier we talked about context
14 for leave and we talked about the reasons that
15 people have taken time off.  Do you recall that
16 conversation?
17    A.   Yes.
18    Q.   And I do agree with you that the
19 context does matter if someone is taking off
20 because they want to go see the Atlanta Braves
21 every time they have a key series, that's one
22 thing.  If they are taking off for medical
23 reasons or serious reasons, that's another

Page 225

1 thing.  Do you agree with that?
2    A.   Yes.  Context matters.
3    Q.   You are aware that your office is
4 governed by the Family Medical Leave Act; is
5 that correct?
6    A.   Yes.
7    Q.   And do you believe that your
8 office is also governed by the Americans with
9 Disabilities Act?
10    A.   I would hope so.
11    Q.   And the Americans with
12 Disabilities Act deals with the legal rights of
13 people who have medical conditions; is that
14 correct?
15       MR. MURRILL:  Object to the form.
16    A.   I hadn't dug into it, to be honest
17 with you.  I don't know.
18    Q.   (BY MR. DAVIS:)  Okay.  The FMLA
19 deals with the potential right or entitlement
20 of employees to take medical leave.  Do you
21 agree with that?
22    A.   That's kind of what I understand
23 it to be.

57 (Pages 222 - 225)

1    Q.   Okay.  I'm going to show you a
2  document that we will mark Plaintiff's Number
3  16.
4         (Whereupon, Plaintiff's Exhibit 16
5         was marked for identification
6         and a copy of same is attached
7         hereto.)
8    A.   (Reviewing document.)
9    Q.   You're not the person who is
10 copied or the person who is addressed on this
11 document.  Perchance have you seen Plaintiff's
12 16 before I showed it to you?
13   A.   I have not.
14   Q.   Plaintiff's 16 is Bates stamped
15 000364.  It's a set of messages between Judy
16 Yates and Michael McCurry and it's dated
17 November 6th, 2019.  And would you just read
18 what LaNitra Jeter writes at 10:30 a.m. on
19 Wednesday, November 6th, 2019, to Michael
20 McCurry?
21   A.   My doctor advised that I will need
22 more invasive surgery within a few months.
23 When I had my surgery, she found additional

1  issues that she could not fix or address
2  because I did not have enough time set aside
3  for recovery.  I need to start accruing comp
4  time so I will be able to have the surgery that
5  I need.  The surgery I had was a temporary fix
6  and did not correct -- it did not correct my
7  severe pain that I have.
8    Q.   And those were the words of
9  LaNitra Jeter on November 6th, 2019, correct?
10   A.   Correct.
11   Q.   Does this sound like a serious set
12 of concerns to you?
13   A.   I mean, it does.
14   Q.   Does it sound like a reason an
15 employee might want or need to take additional
16 time off?
17   A.   Yes.
18   Q.   Did Judy Yates ever suggest to you
19 at any point that Ms. Jeter presented false
20 medical information?
21   A.   Not to my knowledge.
22   Q.   I'm going to show you a set of
23 documents that we will collectively mark

1  Plaintiff's Number 17, and I'll represent to
2  you that this is a number of pages of text
3  messages between Judy Yates and LaNitra Jeter.
4         (Whereupon, Plaintiff's Exhibit 17
5         was marked for identification
6         and a copy of same is attached
7         hereto.)
8    A.   Okay.
9    Q.   And some of it is harder to read
10 than others because I think this may have come
11 from Ms. Jeter's phone, some of the bubble
12 sections are harder to read, but I want you to
13 take a moment and take a look at these
14 documents and when you have finished looking at
15 them and when you feel comfortable answering
16 questions, you let me know.
17   A.   (Reviewing document.)
18   Q.   I'm obviously not going to ask you
19 about every page, but I want you to get a good
20 feel for what these messages are about.
21   A.   (Reviewing document.)  Okay.
22   Q.   How would you describe -- first of
23 all, would you agree that those are text

1  threads that appear to be between Judy Yates
2  and LaNitra Jeter?
3    A.   That's what it appears to be.
4    Q.   How would you describe the subject
5  matter of these text threads?
6    A.   Conversations about being off and
7  just different things, being off sick, not
8  feeling well, things of that nature.
9    Q.   Would you agree with me that these
10 text threads consistently involve Ms. Jeter
11 reporting to Judy Yates that she was not
12 feeling well and was sick?
13       MR. MURRILL:  Object to the form.
14   A.   I mean, a quick glance, it appears
15 to be.  I mean, I didn't look at each line of
16 each one, but it appears to be, you know.  And
17 some of it dealt with sick, some of it dealt
18 with realtors and other stuff as well.
19   Q.   (BY MR. DAVIS:)  But a good chunk
20 of it deals with medical and sick?
21   A.   Yeah.  Some of them dealt with
22 medical, yes.
23   Q.   A good chunk of it deals with

Page 230

1 medical and sick leave related issues, correct?
2    A.   Yes, some of it deals with medical
3 and sick leave.
4    Q.   And just so we are clear --
5    A.   I mean medical and being sick.
6 I'm sorry.
7    Q.   And just so we are clear, if an
8 employee in your office is not feeling well or
9 is sick, should that employee reach out to
10 their supervisor and tell them?
11    A.   Yes.
12    Q.   Does it appear Ms. Jeter followed
13 that process?
14    A.   Yes.
15    Q.   If an employee in your office is
16 not feeling well and needs to take time off or
17 seek time off for medical reasons, should the
18 employee convey that to the supervisor?
19    A.   Yes.
20    Q.   Does it appear that Ms. Jeter did
21 that?
22    A.   In that text message she did, yes.
23    Q.   And in the various text threads

Page 231

1 that I've shown you, is there any instance that
2 you see where Judy Yates says to LaNitra Jeter,
3 LaNitra, that's not a valid reason or I'm not
4 going to excuse that absence or leave or comp
5 time request?
6    A.   No.  It appears Judy is working
7 with her.
8    Q.   In fact, of all the documents that
9 we've looked at today that relate to leave and
10 comp time requests, you saw fourteen specific
11 requests submitted by LaNitra Jeter.  Did you
12 see a single notation on those requests that
13 LaNitra Jeter's requests for comp, leave, or
14 vacation time were actually denied?
15    A.   You are talking about the papers
16 you gave me?
17    Q.   Yes.
18    A.   I don't see where it was denied,
19 no.
20    Q.   Have you seen from any source any
21 documentation or papers that suggests that any
22 request by LaNitra Jeter was denied?
23    A.   She was allowed to take vacation

Page 232

1 and leave.
2    Q.   So we know about her allegations
3 that are a part of her case related to her comp
4 time being restricted going forward.  We know
5 there was an allegation that at some point she
6 was told you can't take any more comp time, but
7 are you aware of any specific instance prior to
8 that when her comp time had been denied?
9    A.   Not from the information that I've
10 seen.
11    Q.   And are you aware that actually at
12 some point in the fall of '19 that Judy Yates
13 reinstated LaNitra Jeter's comp time and
14 allowed her to take comp time again?
15    A.   I wasn't aware.
16    Q.   But did you see some comp time
17 requests from 2020 --
18    A.   Yes.
19    Q.   -- that suggested --
20    A.   Yeah, I saw it.  But I didn't put
21 it in that context, but I saw it, yes.
22    Q.   So just to be clear, for all of
23 this talk about LaNitra Jeter abusing or

Page 233

1 misusing sick leave, comp time, or vacation
2 time, have you seen any document that suggests
3 to you that on a given instance a request of
4 hers was denied by her supervisor?
5    A.   The documents you presented today
6 right now, no.
7    Q.   And forget what I've presented
8 today and just the person who was the ultimate
9 decision-maker --
10    A.   Right.
11    Q.   -- and we'll talk with Roberts and
12 Yates about this --
13    A.   Right.
14    Q.   -- did they ever present to you
15 proof that they had actually rejected any of
16 her applications as inappropriate or not
17 fitting policy?
18    A.   No.
19        MR. DAVIS:  I have no further
20 questions.
21        MR. MURRILL:  Danny, just a few.
22        THE DEPONENT:  All right.
23

59 (Pages 230 - 233)

Page 234

1 EXAMINATION BY MR. MURRILL:
2     Q.   You testified to a lot of things
3 today on subjects I kind of want to hop around
4 a little bit.  Mr. Davis had asked you earlier
5 about memos to file that Judy Yates had written
6 concerning Ms. Jeter.  Do you recall that?
7     A.   I do.
8     Q.   Okay.  And I believe your
9 testimony was you had not seen any of those
10 memos to file, correct?
11     A.   Correct.
12     Q.   During your time as the DA, did
13 the DA's office have a policy where memos to
14 file were supposed to be forwarded up the chain
15 of command?
16     A.   No, we did not.
17     Q.   During your time as DA, did the
18 DA's office have a policy where you as the DA
19 were supposed to see memos to file?
20     A.   No.
21     Q.   Okay.  The other folks that you
22 have fired during your tenure as DA, were there
23 five other folks or five including Ms. Jeter?

Page 235

1     A.   If my recollection recall, it's
2 five including Ms. Jeter, yeah.
3     Q.   Okay.  Of the other four employees
4 you have fired, do you know the race of those
5 employees?
6     A.   All of them are white.
7     Q.   All of them are white?
8     A.   Yes.
9     Q.   So during your time as DA, the
10 only black or African-American employee you
11 have fired is Ms. Jeter, correct?
12     A.   Yes.  Yes.  I think.  Yeah.  I
13 think that's right.  Well, no.  Three were
14 white, one was African-American.  He was a DA.
15 He was a DA.  Yes.  So it's three white and one
16 African-American DA.
17     Q.   Okay.  Mr. Davis had asked you
18 about whether this case or events in this case,
19 words to that effect, have caused you to
20 question any trustworthiness or issues with Joe
21 Roberts.  Do you still maintain confidence in
22 Joe Roberts?
23     A.   Yes, I do.

Page 236

1     Q.   How long have you known Joe
2 Roberts?
3     A.   Twenty-two years.
4     Q.   During those twenty-two years,
5 have you found him to be trustworthy?
6     A.   Very.
7     Q.   Have you ever known Joe Roberts to
8 take any action that you believed was motivated
9 by some sort of racial animus?
10     A.   Never.
11     Q.   I believe you testified that
12 you've known Judy Yates for about twenty-six
13 years; is that correct?
14     A.   About twenty-four, somewhere up in
15 there, twenty-four, twenty-five.
16     Q.   Okay.  And have you always found
17 Ms. Yates to be trustworthy?
18     A.   Yes.
19     Q.   During the time you've known
20 Ms. Yates, have you ever known her to take any
21 action that you believe was motivated by any
22 racial animus?
23     A.   No.

Page 237

1     Q.   Okay.  And your decision to
2 terminate Ms. Jeter, you testified a lot about
3 relying on the information in the March 13th,
4 2020, memo from Judy Yates to Joe Roberts,
5 correct?
6     A.   Correct.
7     Q.   Was there anything else going on
8 at the DA's office around March 13th, 2020,
9 that was involving personnel?
10     A.   Well, you know, during that time
11 also, COVID hit and we were going to go to a
12 skeletal crew.  Skeletal crew meant that we
13 were going to go from a hundred and fifteen, a
14 hundred and fourteen people in the office to at
15 least eight at one given time, and we were
16 going to try to operate under that.  And the
17 reason we did that is because we wanted to make
18 less contact.  The way the office is set up,
19 people are on top of each other, so we wanted
20 to look at doing that.  And in order to do
21 that, we had to have people that we can rely on
22 to be there that had a good track record that
23 we can rely on to do the job that we trusted,

Page 238

1  and that was -- that was an issue as well.
2      Q.   Okay.  You testified about eight
3  people being in the office?
4      A.   Uh-huh.
5      Q.   Did you mean eight people at any
6  given time would be physically present in the
7  office?
8      A.   Yes.  And the way it worked, we
9  had teams.  There was a team from each sector,
10 and we had a certain amount, we had like two or
11 three DAs there and then we had a VSO, we had a
12 person at the front desk, and then we had one
13 of the investigators as well for protection.
14 But we operated that way during the COVID time,
15 we made the decision to do that, to try to keep
16 the office open and not having COVID outbreaks,
17 so yeah, that was a part of it.
18     Q.   Okay.  So during that process, how
19 many VSOs would be physically present in the
20 office on any given day?
21     A.   One.
22     Q.   Okay.  And would the identity of
23 that VSO change day by day?

Page 239

1      A.   Yes, it would.
2      Q.   Okay.  Was your decision to
3  terminate Ms. Jeter motivated by racial animus?
4      A.   Not at all.
5      Q.   Was it in retaliation for anything
6  she had done or said during her time at the
7  DA's office regarding complaints of
8  discrimination?
9      A.   Not at all.
10     Q.   Okay.  Mr. Davis had asked you
11 about a meeting that Ms. Jeter says happened in
12 the fall of 2019.  If Ms. Jeter had come to you
13 in the fall of 2019 and complained about being
14 discriminated against or complained about being
15 treated differently than white employees, would
16 you remember such a meeting?
17     A.   I'm a black man, I would have
18 remembered that meeting.  I would have
19 remembered that meeting.  And if that meeting
20 had occurred and I was told that she was being
21 treated differently and discriminated against
22 and she felt she was being discriminated
23 against because of her race and solely because

Page 240

1  of her race, then yes, I would remember that
2  meeting, absolutely.  No doubt about it.
3      Q.   Okay.  Ms. Jeter testified in her
4  deposition that as a part of that meeting, she
5  also heard from you words that she interpreted
6  as dropping any cases involving her husband.
7          Did you ever have a meeting with
8  Ms. Jeter where the subject of her husband's
9  cases came up?
10     A.   No, I don't recall that at all.
11 Dropping cases, no.  No.
12     Q.   Okay.  She also testified that in
13 that meeting that she said that there were
14 rumors in the office that you and her had been
15 in a physical relationship.  Did she ever make
16 that allegation to you?
17     A.   I've never heard that, no.  That
18 is absolutely not true.
19     Q.   You testified that Ms. Jeter
20 was -- after she was terminated, another VSO
21 was hired.  Who was that VSO?
22     A.   Alaysia Myles.
23     Q.   Is Ms. Myles black?

Page 241

1      A.   She's black, yes.
2      Q.   Who made the determination to hire
3  Ms. Myles?
4      A.   Judy hired her.
5      Q.   Is she still employed by the DA's
6  office?
7      A.   Yes, sir.
8          MR. MURRILL:  Okay.  No further
9  questions.
10         MR. DAVIS:  Just a few redirect
11 based solely on the questions you were just
12 asked.
13         THE DEPONENT:  Okay.
14
15 REEXAMINATION BY MR. DAVIS:
16     Q.   When Ms. Miles was hired, was it
17 after Ms. Jeter had filed her EEOC charge?
18     A.   I'm not sure.  I don't think -- I
19 think it was before that.
20     Q.   Well, Jeter was fired in March.
21     A.   Yes.
22     Q.   And there is correspondence here
23 that in April the office seems to have been

61 (Pages 238 - 241)

Page 242

1 aware of the charge.  Do you know for a fact
2 when Myles was hired?
3     A.   I don't know for a fact the date,
4 no, I do not.
5     Q.   Can you even give me a best
6 judgment or estimate?
7     A.   Honestly, I can't.
8     Q.   But we have established that
9 Roberts and you had an expectation that Jeter
10 might file a lawsuit, correct?
11     A.   I had expectation anybody I fire
12 will file a lawsuit.
13     Q.   So could the decision to hire an
14 African-American to replace Jeter have in part
15 been motivated by the fact that you all thought
16 Jeter was going to file a lawsuit?
17     A.   No, not at all.
18     Q.   With respect to the other four
19 employees -- and I get you are not looking at a
20 list of the number of people, so it could be
21 four, it could be six, I get that.
22     A.   Right.
23     Q.   But of the group of employees that

Page 243

1 you have fired, moving beyond the question of
2 their race, is LaNitra Jeter the only employee
3 you filed who had complained about
4 discrimination from her supervisor?
5         MR. MURRILL:  Object to the form.
6     A.   Filed?
7     Q.   (BY MR. DAVIS:  I will rephrase.
8 Fired is what I mean.
9     A.   Okay.  Okay.  I want to make sure.
10 I thought I heard filed.  Okay.
11         Was -- say that again.  Filed
12 threw me off.
13     Q.   Yes.  Of the -- let's say five for
14 purposes of having a baseline number.
15     A.   Right.
16     Q.   Of the five folks you've fired,
17 LaNitra Jeter says that she made a complaint
18 about discrimination, and I believe I showed
19 you a memo earlier where Judy Yates refers to
20 her making a complaint about being treated
21 unfairly.  Do you recall seeing that memo?
22     A.   I recall the memo, yes.
23     Q.   Of the other people that you

Page 244

1 terminated, have any of them made a complaint
2 about their supervisor treating them unfairly?
3     A.   Not to my knowledge.
4     Q.   And you are aware that there is
5 also a retaliation claim in this case and not
6 just a race discrimination claim, correct?
7     A.   Correct.
8     Q.   With respect to these questions
9 you were asked about the timing, let me close
10 out by asking you a couple of questions about
11 that.  Are you suggesting that the decision to
12 terminate LaNitra Jeter was affected in any way
13 by the fact that the office was paring down
14 personnel because of COVID?
15     A.   I'm suggesting that was a
16 consideration as well because we had to have
17 people there who we could trust.  They would be
18 there alone, there would not be any supervision
19 there.  They would have to be on schedule based
20 on the date and time that they were scheduled
21 to be there.  That was a consideration.  It
22 was.
23     Q.   Did the twelve bullet points that

Page 245

1 Judy Yates submitted about LaNitra Jeter --
2     A.   Right.
3     Q.   -- contain any reference to your
4 COVID policy?
5     A.   It does not.
6     Q.   Prior to the last six minutes, at
7 any point in this case -- and your office has
8 filed answers to the original complaint.  Am I
9 correct?
10     A.   Yes.
11     Q.   Your office has filed an answer to
12 the amended complaint, correct?
13     A.   Yes.
14     Q.   And there have been multiple
15 amended complaints in this case, correct?
16     A.   Yeah.
17     Q.   Your office has answered each one
18 of them; is that right?
19     A.   Yes.
20     Q.   Your office submitted a set of
21 initial disclosures in this case where the
22 defendant has to lay out a factual narrative.
23 Are you aware of that?

1     A.    Yeah, I am.  Yes, sir.
2     Q.    Your office submitted
3  interrogatory responses in this case where
4  Mr. Noble and I propounded questions and y'all
5  responded.  Are you aware of that?
6     A.    Yes.
7     Q.    And you answered my questions for
8  approximately four and a half hours today.
9     A.    Correct.
10    Q.    Are you aware of that?
11    A.    I am.
12    Q.    Feels like more, doesn't it?
13    A.    It does.
14    Q.    At any point prior to
15  Mr. Murrill's questions of you in the last six
16  minutes, has there been any reference to
17  LaNitra Jeter's termination being connected to
18  COVID and COVID policies?
19    A.    It has not been.  But the question
20  that was propounded to me was there anything
21  else other than what was on that paper.
22    Q.    To answer my question and the
23  various answers that have been submitted --

1     A.    Right.
2     Q.    -- and the disclosures that have
3  been submitted --
4     A.    Right.
5     Q.    -- and the discovery requests that
6  have been responded to --
7     A.    Right.
8     Q.    -- was there any reference to
9  Jeter's termination being linked to the office
10  trying to pare down personnel because of COVID?
11    A.    In the responses, probably not.
12    Q.    Or in the various pleadings or
13  documents?
14    A.    To my knowledge, no.
15    Q.    And during my questions of you --
16    A.    Uh-huh.
17    Q.    -- I asked you several times about
18  the decision to terminate.
19    A.    Uh-huh.
20    Q.    And do you recall that perhaps as
21  many as nineteen or twenty occasions --
22    A.    Several.
23    Q.    -- you said you based the

1  decision --
2     A.    On information in the memo.
3     Q.    -- on the bullet points and the
4  information in the memo?
5     A.    Right.
6     Q.    And do you agree that you made
7  that assertion perhaps as many as nineteen or
8  twenty times earlier today?
9     A.    I made it a couple of times.  I
10  did.
11    Q.    Did you at any point during my
12  questions of you make an assertion that part of
13  the reason for her termination was paring down
14  personnel because of COVID?
15    A.    No.  I think we stopped at the
16  last bullet.  I figured the other bullet you
17  would say is there anything else other than
18  what's on this paper, and I would have gone
19  into the COVID.
20    Q.    But in fact I did ask you several
21  times what your reason was for terminating her.
22    A.    Uh-huh.
23    Q.    You agree that's a question that

1  asked for your reason for terminating her?
2     A.    I agree that's a play on words,
3  but --
4     Q.    Okay.  So on that point that the
5  office wanted to think about people who had a
6  history of coming in to work, since we are
7  going to move in this era where not as many
8  people are going to be here, so the few we're
9  going to have here definitely need to show up,
10  right?
11    A.    Right.
12    Q.    How does the person who asks for
13  vacation leave or comp time thirty-one times
14  win that lottery over somebody who only asks
15  for it fourteen times?
16    A.    I don't think it's a lottery.
17  There is no lottery.  I mean, everybody --
18    Q.    But you understand the point I'm
19  asking, Mr. Carr.  You yourself in response to
20  Mr. Murrill suggested that a factor that you
21  might have considered was that as the office
22  pared down because of COVID, you wanted to
23  streamline to focus on people who had a history

Page 250

1 of showing up, propensity for attendance. I'm
2 asking you a very simple question. Cheryl
3 Black wasn't fired, was she?
4    A.   No, she was not.
5    Q.   With her thirty-one requests for
6 vacation leave or comp time, she wasn't fired,
7 was she?
8    A.   No, she was not fired.
9    Q.   And Erin Barefield with her
10 nineteen requests wasn't fired, was she?
11    A.   She wasn't there at the time.
12    Q.   And are you aware that some of
13 Cheryl Black's requests amounted to I want to
14 take a day off, tell me what I need to do, take
15 vacation, comp, or leave time?
16    A.   I'm not.
17    Q.   Okay.  You actually fired
18 Ms. Jeter, correct?
19    A.   Yes.
20    Q.   You didn't say you are going to
21 work remotely; you actually fired her, correct?
22    A.   Yes, sir.
23    Q.   As you were thinking about how

Page 251

1 COVID is going to affect the size and stability
2 of our workforce, did you fire any other
3 employees in this same timeframe in March?
4    A.   I hadn't had that list of problems
5 with other employees that was reported to me.
6    Q.   So it was the list of problems
7 that drove your decision, not COVID?
8    A.   Along with COVID, yes.
9    Q.   But just to be clear, you could
10 have simply said to Ms. Jeter you are going to
11 work remotely?
12    A.   Could have said a lot.
13    MR. DAVIS:  Okay.  No further
14 questions.
15    MR. MURRILL:  One follow-up.
16
17 REEXAMINATION BY MURRILL:
18    Q.   You had testified about Mr. Yates
19 hiring the replacement VSO.  Who hired
20 Ms. Jeter?
21    A.   Ms. Yates.
22    MR. MURRILL:  Okay.  No further
23 questions.

Page 252

1    MR. DAVIS:  And just one follow-up
2 based on that.
3
4 REEXAMINATION BY MR. DAVIS:
5    Q.   When Ms. Jeter hired Ms. Yates,
6 she had no way of knowing --
7    MR. MURRILL:  I think you --
8    Q.   (BY MR. DAVIS:)  Or when Ms. Yates
9 hired Ms. Jeter, at that point Ms. Yates had no
10 way of knowing Ms. Jeter was going to file a
11 discrimination complaint against her, did she?
12    A.   Not to my knowledge.
13    MR. DAVIS:  No further questions.
14
15    FURTHER THE DEPONENT SAITH NOT
16
17    (Deposition concluded at 2:15 p.m.)
18
19
20
21
22
23

Page 253

1    C E R T I F I C A T E
2
3 STATE OF ALABAMA
4 JEFFERSON COUNTY
5
6    I hereby certify that the above
7 and foregoing deposition was taken down by me
8 in stenotype, and the questions and answers
9 thereto were reduced to computer print under my
10 supervision, and that the foregoing represents
11 a true and correct transcript of the testimony
12 given by said witness upon said proceedings.
13    I further certify that I am
14 neither of counsel nor of kin to the parties to
15 the action, nor am I in anywise interested in
16 the result of said cause.
17
18
19
20
21    ACCR LICENSE NO. 278 - Expires 9/30/2022
22    Transcript Certified On 2/14/2022
23

**&**

**&**   2:14 8:9

**0**

**000002**   46:4
**000008**   219:19
**000009**   46:4
**000010**   48:21
**000018**   48:21
**000025**   131:12
**000026**   131:12
**000127**   152:18
**000128**   152:18
**000144**   161:2
**000145**   161:2
**000146**   161:3
**000147**   161:3
**000148**   161:3
**000151**   161:5
**000157**   161:5
**000161**   161:5
**000164**   161:5
**000172**   161:5
**000177**   161:6
**000178**   161:7
**000179**   161:6,7
**000179s**   161:6
**000273**   163:14,15
   163:18
**000364**   226:15
**01863**   1:5

**1**

**1**   3:13 45:14,15,20
   45:21 46:3,7 47:5
   48:4,19 49:2 50:4
   50:20 219:12,13,16
   219:20
**10**   5:4 157:23 158:1
   158:7 160:18
**10:30**   226:18

**10:43**   78:19
**10th**   10:13,15,16
   153:1 169:21
**11**   5:7 162:13,14
   165:11 166:2,4
**114**   4:4
**11:01**   78:19
**11:30**   11:12 12:23
**11:48**   127:13
**11:54**   127:13
**12**   4:5 5:10 162:22
   163:1,6
**129**   4:7
**12:00**   12:23
**12th**   115:4 116:2
   118:8 121:10
   123:14 216:17
**13**   4:15 5:13 49:17
   169:11,12,16,20
   172:7,13 173:1
**131**   4:10
**135**   4:14
**137**   4:17
**13th**   49:19 135:22
   137:2 139:22
   145:20 163:19
   199:15,19 237:3,8
**14**   5:16 173:11,12
   173:16 174:5
**15**   5:19 174:22,23
   175:5
**152**   4:21
**158**   5:4
**16**   4:19 5:22 226:3
   226:4,12,14
**162**   5:7
**163**   5:10
**169**   5:13
**16th**   136:17 137:17
   189:3,5

**17**   6:4 228:1,4
**173**   5:16
**174**   5:19
**17th**   48:2
**18**   175:16
**18410**   253:20
**19**   125:2 166:12
   167:8,12 175:16,16
   180:17 197:19
   232:12
**1:29**   213:7
**1:38**   213:7
**1st**   49:8

**2**

**2**   1:19 3:17 8:11
   48:10,11,17,23
   49:5,16,21 50:4
   219:12,13,16
**2/14/2022**   253:22
**20**   4:12 166:12
   167:9,12 175:16
   180:17 221:16
**2000**   18:19,19
**2001**   18:20,20
**2018**   48:2
**2019**   4:5,8 46:21
   50:12 85:1 87:22
   88:12 89:5 91:16
   91:18 97:9 104:17
   106:11,14,17
   112:10 113:22
   115:4 116:2 118:8
   121:11 123:14
   124:6,19 125:13
   127:1 128:19 130:9
   130:12 131:23
   133:15 134:11
   136:17 152:21
   153:9,10 162:5
   165:16 170:19
   173:20 176:2

   198:22 226:17,19
   227:9 239:12,13
**2020**   4:12,15,19
   49:9,17,19 50:11
   106:22 108:8,11
   134:11 135:22
   145:20 163:7,11,19
   165:17,20 169:20
   170:9,13,21 176:2
   189:3,5 199:1,15
   199:19 216:17
   232:17 237:4,8
**2022**   1:19 8:11
**22**   4:8
**226**   5:22
**228**   6:4
**22nd**   130:8,12
**234**   3:5
**23rd**   131:23 132:10
   132:23 133:14
**241**   3:6
**251**   3:7
**252**   3:8
**26th**   46:21
**278**   253:21
**2:15**   252:17
**2:20**   1:5

**3**

**3**   3:21 94:19,20
   95:3
**30326**   2:8
**30th**   97:9 123:15
   133:5,14
**3355**   2:7
**35209**   2:16 8:10
**3530**   2:15 8:9

**4**

**4**   4:4 114:3,11,14
   115:3 121:10

**45**  3:13
**48**  3:17

**5**

**5**  4:7 129:3,4,9,12

**6**

**6**  4:10 131:3,4
**6th**  226:17,19
  227:9

**7**

**7**  4:14 135:9,10
  139:13,14,18,22
  141:13 142:11
  145:14 146:15
  147:16,21 148:6
**7:00**  163:22
**7:11**  163:21

**8**

**8**  4:17 137:8,9
**8/26/2019**  47:10

**9**

**9**  3:4 4:21 152:5,6
  152:11,14,14,20
  154:23 156:15,17
  170:20,23 172:6,13
  172:23
**9/30**  96:14,15,17
**9/30/19**  102:22
**9/30/2019**  3:23
  96:10 99:10
**9/30/2022**  253:21
**94**  3:21
**9:30**  8:12
**9:40**  11:11

**a**

**a.m.**  8:12 78:19,19
  127:13,13 163:22
  226:18
**abilities**  55:9,17

**ability**  17:11 59:7
  101:15,18 154:12
**able**  12:22 13:13,15
  59:9,10 63:1 67:6
  70:7 73:20 98:21
  98:22 191:20 227:4
**absence**  231:4
**absent**  154:11
**absentee**  151:9,12
  151:16 154:7
  156:14
**absenteeism**
  154:21 199:12
**absolutely**  127:11
  240:2,18
**abuse**  74:1 149:9
  197:11 210:9
**abused**  58:9,11
  100:6 150:18
  176:15
**abusing**  57:9 99:23
  104:20 167:19
  168:8 182:7 232:23
**aca**  1:5
**accept**  128:11
**access**  30:5 58:12
  69:15 190:18
**accessible**  90:11
**accomplishment**
  9:19
**account**  192:13,16
  192:19
**accountable**  77:6
  77:10
**accr**  253:21
**accrue**  57:4,6 132:2
**accruing**  227:3
**accurate**  27:13
**accused**  82:14,19
  82:22 83:2 99:23
  123:1 183:18

**accusing**  34:21
  123:6
**act**  64:23 132:15
  225:4,9,12
**acting**  8:4
**action**  1:5 102:21
  103:2 236:8,21
  253:15
**actual**  191:16
**acumen**  67:8
**add**  165:22 166:3
**added**  165:23
**additional**  71:2
  226:23 227:15
**address**  227:1
**addressed**  28:11,12
  226:10
**administer**  63:5
**administered**  71:19
**administration**
  19:15 63:17 113:11
**administrative**
  23:20 43:18,20
  159:7
**administrator**  58:1
  62:15 95:9 148:17
  213:14
**adopting**  51:2
**adult**  193:19 194:6
**advance**  108:19
**advantage**  70:4
**advise**  64:14
**advised**  226:21
**advisor**  64:23
  65:12
**advocate**  209:15
  211:23 212:5,13
**affect**  64:7 154:12
  251:1
**affidavits**  208:21
  209:1

**affirmatively**  91:13
  113:1 126:1
**affirmed**  8:18
**afford**  65:4
**afforded**  54:21
**african**  9:22 41:7
  159:4,5,8 160:15
  235:10,14,16
  242:14
**ag's**  67:12,19
**agency**  213:14
**ago**  10:12 17:1
  221:22
**agree**  32:16 33:8
  34:18 35:1 40:5,6
  41:18 42:10 46:22
  47:4 48:3 49:18
  54:5,9,14,22 55:10
  59:3 62:6 69:12,19
  70:3 71:18,23
  74:18 75:1,6 79:8
  100:19 115:2 116:2
  123:11 132:4,6
  137:13 144:20
  145:12 149:13,16
  151:21 152:19
  153:10 154:16,23
  161:19 162:4
  163:10 165:18
  166:6 167:14
  171:18 172:5,19
  173:18 174:4,8
  175:22 178:10
  182:5 190:15,17
  195:10 204:12,17
  204:19,20 207:21
  211:1 220:5 223:1
  224:18 225:1,21
  228:23 229:9 248:6
  248:23 249:2

**agreed** 7:2 72:8
75:2 219:15
**agreeing** 14:5
**agreement** 38:16
**ahead** 78:11 81:22
106:21 137:7
162:19
**alabama** 1:2 2:16
8:2,3,10 17:23
43:13 64:13 253:3
**alaysia** 240:22
**albeit** 207:20
**allegation** 41:15,16
41:17 42:16,20
83:1 125:16 127:18
182:7 190:1,4,12
207:18,21 212:12
232:5 240:16
**allegations** 40:23
41:2 127:23 147:13
232:2
**alleges** 34:6
**allow** 209:18
**allowed** 132:2
231:23 232:14
**amended** 39:5,9,14
40:5 245:12,15
**american** 9:22 41:7
159:4,5,8 235:10
235:14,16 242:14
**americans** 160:15
225:8,11
**amount** 58:3
149:14 160:13
238:10
**amounted** 250:13
**amusing** 197:16
**anderton** 20:2,3,10
20:20
**anecdotes** 188:7

**animus** 236:9,22
239:3
**announced** 76:9
**answer** 14:5,10,22
15:1,14,17,23 16:1
16:6 17:17 42:2
50:3 59:8 103:23
112:12 126:14
132:19 179:19
180:2,3 184:12
198:2,5,8 203:6
204:21 206:16
208:2 218:17
219:10 245:11
246:22
**answered** 133:22
245:17 246:7
**answering** 228:15
**answers** 14:21
183:3 245:8 246:23
253:8
**anybody** 22:14
66:14 200:3 209:4
242:11
**anyway** 98:17
**anywise** 253:15
**apologize** 114:5,9
197:15 224:12
**appear** 47:15 161:6
162:5 163:10
165:16 175:23
219:16,18 229:1
230:12,20
**appears** 47:9 48:4
49:18 95:6 117:23
137:23 153:12,15
154:16 155:10
162:3 165:5,17
166:11 170:13
171:7 210:14 229:3
229:14,16 231:6

**applicable** 54:21
**applications**
233:16
**applied** 74:12,14
**applies** 51:10
**apply** 53:7 68:23
68:23 72:5
**appointed** 19:14,21
19:23 21:6 220:6
**appointment** 220:1
220:12 223:4
**approach** 80:10
**appropriate** 116:9
202:14
**approximately**
8:12 10:12 246:8
**approximation**
37:17
**april** 40:11 87:16
87:19 88:2,6,7 89:8
89:16,19 90:18,22
136:17 153:9
170:23 197:19
198:22 216:17
241:23
**areas** 14:17
**argument** 14:2
157:8 173:2
**arguments** 157:10
**arisen** 109:21
**arrived** 9:15
**articulated** 119:11
119:14 120:13,18
**articulating** 120:23
**articulation** 74:5
**artur** 2:4 77:14
105:8 152:17
185:12 212:20
**ascertain** 184:7,13
**aside** 42:9 80:11
125:9 202:13 227:2

**asked** 27:11 33:12
47:17 49:21 58:21
67:3 75:14,23 94:5
105:10,13 112:12
118:20 126:10
127:20 128:17
133:22,23 134:20
136:18 150:13
161:21 179:15
183:14 193:11
209:15 210:23
211:5 218:15 234:4
235:17 239:10
241:12 244:9
247:17 249:1
**asking** 14:9 72:15
78:21 91:3 108:21
127:17 134:3,4
164:7 182:2 197:12
212:14 218:18
244:10 249:19
250:2
**asks** 249:12,14
**asleep** 201:12,17
202:2,6,15
**aspect** 32:19
**aspects** 213:18
**assertion** 197:23
198:9,17 248:7,12
**assessing** 33:11
**assessment** 34:14
**asset** 101:20
**assign** 7:18
**assigned** 20:18
86:5
**assistant** 17:5
40:11 114:5 116:13
159:5
**assistants** 159:3
**assume** 22:15 97:10
131:8 141:3,5

221:8
**assuming** 22:17
207:1
**assumption** 141:5
**atlanta** 2:8 224:20
**attached** 45:17
48:13 94:22 114:16
129:6 131:6 135:12
137:11 152:8 158:3
162:16 163:3
169:14 173:14
175:2 226:6 228:6
**attempt** 117:16
120:3 147:5 184:6
184:13 185:8
190:23 202:9
**attempted** 44:6
**attendance** 4:22
5:14,17 151:14
152:21 153:13
169:21 170:19,21
171:22 173:17,20
174:5,13,19 198:14
200:22 201:2,5,9
250:1
**attending** 201:18
**attention** 99:7
**attire** 116:9
**attorney** 1:11 2:5
16:11 18:17 19:14
27:18 64:22 65:17
65:23 66:16,22
152:23 169:21
220:3,8,13 223:4
223:18
**attorney's** 72:7
101:22 222:22
223:15
**attorneys** 2:6,13
19:6 20:14 134:7
150:7

**atypical** 22:8
**august** 46:20
**authority** 17:8 28:9
29:15,20,21 45:5,6
96:22 122:12
**authorization**
61:12,14 203:15
**authorized** 182:19
**auto** 140:14,15
**availability** 64:1
68:12
**available** 51:21,23
57:10,17 58:4
61:19 73:15,22
191:22 203:1
**aware** 39:3,6,8
40:8 41:8 125:1,13
125:15,18,19 126:1
126:2,8,14,18
128:18 130:13,20
130:23 150:9,12,15
225:3 232:7,11,15
242:1 244:4 245:23
246:5,10 250:12
**awry** 31:8

**b**

**baby** 18:12,20 19:5
**back** 21:9 27:12
40:3 86:22 92:3
112:10 117:15
119:20 120:2 124:4
219:11 224:5
**background** 16:9
17:20
**bahakel's** 205:9
**ball** 104:5
**ballpark** 37:7
**bank** 70:15 71:2
73:19
**banked** 177:17

**bar** 15:22 17:23
**barber** 18:17
**barefield** 165:12,20
166:6,16 167:11,18
167:23 168:7 170:2
170:8 171:7,17
174:2 250:9
**barefield's** 170:5
170:20 173:6
**barking** 104:8
**barry** 65:21 221:17
221:18 222:1,6,11
222:14,17 223:22
**base** 122:14
**based** 16:21 17:13
20:18 25:16 36:5,9
38:5 41:18 42:16
46:10 50:9 53:18
55:8,16 56:10
68:16 102:22 110:7
110:14 115:21
146:1 147:3 149:18
218:19 241:11
244:19 247:23
252:2
**baseline** 243:14
**basic** 151:13
**basically** 17:3,12
24:20 41:16 70:15
102:5 183:5
**basis** 41:5 42:13
54:21 56:11,12
65:3 211:18
**batch** 165:22
**bates** 46:3 131:11
152:16 219:19
226:14
**beat** 19:17,18
**becoming** 19:5
**began** 136:17

**beginning** 15:9
16:10
**begins** 131:23
196:4
**behavior** 195:10
**beknownst** 19:22
**belabor** 157:5
178:9
**belatedly** 9:18
**belief** 52:10 148:14
173:4 181:18
**believe** 32:23 35:11
50:10 60:15 61:1
110:9,18,20,22
111:2,7 119:10
128:20 180:22
181:3,5,9 198:16
198:23 219:2 225:7
234:8 236:11,21
243:18
**believed** 27:6 93:5
93:13 94:11 125:4
132:13 236:8
**believes** 41:21
218:7
**benefit** 70:7 71:7
72:6
**benefits** 52:18
69:14,16,22 70:1
**bessemer** 16:15,20
17:4,7,8,11
**best** 14:7 32:23
33:11 37:12,17
38:7,8,18 44:13
50:9 108:3,13,17
108:21 132:19
142:4 203:5 204:21
242:5
**better** 43:22 44:8
58:20 103:22 198:3
198:8

**beyond** 243:1
**big** 102:6 190:10
**biggest** 13:22
**bill** 16:22 136:11
**birmingham** 2:16
8:2,10 16:20 17:10
**bit** 11:3 14:14
17:20 23:4 79:3
80:13 210:3 234:4
**black** 125:11
126:12 127:19
128:8 158:17 160:9
160:10 173:17,21
174:7,13,20 175:7
175:7 176:2,15,19
176:23 177:13
179:20 224:7,9
235:10 239:17
240:23 241:1 250:3
**black's** 179:13
250:13
**board** 159:19,21,23
**boohaker** 19:20
**boosted** 13:18
**bother** 216:14
**bottom** 32:3,5 49:2
49:4 97:14,21
139:23 152:21
169:20
**brandon** 19:12,13
19:17,18
**braves** 224:20
**break** 11:20,22
12:21 77:17 78:2
78:18 127:9,12,15
213:5,6
**breaking** 12:5
**brief** 28:18,19 64:8
**briefed** 28:15
**briefing** 44:12 63:5
63:8,15,16

**briefly** 126:7
**bring** 99:7 127:6
186:14
**broad** 208:5
**broadly** 45:5,6
56:18
**brought** 41:9
185:15
**brown** 18:18
**bubble** 228:11
**budget** 17:6
**building** 86:5,6,16
202:23 203:3,8,14
203:23 204:5,11,22
**bullet** 149:7 151:4
182:13 184:11,16
185:11 187:3,3
192:6 193:17 196:3
196:4 197:10
201:12 202:22
205:3 206:11
209:14 210:1,20,22
211:2,14 219:3
244:23 248:3,16,16
**bullets** 146:6,9,14
146:21 169:6 182:1
182:6 185:17,22
**burned** 170:10
**business** 12:23
15:20 195:19

**c**

**c** 2:1 23:19 253:1,1
**calendar** 162:4
**call** 18:13 41:9
66:15 78:7 204:6
205:14
**called** 205:7
**calls** 12:7 15:16
16:1
**candidly** 157:11

**capacity** 1:11 87:2
148:16
**career** 18:11
**carr** 1:10,18 7:5
8:12,16 9:7 10:23
49:1 53:11 54:5
68:22 72:17 76:3
77:22 87:11,20
88:7 89:6 90:19
92:16,19 95:6
100:17 107:12
114:4 116:8 123:19
127:15 130:17
133:11 152:20
157:5 158:8 166:1
181:19 186:1 198:6
213:8 224:5 249:19
**carr's** 75:7 83:13
120:20
**carried** 55:4
**carries** 171:15
**carry** 156:17,19,23
**case** 10:20 11:5
16:21 23:18,22
38:14 39:1,11
41:19 43:9,15,16
56:11,11 64:6,8,8
66:16 67:4,13,21
68:1,2,13 84:23
92:12 104:11,15,16
105:4 121:18,23
123:19 124:10
125:10 126:6
127:16 137:6
156:13 194:14,14
194:17,17 209:16
210:12 213:11,15
214:9,10,16,20
215:5,11 219:7
232:3 235:18,18
244:5 245:7,15,21

246:3
**cases** 19:1 90:4
92:13 130:21 240:6
240:9,11
**catch** 14:22
**categories** 166:8
**category** 165:13
**cause** 8:13 253:16
**caused** 235:19
**cc'd** 95:9
**certain** 23:23 51:4
182:20 238:10
**certainly** 78:13
90:10 103:17
121:17 155:10
**certified** 1:23 7:6
8:1 51:10 253:22
**certify** 8:4 253:6,13
**chain** 5:23 25:3
28:10 36:11 80:9
80:11 114:8 115:1
117:11 118:5,10,11
119:10 122:3
123:13 124:15,21
130:3 182:14 183:1
183:12,19 184:2,8
184:14,17 185:4
188:20 234:14
**chair** 18:21
**challenge** 13:22
116:20 118:2
**challenging** 102:17
102:19,20
**chance** 80:15 82:20
82:23 104:1 120:1
155:9
**change** 195:9
238:23
**changed** 21:23 22:1
**changes** 40:4

**characterization**
98:23 100:23
161:23
**characterize** 98:5
**charge** 20:15,15
147:19 215:5,11
217:3 241:17 242:1
**charged** 23:23
**charges** 19:9
**chart** 20:17
**check** 78:8
**cheryl** 173:17,21
174:6,13,20 175:7
175:7 176:1,15,19
176:23 177:12
179:20 250:2,13
**chief** 18:18 20:6,8
20:12,23 21:4
22:10,13,19 23:7,9
24:13 28:23 29:4,7
37:11 44:19 45:1
60:4 213:13
**chunk** 229:19,23
**circuit** 18:21 19:6
153:1,3 169:22
**circumstance** 16:2
27:5 31:22 73:6,7
**circumstances** 11:7
42:3,4,6,9 71:20
72:20 177:19
**circumvent** 122:12
**civil** 1:5 8:6 39:12
40:17 41:9 43:6,9
64:18
**claim** 42:14 197:4
217:6,16 244:5,6
**claiming** 217:7
**claims** 217:19
**clarification**
128:11

**clarified** 17:2
**clarify** 124:21
**class** 19:1 23:19,19
**cle** 43:14
**cleaning** 21:10
**clear** 14:18 15:4
51:8 91:20 96:10
112:11,23 113:20
125:8 134:5,22
141:1,10 167:3
195:16 208:4 230:4
230:7 232:22 251:9
**clearly** 13:21
205:16
**clerk** 155:9 201:15
**cles** 43:21 44:1,3
**client** 10:6 185:15
**clock** 191:5 192:1
**close** 10:12 96:16
108:18 126:22
185:17 244:9
**closer** 37:16
**codified** 181:19,21
181:22
**cognizable** 42:20
**colleague** 127:18
168:18
**colleagues** 90:7
**collect** 72:2
**collective** 158:6
175:5
**collectively** 157:22
220:7 227:23
**come** 21:9,11 22:14
24:1 25:7 26:6
28:13,22 45:10
65:14,18 66:3 86:6
88:20 92:1 117:13
117:15 118:7,16
119:20 120:2
136:16 142:17

144:14 197:12
199:14,17 228:10
239:12
**comes** 29:16 36:16
55:14 120:20
177:14 199:16
**comfortable** 67:10
67:12 88:12 228:15
**coming** 44:18
107:12 145:5
155:17 249:6
**comings** 156:1,4
**command** 25:3
28:10 36:11 80:9
80:12 114:8 115:1
117:11 118:5,10,11
119:11 122:4
123:14 124:15,21
130:3 182:14 183:1
183:13,19 184:2,9
184:14,17 185:4
234:15
**commencing** 8:11
**comments** 203:22
**commissioner** 7:6
8:4
**committee** 22:21
**commonplace**
216:8,12
**communicate**
221:1,6
**communicated**
75:8,12,17 77:1
180:23
**communicating**
124:1 221:9
**communication**
117:4,4,8,9,11
**community** 213:12
213:13

**comp** 70:5,8,9,10
70:11,12,22 71:7,9
71:14,15,16,18,23
72:2,5,6,10,13
73:12,13,16,17,18
73:19 74:1,6,23
75:7,12,15,18 76:1
76:4,23 77:5,11
93:13 98:11,14,18
98:19,20,21,22
99:2,8,16,17,20,23
100:6,13 104:13,14
104:20 132:2,11
133:1 147:20 148:2
150:3,8,13,18
158:11 161:21
164:1,2,6,8 165:1
165:13,19 166:8,14
167:2,5 168:1
170:5 175:6,23
177:7,15,16 178:5
179:17 180:1,12,19
181:7,11,14 197:18
197:21 198:15
227:3 231:4,10,13
232:3,6,8,13,14,16
233:1 249:13 250:6
250:15
**comparable** 171:10
171:19
**compare** 171:23
**compared** 173:5
174:12
**compile** 30:1
**compiled** 112:9
135:20 142:11
143:1 182:9
**complain** 81:11
104:13,23 128:4,7
**complainant** 36:13
81:3

complained   42:11
  81:17 118:22
  130:14 239:13,14
  243:3
complaining   26:7
  32:11,13 99:1
  133:7 197:5
complains   30:8
  79:20 81:10 167:18
complaint   25:18,20
  25:22 29:22 33:8
  35:5 39:9,10,14
  40:5 41:10,13,20
  58:8 80:5,17,20
  81:1,13,16 83:19
  83:21 84:16 88:19
  105:2 113:22 120:6
  126:11,23 132:16
  243:17,20 244:1
  245:8,12 252:11
complaints   79:11
  79:16 117:13 118:7
  120:21 128:19
  196:6,10,14,19,23
  239:7 245:15
compliance   7:11
composed   130:18
compromising
  206:12,14 207:8,15
  208:6
computer   12:1,22
  140:21 191:7 253:9
concept   72:10 79:1
  134:1
concern   26:22
  27:20 28:7 122:2,9
  131:18
concerned   22:16
concerning   234:6
concerns   26:12
  30:21 100:21

113:10 168:7
  227:12
concluded   252:17
conclusion   192:3
condensed   136:15
conditions   54:18
  225:13
conduct   33:1 80:2
conducted   37:14
  38:10 54:19 126:16
  126:22
conducting   29:12
  29:16
conducts   37:22
  38:3
confession   201:14
confidence   214:17
  214:21 215:2
  235:21
confident   59:12
  92:16 134:13,14
confirm   146:21
  149:14
conflict   64:16
confused   16:14
  62:18
congratulate   9:18
congressional
  71:14
connected   246:17
consider   21:13
  38:19,21 53:14
  69:1
consideration
  244:16,21
considered   249:21
consistent   73:14
  104:23 119:12
  122:5
consistently   66:14
  229:10

constant   197:11
constructing
  148:15
contact   210:10,12
  211:6 237:18
contacted   81:19
  82:1 142:13,16
contain   245:3
contained   74:7
  139:10 141:13
  142:10 146:14
  219:21
contains   49:12
  54:10
content   115:22
  116:3
context   33:3 79:4,6
  98:14 123:4,8
  211:17 224:13,19
  225:2 232:21
contexts   89:23
contextual   158:16
continue   100:16
continuing   4:1 5:1
  6:1
continuously   18:8
contributed   172:5
contributing
  149:12 151:5 168:4
control   12:15,17
convene   17:8
conversation   14:4
  21:15 22:2 23:22
  25:5 33:18,22
  36:19 82:8,17 94:3
  94:17 106:12,19
  107:3,7,15 108:14
  108:17 109:6,12,15
  109:18,20,23 110:3
  112:13,15,19 113:2
  121:4 141:20

142:18,23 183:15
  183:16 197:8
  203:10 210:23
  224:16
conversations
  15:17 80:7 106:23
  109:3,9,10 142:1,2
  142:5 143:13
  144:21 145:6
  203:14 212:1,6
  229:6
conversed   142:14
  143:22
convey   230:18
copied   226:10
copies   150:8
copy   40:10,11
  45:17 47:16 48:13
  49:20 94:22 101:10
  114:16 129:6 131:6
  135:12 137:11
  152:8 158:3 162:16
  163:3 169:14
  173:14 175:2 215:9
  226:6 228:6
correct   16:11,12
  18:1 21:4 26:22,23
  27:21,22 30:6 34:4
  34:11,16,17 35:8,9
  35:12 36:1,2 39:11
  39:18 40:3,20
  42:14,20 43:10
  44:21 45:2,8,9,11
  45:12 47:7,10,13
  47:14,17,21 48:23
  49:13 50:21,22
  51:4 52:12,13,16
  52:20 53:2 58:13
  59:17,18 60:9
  61:12,15,16,19,20
  62:20 67:21 68:3,8

68:9,20 71:2,3,7,8
71:16 74:12 76:7
76:10,13,14,18,20
77:3 82:20 83:5,9
83:10 86:20 89:3
90:8,9,12,15,20,23
91:1 95:10 96:11
96:15,20 97:11
100:13 102:3
108:11 110:12,13
110:19,23 112:4
117:20,21 123:16
123:17 128:5,23
129:17,20,21 130:9
130:10 131:9,19,20
132:21 133:2,8,9
135:1,3,6,7 137:3
137:20,21 140:18
141:14,15,17 144:7
144:8,21,22 145:1
145:3,15 146:7
147:10 148:17
150:1,4 151:14
159:5,8 160:7,11
165:14 166:12,18
167:9,10,12,13
169:6,7 170:2,3,6,7
170:14 173:1,22
174:2 175:8,9,10
175:11,13 176:7,8
176:10,11 178:19
178:22 181:23
190:4,7,8 192:3,22
192:23 194:19
197:5 200:12
202:16,17 204:6
205:2 210:17,19
219:17 221:10,14
221:19 222:18,19
223:7,18 225:5,14
227:6,6,9,10 230:1

234:10,11 235:11
236:13 237:5,6
242:10 244:6,7
245:9,12,15 246:9
250:18,21 253:11
**corrected** 120:18
**correctly** 132:5
**correspondence**
241:22
**corroborate** 146:13
146:21 189:19,22
202:10 206:7
**corroboration**
197:3
**counsel** 7:4,15,17
8:8 106:5 113:17
126:9 216:20,23
253:14
**counseled** 197:11
**count** 44:17 146:9
162:7 166:17 176:4
**counted** 197:17
**county** 1:12 9:22
11:1 16:11,15,19
17:3,4,15 18:4
27:19 44:14 51:14
51:22 55:14,19,22
56:18,23 65:1,2
69:3 72:7 202:19
253:4
**countywide** 16:19
**couple** 10:20 12:7
21:22 25:15 244:10
248:9
**course** 19:21 25:10
39:4 84:13 86:19
95:17 191:11,21
**court** 1:1,23 7:6,12
8:2,7,23 16:21 17:1
19:6,10 20:18 86:6
90:5 116:7,10

187:19 189:14
194:12 201:19
205:3,9,10 206:8
**courtesy** 87:4
**courthouse** 205:19
**courtroom** 18:21
205:17,18
**cover** 166:11 213:9
**covid** 237:11
238:14,16 244:14
245:4 246:18,18
247:10 248:14,19
249:22 251:1,7,8
**coworkers** 90:7
132:3 206:12 208:9
208:11,15 209:8,12
**crack** 130:22
**crafted** 223:8
**created** 223:8
**creates** 34:3,5
179:23
**credibility** 187:6
188:23 189:7 190:2
206:11 208:8,22
209:8,11
**crew** 237:12,12
**crimes** 81:8
**criminal** 39:13
40:16 64:19 205:19
**crossed** 9:13
**crystal** 112:11
134:22
**culture** 195:8
**current** 15:19
**cut** 77:18 185:13
**cutoff** 16:15
**cutout** 125:11
126:12 128:8
**cv** 1:5

**d**

**da** 9:22 16:18 17:3
17:4,4,15 18:13,20
19:5 20:1,5,9,10,12
20:17 21:8,12
22:10,13,17,19
23:1,6,7,9 24:1,13
27:15 28:5 29:5,6
29:11 37:11 38:2
44:1,8,19 46:3,4
48:21,21 60:3 87:2
87:11 90:11 99:7
99:11,14,22 111:17
131:12,12 136:9
212:16 213:11
219:19 222:23
234:12,17,18,22
235:9,14,15,16
**da's** 10:23 11:17
16:15 18:3,8 19:4
29:13 30:4 33:2
35:14 44:14,20
45:1 46:23 51:14
51:16,22 52:11,15
52:19 53:1,5 55:13
55:19,22 56:18,23
60:1 62:8 65:2
66:17,21 67:5 69:3
71:12,15 76:5
83:13 85:6,10
87:10 90:17 100:22
116:8 143:14
179:23 180:11
190:20 202:19
214:11 221:19
234:13,18 237:8
239:7 241:5
**danny** 1:10,18 7:5
8:12,16 12:4 75:7
76:3 83:13 87:11
88:7 89:6,18 90:19

92:15,19 107:12
120:19,20 181:19
186:10,21 233:21
**das** 24:6 43:17
64:13 65:7 116:13
159:5 238:11
**data** 148:1
**date** 8:5 40:9,15
46:17,18 47:9,23
49:15 95:23 96:1,3
96:10 106:20
107:18 109:7 130:8
133:9 135:21 137:3
137:4,16 189:3
215:6 242:3 244:20
**dated** 3:22 4:8,11
4:15,18 108:8
118:8 121:10 133:5
137:7 216:17
226:16
**dates** 107:4 108:2
153:8
**david** 18:17
**davis** 2:4 3:4,6,8
9:2,5,9 10:14,16
12:9,19 42:7,18
43:2 46:6 48:22
50:16,19 51:7
72:14 75:5 76:21
77:16,21 78:5,13
78:17,20 84:11
96:1,9 103:11
105:9,13,17,22
106:2,5,6,10,16
111:7 113:16,19
114:20 117:2
119:16 120:12
123:9 127:5,10,14
128:14,16 131:15
132:20 133:23
139:16 140:23

141:6 152:18,19
157:1 161:2,10
163:15,18 164:14
168:12 169:2
185:16,21,23 186:5
186:16,19,22 187:2
195:15 198:21
204:23 211:9
212:23 213:4,8
224:4,7 225:18
229:19 233:19
234:4 235:17
239:10 241:10,15
243:7 251:13 252:1
252:4,8,13
**day** 23:15,15 73:13
86:20 88:15 96:5
154:13 155:13
156:10,10 163:21
185:4 197:14,23
198:10,17 199:2,6
199:22 200:20
218:2 238:20,23,23
250:14
**days** 43:13 56:22
57:18 58:3 63:23
70:23 71:5,6 73:2,4
73:9,11 133:5
137:19 172:18,22
174:6,9 185:4
**deal** 28:7 111:3
190:10 193:18
194:5,23 196:1,7
**dealing** 24:14
64:18
**deals** 54:6 225:12
225:19 229:20,23
230:2
**dealt** 16:22 229:17
229:17,21

**debate** 113:17
**december** 4:5
10:13,15,16 48:2
115:4 116:1 118:8
121:10 123:14
153:10
**decide** 43:21 61:17
79:21
**decided** 213:17
**decision** 17:14 21:7
23:2 24:12 25:8
43:1 56:10 67:14
67:14 112:1,5
138:1,9,13,17
141:11 142:14
143:2 145:15 146:4
147:3 153:17,21
154:2 182:10 197:3
200:10 211:21
221:2 222:23 233:9
237:1 238:15 239:2
242:13 244:11
247:18 248:1 251:7
**decisions** 53:18
55:8,15 214:4
**dedicated** 36:19
**defaced** 31:19 32:1
**defendant** 1:13
2:10 209:17 210:15
210:21 245:22
**define** 154:20
**defined** 164:23
**definitely** 249:9
**demeanor** 116:9
**denied** 231:14,18
231:22 232:8 233:4
**department** 205:11
**departments**
213:22
**depending** 42:3
56:12 57:7,8 72:20

**depends** 42:4,5
73:5
**deponent** 12:13,16
78:4,10 186:11,15
187:1 224:6 233:22
241:13 252:15
**deposing** 10:19
**deposition** 1:16 7:4
7:9,10,19 10:5,11
10:19 13:14 67:2
93:12 113:7,15
240:4 252:17 253:7
**depositions** 7:13
13:23 104:5
**deputy** 18:18 20:6
20:8,12,23 21:4
22:10,13,17,19
23:7,9 24:13 28:23
29:5,7 37:11
**deputy's** 23:5
**derived** 36:6,7
**describe** 23:11
24:18 29:19 69:20
135:17 228:22
229:4
**described** 26:20
28:16 52:22 75:1,6
105:1 108:14 120:5
120:10 122:3
**describes** 74:22
**description** 116:13
129:13
**desk** 238:12
**despite** 223:22
**detail** 25:11 155:11
157:20 174:6
**detailed** 155:1
**details** 204:14
**determination** 68:6
107:22,23 108:1
138:5,10 241:2

**determine** 150:17 155:16 156:13 208:4
**determining** 59:2,5
**developed** 110:16 110:16
**difference** 16:14 50:4 51:20 94:4 179:16
**different** 146:19 151:19 160:21 177:12,23 180:12 180:19 181:1,6,11 181:14 184:11 211:8 213:18 218:10,10 219:6,8 229:7
**differently** 178:4 214:14 239:15,21
**difficult** 79:22
**digging** 218:13
**direct** 29:1 39:1
**direction** 68:16
**directly** 22:19 24:4 27:2,23 28:1 156:1
**director** 209:15 211:23 212:6 220:3 220:8,12 221:2,9 221:15 223:3,17
**disabilities** 225:9 225:12
**disagree** 118:2 127:1
**disagreement** 36:9
**disciplinary** 195:4 195:7,13
**discipline** 188:9,18
**disciplined** 195:3
**disciplining** 194:22
**disclosures** 245:21 247:2

**discovery** 95:17 134:6 247:5
**discretion** 28:6 220:4,14
**discriminate** 54:20
**discriminated** 69:10 82:12 112:21 119:23 239:14,21 239:22
**discriminating** 94:12 119:2
**discrimination** 41:21 42:12 82:15 118:22 120:7,15,21 122:7 123:1,6 130:21 132:15 217:4,7 239:8 243:4,18 244:6 252:11
**discuss** 222:2,18
**discussed** 113:9 121:16,18,20
**discussion** 220:22
**disposed** 186:2
**dispute** 34:8 54:1 66:6,7
**disputes** 23:17 24:15 54:7
**disseminated** 116:19
**distinction** 16:17 16:18 55:9,16
**distinguish** 16:13
**district** 1:1,2,11 8:6 16:11 18:17 19:10 19:14 20:14 27:18 64:22 72:7 101:22 152:23 169:21 220:3,8,13 222:22 223:3,14,18

**diverse** 158:22 159:2
**diversity** 159:11
**division** 1:3 16:20 17:10 19:8 20:16 24:5,23
**docket** 89:13
**doctor** 226:21
**document** 3:22 4:18 35:18 45:13 45:20 46:1,17,19 47:5 48:16,18 49:12 50:8 51:2,2 75:4 76:16 94:18 95:13 100:16,20 101:6,8 104:16 114:2,13,21 115:7 115:11,14,22 116:3 116:19 121:21 128:6 129:2,10 130:17,18,19 131:9 132:6 135:8 140:8 140:16 145:14,17 145:19,22 146:7 150:22 151:20 153:12,16,21 154:2 154:5,15,23 155:4 155:9,11,18,21 156:15 160:19,21 161:16 162:2,11,21 163:9,13 165:2 169:10 170:23 171:6,14 176:3 179:3 212:5 220:11 220:12 223:6 226:2 226:8,11 228:17,21 233:2
**documentary** 152:1 186:3
**documentation** 58:17 231:21

**documenting** 84:7 84:9
**documents** 50:2,14 51:8 114:7 115:13 134:7,10 150:20 157:4 158:8,10,21 161:18,20 162:1,5 163:7 164:23 165:1 165:23 166:5,7 172:7 174:18 175:23 176:4 198:13,16 219:17 227:23 228:14 231:8 233:5 247:13
**doing** 9:7,9 15:2 19:2,9,10 67:13 69:17 136:7 187:9 191:11 237:20
**domestic** 210:11
**door** 86:22 92:3 125:6,12 127:20
**doubly** 13:18
**doubt** 240:2
**draw** 65:10
**drill** 80:14
**drinking** 116:10
**drive** 2:15 8:10
**driven** 151:20
**drop** 67:5
**dropping** 240:6,11
**drove** 251:7
**dug** 225:16
**duly** 8:18
**duplicate** 161:14
**dynamic** 14:3
**dynamics** 22:1

| e |
| --- |
| **e** 2:1,1,11 5:5,8,11 5:20,23 97:7,12,23 102:8,11,16 124:11 130:1 145:18 |

164:11 216:16
217:3 221:8 253:1
253:1
**earlier** 52:22 78:1
118:20,23 119:7
133:4 134:1 151:16
170:18 180:15
224:13 234:4
243:19 248:8
**early** 22:3 163:21
197:12,13,13
**earn** 98:21,22
**earning** 149:9
**ears** 64:20
**easier** 14:14
**easy** 86:3
**eating** 116:10
**educate** 213:18
**eeoc** 125:18,22
130:19,21 131:14
132:9 215:5,10
217:7,16,19 241:17
**effect** 7:10 45:4
60:13 107:14 133:7
165:3 170:21 195:5
235:19
**effort** 206:6 208:4
**eight** 20:6 47:6
185:21 237:15
238:2,5
**either** 15:18 16:2
33:21 74:7 78:5
124:6
**elaborate** 155:11
**elected** 17:5 18:17
20:5 43:13
**election** 19:12,13
19:16
**electronic** 215:8
**electronically**
102:13

**element** 69:13,19
**eleven** 169:6 182:1
**eligible** 59:3,6
**ellie** 1:22 7:5 8:1
**employed** 138:6,11
241:5
**employee** 25:17,18
26:7,11,14,18 27:1
27:6,7,20 28:1,6
29:6 30:8,11,15
31:11,18 32:1,11
32:13 33:11 34:19
34:20 45:11 46:23
52:11,15,18 53:1
57:12,16,17 58:5
58:23 59:6 69:2,5
72:6,18 73:2,9
76:12 80:4,17
81:17 82:9 83:15
83:17,18,23 88:5
89:15 90:18 99:22
100:6,22 118:21
119:1,23 120:14,21
123:6 134:2 136:12
141:22 154:7
179:16 190:2,9,13
195:9 198:22,23
217:6 222:21
227:15 230:8,9,15
230:18 235:10
243:2
**employee's** 99:16
100:12
**employees** 24:16
28:15 44:17 45:8
47:3 51:4,6,17,22
53:6 55:23 69:1,13
69:15 71:22 85:14
85:15 99:8 122:6
123:2 148:1 180:1
180:13,20 181:2,7

181:12 199:4 216:9
220:1,6 223:2,7
225:20 235:3,5
239:15 242:19,23
251:3,5
**employer** 82:21
**employment** 2:6
11:6 43:10,21 44:1
44:4,7 48:7 54:11
54:19 55:8,15 66:6
136:17 138:20,21
139:2 142:12
**empty** 205:4,19
206:8
**ends** 168:20
**enforced** 53:12
**enforcement** 19:8
**engaged** 141:20
**english** 209:21
**entire** 86:17 117:6
197:14 198:10
200:20
**entirety** 28:4
**entitled** 52:17,21
72:9,13,19,22,23
73:1
**entitlement** 225:19
**entity** 218:6
**envision** 11:10
12:20
**equal** 54:11
**equally** 53:6
**era** 249:7
**erin** 165:12,20
166:6,15 170:1
250:9
**essentially** 15:12
17:6 50:10 171:1
219:15
**established** 242:8

**estimate** 37:12
44:13 142:4 242:6
**event** 30:9,10,12,13
30:16,20 31:4,9,12
31:14,15 34:20
**events** 144:6
235:18
**eventually** 42:12
**everybody** 249:17
**everybody's** 177:12
**evidence** 7:20
104:11,22 105:4,16
113:14,18 124:9
130:22 186:3 189:2
189:4,7 198:13
201:16 204:9,14
**exact** 40:9,14 44:11
59:19 142:3
**exactly** 57:2,19
88:16 107:18
125:22 154:16
170:15 183:9
**examination** 3:1,4
3:5 8:13 9:5 234:1
**example** 30:19 81:5
178:18 193:15
197:12
**examples** 178:15
178:16
**exception** 15:15
**excessive** 58:23
177:6 199:11
**excuse** 231:4
**executive** 40:11
220:2,7 221:1,9,15
223:3,17
**exempt** 43:14
**exhausted** 70:13
**exhibit** 3:13,17,21
4:4,7,10,14,17,21
5:4,7,10,13,16,19

5:22 6:4 45:14,15
45:20,21 46:3,7
47:5 48:4,10,11,17
48:23 49:2,16,21
50:4,20 94:19,20
95:3 114:3,11,14
115:3 121:10 129:2
129:4,9,12 131:3,4
135:9,10,15 137:8
137:9 139:13,17,22
141:13 142:10
145:14 146:14
147:15,21 148:6
152:5,6,11,20
157:23 158:1,6
160:18 162:12,14
163:1,6 165:11
166:1,4 169:11,12
170:19 172:6,6,13
172:23 173:11,12
173:16 174:21,23
175:5 216:15
219:12 226:4 228:4
**exhibited** 139:14
**exhibits** 3:10 4:1
5:1 6:1
**expand** 71:4
**expanded** 159:16
159:18,20,23 160:1
**expect** 26:11,14
32:4,8,10,12 58:2,6
59:15 79:13,18
199:8,13 215:10
**expectation** 15:14
16:5 89:18,21
242:9,11
**expected** 88:7,9
215:12,16 217:5,9
217:15 218:22
219:9 223:11

**experience** 20:18
24:1 43:6 66:23
**experienced** 38:20
38:22
**expires** 253:21
**explain** 16:16
32:17 168:13,14
177:8 179:16
217:23
**explained** 64:5
**explaining** 76:16
**explanation** 140:7
177:4 223:20
**expressed** 143:15
143:18
**exquisite** 160:13
**extra** 64:20 71:1,6
**eye** 177:20
**eyesight** 161:4

**f**

**f** 253:1
**facebook** 192:10
**fact** 18:7 36:10
38:5 59:23 60:2
68:1 102:17 122:17
138:13 150:7
177:14 199:1 200:9
231:8 242:1,3,15
244:13 248:20
**factor** 102:6 249:20
**facts** 42:5,23 193:3
**factual** 198:9
245:22
**failed** 184:8,14
**failure** 182:13
183:12 184:1,17
**fair** 13:10,11 15:4
16:6,7 35:8 52:7,8
58:20 67:4 73:8
77:9 82:18 84:21
98:23 100:23

103:14 129:13
132:12,15 137:22
138:2 141:5 143:3
143:7,12,15 153:10
153:11,14 155:13
155:14 160:14
161:23 164:20
170:22 171:2,6
179:8 182:12 186:8
200:16 204:16
211:9
**fairly** 31:1 69:7
71:19 130:4,14
**fairness** 69:13,20
**fall** 85:1 91:16,18
104:17 106:11,14
106:15,16,20
112:10 113:22
124:19 125:2
128:18 134:10
232:12 239:12,13
**fallen** 201:12
**falls** 19:12,13,17,18
**false** 227:19
**familiar** 51:1
**family** 38:14 56:9
86:6 225:4
**famously** 43:14
**fancy** 125:9
**far** 20:17 22:16
23:15 27:13 44:3
57:3 66:8 67:8
**fashion** 14:8
210:13
**fate** 143:14
**february** 1:19 8:11
49:8,17,19
**federal** 8:5 54:22
**feel** 119:23 216:1
224:2 228:15,20

**feeling** 110:2,4
122:15 229:8,12
230:8,16
**feelings** 122:16
**feels** 246:12
**fell** 201:17 202:2,6
202:15
**fellow** 132:2
**felt** 26:19 68:15
93:20 110:9 112:20
119:1 132:14
148:11 215:20
239:22
**fifteen** 13:3 22:23
186:6,18,22 213:5
237:13
**fifty** 37:17
**figure** 24:21 60:9
63:3 90:15 213:17
**figured** 248:16
**file** 51:21 55:5
83:15,16,18,23
84:14 97:6 99:6,15
119:22 129:12,16
129:23 134:2,8,17
135:1 216:2,9,12
218:12 234:5,10,14
234:19 242:10,12
242:16 252:10
**filed** 10:6 39:3,9
96:20 125:18,23
210:16,17,18 216:5
216:6 217:6,19
241:17 243:3,6,10
243:11 245:8,11
**filing** 196:5,9,13,18
196:22
**filings** 206:23
**finalized** 38:16
**find** 91:3 114:7
185:9 190:23

**fine** 9:3,9 14:19 21:17 77:17 186:15 187:1
**finish** 14:10,12
**finished** 11:14,20 228:14
**fire** 103:12 211:19 242:11 251:2
**fired** 42:12 108:10 111:21 142:19 144:1 145:7 179:18 212:15 216:5,6,9 218:11 234:22 235:4,11 241:20 243:1,8,16 250:3,6 250:8,10,17,21
**firing** 22:12 112:1 112:5 184:2 200:10
**firings** 55:16
**firm** 64:14,23
**first** 8:17 9:21 18:4 26:15 28:11 40:8 46:14 47:20 48:6 49:3,5 50:20 57:12 57:16 58:4 75:20 80:17 95:2 98:11 98:17 106:23 107:11 114:20 117:3 122:19 129:22 130:21 136:14,21 142:1 144:9 149:7 158:17 161:18 175:21 217:4 228:22
**firsthand** 148:18
**fishing** 101:9
**fit** 100:22 166:7
**fitting** 233:17
**five** 37:16 78:15 85:19,20 86:3 122:21,22 160:2,4

165:9 197:14,23 198:10,17 199:2,6 199:22 200:20 212:19 214:4 234:23,23 235:2 236:15 243:13,16
**fix** 40:2 227:1,5
**floor** 86:3,10,12,12 86:15,17
**flow** 20:17
**flowers** 96:7 97:14 97:14,15,18,21
**flush** 42:23
**fmla** 225:18
**focus** 249:23
**folks** 10:20 44:13 81:9 90:1 110:15 180:7 202:18 214:12 215:2 234:21,23 243:16
**follow** 182:14 183:12 184:1,8,14 184:17,20 251:15 252:1
**followed** 53:23 223:12 230:12
**following** 8:14 183:19
**follows** 8:20
**food** 188:20
**foot** 79:5
**force** 7:10
**foregoing** 8:7 253:7 253:10
**forget** 233:7
**forgetful** 62:17
**form** 7:16 33:20 40:14 41:23 42:1 42:15,21,22 50:13 51:5 72:11 75:3 76:19 84:1 103:9

105:21 111:5 113:13 115:15 119:13 120:8 123:7 132:17 133:21 140:19 156:21 168:10,23 177:10 191:18 195:11 198:19 202:11 204:18 210:13 211:3 225:15 229:13 243:5
**formal** 32:11,12,15 32:20 33:1 80:7 91:10 92:4
**formalized** 140:22
**former** 67:15 216:23 217:5
**forms** 56:14
**forty** 38:12
**forward** 232:4
**forwarded** 130:1 234:14
**found** 67:3 83:14 114:10 205:4 226:23 236:5,16
**four** 16:23 20:4 23:5 27:17 34:7 36:3,18 63:11 99:13,22 111:16 112:3 136:8 151:17 154:13 160:6 212:16,17,18 216:4 235:3 236:14,15 242:18,21 246:8
**fourteen** 162:10 166:23 167:2,7,15 176:6,12 177:5 179:17 197:17,21 231:10 237:14 249:15

**frankly** 68:6 157:8 214:17
**free** 218:12
**frequent** 151:9,12 151:16 154:7 184:22
**front** 90:5 127:6 165:7 216:15 238:12
**fucus** 168:16
**fudged** 148:13
**fudging** 57:9
**full** 7:11 38:17 154:13 201:14 215:1
**fully** 60:16
**further** 233:19 241:8 251:13,22 252:13,15 253:13
**future** 144:21

### g

**gamut** 38:13,17 221:7
**gatekeeper** 97:4
**gather** 54:3 70:15
**gathered** 194:16,18
**gauge** 172:3
**general** 21:19 31:15,15 41:20 54:10 80:8,8 92:2 182:22 216:20,23
**general's** 65:23 66:16,22
**generally** 25:15 66:20 214:14
**generated** 96:2,4 115:6 140:14,15 223:11
**generates** 140:16
**genesis** 41:6

**gentlemen** 67:6
**genuinely** 217:22
**georgia** 2:8
**getting** 32:16 33:6
68:8 77:23 100:9
107:20 168:21
179:18,19
**give** 14:20 24:9
31:17 37:8 61:14
62:22 81:5 83:4
104:1 117:14
119:17 120:1
144:12 177:4
178:17 185:19
193:14 195:20
242:5
**given** 40:12 47:1,16
69:14,21,23 73:11
73:11 76:15 85:20
93:20 111:3 132:10
137:6 140:4 141:1
141:2,16 223:6
233:3 237:15 238:6
238:20 253:12
**giving** 30:19
102:14 178:15,16
188:7
**glance** 229:14
**glanced** 40:21
**glasses** 161:8
**go** 10:1 11:12 12:20
24:7 25:22 26:12
26:16 27:1,12,23
28:1,3,10,22 29:4,7
31:11 36:11 38:13
40:3 62:13 68:15
78:11 79:21 81:11
81:22 86:6 97:2,3
101:5 107:13,22
110:17 112:10
116:13 117:16

118:13,15 119:2,6
119:8 120:2,3,3,10
124:4 137:7 142:15
144:10 148:21
152:14 158:21
162:19 182:21
185:14,22 186:6,17
186:22 201:4 204:5
219:11 224:20
237:11,13
**goes** 25:6,23 31:8
82:9
**going** 13:4 14:5
19:23 21:7,14,16
35:6 44:18 45:14
45:19 48:15 54:15
61:17 70:6 77:15
78:1,6 86:22 94:18
95:1 105:20 107:22
109:21 114:3,11,12
123:19 124:3,4
125:5 129:1 130:16
131:2,21 135:9
138:21 144:17,19
151:17 152:4,10
157:3,18,19,22
158:5,6 161:8
162:11,12,18 165:4
165:10,22,23 166:4
169:8,10 173:10
182:19,21 183:1
185:14,14 188:21
194:11,12,12 205:8
205:9,10,11 212:21
216:14 218:8 226:1
227:22 228:18
231:4 232:4 237:7
237:11,13,16
242:16 249:7,8,9
250:20 251:1,10
252:10

**goings** 156:2,4
**good** 9:6,8,8 13:9
34:14,22 35:5
63:19,22 74:5
77:19,20 78:12
101:19 161:4
186:11 214:6
221:22 228:19
229:19,23 237:22
**gotten** 99:14,19
100:4
**governed** 48:6
225:4,8
**governmental**
71:13
**grand** 17:8 23:16
**grant** 44:17 46:11
51:6 86:4 159:23
160:1 206:13,15,22
207:8,15 208:6
217:5
**grants** 25:2
**great** 21:12 173:1
**ground** 10:2 14:17
15:6 213:9
**grounds** 7:18 13:12
204:17
**group** 22:20 24:6
242:23
**guarantee** 55:3
**guess** 17:13 38:7,18
41:1 72:13 108:23
109:1 171:9 178:23
183:2 194:10
**guessing** 108:20
183:6
**guidance** 111:3
**gut** 110:2,4
**guy** 18:21 19:17
40:17,17 78:9
221:22

| h |
|---|

**habit** 89:9
**half** 39:5 246:8
**hall** 86:14 90:8
**halloween** 125:3,12
**hallway** 91:10
**hand** 141:12 178:6
**handbook** 35:21
37:5
**handed** 102:16
114:21 145:18
162:8
**handle** 12:23 23:14
67:20,23 80:4
213:16
**handled** 23:5 28:13
43:9
**handling** 68:13
**happen** 19:23
20:16 31:7 57:15
65:7 105:6 106:9
111:9 113:2 133:19
140:4 210:1
**happened** 31:3,4
31:12,14 32:6
33:13 93:17 108:18
111:12,14 124:6,19
142:20 161:16
187:18 189:15
202:18 203:11
220:22 239:11
**happening** 12:5
87:23 93:18 202:21
**happens** 123:11
213:10
**happy** 37:9 74:15
98:2 113:16 127:7
178:12
**hard** 198:4 204:10
208:2

**harder** 228:9,12
**hate** 148:23
**head** 60:12,13
  214:5
**hear** 13:15,21
  24:21 187:16,20
  199:8,13
**heard** 15:8 125:7
  187:14,22 188:11
  240:5,17 243:10
**hearing** 197:7
**hearings** 19:10
**held** 77:6
**help** 44:7 158:20
  172:7 217:11
**helpful** 172:13
**henderson** 19:18
  19:18
**hereto** 45:18 48:14
  94:23 114:17 129:7
  131:7 135:13
  137:12 152:9 158:4
  162:17 163:4
  169:15 173:15
  175:3 226:7 228:7
**hey** 21:11,17 35:6
  89:9 102:13 185:12
  212:20 217:5
**hide** 104:5
**high** 159:11
**higher** 82:10,11,13
  82:16,22
**hints** 187:22
**hire** 241:2 242:13
**hired** 18:19 28:20
  159:12 160:8
  220:20 240:21
  241:4,16 242:2
  251:19 252:5,9
**hiring** 22:11,21
  24:4 54:17 251:19

**hirings** 55:15
**hispanic** 224:9
**historic** 213:12
**history** 249:6,23
**hit** 237:11
**hkm** 2:6
**hold** 77:10
**hone** 31:6
**honest** 225:16
**honestly** 20:13
  37:19 85:16 101:2
  188:5 242:7
**honesty** 20:22
**honing** 31:8
**hop** 234:3
**hope** 11:13 225:10
**hopefully** 14:14
**hour** 77:15 174:9
  218:1
**hours** 71:1 151:18
  154:14,17,22
  155:12 172:12,18
  174:6 246:8
**house** 205:10
**hr** 45:10
**huh** 14:23 31:20
  217:17 238:4
  247:16,19 248:22
**humor** 202:13
**hundred** 14:9
  44:15,16,16,18
  45:7,10 64:4 78:6
  85:13,15 215:3
  237:13,14
**hurtful** 132:14
**husband** 196:7
  210:15,21 240:6
**husband's** 193:18
  194:6,23 195:18
  209:16 240:8

**hypothetical**
  118:21
**hypothetically**
  26:18

## i

**idea** 37:15 63:20,22
  174:14,17 185:20
  193:23 196:11
**identical** 219:16
**identification**
  45:16 48:12 94:21
  114:15 129:5 131:5
  135:11 137:10
  152:7 158:2 162:15
  163:2 169:13
  173:13 175:1 226:5
  228:5
**identify** 46:7 161:1
**identity** 238:22
**ignored** 185:3
**illegal** 41:23
**imagine** 39:13
  198:4
**immediate** 53:13
**immediately** 19:19
  177:16
**impacted** 207:4
**important** 13:15
  14:16,20 69:2,4,12
  79:9 84:7 92:12
  157:5 185:2,5
  190:13 195:8
  211:17 213:11
**importantly** 101:17
**impossible** 204:15
**inadvertently** 14:1
  15:16
**inappropriate**
  204:11 212:1,6
  233:16

**incident** 30:16,20
  31:4,9,12 34:19,23
**incidents** 136:11
  141:8 187:23
  188:12
**include** 165:4
**includes** 72:8
**including** 55:23
  234:23 235:2
**incumbent** 200:11
**independence** 2:15
  8:10
**independently**
  189:19,22 202:9
**index** 3:1,10 4:1
  5:1 6:1
**indicate** 58:17
**indicated** 179:4
**indicating** 121:21
  137:23 139:8
  145:13
**indicted** 19:19
**indictment** 39:17
  39:22 40:1,1
**indirectly** 60:6
**individual** 219:6
**individualized**
  167:4,8
**individually** 147:7
**individuals** 23:1
  29:22 30:3 65:21
  121:5 158:14 180:5
**inflection** 14:11
**influenced** 137:23
**inform** 172:8
**informal** 65:12
  77:4
**information** 30:1
  32:2 33:4,6 36:12
  36:13 53:19 54:2,3
  58:12,15,16 62:22

63:2 84:3 107:16
107:20,21 108:15
112:8 121:3 132:10
132:13 138:20
139:1,3 141:12,13
141:16 142:9,11,23
143:1,4,9 144:12
144:14,17 145:11
145:13,23 146:1,4
147:2,3,6 148:9,11
148:16,19 149:18
155:2 184:10,18
185:3 189:16,17
190:19 192:4 194:9
194:15,18 207:10
208:1 211:20
222:22 227:20
232:9 237:3 248:2
248:4
**informed** 131:23
133:1 149:3
**inherently** 156:4
210:12
**initial** 245:21
**initially** 66:16
67:23
**initiate** 33:19
144:23
**initiated** 33:20
144:20 145:2
**initiating** 145:5
**inquiry** 89:16
165:3,5 172:8,10
**insignia** 125:4,9
127:19
**instagram** 192:15
**instance** 178:1
231:1 232:7 233:3
**instances** 67:1
70:14 177:7 179:11
179:17,19 188:17

191:15 204:10
**instituted** 114:8
**instituting** 124:14
**instructed** 134:23
136:2
**instruction** 122:5
135:5
**intakes** 218:5
**intent** 51:13
**interact** 87:1
221:13
**interest** 64:17
**interested** 149:11
151:4 155:17 168:3
177:1 253:15
**internal** 24:15
25:17 29:12,16
32:18 33:2 34:14
35:12,19 36:5,20
37:2,12,22 38:3,8
38:12,20 52:23
53:5 120:6
**internalized** 200:16
200:19
**internally** 122:7
**interpret** 211:8,10
211:13
**interpreted** 240:5
**interrogatory**
126:5,21 127:3,16
246:3
**intervene** 25:4
**interview** 24:7,8
32:11,13,15,20
33:1
**interviewed** 34:16
**interviews** 22:22
22:23
**invasive** 226:22
**investigate** 126:11
146:19 147:1,8

149:17 185:10
**investigating** 25:20
146:16
**investigation** 32:18
33:2 34:15 35:13
36:5,20 38:3,13
95:17 126:15,21
127:22 128:3
**investigations**
29:12,16 35:20
37:2,13,22 38:9
52:23 53:5
**investigative** 30:5
34:22 35:12
**investigator** 38:20
**investigators**
238:13
**invite** 50:1
**involve** 229:10
**involved** 22:16,20
24:4 32:9 33:5,7
43:20 54:2 109:22
112:7 118:18
119:15 123:21
**involving** 25:14
54:11 64:15 112:2
212:12 237:9 240:6
**irrespective** 102:15
**issue** 12:6 26:16
28:22 37:1 56:8
58:10,18,22 59:1
66:2,4,6 83:9 84:8
99:9 104:19 109:21
118:14,17 182:17
238:1
**issues** 11:8 24:15
29:13,17 45:10
64:15,18 65:13,13
65:18,22 66:1 99:8
110:21,23 135:19
136:16 138:3,4,21

139:5,18 143:19
178:4,21 193:18,19
194:5,7,23 196:1
227:1 230:1 235:20
**item** 102:22 103:2
152:4
**items** 139:7
**iterations** 180:17

**j**

**jack** 24:2
**jackson** 2:14 8:9
163:20,20 164:12
164:19
**james** 2:11
**jay** 67:7
**jefferson** 1:12 9:22
11:1 16:11,15,19
17:3 18:4 27:18
44:14 51:14,21
55:13,19,22 56:18
56:23 65:1,2 69:3
72:7 202:19 253:4
**jerk** 15:2
**jeter** 1:7 2:19 10:6
10:8 39:3 46:20
47:16 48:6 49:20
52:9 68:2 74:12,14
75:9,13 76:15 77:1
77:10 85:2,4 87:6
91:5,7,8,15,18,22
92:5,20,21 93:4,7
93:11,15,16,19,22
93:23 94:10,13
95:8 98:6,7,9,14
99:4 100:1,21
102:2 103:8,12
104:9,12,16,19,20
104:22 105:3
106:13 107:1,8
108:16 109:4,16
110:10,15,17 111:4

111:20 112:3,14,15
112:19 113:5,21
124:1,12 125:3,10
125:16 126:22
128:4,19 130:13,18
131:19 132:9,13,18
132:23 133:7,13,17
134:9,17 135:1,20
136:16 137:7,14,20
138:4,6,10,14
139:6,19 141:11,21
142:7,19 143:8
144:13,15 145:7
147:11,12 149:15
150:9,18 153:5,13
153:18,22 154:3
155:16 158:13
159:12,22 160:10
161:20 163:8,12,19
164:13,14 166:18
166:21 167:8 168:2
168:9,18,20 170:22
171:4,18,23 175:12
175:15 178:7,18
180:17,23 181:6
182:7 183:18 184:7
187:11 188:7,9,15
188:18 189:5
191:10 194:22
195:17,23 196:9,13
196:18,22 197:4,19
198:17 199:16,21
201:17 203:2,8,14
203:16,22,23
204:11 206:14
207:3,8,14 208:18
208:21 209:3 212:2
212:7,18 217:6
220:20 222:3 223:7
223:10 226:18
227:9,19 228:3

229:2,10 230:12,20
231:2,11,22 232:23
234:6,23 235:2,11
237:2 239:3,11,12
240:3,8,19 241:17
241:20 242:9,14,16
243:2,17 244:12
245:1 250:18
251:10,20 252:5,9
252:10
**jeter's** 11:6 47:6
49:13,16 67:2
126:11 127:20,23
128:9 132:21
138:20 143:14
144:21 170:18
173:5,6 174:11,12
178:10 179:10
190:18 192:10
208:11,14 220:23
222:11,18 228:11
231:13 232:13
246:17 247:9
**job** 20:11 21:12
23:12,13 44:8
60:21 191:11
237:23
**joe** 23:10,11 24:2
24:13 25:6 26:17
27:2,8 28:1,3,5
29:10 30:14 31:11
31:13,21 36:18
37:11,13 38:9
44:23 53:4,21 58:2
58:6,11 59:6,12
75:23 95:7 106:12
107:16 108:14
109:3,11,14,17
110:7,11,19,21,22
111:2,8,13 112:16
112:20 113:9,22

117:16,19 118:15
118:16 119:3,6,8
119:15 120:3,11
121:6,17,21 123:23
124:2,2,12 130:1
133:6 134:15 135:5
135:19 139:5
141:17,18,19 142:5
142:13,16 143:4,9
143:13 153:20
181:15 188:2,4,6
193:1,10 196:17
200:21,21 202:5,5
207:14 209:10,10
211:13 212:11
214:17 216:16
217:8,14 222:5,10
223:21 235:20,22
236:1,7 237:4
**joe's** 142:21 218:15
**joint** 223:16
**joseph** 19:20
**jr** 2:11,12
**judge** 15:10 19:19
19:20 155:8 209:17
**judges** 43:19 196:6
196:10 197:5
**judgment** 113:17
186:8 204:16 242:6
**judicial** 153:1
169:21 196:6,9,13
196:18,22 202:15
**judy** 59:11,15
60:15 61:1,9,12
62:6,16 63:4,13
75:18 93:6 94:11
95:7 96:22 97:8,21
97:23 98:8 99:1
100:20 102:1,2
103:6,22 104:17
105:1,2 107:17,21

108:15 109:11,14
109:18 110:8,9,16
110:22 111:3,8,20
111:21 112:2,5,16
112:21 113:10,23
117:23 119:11,17
120:17 122:2,10,15
122:20 123:16,23
124:14,20 128:18
129:19 130:13
132:1,11 133:1,6
134:8,23 136:10,19
139:6,18 141:18,19
142:6,11,13,16
143:2,4,9,13
148:10,15,18
149:19 154:1
167:18,23 168:6
171:22 176:15,19
176:23 181:10
183:6,7,11,11
187:10,22 188:1,4
188:6 189:12 191:9
192:3,5 193:6
194:4,19,21 195:17
195:22 196:12
198:2 199:14,20
201:1,1,21 202:1,1
203:5,7 204:20
205:1 206:16,18
207:7,23 208:11
209:6,7,22 211:10
212:11 214:21
220:21 222:14
226:15 227:18
228:3 229:1,11
231:2,6 232:12
234:5 236:12 237:4
241:4 243:19 245:1
**jumping** 106:21

**jury** 17:8 23:16

**k**

**keep** 13:4 78:1,5
134:23 148:1
191:22 238:15
**keeping** 83:15,16
83:18,22 134:2
147:19
**kept** 84:14 97:6
**key** 101:21 224:21
**kin** 253:14
**kind** 18:22 19:3,21
20:23 21:5,23
23:21 24:2,6 37:21
79:5 84:4 117:18
125:4 183:2 211:22
216:21 225:22
234:3
**kinds** 190:19
**knew** 17:2,14 67:7
67:8 83:17,19,20
85:9 87:6 126:2
128:17
**know** 9:12 10:5
12:4 13:7 14:4
15:20,23 17:19
19:22 20:22 21:11
21:12,13,17,23
22:14 24:2 29:1,3,7
30:3 32:7 34:10
37:5,10,19 40:13
41:2 43:17,19
44:11 50:3 56:5,10
57:1,2,15,19,20
58:3 60:7 61:9,15
61:18,21 62:7,9,11
63:4,7,9 64:2,13
65:7,8 66:1,10
67:11 73:22 74:2
75:7,10 77:1 82:4
83:7,8 84:3,8 85:4

85:11,14,20 86:1,3
86:4,7,8,8 87:17
88:16,18 89:1,10
89:11 92:7 95:14
96:3,14 99:19
100:3,6,7 101:1
102:9,12,12 103:10
103:13,16,21
106:18,19,20,21
107:2,3,18,19
109:7,10,14,20,22
110:1 111:14,15
113:1,3,4,12
114:18 115:1,6
120:17,22 121:2,6
121:8,13,14 122:10
123:10 124:22,23
125:22,22 128:21
134:15,18,18 135:4
136:1,3 140:5,6,12
142:3 143:17,21
153:20 154:1
155:21 156:5,22
164:5 170:15,16
171:12 172:12,15
172:18,22 174:10
178:13 180:4
181:15 183:7,9,20
183:23 184:5 185:5
187:20 188:1
190:14 191:6,8
193:1,4,4,10,20
194:13,13,16,21
195:1,2 198:7,20
199:4 200:2 203:1
203:4,6 204:10
205:8,13,15,22
207:2,6,22 209:18
214:4 215:14,21
216:1 217:8,10
218:17 219:9,10

221:12 222:5,8,10
222:14,16 225:17
228:16 229:16
232:2,4 235:4
237:10 242:1,3
**knowing** 14:15
76:17 86:4 110:5,7
110:14 123:5 155:3
252:6,10
**knowledge** 35:1
36:10 51:19 61:5
63:13 103:3 112:2
112:14,18 113:21
116:22,23 118:3,4
148:19 168:6
171:21 181:17
183:18 191:13
196:8 200:4 227:21
244:3 247:14
252:12
**knowledgeable**
60:16,19,22 61:2,4
**known** 122:17,20
122:23 158:22
236:1,7,12,19,20
**knows** 59:13 62:13
222:5

**l**

**l** 7:1
**label** 94:19 157:22
**labeled** 46:3 115:3
117:4,7,9 131:12
**lacked** 189:6
**ladies** 208:16
**lady** 13:15
**lamb** 216:16,17,18
217:3,15
**language** 223:22
**lanitra** 1:7 2:19
10:6 74:12,14 75:8
75:12 85:2,4 87:6

91:5,6,8,9,15,18,22
92:5,20,21 93:4,7
93:11,15,16,19,22
94:10,13 95:8 98:6
98:9 100:1,21
101:18 102:1 103:7
104:9,12,16,19,20
104:22 105:3
106:13 107:1,7,13
108:16 109:4,15
110:10,15,17,21
111:3,9,20 112:3
112:14,15,19 113:5
113:21 124:1,11
125:3 128:19
130:13 133:7,13
134:9 135:1 136:16
139:19 141:21
142:6 143:8,14
144:13,15 145:7
150:9,18 153:5,13
153:18,22 154:3
155:16 159:12
161:20 163:11,19
164:13,14,16,18
168:2 171:23
174:12 183:18
184:7 187:11 188:7
188:9 189:5 190:18
191:10 192:9
194:22 195:17,23
196:9,18,21 197:19
199:15,21 201:17
201:22 203:2
206:14 207:3,7
208:10,14,18,21
209:2 217:6 220:20
220:23 222:2
226:18 227:9 228:3
229:2 231:2,3,11
231:13,22 232:13

232:23 243:2,17
244:12 245:1
246:17
**large** 8:4 213:14
**laughing** 197:15
**law** 2:5,13 8:8
16:21 17:2 18:16
19:8 41:19 42:19
43:1,6,21 44:1,4,7
54:22 64:14,23
201:15
**laws** 7:11
**lawsuit** 10:6 25:15
39:4 40:8,18,19
79:4 95:18 96:20
215:19 216:3
217:14 218:8,12
242:10,12,16
**lawsuits** 216:5,6,10
217:19
**lawyer** 15:13 18:5
38:22 39:8 45:22
105:19
**lawyers** 13:13 15:7
15:18,19,19 16:2
22:16,20 23:17
24:4,8 41:9 64:5,18
64:19 65:8,11 66:8
67:3 91:2 92:7
121:16 126:5,15
149:2 158:9
**lay** 245:22
**layers** 84:5
**laying** 136:10
**lead** 218:8
**leadership** 29:11
36:8 45:6 81:9
**leading** 7:16
**learn** 67:16 144:3
214:1 215:4

**learned** 84:13
213:15
**leave** 13:4 21:7,8
21:17 55:20,21
56:1,3,6,6,12,14,16
56:17,22 57:4,7,18
58:3,8,11,13,19,23
59:1,2,5 61:2,6,8
61:18,18 62:4,6,7,9
62:18 63:5,17
70:23 71:5 72:18
73:1,3 77:21 78:22
113:11 147:19
148:2 150:3 152:1
158:11,12 163:7,11
163:16 165:12,14
165:19 166:9,15
167:2,4 168:1,8,17
170:5,11 174:19
175:6 176:1,1
177:6 179:17,23
180:12,20 181:1
182:7 183:2 197:13
197:17,22 198:15
203:3 204:5,7
208:16 224:14
225:4,20 230:1,3
231:4,9,13 232:1
233:1 249:13 250:6
250:15
**leaves** 56:19 202:23
**leaving** 11:7 151:16
197:13 203:23
204:22
**led** 67:5 124:20
215:18 217:13
**left** 9:16 22:3 170:8
203:8,14 204:11,15
**legal** 39:10 42:10
64:15,23 65:13
83:12 193:19 194:6

194:23 196:1
225:12
**length** 27:14
**lenox** 2:7
**letter** 4:11 108:5
132:21 137:6,14
**letting** 203:1,4
**level** 79:6 159:11
214:17,21
**liberty** 105:16
**license** 253:21
**licensed** 17:22 18:5
**life** 40:18 79:21
**light** 154:6 155:18
155:20,22 156:2
159:10
**likable** 101:19
**likeable** 102:4
103:20
**likes** 48:18
**limited** 131:22
**limiting** 74:23
**limits** 56:21 57:1,2
57:3 77:4
**line** 79:13,18
100:10 127:21
136:14 139:7 217:2
217:4 229:15
**linked** 247:9
**linkedin** 192:18
**list** 136:15 138:3
153:8 242:20 251:4
251:6
**listed** 146:6 149:7
170:1
**listen** 143:19
**listening** 107:20
**literally** 83:15,16
86:9,11 129:15,16
131:18 172:11,17

**litigated** 39:15
**litigation** 34:8
**little** 11:3 14:14
17:20 22:3 23:4
79:3 80:13 136:23
158:21 210:3 234:4
**loaded** 146:18
**lobbyist** 216:22
**located** 86:12
**location** 86:16
**logged** 194:11
**long** 15:22 110:6,8
110:15 144:17
170:15,16 171:12
172:15 179:21
180:1,3,13,20
181:2,7,11 236:1
**longer** 13:7 132:2
182:19
**longest** 59:22
**look** 20:17 34:15
36:21 45:22 46:16
50:1,7 74:15 89:13
98:2 127:7 150:20
161:17 162:1 163:8
165:17 166:7
171:22 175:21
177:23 178:12
179:2 214:13 224:5
228:13 229:15
237:20
**looked** 40:19 126:7
145:17 200:7 231:9
**looking** 15:23
50:18 100:16 114:4
115:15 130:22
151:13 154:15
155:10 175:21
213:21,22 228:14
242:19

**looks**  49:8,22
164:11 171:16
**loss**  187:6 188:23
**lot**  21:2 22:1 23:14
38:18 54:7 65:8,20
66:9 84:5 87:3
105:16 144:7
176:12 205:12
234:2 237:2 251:12
**lottery**  249:14,16
249:17
**loud**  101:13 117:3
129:23 149:8
**lunch**  151:18
185:15 186:13
**luxury**  73:12
**lying**  93:16 113:12

**m**

**mail**  5:23 102:8
130:1 164:11
216:16 217:3 221:8
**mailed**  97:7,12
102:11,16 145:18
215:8
**mailing**  124:11
**mails**  5:5,8,11,20
97:23
**maintain**  235:21
**maker**  138:9 233:9
**making**  29:22 33:8
37:4 38:2,6 53:11
53:21 55:3,14 83:1
93:8,23 94:2,6,13
94:16 113:21
125:16 157:9
188:16 191:15
243:20
**malicious**  146:3
**maliciously**  122:11
**man**  239:17

**management**  45:6
83:4,7
**mandates**  54:17
**manner**  54:20
**manual**  3:15,19
46:9,14 47:2,17
48:5 50:11 51:10
54:6,10,23 60:20
66:11,12 74:10,11
180:16,18 219:21
223:2,11 224:1
**manuals**  53:22
60:17 74:8,20
219:13
**map**  70:9
**march**  4:11,15,19
106:22 108:8,11
135:22 137:2,17
139:22 145:20
163:19 189:3,5
198:23 199:15,19
237:3,8 241:20
251:3
**mark**  14:11 131:2
158:6 226:2 227:23
**marked**  45:16
48:12 94:21 114:15
129:5 131:5 135:11
137:10 152:7 158:2
162:15 163:2
169:13 173:13
175:1 226:5 228:5
**mask**  13:20
**math**  170:22
**matson**  65:21
221:17 222:6,17
223:22
**matter**  13:3 42:10
57:16 59:23 60:2
72:4 86:18 91:13
162:23 224:19

229:5
**matters**  25:14 53:7
53:17 144:7 225:2
**mccurry**  57:21
59:10 62:10,14,19
62:23 95:10 148:3
148:5,16 201:4
226:16,20
**mccurry's**  57:22
**mean**  32:8 33:17,21
38:16 39:21 52:2,6
55:6 60:6 65:15
66:5,6 69:8 72:12
84:2 86:9,12 87:3
88:16,17 89:14
95:23 98:16 101:1
101:4 103:21
106:19 118:11
120:9 121:9 126:1
140:10 142:21
143:18 147:4
149:21 153:11
157:4 175:14
178:23 183:12
185:7 186:12 187:8
194:5 205:5 207:23
209:7,11 213:20
215:20 221:6
227:13 229:14,15
230:5 238:5 243:8
249:17
**meaning**  68:18
210:10,16
**means**  13:16 15:10
15:12 17:10 32:16
35:23 65:5 69:9
147:7 205:6,16,19
205:20
**meant**  183:7,8,10
206:18,20 207:1
208:5 237:12

**measure**  151:11
154:16
**measured**  154:21
**media**  192:7,21
193:2,8
**medical**  178:11,21
179:6,13 224:22
225:4,13,20 227:20
229:20,22 230:1,2
230:5,17
**meet**  87:10,20 88:6
89:5 90:19 91:5,8
92:16,22,23 133:13
**meeting**  4:5 85:1
87:22 88:8,10,11
88:12,17 89:1,2,7
89:12,20 91:10,15
91:17,21,23 92:5
92:20 115:3 116:1
133:16 209:14
239:11,16,18,19,19
240:2,4,7,13
**meetings**  68:2
88:21
**member**  15:22
17:23
**memo**  4:8,15 95:23
96:1,4,10 97:4,5,8
97:10 98:4,10 99:1
100:9 102:2,10,22
103:1,6,15 104:18
115:15 117:19,22
120:19 121:7,9
122:3 123:16
124:14 129:12,15
129:23 130:8 133:4
135:18,23 136:2,5
136:14,19,22
137:18,22 138:2
139:10,17,22
142:10 147:21

148:15,20 149:19
167:17,22 176:14
176:18,21,22
184:19 195:16
200:6 211:21 237:4
243:19,21,22 248:2
248:4
**memorandum** 95:7
**memorialize** 138:4
**memorialized** 76:5
**memorializing**
35:18
**memory** 91:21
100:8 156:5,8
212:9
**memos** 96:23 97:7
97:17,20,22 98:1
99:14 134:3,4,8,16
136:10 234:5,10,13
234:19
**memphis** 170:11,12
**mention** 82:12
**mentioned** 16:10
85:13 164:10 214:3
**mentor** 90:15
**merits** 219:8
**message** 82:3 221:7
230:22
**messages** 6:5
226:15 228:3,20
**met** 9:12 91:6
92:17 93:5 104:12
**methodical** 157:16
**michael** 57:21,22
59:10 62:10,14,18
62:23 95:9 109:12
148:3,5,11 226:16
226:19
**mike** 20:1,3
**miles** 241:16

**mind** 218:16,19
**mindful** 77:22
**minute** 213:3,5
**minutes** 13:4 78:16
186:7,18,23 212:21
245:6 246:16
**mischaracterizes**
113:14
**missing** 161:13
**mistreated** 41:22
**mistreatment** 66:7
**misuse** 100:13
**misusing** 233:1
**mode** 21:19
**moment** 16:16 70:6
79:1 80:13 96:5
125:5 151:1,1
228:13
**momentarily** 62:17
62:17
**montgomery** 46:10
65:21 216:22
**month** 124:13
**months** 10:12 20:7
21:22 124:13 153:8
170:13 171:1,8,10
171:11,15,17,18
226:22
**morning** 9:6,8,8
25:10
**motions** 67:20
**motivated** 236:8,21
239:3 242:15
**move** 67:5 249:7
**moved** 170:11,12
**moving** 243:1
**multiple** 5:5,8,11
5:20 59:7 109:2,9
146:6 221:8 245:14
**murrill** 2:11 3:5,7
9:3 10:15 42:1,15

42:21 45:22 46:2
48:20 50:13 51:5
67:3 72:11 75:3
76:19 84:1 95:22
103:9 106:14 111:5
113:13 114:18
115:12 116:21
119:13 120:8 123:7
127:2,8 128:1,11
128:12 131:10
132:17 139:12
140:19 141:1,4
152:16 156:21
160:23 163:14,16
164:13 168:10,23
177:10 185:12,19
186:4 191:18
195:11 198:19
204:18 211:3
225:15 229:13
233:21 234:1 241:8
243:5 249:20
251:15,17,22 252:7
**murrill's** 246:15
**myles** 240:22,23
241:3 242:2

**n**

**n** 2:1 7:1
**name** 47:12 87:15
125:12 165:15
**named** 35:4
**names** 22:22
**narrative** 245:22
**narrow** 157:12
**narrowed** 157:11
**nature** 20:19 38:17
68:15 161:16 191:6
229:8
**ne** 2:7
**necessarily** 67:11
73:23 84:2 89:1

98:1
**necessary** 7:14
**need** 11:23 12:21
13:17 36:12 37:2
61:8,11,15,18
62:22 63:2 78:2
83:7 84:2 107:13
111:9 150:20 151:1
186:20 195:9 201:7
203:19 226:21
227:3,5,15 249:9
250:14
**needed** 124:20
224:2
**needs** 13:21 32:19
36:20 89:11,13
116:15 230:16
**negative** 83:16
**negotiated** 221:21
**neither** 223:21
253:14
**never** 43:9 70:17
70:19 76:23 77:5
99:9 123:9 134:23
140:21 201:19
236:10 240:17
**new** 16:21
**nice** 9:10
**nineteen** 166:17
167:11,14 176:9
247:21 248:7
250:10
**nitra** 130:1
**noble** 126:9 141:2
150:12 158:9 246:4
**nodding** 14:21,23
**nondiscrimination**
54:12
**nonmedical** 179:11
**normally** 99:7

**northern** 1:2
**notably** 108:19
**notary** 1:23 7:7 8:3
**notation** 49:3,4
 231:12
**note** 163:19
**noted** 15:12 105:22
 106:2,5
**notes** 224:5
**notice** 76:12 119:5
 195:9,13 217:3
**noticed** 139:21
**notices** 27:21
**noticing** 119:9
**notification** 27:3
**notified** 29:2,23
 81:14,16 82:1,7
 105:1 118:17
**notify** 26:15,21
 80:19,21 81:3
 82:14 88:10
**notifying** 135:19
 182:17,18,20,23
 183:3,4
**november** 4:8
 124:6 130:8,12
 226:17,19 227:9
**number** 37:9,9
 44:11,23 48:10
 56:21 57:18 70:23
 71:5 78:22 94:19
 114:3,11 117:3,8
 120:23 129:3,9,12
 131:3 135:9 142:4
 146:9,14 147:15
 152:5,11,17 154:17
 154:22 155:12
 156:15,17 157:23
 158:7 159:3,4,7
 161:13 162:7,13
 163:6 165:11 166:1

166:2,4,21 169:11
174:22 183:23
185:11 187:3,4
195:21 226:2 228:1
228:2 242:20
243:14
**numbers** 161:12

**o**

**o** 7:1
**oath** 92:23 93:12
 93:20 94:11 104:15
 113:6 125:10
**object** 42:1,15,21
 42:22 50:13 51:5
 72:11 75:3 76:19
 84:1 103:9 105:21
 111:5 113:13
 119:13 120:8 123:7
 132:17 133:21
 140:19 156:21
 168:10,23 177:10
 191:18 195:11
 198:19 204:18
 211:3 225:15
 229:13 243:5
**objection** 15:11
 16:3,5
**objections** 7:15,18
 15:7,11
**obligation** 37:20
 38:1,6 149:4 157:9
**observation** 211:18
**observing** 201:13
 202:3,7,15
**obtain** 138:16
**obtained** 138:18,19
 138:22 139:2,4
**obtaining** 177:16
**obviously** 11:5
 16:19 19:12 30:20
 57:4 65:22 67:9

87:4 123:15 137:18
138:5 210:6 218:11
228:18
**occasions** 247:21
**occurred** 19:16
 21:20 107:19
 143:21 144:2
 239:20
**october** 124:6
 127:1
**offense** 184:2
**offered** 7:20
**office** 10:23 11:17
 16:16 18:3,8 19:4
 20:2 21:10 23:15
 29:13 30:4,12,16
 31:18 33:2 35:14
 44:14,20 45:1 46:9
 46:23 51:14,22
 52:12,15,19 53:1,6
 53:11 54:16 55:3
 55:13,20,23 56:4
 56:18,23 58:1,13
 60:1 62:8,14 64:15
 65:2,14,18,19,23
 66:17,17,21,21,22
 67:5,12,20 69:3
 71:9,12,15,16,22
 72:8 73:15,23 74:9
 75:16 76:6,22 79:7
 79:14 80:2,16,18
 81:5,12 83:13 85:6
 85:10 86:23 87:10
 87:21 90:17 91:15
 92:1 95:9 100:22
 101:20,22 114:9
 116:4,8 118:12,22
 122:18 125:6,12
 128:10 142:17,21
 143:14 147:20,23
 149:12 151:6

154:12 158:22
159:11 160:15
168:4 177:2 179:23
180:11 188:21
189:9,10 190:20
191:22 193:17
194:5,10 195:8
202:19 204:4
214:11 215:8,10
216:19,21 220:2
221:19 222:22
223:15 225:3,8
230:8,15 234:13,18
237:8,14,18 238:3
238:7,16,20 239:7
240:14 241:6,23
244:13 245:7,11,17
245:20 246:2 247:9
249:5,21
**officer** 44:20 45:1
 52:7 59:21 60:5
 158:18 191:12,17
 191:23
**officers** 46:12
 51:11,15 52:3,4
 53:8 59:20 69:21
 69:22 70:4,7 85:17
 86:1,9 93:22
 159:13,15
**offices** 8:9 56:13
 71:14
**official** 1:10 195:18
 202:15
**officially** 9:16
**officials** 43:13
**oh** 70:9 72:23 74:17
 81:7 112:8 114:10
 151:10 152:22
 172:19 175:17
 188:22

**okay**  10:4,17,21
  11:9,21 12:18 13:5
  13:19 25:13 28:4
  39:2 43:4 46:22
  49:11 72:16 74:17
  77:16 78:4,10,13
  78:17 84:21 92:14
  92:21 99:5 100:18
  101:7,14 112:8
  117:9,18 118:1
  127:10 130:6
  131:13,16,17
  133:12 148:22
  149:9 154:20 157:1
  157:14,17 160:1
  164:15,16 165:21
  166:20 171:5,17
  178:9 179:15 180:6
  182:4 185:19 186:4
  186:16,17,19
  188:22 202:22
  210:4 212:23 224:6
  225:18 226:1 228:8
  228:21 234:8,21
  235:3,17 236:16
  237:1 238:2,18,22
  239:2,10 240:3,12
  241:8,13 243:9,9
  243:10 249:4
  250:17 251:13,22
**old**  17:2 213:9
  219:7
**once**  18:5 21:22
  39:9 42:23 85:10
  124:9 185:16
  204:23
**ones**  94:7
**ongoing**  65:3 107:6
  107:9
**open**  238:16

**operate**  11:4 73:15
  213:23 237:16
**operated**  238:14
**operative**  39:10
**opinion**  32:20
  33:10 72:17 105:12
  115:21 151:20
  181:19 182:2 184:3
**opportunity**  54:11
  83:3 117:14 119:19
  120:10
**opposed**  30:14 37:8
**ops**  54:16 55:8
  159:23 206:13,21
  207:5 220:7,12
  221:1,15 223:3,8,9
  223:12,17
**oral**  8:13 38:2,6
  141:16
**orally**  139:4
**order**  161:12 210:9
  210:16,17 237:20
**organization**  45:11
  82:10 214:6
**original**  40:1 245:8
**ought**  69:15,23
**outbreaks**  238:16
**outside**  64:22
**overall**  175:18
  213:21,22,22
  214:15 215:14
**overtime**  70:14

**p**

**p**  2:1,1 7:1
**p.c.**  2:14 8:9
**p.m.**  213:7,7
  252:17
**page**  3:3,12 4:3 5:3
  6:3 46:14,18 47:6
  47:20 49:3,5 50:20
  101:5,6 139:23

  140:4,5,8,8,9 141:2
  141:3,7 163:18
  167:3 192:10
  228:19
**pages**  157:19,21
  160:22 161:1,11,14
  161:15 162:8,9
  165:7 166:14 167:3
  175:5 197:17 228:2
**pain**  227:7
**paper**  40:14 152:1
  246:21 248:18
**papers**  177:20
  231:15,21
**paragraph**  98:17
  101:13 131:22
**paralegal**  114:6
  157:21
**parallel**  40:4
**pare**  247:10
**pared**  249:22
**paring**  244:13
  248:13
**part**  33:6 54:23
  59:1 60:21 98:11
  98:17 129:13
  131:22 156:11
  168:16,22 169:2
  232:3 238:17 240:4
  242:14 248:12
**particular**  58:19
  96:5 98:16,16
  218:14
**particulars**  136:11
**parties**  7:3,17 26:4
  33:4,7 54:2 253:14
**party**  33:8 88:14
**passing**  91:9
  187:19
**path**  18:11

**paths**  9:13
**patrick**  216:16,17
  216:18 217:5,15
**pay**  21:8
**payroll**  44:12
**people**  13:23 22:23
  24:11 25:2 30:20
  32:8 37:5 44:10,17
  56:22 58:15 59:7
  65:22 73:18 79:10
  79:15 82:19 84:19
  86:4,5,7,16 90:4
  92:2,2 97:5,6
  123:21 147:18,23
  156:1,3 159:8
  190:7 204:3,7
  205:8,13,14 210:12
  212:15 216:4
  218:11 219:4
  224:15 225:13
  237:14,19,21 238:3
  238:5 242:20
  243:23 244:17
  249:5,8,23
**percent**  14:9 64:4
  78:6 215:3
**perchance**  226:11
**perfect**  14:19 161:9
**perfectly**  70:17
  77:17
**performance**
  208:12
**period**  142:12
  144:18 166:12
  214:15
**perjury**  19:19
**permission**  103:12
  204:1
**permit**  55:23
**persistent**  184:21

**persists** 26:16
**person** 31:1 34:3,6
  39:13 41:15 53:17
  58:19 59:16 68:13
  69:11 75:20 81:12
  81:15 82:1,6,13,14
  82:17,23 83:19,20
  84:15,15 88:13,21
  92:17,18 101:19
  102:4 103:21,23
  111:20 132:19
  148:4 170:1 175:8
  177:14,17,18 178:2
  178:3 203:5 204:21
  208:1 214:7 218:9
  221:12 226:9,10
  233:8 238:12
  249:12
**person's** 79:21
**personal** 56:1,3,6
  56:16,17,22 57:4,6
  57:18 58:3,8,11,13
  58:19 61:2,6,8 62:5
  65:11,15,15 122:14
  122:16 161:21
  197:3 204:6
**personally** 70:19
  75:11 197:1
**personnel** 3:14,18
  22:12,12 24:15
  29:13,17 46:13
  47:1,17 48:5 51:9
  51:14 53:12 60:16
  64:16 65:13,18
  180:16,18 219:13
  223:2,11 237:9
  244:14 247:10
  248:14
**perspective** 108:16
  213:10

**pertain** 166:5
**pfa** 209:17,18
  210:7,8,15,22
  211:6,14 212:13
**philosophy** 74:5,6
  76:3
**phone** 14:14 221:7
  228:11
**phones** 116:11
**photo** 201:21
**phrase** 71:1
**physical** 240:15
**physically** 238:6,19
**pick** 78:21 128:16
  221:7
**picked** 157:22
**pickett** 1:22 7:5 8:1
**picture** 168:15,17
  168:22 169:1,3
**pile** 178:6
**place** 18:4 56:4
  57:5 77:19 87:9,21
**placed** 19:7 20:2
  125:6,11 127:20
**plain** 209:20
**plaintiff** 1:8 2:3
  128:6
**plaintiff's** 3:12 4:3
  5:3 6:3 45:14,15,20
  45:21 46:3,7 47:5
  48:4,9,11,16,19,23
  49:1,5,16,21 50:4
  50:19 94:19,20
  95:2 114:3,11,14
  115:3 121:10 129:2
  129:4,8,12 131:2,4
  135:9,10,15 137:8
  137:9 139:13,14,17
  139:22 141:13
  142:10 145:14
  146:14 147:15,21

148:6 152:5,6,11
  152:20 154:23
  157:23 158:1,7
  160:18 162:12,14
  162:22 163:1,5
  165:10 166:4
  169:11,12,16,20
  170:19,23 172:6,6
  172:12,23 173:10
  173:12,16 174:5,21
  174:23 175:4
  219:11,13,16,20
  226:2,4,11,14
  228:1,4
**plaintiffs** 91:2
**plan** 11:12 21:9
**play** 67:4 219:1
  249:2
**plea** 38:15
**pleadings** 247:12
**please** 45:22 49:7
  117:12 118:6
**plenty** 140:11
**point** 11:13 13:2
  36:23 40:17 44:9
  47:15 49:19 63:20
  68:5 73:22 76:11
  78:2,21 80:14 82:8
  91:22 96:18,20
  98:20 99:11 102:19
  104:17 106:18
  109:19 110:9
  124:19 125:2
  128:17 131:8
  135:18 159:16
  170:9 182:3 184:17
  186:8 188:7 191:10
  210:20,22 211:2,4
  212:10 214:1 221:1
  227:19 232:5,12
  245:7 246:14

248:11 249:4,18
  252:9
**pointed** 115:12
**points** 184:11
  219:3 244:23 248:3
**police** 205:11
**policies** 3:14,18
  46:13 47:1 48:5
  50:11 51:3,9 53:12
  53:22 54:6,9,14
  55:20,21 58:13
  60:17 61:2 62:2,8
  62:10,18 63:6,17
  68:22 74:7,10,20
  76:12 78:22 223:14
  246:18
**policy** 29:1 46:8
  56:3,6 63:23 74:10
  74:13 76:9 81:12
  87:21 89:4,5,8
  104:13,14,23
  113:11 114:8 115:1
  119:11 120:14,18
  120:20,20 122:6,13
  123:14 179:22
  180:1,10,20 181:1
  181:7,11,14,20,22
  219:21 223:23
  233:17 234:13,18
  245:4
**political** 71:13
**politician's** 68:18
**portion** 155:5
  169:4,5,7 172:9
**posed** 127:18
**position** 23:5 24:10
  36:8 93:7,16 128:3
  128:9,9,10 149:3
  190:18 191:19
  213:12,12

positions 24:10
possibility 216:2
possible 26:4 199:3
possibly 109:11
　151:15 152:3
　178:23 179:1,3
post 125:3 192:22
posted 192:6
posting 193:3,8,12
　193:15
potential 225:19
practical 86:18
practice 35:5 80:18
　80:21 81:2,4
practices 33:11
praising 103:17
precise 37:8,9 92:8
precluded 27:8
pregnant 56:7
preliminary 19:10
premise 72:21
preparation 121:23
prepare 136:2,4,19
prepared 126:15
　128:2 137:1,2
present 2:18 10:9
　17:7 27:11 33:23
　73:16 88:14 149:12
　151:5 177:2 233:14
　238:6,19
presented 49:20
　136:9 180:16
　195:16 227:19
　233:5,7
preserved 15:12
presumably 50:23
　59:1
pretend 17:16
pretty 86:2 97:10
　134:14 198:4
　207:17,20

prevented 87:22
previous 94:6
pride 90:10,14
primarily 10:22
　123:19
primary 21:19,21
　21:21,22
principle 71:6
principles 74:23,23
print 253:9
printed 47:13
　149:20,23 150:3
prior 7:20 99:10
　171:23 173:6
　174:10 199:15,19
　232:7 245:6 246:14
privilege 70:5,8
　72:9,12
privileged 15:20
　16:1
privileges 51:16,21
　51:23 54:19 69:14
　69:16,21,23
pro 20:1 21:12
probability 140:20
probably 22:15
　38:11,11 122:21
　132:18 136:23
　137:1 139:3 154:19
　160:17 177:13
　178:13 206:20
　212:17,19 222:15
　223:13 247:11
probate 43:19
problem 29:3,8
　117:15,17 119:7,20
　120:1,4 184:21,22
problematic
　204:12
problems 84:18
　156:5,8 251:4,6

procedure 8:6 46:8
　51:10 223:23
procedures 3:15,19
　46:14 47:2 48:5
　50:11 51:3 52:22
　53:12,22 54:6,10
　54:15 60:17 68:22
　74:8,20
proceedings 8:14
　253:12
process 26:8,10,20
　27:19 28:16 33:1
　35:12,13,19 36:20
　37:3 97:3 120:6
　134:6 214:15
　230:13 238:18
processes 214:11
producing 35:18
　37:21
product 67:8
professional 65:16
　65:16
progression 214:9
prohibition 87:12
project 13:18
promotions 54:18
proof 196:21 202:2
　202:6 204:9 212:12
　233:15
propensity 250:1
proper 35:11
properly 182:16,18
　182:20
propounded 246:4
　246:20
prosecution 46:10
　54:17 65:20 74:10
　216:19,21 220:2
prosecutor 39:23
　156:12 216:23

prosecutors 67:15
　144:4 156:6
protection 54:21
　210:9 238:13
protective 210:16
　210:17
protocols 87:9
provide 58:16,16
　58:17 63:1
provided 8:5 53:19
　84:5,6 134:7
　142:23 143:10
　146:1 147:2 150:8
　158:9 161:14 192:4
provides 155:1
public 1:23 7:7 8:3
pull 200:21 201:2,5
　201:9
punish 73:8
punished 41:16
　72:18 73:3
punishment 73:10
　74:3
purp 156:14
purpose 103:5
　157:20
purposes 17:17
　243:14
put 46:9 66:11 67:9
　67:16 76:12 79:6
　195:8,12 205:11
　219:9 232:20
putting 42:9 80:11

## q

qualifications 55:9
　55:17
qualified 20:3
quest 16:23
question 14:11
　15:15,16 16:6 50:3
　58:21 59:8 62:12

62:12 68:21 84:4,6
88:20 91:4 94:5
103:23 105:8,17
109:8 113:20
114:20 127:17
146:20 154:6 155:1
155:19 158:17
172:4 183:4 184:12
204:21 206:17
208:2 211:5 235:20
243:1 246:19,22
248:23 250:2
**questioned** 103:7
**questioning** 180:8
**questions** 7:16,17
20:14 25:16 27:11
78:22 118:21 126:9
127:21 157:12
209:15 211:1
224:11 228:16
233:20 241:9,11
244:8,10 246:4,7
246:15 247:15
248:12 251:14,23
252:13 253:8
**quick** 115:9 224:4
229:14
**quicker** 101:9
186:2
**quickly** 17:21
97:11 114:6
**quote** 54:15 55:7
84:14 119:17 128:6
184:8 188:8,16
192:6 197:10

**r**

**r** 2:1,12 253:1
**race** 17:21 235:4
239:23 240:1 243:2
244:6

**racial** 236:9,22
239:3
**raising** 100:21
104:19 168:7
**ran** 20:3
**random** 90:1
**ranging** 153:9
**rank** 51:21 55:5
99:6,15 119:22
**rarely** 197:13,23
198:10,17 199:1,5
199:22 200:20
**rat** 125:11 126:12
127:19 128:8
**reach** 222:1,17
230:9
**reached** 87:14,19
88:5 90:18 222:11
223:21
**react** 123:5,10
**reaction** 124:15
**read** 40:19 49:4,7
55:4 98:3,18
100:19 101:3,4,12
103:4 105:4 115:8
117:3,5 129:22
131:21 132:5 149:8
161:4 187:3 196:3
200:6,8,11,13,15
200:17,18 205:16
205:20 219:22
226:17 228:9,12
**reading** 7:8 103:15
104:21 115:16
126:20 132:16
147:20
**ready** 14:10 58:12
**real** 83:9 95:20,22
115:8 155:18
**really** 14:16 21:19
37:2 65:16 75:21

101:14,23 102:12
144:1 162:22 186:9
211:7
**realms** 19:4
**realtime** 34:11
128:4 186:5
**realtors** 229:18
**reason** 11:19 13:6
14:22 58:18 62:16
68:10 97:10 118:4
145:9 146:2 148:12
174:15 180:22
181:3,5,9 215:16
222:20 227:14
231:3 237:17
248:13,21 249:1
**reasonably** 223:10
**reasons** 64:17
140:11 149:3
157:12 204:8
205:12,13 224:14
224:23,23 230:17
**reassess** 13:8
**recall** 66:2 91:17
92:5,10,11,20 93:8
93:9,17,18 94:9,14
94:16 95:4 96:6
102:23 106:23
111:18 114:23
115:18 133:16
136:6,13 139:16
146:16 160:5 167:1
193:16 196:15,20
197:6,7,8 199:23
202:21 203:10,17
203:18 212:14
215:6,7 224:15
234:6 235:1 240:10
243:21,22 247:20
**receive** 72:5 215:9

**received** 40:11
46:11 63:4,7
102:17 107:16
145:19 148:6,15
149:17 189:16,17
**receiving** 40:10
63:14
**recognize** 42:19
43:5
**recognized** 60:7
**recollection** 50:10
66:20 85:1 91:13
93:1,3,15 106:11
107:5 108:13,17,22
111:19 124:5
128:20 141:7,9
160:5 173:8 235:1
**recommend** 22:22
**recommendation**
138:16,19,22
**record** 4:22 5:14,17
15:3 34:3,5 46:2
48:20 131:11 161:1
170:19,21 173:17
173:20 174:5,13
198:14 237:22
**records** 147:19
148:1 150:13
151:14 156:10
171:23 173:5,6
198:14 200:22
201:2,5,9
**recovery** 227:3
**rectified** 29:9 30:2
36:15
**rectify** 117:14,17
119:19 120:1,4
**recurring** 107:6
**redirect** 241:10
**reduce** 20:15

**reduced** 23:18
38:14 253:9
**reexamination** 3:6
3:7,8 241:15
251:17 252:4
**reference** 54:16
210:14 223:16
245:3 246:16 247:8
**referred** 118:9
**referring** 15:17
139:13,18 193:21
194:1
**refers** 243:19
**reflect** 171:7
**reflects** 47:6 51:1
165:3 167:4 171:1
**refresh** 219:12
**regard** 24:19 53:15
**regarding** 12:6
130:2 139:2 148:1
212:1,6 214:21
239:7
**regardless** 213:10
**regular** 51:16 65:1
65:3 156:14
**regularly** 20:23
218:7 221:13
**reinstated** 232:13
**rejected** 233:15
**relate** 231:9
**related** 53:7 150:23
156:1 178:11 230:1
232:3
**relates** 23:16,17
204:22 206:21
214:14
**relating** 7:12
**relationship** 30:10
30:14,23 31:8
65:15,16 240:15

**relationships** 65:11
**relative** 135:20
139:6
**relay** 82:2
**reliable** 148:12
**relied** 143:3 145:23
147:1,9 148:10
184:10,16,18
200:13 205:1
211:21 222:23
**rely** 24:6 58:15
65:19 156:15
191:20 237:21,23
**relying** 237:3
**remain** 138:6
**remained** 138:10
**remember** 36:17
36:23 40:7,9,10,14
41:3 91:6 92:17
94:1,7,8 95:12,15
96:6,7 97:13,15,20
97:22 100:4,9
102:7,21 107:12
116:7 118:23
133:19,20 142:3
164:22 166:20
239:16 240:1
**remembered**
239:18,19
**remotely** 74:22
250:21 251:11
**removed** 20:1
**repeatedly** 187:5,8
196:4,5 197:11
**rephrase** 104:10
243:7
**replace** 242:14
**replacement**
251:19
**report** 37:21 38:2,6
54:4 119:6 120:14

122:6 206:13,15,21
207:9,15 208:6
**reported** 1:22
132:9 189:9,12
251:5
**reporter** 1:23 7:6
8:2,23 166:21
**reporters** 13:22
**reporting** 191:4
206:20 229:11
**reports** 30:15
206:23 207:23
**represent** 74:19
116:7,18 117:23
129:11 130:17
134:6 137:5 140:3
158:7 161:11
162:18 163:6
165:11 169:19
175:4 179:5 228:1
**representation**
68:7,11 128:1
**represented** 66:17
**represents** 66:22
253:10
**request** 158:14
163:17 164:2,4,19
165:6,12 167:4
231:5,22 233:3
**requested** 136:15
158:10 168:9
**requesting** 164:17
**requests** 150:3,8,14
158:12 163:8,11
165:1,20 166:9,15
167:8 168:2,17
170:6 174:19 175:6
176:1 178:11 179:6
197:18,18,22
198:15 231:10,11
231:12,13 232:17

247:5 250:5,10,13
**require** 59:2
**required** 21:16
**requirements**
43:14
**reschedule** 89:12
**resolved** 26:5 53:17
54:4 118:15,16,18
**resolving** 54:7 59:1
**respect** 16:3 48:22
52:23 53:5,21 62:4
83:11 111:19
118:11 172:21
188:17 213:14
242:18 244:8
**respectful** 64:10
**respective** 7:4
**respond** 82:20,23
105:5,14,18,19,19
106:4
**responded** 89:15
246:5 247:6
**response** 106:7,8
126:21 127:4
218:10 249:19
**responses** 68:14
80:8 126:5 127:3
127:16 128:2 246:3
247:11
**responsibilities**
20:12 22:11 23:12
23:13,15 24:19
43:18,20 52:11
53:4
**responsibility**
24:14,20 25:20
29:11 53:10,15,16
53:20 55:2,13
78:23
**responsible** 44:20
45:1 138:9

**responsive** 157:10 164:19 165:6
**rest** 101:4
**restricted** 93:14 133:2 232:4
**result** 253:16
**resumes** 24:7
**retain** 215:1
**retained** 64:22 66:13 138:19
**retainer** 64:14
**retaliate** 79:10,15
**retaliation** 41:10 41:13,23 42:13 79:2,4 83:11 239:5 244:5
**retrieve** 194:10
**review** 153:16
**reviewed** 126:4 153:21 154:1
**reviewing** 46:1 50:8 115:11 128:5 129:10 131:10 162:2 163:9,13 176:3 179:3 226:8 228:17,21
**right** 9:6,17 10:8 10:14 11:15,18 12:2,5,17 13:1 15:8 16:8 17:18 18:14 22:9 23:6 28:2 30:22 31:2,5,10 38:23 39:20 40:7 44:5 45:19 47:4 49:2,4,10 51:11,12 56:15 57:14 62:10 62:19 63:12 66:11 66:18 69:2,4 70:21 71:23 72:2,10 75:5 78:20 90:3,6 92:9 96:12 100:11

101:11 108:7,9 114:10 117:2 119:18,21 120:12 125:1 128:22 132:8 139:7 140:15 141:22,23 144:5,11 151:7 152:14 158:23 159:6 160:9 164:9,12,22 165:8 166:3 167:1,6,7 168:19 169:22 170:9 171:11,14,20 172:21 175:20 178:17 179:4,7,8,9 180:9 181:23 187:2 191:17 202:22 207:19 209:6 214:8 217:21 218:3,21 219:14 225:19 233:6,10,13,22 235:13 242:22 243:15 245:2,18 247:1,4,7 248:5 249:10,11
**rights** 51:16,20 52:15 76:13,16 225:12
**riley** 2:12,14 8:9 12:3,11,14,18 42:22 67:7 77:14 77:18 78:8,11,15 105:7,11,15,20,23 106:3 133:21 186:9 186:12,17,20 212:20 213:2
**road** 2:7
**rob** 186:1
**robert** 2:12
**roberts** 23:10,12 24:14 25:11,19,21 25:23 26:1 27:2,8

28:2,3,5 29:10 30:15 31:12,13,21 32:5 36:4,18 37:11 37:13 38:9 44:23 53:4,21 58:2,6,11 59:6,13 75:23 95:8 106:12 108:15 109:3 110:8,12,19 112:16,20 113:10 113:22 117:16,19 119:3,6,8 120:3,11 121:6,18,21 123:20 123:23 124:2,2,10 124:12 133:6 134:16 135:5 136:1 137:19 141:17,18 141:19 142:6 143:4 143:9,13 144:10,13 145:4 147:9 153:20 173:5 174:11 181:15 188:15 193:1,10 196:17 202:5 206:3 207:14 209:10 214:18 216:16 217:2,4,8 217:14 222:5 223:21 233:11 235:21,22 236:2,7 237:4 242:9
**roger** 18:18
**role** 23:20
**roles** 25:12
**roughly** 99:11 171:12
**roundabout** 17:13
**royal** 68:18
**rude** 15:2
**rudeness** 14:2
**rule** 14:17 15:6,11 180:12

**rules** 7:12 8:5 10:2 13:12 61:15 77:10
**rumors** 240:14
**run** 16:19,23 20:21 21:8,15 38:17 86:19 154:12
**running** 11:17 79:6 191:22
**runs** 83:13

**s**

**s** 2:1 7:1
**safety** 205:12
**saith** 252:15
**sake** 77:23
**sat** 188:21
**satisfied** 68:7,11 117:15 119:20
**saw** 95:16,20 96:4 96:14,16,18,19 102:20 121:1,7,13 134:19 136:21 177:20 200:5,19 231:10 232:20,21
**saying** 14:6,23 17:13 32:18 38:14 51:3 89:16 91:4,14 92:15,19 93:22,23 94:2,6 96:13 98:9 98:13,15 100:2,3,5 100:14 104:18 107:13 109:19 113:1 118:23 119:22 133:18,19 164:6 176:15,19,23 177:22 179:10 184:4 190:1 191:6 199:23 200:2,14 203:11 208:21 209:2 210:1,5,6 219:2,7

**says** 30:11 31:18,23 32:1 34:19 35:19 42:11 54:15 82:10 92:21 93:4 102:2 116:1 118:5 128:6 129:16,19 131:17 132:23 136:14 152:21 163:20 169:20 180:11 182:13 188:23 217:15 220:5,12,15 220:18 223:2,5,19 231:2 239:11 243:17
**scenario** 26:9
**scenarios** 144:10
**scene** 9:16,16
**schedule** 87:17 88:8,10 244:19
**scheduled** 89:19 244:20
**school** 18:16
**screening** 19:7 20:16 24:1,23
**screenshots** 193:7 193:11
**se** 66:7 138:23
**second** 18:21 57:17 58:4 101:5,6 131:22 141:7 182:13
**secretary** 87:15
**section** 54:11 219:20 223:23
**sections** 228:12
**sector** 238:9
**see** 9:10 11:11,12 15:10 26:4 36:15 46:18 51:8 74:19 86:7 96:3 115:8 134:9 140:1 146:10

155:9 162:9 164:4 186:23 193:2 201:8 208:20 211:22 212:3 224:20 231:2 231:12,18 232:16 234:19
**seeing** 35:7 86:22 95:4,13,15 96:6,8 114:23 139:17 155:4 167:1 243:21
**seek** 230:17
**seeking** 103:11
**seen** 45:21 48:16 90:22 91:9 95:2 114:12,21 124:7 129:8 131:8 134:16 135:14 152:11 167:17,22 169:16 176:14,18,21,22 192:12,15,18 195:4 201:16 209:1 226:11 231:20 232:10 233:2 234:9
**select** 21:3
**send** 24:9,11
**sends** 124:2
**senior** 19:5
**sense** 11:4 108:4
**sensitive** 12:12 89:17 190:19
**sent** 130:2,19 218:16
**sentence** 14:11 55:7 129:22 130:7 130:11 132:5 150:21 199:20,21 200:5,19
**separate** 175:23 179:23
**september** 97:9 123:15 131:23

132:10,23 133:5,14 133:14
**sequence** 140:17 144:6 161:17
**series** 118:20 136:11 175:5 224:21
**serious** 182:6 190:1 190:3,5 207:17,21 224:23 227:11
**serve** 20:9 220:1
**served** 19:23
**service** 46:12 52:4 59:20,21 86:8 159:15
**services** 46:10 51:11,15 52:3,6 53:7 54:17 60:4 65:20 69:21,22 70:4,7 85:17 86:1 93:21 116:4 118:12 158:18 159:13 191:12,17,23 216:20,21 220:2
**serving** 59:22
**set** 11:23 12:22 64:20 78:3,12,12 157:18,21 166:5 174:18 224:11 226:15 227:2,11,22 237:18 245:20
**settings** 194:12
**setup** 20:23
**seven** 133:5 171:1 171:11,18
**seventeen** 19:3,11
**severe** 227:7
**shape** 202:10 210:13
**share** 101:8

**shared** 110:18,20
**shed** 154:6 155:18 155:20,22 156:2 159:10
**sheet** 153:13
**sheets** 149:17,18,20 149:21,23 166:19
**sheriff's** 66:21
**shift** 23:4
**shock** 192:8
**shop** 35:7
**short** 11:20,22
**shorthand** 52:5
**shot** 64:11
**show** 45:13 48:9 94:18 114:2 129:1 130:16 135:8 152:4 157:3,18,21 158:5 162:11 163:5 165:10 169:10 173:10 174:18 226:1 227:22 249:9
**showed** 133:4 170:18 226:12 243:18
**showing** 170:20 250:1
**shown** 198:13 231:1
**shows** 174:5,8
**sic** 104:6 163:23 164:19
**sick** 56:17 57:4 62:4,7,9,18 164:8 165:2 176:1 178:19 229:7,12,17,20 230:1,3,5,9 233:1
**side** 36:14 83:4,8 157:9,11
**sides** 24:21

sign 47:17 49:21
signatory 97:17
signature 7:8 46:18
  47:6,20 48:1 49:13
  49:16 50:20,23
  115:14 253:20
signed 46:20 47:13
  49:22 131:18
  132:22 205:17
  206:7
signing 202:23
  203:3,8
signs 205:3
similar 49:1 199:21
similarly 219:5
simple 250:2
simply 37:7 251:10
single 69:2,4
  231:12
singled 69:9
sir 9:11,14,23 11:2
  18:6,10 23:8 38:4
  39:7 44:22 46:5
  47:8,11,18,22 48:8
  60:14 71:11 76:2
  85:12 95:11 104:3
  108:12,12 113:8
  137:15 138:15
  141:9 143:6,11
  145:16 211:15
  214:23 241:7 246:1
  250:22
sit 32:16
sites 192:21 193:2
sitting 36:17 50:9
  100:8
situated 219:5
situation 11:6
  20:20 22:8,18
  56:11,11 57:8 80:4
  150:23 151:1,2

177:12,19 214:2
  219:8
situations 177:23
six 17:23 170:13
  171:7,10,15,17
  236:12 242:21
  245:6 246:15
size 251:1
skeletal 237:12,12
skimmed 200:15
sleeping 201:22
small 169:4,7 172:9
smith 87:16,20
  88:2,6,8
so's 205:9
social 192:7,21
  193:2,8
solely 239:23
  241:11
solemn 116:10
somebody 34:9
  66:14 79:19 81:11
  88:19 123:10
  143:23 177:5 185:3
  186:13 205:14
  210:18 215:23
  249:14
someone's 30:17
somewhat 12:12
  197:16
son's 193:19 194:6
  194:14,16 196:1
sorry 39:20 44:4
  50:17 63:1 67:14
  68:19 70:10 81:7
  81:21 98:7 99:4
  107:23 110:16
  117:10 139:11
  161:7 189:17
  204:13 230:6

sort 10:1 39:1 44:6
  57:7 65:2,12 80:2
  127:19 135:1 212:5
  236:9
sound 66:11 116:12
  116:16 155:13
  227:11,14
sounds 13:9 155:14
source 44:7 62:13
  192:2 231:20
sources 30:21
southern 1:3
speak 8:18 13:17
  35:22,23 50:14
  87:3 115:13 155:5
  209:18
speaking 45:5,7
speaks 75:4 155:1,6
specific 25:12
  31:16,17 108:2
  183:20 184:15
  193:14 203:12
  213:23 215:16,23
  231:10 232:7
specifically 56:5
  85:8 97:23 99:17
  99:20 100:5 125:3
  187:13 193:22
  194:2,3 199:18
  200:1
specify 89:6
speculate 37:18
  102:1 143:23
speculating 101:2
  103:22 108:20
  124:23
speculation 38:8
spend 160:12
spiked 30:13,17,18
spirit 67:4

spoke 212:22
stability 251:1
staff 4:5 90:11,15
  115:3 116:1,20
  122:3
stamp 219:19
stamped 226:14
stand 186:21 219:7
start 14:5 153:9
  173:1 227:3
started 12:4 18:12
  18:16,20 19:1
  67:19 83:22 170:22
starting 14:15
starts 46:23 177:15
  177:15 198:22
state 8:3 54:22
  131:11 218:16,18
  253:3
stated 17:3
statement 33:12,22
  33:23 34:2,10
  105:11,15 116:7
  123:12 151:3 190:5
  202:10 208:5
  211:23
statements 145:22
  208:20
states 1:1 8:6
statistically 160:16
stay 21:8,14,16
staying 21:13
  163:22
stenotype 253:8
step 12:6 145:21
  146:20
steps 37:5 126:10
  146:12,23 149:14
  189:18,21 203:21
stipulated 7:2

**stipulation** 8:7
**stipulations** 9:1
  15:9
**stop** 78:6 130:5
**stopped** 92:3
  248:15
**stopping** 14:15
  77:19
**stories** 101:16
  187:5,11,14,17
  188:8,16 189:6
  191:15 192:7,22
**story** 12:11 83:4,8
  172:16 180:4
  188:22
**straight** 12:21
**straighten** 62:19
**strange** 21:5
**streamline** 249:23
**street** 90:2
**strengthen** 40:2
**stretch** 186:21
**strike** 197:16
**strip** 125:8
**stuff** 23:16 39:12
  80:12 125:18,23
  182:23 188:20
  189:15 229:18
**subject** 30:11 35:4
  80:17,20 81:1,13
  81:16 89:1,6,17
  95:8 142:18 156:4
  156:7 217:2 220:3
  220:6,13 229:4
  240:8
**subjects** 191:1,3
  234:3
**submissions** 207:4
**submit** 25:7 206:13
**submitted** 126:6
  150:9,14 158:13

163:11 231:11
  245:1,20 246:2,23
  247:3
**subsequently** 19:16
**substance** 17:22
  50:5 84:23 98:9
**substantiate** 201:8
**sudden** 218:7
**sued** 16:23 66:21
  218:1,7
**suggest** 124:18
  130:7,11 136:18
  151:8 227:18
**suggested** 161:21
  232:19 249:20
**suggesting** 99:21
  167:23 244:11,15
**suggests** 116:3
  117:18 164:18
  180:19 231:21
  233:2
**suit** 39:5 218:23
**summary** 113:17
**superior** 82:2
**superseding** 39:16
  39:22,23
**supervised** 37:13
  111:21
**supervises** 59:16
**supervising** 81:6
**supervision** 81:10
  244:18 253:10
**supervisor** 24:22
  25:1,1,4,19,23 26:2
  26:3,8,12,13,15,20
  26:21 27:7,20,21
  28:8,11,12,21
  29:23 30:1 32:14
  34:16,21,23 35:4,6
  36:14 53:13 60:2,3
  79:14,19,20,22

80:16,19,22,23
  81:3 83:2,3,14,20
  83:22 84:12,14
  100:10 117:12
  118:6,13 119:1,5,9
  132:1 134:1 182:17
  182:18,21,23 183:3
  183:4 230:10,18
  233:4 243:4 244:2
**supervisor's** 83:8
**supervisors** 79:9
  80:3 99:6,15 128:7
**supervisory** 45:5
  60:8 63:3
**support** 198:16
**supposed** 191:15
  234:14,19
**supposedly** 191:2
**supreme** 16:21
  17:1
**sure** 11:16 13:13
  14:9 15:3 20:13
  23:14 33:17 37:4,7
  44:10 53:11,22
  55:3,14 63:18 64:4
  64:5 68:4 81:23
  82:5 97:19 102:14
  104:3 109:1,23
  111:6,11,14 113:2
  113:4 115:10 116:5
  116:17 127:10
  128:21 136:20,23
  140:20 148:11
  153:23 154:4 161:2
  165:14 183:14,15
  183:22 188:2,5
  190:22 198:2,7
  204:7 209:22 211:4
  211:7 212:8 219:9
  241:18 243:9

**surgery** 177:21
  226:22,23 227:4,5
**surprised** 215:21
**surrounding**
  136:13
**suspect** 83:21
  84:12,17
**sworn** 8:18
**symbol** 125:4
**system** 205:6,7
  218:5

**t**

**t** 7:1,1 253:1,1
**tag** 125:12
**take** 11:20,23 12:7
  13:6 18:15 37:6,9
  43:21 56:1,22 61:8
  70:4 73:4,23 77:17
  78:2,15 103:1
  127:8 146:12,18
  151:17 160:21
  161:11 163:8
  175:20 177:18
  182:19 203:21
  213:1,2,4 224:4
  225:20 227:15
  228:13,13 230:16
  231:23 232:6,14
  236:8,20 250:14,14
**taken** 7:5 10:11
  43:23 44:3 93:14
  126:10 224:15
  253:7
**takes** 23:21 105:16
**talk** 10:23 12:1
  14:1 19:8 24:1,22
  25:8,11 26:1,3 27:3
  28:6 29:21,23 32:8
  34:22 35:5 36:14
  38:23 39:21 54:2
  58:7 59:7,9,11 64:6

65:12,17,19,23
66:9 80:12,15
89:18 121:15 124:2
124:3,12 125:5
147:11,12,18 148:5
157:19 169:8 196:9
196:13,18 208:10
222:11 232:23
233:11
**talked** 13:13 21:11
31:7 38:15 60:18
62:21,23 66:10
68:1 79:3 80:13
107:17 110:11,23
111:8 139:6 180:15
195:1 196:22
208:16 209:4
224:13,14
**talking** 26:2 27:8
30:9 33:7 83:12,12
90:1 98:11,18,19
98:20 127:15 139:4
170:4 175:17
182:14,16 194:9
196:15 197:4
231:15
**talks** 23:1 196:5
**tamika** 163:20,20
164:12
**target** 30:12
**taught** 214:10,13
214:16,20
**team** 238:9
**teams** 238:9
**technically** 103:19
**techniques** 32:4,7
**tedious** 148:23
**tell** 28:21 45:20
46:17 70:20 73:7
98:4 100:22 101:3
104:6,7,8 115:15

115:16 119:3 124:3
124:4 145:20
146:20 161:19,22
162:8 165:18
175:21 177:11
180:7 186:6 189:13
189:18 191:9
203:15 210:4 212:4
230:10 250:14
**telling** 187:17
188:8 195:12,14
203:18
**tells** 155:11
**tem** 20:1 21:12
**temporary** 227:5
**ten** 13:3 22:23
37:16 218:4
**tenor** 215:15,17
217:12 218:19
**tense** 27:11
**tension** 22:3
**tenure** 66:8 111:22
111:23 197:20
216:9,12 217:20
234:22
**term** 19:9 20:5 52:6
180:1,13,20 181:2
181:7,11
**terminate** 107:7
138:14 141:11
146:5 153:17,22
154:3 203:21 237:2
239:3 244:12
247:18
**terminated** 41:6
106:13,22 109:4
110:10 111:10,16
141:21 142:7 143:8
143:16 168:21
172:1 215:22 216:1
219:4 240:20 244:1

**terminating** 107:1
109:15 204:17
214:11 221:3
248:21 249:1
**termination** 108:5
108:18,19 137:6,14
137:20 138:1 149:4
173:7 174:11 189:4
197:2 214:4 215:15
215:18 217:7,13
218:8,20 219:21,23
220:4,7,14,23
222:2,12,18 223:23
246:17 247:9
248:13
**terminations**
213:16
**terms** 11:10 14:15
50:5,14 51:20,22
54:18 83:12 154:22
**testified** 8:20 92:22
93:11,19 94:10
113:5,15 234:2
236:11 237:2 238:2
240:3,12,19 251:18
**testify** 156:3
**testimony** 104:12
104:15 125:10
128:13 155:23
156:7,16,19 234:9
253:11
**text** 6:5 123:18,22
123:22 124:3,5,7
124:13 221:7 228:2
228:23 229:5,10
230:22,23
**texting** 116:11
124:11
**thank** 9:20,23
115:11

**theory** 76:22
**thereto** 7:20 253:9
**thing** 24:3 98:16
117:6 202:14
218:14 224:22
225:1
**things** 10:2 11:4,16
12:4 13:6 16:9 17:5
19:2 20:19 21:23
23:19 25:9 38:16
38:18 66:9 68:14
83:16 84:7,9 116:6
143:20 144:3
157:13 177:21
182:20 187:19
191:5 192:1 193:7
193:11,15 213:23
214:14 229:7,8
234:2
**think** 12:14 13:7
16:22 18:19 19:17
32:21,22 33:18,21
35:7,15 37:3 38:9
40:10,12,13 41:5
46:9 50:6 57:5
60:19 61:4,5 63:19
63:22 68:4 73:8,10
73:17,20,21 74:9
80:6 82:11,13 84:3
84:6,7 85:8 92:1,4
95:4,16,20 96:4,16
96:19,21,21 103:5
103:14,19,22 105:7
107:13,18 108:4
109:17 110:2
111:23 112:9
119:14 120:23
124:8,20 125:17
127:3 136:21 141:4
142:2,5,8,9,20
143:18,21 144:1,2

146:2 148:12
150:20,22,23
151:19 154:5 155:3
155:6,23 156:7
157:1 158:19
160:20 161:23
164:4 172:9 174:15
177:14,18 181:13
182:9 185:1,7,13
186:1,5 191:3
200:12 207:23
211:7,16,20 215:7
215:12,15,18 216:7
217:14 218:4,9,15
219:6 228:10
235:12,13 241:18
241:19 248:15
249:5,16 252:7
**thinking** 37:1 94:8
104:7,8 250:23
**thinks** 140:21
**third** 88:14,21
**thirty** 38:11 79:5
176:5 177:7 179:18
212:21 249:13
250:5
**thoroughly** 62:2
**thought** 35:17 37:4
102:1,3 105:10
106:1,4 175:17
200:15 208:18
242:15 243:10
**thoughts** 74:2
101:2
**thousand** 79:5
**thread** 123:18,22
123:22 124:5,7,13
**threads** 229:1,5,10
230:23
**three** 18:23 22:22
24:9 34:7 137:19

160:8 164:9 166:8
177:13 185:11
187:3,4 221:22
235:13,15 238:11
**threw** 243:12
**throwing** 103:20
**time** 7:18,19 11:6
11:11 12:12 14:1
15:22 18:18 19:20
20:10,20 21:1,18
24:22 27:14 28:5
37:10 43:23 56:17
57:4,6 64:6,10,21
67:11 70:5,8,9,10
70:11,12,13,15,16
70:22 71:2,7,10,14
71:15,16,18,23
72:3,5,6,10,13,19
73:2,3,4,12,13,17
73:18,19,20 74:1,6
75:1,7,12,15,15,18
76:1,4,23 77:5,11
77:23 78:12 85:21
93:13 95:21,22
98:12,14,18,19,20
98:21,22 99:2,8,16
99:17,20,23 100:6
100:13 104:13,14
104:20 107:11
108:18 110:6,8,15
123:15 126:3,22
132:2,11 133:1,10
134:3 142:12
144:18 147:19,20
148:2,19 149:9,10
149:14,17,18,20,21
149:22,23 150:8,13
150:18,19 151:17
153:12 158:11,11
158:11,12,19
160:13 161:21,22

161:22 163:23,23
164:2,6,8 165:1,2,2
165:6,14,19 166:8
166:8,9,15 167:5
167:19,19 168:1,8
168:8,9 170:6,10
171:15 175:6,12,14
175:18,19 176:1,16
176:20 177:7,15,16
178:2,3,5,19,22
179:18,21 180:1,3
180:13 181:7,11,14
182:8,22 183:21
184:1,5 185:5
187:9 188:13,19
193:17 194:5,11,22
195:18,23 197:6,12
197:18,18,22
198:15 204:2
206:20 208:17
212:22 215:22,23
216:18 218:4,16
224:15,21 227:2,4
227:16 230:16,17
231:5,10,14 232:4
232:6,8,13,14,16
233:1,2 234:12,17
235:9 236:19
237:10,15 238:6,14
239:6 244:20
249:13 250:6,11,15
**timeframe** 175:15
175:16 206:22
251:3
**timeline** 12:20
108:4
**times** 39:6 118:9
122:19,23 177:5
183:17 184:5,7,13
187:11,13 188:14
189:8 195:17,21,23

196:8 203:2,7,11
205:21,23 206:3,8
247:17 248:8,9,21
249:13,15
**timing** 123:13
244:9
**tire** 30:13
**tires** 30:18
**title** 57:23 59:19,22
60:4,12
**today** 9:7 10:3,9,19
10:22 11:17 14:7
17:17 48:17 52:6
60:18 64:9 95:3
100:8 113:6 121:19
133:4 135:15
151:16 152:12
198:13 231:9 233:5
233:8 234:3 246:8
248:8
**todd** 19:17,18
**told** 12:7 21:1 93:5
93:12 101:16 119:7
180:23 181:4,6,10
181:13,16 187:5,11
188:15,22 189:5,11
232:6 239:20
**tomorrow** 10:20
104:2
**tool** 34:22
**top** 24:9 153:6
170:1 188:19
237:19
**topic** 43:22 44:2
121:20
**total** 166:14,17
168:15,17 169:1
**totality** 155:6
**totally** 15:5 155:4
**touch** 205:15

**touched** 64:3
**tough** 214:5,7
**track** 237:22
**trades** 24:3
**trail** 152:2
**training** 44:6 63:5
63:8,15,16,21 80:3
**transcript** 253:11
253:22
**transition** 84:22
**translate** 209:20
**treat** 31:1
**treated** 26:19 27:7
60:8 69:7,10 130:4
130:14 178:4
239:15,21 243:20
**treating** 93:6 244:2
**treatment** 93:21
112:16
**tree** 104:9
**trial** 7:19 19:6
180:8 201:13,18,22
202:3,7,16
**true** 123:12 201:8
240:18 253:11
**truly** 125:18,19
**trust** 21:2 101:15
101:18,21 102:5,5
103:7 104:19 190:6
244:17
**trusted** 237:23
**trustworthiness**
235:20
**trustworthy** 187:7
189:1 190:3,10,13
236:5,17
**truth** 8:18,19,19
21:1 101:20
**truthful** 32:19
191:20

**try** 13:17 14:6,7
17:21 24:21 32:2
64:8 108:3 122:11
237:16 238:15
**trying** 15:3 19:1
31:6 114:7 156:13
156:13 159:1
185:13 217:22
247:10
**turn** 14:12 73:12
101:5
**turned** 84:15 105:2
187:6,11,14
**twelve** 146:11,13
146:22 182:6
244:23
**twenty** 17:23 18:2
18:9 44:16,16,18
45:7,11 57:12
85:14,15 122:21,22
177:13 236:3,4,12
236:14,15,15
247:21 248:8
**twitter** 192:12
**two** 10:12 24:10,11
30:21 44:23 45:4
51:8 56:13,19
67:16,16 82:4
124:13 140:4,5,9
140:18,21,21 141:3
141:3 144:9 159:14
159:15 160:2,4,8
161:6 166:11
171:22 172:7 188:3
210:12 213:3
222:16 236:3,4
238:10
**type** 122:12 160:21
**types** 56:19 130:20
**typewritten** 3:22
4:11,18

**typical** 20:19,22
22:18
**typically** 22:19
23:2 25:22 88:14
88:15
**typo** 140:10,11,12
140:13

**u**

**u** 7:1
**uh** 14:23 31:20
217:17 238:4
247:16,19 248:22
**ultimate** 53:18
55:12 233:8
**ultimately** 19:5,7,9
21:10 22:2 25:6
26:3,5 36:12 55:5,6
55:6,18 58:7 82:17
119:15 142:9,13,22
**unavailable** 203:4
**unbeknownst**
19:21
**understand** 15:5
15:21 17:16 22:7
27:13 39:20 40:16
40:22 41:1,12
43:22 44:2 57:11
62:1,7 63:23 64:12
65:9 70:18 79:9,14
79:19,22 96:13
112:12 117:12
118:6,10 149:6
157:2,7 158:20
165:2 209:23 210:2
217:11,23 218:6
225:22 249:18
**understandably**
123:21
**understanding**
36:4,8 41:19 43:12
70:12,20,21 130:2

191:14 194:8
**understood** 12:9,10
22:5 41:4 42:7,8
43:2,3 50:16 70:17
70:19 88:2 105:22
128:14,15
**undisputed** 108:5
108:10
**unfairly** 26:19 27:6
93:6,13 243:21
244:2
**unfortunately**
161:3
**unit** 30:5 60:12,13
81:8
**united** 1:1 8:6
**unquote** 84:14
184:8 188:8,16
**untrue** 187:6,12,15
187:17 192:7 193:3
193:7,11,15
**untrustworthy**
189:6 190:14
**untruthful** 191:2
191:10
**unusual** 90:20,23
**unwritten** 77:10
**update** 144:18
**updated** 49:6,8
**updates** 68:14
**ups** 195:7
**usage** 98:19
**use** 32:5 52:5 71:1
73:13,21 74:1 99:2
99:16 100:12
104:14 134:3 148:2
149:22 163:23
164:6,7 177:6
217:13
**uses** 191:7

**usual** 8:23 15:9
**usually** 140:17
**usurp** 122:12

**v**

**vac** 163:23
**vacation** 57:6
  158:11 161:22
  164:8 165:1,13,19
  166:8,15 167:5
  168:1 170:6 175:6
  175:23 177:6
  179:17 180:12,19
  197:18,22 198:15
  231:14,23 233:1
  249:13 250:6,15
**vaccinated** 13:18
**vacuum** 84:4
**vague** 207:20
**valid** 231:3
**value** 69:18 156:9
  192:8
**vandalized** 30:12
**variety** 204:8
**various** 32:21
  196:6 230:23
  246:23 247:12
**vehicle** 150:5
**vein** 44:5
**veitch** 16:22
**verbal** 14:21
**verify** 145:21
  146:13 147:5
  150:21
**versed** 39:12
**version** 91:3
**versus** 86:4,15
  177:16 183:1
**victim** 46:11 51:11
  51:15 52:2,4,6 53:7
  59:20,21 60:4
  69:21,22 70:4,6

85:17 86:1,8 93:21
  116:4 118:12
  158:18 159:13,15
  191:11,17,23
**victim's** 205:10
**victims** 160:14
**view** 75:12,15,18
  110:17,18
**viewpoint** 143:16
  143:18
**vindictive** 209:19
**violence** 210:11
**violent** 81:8
**virtue** 34:2,9
**vision** 75:7,18 76:1
  76:22
**vitally** 13:14
**vote** 17:12
**voters** 17:11
**vs** 1:9
**vso** 25:1 52:6,9
  60:12,13 61:7
  87:10,14,19 88:5
  88:12 90:17 111:15
  111:18 116:20
  136:13 173:21
  174:1 175:10,12,15
  207:5 217:5 223:2
  238:11,23 240:20
  240:21 251:19
**vso's** 55:15
**vsos** 51:23 52:2
  55:23 59:17 60:9
  60:17 61:3 68:23
  72:8 73:19 86:19
  87:2 150:14 208:15
  224:8 238:19

**w**

**waived** 7:9
**walk** 18:11 87:4

**walked** 92:2
**walking** 86:21
**walmart** 218:1,5
**want** 10:22 11:3,5
  27:3 33:16,17
  37:18 40:2 48:9
  64:4,9,17,19 72:5
  73:16 77:18,22
  78:1 80:14 81:23
  88:20 89:17 98:3
  101:12 108:23
  109:1 112:11 142:4
  143:22 144:18
  145:20 149:8
  160:12,19 161:10
  161:17,18 164:5,6
  166:23 175:20
  178:9 180:6 186:12
  186:13 209:2
  217:11 219:21
  224:20 227:15
  228:12,19 234:3
  243:9 250:13
**wanted** 61:8 67:10
  68:15 87:10 150:17
  151:11 155:15
  172:3,11,17,22
  237:17,19 249:5,22
**wanting** 124:1,12
**wants** 15:13 88:23
  216:2
**way** 16:9 17:13
  18:22 23:23 31:19
  32:22 33:19,21
  39:1 76:5,17 80:9
  87:15 105:3 106:9
  106:21 116:22
  117:1 118:19
  132:14 148:13
  162:20 173:1
  198:12 202:10

213:18,23 222:2
  237:18 238:8,14
  244:12 252:6,10
**ways** 32:22 121:2
  151:19,22 154:11
  211:8 221:8
**we've** 60:18 62:5
  79:3 140:3 143:19
  158:10 231:9
**wear** 116:8
**wearing** 13:20
**wednesday** 226:19
**week** 44:12 199:6
**weight** 156:17,19
**weighted** 200:10
**went** 17:5 104:22
  160:2,4 197:4
  219:3
**white** 93:21 159:13
  160:6,9 168:18
  174:1 175:8 224:10
  235:6,7,14,15
  239:15
**wild** 101:15
**win** 249:14
**winter** 134:11
**wish** 65:4
**witness** 7:9 8:12,17
  253:12
**witnesses** 104:7
**won** 19:17 20:4
  21:20,21,22
**wondering** 104:4
**word** 125:9 129:15
  146:18 196:4
  217:13
**words** 82:3 92:8
  219:2 227:8 235:19
  240:5 249:2
**work** 14:7 25:5
  44:14 51:15 67:8

**index**

67:12 69:18 70:14
70:23 72:21 76:23
116:9 132:8 144:4
149:10,11,15
150:19 151:5
154:11 155:17
167:20 168:3 172:4
172:5 176:20 177:1
182:22 190:7 191:4
191:16,21 194:22
195:18,23 199:16
208:12 209:2 249:6
250:21 251:11
**worked** 18:4,8,22
19:3,14 25:7
154:18,22 155:13
158:15 170:13,16
171:13 172:12,18
172:23 174:6
197:14,23 198:10
198:17 199:1,5,6
200:20 216:19
238:8
**worker** 101:19
**workforce** 251:2
**working** 35:21
66:13 81:9 101:21
122:18 175:18
177:15 202:19
204:4 231:6
**workplace** 30:9
**works** 23:3 160:15
199:22
**workweek** 197:14
198:1,11,18 199:2
199:22 200:20
**write** 33:12,23
96:23 97:4 115:19
117:19,20 195:5,7
195:14 203:19

**writes** 104:18
226:18
**writing** 34:2 76:11
103:6 121:3 217:15
**written** 34:9 35:13
35:15 37:21 76:16
77:6,11 117:5,23
119:17 120:13
129:16 134:10
139:18 168:21
177:5,8 179:19,22
180:10 203:16
211:22 219:22
234:5
**wrong** 70:21 84:9
**wrote** 97:5,6,8
102:10 105:3
115:16,17,18,22
133:6 134:8,17

**y**

**y'all** 200:21 212:11
217:18 218:1 246:4
**yates** 59:11,15
60:15 61:1,9,12,21
62:6,16 63:4,14
75:18 93:6 94:11
95:7 96:22 97:8,21
98:8,13 99:1,2,3
100:20 102:1,2
103:6 104:6,14,18
105:1,2 108:15
110:8,9,16 111:20
111:21 112:2,16,21
113:10,23 117:23
119:11 120:17,19
122:3,15,20 123:16
123:20,23 124:10
124:14,20 128:18
129:19 130:13
132:1,11 133:1,6
134:3,4,8,17,23

136:1,2,4,10,19
137:18 139:18
141:19 142:6 143:5
143:9,13 144:10,13
145:4 147:9 148:15
154:1 167:18,23
168:7 171:22 173:5
174:12 176:15,19
176:23 181:10
183:7,8,11 184:20
187:10,22 188:15
191:9 192:3 193:6
194:4,19,21 195:17
195:22 196:12
199:14,20 201:21
202:1 203:13,22
205:23 207:7 208:5
208:11 209:7 212:4
214:22 220:21
226:16 227:18
228:3 229:1,11
231:2 232:12
233:12 234:5
236:12,17,20 237:4
243:19 245:1
251:18,21 252:5,8
252:9
**yeah** 12:13 21:2
22:6 29:2 32:21
33:21 50:6 60:1
65:19 72:12 82:6,6
89:14 97:7 98:21
115:1 121:12 127:8
136:20 140:15
159:1 164:11 171:9
174:8 175:18
210:18 220:19
224:2 229:21
232:20 235:2,12
238:17 245:16
246:1

**year** 20:1,6 39:4
40:18 48:6 57:12
57:16,17 58:4
84:13 99:11,12
162:5 166:11 199:1
199:5
**years** 9:13 16:23
18:1,9,23,23 19:3
19:11 20:4 23:6
27:17 34:7 36:3,18
57:13 63:11 99:13
99:22 111:16 112:3
122:17,20,22 136:8
159:15 176:2
177:14 212:16
221:22 236:3,4,13
**young** 13:15 18:12
**ywca** 209:15
210:23 211:23
212:5

**z**

**zip** 114:6

Alabama Rules of Civil Procedure

Part V. Depositions and Discovery

Rule 30

(e) Submission to witness; changes; signing. When
the testimony is fully transcribed the deposition
shall be submitted to the witness for examination
and shall be read to or by the witness, unless such
examination and reading are waived by the witness
and by the parties. Any changes in form or
substance which the witness desires to make shall
be entered upon the deposition by the officer with
a statement of the reasons given by the witness for
making them. The deposition shall then be signed by
the witness, unless the parties by stipulation
waive the signing or the witness is ill or cannot
be found or refuses to sign. If the deposition is
not signed by the witness within thirty (30) days
of its submission to the witness, the officer shall
sign it and state on the record the fact of the
waiver or of the illness or absence of the witness
or the fact of the refusal to sign together with
the reason, if any, given therefor; the deposition
may then be used as fully as though signed unless
on a motion to suppress under Rule 32(d)(4) the

court holds that the reasons given for the refusal
to sign require rejection of the deposition in
whole or in part.


(F) Certification and filing by officer; exhibits;
copies; notice of filing.
(1) The officer shall certify on the deposition
that the witness was duly sworn by the officer and
that the deposition is a true record of the
testimony given by the witness. Unless otherwise
ordered by the court, the officer shall then
securely seal the deposition in an envelope
indorsed with the title of the action and marked
"Deposition of [here insert name of witness]" and
shall promptly file it with the court in which the
action is pending or send it by registered or
certified mail to the clerk thereof for filing.



DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

**Office of Prosecution Services**

**Personnel Policies and Procedures Manual**

**Certified Victim Service Officer Program**



This manual has been prepared to define guidelines and procedures affecting the relationship of Certified Victim Service Officer (herein after CVSO) employees hired within the Office of Prosecution Services (herein after OPS) through Alabama Department of Economic and Community Affairs (herein after ADECA) and Victims of Crime Act (herein after VOCA) Grant #_____ **TBD upon Governor's signature**_____ (herein after GRANT) and the District Attorneys Office for which the employees are assigned (herein after District Attorney) and their relationship with members of the public; within the criminal justice and legal communities; and with the media. The contents of this manual are confidential, and solely for use by and within OPS and the District Attorney Office. This document or any portion thereof shall not be copied, disseminated or discussed in any manner with persons not employed by this organization without express written approval of the Executive Director of the Office of Prosecution Services.

PLAINTIFF'S EXHIBIT
tabbies®
/

District Attorney: _Doug C_____

Circuit: _10th Judicial_____

Date: _12/17/18_____

DA 000002

The Office of Prosecution Services CVSO employee hired under the GRANT shall remain employed in the judicial district in which they have been assigned and will remain at the discretion of the Executive Director of the Office of Prosecution Services and/or the District Attorney in such circuit.

This Personnel Policies and Procedures Manual is intended to be a guide for policies, benefits and general information. These guidelines should not be considered or construed as a contract or future of continued employment. Failure to comply with any provisions of this manual may be grounds for disciplinary action up to and including immediate termination of employment at the sole discretion of the District Attorney in the jurisdiction for which the employee is assigned.

Employment with OPS and the District Attorney is terminable at the will of either the employee, the Executive Director of OPS or the District Attorney without cause or advance notice. No representative of OPS or the District Attorney has the authority to make an independent contract of employment or agreement with any employee regarding the terms and conditions of employment.

## General Policies

### Equal Employment Opportunity and Non-Discrimination

OPS mandates that all hiring, promotions, and other terms, conditions and privileges of employment shall be conducted in a manner that does not discriminate on the basis of any protection afforded by applicable state and federal law. Employment decisions at OPS will be based on distinction, qualifications, and abilities. Length of service may also be considered.

### Sexual Harassment

Sexual harassment of any kind is unacceptable and will not be tolerated. Sexual harassment is defined as unwanted conduct or communications of a sexual nature, which adversely affect the person's employment or working environment. Such conduct or communication must negatively affect the person's employment, wages, advancement, tenure, and assignment of duties, conditions of employment or working environment. Such conduct is prohibited and employees who violate this policy will be subject to disciplinary action or termination.

Any employee who wants to report such an incident should promptly contact his or her supervisor. If the supervisor is unavailable or the employee believes it would be inappropriate to contact that person, the employee should immediately contact the OPS Executive Director or the District Attorney. The facts will be investigated and appropriate discipline, if warranted, will follow.

DA 000003

**Professionalism and Ethics in Public Service**

Each employee, as a representative of OPS and the District Attorney is charged with maintaining the public trust. Employees who serve the public interest are required to conduct themselves in a manner appropriate to the position and employment that is held. Employees shall conduct themselves with integrity, the highest degree of professionalism, and in a manner that is sensitive to the needs of others.

All employees shall remain in compliance with all local, state and federal laws. Employees are expressly included as public employees and subject to the jurisdiction of the Ethics Commission and the ethics laws of the State of Alabama.

**Public Responsibility**

The primary responsibility of all employees is to assure that justice is accomplished within the framework of the constitutions and laws of the United States and the State of Alabama. Employees should use all legal and ethical means to fulfill this responsibility.

Every employee shall perform his/her duties in a prompt and courteous manner, including responding promptly to telephone calls and written communication.

**Conduct and Appearance**

As a representative of OPS and the Office of District Attorney, it is each employee's responsibility to present a neat and professional appearance. Conduct and appearance of employees contribute substantially to the image of a professional office. Employees are expected to be well groomed and professional in manner and dress.

The final decision regarding what is appropriate appearance for employees rests with the Executive Director of OPS and/or the District Attorney. Good taste and common sense are the guidelines. Employees should always remember that they represent OPS and the Office of the District Attorney at all times.

**Confidentiality**

In the course of everyday work, employees will often become aware of documents, materials and information of a sensitive or confidential nature that are received within or generated by OPS or the District Attorney's office. The importance of preserving the confidentiality of all such information, materials and documents cannot be overstated. Information obtained during the course of employment may only be used for the purpose for which it was obtained.

The existence, progress or results of any investigation or prosecution, or that charges are under consideration shall not be disclosed to individuals outside of OPS or the Office of the District Attorney. Charges may be disclosed if the District Attorney determines that the

3

disclosure is necessary to the success of the investigation or prosecution; for the safety and welfare of the public; or necessary for the operation of the office. All "discovery" production pursuant to the Alabama Rules of Criminal Procedure, or other pertinent law, should be accomplished under the supervision of the District Attorney or Assistant District Attorney assigned the case.

Unless authorized by the District Attorney, this office does not confirm or deny the existence of any ongoing investigation or the fact that a suspect has been considered.

Any request by any person or entity for information alleged to be a public record shall immediately be forwarded to the District Attorney for a determination of the appropriate response under the provisions of appropriate law relating to the dissemination of public records.

Employees should be aware that almost all information in the possession of this office is protected from disclosure. The disclosure by employees of the issuance or existence of any outstanding arrest warrant or search warrant is prohibited unless such disclosure is approved by the District Attorney.

State law declares that it is essential to the fair and impartial administration of justice that Grand Jury proceeding be secret and the secrecy of such proceedings remain inviolate. With few exceptions, disclosure of witnesses or evidence considered by a grand jury, or the findings of the grand jury, is punishable by fine and/or imprisonment.

Employees should make no such disclosures without consulting the District Attorney.

The dissemination or disclosure of information or records, including criminal history record information, in violation of law or the policy set forth herein shall result in immediate discipline, including where appropriate, termination.

**Criminal History Information**

The District Attorney receives criminal history information generated by the Alabama Criminal Justice Information Center (ACJIC), the National Crime Information Center (NCIC) and various state, federal and local law enforcement agencies and sources.

All criminal history records are generated, received, and maintained for official business purposes only and are to be disseminated only as permitted by law and office policy. Criminal history information, including arrest and conviction records, may be accessed or obtained by the office only for criminal justice purposes and no dissemination of the information will be made except as permitted by law. Violation of any portion of any agreement this office may have with ACJIC, NCIC, or any other such agency may jeopardize this office's future access to criminal justice information.

In addition, any employee who willfully requests, obtains or seeks to obtain criminal history information under false pretenses, or who willfully communicates or seeks to communicate such information to unauthorized persons or agencies may be terminated and/or prosecuted criminally.

4

**Use of Issued Computers**

Employees will be issued a computer as part the GRANT. Use of issued computers and related equipment should only be used for business purposes. Use of public property for private benefit is expressly prohibited under the ethics laws of Alabama and may result in investigation by the Alabama Ethics Commission and/or criminal prosecution for violations of the ethics laws.

**Use of Internet**

The Certified Victim Service Officer employee will adhere to the Internet use policy of the District Attorney for which they are assigned.

**Use of Issued Cell Phones**

Employees will be issued a cell phone as part of the GRANT. Use of issued cell phones and related equipment shall only be for business purposes. Use of issued phone for personal or outside of business purposes could result in removal of the issued device. Use of public property for private benefit is expressly prohibited under the ethics laws of Alabama and may result in investigation by the Alabama Ethics Commission and/or criminal prosecution for violations of the ethics laws.

**Firearms**

The CVSO employee will adhere to the firearm policy of the District Attorney.

**Authorized Expenditures**

This office is entrusted with the management of public funds. No expenses may be incurred for or on behalf of OPS or the District Attorney's office without appropriate authorization.

**Personnel**

**Employee Code of Conduct**

All employees shall conduct themselves at work or elsewhere in a professional, courteous and respectful manner when dealing with each other or dealing with members of the public.

All employees shall obey all federal, state, and local laws and shall promptly notify the District Attorney of any violation of law in any jurisdiction (other than a minor traffic infraction not related to work) of which they have been convicted, charged, accused, questioned or suspected. Likewise, employees are required to follow the same notification requirement concerning any immediate family member or significant other who is convicted, charged, accused, questioned or suspected of having committed a violation of the law (exclusive of minor

5

DA 000006

traffic infractions) in this or any other jurisdiction. Any violation of law or ordinance committed by the employee shall subject the employee to immediate and appropriate disciplinary action or termination in the discretion of the Executive Director of OPS or District Attorney.

All employees are prohibited from any use or attempted use of his or her position or place of employment to gain any form of special or preferential treatment that would not otherwise be available to a member of the general public.

All employees of OPS may be compelled to submit to drug or other substance testing at the discretion of OPS or the District Attorney.

The CVSO employee will adhere to any additional personnel policies of the District Attorney.

**Attendance**

The CVSO employee will adhere to the attendance policy of the District Attorney for which he/she is assigned.

**Leave**

Personal and sick leave will be granted and/or denied by the District Attorney. Personal and sick leave documentation will be maintained at OPS and it will be the responsibility of the CVSO to complete and submit a leave form on each occasion leave is granted by the supervising District Attorney. Said form will be provided in duplicate to the District Attorney and the Office of Prosecution Services.

Payment of leave (including accrued) will be determined by the District Attorneys Office for which the employee is assigned.

**Evaluation of Employees**

The CVSO employee will adhere to the evaluation policy of the District Attorney.

**Conflict of Interest**

When it comes to the attention of an employee that a spouse, companion, relative or friend may be under investigation or prosecution for a criminal or civil action handled by the Office of the District Attorney, that employee shall immediately notify the District Attorney. No employee shall interfere or inquire, either directly or indirectly, concerning such investigation or prosecution and the employee shall have no contact with any person, material, files, evidence or other related matter.

As soon as an employee learns that a relative, including spouse, relatives by marriage, and individuals whom the employee shares a personal and professional relationship is a witness or potential witness in any investigation, review or prosecution of any matter, criminal or civil,

6

by this office, that employee shall immediately notify the District Attorney who, in the exercise of discretion, shall determine if the employee should be isolated from contact with the matter.

If any employee cannot or should not participate in the investigation, review or prosecution of any matter, criminal or civil, due to any personal, moral, religious or other belief, that employee shall immediately notify his or her supervisor.

**Termination**

All employees serve by appointment of the OPS Executive Director and District Attorney and are subject to termination at their discretion.

**Grievance Policy**

The CVSO employee will adhere to the grievance policy of the District Attorney.

**CVSO Acknowledgement**

I have received a copy of the Policies and Procedures Manual of the Office of Prosecution Services as employed under the GRANT. I agree to abide by all grant requirements and requests and to timely submit all grant documentation. I understand that it is my responsibility to read these Policies and Procedures and abide by the rules established therein as they apply to the job that I perform.

Employee:_____

Date:_____

7

I have received a copy of the Policies and Procedures Manual of the Office of Prosecution Services as employed under the GRANT. I agree to abide by all grant requirements and requests and to timely submit all grant documentation. I understand that it is my responsibility to read these Policies and Procedures and abide by the rules established therein as they apply to the job that I perform.

Employee Name Printed: _LaNitra Jeter_

Employee Signature: _____

Date: _8/26/19_

8

DA 000009

**Office of Prosecution Services**

**Personnel Policies and Procedures Manual**

**Certified Victim Service Officer Program**



This manual has been prepared to define guidelines and procedures affecting the relationship of Certified Victim Service Officer (herein after CVSO) employees hired within the Office of Prosecution Services (herein after OPS) through Alabama Department of Economic and Community Affairs (herein after ADECA) and Victims of Crime Act (herein after VOCA) Grant (herein after GRANT) and the District Attorney's Office for which the employees are assigned (herein after District Attorney) and their relationship with members of the public; within the criminal justice and legal communities; and with the media.

District Attorney: _____

Circuit: _____

Date: _____

PLAINTIFF'S
EXHIBIT
tabbies®
2

Updated 2-1-2020

DA 000010

**Office of Prosecution Services**

**Personnel Policies and Procedures Manual**

**Certified Victim Service Officer Program**

The Office of Prosecution Services Certified Victim Service Officer (CVSO) employee hired under the GRANT shall remain employed in the judicial district in which they have been assigned. Employment with OPS and the District Attorney is terminable at the will of either the employee, the Executive Director of OPS or the District Attorney without cause or advance notice. No representative of OPS or the District Attorney has the authority to make an independent contract of employment or agreement with any employee regarding the terms and conditions of employment.

This Personnel Policies and Procedures Manual is intended to be a guide for policies, benefits and general information. These guidelines should not be considered or construed as a contract or future continued employment. Failure to comply with any provisions of this manual may be grounds for disciplinary action up to and including immediate termination of employment at the sole discretion of the District Attorney in the jurisdiction for which the employee is assigned.

**General Policies**

**Equal Employment Opportunity and Non-Discrimination**

OPS mandates that all hiring, promotions, and other terms, conditions and privileges of employment shall be conducted in a manner that does not discriminate on the basis of any protection afforded by applicable state and federal law. Employment decisions will be based on distinction, qualifications, and abilities. Length of service may also be considered.

**Sexual Harassment**

Sexual harassment of any kind is unacceptable and will not be tolerated. Sexual harassment is defined as unwanted conduct or communications of a sexual nature, which adversely affect the person's employment or working environment. Such conduct or communication must negatively affect the person's employment, wages, advancement, tenure, and assignment of duties, conditions of employment or working environment. Such conduct is prohibited and employees who violate this policy will be subject to disciplinary action or termination.

Any employee who wants to report such an incident should promptly contact his or her supervisor. If the supervisor is unavailable or the employee believes it would be inappropriate to contact that person, the employee should immediately contact the OPS Executive Director or the District Attorney. The facts will be investigated and appropriate discipline, if warranted, will follow.

DA 000011

**Professionalism and Ethics in Public Service**

Each employee, as a representative of OPS and the District Attorney is charged with maintaining the public trust. Employees who serve the public interest are required to conduct themselves in a manner appropriate to the position and employment that is held. Employees shall conduct themselves with integrity, the highest degree of professionalism, and in a manner that is sensitive to the needs of others.

All employees shall remain in compliance with all local, state and federal laws. Employees are expressly included as public employees and subject to the jurisdiction of the Ethics Commission and the ethics laws of the State of Alabama.

**Public Responsibility**

The primary responsibility of all employees is to assure that justice is accomplished within the framework of the constitutions and laws of the United States and the State of Alabama. Employees should use all legal and ethical means to fulfill this responsibility.

Every employee shall perform his/her duties in a prompt and courteous manner, including responding promptly to telephone calls and written communication.

**Conduct and Appearance**

As a representative of OPS and the Office of District Attorney, it is each employee's responsibility to present a neat and professional appearance. Conduct and appearance of employees contribute substantially to the image of a professional office. Employees are expected to be well groomed and professional in manner and dress.

The final decision regarding what is appropriate appearance for employees rests with the Executive Director of OPS and/or the District Attorney. Good taste and common sense are the guidelines. Employees should always remember that they represent OPS and the Office of the District Attorney at all times.

**Confidentiality**

In the course of everyday work, employees will often become aware of documents, materials and information of a sensitive or confidential nature that are received within or generated by OPS or the District Attorney's office. The importance of preserving the confidentiality of all such information, materials and documents cannot be overstated. Information obtained during the course of employment may only be used for the purpose for which it was obtained.

The existence, progress or results of any investigation or prosecution, or that charges are under consideration shall not be disclosed to individuals outside of OPS or the Office of the District Attorney. Charges may be disclosed if the District Attorney determines that the disclosure is necessary to the success of the investigation or prosecution; for the safety and welfare of the public; or necessary for the operation of the office. All "discovery" production pursuant to the Alabama

DA 000012

Rules of Criminal Procedure, or other pertinent law, should be accomplished under the supervision of the District Attorney or Assistant District Attorney assigned to the case.

Unless authorized by the District Attorney, employees shall neither confirm nor deny the existence of any investigations, prosecutions, or other matters related to the enforcement of state laws against individuals or entities.

Any request by any person or entity for information alleged to be a public record shall immediately be forwarded to the District Attorney for a determination of the appropriate response under the provisions of appropriate law relating to the dissemination of public records.

Employees should be aware that almost all information in the possession of this office is confidential and sensitive in nature. The disclosure by employees of the issuance or existence of any outstanding arrest warrant or search warrant is prohibited unless such disclosure is approved by the District Attorney.

State law declares that it is essential to the fair and impartial administration of justice that Grand Jury proceeding be secret and the secrecy of such proceedings remain inviolate. With few exceptions, disclosure of witnesses or evidence considered by a grand jury, or the findings of the grand jury, is punishable by fine and/or imprisonment.

Employees should make no such disclosures without consulting the District Attorney.

The dissemination or disclosure of information or records, including criminal history record information, in violation of law or the policy set forth herein shall result in immediate discipline, including where appropriate, termination.

**Criminal History Information**

The District Attorney receives criminal history information generated by the Alabama Criminal Justice Information Center (ACJIC), the National Crime Information Center (NCIC), and various state, federal and local law enforcement agencies and sources.

All criminal history records are generated, received, and maintained for official business purposes only and are to be disseminated only as permitted by law and office policy. Criminal history information, including arrest and conviction records, may be accessed or obtained by the office only for criminal justice purposes and no dissemination of the information will be made except as permitted by law. Violation of any portion of any agreement this office may have with ACJIC, NCIC, or any other such agency may jeopardize this office's future access to criminal justice information.

In addition, any employee who willfully requests, obtains or seeks to obtain criminal history information under false pretenses, or who willfully communicates or seeks to communicate such information to unauthorized persons or agencies may be terminated and/or prosecuted criminally.

DA 000013

**Use of Issued Computers**

      Employees will be issued a computer as part of the GRANT. Use of issued computers and related equipment should only be used for business purposes. Use of public property for private benefit is expressly prohibited under the ethics laws of Alabama and may result in investigation by the Alabama Ethics Commission and/or criminal prosecution for violations of the ethics laws.

**Use of Internet**

      The Certified Victim Service Officer employee will adhere to the Internet use policy of the District Attorney for which they are assigned.

**Use of Issued Cell Phones**

      Employees will be issued a cell phone as part of the GRANT. Use of issued cell phones and related equipment shall only be for business purposes. Use of issued phone for personal or outside of business purposes could result in removal of the issued device, and/or other disciplinary measures. Use of public property for private benefit is expressly prohibited under the ethics laws of Alabama and may result in investigation by the Alabama Ethics Commission and/or criminal prosecution for violations of the ethics laws.

**Firearms**

      The CVSO employee will adhere to the firearm policy of the District Attorney.

**Authorized Expenditures**

      This office is entrusted with the management of public funds. No expenses may be incurred for or on behalf of OPS or the District Attorney's office without appropriate authorization.

**Personnel File**

      The following items will be maintained in the CVSO's personnel file at OPS: A signed copy of the Policy and Procedure Manuel; Yearly evaluations; Non-disclosure policy statement; Signed Drug Free Policy; E-Verify; W-4; and the pay rate.

**Employee Code of Conduct**

      All employees shall conduct themselves at work or elsewhere in a professional, courteous and respectful manner when dealing with each other or dealing with members of the public.

      All employees shall obey all federal, state, and local laws and shall promptly notify the District Attorney of any violation of law in any jurisdiction (other than a minor traffic infraction not related to work) of which they have been convicted, charged, accused, questioned or suspected. Likewise, employees are required to follow the same notification requirement concerning any immediate family member or significant other who is convicted, charged, accused, questioned or

DA 000014

suspected of having committed a violation of the law (exclusive of minor traffic infractions) in this or any other jurisdiction. Any violation of law or ordinance, or a failure to report same, committed by the employee shall subject the employee to immediate and appropriate disciplinary action or termination in the discretion of the Executive Director of OPS or District Attorney.

All employees are prohibited from any use or attempted use of his or her position or place of employment to gain any form of special or preferential treatment that would not otherwise be available to a member of the general public.

All employees of OPS may be compelled to submit to drug or other substance testing at the discretion of OPS or the District Attorney.

The CVSO employee will adhere to any additional personnel policies of the District Attorney.

**Attendance**

The CVSO employee will adhere to the attendance policy of the District Attorney for which he/she is assigned.

**Leave**

Personal and sick leave will be granted and/or denied by the District Attorney. Personal and sick leave documentation will be maintained at OPS and it will be the responsibility of the CVSO to complete and submit a leave form on each occasion leave is granted by the supervising District Attorney. Said form will be provided in duplicate to the District Attorney and the Office of Prosecution Services.

Payment of leave (including accrued) will be determined by the District Attorney's Office for which the employee is assigned.

**Evaluation of Employees**

The CVSO employee will be evaluated once yearly by the District Attorney for which the employee is assigned according to an evaluation created and provided to the District Attorney by OPS. The evaluation will be based on performance under the GRANT. The evaluations will be maintained in the CVSO's employees file.

**Conflict of Interest**

When it comes to the attention of an employee that a spouse, companion, relative or friend may be under investigation or prosecution for a criminal or civil action handled by the Office of the District Attorney, that employee shall immediately notify the District Attorney. No employee shall interfere or inquire, either directly or indirectly, concerning such investigation or prosecution

DA 000015

and the employee shall have no contact with any person, material, files, evidence or other related matter.

As soon as an employee learns that a relative, including spouse, relatives by marriage, and individuals whom the employee shares a personal and professional relationship is a witness or potential witness in any investigation, review or prosecution of any matter, criminal or civil, by this office, that employee shall immediately notify the District Attorney who, in the exercise of discretion, shall determine if the employee should be isolated from contact with the matter.

If any employee cannot or should not participate in the investigation, review or prosecution of any matter, criminal or civil, due to any personal, moral, religious or other belief, that employee shall immediately notify his or her supervisor.

**Termination**

All employees serve by appointment of the OPS Executive Director and District Attorney and are subject to termination at their discretion.

**Grievance Policy**

The CVSO employee will adhere to the grievance policy of the District Attorney.

DA 000016

**Drug Free Policy**

The CVSO is assigned to a Drug Free Workplace.  The unlawful use, possession, distribution, dispensing, manufacture, sale, purchase, or being under the influence of intoxicants, non-prescribed narcotics, hallucinogenic drugs, marijuana or other non-prescribed narcotics, hallucinogenic drugs, marijuana or other non-prescribed controlled substances is prohibited. Reporting to or being at work with a measurable quantity of intoxicants, non-prescribed narcotics, hallucinogenic drugs, marijuana or other nonprescribed controlled substances in the blood or urine is prohibited.  Adherence to this policy on drugs and alcohol is a condition of employment or all employees.

The CVSO is required to notify the District Attorney of any criminal drug statute arrest or conviction for a violation occurring in the workplace no later than five days after such arrest or conviction.

Drug/Alcohol Testing:  An employee may be requested to undergo a blood test, urinalysis, "breath analyzer" test or other diagnostic test under any circumstances where there is reasonable suspicion that an employee has reported to work, or is near any workspace, with a measurable quantity of intoxicants, drugs or narcotics in the blood or urine.

Any violation of this policy will result in disciplinary action including possible termination.


## DRUG AND ALCOHOL POLICY ACKNOWLEDGMENT AND CONSENT

I, _____, have read and been given a copy of the Office of Prosecution Services (OPS) policies and procedures relating to drugs and alcohol.  I understand that as a condition of employment, I am subject to such policy and to changes that may be made in such policy from time to time.  I further understand that drug and alcohol tests and/or searches may be conducted of the persons and belongings of employees under the circumstances described in the policy.  I hereby give my consent to OPS/District Attorney and any agency, laboratory or health-care provider that OPS/District Attorney may designate, to collect and test urine/blood samples from me to identify the presence of drugs or alcohol.  I also authorize any such agency, laboratory or health-care provider that performs such test or tests to release the tests results to OPS/District Attorney and to any medical review officer designated by OPS and I hereby release OPS/District Attorney, its officers, agents and employees from any and all liability in connection with or as a result of any such test or tests.

Date:_____        Signed:_____

Witness:_____

DA 000017

**CVSO Acknowledgement**

**Policies and Procedures: VOCA Grant**

I have received a copy of the Policies and Procedures Manual of the Office of Prosecution Services as employed under the GRANT. I agree to abide by all grant requirements and requests and to timely submit all grant documentation. I understand that it is my responsibility to read these Policies and Procedures and abide by the rules established therein as they apply to the job that I perform.

Employee Name Printed: _LaNitra Jeter_

Employee Signature: _[signature]_

Date: _2/13/20_

DA 000018



9/30/2019

TO:        DANNY CARR, JOE ROBERTS

FROM:      JUDY YATES

SUBJECT:   LANITRA JETER



CC:        MICHEAL MCCURRY

On Monday, September 23, 2019, I received a text from LaNitra that she was at work but needed to leave at 10:30 a.m. to go to a Dr.'s appointment and to pick up her puppy from the vet. When I arrived at work, she had requested the time off using filemaker, however, I did not approve until I had spoken to Micheal McCurry. He said to let her know she needed to bring a Dr.'s excuse when she returned to work, and that since that would essentially use all of her time, that for the remainder of the week, and until further notice, she was to work 7:30 a.m. to 4:30 p.m., and to take her lunch hour and 30 minute break time, because she would not be able to earn comp time. Her question was not why, but when could she begin making time again, would it be the next week? I told her I would probably have the answer by the end of the week.

On Wednesday, September 25, 2019, Micheal McCurry and I had a meeting with her regarding two issues: the court story and her time. Micheal led the meeting, and for the most part, I observed. Micheal began by asking her to tell him about the incident that had occurred the previous Monday. She was asked where the altercation occurred, who was present, who was the judge. She started to tell the story, then she said, she wasn't there for the mediation because they would not let her be involved (keep in mind that the mediation never took place that day). She said she left and went to see her attorney in Bessemer. She said the incident took place at a private location. When asked where, she finally said it was just a joke that she had put out on facebook and social media, that she likes to joke around about things, and that everyone knew that. When told by Micheal that a joke like that could be jeopardizing her job, she said it was told to relieve stress because of all the things going on in her life, and that she thought working here would help her to get justice in all the cases she is involved in, but they have only gotten worse, and she began to go over a lifetime of tragedies and difficulties. I asked her how she was going to repair the damage she had created with me trusting her to tell me the truth, and her response that being a hard worker with initiative should take care of that. She never really apologized for what had happened.



DA 000078

Page Two

Memo regarding L. Jeter meeting

Judy Yates

Micheal then discussed the problem with her time, explaining how many weeks she has been here, and how she had only two weeks that she worked 40 hour weeks and did not take time off.  She really could not grasp that taking so much time in such a short period of time was an issue, and she just kept wanting to know when she could begin making comp time again.

I should state that she was crying through the  interview, and we actually had ended the discussion and sat there for 20 minutes at least, while she tried to compose herself.

For me, this has really affected my ability to trust any of the wild stories that she has told us since she has been here, but more importantly, it has affected my ability to trust her from now on.  LaNitra is a likable person, she could be a good worker, and an asset to the office, but for me, truth and trust are key for anyone working in the District Attorney's Office.

Staff Meeting December 12, 2019

1. Communication – Chain of Command, please understand that I am your supervisor. If you have any complaints, you must come to me. Give me an opportunity to rectify the problem and if not satisfied, come back to me and I will go to Joe Roberts for him to attempt to rectify the problem.

2. Court – remember you represent the DA's Office and Mr Carr. Always wear appropriate attire to work. The demeanor in court must be solemn. No eating, drinking or texting on phones. If you find yourself getting sleepy, either leave the courtroom or do something to wake yourself. People are always watching.

3. You are a representative employee of the office 24/7. Your actions reflect this office, whether at work or away from the office.

4. Children – If you need to have your children here for any reason, please get permission in advance. This office space belongs to the County, and we must follow County rules when it pertains to anyone coming to the courthouse.

5. Work time - Work hours are 7:30 a.m. to 4:30 p.m. or 8:00 to 5:00 p.m. I will work with you as best I can when you need to come in late, go to Doctor appt. or leave early. But you must let me know in advance, and it must not be a burden on other employees.

6. Beginning January 1, 2020, I will be assigning each of you Murder cases, when I deem it appropriate.



**VICTIM WITNESS**

# Memo

**To:**      File

**From:**    Judy Yates

**Date:**    November 22, 2019

**CC:**

**Re:**      Chain of Command



PLAINTIFF'S
EXHIBIT
5

---

**Joe had forwarded an email Nitra had sent to him and**

Joe had forwarded an email Nitra had sent to him regarding not understanding the chain of command and that she was not being treated fairly. I believe this stemmed from Cheryl, Erin and Elise being allowed to attend a Domestic Violence Seminar and I asked Nitra to work in the office that day because I would be out of the office. I explained that someone needed to be here in case a VSO was needed. I also told her she would be able to attend the next training available.

Addendum March 11, 2020:  A two day seminar came up and I offered it to all the VSO's who wanted could attend as I would be staying at the office. I asked Nitra first, and she declined going. Elise and Erin attended. Then an invitation to go to Nashville was sent to us, and I asked Nitra first if she wanted to go, and again she declined, so I allowed Cheryl, Elise and Erin to attend. I have made training opportunities available and she has shown no interest in attending.

1



March 20, 2020

La Nitra Jeter
lanitramckinney@yahoo.com



RECEIVED
U.S. EEOC

MAR 2 0 2020

Birmingham District Office

The Office of The District Attorney Office
carrd@jccal.org
801 Richard Arrington Jr. Blvd North
Birmingham, AL 35203
(205) 325-5252



PLAINTIFF'S
EXHIBIT

6

Date of Incident: September 23, 2019

RE: Case 420-2020-00512

To Whom it May Concern,

    I want to file a charge of discrimination against The District Attorney Office of Danny Carr. While employed under the District Attorney I was the only African American Victim Service Officer in the office, and I was treated very differently than my Caucasian coworkers. I experienced discrimination based on race, color, religion and retaliation on a constant basis. I was harassed by my Supervisor Judy Yates in various ways off and on during my employment. Having to deal with the discrimination caused me to have increased anxiety, depression, suicidal thoughts and isolation from some coworkers.

    On September 23, 2019, I was informed by my supervisor Judy Yates that I was no longer allowed to accrue comp time as my fellow coworkers did. I asked why, but no reason was given at that time. I advised Ms. Yates that I had a doctor's appointment that afternoon that I could not miss. I was informed by Ms. Yates that I would need to bring an excuse back to the office in order to go to my appointment. I followed the directions given to me and brought an excuse back to Ms. Yates.

    I later met with Ms. Judy Yates and Michael McCurry in reference to me being prohibited from accruing comp time. At the meeting I was advised I am no longer allowed to receive comp time because it appeared as soon as I accrued the comp time, I utilized it for whatever reason and other employees, within the office, had noticed. I asked, "if I have legitimately accrued comp time and it is available to me to use why am I being penalized for using it?" I received no answer from either party. I advised both Judy and Michael that my

husband has medical issues which sometimes prohibits him from driving so I must take him to his appointments. I myself have a medical issue I am trying to rectify with my provider along with upcoming court dates. I attempted to explain the circumstances to Michael McCurry and Judy Yates but was advised it is my business the reasons I use my comp time. After becoming very frustrated and upset I went back to my office unable to accrue comp time with no legitimate reason given. The other four Caucasian victim service officers in the office could accrue comp time and leave the office for hair appointments, because it gets dark outside and other reasons with no consequences.

During the time I could not accrue comp time I missed several doctor's appointments that I needed to go to. My husband missed doctor's appointments as well. On November 12, 2019 I met with Judy Yates and informed her that I needed to have my comp time reinstated. I advised her that my husband has an upcoming surgery and I did not have any time accrued for his procedure or if an emergency arose and I needed to be off. After being prohibited to accrue comp time for over a month's time Judy Yates granted my request but with restrictions. I was only allowed to come into the office from 7:30am to 4:30pm, whereas another officer, who is Caucasian, could come into the office from 7:00am to 4:30pm and accrue additional comp time.

I emailed a complaint to the Assistant District Attorney, Joe Roberts, with no resolution. Joe Roberts informed me to follow the chain of command and to only utilize the Assistant and District Attorney after that has been done. I followed the chain of command as instructed and discussed my issues and concerns with my Supervisor. A few days later I came to work, and a cut out of a large black rat had been placed on my name place by my officer door. This upset me tremendously and I took a photo of the image. I asked my coworkers who placed the rat on my name plate but received no response. The black rat remained on my name plate for weeks and was eventually removed by an unknown individual. I was being called a black rat as retaliation and harassment because I submitted a complaint against my supervisor to her supervisor.

I have endured discriminated against me in my office because I am African American, I reported my supervisor for misconduct and I reported inaccuracies of my supervisor. I have been stripped of employment privileges, constantly harassed by management and forced to work in a hostile environment. I 'm sure I left out pertinent information and details so If you have additional questions or need additional information I can be reached at (205) 876-7782 and lanitramckinney@yahoo.com.

Respectfully,

LaNitra Jeter

**VICTIM WITNESS**

# Memo



PLAINTIFF'S
EXHIBIT
7

| | |
|---|---|
| **To:** | Joe Roberts |
| **From:** | Judy Yates |
| **Date:** | March 13, 2020 |
| **Re:** | LaNitra Jeter |

As requested, below is a condensed list of issues that have come up since LaNitra Jeter began her employment here April 16, 2019.

- Abuse of earning time and taking time away from work. She is more interested in being away from work than being present and contributing to the office

- Failure to follow chain of command

- Repeatedly has told stories that turned out to untrue, so loss of credibility and being trustworthy

- Has posted on social media stories that were untrue, just for the shock value

- Has used office time to deal with issues that are her husband's or her adult son's legal issues

- Repeatedly talks about filing Judicial complaints against various judges her husband has to deal with

- Has been repeatedly counseled about the constant abuse of her time, ex. Asking to come in early to leave early, leaving early, has rarely worked an entire five day work week

- Has fallen asleep while observing a trial

- Leaves the building without signing out or letting someone know she will be unavailable

- Signs out to a court that is empty and cannot be found

- Has no credibility with her co-workers, and is compromising the Grant Report we submit to OPS

- During a meeting with the YWCA Advocate Director, she asked questions about her husband's case where he is the defendant of a PFA and how to get the judge to allow them to speak and let her know the PFA was vindictive

1

# OFFICE OF THE DISTRICT ATTORNEY



**DANNY CARR**
District Attorney
Tenth Judicial Circuit

TELEPHONE
(205) 325-5252

FAX
(205) 325-5266

801 RICHARD ARRINGTON, JR. BLVD. N.
BIRMINGHAM, ALABAMA 35203-2320

March 16, 2020

LaNitra Jeter
801 Richard Arrington Jr. Blvd. N.
Birmingham, AL 35203



Dear Ms. Jeter,

Pursuant to Section 12-17-220(a) of the Code of Alabama, 1975, all employees of the District Attorney of each judicial circuit serve at the pleasure of the District Attorney.   It is no longer the pleasure of the District Attorney that you continue to serve as an employee of this office.  You are hereby terminated immediately.

Please relinquish all badges, identification cards, card keys, and any other items that are the property of this office.  You may schedule an appointment with Investigator Sam Johnson to meet so he can return to you any additional belongings from your office.

Sincerely,

Danny Carr
District Attorney

cc: Employee's Personnel File

NAME: LANITRA JETER
POSITION:

VH: 2019 5/13/19 2020 /__/__

PAGE 1

| DATE | SAT | SUN | MON | TUE | WED | THU | FRI | SE | SF | VAC | S-Bal | V-Bal | E | U | BAL |
|------|-----|-----|-----|-----|-----|-----|-----|----|----|-----|-------|-------|---|---|-----|
| 12/29 |   |   |   | H |   |   |   |   |   |   |   |   |   |   |   |
| 1/5 |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |
| 1/12 |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |
| 1/19 |   |   | H |   |   |   |   |   |   |   |   |   |   |   |   |
| 1/26 |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |
| 2/2 |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |
| 2/9 |   |   | H |   |   |   |   |   |   |   |   |   |   |   |   |
| 2/16 |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |
| 2/23 |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |
| 3/2 |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |
| 3/9 |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |
| 3/16 |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |
| 3/23 |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |
| 3/30 |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |
| 4/6 |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |
| 4/13 | Started 13th |   |   | Start |   |   |   |   |   |   | 0 | 0 |   |   | 0 |
| 4/20 |   |   | 1+ |   |   |   |   | +8 |   | +8 | 0 | 0 |   |   | 0 |
| 4/27 |   |   |   |   |   |   | MU | -8.0 |   | -8.0 | 0 | 0 |   |   | 0 |
| 5/4 |   |   | S-8.0 | V-8.0 | +1.0 | +1 | MU |   |   |   | 0 | 0 | .25 |   | .25 |
| 5/11 |   |   | MU | MU | +1.0 | +1.25 | +1.25 |   |   |   | 0 | 0 |   |   | .25 |
| 5/18 |   |   | +1.25 | +1.50 | +1.50 | +1.25 | M.25 |   |   |   | 0 | 0 | 10.25 |   | 10.50 |
| 5/25 |   |   | H | +1.25 | +1.25 | +1.25 | +1.25 |   |   |   | 0 | 0 | 5.0 |   | 13.50 |
| 6/1 |   |   | H | -5.25 | S-8 | -5.0 | -4.0 | +8 |   | +8 | 0 | 0 |   | -14.25 | 1.25 |
| 6/8 |   |   | MU | +1.25 | +1.25 | -.50 | -.50 MU |   |   |   | 0 | 0 |   | .50 | .75 |
| 6/15 |   |   | +1.25 | +1.25 | +1.25 | +1.50 | MU |   |   |   | 0 | 0 | 7.50 |   | 8.25 |
| 6/22 |   |   | +1.25 | +1.25 | -.25 PML | -3.0 | +1.25 |   |   |   | 0 | 0 |   | -5.25 | 3.0 |

2019 Attendance
District Attorney, 10th Judicial Circuit

PLAINTIFF'S EXHIBIT
GAD 800-631-6989

DA000127

NAME: LANITRA JETER
POSITION:

VH: 2019 5/18/19 2020 11/1/19
PAGE 2

| DATE/SAT | SUN | MON | TUE | WED | THU | FRI | SE | SF | VAC | S-Bal | V-Bal | E | U | BAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6/29 | | +1.25 | +1.25 | +1.25 | H | H | +8 | | +8 | 8 | 16 | 3.75 | | 12.75 |
| 7/6 | | +1.25 | +1.0 | +1.0 | +1.0 | +1.0 | | | | 8 | 16 | 8.0 | | 14.75 |
| 7/13 | | S-8 | MU | +1.25 | 2.75 | -.25 | -8 | | | 0 | 16 | | -3.0 | 11.75 |
| 7/20 | | +1.0 | +1.25 | +1.25 | +1.0 | +1.25 | | | +8 | 8 | 16 | 8.75 | | 20.50 |
| 7/27 | | -8 | +1.50 | +1.25 | -6.25 | | | | +8 | 8 | 24 | +2.75 | -14.25 | 9.0 |
| 8/3 | | -1.75 | +1.25 | +1.50 | +1.25 | +1.25 | +8 | | | 8 | 24 | 11.0 | -1.75 | 14.25 |
| 8/10 | | -3 | -2.75 | +1.50 | +1.25 | | | | | 8 | 24 | +2.50 | -5.75 | 11 |
| 8/17 | | -8 | V-8 | V-8 | V-8 | S-8 | -8 | | -24 | 0 | 0 | | -8 | 3 |
| 8/24 | | | | | | | | | | 0 | 0 | | | 3 |
| 8/31 | | H | +.50 | +1.50 | +1.50 | V-8 | +8/-8 | | -8/+8 | 8 | 0 | 3.50 | | 6.50 |
| 9/7 | | S-8 | +1.50 | -3 | +1.60 | | -8 | | | 0 | 0 | +3 | -3 | 6.50 |
| 9/14 | | -3 | +1.50 | -3.25 | +1.50 | +1.50 | | | | 0 | 0 | 4.50 | -16.25 | 4.75 |
| 9/21 | | -4 | | +1 | | | | | +8 | 0 | 0 | | -4 | .75 |
| 9/28 | | | | | | | +8 | | +8 | 8 | 0 | +1.50 | | 2.25 |
| 10/5 | | | | | | | | | | 8 | 0 | | | 2.25 |
| 10/12 | | H | | | | | | | | 8 | 0 | | | 2.25 |
| 10/19 | | | | | | | | | | 8 | 0 | | | 2.25 |
| 10/26 | | -2.25 | +1 | V-8 | V-8 | VH | -8/+8 | | +8/-8 | 8 | 0 | +1 | -2.25 | |
| 11/2 | | S-8 | +.25 | -1/V-8 | | | -8 | | +8/-8 | 0 | 0 | +1.25 | | 1.25 |
| 11/9 | | H | +1 | +1/V-8 | +1 | | | | | 0 | 0 | +3 | | 4.25 |
| 11/16 | | +1 | +1.25 | +1/H | H | | -8 | | -8 | 8 | 0 | +2.25 | | 6.50 |
| 11/23 | | +1 | +1 | +1/H | H | H | +8 | | +8 | 8 | 0 | +2 | | 8.50 |
| 11/30 | | -3 | -4.50 | -1/1.50 | +1 | | +8 | | | 8 | 0 | +2 | -3 | 7.50 |
| 12/7 | | +1 | | -1/1.50 | +1/V-8 | | -8 | | -8 | 8 | 0 | +2 | -6 | 3.50 |
| 12/14 | | | | | | | | | | 8 | 0 | | | 6.50 |
| 12/21 | | | | H | V-8 | S-8 | -8/+8 | | -8/+8 | 8 | 0 | +3 | | 6.50 |
| 12/28 | | +1 | -2 | H | V-8 | S-8/S-8 | -8/+8/-8 | | +8/-8 | 0 | 0 | +1 | -2 | 5.50 |

2019 Attendance
District Attorney, 10th Judicial Circuit

DA000128

**Jackson, Tamika**

| | |
|---|---|
| **From:** | District Attorney's HR System <filemaker@jccal.org> |
| **Sent:** | Wednesday, August 14, 2019 9:51 AM |
| **To:** | lanitramckinney@yahoo.com |
| **Cc:** | Jackson, Tamika; Hardy, Dionne R. |
| **Subject:** | Nitra Jeter – Approval/Authorization Notice |

Nitra,


The listed request has been approved/authorized by  yatesj on  8/14/2019


Approved   8/23/2019   8.00    002 SICK–EMPLOYEE



DA000144

**Jackson, Tamika**

| | |
|---|---|
| **From:** | District Attorney's HR System <filemaker@jccal.org> |
| **Sent:** | Wednesday, August 14, 2019 9:51 AM |
| **To:** | lanitramckinney@yahoo.com |
| **Cc:** | Jackson, Tamika; Hardy, Dionne R. |
| **Subject:** | Nitra Jeter – Approval/Authorization Notice |

**Nitra,**

**The listed request has been approved/authorized by  yatesj on  8/14/2019**

**Approved   8/22/2019   8.00    001 VACATION**

1

DA000145

**Jackson, Tamika**

| | |
|---|---|
| **From:** | District Attorney's HR System <filemaker@jccal.org> |
| **Sent:** | Wednesday, August 14, 2019 9:51 AM |
| **To:** | lanitramckinney@yahoo.com |
| **Cc:** | Jackson, Tamika; Hardy, Dionne R. |
| **Subject:** | Nitra Jeter - Approval/Authorization Notice |

Nitra,

The listed request has been approved/authorized by yatesj on 8/14/2019

Approved  8/21/2019  8.00   001 VACATION

1

DA000146

**Jackson, Tamika**

| | |
|---|---|
| **From:** | District Attorney's HR System <filemaker@jccal.org> |
| **Sent:** | Wednesday, August 14, 2019 9:50 AM |
| **To:** | lanitramckinney@yahoo.com |
| **Cc:** | Jackson, Tamika; Hardy, Dionne R. |
| **Subject:** | Nitra Jeter - Approval/Authorization Notice |

Nitra,

The listed request has been approved/authorized by  yatesj on  8/14/2019

Approved   8/20/2019   8.00    001 VACATION

1

DA000147

**Jackson, Tamika**

| | |
|---|---|
| **From:** | District Attorney's HR System <filemaker@jccal.org> |
| **Sent:** | Wednesday, August 14, 2019 9:50 AM |
| **To:** | lanitramckinney@yahoo.com |
| **Cc:** | Jackson, Tamika; Hardy, Dionne R. |
| **Subject:** | Nitra Jeter - Approval/Authorization Notice |

Nitra,

The listed request has been approved/authorized by  yatesj on  8/14/2019

Approved   8/19/2019   8.00    016 COMP TIME USED

1

DA000148

**Jackson, Tamika**

| | |
|---|---|
| **From:** | District Attorney's HR System <filemaker@jccal.org> |
| **Sent:** | Wednesday, August 14, 2019 3:10 PM |
| **To:** | lanitramckinney@yahoo.com |
| **Cc:** | Jackson, Tamika; Hardy, Dionne R. |
| **Subject:** | Nitra Jeter - Approval/Authorization Notice |

Nitra,

The listed request has been approved/authorized by  yatesj  on  8/14/2019

Approved   8/13/2019   2.75    016 COMP TIME USED   Didn't feel well

DA000150

1

**Jackson, Tamika**

| | |
|---|---|
| **From:** | District Attorney's HR System <filemaker@jccal.org> |
| **Sent:** | Monday, August 12, 2019 11:35 AM |
| **To:** | lanitramckinney@yahoo.com |
| **Cc:** | Jackson, Tamika; Hardy, Dionne R. |
| **Subject:** | Nitra Jeter – Approval/Authorization Notice |

Nitra,

The listed request has been approved/authorized by  yatesj on  8/12/2019

Approved   8/12/2019   3.00   016 COMP TIME USED   Don't feel very well

1

DA000151

**Jackson, Tamika**

| | |
|---|---|
| **From:** | District Attorney's HR System <filemaker@jccal.org> |
| **Sent:** | Thursday, July 18, 2019 12:17 PM |
| **To:** | lanitramckinney@yahoo.com |
| **Cc:** | Jackson, Tamika; Hardy, Dionne R. |
| **Subject:** | Nitra Jeter - Approval/Authorization Notice |

Nitra,

The listed request has been approved/authorized by  yatesj on  7/18/2019

Approved   7/18/2019   2.75    016 COMP TIME USED

1

DA000157

**Jackson, Tamika**

| | |
|---|---|
| **From:** | District Attorney's HR System <filemaker@jccal.org> |
| **Sent:** | Thursday, January 02, 2020 12:15 PM |
| **To:** | lanitramckinney@yahoo.com |
| **Cc:** | Jackson, Tamika; Hardy, Dionne R. |
| **Subject:** | Nitra Jeter - Approval/Authorization Notice |

Nitra,

The listed request has been approved/authorized by  yatesj on  1/2/2020

Approved   1/9/2020   4.00   016 COMP TIME USED

1

DA000161

**Jackson, Tamika**

| | |
|---|---|
| **From:** | District Attorney's HR System <filemaker@jccal.org> |
| **Sent:** | Tuesday, December 03, 2019 11:29 AM |
| **To:** | lanitramckinney@yahoo.com |
| **Cc:** | Jackson, Tamika; Hardy, Dionne R. |
| **Subject:** | Nitra Jeter - Approval/Authorization Notice |

Nitra,

The listed request has been approved/authorized by yatesj on 12/3/2019

Approved  12/27/2019  8.00  002 SICK–EMPLOYEE  Christmas vacation

1

DA000164

## Jackson, Tamika

| | |
|---|---|
| **From:** | District Attorney's HR System <filemaker@jccal.org> |
| **Sent:** | Tuesday, November 19, 2019 4:06 PM |
| **To:** | lanitramckinney@yahoo.com |
| **Cc:** | Jackson, Tamika; Hardy, Dionne R. |
| **Subject:** | Nitra Jeter - Approval/Authorization Notice |

Nitra,


The listed request has been approved/authorized by yatesj on 11/19/2019



Approved  11/20/2019  8.00   001 VACATION   Driving to Atlanta to sign lease agreement for son

1

DA000172

**Jackson, Tamika**

| | |
|---|---|
| **From:** | District Attorney's HR System <filemaker@jccal.org> |
| **Sent:** | Tuesday, October 29, 2019 3:39 PM |
| **To:** | lanitramckinney@yahoo.com |
| **Cc:** | Jackson, Tamika; Hardy, Dionne R. |
| **Subject:** | Nitra Jeter - Approval/Authorization Notice |

Nitra,

The listed request has been approved/authorized by  yatesj on  10/29/2019

Approved   11/1/2019   8.00    019 VAR HOLIDAY   Recovering from surgery

1

DA000177

**Jackson, Tamika**

| | |
|---|---|
| **From:** | District Attorney's HR System <filemaker@jccal.org> |
| **Sent:** | Tuesday, October 29, 2019 3:39 PM |
| **To:** | lanitramckinney@yahoo.com |
| **Cc:** | Jackson, Tamika; Hardy, Dionne R. |
| **Subject:** | Nitra Jeter - Approval/Authorization Notice |

Nitra,

The listed request has been approved/authorized by  yatesj on  10/29/2019

Approved   10/31/2019   8.00   001 VACATION   Surgery Date

1

DA000178

ckson, Tamika

From:      District Attorney's HR System <filemaker@jccal.org>
Sent:      Monday, October 28, 2019 11:34 AM
To:      lanitramckinney@yahoo.com
Cc:      Jackson, Tamika; Hardy, Dionne R.
Subject:      Nitra Jeter - Approval/Authorization Notice

Nitra,

The listed request has been approved/authorized by yatesj on 10/28/2019

Approved  10/28/2019  2.25  016 COMP TIME USED  Don't feel well, in pain.

DA000179

1