

# EXHIBIT E

Page 1

1      IN THE UNITED STATES DISTRICT COURT FOR THE

2             NORTHERN DISTRICT OF ALABAMA

3                 SOUTHERN DIVISION

4

5   CIVIL ACTION NO.:  2:20-CV-01863-ACA

6

7   LANITRA JETER,

8                 Plaintiff,

9   vs.

10  DANNY CARR, in his official

11  capacity as District Attorney

12  of Jefferson County,

13                 Defendant.

14

15

16                 DEPOSITION

17                    OF

18                JOE ROBERTS

19              February 3, 2022

20

21

    REPORTED BY:

22         Ellie Pickett,

           Certified Court Reporter and

23         Notary Public

Page 2

1       A P P E A R A N C E S
2
3   FOR THE PLAINTIFF:
4       Mr. Artur Davis
5       Attorney at Law
6       HKM Employment Attorneys
7       3355 Lenox Road NE
8       Atlanta, Georgia 30326
9
10  FOR THE DEFENDANT:
11      Mr. James E. Murrill, Jr.
12      Mr. Robert R. Riley, Jr.
13      Attorneys at Law
14      Riley & Jackson, P.C.
15      3530 Independence Drive
16      Birmingham, Alabama 35209
17
18  OTHERS PRESENT:
19      LaNitra Jeter
20
21
22
23

Page 4

1        INDEX OF EXHIBITS (Continuing)
2
3                        PAGE:
4   Plaintiff's Exhibit 15        71
5   Plaintiff's Exhibit 18        44
6   Plaintiff's Exhibit 19        22
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 3

1        INDEX OF EXAMINATION
2
3                        PAGE:
4   EXAMINATION BY MR. DAVIS        7
5
6            INDEX OF EXHIBITS
7
8   PLAINTIFF'S               PAGE:
9   Exhibit 26                47
10
11
12       The following exhibits, having been
13  previously marked for identification in the
14  deposition of Danny Carr and/or Judy Yates,
15   were referenced in this deposition:
16
17                        PAGE:
18  Plaintiff's Exhibit 3         27
19  Plaintiff's Exhibit 7         68
20  Plaintiff's Exhibit 10        71
21  Plaintiff's Exhibit 11        71
22  Plaintiff's Exhibit 12        71
23

Page 5

1          S T I P U L A T I O N
2          IT IS STIPULATED AND AGREED, by
3   and between the parties, through their
4   respective counsel, that the deposition of JOE
5   ROBERTS may be taken before Ellie Pickett,
6   Commissioner, Certified Court Reporter and
7   Notary Public;
8          That the signature to and reading
9   of the deposition by the witness is waived, the
10  deposition to have the same force and effect as
11  if full compliance had been had with all laws
12  and rules of Court relating to the taking of
13  depositions;
14          That it shall not be necessary for
15  any objections to be made by counsel to any
16  questions, except as to form or leading
17  questions, and that counsel for the parties may
18  make objections and assign grounds at the time
19  of trial, or at the time said deposition is
20  offered in evidence, or prior thereto.
21
22
23

2 (Pages 2 - 5)

Page 6

1          I, Ellie Pickett, a Certified
2  Court Reporter of Birmingham, Alabama, and a
3  Notary Public for the State of Alabama at
4  Large, acting as Commissioner, certify that on
5  this date, as provided by the Federal Rules of
6  Civil Procedure of the United States District
7  Court, and the foregoing stipulation of
8  counsel, there came before me at the law
9  offices of Riley & Jackson, P.C., 3530
10 Independence Drive, Birmingham, Alabama 35209,
11 on February 3, 2022, commencing at
12 approximately 3:12 p.m., JOE ROBERTS, witness
13 in the above cause, for oral examination,
14 whereupon the following proceedings were had:
15
16          JOE ROBERTS,
17       The witness, having first been
18 duly sworn or affirmed to speak the truth, the
19 whole truth and nothing but the truth,
20 testified as follows:
21
22       THE COURT REPORTER:  Usual
23 stipulations?

Page 7

1          MR. MURRILL:  That's fine.
2          MR. DAVIS:  Yes.
3
4  EXAMINATION BY MR. DAVIS:
5       Q.  Sir, you are Joe Roberts; is that
6  correct?
7       A.  Correct.
8       Q.  Would you give your full middle
9  name and last name?
10      A.  Joe Lester Roberts.
11      Q.  And may I ask your date of birth,
12 Mr. Roberts?
13      A.  November 26th of 1970.
14      Q.  Mr. Roberts, you are currently the
15 chief deputy --
16          (Weather alert interruption.)
17          (Whereupon, a break was had from
18       3:12 p.m. until 3:21 p.m.)
19          MR. DAVIS:  Mr. Roberts, let's go
20 back on the record.  And just so we have all
21 this on the record, we are under a tornado
22 warning at this point.  We have attempted to
23 determine by the power of television and social

Page 8

1  media exactly what's going on, and we have
2  agreed in our off-the-record conversation that
3  there are people in this building and in this
4  office who are monitoring on television the
5  weather reports.  So we have agreed that we are
6  going to proceed, unless we get a notice that
7  we are in an imminent strike zone.
8          MR. RILEY:  Off the record.
9          (Off-the-record discussion.)
10      Q.  (BY MR. DAVIS:)  Mr. Roberts, if
11 you are comfortable, we are going to proceed.
12 And obviously if at some point we have a change
13 in the weather, we will take that into account.
14 Are you comfortable proceeding?
15      A.  Yes.
16      Q.  Mr. Roberts, we had literally, I
17 think, just gotten to the very beginning phases
18 where I had asked you your name and your date
19 of birth.  You are the chief deputy DA in
20 Jefferson County; is that correct?
21      A.  Yes.
22      Q.  How long have you been the chief
23 deputy DA?

Page 9

1       A.  Officially since November of 2018.
2  Danny served as the interim DA for a year
3  before that and I was in the chief deputy spot,
4  but officially when he was -- in November of
5  2018.
6       Q.  How long have you worked for the
7  Jefferson County DA's office?
8       A.  Since June of 2000.
9       Q.  Based on your age and the
10 longevity of your time in the DA's office, it
11 sounds like the overwhelming majority of your
12 legal career has been spent on the criminal
13 side; is that right?
14      A.  Yes.
15      Q.  Do you have any civil experience
16 at all?
17      A.  Very little.  About six months I
18 worked with a firm here in Birmingham while I
19 was trying to figure out what I wanted to do,
20 but yes, for just a short period of time.
21      Q.  Do you consider yourself to have
22 any knowledge of federal employment law?
23      A.  No.

3 (Pages 6 - 9)

1    Q.   Do you consider yourself to have
2 any knowledge of federal law regarding the
3 civil rights statutes?
4    A.   Not specifically, no.
5    Q.   Do you consider yourself to have
6 any particular knowledge of the parts of the
7 civil rights statutes that deal with the
8 concept of retaliation?
9    A.   Nothing more than just general
10 knowledge, not specific, no.
11    Q.   Nothing more than don't retaliate,
12 correct?
13    A.   Correct.  I mean, we -- we have
14 training that we go through in our office and
15 they reference federal law in regard to
16 employment, you know, the county has us
17 participate.  So, again, I'm -- I've heard of
18 it and I'm aware of it.  But as far as
19 specifically, I've never practiced in that area
20 specifically, so nothing beyond that.
21    Q.   How would you describe your job as
22 chief deputy DA?
23    A.   I'm the second in command at the

1 DA's office, so I assist Danny in running the
2 office.  I serve as kind of the supervisor over
3 our supervisors.  We have deputy district
4 attorneys who have -- all have a supervisor,
5 and then I'm kind of the supervisor over those
6 supervisors.  And I also serve as kind of the
7 supervisor to the support staff supervisor as
8 well as the victim services officers
9 supervisor.  So, I mean, at the chain of
10 command, it all kind of comes up, you know, to
11 me right below Danny.
12    Q.   Do you have any role or
13 responsibility for dealing with conflict
14 between employees that may arise in the DA's
15 office?
16    A.   Occasionally.  We try to let that
17 be handled on a lower level with the
18 supervisors that are in place, but yes, it does
19 come to me occasionally, I will be involved.
20    Q.   Is any part of your role, as you
21 understand it, related to investigating or
22 overseeing the office's response to
23 discrimination complaints?

1    A.   Definitely not investigating.  We
2 have only had one discrimination complaint
3 since we've been in the district attorney and
4 chief deputy district attorney position.
5    Q.   The "we" is you and Mr. Carr you
6 are referring to?
7    A.   Yes.  So yeah, at that point
8 obviously something of that nature would be
9 forwarded to Danny and I to look at and decide
10 what the next steps are.
11    Q.   If an employee made a complaint
12 about how their supervisor was treating them --
13 let's put discrimination aside for a moment.
14 In any context, if an employee made a complaint
15 about how their supervisor was treating them,
16 what is the process in the DA's office for
17 handling such a complaint?
18    A.   If it was a complaint about their
19 supervisor, then they could come directly to
20 me.  I would discuss that with them and would
21 most likely then discuss that with their
22 supervisor and just try to see if it's
23 something we can resolve.

1    Q.   Over the course of the four years
2 that you have been deputy DA for Danny Carr,
3 how many instances have you become aware of
4 employees complaining about unfair treatment by
5 their supervisor?  Just give me a ballpark.
6    A.   I'm not aware of any.
7    Q.   And my next question, your answer
8 might flow out of the answer that you just
9 gave, but I'll still ask it.  In the past four
10 years where you have been deputy DA and
11 Mr. Carr has been DA, do you have any knowledge
12 of employees other than LaNitra Jeter making a
13 complaint of discrimination against their
14 supervisor?
15    A.   No.
16    Q.   If there is a issue that develops
17 in the office around whether an employee should
18 be terminated, do you have any responsibility
19 in that termination process?
20    A.   I would typically be involved.  I
21 don't know about a responsibility; in other
22 words, it's ultimately Danny's decision and
23 his -- his -- you know, so he could leave me

4 (Pages 10 - 13)

Page 14

1 out of it if he chose to, but typically I would
2 be involved just because of the way our office
3 is structured with chain of command, usually
4 I'm aware of what's going on before Danny is
5 aware. So yes, you know, I typically will know
6 what is going on. But as far as
7 responsibilities, I mean, you know, I'll offer
8 to discuss or give my opinion, but, I mean,
9 ultimately it's up to Danny. I don't know that
10 I have any specific responsibilities.
11     Q.   Mr. Carr or DA Carr testified
12 yesterday during his deposition that he
13 believes there have been four or five
14 terminations or firings that have happened
15 since he has become DA. Does that sound about
16 right to you?
17     A.   That sounds about right.
18     Q.   And that's including LaNitra
19 Jeter. Does that still sound about right?
20     A.   Yes.
21     Q.   Have you been involved in some
22 shape or form in the decision-making process
23 for all four or five?

Page 15

1     A.   Yes.
2     Q.   And what has been your
3 involvement?
4     A.   Again, just due to the fact that
5 most of the time I was aware of the issues that
6 were going on with the employees, people would
7 come to me and then I would discuss it with
8 Danny. I know I was present on a couple of the
9 occasions, not all of the occasions, but there
10 were certainly discussions between Mr. Carr and
11 I. That's kind of been my role just as the
12 second in command that, you know, I'm typically
13 aware of what's going on in those situations
14 and discuss it with him, but that's -- I guess
15 that's kind of about it.
16     Q.   Is it fair to say that when
17 Mr. Carr has made termination decisions that he
18 has sought out your opinion as to what he
19 should do?
20     A.   Yes.
21     Q.   Is it fair to say when Mr. Carr
22 has made termination decisions that he has
23 asked you to gather information that may be

Page 16

1 relevant to what he should do?
2     A.   I don't agree with that actually.
3 That -- that's typically not the way it
4 happens. He doesn't say here, go do this or
5 get me that. He -- no, I don't recall that
6 happening.
7     Q.   And that's with respect to any of
8 the four or five?
9     A.   Anything, no.
10     Q.   Before we get to Ms. Jeter, I do
11 want to talk about process a little bit more.
12     A.   Okay.
13     Q.   If a rank-and-file employee feels
14 that he or she is the target of discrimination
15 by a supervisor, what process should that
16 employee follow?
17     A.   They would come to me because,
18 like I said, I am kind of over the supervisors.
19 So if the issue is with their direct
20 supervisor, you basically just skip that line
21 in the chain of command, which would be me.
22     Q.   And that makes sense because if
23 I'm complaining about somebody, it's not going

Page 17

1 to be too effective --
2     A.   Exactly.
3     Q.   -- for me to go to them, correct?
4     A.   Exactly.
5         MR. MURRILL: And let him finish
6 his question before you answer.
7         THE DEPONENT: Yeah.
8     Q.   (BY MR. DAVIS:) Just one point of
9 ground rules, because of your lawyerly
10 experience, I didn't spend as much time on that
11 as I did with Ms. Yates.
12     A.   Sure.
13     Q.   But the one thing that we have to
14 not do for our reporter's sake today is to
15 speak at the same time.
16     A.   Sure.
17     Q.   And I know it can happen
18 inadvertently, I know in normal conversation we
19 don't worry about that, but her task is to
20 capture every word that is spoken by any of us
21 lawyers who are in this room and the witness.
22 So if you and I both speak at the same time,
23 she has to write both of them down, which

Page 18

1 creates a bunch of staccato of broken sentences
2 that make us look semi-illiterate. So I would
3 ask you even if it's a hundred percent clear
4 what I'm asking, even if you are agreeing as
5 you are nodding your head right now, if you
6 would wait for me to put the inflection of a
7 question mark at the end before you answer, I
8 would appreciate it.
9     A.   Okay.
10    Q.   And similarly, if I can tell that
11 you've finished an answer, I will give you an
12 opportunity to do so without interrupting you.
13 Is that a fair set of ground rules?
14    A.   Yes.
15    Q.   And if for some reason it's not
16 clear to me that verbally you've finished an
17 answer, I'm happy to have you to tell me I'm
18 not finished or I would like to add something
19 to that. Fair enough?
20    A.   Fair.
21    Q.   So, Mr. Roberts, is there a
22 written policy in place at the DA's office for
23 how discrimination complaints are handled?

Page 19

1     A.   No.
2     Q.   Is there a written policy in place
3 that's disseminated to employees that tells
4 them that they can go to you if they have an
5 issue with their supervisor discriminating
6 against them?
7     A.   No.
8     Q.   And you mentioned that you have
9 participated in briefing sessions in the DA's
10 office that broadly deal with the question of
11 employment law. Have those been senior level
12 meetings just held for supervisors?
13    A.   Yes.
14    Q.   They are not meetings broadly held
15 for rank-and-file employees, correct?
16    A.   Correct.
17    Q.   Is it correct that the DA's office
18 does not sponsor briefings for employees about
19 what to do if you feel you have been a victim
20 of discrimination?
21    A.   Not since 2018 have we done that,
22 no.
23    Q.   Did you do it before 2018?

Page 20

1     A.   I know I've been to a training
2 before, I don't know if it was specifically
3 about discrimination, but I know we had one
4 about sexual harassment in kind of following
5 the correct procedure. But that was years ago,
6 but not recently, no.
7     Q.   Okay. Fair enough.
8          So let me transition to some of
9 the facts relevant to this case. When did you
10 first become aware that there was an employee
11 in the victim services office called LaNitra
12 Jeter?
13    A.   Pretty close to the time she was
14 hired. Judy Yates discussed the fact that she
15 was hiring her with me and then that she was in
16 fact hired, so immediately.
17    Q.   And that would have just been in
18 the course of your being informed about
19 personnel in the office, correct?
20    A.   Correct.
21    Q.   And you are essentially informed
22 at some level about all personnel hires that
23 happen in the office, correct?

Page 21

1     A.   Yes.
2     Q.   Let me talk about the first six
3 months of Ms. Jeter's employment. I'll
4 represent to you there has been testimony that
5 she was hired in April 2020 by -- I assume you
6 don't dispute that or challenge that in any
7 way?
8     A.   No.
9     Q.   Between April 2019, I'm sorry,
10 between April 2000 -- between April 2019 and
11 September 2019, let's focus just on that
12 six-month timeframe. Fair enough?
13    A.   Yes.
14    Q.   In that six-month timeframe
15 between April 2019 and September 2019, do you
16 recall Judy Yates expressing a concern to you
17 or any concern to you as to whether LaNitra
18 Jeter was a fit employee for the DA's office?
19    A.   I don't recall when the first time
20 she came to me to report an issue or a problem.
21    Q.   At some point Ms. Yates came to
22 you and reported that she had concerns about
23 Ms. Jeter. Is that fair?

Page 22

1    A.   Yes.
2    Q.   But you don't recall specifically
3 when that happened?
4    A.   I don't.
5    Q.   Do you think it was in the first
6 month of Ms. Jeter's tenure?
7    A.   I don't recall.
8    Q.   So really no recollection of
9 timeframe at all?
10    A.   I don't.
11    Q.   I'm going to show you a memo that
12 was written to you that is Exhibit Number 19.
13 And I'll represent to you that it's a memo from
14 Judy Yates to you and Mr. Carr.  Tell me if you
15 remember Plaintiff's Exhibit Number 19.
16        (Whereupon, Plaintiff's Exhibit
17         19, having been previously marked
18         for identification in the
19         deposition of Judy Yates, was
20         referenced in this deposition.)
21    A.   I recognize it.
22    Q.   What is the date on it?
23    A.   September the 19th of 2019.

Page 23

1    Q.   You say you recognize it.  Do you
2 remember getting the memo?
3    A.   I don't.
4    Q.   Take a moment and just read the
5 memo and when you are ready to answer questions
6 about it, you let me know.
7    A.   (Reviewing document.)  Yes.
8    Q.   Let me have the document back,
9 Mr. Roberts.
10        Would you agree with me that this
11 is a memo from Judy Yates that discusses an
12 incident involving LaNitra Jeter and an
13 individual during court mediation?
14    A.   Yes.
15    Q.   Did Ms. Yates ask you to take any
16 action based on the incident she describes in
17 the memo written on September 19th?
18    A.   No.
19    Q.   Did you take any action based on
20 the incident described in the memo written on
21 September 19th?
22    A.   I talked to Danny about it.
23    Q.   What did you say to Danny?

Page 24

1    A.   Just told him about what occurred.
2    Q.   And what you would have told Danny
3 would have been derived solely from the memo
4 that Ms. Yates wrote to you, correct?
5    A.   My memory was a discussion with
6 Ms. Yates.  That's what I remember was being
7 told, and then -- and I don't recall this, but
8 typically, if somebody tells me a story that
9 involves that much, I'll say can you put that
10 in a memo.  But as far as my memory, I remember
11 talking to her about it.
12    Q.   But you think, based on your
13 practice and experience, that it's likely that
14 you had a conversation with Ms. Yates and you
15 then asked her to reduce the conversation to a
16 memo, correct?
17    A.   Yes, based on normal practice.
18    Q.   And you have no reason to think
19 you didn't follow that normal practice here?
20    A.   No.
21    Q.   What was your purpose in
22 discussing the incident that is described in
23 the September 19th memo with Danny Carr?

Page 25

1    A.   I felt like it was serious enough
2 to where Danny needed to know about it.
3    Q.   Do you agree with me that the
4 incident that's described here is not an
5 incident involving Ms. Jeter's work as a VSO?
6    A.   Technically I agree with that,
7 yes.
8    Q.   And do you agree with me that
9 there's nothing that's described here that
10 relates to a victim in Jefferson County who
11 would be under Ms. Jeter's supervision or
12 engagement?
13    A.   I agree with that.
14    Q.   Do you remember what you said to
15 Danny Carr about this incident that's captured
16 in this memo?
17    A.   No.
18    Q.   Do you remember what he said to
19 you?
20    A.   No.  I just know we discussed it.
21    Q.   Is it fair to say that he did not
22 tell you to take any steps or to take any
23 actions after reading the memo written on

Page 26

1 September 19th?
2    A.   I don't recall him telling me to
3 do anything in regard to that conversation.
4    Q.   And do you have any recollection
5 of you saying to Judy Yates that we need to
6 monitor this employee more closely or we need
7 to watch this employee more closely or any
8 permutation of that?
9    A.   No.
10    Q.   Did you tell Judy Yates that this
11 employee needs to be written up or disciplined
12 for the incident described in the September
13 19th memo?
14    A.   No.
15    Q.   Did you tell Judy Yates that the
16 employee needs to be suspended or put on leave
17 for the incident written up in the September
18 19th memo?
19    A.   No.
20    Q.   Did you talk with Ms. Jeter about
21 the incident in the September 19th memo?
22    A.   No.
23    Q.   Did you ask Ms. Jeter to submit a

Page 27

1 written statement about the incident in the
2 September 19th memo?
3    A.   I did not.
4    Q.   I'm going to show you another
5 document that is Plaintiff's Exhibit Number 3,
6 and I'll represent to you that it's a memo from
7 Judy Yates once again to you and to Mr. Carr.
8 Just look at this document which is dated
9 September 30th and tell me if you remember
10 seeing that document.
11         (Whereupon, Plaintiff's Exhibit 3,
12         having been previously marked for
13         identification in the deposition
14         of Danny Carr, was referenced in
15         this deposition.)
16    A.   I recognize it, yes.
17    Q.   And just take a moment and look at
18 it and tell me if not only do you recognize the
19 document, do you remember the incidents
20 described and do you remember discussing the
21 incidents described in it?
22    A.   I remember having a conversation
23 with Judy about the incidents described in the

Page 28

1 memo, yes.
2    Q.   And the date again is September
3 30th in this memo?
4    A.   Correct.
5    Q.   Did you ask for this memo to be
6 written or generated?
7    A.   I don't recall specifically asking
8 it to be generated.  But again, in normal
9 practice, if somebody comes and tells me
10 verbally this much information, that oftentimes
11 I'll tell them can you put that in a memo.
12    Q.   So I want to focus on the dates.
13 Do you agree with me that the two dates
14 described in the September 30th memo are
15 meetings on September 23rd and September 25th?
16    A.   Yes.
17    Q.   But you agree the memo is written
18 five days after September 25th, correct?
19    A.   That's what the memo says.
20    Q.   Do you have any recollection of
21 learning in September 2019 that LaNitra Jeter
22 met with Danny Carr?
23    A.   No.

Page 29

1    Q.   And just so I'm clear, are you
2 saying that you emphatically know that such a
3 meeting did not happen or that you don't recall
4 hearing or learning about a meeting?  Which one
5 are you saying?
6    A.   I know I never heard about the
7 meeting.  As far as knowing that it didn't
8 happen, I don't know that it didn't happen but
9 I don't expect that it happened.  Because if it
10 would have happened, I expect Danny would have
11 told me about it.  But as far as, I mean, how
12 can I say that no, for sure it didn't happen,
13 but I know no one ever told me that it
14 happened.
15    Q.   Do you have access to what
16 Mr. Carr's schedule as chief deputy DA?
17    A.   No.
18    Q.   Was it your practice to ever
19 monitor or review his schedule to see if he
20 might need you to be present during a meeting
21 or if there might be something you needed to
22 handle because of how busy he was?
23    A.   No.

Page 30

1    Q.   So as a general practice, you
2 would not have monitored his schedule, correct?
3    A.   No.
4    Q.   In fact, would you have even had
5 access to his schedule?
6    A.   No.
7    Q.   Who would have handled his
8 schedule?
9    A.   April Smith, his executive
10 assistant.
11    Q.   And in September 2019, do you know
12 of any policy in place in the DA's office that
13 would have prevented a rank-and-file employee
14 from meeting with Danny Carr?
15    A.   Typically the chain of command is
16 communicated to our employees that they are to
17 follow their chain of command.  So that -- it's
18 really -- especially for support staff, that's
19 not supposed to happen, in other words, a
20 nonattorney should not just go meet with Danny.
21 So it's not supposed to happen.
22    Q.   Does it happen sometimes?
23    A.   I don't know if it actually

Page 31

1 happens.  I know it's been tried, people have
2 tried to do it before, but, you know, that's
3 kind of what April does is she's a buffer
4 between the public, between employees and
5 Danny, so everybody is kind of funneled to her.
6 So I don't know that it's actually ever
7 happened, but I know that people have tried to
8 go directly to him before, and I don't know if
9 it was successful or not.
10    Q.   You wouldn't know one way or
11 another because you don't monitor his schedule
12 and you wouldn't expect him to talk about every
13 conversation he's had, correct?
14    A.   I would expect him to talk about
15 that conversation with me because, like we
16 talked about before, you know, those decisions
17 I'm involved in, we discuss.  If Danny and I
18 are talking about everything that's in those
19 memos and then he met with LaNitra, there is no
20 way that he wouldn't have said hey, let me fill
21 you in on this meeting.  So that's why I say I
22 don't believe it happened.
23    Q.   What about the opposite scenario

Page 32

1 in which LaNitra Jeter meets with Danny Carr
2 before these memos are sent to Danny Carr, so
3 specifically the September 30th memo, if
4 LaNitra Jeter hypothetically had met with Danny
5 Carr prior to the September 30th memo, he
6 wouldn't have had any way of knowing the
7 context of the meeting, correct?
8    A.   Are you saying after the September
9 the 19th memo but before the September the 30th
10 memo?
11    Q.   Well, that was actually going to
12 be my next question.  So if you would like to
13 answer that, that's fine.
14    A.   Yeah.  I mean, I -- if Danny knows
15 about this (indicating), the September --
16    Q.   This being the September 19th.
17    A.   -- 19th, 2019, and then she met
18 with him, yes, he would have told me.
19    Q.   Let me see the September 19th memo
20 again.  Do you know whether or not Danny Carr
21 read or paid attention to the September 19th
22 e-mail?
23    A.   I have no way of knowing that, no.

Page 33

1    Q.   He gets a lot of e-mails, doesn't
2 he?
3    A.   Now, that was a memo.  I believe
4 that was an actual paper memo that was handled.
5    Q.   Why do you believe that?
6    A.   Because I think we went through
7 all our e-mails and I never saw those memos in
8 an e-mail.
9    Q.   So you believe the September 19th
10 memo and September 30th memo were
11 hand-delivered to Danny Carr?
12    A.   Well, to me.  I'm talking about
13 the ones -- those (indicating), the ones that
14 have my name on it, it was not an e-mail.  It
15 was a hand delivery.
16    Q.   They have your name and have his
17 name?
18    A.   Right.
19    Q.   So I'm asking if you believe they
20 were hand-delivered to Carr?
21    A.   I do.
22    Q.   Who would have hand-delivered
23 them?

9 (Pages 30 - 33)

Page 34

1    A.   Judy.
2    Q.   So Judy Yates would have had
3 direct access to hand-deliver a memo to Danny
4 Carr, correct?
5    A.   Yes.
6    Q.   And was there any barrier or any
7 chain of command that prevented Judy Yates from
8 interacting with Danny Carr?
9    A.   Without first interacting with me,
10 yes.  In other words, she would not have gone
11 to Danny with information about one of her
12 employees without talking to me.  So once we've
13 talked and I've spoken with Danny, then, you
14 know, he knows about it, then certainly she can
15 hand him a memo and he will know what she's
16 talking about, you know, because I let her
17 know, yes, I've talked to Danny about these
18 issues.
19    Q.   So with respect to the September
20 19th memo, you've said that you don't have any
21 real memory of what you and Carr talked about?
22    A.   I don't.
23    Q.   Do you remember when you talked

Page 35

1 with Carr about the September 19th memo?
2    A.   I don't.
3    Q.   Do you remember, in fact, if you
4 talked with Carr about the September 19th memo
5 before you talked with him about the September
6 30th memo?
7    A.   I'm sure I did.
8    Q.   Why?
9    A.   Because that's a long period of
10 time between those two memos.  I wouldn't --
11 that's something I would have spoken to him
12 about, if not immediately, as soon as possible.
13    Q.   When you say that, what are you
14 referring to?
15    A.   The September the 19th, 2019,
16 memo.  I would not have waited ten days to talk
17 with him about that first memo.
18    Q.   Fair enough.  Fair enough.
19         With respect to these two memos,
20 did you believe that LaNitra Jeter's
21 termination was in order?
22    A.   In September of 2019?
23    Q.   Yes.

Page 36

1    A.   I don't recall if I formed that
2 opinion on that date or not.  I -- I just don't
3 remember.
4    Q.   Do you have any recollection of
5 telling Danny Carr in or about late September,
6 early October 2019 that we need to look at
7 terminating LaNitra Jeter?
8    A.   No.
9    Q.   Do you have any recollection of
10 telling Judy Yates in late September, early
11 October 2019 that we need to look at
12 terminating LaNitra Jeter?
13    A.   No.
14    Q.   Any recollection of putting any
15 document in place or any memo in place that
16 would have expressed your belief that LaNitra
17 Jeter should be terminated as of late
18 September, early October 2019?
19    A.   No.
20    Q.   Let me ask you about something
21 that caught my attention on the September 30th
22 memo.  I want to read a sentence to you.  It
23 says Michael, and I'll tell you it's been

Page 37

1 testimony that it's Michael McCurry, chief
2 administrator.  Michael -- again, this is Yates
3 speaking -- Michael then discussed the problem
4 with her time, her being Jeter, explaining how
5 many weeks she has been here and how she had
6 only two weeks that she worked forty-hour weeks
7 and did not take time off.  She really could
8 not grasp that taking so much time in such a
9 short period of time was an issue and she just
10 kept wanting to know when she could begin
11 making comp time again.
12         Do you remember reading that
13 contemporaneously on September 30th, 2019, or
14 thereabouts?
15    A.   I don't remember reading it right
16 now, no, I don't.
17    Q.   If you -- do you remember -- and
18 just so we are clear, you did actually not just
19 get these memos, you read them and absorbed
20 them, correct?
21    A.   I remember having the
22 conversation.
23    Q.   But beyond the conversation, let

10 (Pages 34 - 37)

Page 38

1  me ask you this specific question, do you
2  remember reading and absorbing this memo
3  itself?
4      A.   No.
5      Q.   Do you remember if in the
6  conversation around September 30th if Judy
7  Yates made the statement that LaNitra Jeter had
8  only had two weeks where she worked forty-hour
9  weeks?
10     A.   I don't recall that specific
11  statement.  I know they talked about her comp
12  time and her attendance at work, but the
13  specifics, I don't recall.
14     Q.   Do you think it would stand out to
15  you if you heard that an employee had been
16  working for six months -- which is twenty-six
17  weeks, you agree?
18     A.   (Witness nods head affirmatively.)
19     Q.   You have to answer.
20     A.   Yes.
21     Q.   Do you think it would stand out if
22  you heard that an employee had worked for
23  twenty-six weeks and twenty-four of them had

Page 39

1  not done a full workweek, do you think that
2  would stand out to you?
3      A.   I'm sure it stood out at the time.
4  But you also have to understand as the chief
5  deputy, we have a hundred and twenty employees
6  and there's always issues going on with support
7  staff and DDAs, and, you know, it's constantly
8  things.  So yes, at the time, I'm sure, but I
9  mean I just don't remember it because a million
10  things happened since that time.
11     Q.   Understood.
12     A.   So I just don't recall.
13     Q.   So let's hone in on at the time
14  and how you likely would have reacted.
15     A.   Okay.
16     Q.   One way to measure whether an
17  employee had consistently failed to put in
18  forty-hour workweeks would be to look at their
19  attendance records.  Do you agree?
20     A.   Yes.
21     Q.   Do you agree that another way to
22  measure whether an employee had consistently
23  failed to put in forty-hour workweeks would be

Page 40

1  to look at the amount of leave submissions they
2  had submitted?
3      A.   Yes.  I think that could be a way
4  to determine that, yes.
5      Q.   And who is Tamika Jackson?
6      A.   She is one of our support staff
7  workers who deals with that -- that's one of
8  her jobs is dealing with -- I know she deals
9  with vacation time because that's what our DDAs
10  use her for.  I don't know if she's involved in
11  comp time as well.  Again, I don't know that
12  much about comp time, requesting it, taking it,
13  because the DDAs don't have comp time, so I
14  just don't deal with comp time as much, to be
15  honest with you.  I really don't have a lot of
16  knowledge about how that process works, so --
17     Q.   Well, you have, like a good
18  lawyer, nicely anticipated a whole battery of
19  questions I was coming to in about five
20  minutes, so let me put a pin in that, as they
21  say.  Do you have any recollection in September
22  or early October 2019 of pulling Ms. Jeter's
23  attendance records?

Page 41

1      A.   No.
2      Q.   Do you have any recollection in
3  September or October 2019 of pulling
4  Ms. Jeter's leave, comp, or vacation time
5  requests?
6      A.   No, I never did any of that.
7      Q.   And to pick up on the last thing
8  you said, not only did you not pull Jeter's
9  attendance records in September, October 2019,
10  is it fair to say that at no point while she
11  worked in the DA's office did you, Joe Roberts,
12  pull her attendance records?
13     A.   I did not, no.
14     Q.   And is it fair to say during the
15  whole time LaNitra Jeter worked in the DA's
16  office that at no time did you pull sheets or
17  documents inventorying her request for comp
18  time?
19     A.   I did not, no.
20     Q.   And is it fair to say that at no
21  point while she worked in the DA's office did
22  you pull documents inventorying or capturing in
23  any way her requests for sick leave time?

11 (Pages 38 - 41)

Page 42

1     A.    I did not.
2     Q.    Does the same go for vacation
3 time?
4     A.    Same.
5     Q.    And in that vein, do you have any
6 recollection of talking with anybody -- let me
7 back up.
8           Who or what section of the office
9 does Tamika Jackson work in?
10    A.    When you say -- what do you mean
11 by section?
12    Q.    Is she in a division?  What's her
13 job title?
14    A.    No.  I actually don't know her
15 exact job title.
16    Q.    Do you know who her supervisor is?
17    A.    Cheryl Lockhart.
18    Q.    Do you have any recollection of
19 discussing with Cheryl Lockhart any issues
20 around LaNitra Jeter's attendance while Jeter
21 worked in the DA's office?
22    A.    No.
23    Q.    Do you have any recollection of

Page 43

1 asking Lockhart to provide documents around
2 Jeter's attendance while Jeter worked in the
3 DA's office?
4     A.    I didn't, no.
5     Q.    And everything that you've just
6 said, do you believe that all of that applies
7 to Danny Carr as well, that he did not review
8 any of the documents that we've just talked
9 about?
10    A.    I don't know.
11    Q.    You have no reason to think he
12 did, do you?
13    A.    I really don't know.
14    Q.    Do you have any recollection of at
15 any point discussing with Carr any of the
16 documents we've just talked about?
17    A.    No, we did not.
18    Q.    Do you have any recollection of
19 Carr ever asking you to pull any of the
20 documents we've just talked about?
21    A.    He did not.
22    Q.    Do you have any recollection of
23 discussing with Yates any of the documents

Page 44

1 we've just talked about?
2     A.    I had discussions with Judy Yates
3 and Michael McCurry about those documents, yes,
4 but I never pulled any.
5     Q.    But based on those conversations,
6 you never proceeded to then review documents,
7 correct?
8     A.    I did not.
9     Q.    Let me show you another document
10 that is Plaintiff's Exhibit Number 18.  This is
11 not a document that is sent to you but let me
12 ask you in the course of your preparation for
13 this case if you have seen this before?
14          (Whereupon, Plaintiff's Exhibit
15          18, having been previously marked
16          for identification in the
17          deposition of Judy Yates, was
18          referenced in this deposition.)
19    A.    I have seen it.
20    Q.    Can you hand it back to me, sir?
21    A.    Do you mind if I look at it for
22 just a second?
23    Q.    Yes, absolutely.

Page 45

1     A.    (Reviewing document.)
2     Q.    Are you ready to talk about it?
3     A.    Yes.
4     Q.    I'm going to read the first
5 sentence, and in fairness, there is a sentence
6 that appears to stop and then the font changes
7 and starts again, so I'm going to ignore the
8 half sentence.  The first full sentence is,
9 quote -- and, again, this is a memo from Judy
10 Yates to file.  First full sentence, quote, Joe
11 had forward an e-mail Nitra had sent to him
12 regarding not understanding the chain of
13 command and that she was not being treated
14 fairly.
15          Did LaNitra Jeter e-mail you in
16 the fall of 2019 requesting to meet with you?
17    A.    Yes.
18    Q.    When?  Give me your best
19 recollection when.
20    A.    I actually don't know the date.  I
21 would have to look at the e-mail.  I have seen
22 it since, but I don't know what the date is.
23    Q.    But the e-mail would control in

1 terms of what the date would be.  Would you
2 agree?
3     A.   Yes.
4     Q.   Would you agree it was prior in
5 time to November 22nd, 2019, based on the
6 framing?
7     A.   Yes.
8     Q.   What did Ms. Jeter say in the
9 e-mail as best you recall?
10     A.   Again, the e-mail would be the
11 best evidence of that, but I just recall that
12 she -- I -- honestly I've looked at so many
13 documents, I -- can I see the e-mail?
14     Q.   Well, I'll represent to you that
15 I'm not a hundred percent sure that we've
16 actually had the e-mail provided.
17         MR. MURRILL:  You do.
18         MR. DAVIS:  Well, if you would
19 like to pull out a copy of it, I'll --
20         MR. MURRILL:  Sure.  Be happy to.
21 Let's take a break.
22         (Whereupon, a break was had from
23         4:01 p.m. until 4:04 p.m.)

1         MR. DAVIS:  Back on.
2     Q.   (BY MR. DAVIS:)  Mr. Roberts, take
3 a look at the e-mail that your counsel has just
4 provided, and we'll make it Plaintiff's Exhibit
5 Number 26.
6         (Whereupon, Plaintiff's Exhibit 26
7         was marked for identification
8         and a copy of same is attached
9         hereto.)
10         MR. MURRILL:  And for the record,
11 this is document Bates-labeled 001122 produced
12 in this case.
13     Q.   (BY MR. DAVIS:)  So that's great
14 and I will put the exhibit in front of you and
15 you hand the copy to me.
16     A.   Okay.
17     Q.   Just take a moment and look at
18 that, Mr. Roberts, and tell me when you are
19 ready to talk about it.
20     A.   (Reviewing document.)  Yes, I
21 recall.
22     Q.   So at the very bottom there is an
23 e-mail dated November 21st, 2019, at 7:53 from

1 LaNitra Jeter.  Do you agree?
2     A.   Yes.
3     Q.   And I'll just read it.  It says,
4 good morning Joe, Per Danny's e-mail, we are to
5 follow the proper chain of command if we have a
6 problem or issue.  In my case I am not clear as
7 to who to report my concern to.  I do feel that
8 I am being treated -- it actually says I'm
9 being treated fairly in some situations, but
10 would you agree with me that unfairly is the
11 most logical reading of that sentence,
12 Mr. Roberts?  Actually it says I do not feel --
13 all right.  It says I do not feel that I am
14 treated fairly in some situations and I do not
15 know who I'm supposed to report this to.  I do
16 not mind meeting with you to advise you of my
17 concerns so you may have a better understanding
18 and direct me in the right direction.  I'm
19 available today as I'm the only VSO in the
20 office.
21         Other than my fifty-four-year-old
22 eyesight failing me for a moment, did I read
23 that correctly?

1     A.   Yes.
2     Q.   And there's a response from you
3 that is sent soon after at 8:16, correct?
4     A.   Yes.
5     Q.   Would you read your response out
6 loud?
7     A.   You must discuss any concern that
8 you have specifically with Judy Yates first.
9 If Judy needs to come to me to discuss those
10 concerns, she can.  After that discussion and
11 attempt at resolving, if things after some time
12 do not improve, then you can come to me to
13 discuss.  That is how the chain of command
14 works.  The most important thing is please
15 don't come to me to discuss things that you
16 have not discussed with Judy first.  Thanks,
17 Joe.
18     Q.   Now, help me understand one thing.
19 There is an e-mail exchange that I saw in July
20 of 2019 from LaNitra Jeter to you where she
21 asked if she can meet with you about what she
22 describes as an issue or matter or something of
23 that phrase and your response to her is

Page 50

1 essentially sure.  Do you remember that e-mail
2 exchange?
3     A.   I do.
4     Q.   Tell me what is different about
5 that and this time.
6     A.   That occasion I kind of knew what
7 she wanted to talk about and it really wasn't
8 work related.  She -- her husband had some
9 ongoing criminal cases that we were aware of
10 and I think at that time we had made the
11 decision to recuse from.  So when she came to
12 talk to me, I basically told her I can't talk
13 to you about that.  So I kind of knew what she
14 was wanting to talk to me about, explained to
15 her that hey, we are not going to be
16 prosecuting the cases on Laquetta Murrell and
17 I'm not really able to get into that with you.
18 So I kind of knew what that e-mail in July was
19 about.
20     Q.   Whereas your position being that
21 you did not know what the November e-mail was
22 about, correct?
23     A.   No, I did not.

Page 51

1     Q.   But you agree that this e-mail
2 specifically includes an employee saying she's
3 not being treated fairly in some situations,
4 correct?
5     A.   It does say that, yes.
6     Q.   As the chief deputy DA, would it
7 be of concern to you that an employee felt she
8 was not being treated fairly?
9     A.   Well, I mean, I would be concerned
10 about any employee in that situation, but that
11 doesn't mean that I would break the chain of
12 command and jump in and try to solve it myself.
13 There is still a chain of command that's
14 supposed to be followed.  I had no idea if she
15 was talking about her coworkers, the VSOs were
16 treating her unfairly, if it was a deputy
17 district attorney, if it was the custodian, I
18 had no idea what this was about.  So no, I was
19 concerned, just like I would be concerned about
20 any issue that arises in the office, but there
21 is still a chain of command that should be
22 followed.
23     Q.   Do you have any recollection of

Page 52

1 discussing LaNitra Jeter's concern with Judy
2 Yates?
3     A.   I discussed -- I'm not sure I
4 understand your question.
5     Q.   Sure.  Do you have any
6 recollection of discussing the concerns that
7 LaNitra Jeter identified in this e-mail with
8 Judy Yates?
9     A.   No.  If I understand your --
10     Q.   I don't know that it's a terribly
11 complex question.
12     A.   Well, I discussed with Judy that
13 she sent me this e-mail, yes, but I did not
14 discuss with Judy what the concerns were, if
15 that makes sense.
16     Q.   It does.
17     A.   Okay.  I just want to make sure I
18 understood what you were asking.
19     Q.   Yeah.  And I think I understand
20 that distinction.
21     A.   Okay.
22     Q.   That you discussed -- in fact, I
23 have seen a text where you texted --

Page 53

1     A.   Yes.
2     Q.   -- Judy Yates --
3     A.   Correct.
4     Q.   And you said to Judy that LaNitra
5 e-mailed me and I told her to talk to you?
6     A.   Yes.
7     Q.   But you don't have any
8 recollection of following up with Judy Yates to
9 see what the substance was of Jeter's concerns
10 were?
11     A.   I did not.  I don't have any
12 memory of that.
13     Q.   Do you have any memory of
14 following up with Jeter?
15     A.   No.  And we get a lot of issues
16 that occur in the office and my hope is that
17 they are resolved on a lower level.  You know,
18 that's why we have supervisors.  And my hope is
19 that that can be worked out and it doesn't ever
20 have to involve me or it doesn't ever have to
21 involve Danny.  That's kind of the purpose of
22 the chain of command.  So I didn't like -- I
23 wasn't sitting around thinking ooh, I wonder

14 (Pages 50 - 53)

Case 2:20-cv-01863-ACA   Document 78-6   Filed 05/31/22   Page 16 of 51

Page 54

1 what happened with LaNitra because then
2 something else happened and something else
3 happened, so no, I didn't follow up on it and
4 honestly just didn't think about it again.
5     Q.   So let's get some perspective.
6 You get the September 23rd memo delivered to
7 you about LaNitra Jeter, in short order you get
8 a September 30th e-mail delivered to you about
9 LaNitra Jeter.  Do you remember following up
10 over the next several months and asking Judy
11 Yates how are things going with Jeter?
12     A.   I do not recall that.  I recall
13 Judy continuing to kind of maybe verbally
14 update me if there were further issues.  But,
15 again, I wouldn't go back to her and say hey,
16 how are things going.  It's more of them coming
17 to me just because for them that's an issue
18 that they are dealing with.  I can't keep up
19 with all the issues to where I keep going back
20 to everybody saying hey, how is this going, how
21 is this going.  So I did not do that and don't
22 normally do that.  But yes, I do remember Judy
23 coming to me after those September memos and

Page 55

1 saying -- kind of updating me on how things
2 were going.
3     Q.   And when Judy came to you after
4 the September memos and gave you updates how
5 things were going, what was she saying to you?
6     A.   I don't recall specifically, but I
7 know that there were -- there continued to be
8 issues.  There was never like a period of time
9 where everything was just perfect with LaNitra
10 was my memory, that over the next several
11 months there continued to be issues, but I
12 don't recall specifically what they were.
13     Q.   Over the next several months did
14 Judy Yates tell you anything about LaNitra
15 Jeter that led you to think that LaNitra Jeter
16 should be terminated?
17     A.   I didn't make that decision in my
18 mind, no.  It all kind of, you know, built up.
19 But I remember her coming to me about -- and I
20 don't remember when it was -- she was supposed
21 to be somewhere that she wasn't.  She was
22 either supposed to be in court and they went
23 and looked for her and she wasn't there, and

Page 56

1 then maybe one day she marked out but we didn't
2 know where she was.  I mean, those things where
3 she would just say hey, this happened.  I don't
4 remember the time period, but it just continued
5 to be issues along the way.  That's my memory.
6     Q.   Did any of these issues strike you
7 as being a basis to move toward termination?
8     A.   Again, at that time I didn't in my
9 mind say okay, this is -- this is it, no.  It
10 was just more of kind of her, Judy, continuing
11 to update me about the issues that were going
12 on.
13     Q.   As Judy Yates continued to give
14 you updates over the final months of 2019 into
15 2020, did you ever direct her to take
16 disciplinary action against LaNitra Jeter?
17     A.   No.
18     Q.   And did she have authority on her
19 own to discipline VSOs?
20     A.   No.
21     Q.   Who would have had that authority?
22     A.   I -- you know, we don't have a
23 what I would call a disciplinary kind of

Page 57

1 structure that I'm aware of.  I mean, we, you
2 know, deal with issues that come up and we deal
3 with personnel and we try to work with them and
4 try to help them to be good, productive
5 employees and, you know, we encourage them in
6 what they are doing.  But as far as like, you
7 know, disciplining them, I'm not aware of that
8 happening since I've been in charge as far as
9 like you're suspended or you're not going to be
10 paid for this amount of time.  I'm not aware of
11 any structure like that.  I haven't seen that
12 in practice.
13     Q.   Fair enough.
14         So as we move into 2020, is it
15 fair to say at some point, Mr. Roberts, that
16 you have a conversation with Judy Yates about
17 LaNitra Jeter being terminated?
18     A.   No.
19     Q.   And, again, I want to make sure
20 you heard me, we're in 2020 now, left '19 into
21 2020.  At any point in the early months of
22 2020, prior to Ms. Jeter's termination, do you
23 recall having a conversation with Judy Yates

15 (Pages 54 - 57)
Veritext Legal Solutions
877-373-3660                                800.808.4958

Page 58

1 about whether LaNitra Jeter should be
2 terminated?
3     A.   At any point prior to March the
4 13th of 2020?  At any point?  Is that what you
5 are asking?
6     Q.   Yes.
7     A.   Yes.  She was informed that she
8 was going to be terminated, but Judy was not
9 part of a conversation about what do you think
10 about her termination.  In other words, that
11 decision -- Judy is not involved in termination
12 decision I guess is what I'm trying to say.
13     Q.   Who is involved in the termination
14 decisions involving VSOs?
15     A.   The decision is made by Danny, but
16 I, as I mentioned earlier, would discuss with
17 Danny and have conversations about that.  But
18 ultimately Danny is the DA, he decides who's
19 terminated.
20     Q.   As Judy Yates was giving you
21 information and updates on LaNitra Jeter from
22 2019 into 2020, did you make any efforts to
23 corroborate or gather independent information

Page 59

1 about the things that Yates was telling you?
2     A.   I had discussions with Michael
3 McCurry.  He's the only person that I know of
4 that I discussed LaNitra Jeter with, Judy and
5 Michael McCurry.  I know there were some
6 statements given by some other VSOs, I saw
7 those, but I never talked with them.  I didn't
8 do any investigation.
9        In the position that Judy and
10 Michael are in, I've worked with both of them
11 for twenty years and trust them and trust their
12 evaluation of their employees.  I mean, that's
13 what we have to do as supervisors.  We put
14 people in supervisory positions that we know we
15 can trust and so when they tell us something, I
16 don't have to go behind them and investigate.
17 So no, I didn't investigate anything.  If Judy
18 told me something, unless there was some reason
19 to question it, then, you know, I believed her
20 account to me.
21     Q.   So picking up on the last thing
22 you said, that you would believe Judy Yates
23 unless there was some reason to question it,

Page 60

1 let me go back in time for a moment.  You knew
2 from the memo that she sent to you that LaNitra
3 Jeter had raised concerns that she was being
4 treated unfairly.  Mr. Roberts, did it ever
5 occur to you that the person who was giving you
6 updates about LaNitra Jeter and who was giving
7 you information about LaNitra Jeter might be
8 the person who was treating her unfairly?
9     A.   No.  Because she didn't tell me
10 that.  LaNitra --
11     Q.   Because you wouldn't meet with
12 her, correct?
13     A.   Well, her e-mail didn't say it had
14 anything to do with Judy Yates.  When I sent my
15 response to her to follow the chain of command,
16 my expectation would be if you are having a
17 problem with Judy Yates, you would come back
18 and say actually the problem is with Judy
19 Yates, I don't feel comfortable talking with
20 her, and I would have said come talk to me.  I
21 had no clue, as I mentioned before, what her
22 e-mail was in regard to.  It could have been a
23 number of anything, many things, and it

Page 61

1 didn't -- it never crossed my mind that it was
2 a problem with Judy.  There was no indication
3 in any e-mails, in any texts, in any
4 conversations that LaNitra had a problem with
5 Judy.  I never heard that.
6     Q.   So just to be clear, you knew from
7 an e-mail, therefore in writing, that LaNitra
8 Jeter contended she was being unfairly and you
9 knew that she thought enough of the situation
10 to reach out to you, the number two guy in the
11 DA's office, and you are saying that it never
12 occurred to you that the reason she may have
13 gone to you was because Yates was the person
14 she was concerned about?
15     A.   Correct.  She asked me, I don't
16 know what the proper chain of command was.  I
17 gave that to her and told her what to do, and
18 she never responded -- in fact, she said -- do
19 you have that e-mail still?  This is it right
20 here.  She said thanks for the clarification.
21 I will have a discussion with Judy tomorrow.
22        So to me, I answered her question,
23 and again, I kind of let her and Judy handle it

Page 62

1 from that point. She didn't come back and say
2 I would rather talk with you, the problem is
3 with Judy. So no, I had no idea that it was
4 with Judy.
5      Q.   Okay. So as we move into these
6 conversations that are happening in 2020 about
7 LaNitra Jeter's possibly being terminated, who
8 is participating in these conversations?
9      A.   Danny and I.
10      Q.   Anybody else?
11      A.   No.
12      Q.   And when you and Danny are having
13 these conversations, did you ever say to him,
14 you know, or words to this effect, you know,
15 Danny, I do remember getting an e-mail from her
16 raising concern about unfair treatment? Did
17 you say that to Mr. Carr during any of your
18 conversations about her --
19      A.   I don't recall ever saying that,
20 no.
21      Q.   Let me finish my sentence.
22           -- in your conversations about her
23 termination?

Page 63

1      A.   I don't recall saying that, no.
2      Q.   Did you actually remember -- in
3 fairness to you, did you actually remember that
4 Jeter had sent an e-mail complaining about
5 unfair treatment when you were having your
6 conversations with Carr in the spring of 2020?
7      A.   Yes. My memory of it was it was
8 an e-mail about chain of command. That was
9 kind of my memory was she was asking who do I
10 talk to. So yes, I definitely -- I remembered
11 that e-mail, yes.
12      Q.   Okay. And of course if you
13 remembered the e-mail, you would have
14 remembered the substance of the e-mail,
15 correct?
16      A.   True.
17      Q.   And the substance of the e-mail
18 included a statement that she was being treated
19 unfairly, correct?
20      A.   Yes.
21      Q.   You are not in any way suggesting
22 you'd forgotten about that, are you?
23      A.   No.

Page 64

1      Q.   But you are acknowledging that you
2 didn't share that with Carr, correct?
3      A.   No, I'm not saying that.
4      Q.   What are you saying?
5      A.   You asked me if I recalled in the
6 conversations in the early months of 2020
7 mentioning that e-mail. I don't recall that.
8      Q.   Okay.
9      A.   But then you just said I don't
10 recall sharing that with Danny at all was the
11 way I took the answer.
12      Q.   Well, let me -- that's a fair
13 point, so I will ask another variation.
14           Do you remember at any point
15 discussing with Danny Carr the e-mail that is
16 Plaintiff's Exhibit Number 26?
17      A.   I did tell Danny that LaNitra
18 wanted to talk with me about some issues. I
19 don't know how specific I got as far as her
20 being treated unfairly, I don't recall
21 mentioning that, but I told Danny that she
22 reached out to me and I told her to talk to
23 Judy and I didn't hear anything else after.

Page 65

1      Q.   When did you tell him that?
2      A.   I don't recall when it was.
3      Q.   Do you think it was close to the
4 termination, or do you think it was close to --
5      A.   No.
6      Q.   Well, let me finish the sentence.
7      A.   Sorry.
8      Q.   Do you think it was close to the
9 termination, or do you think it was close to
10 the November e-mail? Which do you think it was
11 closer to?
12      A.   2019.
13      Q.   So you think closer to November
14 2019 that you told Danny Carr that Jeter
15 reached out to me with some concerns but I sent
16 her to Yates, correct?
17      A.   Yes.
18      Q.   Why would you discuss that with
19 Carr?
20      A.   Because we talk about chain of
21 command on a regular basis. I mean, that's a
22 big part of, you know, the structure of our
23 office and it's a policy that's violated a lot

17 (Pages 62 - 65)

Page 66

1 where people try to come to me or try to come
2 to Danny, and we have to reenforce it with
3 individuals. We have to reenforce it, you
4 know, with an e-mail to the office like
5 occasionally because people just forget or
6 don't think it applies to them. So my memory
7 is just that hey, this was a situation where an
8 employee came to me and I told her to go to her
9 supervisor, he said that's good.
10    Q.   And moving back into the
11 termination conversations --
12    A.   Yes.
13    Q.   -- when do you recall, as best you
14 can recall, having your first conversation with
15 Danny Carr about the possibility of LaNitra
16 Jeter being terminated?
17    A.   I don't recall a date.
18    Q.   So we know from the correspondence
19 that she was terminated on March 16th, correct?
20    A.   Yes.
21    Q.   And we know from the
22 correspondence that the Yates memo that we are
23 going to talk about in a moment that lists the

Page 67

1 twelve bullet points happened on March 13th.
2 Do you agree with that?
3    A.   Yes.
4    Q.   Give me your best estimate of how
5 close in time to March 13th and March 16th your
6 conversations with Carr happened about
7 terminating Jeter.
8    A.   I know we discussed it on March
9 the 13th of 2020 because we discussed it in
10 conjunction with that memo, but I can't say
11 whether there were other conversations prior to
12 that in 2020. I just don't recall.
13    Q.   What was the urgency of
14 terminating LaNitra Jeter in March of 2020?
15    A.   You know, I don't know that it was
16 an urgency other than, you know, there had been
17 continuing problems and conversations that
18 Danny and I had had, I don't recall when they
19 were, but they were ongoing. And I know that
20 during that time was -- you know, we were
21 dealing with COVID. There had been
22 conversations about, you know, kind of going to
23 a system in our office where we would have

Page 68

1 teams in the office to prevent everybody in the
2 office showing up with everything that was
3 going on with COVID. So I know we were having
4 some discussions around that time in regard to
5 that process, and so I know that all those
6 conversations were happening at the same time.
7 That's my memory.
8    Q.   During this time that COVID was
9 happening initially and you were deciding to
10 limit the number of staff in the office, was
11 anybody other than LaNitra Jeter fired?
12    A.   No.
13    Q.   I'm going to show you Plaintiff's
14 Exhibit Number 7. And I assume you recognize
15 and have seen Plaintiff's 7 many times,
16 correct?
17       (Whereupon, Plaintiff's Exhibit 7,
18       having been previously marked for
19       identification in the deposition
20       of Danny Carr, was referenced in
21       this deposition.)
22    A.   Yes.
23    Q.   And it's the memo that Ms. Yates

Page 69

1 wrote. Do you agree at the very beginning of
2 that memo Ms. Yates says as requested?
3    A.   Yes.
4    Q.   Who requested the memo that was
5 written on March 13th that is Plaintiff's
6 Exhibit Number 7?
7    A.   I requested.
8    Q.   Did you request it on the day of
9 the 13th or close to that time as best you
10 recall?
11    A.   Close to that time, yes.
12    Q.   Why did you request it?
13    A.   Danny and I had had some
14 conversations about LaNitra and the ongoing
15 issues, and I wanted something in writing so we
16 could have something to refer to and have
17 specific discussions about. That was the
18 purpose of the memo.
19    Q.   Did you give Judy Yates a sense of
20 what kind of content you wanted to see in the
21 memo?
22    A.   Other than can you do a memo in
23 regard to the issues you've had with LaNitra

1 and her employment, that's all I said.

2    Q.   Did you tell her that any

3 particular issues needed to be highlighted or

4 prioritized?

5    A.   No.

6    Q.   Let me see the document again.

7    A.   (Witness complies.)

8    Q.   I'll represent to you there are

9 twelve bullets on here, instead of making you

10 count them.  Does that seem fair?

11    A.   Yes.

12    Q.   The first bullet, abuse of earning

13 time and taking time away from work.  She is

14 more interested in being away from work than

15 being present and contributing in the office.

16       You have said earlier that you

17 didn't review any leave documents or any comp

18 documents.  Do you recall saying that earlier?

19    A.   Say that again.  I'm sorry, I

20 missed the first part.

21    Q.   Yeah.  You said earlier that you

22 didn't review any leave or comp documents

23 related to Jeter.  Do you remember saying that

1 earlier?

2    A.   Yes.

3    Q.   Let me show you a set of documents

4 that have been admitted into evidence in these

5 exhibits in the last few days.  Well, let me

6 show you Plaintiff's Exhibit Number 11.  I'm

7 going to show you Plaintiff's Exhibit Number

8 12.  I'm going to show you Plaintiff's Exhibit

9 Number 15.  I'm going to show you Plaintiff's

10 Exhibit Number -- actually just the ones in

11 front of you.  Have you seen those documents

12 before today?

13       (Whereupon, Plaintiff's Exhibits

14       11, 12 & 15, having been

15       previously marked for

16       identification in the

17       deposition of Danny Carr, were

18       referenced in this

19       deposition.)

20    A.   No.

21       (Whereupon, Plaintiff's Exhibit

22       10, having been previously marked

23       for identification in the

1       deposition of Danny Carr, was

2       referenced in this

3       deposition.)

4    Q.   And one more, Plaintiff's Exhibit

5 Number 10, I'm sorry.  Have you seen that

6 document prior to today?

7    A.   No.

8    Q.   Okay.  Turn them where I can see

9 them or hand them to me one by one.

10    A.   (Witness complies.)

11    Q.   All right.  Plaintiff's Exhibit

12 Number 10 I will represent to you are all

13 requests for vacation, comp, or leave time by

14 LaNitra Jeter.  That's (indicating) Plaintiff's

15 Number 10, so I want you to take that in your

16 hand.  I want to represent to you that

17 Plaintiff's Exhibit Number 11 is all requests

18 for leave, comp, or vacation time by Erin

19 Barefield, I want you to take that in hand.

20 And I will represent to you that Plaintiff's

21 Exhibit Number 12 is additional requests for

22 vacation or leave time by LaNitra Jeter, I want

23 you to take that in hand.  All right.  There is

1 one more for Barefield here, let me find that.

2       What are those numbers again,

3 Mr. Roberts?

4    A.   10, 11, 12, and 15.

5    Q.   All right.  Hand me 15.  That's

6 right, Cheryl Black, I'm sorry.

7       All right.  Now, I want you to put

8 15 to one side, that's Cheryl Black.

9    A.   Okay.

10    Q.   Again, I can't read upside-down,

11 so let me see the second one to your right.

12       MR. MURRILL:  12.

13    Q.   (BY MR. DAVIS:)  Let me see it.

14 All right.  And hand me the one in the middle.

15 All right.  So I'm going to represent to you

16 this (indicating) is Barefield, Number 11,

17 please put that to the side.  And I'll

18 represent to you these (indicating) two are

19 Jeter, 12 and -- what's that number again?

20    A.   10.

21    Q.   All right.  The first allegation

22 in the memo -- and I'm using the word

23 "allegation" because I see these as being

Page 74

1 charges, so I use that term.  The first
2 allegation in the memo that Yates wrote is that
3 Jeter abused time and took time away from work
4 and was more interesting in being away from
5 work than being present and contributing to the
6 office.
7        I'll represent to you that the
8 testimony offered in this case -- let me back
9 up.
10        All these documents come from your
11 lawyers and from your office.  These are
12 documents that are generated by folks in your
13 office and they were provided as part of the
14 discovery, and I'll represent to you there has
15 been testimony in my conversation with Mr. Carr
16 about the substance of these documents.  And I
17 represent that Mr. Carr, I literally asked him
18 to count the number of pages that were
19 submitted and that each page represents a
20 distinct request for one of three things,
21 vacation time, comp time, or leave time.  I'll
22 represent that Mr. Carr counted them and
23 counted that there were, for these three

Page 75

1 employees, thirty-one instances of comp,
2 vacation, or leave time for one; nineteen
3 instances of comp, vacation, or leave time for
4 another; and fourteen instances of comp,
5 vacation, or leave time for another.  I'll
6 represent to you that Jeter was one of those
7 three employees, who is a black female; Erin
8 Barefield who is one of those three employees,
9 who is a white female; and Elise Driskill is
10 one of those three employees, who is a white
11 female.  If I asked you which one of those
12 three has the highest number of vacation,
13 leave, or comp time days during 2019 and '20,
14 who would you think it would be?
15        MR. MURRILL:  Object to the form.
16    Q.   (BY MR. DAVIS:)  You can answer.
17    A.   I don't know.
18    Q.   And if I ask you which one had the
19 lowest number of days, which would be fourteen
20 for combined leave, comp, and vacation time out
21 of those individuals, who would you suspect it
22 would be?
23    A.   I don't know.  I have no knowledge

Page 76

1 of any of these documents or anything in regard
2 to this.
3    Q.   If I were to tell you that the
4 person who has the highest number by far,
5 thirty-one, is Cheryl Black, would that
6 surprise you?
7    A.   I don't know how to answer that.
8 I don't -- I don't know what you mean would
9 that surprise me.  I don't -- I don't have any
10 knowledge of her requests or the reasons.  I
11 don't know how to answer that honestly.
12    Q.   Well, let me ask you this:  If
13 there's a representation by a department head,
14 in effect, by a senior supervisor, that someone
15 is more interested in being away from work than
16 being present and contributing to the office,
17 would you agree that one way of measuring the
18 accuracy of that statement would be to compare
19 how much time that person has missed as opposed
20 to how much time their coworkers have missed?
21        MR. MURRILL:  Object to the form.
22    A.   Yeah, I don't know that you can
23 just look at that one thing.  I think there

Page 77

1 would be a lot of things that would go into
2 that determination.  I don't know that just
3 looking at the amount of time asked off versus
4 another employee -- I think it's too
5 complicated of a question to break it down and
6 just say because one has this amount and one
7 has this amount that obviously -- I just don't
8 know that I can make a determination on that
9 one issue.
10    Q.   (BY MR. DAVIS:)  What about the
11 actual attendance records?
12    A.   Again, I don't -- I don't know
13 that it can just be one issue.  I think it's
14 more -- kind of more complicated than that.
15    Q.   So, Mr. Roberts, for my
16 edification, attendance records, and I
17 represent to you the attendance records of all
18 three have been put in evidence and were
19 discussed with Mr. Carr and Ms. Yates, in
20 addition to the attendance records that show
21 every day the person came to work or didn't
22 come to work, how many hours they worked and
23 what the leave of comp time was deducted, in

20 (Pages 74 - 77)

Page 78

1 addition to the attendance records, in addition
2 to the printouts of the number of times they
3 asked for leave, is there any third category of
4 documents you would suggest that I should look
5 at?
6    A.   I don't know.
7    Q.   Can you think of any?
8    A.   I don't know of any.
9    Q.   And would you agree that the most
10 authoritative indicator of how often someone
11 comes to work would be their attendance record?
12    A.   Yes, I do agree with that.  Yes.
13    Q.   Would you agree that the most
14 authoritative indicator of whether someone
15 takes off too much leave time would be a
16 printout of how much leave time they've taken?
17    A.   I'm not sure about that.  I think
18 that is where I'm getting a little bit
19 confused.  That depends on circumstances and
20 other employees, and, you know, that's part of
21 I think where it gets a little bit more
22 complicated than just the number of days
23 somebody took off.  I mean, it could be

Page 79

1 different I think for different employees.
2    Q.   Well, does Jefferson County intend
3 to have one set of policies that fairly applies
4 to all employees?
5    A.   No, I mean, like it could depend
6 on if you want to take off -- for example, what
7 I deal with is DDAs and vacation.  I don't deal
8 with comp time.  So, again, I apologize, I
9 don't understand the details of all this.  But
10 four a DDA to ask off for vacation, you know,
11 if they don't have court, if somebody else is
12 not already off on vacation in that courtroom
13 and the same day, you know, one -- just a day
14 off you can't look at the number and say yes,
15 that -- you know, it's more complicated.  There
16 is other factors that play into it.  And I
17 don't know if that's true with comp time or
18 not.  I just don't have enough knowledge about
19 comp time and how it works.  Again, I was never
20 involved in requests.  I don't approve comp
21 time.  I just don't know how that works.
22    Q.   Mr. Roberts, help me understand
23 this.  You have an allegation from a supervisor

Page 80

1 about someone taking too much time off work and
2 later on there is a bullet that says has been
3 repeatedly counseled about the constant abuse
4 of her time, asking to come in early, to leave
5 early, leaving early, has rarely worked an
6 extra five-day workweek, when you have -- are
7 those serious assertions in your opinion?
8    A.   That was my understanding was that
9 it was that she was not working a full week.
10 Like you mentioned earlier, she's been there
11 twenty-six weeks and twenty-four of those weeks
12 she wasn't there five days in a row.  I mean,
13 that was my understanding.  And maybe that's
14 not a very deep understanding, but that was
15 from Judy and from Michael, that was my
16 understanding was that she was just not working
17 a full week hardly any week.  That was a
18 concern, yes.
19        I think as an employee, you should
20 recognize hey, even if I have vacation days,
21 like, again, I'm relating it to DDAs, even if
22 you have a lot of vacation days, you know, you
23 need to be at work.  That's part of your

Page 81

1 responsibility is to be there and be involved
2 with what's going on.  You know, that's the way
3 I viewed it and I understood it was that she
4 was just not being at work for a full week
5 hardly at all.
6    Q.   Did you ask Judy Yates or Michael
7 McCurry to provide you any documentation
8 confirming the statement that she regularly did
9 not come to work?
10    A.   I didn't.
11    Q.   Did you and Judy Yates -- you
12 asked her for the memo -- did you ask Judy
13 Yates for any documentation confirming or
14 bearing out these assertions about leave time
15 and comp time in this memo?
16    A.   No.  I know her and Michael
17 discussed it, but I never -- and I know they
18 looked at them, but I did not.
19    Q.   Did Michael McCurry make the
20 decision to fire LaNitra Jeter?
21    A.   No.
22    Q.   And according to you, did Judy
23 Yates make the decision to fire LaNitra Jeter?

Page 82

1    A.   No.
2    Q.   And according to you, the two
3 people involved in that decision were you and
4 Carr, correct?
5    A.   Danny made the decision.  Danny
6 and I discussed it, but he's the
7 decision-maker.  I don't think Judy and Michael
8 even knew about it until he made the decision.
9 He told me.  And then there were some
10 preparations that had to be made where I
11 communicated that to Judy and Michael, but no,
12 Danny is the only decision-maker on that.
13    Q.   Do you have any reason to think
14 that Danny saw any of these documents that I
15 have just placed in front of you?
16    A.   I don't know.  I really don't.
17 When he goes into that final decision mode he
18 may have, I don't know.
19    Q.   Did he ever share that with you?
20    A.   No.
21    Q.   There's a representation in
22 Ms. Yates' memo that Jeter failed to follow the
23 chain of command.  Did you ask Yates how many

Page 83

1 times Jeter failed to follow the chain of
2 command?
3    A.   No.
4    Q.   There is a representation that
5 Jeter repeatedly has told stories that turn out
6 to be untrue, so loss of credibility and being
7 trustworthy.  Did you ask Yates for specific
8 examples of these repeated stories that were
9 told that turned out to be untrue?
10    A.   I was aware of a few that she had
11 told me, so I knew what she was talking about
12 on that bullet point.
13    Q.   And when you say you were aware,
14 you were aware based on what Judy Yates had
15 said to you, correct?
16    A.   Yes.
17    Q.   There is an allegation, has posted
18 on social media stories that were untrue just
19 for the shock value.  Have you ever been to
20 LaNitra Jeter's Facebook page?
21    A.   No.
22    Q.   Have you ever been to any Twitter
23 account owned by her?

Page 84

1    A.   No.
2    Q.   Have you ever been to any
3 Instagram account owned by her?
4    A.   No.
5    Q.   Ever been to any LinkedIn account
6 owned by her?
7    A.   No.
8    Q.   Ever been to any social media
9 account owned by her?
10    A.   No.
11    Q.   Did you in any way attempt to go
12 to her social media to see if there were posts
13 that were untrue just for the shock value?
14    A.   No.
15    Q.   There is a representation, has
16 used office time to deal with issues that are
17 her husband's or her adult son's legal issues.
18 Did you ask Judy Yates for specific examples
19 that bear that out?
20    A.   She had told me about some
21 instances, so I was aware of those.  So I
22 didn't follow up with that.
23    Q.   But is it fair to say that after

Page 85

1 she told you about those instances that you
2 took no action?
3    A.   The only action I would have
4 possibly taken would be to tell Danny about it.
5 But as far as me directly doing any
6 investigation or discussing it with anybody
7 else, no, I didn't.
8    Q.   Is it fair to say you had known
9 about those incidents for months?
10    A.   Yes.
11    Q.   Statement, repeatedly talks about
12 filing judicial complaints against various
13 judges her husband has to deal with.  Who are
14 the judges that she wanted to file complaints
15 against?
16    A.   I don't know.
17    Q.   Did you ask Yates?
18    A.   No.
19    Q.   Did you ask Yates for proof that
20 that statement was accurate?
21    A.   No.
22    Q.   Next allegation, has been -- well,
23 actually we have talked about the leave ones, I

22 (Pages 82 - 85)

Page 86

1  will skip that.
2         Next bullet, has fallen asleep
3  while observing a trial.  Did you ask Yates how
4  many times Jeter fell asleep observing a trial?
5      A.   No.
6      Q.   Did you ask her what her proof was
7  that Jeter had fallen asleep observing a trial?
8      A.   She told me about it, and I just
9  don't remember the details.  My understanding
10 it was one occasion and somebody had told her.
11 But honestly, I just don't remember the details
12 of it.  So I knew what she was referencing, but
13 I don't -- I don't remember the details of what
14 courtroom or who was there, who told.  I just
15 don't remember.
16     Q.   And you certainly don't remember
17 hearing that the judge got involved or anything
18 of that nature, did you?
19     A.   Not on that occasion, no.
20     Q.   You don't remember hearing that
21 the bailiff got involved, that it caused a
22 scene or disturbance or anything of that
23 nature, do you?

Page 87

1      A.   No.
2      Q.   And how long ago did that incident
3  happen prior to March 2020?
4      A.   It was in 2019.
5      Q.   So it was a while before March
6  2020, correct?
7      A.   Yes.
8      Q.   Next bullet, leaves the building
9  without signing out or letting someone know she
10 would be unavailable.  Do you know how many
11 times Jeter had done that?
12     A.   I remember hearing about at least
13 one, that's all I can recall that Judy
14 specifically mentioned that one time.  But it
15 could have happened more, but I know of at
16 least one.
17     Q.   You remember at least one?
18     A.   Yes.
19     Q.   And when did that one time occur?
20     A.   I don't recall -- 2019.
21     Q.   You are not really sure, are you?
22     A.   No.  I don't know the month.
23     Q.   Do you remember taking any action

Page 88

1  or instructing Judy to take any action based on
2  hearing about Jeter leaving the building one
3  time?
4      A.   No.
5      Q.   Next bullet, signs out to a court
6  that is empty and cannot be found.  Did you
7  know what that meant when you read it?
8      A.   Yes.
9      Q.   What did you understand it to
10 mean?
11     A.   Because she told me about it.
12     Q.   She being Yates?
13     A.   Correct.  So I knew about that
14 already.  She had previously told me about that
15 incident.
16     Q.   When did Yates tell you about it?
17     A.   2019.
18     Q.   Kind of the same thing, it was
19 way --
20     A.   Yes.  I just don't remember dates
21 or months.
22     Q.   Is it fair to say, though, if you
23 had known about this incident of her, quote,

Page 89

1  unquote, signing out to a court that is empty,
2  is it fair to say you had known about that for
3  months?
4      A.   Yes.
5      Q.   And when I say known about it,
6  actually it's fair to say you had heard about
7  it for months, correct?
8      A.   Yes.
9      Q.   And, again, did you take any
10 action when you heard about it?
11     A.   No.
12     Q.   Did you instruct Yates to take any
13 action when you heard about it?
14     A.   No.
15     Q.   Next bullet, has no credibility
16 with her coworkers and is compromising the
17 grant report we submit to OPS.  How is Jeter
18 compromising the grant report submitted to OPS?
19     A.   You know, I'm not a hundred
20 percent sure what Judy meant by the grant part.
21 To me, the losing credibility, to me when I
22 read that, I took that to mean about this
23 incident where she made up this story and, you

Page 90

1  know, according to what I was told, posted
2  about it on social media.
3      Q.   What you were told by Yates?
4      A.   Correct.  And then when she was
5  confronted about it, admitted that it was not
6  true.
7          And so obviously with an employee
8  that works at the district attorney's office
9  who we have to trust to have integrity, to deal
10  with victims, to deal with sensitive material.
11  You know, our VSOs have access to what we call
12  our Filemaker system, I'm sure somebody else
13  has mentioned this, that has confidential
14  information in it.  So employees in the DA's
15  office we have to be able to trust them.  I
16  mean, if we can't, then yes, that is a problem.
17  That's what I took that last bullet point to
18  mean.
19          As far as the specifics of OPS
20  grant, I'm not sure exactly what she meant by
21  that part.  But yes, that would be an issue
22  with an employee when they are not able to be
23  trusted.

Page 91

1      Q.   Didn't we establish earlier in
2  looking at these memos that you learned about
3  that incident on September 30th, 2019?
4      A.   Yes.
5      Q.   After learning about that incident
6  on September 30th, 2019, didn't we establish
7  you did not do anything?
8      A.   When you say did not do anything,
9  you mean in regard to discipline or --
10      Q.   Yes.
11      A.   No, we did not take any direct
12  action towards LaNitra at that time.
13      Q.   So you just described to me in
14  robust terms your concern that this incident
15  reflected on LaNitra Jeter's credibility and
16  her capacity to be an effective victim services
17  officer?
18      A.   Yes.
19      Q.   But when you heard about it, you
20  did not take any disciplinary steps, did you,
21  sir?
22      A.   No.
23      Q.   And when I say you did not take

Page 92

1  any disciplinary steps, you didn't even direct
2  Jeter to be written up for the incident, did
3  you?
4      A.   When you say written up, there was
5  a memo that was done in regard to --
6      Q.   To you?
7      A.   Correct.
8      Q.   Did you direct or instruct a
9  letter of reprimand to be prepared to Jeter
10  based on this incident that you've just
11  described that you say raises serious concerns
12  about her integrity and trustworthiness, did
13  you direct a written document counseling her or
14  reprimanding Jeter to be generated?
15          MR. MURRILL:  Object to the form.
16      A.   No.  They had a conversation with
17  her, but no document was given to her in regard
18  to that incident, no.
19      Q.   (BY MR. DAVIS:)  Was she
20  suspended?
21      A.   No.
22      Q.   Was she put on leave?
23      A.   No.

Page 93

1      Q.   Did you take steps to terminate
2  her?
3      A.   At that time, no.
4      Q.   Last bullet, during a meeting with
5  the Y -- let me go back to the no credibility
6  with her coworkers.  You mentioned earlier that
7  you saw some statements from coworkers, are you
8  talking about the written statements from
9  Driskill and Barefield that describe the
10  incident involving Jeter having a physical
11  confrontation with the husband's ex-wife?
12      A.   Those are the statements that I'm
13  talking about.
14      Q.   Okay.
15      A.   I think Judy memorialized them,
16  and that's what I saw.  I don't know that I saw
17  the statements they wrote out.
18      Q.   Understand.
19      A.   I don't know if those exist.  I
20  don't know.
21      Q.   Okay.  I will actually tell you
22  that they do exist.
23      A.   They do?  Okay.  I don't know that

24 (Pages 90 - 93)

1  I saw the original statements.
2      Q.   All right.  Do you know of any
3  other incidents that suggest that Judy Yates --
4  or that LaNitra Jeter lost credibility with her
5  coworkers?
6      A.   I think some of the unprofessional
7  conduct factored into that.  Some of these
8  other things that are part of the bullet points
9  where she talks about, you know, ongoing
10  criminal matters and filing complaints on
11  judges, I think all of that played a part in
12  it's just unprofessional conduct, you know,
13  when you are in an office setting to be talking
14  about all these kind of wild stories I think
15  Judy called them, you know.  So I think that
16  played a part in kind of the credibility with
17  her coworkers.  That was the way it was
18  reported to me.
19      Q.   You think?
20      A.   Yes.
21      Q.   Did you actually talk to any of
22  LaNitra Jeter's coworkers other than Judy Yates
23  about whether she was a fit employee as a VSO?

1      A.   No.
2      Q.   Did any of her coworkers report to
3  you any concerns that she was not, she being
4  Jeter, was not a fit employee?
5      A.   Not directly to me, no.
6      Q.   In fact, do you know of any of
7  Jeter's coworkers reporting to anybody their
8  concerns that she was not a fit employee other
9  than Yates?
10      A.   They wouldn't have and Judy is
11  their supervisor.  So yeah, I mean, I know they
12  reported it to Judy, but I don't know of them
13  reporting it to anybody else, no.
14      Q.   So the answer is no?
15      A.   No.
16      Q.   With respect to all twelve of
17  these bullet items, is there a single one of
18  them that happened close in time to March 13th,
19  2020?
20      A.   You know, I don't -- I can't tell
21  you by looking at these and give you a date on
22  when these occurred.
23      Q.   Do you have any memory of Judy

1  saying this just happened?
2      A.   In 2020?
3      Q.   As of March 13th, 2020.
4      A.   No, I don't.
5      Q.   Help me understand this,
6  Mr. Roberts.  We have gone through a list of
7  items which you have said informed the decision
8  that was made to terminate LaNitra Jeter, but
9  you have told me that each one of those items
10  did not produce disciplinary action, that each
11  one of those items did not produce a written
12  counseling or written report, and you've told
13  me that a number of those items were not
14  documented and not substantiated, and you've
15  told me that all of the items happened prior in
16  time and were known by you in advance and in
17  some instances well in advance of March 2020.
18  Is there something I've just said that's wrong
19  or inaccurate?
20          MR. MURRILL:  Object to the form.
21      A.   Yes, there was a lot in that
22  question actually.  I don't know that I can
23  answer.  You asked like five questions in

1  there, so I --
2      Q.   (BY MR. DAVIS:)  Is there anything
3  that you heard me speaking that struck you as
4  not accurate or an accurate rendition of what
5  you just said?
6          MR. MURRILL:  Object to the form.
7      A.   I think there was one question
8  where you said something about none of them
9  had -- I can't remember what the question was,
10  but yes, there was one question where I thought
11  I'm not sure I agree with that.  But then you
12  continued to ask two more questions after that,
13  and I kind of got lost.
14          MR. DAVIS:  Please read the
15  question.  I want you to listen carefully and
16  then tell me what you find inaccurate.
17          (Record read.)
18          MR. MURRILL:  Same objection.
19      A.   So the question about I think you
20  said several of them were not documented or
21  substantiated, what do you mean by
22  substantiated?
23      Q.   (BY MR. DAVIS:)  Well,

1  substantiated means proof other than Judy
2  Yates.
3      A.    Yeah, see, that's what I mean.  I
4  -- again, Judy, I told you earlier that I trust
5  what she told me.  As far as me doing an
6  independent investigation, no.  But I mean --
7      Q.    And just so we are clear about
8  that, the things I'm asking you whether you
9  independently investigated, you've acknowledged
10  some of these areas like comp time are not
11  familiar to you, correct?
12      A.    That specific area, comp time,
13  yes.
14      Q.    Do you think Danny Carr is very
15  familiar with how comp time works in the DA's
16  office from your conversations with him?
17      A.    I would not say very familiar, no.
18      Q.    So help me understand again,
19  Mr. Roberts, how do you fire somebody for doing
20  things that happened a long time before you
21  fired them?
22      A.    The decision whether to fire an
23  employee is not something that Danny takes

1  lightly and it's not something I take lightly
2  either.  In other words, we don't have, you
3  know, for lack of a better phrase, a quick
4  trigger in regards to terminating somebody, you
5  know.  When we have employees, especially new
6  employees, that have issues, we try to work
7  with them.  We try to help them recognize the
8  issues that they are having.  We try to help
9  them become a better employee, become a
10  productive employee.
11          So even when there are issues that
12  you may say that looks like something somebody
13  could be fired over, that doesn't necessarily
14  mean that we would do it.  Sometimes it just --
15  it takes a building up and a building up over
16  time to where you don't see improvement, you
17  don't see like the correction of issues that
18  you were hoping for, and then you just make a
19  decision at some point.  Sometimes it takes a
20  long time.
21          So that's not unusual in my
22  experience to have an employee have issues and
23  it go on for a while before Danny makes that

1  final decision.
2      Q.    There is an e-mail that I saw from
3  you, Mr. Roberts, after the EEOC charge is
4  filed, and I believe it's an e-mail from you to
5  McCurry but it possibly could have been to
6  Carr, and you state in the e-mail something to
7  the effect that as expected, the EEOC charge
8  filed or as expected there has been a charge of
9  discrimination.  Do you recall that e-mail?
10      A.    I do recall the e-mail.
11      Q.    Who is the e-mail to, as best you
12  remember?
13      A.    Yeah.  I mean, I don't recall
14  exactly.  Of course, the e-mail would be the
15  best evidence.  I can't remember if it was to
16  Patrick Lamb and I cc'd McCurry and Danny.  I
17  can't remember exactly who the e-mail was to,
18  but I remember the e-mail you are referencing.
19      Q.    And you remember the statement "as
20  expected," correct?
21      A.    I do.
22      Q.    Why was Jeter's EEOC charge
23  expected?

1      A.    In my mind I was thinking, knowing
2  what I knew about LaNitra at that time, that it
3  was not going to be a situation where she took
4  responsibility for her actions in the situation
5  that she was in and that I was not surprised
6  that she was trying to, you know, turn it back
7  on us and somehow say that we were at fault,
8  even though we had this long list of things
9  that, you know, were issues with her job
10  performance.  I was just not surprised based on
11  what I knew about some of the legal things that
12  she had been involved in.  You know, I heard
13  from Judy that making the complaints on judges
14  in cases with, I think, her husband.  You know,
15  those things are kind of unusual things.  So I
16  just wasn't shocked.  That's all I meant was I
17  was not surprised that it, you know, was
18  continued to be appealed and, you know, lawsuit
19  and that kind of stuff.
20      Q.    Everything you've just said, did
21  you hold all those opinions on March 13th,
22  2020?
23      A.    Really, I don't know that I

1 thought about it on March the 13th of 2020.
2    Q.   But you just articulated a set of
3 observations and perspectives and views that
4 you have about LaNitra Jeter, did you have
5 those same perspectives and views on March
6 13th, 2020?
7    A.   I'm trying to think about the
8 timeline because I know she had sent an e-mail
9 to OPS asking about appeal, you know, trying to
10 appeal her -- and that was the first time I
11 kind of triggered in my mind that oh, okay,
12 this is -- she's not just going to let this go,
13 she's going to pursue and appeal and
14 possibly -- I didn't know the procedure as far
15 as EEOC and lawsuits and all that very well,
16 but in my mind I was just thinking, you know,
17 she wasn't just going to let it go.  She was
18 going to try to appeal or pursue further this
19 issue.
20       MR. RILEY:  Artur, let's stop in
21 about five minutes.
22       MR. DAVIS:  That's fine.
23       MR. RILEY:  I mean not for the

1 day.
2       MR. DAVIS:  I knew what you meant.
3 That's fine.
4    Q.   (BY MR. DAVIS:)  And you also knew
5 that at some point she complained she had been
6 treated unfairly, didn't you?
7    A.   Yes.
8    Q.   And you knew on March 13th, 2020,
9 that at some point she complained she had been
10 treated unfairly, correct?
11   A.   Yes.  I didn't know what that was.
12 And as far as I knew, it could have been
13 resolved months ago.  I never heard anything
14 else about that, as we've discussed.  So I knew
15 about it, yes, but I didn't know that that had
16 anything to do with what was going on in her
17 mind currently.
18   Q.   But you hadn't forgotten it, had
19 you?
20   A.   I remembered that she sent me the
21 e-mail, yes.
22       MR. DAVIS:  We can take a break
23 right now.

1       MR. RILEY:  Good.
2       (Whereupon, a break was had from
3       5:01 p.m. until 5:13 p.m.)
4    Q.   (BY MR. DAVIS:)  In preparation
5 for your testimony today, have you talked with
6 Danny Carr about this case?
7    A.   Not the substance of the case,
8 just maybe scheduling.
9    Q.   In going back to 2020 when the
10 EEOC charge and the lawsuit was initially
11 filed, did you have any conversation with Danny
12 Carr about how we're going to defend this case
13 or how we're going to respond to the charges in
14 this lawsuit?
15   A.   The logistics of responding to the
16 EEOC, there were some e-mails that went back
17 and forth about how to handle it just because
18 we had not had one.  So yes, there were some
19 e-mails in regard to, you know, we need to look
20 at this and deal with this and figure out how
21 to respond, yes.
22   Q.   Did you have any discussions with
23 him after the lawsuit -- let me back up.

1       My understanding is you all never
2 actually responded to the EEOC charge; is that
3 correct?
4    A.   We didn't -- a response was not
5 required, no.
6    Q.   And the first response in this
7 case, quote, unquote, would have been the
8 answer that was filed by the AG's office; is
9 that right?
10   A.   Yes.
11   Q.   And do you know what initial
12 disclosures are?
13   A.   No.
14   Q.   I'll represent to you that every
15 party in a civil case, or at least every party
16 in the employment cases I practice, have to
17 produce a document called initial disclosures
18 where you outline your factual allegations and
19 if you are an employer, you outline your
20 defenses.  Did you have any role in helping
21 prepare the initials disclosures that the AG's
22 office submitted in this case?
23   A.   No.

27 (Pages 102 - 105)

Page 106

1      Q.    Did you have any role in preparing
2  the answer submitted in this case?
3      A.    No.
4      Q.    Did you have any role in preparing
5  responses to interrogatories in this case?
6      A.    You mean when -- I was not
7  involved with the AG's office.  Now, once we
8  hired Riley & Jackson there were some
9  interrogatories that were sent to us, and yes,
10 we helped prepare some answers.
11     Q.    Didn't you verify the
12 interrogatory responses?
13     A.    Yes.
14     Q.    And what did you understand
15 yourself to be doing when you verified the
16 interrogatory responses?
17     A.    What do you mean what did I
18 understand myself to be doing?
19     Q.    Well, you signed a statement
20 affirming to the court -- and you are an
21 officer of the court as a lawyer, correct?
22     A.    Yes.
23     Q.    You signed a statement to the

Page 107

1  court affirming that you had reviewed the
2  responses and that they were accurate to the
3  best of your ability.  What did you believe you
4  were doing when you signed that statement?
5      A.    That I was affirming that my
6  responses were true and accurate and correct
7  and that the responses that other people gave,
8  according to them, were true and accurate and
9  correct.  I didn't have personal knowledge of
10 all of it, but I knew the people, Judy and
11 Michael and Danny, that were providing the
12 answers, and I -- yes, that was what I
13 understood I was doing.
14     Q.    Let me ask you something that I
15 meant to ask Mr. Carr yesterday and frankly
16 forgot to because of the amount of time that we
17 talked.  Who actually provides the funds to pay
18 a judgment against the DA acting in his
19 individual or his official capacity, and, in
20 the same vein, who pays the funds if there were
21 a settlement of a case involving the DA's
22 office?
23     A.    I actually don't know.

Page 108

1      Q.    Do you know if Danny Carr knows?
2      A.    I don't.
3      Q.    Have you discussed it with him?
4      A.    No.
5      Q.    And are you aware that, because of
6  some peculiarities of Alabama law, that if a
7  DA's office is hit with a judgment or if a DA's
8  office pays out a settlement in a case, that
9  the money actually comes from the State of
10 Alabama?
11     A.    I'm not aware of that.
12     Q.    And do you know whether or not the
13 State of Alabama has any insurance policy or
14 insurance coverage that covers cases like this?
15     A.    I don't know.
16     Q.    Have you all attempted to find
17 that out?
18     A.    Not that I know of.
19          MR. DAVIS:  I have no further
20 questions.
21          MR. MURRILL:  No questions.
22
23          FURTHER THE DEPONENT SAITH NOT

Page 109

1
2     (Deposition concluded at 5:18 p.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

28 (Pages 106 - 109)

Page 110

```
1          C E R T I F I C A T E
2
3  STATE OF ALABAMA
4  JEFFERSON COUNTY
5
6          I hereby certify that the above
7  and foregoing deposition was taken down by me
8  in stenotype, and the questions and answers
9  thereto were reduced to computer print under my
10  supervision, and that the foregoing represents
11  a true and correct transcript of the testimony
12  given by said witness upon said proceedings.
13          I further certify that I am
14  neither of counsel nor of kin to the parties to
15  the action, nor am I in anywise interested in
16  the result of said cause.
17
18
19
20
21      ACCR LICENSE NO. 278 - Expires 9/30/2022
22      Transcript Certified On 2/17/2022
23
```

Veritext Legal Solutions
877-373-3660                                                800.808.4958

| & |
| --- |
| **&**   2:14 6:9 71:14 106:8 |

| 0 |
| --- |
| **001122**   47:11 |
| **01863**   1:5 |

| 1 |
| --- |
| **10**   3:20 71:22 72:5 72:12,15 73:4,20 |
| **11**   3:21 71:6,14 72:17 73:4,16 |
| **12**   3:22 71:8,14 72:21 73:4,12,19 |
| **13th**   58:4 67:1,5,9 69:5,9 95:18 96:3 101:21 102:1,6 103:8 |
| **15**   4:4 71:9,14 73:4 73:5,8 |
| **16th**   66:19 67:5 |
| **18**   4:5 44:10,15 |
| **18410**   110:20 |
| **19**   4:6 22:12,15,17 57:20 |
| **1970**   7:13 |
| **19th**   22:23 23:17 23:21 24:23 26:1 26:13,18,21 27:2 32:9,16,17,19,21 33:9 34:20 35:1,4 35:15 |

| 2 |
| --- |
| **2/17/2022**   110:22 |
| **20**   75:13 |
| **2000**   9:8 21:10 |
| **2018**   9:1,5 19:21,23 |
| **2019**   21:9,10,11,15 21:15 22:23 28:21 30:11 32:17 35:15 35:22 36:6,11,18 |

37:13 40:22 41:3,9 45:16 46:5 47:23 49:20 56:14 58:22 65:12,14 75:13 87:4,20 88:17 91:3 91:6
**2020**   21:5 56:15 57:14,20,21,22 58:4,22 62:6 63:6 64:6 67:9,12,14 87:3,6 95:19 96:2,3 96:17 101:22 102:1 102:6 103:8 104:9
**2022**   1:19 6:11
**21st**   47:23
**22**   4:6
**22nd**   46:5
**23rd**   28:15 54:6
**25th**   28:15,18
**26**   3:9 47:5,6 64:16
**26th**   7:13
**27**   3:18
**278**   110:21
**2:20**   1:5

| 3 |
| --- |
| **3**   1:19 3:18 6:11 27:5,11 |
| **30326**   2:8 |
| **30th**   27:9 28:3,14 32:3,5,9 33:10 35:6 36:21 37:13 38:6 54:8 91:3,6 |
| **3355**   2:7 |
| **35209**   2:16 6:10 |
| **3530**   2:15 6:9 |
| **3:12**   6:12 7:18 |
| **3:21**   7:18 |

| 4 |
| --- |
| **44**   4:5 |

**47**   3:9
**4:01**   46:23
**4:04**   46:23

| 5 |
| --- |
| **5:01**   104:3 |
| **5:13**   104:3 |
| **5:18**   109:2 |

| 6 |
| --- |
| **68**   3:19 |

| 7 |
| --- |
| **7**   3:4,19 68:14,15 68:17 69:6 |
| **71**   3:20,21,22 4:4 |
| **7:53**   47:23 |

| 8 |
| --- |
| **8:16**   49:3 |

| 9 |
| --- |
| **9/30/2022**   110:21 |

| a |
| --- |
| **ability**   107:3 |
| **able**   50:17 90:15,22 |
| **absolutely**   44:23 |
| **absorbed**   37:19 |
| **absorbing**   38:2 |
| **abuse**   70:12 80:3 |
| **abused**   74:3 |
| **aca**   1:5 |
| **access**   29:15 30:5 34:3 90:11 |
| **account**   8:13 59:20 83:23 84:3,5,9 |
| **accr**   110:21 |
| **accuracy**   76:18 |
| **accurate**   85:20 97:4,4 107:2,6,8 |
| **acknowledged**   98:9 |
| **acknowledging**   64:1 |

**acting**   6:4 107:18
**action**   1:5 23:16,19 56:16 85:2,3 87:23 88:1 89:10,13 91:12 96:10 110:15
**actions**   25:23 101:4
**actual**   33:4 77:11
**add**   18:18
**addition**   77:20 78:1 78:1
**additional**   72:21
**administrator**   37:2
**admitted**   71:4 90:5
**adult**   84:17
**advance**   96:16,17
**advise**   48:16
**affirmatively**   38:18
**affirmed**   6:18
**affirming**   106:20 107:1,5
**ag's**   105:8,21 106:7
**age**   9:9
**ago**   20:5 87:2 103:13
**agree**   16:2 23:10 25:3,6,8,13 28:13 28:17 38:17 39:19 39:21 46:2,4 48:1 48:10 51:1 67:2 69:1 76:17 78:9,12 78:13 97:11
**agreed**   5:2 8:2,5
**agreeing**   18:4
**alabama**   1:2 2:16 6:2,3,10 108:6,10 108:13 110:3
**alert**   7:16
**allegation**   73:21,23 74:2 79:23 83:17 85:22

[allegations - carr]                                                          Page 112

**allegations** 105:18
**amount** 40:1 57:10
 77:3,6,7 107:16
**answer** 13:7,8 17:6
 18:7,11,17 23:5
 32:13 38:19 64:11
 75:16 76:7,11
 95:14 96:23 105:8
 106:2
**answered** 61:22
**answers** 106:10
 107:12 110:8
**anticipated** 40:18
**anybody** 42:6
 62:10 68:11 85:6
 95:7,13
**anywise** 110:15
**apologize** 79:8
**appeal** 102:9,10,13
 102:18
**appealed** 101:18
**appears** 45:6
**applies** 43:6 66:6
 79:3
**appreciate** 18:8
**approve** 79:20
**approximately**
 6:12
**april** 21:5,9,10,10
 21:15 30:9 31:3
**area** 10:19 98:12
**areas** 98:10
**arises** 51:20
**articulated** 102:2
**artur** 2:4 102:20
**aside** 12:13
**asked** 8:18 15:23
 24:15 49:21 61:15
 64:5 74:17 75:11
 77:3 78:3 81:12
 96:23

**asking** 18:4 28:7
 33:19 43:1,19
 52:18 54:10 58:5
 63:9 80:4 98:8
 102:9
**asleep** 86:2,4,7
**assertions** 80:7
 81:14
**assign** 5:18
**assist** 11:1
**assistant** 30:10
**assume** 21:5 68:14
**atlanta** 2:8
**attached** 47:8
**attempt** 49:11
 84:11
**attempted** 7:22
 108:16
**attendance** 38:12
 39:19 40:23 41:9
 41:12 42:20 43:2
 77:11,16,17,20
 78:1,11
**attention** 32:21
 36:21
**attorney** 1:11 2:5
 12:3,4 51:17
**attorney's** 90:8
**attorneys** 2:6,13
 11:4
**authoritative** 78:10
 78:14
**authority** 56:18,21
**available** 48:19
**aware** 10:18 13:3,6
 14:4,5 15:5,13
 20:1 50:9 57:1,7
 57:10 83:10,13,14
 84:21 108:5,11

**b**

**back** 7:20 23:8 42:7
 44:20 47:1 54:15
 54:19 60:1,17 62:1
 66:10 74:8 93:5
 101:6 104:9,16,23
**bailiff** 86:21
**ballpark** 13:5
**barefield** 72:19
 73:1,16 75:8 93:9
**barrier** 34:6
**based** 9:9 23:16,19
 24:12,17 44:5 46:5
 83:14 88:1 92:10
 101:10
**basically** 16:20
 50:12
**basis** 56:7 65:21
**bates** 47:11
**battery** 40:18
**bear** 84:19
**bearing** 81:14
**beginning** 8:17
 69:1
**belief** 36:16
**believe** 31:22 33:3
 33:5,9,19 35:20
 43:6 59:22 100:4
 107:3
**believed** 59:19
**believes** 14:13
**best** 45:18 46:9,11
 66:13 67:4 69:9
 100:11,15 107:3
**better** 48:17 99:3,9
**beyond** 10:20
 37:23
**big** 65:22
**birmingham** 2:16
 6:2,10 9:18

**birth** 7:11 8:19
**bit** 16:11 78:18,21
**black** 73:6,8 75:7
 76:5
**bottom** 47:22
**break** 7:17 46:21
 46:22 51:11 77:5
 103:22 104:2
**briefing** 19:9
**briefings** 19:18
**broadly** 19:10,14
**broken** 18:1
**buffer** 31:3
**building** 8:3 87:8
 88:2 99:15,15
**built** 55:18
**bullet** 67:1 70:12
 80:2 83:12 86:2
 87:8 88:5 89:15
 90:17 93:4 94:8
 95:17
**bullets** 70:9
**bunch** 18:1
**busy** 29:22

**c**

**c** 2:1 110:1,1
**call** 56:23 90:11
**called** 20:11 94:15
 105:17
**capacity** 1:11 91:16
 107:19
**capture** 17:20
**captured** 25:15
**capturing** 41:22
**career** 9:12
**carefully** 97:15
**carr** 1:10 3:14 12:5
 13:2,11 14:11,11
 15:10,17,21 22:14
 24:23 25:15 27:7
 27:14 28:22 30:14

32:1,2,5,20 33:11
33:20 34:4,8,21
35:1,4 36:5 43:7,15
43:19 62:17 63:6
64:2,15 65:14,19
66:15 67:6 68:20
71:17 72:1 74:15
74:17,22 77:19
82:4 98:14 100:6
104:6,12 107:15
108:1
**carr's** 29:16
**case** 20:9 44:13
47:12 48:6 74:8
104:6,7,12 105:7
105:15,22 106:2,5
107:21 108:8
**cases** 50:9,16
101:14 105:16
108:14
**category** 78:3
**caught** 36:21
**cause** 6:13 110:16
**caused** 86:21
**cc'd** 100:16
**certainly** 15:10
34:14 86:16
**certified** 1:22 5:6
6:1 110:22
**certify** 6:4 110:6,13
**chain** 11:9 14:3
16:21 30:15,17
34:7 45:12 48:5
49:13 51:11,13,21
53:22 60:15 61:16
63:8 65:20 82:23
83:1
**challenge** 21:6
**change** 8:12
**changes** 45:6

**charge** 57:8 100:3
100:7,8,22 104:10
105:2
**charges** 74:1
104:13
**cheryl** 42:17,19
73:6,8 76:5
**chief** 7:15 8:19,22
9:3 10:22 12:4
29:16 37:1 39:4
51:6
**chose** 14:1
**circumstances**
78:19
**civil** 1:5 6:6 9:15
10:3,7 105:15
**clarification** 61:20
**clear** 18:3,16 29:1
37:18 48:6 61:6
98:7
**close** 20:13 65:3,4,8
65:9 67:5 69:9,11
95:18
**closely** 26:6,7
**closer** 65:11,13
**clue** 60:21
**combined** 75:20
**come** 11:19 12:19
15:7 16:17 49:9,12
49:15 57:2 60:17
60:20 62:1 66:1,1
74:10 77:22 80:4
81:9
**comes** 11:10 28:9
78:11 108:9
**comfortable** 8:11
8:14 60:19
**coming** 40:19 54:16
54:23 55:19
**command** 10:23
11:10 14:3 15:12

16:21 30:15,17
34:7 45:13 48:5
49:13 51:12,13,21
53:22 60:15 61:16
63:8 65:21 82:23
83:2
**commencing** 6:11
**commissioner** 5:6
6:4
**communicated**
30:16 82:11
**comp** 37:11 38:11
40:11,12,13,14
41:4,17 70:17,22
72:13,18 74:21
75:1,3,4,13,20
77:23 79:8,17,19
79:20 81:15 98:10
98:12,15
**compare** 76:18
**complained** 103:5
103:9
**complaining** 13:4
16:23 63:4
**complaint** 12:2,11
12:14,17,18 13:13
**complaints** 11:23
18:23 85:12,14
94:10 101:13
**complex** 52:11
**compliance** 5:11
**complicated** 77:5
77:14 78:22 79:15
**complies** 70:7
72:10
**compromising**
89:16,18
**computer** 110:9
**concept** 10:8
**concern** 21:16,17
48:7 49:7 51:7 52:1

62:16 80:18 91:14
**concerned** 51:9,19
51:19 61:14
**concerns** 21:22
48:17 49:10 52:6
52:14 53:9 60:3
65:15 92:11 95:3,8
**concluded** 109:2
**conduct** 94:7,12
**confidential** 90:13
**confirming** 81:8,13
**conflict** 11:13
**confrontation**
93:11
**confronted** 90:5
**confused** 78:19
**conjunction** 67:10
**consider** 9:21 10:1
10:5
**consistently** 39:17
39:22
**constant** 80:3
**constantly** 39:7
**contemporaneou...**
37:13
**contended** 61:8
**content** 69:20
**context** 12:14 32:7
**continued** 55:7,11
56:4,13 97:12
101:18
**continuing** 4:1
54:13 56:10 67:17
**contributing** 70:15
74:5 76:16
**control** 45:23
**conversation** 8:2
17:18 24:14,15
26:3 27:22 31:13
31:15 37:22,23
38:6 57:16,23 58:9

66:14 74:15 92:16
104:11
**conversations** 44:5
58:17 61:4 62:6,8
62:13,18,22 63:6
64:6 66:11 67:6,11
67:17,22 68:6
69:14 98:16
**copy** 46:19 47:8,15
**correct** 7:6,7 8:20
10:12,13 17:3
19:15,16,17 20:5
20:19,20,23 24:4
24:16 28:4,18 30:2
31:13 32:7 34:4
37:20 44:7 49:3
50:22 51:4 53:3
60:12 61:15 63:15
63:19 64:2 65:16
66:19 68:16 82:4
83:15 87:6 88:13
89:7 90:4 92:7
98:11 100:20
103:10 105:3
106:21 107:6,9
110:11
**correction** 99:17
**correctly** 48:23
**correspondence**
66:18,22
**corroborate** 58:23
**counsel** 5:4,15,17
6:8 47:3 110:14
**counseled** 80:3
**counseling** 92:13
96:12
**count** 70:10 74:18
**counted** 74:22,23
**county** 1:12 8:20
9:7 10:16 25:10
79:2 110:4

**couple** 15:8
**course** 13:1 20:18
44:12 63:12 100:14
**court** 1:1,22 5:6,12
6:2,7,22 23:13
55:22 79:11 88:5
89:1 106:20,21
107:1
**courtroom** 79:12
86:14
**coverage** 108:14
**covers** 108:14
**covid** 67:21 68:3,8
**coworkers** 51:15
76:20 89:16 93:6,7
94:5,17,22 95:2,7
**creates** 18:1
**credibility** 83:6
89:15,21 91:15
93:5 94:4,16
**criminal** 9:12 50:9
94:10
**crossed** 61:1
**currently** 7:14
103:17
**custodian** 51:17
**cv** 1:5

**d**

**da** 8:19,23 9:2
10:22 13:2,10,11
14:11,15 29:16
51:6 58:18 107:18
**da's** 9:7,10 11:1,14
12:16 18:22 19:9
19:17 21:18 30:12
41:11,15,21 42:21
43:3 61:11 90:14
98:15 107:21 108:7
108:7
**danny** 1:10 3:14
9:2 11:1,11 12:9

13:2 14:4,9 15:8
23:22,23 24:2,23
25:2,15 27:14
28:22 29:10 30:14
30:20 31:5,17 32:1
32:2,4,14,20 33:11
34:3,8,11,13,17
36:5 43:7 53:21
58:15,17,18 62:9
62:12,15 64:10,15
64:17,21 65:14
66:2,15 67:18
68:20 69:13 71:17
72:1 82:5,5,12,14
85:4 98:14,23
99:23 100:16 104:6
104:11 107:11
108:1
**danny's** 13:22 48:4
**date** 6:5 7:11 8:18
22:22 28:2 36:2
45:20,22 46:1
66:17 95:21
**dated** 27:8 47:23
**dates** 28:12,13
88:20
**davis** 2:4 3:4 7:2,4
7:19 8:10 17:8
46:18 47:1,2,13
73:13 75:16 77:10
92:19 97:2,14,23
102:22 103:2,4,22
104:4 108:19
**day** 56:1 69:8 77:21
79:13,13 80:6
103:1
**days** 28:18 35:16
71:5 75:13,19
78:22 80:12,20,22
**dda** 79:10

**ddas** 39:7 40:9,13
79:7 80:21
**deal** 10:7 19:10
40:14 57:2,2 79:7,7
84:16 85:13 90:9
90:10 104:20
**dealing** 11:13 40:8
54:18 67:21
**deals** 40:7,8
**decide** 12:9
**decides** 58:18
**deciding** 68:9
**decision** 13:22
14:22 50:11 55:17
58:11,12,15 81:20
81:23 82:3,5,7,8,12
82:17 96:7 98:22
99:19 100:1
**decisions** 15:17,22
31:16 58:14
**deducted** 77:23
**deep** 80:14
**defend** 104:12
**defendant** 1:13
2:10
**defenses** 105:20
**definitely** 12:1
63:10
**deliver** 34:3
**delivered** 33:11,20
33:22 54:6,8
**delivery** 33:15
**department** 76:13
**depend** 79:5
**depends** 78:19
**deponent** 17:7
108:23
**deposition** 1:16
3:14,15 5:4,9,10,19
14:12 22:19,20
27:13,15 44:17,18

68:19,21 71:17,19
72:1,3 109:2 110:7
**depositions** 5:13
**deputy** 7:15 8:19
8:23 9:3 10:22 11:3
12:4 13:2,10 29:16
39:5 51:6,16
**derived** 24:3
**describe** 10:21 93:9
**described** 23:20
24:22 25:4,9 26:12
27:20,21,23 28:14
91:13 92:11
**describes** 23:16
49:22
**details** 79:9 86:9,11
86:13
**determination** 77:2
77:8
**determine** 7:23
40:4
**develops** 13:16
**different** 50:4 79:1
79:1
**direct** 16:19 34:3
48:18 56:15 91:11
92:1,8,13
**direction** 48:18
**directly** 12:19 31:8
85:5 95:5
**disciplinary** 56:16
56:23 91:20 92:1
96:10
**discipline** 56:19
91:9
**disciplined** 26:11
**disciplining** 57:7
**disclosures** 105:12
105:17,21
**discovery** 74:14

**discriminating**
19:5
**discrimination**
11:23 12:2,13
13:13 16:14 18:23
19:20 20:3 100:9
**discuss** 12:20,21
14:8 15:7,14 31:17
49:7,9,13,15 52:14
58:16 65:18
**discussed** 20:14
25:20 37:3 49:16
52:3,12,22 59:4
67:8,9 77:19 81:17
82:6 103:14 108:3
**discusses** 23:11
**discussing** 24:22
27:20 42:19 43:15
43:23 52:1,6 64:15
85:6
**discussion** 8:9 24:5
49:10 61:21
**discussions** 15:10
44:2 59:2 68:4
69:17 104:22
**dispute** 21:6
**disseminated** 19:3
**distinct** 74:20
**distinction** 52:20
**district** 1:1,2,11 6:6
11:3 12:3,4 51:17
90:8
**disturbance** 86:22
**division** 1:3 42:12
**document** 23:7,8
27:5,8,10,19 36:15
44:9,11 45:1 47:11
47:20 70:6 72:6
92:13,17 105:17
**documentation**
81:7,13

**documented** 96:14
97:20
**documents** 41:17
41:22 43:1,8,16,20
43:23 44:3,6 46:13
70:17,18,22 71:3
71:11 74:10,12,16
76:1 78:4 82:14
**doing** 57:6 85:5
98:5,19 106:15,18
107:4,13
**driskill** 75:9 93:9
**drive** 2:15 6:10
**due** 15:4
**duly** 6:18

## e

**e** 2:1,1,11 32:22
33:1,7,8,14 45:11
45:15,21,23 46:9
46:10,13,16 47:3
47:23 48:4 49:19
50:1,18,21 51:1
52:7,13 53:5 54:8
60:13,22 61:3,7,19
62:15 63:4,8,11,13
63:14,17 64:7,15
65:10 66:4 100:2,4
100:6,9,10,11,14
100:17,18 102:8
103:21 104:16,19
110:1,1
**earlier** 58:16 70:16
70:18,21 71:1
80:10 91:1 93:6
98:4
**early** 36:6,10,18
40:22 57:21 64:6
80:4,5,5
**earning** 70:12
**edification** 77:16

**eeoc** 100:3,7,22
102:15 104:10,16
105:2
**effect** 5:10 62:14
76:14 100:7
**effective** 17:1 91:16
**efforts** 58:22
**either** 55:22 99:2
**elise** 75:9
**ellie** 1:22 5:5 6:1
**emphatically** 29:2
**employee** 12:11,14
13:17 16:13,16
20:10 21:18 26:6,7
26:11,16 30:13
38:15,22 39:17,22
51:2,7,10 66:8 77:4
80:19 90:7,22
94:23 95:4,8 98:23
99:9,10,22
**employees** 11:14
13:4,12 15:6 19:3
19:15,18 30:16
31:4 34:12 39:5
57:5 59:12 75:1,7,8
75:10 78:20 79:1,4
90:14 99:5,6
**employer** 105:19
**employment** 2:6
9:22 10:16 19:11
21:3 70:1 105:16
**empty** 88:6 89:1
**encourage** 57:5
**engagement** 25:12
**erin** 72:18 75:7
**especially** 30:18
99:5
**essentially** 20:21
50:1
**establish** 91:1,6

estimate  67:4
evaluation  59:12
everybody  31:5
  54:20 68:1
evidence  5:20
  46:11 71:4 77:18
  100:15
ex  93:11
exact  42:15
exactly  8:1 17:2,4
  90:20 100:14,17
examination  3:1,4
  6:13 7:4
example  79:6
examples  83:8
  84:18
exchange  49:19
  50:2
executive  30:9
exhibit  3:9,18,19
  3:20,21,22 4:4,5,6
  22:12,15,16 27:5
  27:11 44:10,14
  47:4,6,14 64:16
  68:14,17 69:6 71:6
  71:7,8,10,21 72:4
  72:11,17,21
exhibits  3:6,12 4:1
  71:5,13
exist  93:19,22
expect  29:9,10
  31:12,14
expectation  60:16
expected  100:7,8
  100:20,23
experience  9:15
  17:10 24:13 99:22
expires  110:21
explained  50:14
explaining  37:4

expressed  36:16
expressing  21:16
extra  80:6
eyesight  48:22

**f**

f  110:1
facebook  83:20
fact  15:4 20:14,16
  30:4 35:3 52:22
  61:18 95:6
factored  94:7
factors  79:16
facts  20:9
factual  105:18
failed  39:17,23
  82:22 83:1
failing  48:22
fair  15:16,21 18:13
  18:19,20 20:7
  21:12,23 25:21
  35:18,18 41:10,14
  41:20 57:13,15
  64:12 70:10 84:23
  85:8 88:22 89:2,6
fairly  45:14 48:9,14
  51:3,8 79:3
fairness  45:5 63:3
fall  45:16
fallen  86:2,7
familiar  98:11,15
  98:17
far  10:18 14:6
  24:10 29:7,11 57:6
  57:8 64:19 76:4
  85:5 90:19 98:5
  102:14 103:12
fault  101:7
february  1:19 6:11
federal  6:5 9:22
  10:2,15

feel  19:19 48:7,12
  48:13 60:19
feels  16:13
fell  86:4
felt  25:1 51:7
female  75:7,9,11
fifty  48:21
figure  9:19 104:20
file  16:13 19:15
  30:13 45:10 85:14
filed  100:4,8
  104:11 105:8
filemaker  90:12
filing  85:12 94:10
fill  31:20
final  56:14 82:17
  100:1
find  73:1 97:16
  108:16
fine  7:1 32:13
  102:22 103:3
finish  17:5 62:21
  65:6
finished  18:11,16
  18:18
fire  81:20,23 98:19
  98:22
fired  68:11 98:21
  99:13
firings  14:14
firm  9:18
first  6:17 20:10
  21:2,19 22:5 34:9
  35:17 45:4,8,10
  49:8,16 66:14
  70:12,20 73:21
  74:1 102:10 105:6
fit  21:18 94:23 95:4
  95:8
five  14:13,23 16:8
  28:18 40:19 80:6

80:12 96:23 102:21
flow  13:8
focus  21:11 28:12
folks  74:12
follow  16:16 24:19
  30:17 48:5 54:3
  60:15 82:22 83:1
  84:22
followed  51:14,22
following  3:12 6:14
  20:4 53:8,14 54:9
follows  6:20
font  45:6
force  5:10
foregoing  6:7 110:7
  110:10
forget  66:5
forgot  107:16
forgotten  63:22
  103:18
form  5:16 14:22
  75:15 76:21 92:15
  96:20 97:6
formed  36:1
forth  104:17
forty  37:6 38:8
  39:18,23
forward  45:11
forwarded  12:9
found  88:6
four  13:1,9 14:13
  14:23 16:8 38:23
  48:21 79:10 80:11
fourteen  75:4,19
framing  46:6
frankly  107:15
front  47:14 71:11
  82:15
full  5:11 7:8 39:1
  45:8,10 80:9,17
  81:4

**funds** 107:17,20
**funneled** 31:5
**further** 54:14
    102:18 108:19,23
    110:13

**g**

**gather** 15:23 58:23
**general** 10:9 30:1
**generated** 28:6,8
    74:12 92:14
**georgia** 2:8
**getting** 23:2 62:15
    78:18
**give** 7:8 13:5 14:8
    18:11 45:18 56:13
    67:4 69:19 95:21
**given** 59:6 92:17
    110:12
**giving** 58:20 60:5,6
**go** 7:19 10:14 16:4
    17:3 19:4 30:20
    31:8 42:2 54:15
    59:16 60:1 66:8
    77:1 84:11 93:5
    99:23 102:12,17
**goes** 82:17
**going** 8:1,6,11 14:4
    14:6 15:6,13 16:23
    22:11 27:4 32:11
    39:6 45:4,7 50:15
    54:11,16,19,20,21
    55:2,5 56:11 57:9
    58:8 66:23 67:22
    68:3,13 71:7,8,9
    73:15 81:2 101:3
    102:12,13,17,18
    103:16 104:9,12,13
**good** 40:17 48:4
    57:4 66:9 104:1
**gotten** 8:17

**grant** 89:17,18,20
    90:20
**grasp** 37:8
**great** 47:13
**ground** 17:9 18:13
**grounds** 5:18
**guess** 15:14 58:12
**guy** 61:10

**h**

**half** 45:8
**hand** 33:11,15,20
    33:22 34:3,15
    44:20 47:15 72:9
    72:16,19,23 73:5
    73:14
**handle** 29:22 61:23
    104:17
**handled** 11:17
    18:23 30:7 33:4
**handling** 12:17
**happen** 17:17
    20:23 29:3,8,8,12
    30:19,21,22 87:3
**happened** 14:14
    22:3 29:9,10,14
    31:7,22 39:10 54:1
    54:2,3 56:3 67:1,6
    87:15 95:18 96:1
    96:15 98:20
**happening** 16:6
    57:8 62:6 68:6,9
**happens** 16:4 31:1
**happy** 18:17 46:20
**harassment** 20:4
**head** 18:5 38:18
    76:13
**hear** 64:23
**heard** 10:17 29:6
    38:15,22 57:20
    61:5 89:6,10,13
    91:19 97:3 101:12

103:13
**hearing** 29:4 86:17
    86:20 87:12 88:2
**held** 19:12,14
**help** 49:18 57:4
    79:22 96:5 98:18
    99:7,8
**helped** 106:10
**helping** 105:20
**hereto** 47:9
**hey** 31:20 50:15
    54:15,20 56:3 66:7
    80:20
**highest** 75:12 76:4
**highlighted** 70:3
**hired** 20:14,16 21:5
    106:8
**hires** 20:22
**hiring** 20:15
**hit** 108:7
**hkm** 2:6
**hold** 101:21
**hone** 39:13
**honest** 40:15
**honestly** 46:12 54:4
    76:11 86:11
**hope** 53:16,18
**hoping** 99:18
**hour** 37:6 38:8
    39:18,23
**hours** 77:22
**hundred** 18:3 39:5
    46:15 89:19
**husband** 50:8
    85:13 101:14
**husband's** 84:17
    93:11
**hypothetically** 32:4

**i**

**idea** 51:14,18 62:3
**identification** 3:13
    22:18 27:13 44:16
    47:7 68:19 71:16
    71:23
**identified** 52:7
**ignore** 45:7
**illiterate** 18:2
**immediately** 20:16
    35:12
**imminent** 8:7
**important** 49:14
**improve** 49:12
**improvement**
    99:16
**inaccurate** 96:19
    97:16
**inadvertently**
    17:18
**incident** 23:12,16
    23:20 24:22 25:4,5
    25:15 26:12,17,21
    27:1 87:2 88:15,23
    89:23 91:3,5,14
    92:2,10,18 93:10
**incidents** 27:19,21
    27:23 85:9 94:3
**included** 63:18
**includes** 51:2
**including** 14:18
**independence** 2:15
    6:10
**independent** 58:23
    98:6
**independently** 98:9
**index** 3:1,6 4:1
**indicating** 32:15
    33:13 72:14 73:16
    73:18

indication 61:2
indicator 78:10,14
individual 23:13
  107:19
individuals 66:3
  75:21
inflection 18:6
information 15:23
  28:10 34:11 58:21
  58:23 60:7 90:14
informed 20:18,21
  58:7 96:7
initial 105:11,17
initially 68:9
  104:10
initials 105:21
instagram 84:3
instances 13:3 75:1
  75:3,4 84:21 85:1
  96:17
instruct 89:12 92:8
instructing 88:1
insurance 108:13
  108:14
integrity 90:9
  92:12
intend 79:2
interacting 34:8,9
interested 70:14
  76:15 110:15
interesting 74:4
interim 9:2
interrogatories
  106:5,9
interrogatory
  106:12,16
interrupting 18:12
interruption 7:16
inventorying 41:17
  41:22

investigate 59:16
  59:17
investigated 98:9
investigating 11:21
  12:1
investigation 59:8
  85:6 98:6
involve 53:20,21
involved 11:19
  13:20 14:2,21
  31:17 40:10 58:11
  58:13 79:20 81:1
  82:3 86:17,21
  101:12 106:7
involvement 15:3
involves 24:9
involving 23:12
  25:5 58:14 93:10
  107:21
issue 13:16 16:19
  19:5 21:20 37:9
  48:6 49:22 51:20
  54:17 77:9,13
  90:21 102:19
issues 15:5 34:18
  39:6 42:19 53:15
  54:14,19 55:8,11
  56:5,6,11 57:2
  64:18 69:15,23
  70:3 84:16,17 99:6
  99:8,11,17,22
  101:9
items 95:17 96:7,9
  96:11,13,15

**j**

jackson 2:14 6:9
  40:5 42:9 106:8
james 2:11
jefferson 1:12 8:20
  9:7 25:10 79:2
  110:4

jeter 1:7 2:19 13:12
  14:19 16:10 20:12
  21:18,23 23:12
  26:20,23 28:21
  32:1,4 36:7,12,17
  37:4 38:7 41:15
  42:20 43:2 45:15
  46:8 48:1 49:20
  52:7 53:14 54:7,9
  54:11 55:15,15
  56:16 57:17 58:1
  58:21 59:4 60:3,6,7
  61:8 63:4 65:14
  66:16 67:7,14
  68:11 70:23 72:14
  72:22 73:19 74:3
  75:6 81:20,23
  82:22 83:1,5 86:4,7
  87:11 88:2 89:17
  92:2,9,14 93:10
  94:4 95:4 96:8
  102:4
jeter's 21:3 22:6
  25:5,11 35:20
  40:22 41:4,8 42:20
  43:2 52:1 53:9
  57:22 62:7 83:20
  91:15 94:22 95:7
  100:22
job 10:21 42:13,15
  101:9
jobs 40:8
joe 1:18 5:4 6:12,16
  7:5,10 41:11 45:10
  48:4 49:17
jr 2:11,12
judge 86:17
judges 85:13,14
  94:11 101:13
judgment 107:18
  108:7

judicial 85:12
judy 3:14 20:14
  21:16 22:14,19
  23:11 26:5,10,15
  27:7,23 34:1,2,7
  36:10 38:6 44:2,17
  45:9 49:8,9,16 52:1
  52:8,12,14 53:2,4,8
  54:10,13,22 55:3
  55:14 56:10,13
  57:16,23 58:8,11
  58:20 59:4,9,17,22
  60:14,17,18 61:2,5
  61:21,23 62:3,4
  64:23 69:19 80:15
  81:6,11,12,22 82:7
  82:11 83:14 84:18
  87:13 88:1 89:20
  93:15 94:3,15,22
  95:10,12,23 98:1,4
  101:13 107:10
july 49:19 50:18
jump 51:12
june 9:8

**k**

keep 54:18,19
kept 37:10
kin 110:14
kind 11:2,5,6,10
  15:11,15 16:18
  20:4 31:3,5 50:6,13
  50:18 53:21 54:13
  55:1,18 56:10,23
  61:23 63:9 67:22
  69:20 77:14 88:18
  94:14,16 97:13
  101:15,19 102:11
knew 50:6,13,18
  60:1 61:6,9 82:8
  83:11 86:12 88:13
  101:2,11 103:2,4,8

103:12,14 107:10
**know**   10:16 11:10
   13:21,23 14:5,5,7,9
   15:8,12 17:17,18
   20:1,2,3 23:6 25:2
   25:20 29:2,6,8,13
   30:11,23 31:1,2,6,7
   31:8,10,16 32:20
   34:14,15,16,17
   37:10 38:11 39:7
   40:8,10,11 42:14
   42:16 43:10,13
   45:20,22 48:15
   50:21 52:10 53:17
   55:7,18 56:2,22
   57:2,5,7 59:3,5,14
   59:19 61:16 62:14
   62:14 64:19 65:22
   66:4,18,21 67:8,15
   67:15,16,19,20,22
   68:3,5 75:17,23
   76:7,8,11,22 77:2,8
   77:12 78:6,8,20
   79:10,13,15,17,21
   80:22 81:2,16,17
   82:16,18 85:16
   87:9,10,15,22 88:7
   89:19 90:1,11
   93:16,19,20,23
   94:2,9,12,15 95:6
   95:11,12,20 96:22
   99:3,5 101:6,9,12
   101:14,17,18,23
   102:8,9,14,16
   103:11,15 104:19
   105:11 107:23
   108:1,12,15,18
**knowing**   29:7 32:6
   32:23 101:1
**knowledge**   9:22
   10:2,6,10 13:11

40:16 75:23 76:10
   79:18 107:9
**known**   85:8 88:23
   89:2,5 96:16
**knows**   32:14 34:14
   108:1

## l

**l**   5:1
**labeled**   47:11
**lack**   99:3
**lamb**   100:16
**lanitra**   1:7 2:19
   13:12 14:18 20:11
   21:17 23:12 28:21
   31:19 32:1,4 35:20
   36:7,12,16 38:7
   41:15 42:20 45:15
   48:1 49:20 52:1,7
   53:4 54:1,7,9 55:9
   55:14,15 56:16
   57:17 58:1,21 59:4
   60:2,6,7,10 61:4,7
   62:7 64:17 66:15
   67:14 68:11 69:14
   69:23 72:14,22
   81:20,23 83:20
   91:12,15 94:4,22
   96:8 101:2 102:4
**laquetta**   50:16
**large**   6:4
**late**   36:5,10,17
**law**   2:5,13 6:8 9:22
   10:2,15 19:11
   108:6
**laws**   5:11
**lawsuit**   101:18
   104:10,14,23
**lawsuits**   102:15
**lawyer**   40:18
   106:21

**lawyerly**   17:9
**lawyers**   17:21
   74:11
**leading**   5:16
**learned**   91:2
**learning**   28:21 29:4
   91:5
**leave**   13:23 26:16
   40:1 41:4,23 70:17
   70:22 72:13,18,22
   74:21 75:2,3,5,13
   75:20 77:23 78:3
   78:15,16 80:4
   81:14 85:23 92:22
**leaves**   87:8
**leaving**   80:5 88:2
**led**   55:15
**left**   57:20
**legal**   9:12 84:17
   101:11
**lenox**   2:7
**lester**   7:10
**letter**   92:9
**letting**   87:9
**level**   11:17 19:11
   20:22 53:17
**license**   110:21
**lightly**   99:1,1
**limit**   68:10
**line**   16:20
**linkedin**   84:5
**list**   96:6 101:8
**listen**   97:15
**lists**   66:23
**literally**   8:16 74:17
**little**   9:17 16:11
   78:18,21
**lockhart**   42:17,19
   43:1
**logical**   48:11

**logistics**   104:15
**long**   8:22 9:6 35:9
   87:2 98:20 99:20
   101:8
**longevity**   9:10
**look**   12:9 18:2 27:8
   27:17 36:6,11
   39:18 40:1 44:21
   45:21 47:3,17
   76:23 78:4 79:14
   104:19
**looked**   46:12 55:23
   81:18
**looking**   77:3 91:2
   95:21
**looks**   99:12
**losing**   89:21
**loss**   83:6
**lost**   94:4 97:13
**lot**   33:1 40:15
   53:15 65:23 77:1
   80:22 96:21
**loud**   49:6
**lower**   11:17 53:17
**lowest**   75:19

## m

**mail**   32:22 33:8,14
   45:11,15,21,23
   46:9,10,13,16 47:3
   47:23 48:4 49:19
   50:1,18,21 51:1
   52:7,13 54:8 60:13
   60:22 61:7,19
   62:15 63:4,8,11,13
   63:14,17 64:7,15
   65:10 66:4 100:2,4
   100:6,9,10,11,14
   100:17,18 102:8
   103:21
**mailed**   53:5

**mails** 33:1,7 61:3 104:16,19
**majority** 9:11
**maker** 82:7,12
**making** 13:12 14:22 37:11 70:9 101:13
**march** 58:3 66:19 67:1,5,5,8,14 69:5 87:3,5 95:18 96:3 96:17 101:21 102:1 102:5 103:8
**mark** 18:7
**marked** 3:13 22:17 27:12 44:15 47:7 56:1 68:18 71:15 71:22
**material** 90:10
**matter** 49:22
**matters** 94:10
**mccurry** 37:1 44:3 59:3,5 81:7,19 100:5,16
**mean** 10:13 11:9 14:7,8 29:11 32:14 39:9 42:10 51:9,11 56:2 57:1 59:12 65:21 76:8 78:23 79:5 80:12 88:10 89:22 90:16,18 91:9 95:11 97:21 98:3,6 99:14 100:13 102:23 106:6,17
**means** 98:1
**meant** 88:7 89:20 90:20 101:16 103:2 107:15
**measure** 39:16,22
**measuring** 76:17

**media** 8:1 83:18 84:8,12 90:2
**mediation** 23:13
**meet** 30:20 45:16 49:21 60:11
**meeting** 29:3,4,7,20 30:14 31:21 32:7 48:16 93:4
**meetings** 19:12,14 28:15
**meets** 32:1
**memo** 22:11,13 23:2,5,11,17,20 24:3,10,16,23 25:16,23 26:13,18 26:21 27:2,6 28:1,3 28:5,11,14,17,19 32:3,5,9,10,19 33:3 33:4,10,10 34:3,15 34:20 35:1,4,6,16 35:17 36:15,22 38:2 45:9 54:6 60:2 66:22 67:10 68:23 69:2,4,18,21,22 73:22 74:2 81:12 81:15 82:22 92:5
**memorialized** 93:15
**memory** 24:5,10 34:21 53:12,13 55:10 56:5 63:7,9 66:6 68:7 95:23
**memos** 31:19 32:2 33:7 35:10,19 37:19 54:23 55:4 91:2
**mentioned** 19:8 58:16 60:21 80:10 87:14 90:13 93:6
**mentioning** 64:7,21

**met** 28:22 31:19 32:4,17
**michael** 36:23 37:1 37:2,3 44:3 59:2,5 59:10 80:15 81:6 81:16,19 82:7,11 107:11
**middle** 7:8 73:14
**million** 39:9
**mind** 44:21 48:16 55:18 56:9 61:1 101:1 102:11,16 103:17
**minutes** 40:20 102:21
**missed** 70:20 76:19 76:20
**mode** 82:17
**moment** 12:13 23:4 27:17 47:17 48:22 60:1 66:23
**money** 108:9
**monitor** 26:6 29:19 31:11
**monitored** 30:2
**monitoring** 8:4
**month** 21:12,14 22:6 87:22
**months** 9:17 21:3 38:16 54:10 55:11 55:13 56:14 57:21 64:6 85:9 88:21 89:3,7 103:13
**morning** 48:4
**move** 56:7 57:14 62:5
**moving** 66:10
**murrell** 50:16
**murrill** 2:11 7:1 17:5 46:17,20 47:10 73:12 75:15

76:21 92:15 96:20 97:6,18 108:21

**n**

**n** 2:1 5:1
**name** 7:9,9 8:18 33:14,16,17
**nature** 12:8 86:18 86:23
**ne** 2:7
**necessarily** 99:13
**necessary** 5:14
**need** 26:5,6 29:20 36:6,11 80:23 104:19
**needed** 25:2 29:21 70:3
**needs** 26:11,16 49:9
**neither** 110:14
**never** 10:19 29:6 33:7 41:6 44:4,6 55:8 59:7 61:1,5,11 61:18 79:19 81:17 103:13 105:1
**new** 99:5
**nicely** 40:18
**nineteen** 75:2
**nitra** 45:11
**nodding** 18:5
**nods** 38:18
**nonattorney** 30:20
**normal** 17:18 24:17 24:19 28:8
**normally** 54:22
**northern** 1:2
**notary** 1:23 5:7 6:3
**notice** 8:6
**november** 7:13 9:1 9:4 46:5 47:23 50:21 65:10,13

**number**  22:12,15
  27:5 44:10 47:5
  60:23 61:10 64:16
  68:10,14 69:6 71:6
  71:7,9,10 72:5,12
  72:15,17,21 73:16
  73:19 74:18 75:12
  75:19 76:4 78:2,22
  79:14 96:13
**numbers**  73:2

**o**

**o**  5:1
**object**  75:15 76:21
  92:15 96:20 97:6
**objection**  97:18
**objections**  5:15,18
**observations**  102:3
**observing**  86:3,4,7
**obviously**  8:12 12:8
  77:7 90:7
**occasion**  50:6
  86:10,19
**occasionally**  11:16
  11:19 66:5
**occasions**  15:9,9
**occur**  53:16 60:5
  87:19
**occurred**  24:1
  61:12 95:22
**october**  36:6,11,18
  40:22 41:3,9
**offer**  14:7
**offered**  5:20 74:8
**office**  8:4 9:7,10
  10:14 11:1,2,15
  12:16 13:17 14:2
  18:22 19:10,17
  20:11,19,23 21:18
  30:12 41:11,16,21
  42:8,21 43:3 48:20
  51:20 53:16 61:11

65:23 66:4 67:23
  68:1,2,10 70:15
  74:6,11,13 76:16
  84:16 90:8,15
  94:13 98:16 105:8
  105:22 106:7
  107:22 108:7,8
**office's**  11:22
**officer**  91:17
  106:21
**officers**  11:8
**offices**  6:9
**official**  1:10 107:19
**officially**  9:1,4
**oftentimes**  28:10
**oh**  102:11
**okay**  16:12 18:9
  20:7 39:15 47:16
  52:17,21 56:9 62:5
  63:12 64:8 72:8
  73:9 93:14,21,23
  102:11
**old**  48:21
**once**  27:7 34:12
  106:7
**ones**  33:13,13
  71:10 85:23
**ongoing**  50:9 67:19
  69:14 94:9
**ooh**  53:23
**opinion**  14:8 15:18
  36:2 80:7
**opinions**  101:21
**opportunity**  18:12
**opposed**  76:19
**opposite**  31:23
**ops**  89:17,18 90:19
  102:9
**oral**  6:13
**order**  35:21 54:7

**original**  94:1
**outline**  105:18,19
**overseeing**  11:22
**overwhelming**  9:11
**owned**  83:23 84:3,6
  84:9

**p**

**p**  2:1,1 5:1
**p.c.**  2:14 6:9
**p.m.**  6:12 7:18,18
  46:23,23 104:3,3
  109:2
**page**  3:3,8,17 4:3
  74:19 83:20
**pages**  74:18
**paid**  32:21 57:10
**paper**  33:4
**part**  11:20 58:9
  65:22 70:20 74:13
  78:20 80:23 89:20
  90:21 94:8,11,16
**participate**  10:17
**participated**  19:9
**participating**  62:8
**particular**  10:6
  70:3
**parties**  5:3,17
  110:14
**parts**  10:6
**party**  105:15,15
**patrick**  100:16
**pay**  107:17
**pays**  107:20 108:8
**peculiarities**  108:6
**people**  8:3 15:6
  31:1,7 59:14 66:1,5
  82:3 107:7,10
**percent**  18:3 46:15
  89:20
**perfect**  55:9

**performance**
  101:10
**period**  9:20 35:9
  37:9 55:8 56:4
**permutation**  26:8
**person**  59:3 60:5,8
  61:13 76:4,19
  77:21
**personal**  107:9
**personnel**  20:19,22
  57:3
**perspective**  54:5
**perspectives**  102:3
  102:5
**phases**  8:17
**phrase**  49:23 99:3
**physical**  93:10
**pick**  41:7
**pickett**  1:22 5:5 6:1
**picking**  59:21
**pin**  40:20
**place**  11:18 18:22
  19:2 30:12 36:15
  36:15
**placed**  82:15
**plaintiff**  1:8 2:3
**plaintiff's**  3:8,18,19
  3:20,21,22 4:4,5,6
  22:15,16 27:5,11
  44:10,14 47:4,6
  64:16 68:13,15,17
  69:5 71:6,7,8,9,13
  71:21 72:4,11,14
  72:17,20
**play**  79:16
**played**  94:11,16
**please**  49:14 73:17
  97:14
**point**  7:22 8:12
  12:7 17:8 21:21
  41:10,21 43:15

57:15,21 58:3,4
62:1 64:13,14
83:12 90:17 99:19
103:5,9
**points** 67:1 94:8
**policies** 79:3
**policy** 18:22 19:2
30:12 65:23 108:13
**position** 12:4 50:20
59:9
**positions** 59:14
**possibility** 66:15
**possible** 35:12
**possibly** 62:7 85:4
100:5 102:14
**posted** 83:17 90:1
**posts** 84:12
**power** 7:23
**practice** 24:13,17
24:19 28:9 29:18
30:1 57:12 105:16
**practiced** 10:19
**preparation** 44:12
104:4
**preparations** 82:10
**prepare** 105:21
106:10
**prepared** 92:9
**preparing** 106:1,4
**present** 2:18 15:8
29:20 70:15 74:5
76:16
**pretty** 20:13
**prevent** 68:1
**prevented** 30:13
34:7
**previously** 3:13
22:17 27:12 44:15
68:18 71:15,22
88:14

**print** 110:9
**printout** 78:16
**printouts** 78:2
**prior** 5:20 32:5
46:4 57:22 58:3
67:11 72:6 87:3
96:15
**prioritized** 70:4
**problem** 21:20 37:3
48:6 60:17,18 61:2
61:4 62:2 90:16
**problems** 67:17
**procedure** 6:6 20:5
102:14
**proceed** 8:6,11
**proceeded** 44:6
**proceeding** 8:14
**proceedings** 6:14
110:12
**process** 12:16
13:19 14:22 16:11
16:15 40:16 68:5
**produce** 96:10,11
105:17
**produced** 47:11
**productive** 57:4
99:10
**proof** 85:19 86:6
98:1
**proper** 48:5 61:16
**prosecuting** 50:16
**provide** 43:1 81:7
**provided** 6:5 46:16
47:4 74:13
**provides** 107:17
**providing** 107:11
**public** 1:23 5:7 6:3
31:4
**pull** 41:8,12,16,22
43:19 46:19

**pulled** 44:4
**pulling** 40:22 41:3
**purpose** 24:21
53:21 69:18
**pursue** 102:13,18
**put** 12:13 18:6 24:9
26:16 28:11 39:17
39:23 40:20 47:14
59:13 73:7,17
77:18 92:22
**putting** 36:14

**q**

**question** 13:7 17:6
18:7 19:10 32:12
38:1 52:4,11 59:19
59:23 61:22 77:5
96:22 97:7,9,10,15
97:19
**questions** 5:16,17
23:5 40:19 96:23
97:12 108:20,21
110:8
**quick** 99:3
**quote** 45:9,10
88:23 105:7

**r**

**r** 2:1,12 110:1
**raised** 60:3
**raises** 92:11
**raising** 62:16
**rank** 16:13 19:15
30:13
**rarely** 80:5
**reach** 61:10
**reached** 64:22
65:15
**reacted** 39:14
**read** 23:4 32:21
36:22 37:19 45:4
48:3,22 49:5 73:10

88:7 89:22 97:14
97:17
**reading** 5:8 25:23
37:12,15 38:2
48:11
**ready** 23:5 45:2
47:19
**real** 34:21
**really** 22:8 30:18
37:7 40:15 43:13
50:7,17 82:16
87:21 101:23
**reason** 18:15 24:18
43:11 59:18,23
61:12 82:13
**reasons** 76:10
**recall** 16:5 21:16
21:19 22:2,7 24:7
26:2 28:7 29:3 36:1
38:10,13 39:12
46:9,11 47:21
54:12,12 55:6,12
57:23 62:19 63:1
64:7,10,20 65:2
66:13,14,17 67:12
67:18 69:10 70:18
87:13,20 100:9,10
100:13
**recalled** 64:5
**recognize** 22:21
23:1 27:16,18
68:14 80:20 99:7
**recollection** 22:8
26:4 28:20 36:4,9
36:14 40:21 41:2
42:6,18,23 43:14
43:18,22 45:19
51:23 52:6 53:8
**record** 7:20,21 8:2
8:8,9 47:10 78:11
97:17

**records**  39:19
40:23 41:9,12
77:11,16,17,20
78:1
**recuse**  50:11
**reduce**  24:15
**reduced**  110:9
**reenforce**  66:2,3
**refer**  69:16
**reference**  10:15
**referenced**  3:15
22:20 27:14 44:18
68:20 71:18 72:2
**referencing**  86:12
100:18
**referring**  12:6
35:14
**reflected**  91:15
**regard**  10:15 26:3
60:22 68:4 69:23
76:1 91:9 92:5,17
104:19
**regarding**  10:2
45:12
**regards**  99:4
**regular**  65:21
**regularly**  81:8
**related**  11:21 50:8
70:23
**relates**  25:10
**relating**  5:12 80:21
**relevant**  16:1 20:9
**remember**  22:15
23:2 24:6,10 25:14
25:18 27:9,19,20
27:22 34:23 35:3
36:3 37:12,15,17
37:21 38:2,5 39:9
50:1 54:9,22 55:19
55:20 56:4 62:15
63:2,3 64:14 70:23

86:9,11,13,15,16
86:20 87:12,17,23
88:20 97:9 100:12
100:15,17,18,19
**remembered**  63:10
63:13,14 103:20
**rendition**  97:4
**repeated**  83:8
**repeatedly**  80:3
83:5 85:11
**report**  21:20 48:7
48:15 89:17,18
95:2 96:12
**reported**  1:21
21:22 94:18 95:12
**reporter**  1:22 5:6
6:2,22
**reporter's**  17:14
**reporting**  95:7,13
**reports**  8:5
**represent**  21:4
22:13 27:6 46:14
70:8 72:12,16,20
73:15,18 74:7,14
74:17,22 75:6
77:17 105:14
**representation**
76:13 82:21 83:4
84:15
**represents**  74:19
110:10
**reprimand**  92:9
**reprimanding**
92:14
**request**  41:17 69:8
69:12 74:20
**requested**  69:2,4,7
**requesting**  40:12
45:16
**requests**  41:5,23
72:13,17,21 76:10

79:20
**required**  105:5
**resolve**  12:23
**resolved**  53:17
103:13
**resolving**  49:11
**respect**  16:7 34:19
35:19 95:16
**respective**  5:4
**respond**  104:13,21
**responded**  61:18
105:2
**responding**  104:15
**response**  11:22
49:2,5,23 60:15
105:4,6
**responses**  106:5,12
106:16 107:2,6,7
**responsibilities**
14:7,10
**responsibility**
11:13 13:18,21
81:1 101:4
**result**  110:16
**retaliate**  10:11
**retaliation**  10:8
**review**  29:19 43:7
44:6 70:17,22
**reviewed**  107:1
**reviewing**  23:7
45:1 47:20
**right**  9:13 11:11
14:16,17,19 18:5
33:18 37:15 48:13
48:18 61:19 72:11
72:23 73:5,6,7,11
73:14,15,21 94:2
103:23 105:9
**rights**  10:3,7
**riley**  2:12,14 6:9
8:8 102:20,23

104:1 106:8
**road**  2:7
**robert**  2:12
**roberts**  1:18 5:5
6:12,16 7:5,10,12
7:14,19 8:10,16
18:21 23:9 41:11
47:2,18 48:12
57:15 60:4 73:3
77:15 79:22 96:6
98:19 100:3
**robust**  91:14
**role**  11:12,20 15:11
105:20 106:1,4
**room**  17:21
**row**  80:12
**rules**  5:12 6:5 17:9
18:13
**running**  11:1

**s**

**s**  2:1 5:1
**saith**  108:23
**sake**  17:14
**saw**  33:7 49:19
59:6 82:14 93:7,16
93:16 94:1 100:2
**saying**  26:5 29:2,5
32:8 51:2 54:20
55:1,5 61:11 62:19
63:1 64:3,4 70:18
70:23 96:1
**says**  28:19 36:23
48:3,8,12,13 69:2
80:2
**scenario**  31:23
**scene**  86:22
**schedule**  29:16,19
30:2,5,8 31:11
**scheduling**  104:8
**second**  10:23 15:12
44:22 73:11

**section**  42:8,11
**see**  12:22 29:19
  32:19 46:13 53:9
  69:20 70:6 72:8
  73:11,13,23 84:12
  98:3 99:16,17
**seeing**  27:10
**seen**  44:13,19 45:21
  52:23 57:11 68:15
  71:11 72:5
**semi**  18:2
**senior**  19:11 76:14
**sense**  16:22 52:15
  69:19
**sensitive**  90:10
**sent**  32:2 44:11
  45:11 49:3 52:13
  60:2,14 63:4 65:15
  102:8 103:20 106:9
**sentence**  36:22
  45:5,5,8,8,10 48:11
  62:21 65:6
**sentences**  18:1
**september**  21:11
  21:15 22:23 23:17
  23:21 24:23 26:1
  26:12,17,21 27:2,9
  28:2,14,15,15,18
  28:21 30:11 32:3,5
  32:8,9,15,16,19,21
  33:9,10 34:19 35:1
  35:4,5,15,22 36:5
  36:10,18,21 37:13
  38:6 40:21 41:3,9
  54:6,8,23 55:4 91:3
  91:6
**serious**  25:1 80:7
  92:11
**serve**  11:2,6
**served**  9:2

**services**  11:8 20:11
  91:16
**sessions**  19:9
**set**  18:13 71:3 79:3
  102:2
**setting**  94:13
**settlement**  107:21
  108:8
**sexual**  20:4
**shape**  14:22
**share**  64:2 82:19
**sharing**  64:10
**sheets**  41:16
**shock**  83:19 84:13
**shocked**  101:16
**short**  9:20 37:9
  54:7
**show**  22:11 27:4
  44:9 68:13 71:3,6,7
  71:8,9 77:20
**showing**  68:2
**sick**  41:23
**side**  9:13 73:8,17
**signature**  5:8
  110:20
**signed**  106:19,23
  107:4
**signing**  87:9 89:1
**signs**  88:5
**similarly**  18:10
**single**  95:17
**sir**  7:5 44:20 91:21
**sitting**  53:23
**situation**  51:10
  61:9 66:7 101:3,4
**situations**  15:13
  48:9,14 51:3
**six**  9:17 21:2,12,14
  38:16,16,23 80:11
**skip**  16:20 86:1

**smith**  30:9
**social**  7:23 83:18
  84:8,12 90:2
**solely**  24:3
**solve**  51:12
**somebody**  16:23
  24:8 28:9 78:23
  79:11 86:10 90:12
  98:19 99:4,12
**son's**  84:17
**soon**  35:12 49:3
**sorry**  21:9 65:7
  70:19 72:5 73:6
**sought**  15:18
**sound**  14:15,19
**sounds**  9:11 14:17
**southern**  1:3
**speak**  6:18 17:15
  17:22
**speaking**  37:3 97:3
**specific**  10:10
  14:10 38:1,10
  64:19 69:17 83:7
  84:18 98:12
**specifically**  10:4,19
  10:20 20:2 22:2
  28:7 32:3 49:8 51:2
  55:6,12 87:14
**specifics**  38:13
  90:19
**spend**  17:10
**spent**  9:12
**spoken**  17:20 34:13
  35:11
**sponsor**  19:18
**spot**  9:3
**spring**  63:6
**staccato**  18:1
**staff**  11:7 30:18
  39:7 40:6 68:10

**stand**  38:14,21 39:2
**starts**  45:7
**state**  6:3 100:6
  108:9,13 110:3
**statement**  27:1
  38:7,11 63:18
  76:18 81:8 85:11
  85:20 100:19
  106:19,23 107:4
**statements**  59:6
  93:7,8,12,17 94:1
**states**  1:1 6:6
**statutes**  10:3,7
**stenotype**  110:8
**steps**  12:10 25:22
  91:20 92:1 93:1
**stipulated**  5:2
**stipulation**  6:7
**stipulations**  6:23
**stood**  39:3
**stop**  45:6 102:20
**stories**  83:5,8,18
  94:14
**story**  24:8 89:23
**strike**  8:7 56:6
**struck**  97:3
**structure**  57:1,11
  65:22
**structured**  14:3
**stuff**  101:19
**submissions**  40:1
**submit**  26:23 89:17
**submitted**  40:2
  74:19 89:18 105:22
  106:2
**substance**  53:9
  63:14,17 74:16
  104:7
**substantiated**
  96:14 97:21,22
  98:1

successful 31:9
suggest 78:4 94:3
suggesting 63:21
supervision 25:11
  110:10
supervisor 11:2,4,5
  11:7,7,9 12:12,15
  12:19,22 13:5,14
  16:15,20 19:5
  42:16 66:9 76:14
  79:23 95:11
supervisors 11:3,6
  11:18 16:18 19:12
  53:18 59:13
supervisory 59:14
support 11:7 30:18
  39:6 40:6
supposed 30:19,21
  48:15 51:14 55:20
  55:22
sure 17:12,16 29:12
  35:7 39:3,8 46:15
  46:20 50:1 52:3,5
  52:17 57:19 78:17
  87:21 89:20 90:12
  90:20 97:11
surprise 76:6,9
surprised 101:5,10
  101:17
suspect 75:21
suspended 26:16
  57:9 92:20
sworn 6:18
system 67:23 90:12

t

t 5:1,1 110:1,1
take 8:13 23:4,15
  23:19 25:22,22
  27:17 37:7 46:21
  47:2,17 56:15
  72:15,19,23 79:6

88:1 89:9,12 91:11
  91:20,23 93:1 99:1
  103:22
taken 5:5 78:16
  85:4 110:7
takes 78:15 98:23
  99:15,19
talk 16:11 21:2
  26:20 31:12,14
  35:16 45:2 47:19
  50:7,12,12,14 53:5
  60:20 62:2 63:10
  64:18,22 65:20
  66:23 94:21
talked 23:22 31:16
  34:13,17,21,23
  35:4,5 38:11 43:8
  43:16,20 44:1 59:7
  85:23 104:5 107:17
talking 24:11 31:18
  33:12 34:12,16
  42:6 51:15 60:19
  83:11 93:8,13
  94:13
talks 85:11 94:9
tamika 40:5 42:9
target 16:14
task 17:19
teams 68:1
technically 25:6
television 7:23 8:4
tell 18:10,17 22:14
  25:22 26:10,15
  27:9,18 28:11
  36:23 47:18 50:4
  55:14 59:15 60:9
  64:17 65:1 70:2
  76:3 85:4 88:16
  93:21 95:20 97:16
telling 26:2 36:5,10
  59:1

tells 19:3 24:8 28:9
ten 35:16
tenure 22:6
term 74:1
terminate 93:1
  96:8
terminated 13:18
  36:17 55:16 57:17
  58:2,8,19 62:7
  66:16,19
terminating 36:7
  36:12 67:7,14 99:4
termination 13:19
  15:17,22 35:21
  56:7 57:22 58:10
  58:11,13 62:23
  65:4,9 66:11
terminations 14:14
terms 46:1 91:14
terribly 52:10
testified 6:20 14:11
testimony 21:4
  37:1 74:8,15 104:5
  110:11
text 52:23
texted 52:23
texts 61:3
thanks 49:16 61:20
thereabouts 37:14
thereto 5:20 110:9
thing 17:13 41:7
  49:14,18 59:21
  76:23 88:18
things 39:8,10
  49:11,15 54:11,16
  55:1,5 56:2 59:1
  60:23 74:20 77:1
  94:8 98:8,20 101:8
  101:11,15,15
think 8:17 22:5
  24:12,18 33:6

38:14,21 39:1 40:3
  43:11 50:10 52:19
  54:4 55:15 58:9
  65:3,4,8,9,10,13
  66:6 75:14 76:23
  77:4,13 78:7,17,21
  79:1 80:19 82:7,13
  93:15 94:6,11,14
  94:15,19 97:7,19
  98:14 101:14 102:7
thinking 53:23
  101:1 102:16
third 78:3
thirty 75:1 76:5
thought 61:9 97:10
  102:1
three 74:20,23 75:7
  75:8,10,12 77:18
time 5:18,19 9:10
  9:20 15:5 17:10,15
  17:22 20:13 21:19
  35:10 37:4,7,8,9,11
  38:12 39:3,8,10,13
  40:9,11,12,13,14
  41:4,15,16,18,23
  42:3 46:5 49:11
  50:5,10 55:8 56:4,8
  57:10 60:1 67:5,20
  68:4,6,8 69:9,11
  70:13,13 72:13,18
  72:22 74:3,3,21,21
  74:21 75:2,3,5,13
  75:20 76:19,20
  77:3,23 78:15,16
  79:8,17,19,21 80:1
  80:4 81:14,15
  84:16 87:14,19
  88:3 91:12 93:3
  95:18 96:16 98:10
  98:12,15,20 99:16
  99:20 101:2 102:10

107:16
**timeframe** 21:12
21:14 22:9
**timeline** 102:8
**times** 68:15 78:2
83:1 86:4 87:11
**title** 42:13,15
**today** 17:14 48:19
71:12 72:6 104:5
**told** 24:1,2,7 29:11
29:13 32:18 50:12
53:5 59:18 61:17
64:21,22 65:14
66:8 82:9 83:5,9,11
84:20 85:1 86:8,10
86:14 88:11,14
90:1,3 96:9,12,15
98:4,5
**tomorrow** 61:21
**tornado** 7:21
**training** 10:14 20:1
**transcript** 110:11
110:22
**transition** 20:8
**treated** 45:13 48:8
48:9,14 51:3,8 60:4
63:18 64:20 103:6
103:10
**treating** 12:12,15
51:16 60:8
**treatment** 13:4
62:16 63:5
**trial** 5:19 86:3,4,7
**tried** 31:1,2,7
**trigger** 99:4
**triggered** 102:11
**true** 63:16 79:17
90:6 107:6,8
110:11
**trust** 59:11,11,15
90:9,15 98:4

**trusted** 90:23
**trustworthiness**
92:12
**trustworthy** 83:7
**truth** 6:18,19,19
**try** 11:16 12:22
51:12 57:3,4 66:1,1
99:6,7,8 102:18
**trying** 9:19 58:12
101:6 102:7,9
**turn** 72:8 83:5
101:6
**turned** 83:9
**twelve** 67:1 70:9
95:16
**twenty** 38:16,23,23
39:5 59:11 80:11
80:11
**twitter** 83:22
**two** 28:13 35:10,19
37:6 38:8 61:10
73:18 82:2 97:12
**typically** 13:20
14:1,5 15:12 16:3
24:8 30:15

**u**

**u** 5:1
**ultimately** 13:22
14:9 58:18
**unavailable** 87:10
**understand** 11:21
39:4 49:18 52:4,9
52:19 79:9,22 88:9
93:18 96:5 98:18
106:14,18
**understanding**
45:12 48:17 80:8
80:13,14,16 86:9
105:1
**understood** 39:11
52:18 81:3 107:13

**unfair** 13:4 62:16
63:5
**unfairly** 48:10
51:16 60:4,8 61:8
63:19 64:20 103:6
103:10
**united** 1:1 6:6
**unprofessional**
94:6,12
**unquote** 89:1 105:7
**untrue** 83:6,9,18
84:13
**unusual** 99:21
101:15
**update** 54:14 56:11
**updates** 55:4 56:14
58:21 60:6
**updating** 55:1
**upside** 73:10
**urgency** 67:13,16
**use** 40:10 74:1
**usual** 6:22
**usually** 14:3

**v**

**vacation** 40:9 41:4
42:2 72:13,18,22
74:21 75:2,3,5,12
75:20 79:7,10,12
80:20,22
**value** 83:19 84:13
**variation** 64:13
**various** 85:12
**vein** 42:5 107:20
**verbally** 18:16
28:10 54:13
**verified** 106:15
**verify** 106:11
**versus** 77:3
**victim** 11:8 19:19
20:11 25:10 91:16

**victims** 90:10
**viewed** 81:3
**views** 102:3,5
**violated** 65:23
**vs** 1:9
**vso** 25:5 48:19
94:23
**vsos** 51:15 56:19
58:14 59:6 90:11

**w**

**wait** 18:6
**waited** 35:16
**waived** 5:9
**want** 16:11 28:12
36:22 52:17 57:19
72:15,16,19,22
73:7 79:6 97:15
**wanted** 9:19 50:7
64:18 69:15,20
85:14
**wanting** 37:10
50:14
**warning** 7:22
**watch** 26:7
**way** 14:2 16:3 21:7
31:10,20 32:6,23
39:16,21 40:3
41:23 56:5 63:21
64:11 76:17 81:2
84:11 88:19 94:17
**we've** 12:3 34:12
43:8,16,20 44:1
46:15 103:14
**weather** 7:16 8:5
8:13
**week** 80:9,17,17
81:4
**weeks** 37:5,6,6 38:8
38:9,17,23 80:11
80:11

**went** 33:6 55:22
104:16
**white** 75:9,10
**wife** 93:11
**wild** 94:14
**witness** 5:9 6:12,17
17:21 38:18 70:7
72:10 110:12
**wonder** 53:23
**word** 17:20 73:22
**words** 13:22 30:19
34:10 58:10 62:14
99:2
**work** 25:5 38:12
42:9 50:8 57:3
70:13,14 74:3,5
76:15 77:21,22
78:11 80:1,23 81:4
81:9 99:6
**worked** 9:6,18 37:6
38:8,22 41:11,15
41:21 42:21 43:2
53:19 59:10 77:22
80:5
**workers** 40:7
**working** 38:16 80:9
80:16
**works** 40:16 49:14
79:19,21 90:8
98:15
**workweek** 39:1
80:6
**workweeks** 39:18
39:23
**worry** 17:19
**write** 17:23
**writing** 61:7 69:15
**written** 18:22 19:2
22:12 23:17,20
25:23 26:11,17
27:1 28:6,17 69:5

92:2,4,13 93:8
96:11,12
**wrong** 96:18
**wrote** 24:4 69:1
74:2 93:17

**y**

**y** 93:5
**yates** 3:14 17:11
20:14 21:16,21
22:14,19 23:11,15
24:4,6,14 26:5,10
26:15 27:7 34:2,7
36:10 37:2 38:7
43:23 44:2,17
45:10 49:8 52:2,8
53:2,8 54:11 55:14
56:13 57:16,23
58:20 59:1,22
60:14,17,19 61:13
65:16 66:22 68:23
69:2,19 74:2 77:19
81:6,11,13,23
82:22,23 83:7,14
84:18 85:17,19
86:3 88:12,16
89:12 90:3 94:3,22
95:9 98:2
**yeah** 12:7 17:7
32:14 52:19 70:21
76:22 95:11 98:3
100:13
**year** 9:2 48:21
**years** 13:1,10 20:5
59:11
**yesterday** 14:12
107:15

**z**

**zone** 8:7

Alabama Rules of Civil Procedure

Part V. Depositions and Discovery

Rule 30

(e) Submission to witness; changes; signing. When
the testimony is fully transcribed the deposition
shall be submitted to the witness for examination
and shall be read to or by the witness, unless such
examination and reading are waived by the witness
and by the parties. Any changes in form or
substance which the witness desires to make shall
be entered upon the deposition by the officer with
a statement of the reasons given by the witness for
making them. The deposition shall then be signed by
the witness, unless the parties by stipulation
waive the signing or the witness is ill or cannot
be found or refuses to sign. If the deposition is
not signed by the witness within thirty (30) days
of its submission to the witness, the officer shall
sign it and state on the record the fact of the
waiver or of the illness or absence of the witness
or the fact of the refusal to sign together with
the reason, if any, given therefor; the deposition
may then be used as fully as though signed unless
on a motion to suppress under Rule 32(d)(4) the

court holds that the reasons given for the refusal
to sign require rejection of the deposition in
whole or in part.

(F) Certification and filing by officer; exhibits;
copies; notice of filing.

(1) The officer shall certify on the deposition
that the witness was duly sworn by the officer and
that the deposition is a true record of the
testimony given by the witness. Unless otherwise
ordered by the court, the officer shall then
securely seal the deposition in an envelope
indorsed with the title of the action and marked
"Deposition of [here insert name of witness]" and
shall promptly file it with the court in which the
action is pending or send it by registered or
certified mail to the clerk thereof for filing.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

**From:** Roberts, Joe
**To:** McCurry, Micheal
**Subject:** FW: Some Concerns
**Date:** Monday, November 1, 2021 10:21:26 AM

---

**From:** Jeter, LaNitra <Jeterl@jccal.org>
**Sent:** Thursday, November 21, 2019 8:18 AM
**To:** Roberts, Joe <robertsjo@jccal.org>
**Subject:** RE: Some Concerns

Thanks for the clarification. I will have a discussion with Judy tomorrow.

**From:** Roberts, Joe <robertsjo@jccal.org>
**Sent:** Thursday, November 21, 2019 8:16 AM
**To:** Jeter, LaNitra <Jeterl@jccal.org>
**Subject:** Re: Some Concerns

You must discuss any concern you have specifically with Judy Yates first. If Judy needs to come to me to discuss those concerns she can. After that discussion and attempt at resolving if things, after some time, do not improve then you can come to me to discuss. That is how the chain of command works. The most important thing is please don't come to me to discuss things that you have not discussed with Judy first. Thanks.

Joe

> On Nov 21, 2019, at 7:53 AM, Jeter, LaNitra <Jeterl@jccal.org> wrote:
>
> Good morning Joe
>
> Per Danny's email we are to follow the proper chain of command if we have a problem or issue. In my case I am not clear as to who I report my concern to. I do not feel that I am being treated fairly in some situations and I do not know who I am supposed to report this to. I do not mind meeting with you to advise you of my concerns so you may have a better understanding and direct me in the right direction. I am available today as I am the only VSO in the office.
>
>
> Thanks
> Nitra



DA001122