
FILED
2022 Jun-01  PM 02:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| **LANITRA JETER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:20-CV-01863-ACA** |
| | ) | |
| **DANNY CARR, in his official** | ) | |
| **capacity as District Attorney** | ) | |
| **of Jefferson County,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF THE MOTION FOR SUMMARY JUDGMENT

Respectfully submitted,

*/s/ James E. Murrill, Jr.*
Robert R. Riley, Jr. (ASB-0909-168A)
James E. Murrill, Jr. (ASB-4329-A57M)

OF COUNSEL:
**RILEY & JACKSON, P.C.**
3530 Independence Drive
Birmingham, Alabama 35209
(205) 879-5000 *telephone*
(205) 879-5901 *facsimile*

1

## <u>TABLE OF CONTENTS</u>

Table of Contents ..................................................................................................2

I.  Statement of Undisputed Facts ......................................................................4

    A. The Chain of Command ...............................................................................5

    B. VSOs and Comp Time...................................................................................6

    C. Taking Away Ms. Jeter's Ability to Earn Comp Time ...................................7

    D. Having to Bring a Doctor's Excuse..............................................................11

    E. Being Watched and Reported On .................................................................11

    F. Ms. Jeter's Husband's Criminal Cases .......................................................12

    G. The Black Rat Cutout ..................................................................................13

    H. "Restricted" Ability to Earn Comp Time ....................................................14

    I.  Email to Joe Roberts....................................................................................16

    J.  Not Receiving New Office Furniture ..........................................................17

    K. Permission to Work Through Lunch ............................................................18

    L. Moving Into a Vacant Office.......................................................................18

    M. Ms. Jeter Wanting to Meet Someone in Her Office .....................................19

    N. Termination and Being Escorted Out of the Building....................................20

II.  Legal Analysis.................................................................................................24

    A. DA Carr has Eleventh Amendment immunity to the § 1981 claims
       and Ms. Jeter did not make a claim under § 1983. .......................................24

B. Ms. Jeter did not administratively exhaust all her Title VII claims ..............25

C. Ms. Jeter cannot establish a *prima facie* case of discrimination
   or retaliation for many of her claims ............................................................26

   1. Many claims do not involve an adverse employment action. ..................27

      a. No adverse employment action for many of the discrimination
        claims...............................................................................................27

      b. No adverse employment action for many retaliation claims..............29

   2. No close temporal proximity to establish a causal connection
      between protected activity and the termination.......................................30

   3. No causal connection between any protected activity
      and certain alleged reretaliation .................................................................31

   4. Ms. Jeter was not treated less favorably than a white VSO ....................32

D. There were legitimate, non-discriminatory reasons
   for the events at issue.....................................................................................34

E. DA Carr and Ms. Jeter are the same race ......................................................36

F. This is not a "cat's paw" or "mixed motive" case.........................................37

III. Conclusion ..........................................................................................................38

Certificate of Service ................................................................................................39

COMES NOW the Defendant, Danny Carr in his official capacity as Jefferson County District Attorney ("DA Carr"), and files this Memorandum of Law in support of his previously filed Motion for Summary Judgment [Doc. 77]. In this employment discrimination and retaliation case, DA Carr is entitled to summary judgment on Plaintiff Lanitra Jeter's ("Ms. Jeter") § 1981 claims based on his Eleventh Amendment immunity and because there is no underlying § 1983 claim. DA Carr is entitled to summary judgment on the Title VII claims because many have not been administratively exhausted, Ms. Jeter cannot establish a *prima facie* case for many of her claims, and there were legitimate, non-discriminatory reasons for the events at issue. Additionally, it is implausible that Ms. Jeter's termination was based on discrimination since DA Carr and Ms. Jeter are both African American. Finally, this is not a "cat's paw" or "mixed-motive" case since there is no discriminatory animus.

## I.    STATEMENT OF UNDISPUTED FACTS

1.    Ms. Jeter, African American, is a former victim services officer ("VSO") for the Jefferson County DA's Office (the "DA's Office"). Ex. A [Doc. 78-1] at 20:8-17; Ex. B [Doc. 78-2] at Resp. No. 5.

2.    Ms. Jeter claims she was discriminated against on September 23, 2019 when she was told she could not earn compensatory time ("comp time") until further notice. Ex. B [Doc. 78-2] at Resp. No. 6; Ex. C [Doc. 78-3] at 27:15-20, 45:7-20.

She claims she was then discriminated against and/or retaliated against by: (1) having to bring a doctor's excuse to confirm she had an appointment; (2) being watched and reported on; (3) having criminal cases where her husband was the victim "purposely mishandled, dismissed and no billed;" (4) having a cutout of a black rat placed above her office nameplate the week of Halloween 2019; (5) only having a restricted ability to earn comp time on and after November 12, 2019; (6) not receiving new office furniture; (7) having to request permission to work through lunch on one occasion; (8) having to ask if a white VSO wanted an empty office before Ms. Jeter could move into it; (9) being told she would have to clock out or use time when she wanted to meet with her real estate agent in the office; and (10) being terminated and escorted out of the building on March 16, 2020. Ex. B [Doc. 78-2] at Resp. Nos. 6, 9; Ex. C [Doc. 78-3] at 91:2–92:11, 115:20–116:3.[1]

3.    Ms. Jeter has sued DA Carr in his official capacity for discrimination and retaliation under Title VII and § 1981.  Third Am. Compl. [Doc. 61] at p. 1; Joint Motion to Substitute Party [Doc. 63].

A.    __The Chain of Command__

4.    Judy Yates was Ms. Jeter's direct supervisor and Chief Deputy District Attorney Joe Roberts was Ms. Jeter's next-level supervisor. Ex. C [Doc. 78-3] at 27:15-20; Ex. E [Doc. 78-6] at 8:16– 9:5, 10:21–11:11.  Ms. Jeter is not aware of

---

[1]    Ms. Jeter's allegations have been put in date-order to the extent possible.

them making any derogatory comments about African Americans or comments about favoring white people.  Ex. C [Doc. 78-3] at 28:22–29:10, 30:18–31:2.

5.      DA Carr, an African American, was Ms. Jeter's next-level supervisor after Joe Roberts and Ms. Jeter is not aware of him making any derogatory comments about African Americans or comments about favoring white people. Ex. C [Doc. 78-3] at 37:21–38:5; Ex. D [Doc. 78-4] at 9:18-23; Ex. E [Doc. 78-6] at 10:21–11:11.

6.      DA Carr would remind employees that if they had a problem, they were to report it to their immediate supervisor.  Ex. E [Doc. 78-6] at 65:20–66:9 and at exhibit 26 thereto; Ex. F [Doc. 78-7].  If an employee felt her supervisor was discriminating against her, she could notify her next-level supervisor about the problem.  Ex. D [Doc. 78-4] at 25:17–28:14; Ex. E [Doc. 78-6] at 16:13-21.

## B.   VSOs and Comp Time

7.      A new VSO starts with no vacation leave or sick leave, but she earns 8 hours of vacation and 8 hours of sick leave a month.  Ex. G [Doc. 78-8] at ¶ 5.

8.      A VSO's normal schedule was 7:30 AM to 4:30 PM or 8:00 AM to 5:00 PM, with 1 hour for lunch and two 15 minute breaks. Ex. A [Doc. 78-1] at 144:1-7; Ex. C [Doc. 78-3] at 41:5–42:3; Ex. G [Doc. 78-8] at ¶ 6.  With permission, the VSO could combine the two 15 minute breaks into a 30 minute lunch break. Ex. A [Doc. 78-1] at 144:1–145:20; Ex. G [Doc. 78-8] at ¶ 6.  The VSO could then work through the 1 hour given for lunch and earn 1.5 hours of comp time for every hour

worked over 8 hours on a given day.  Ex. A [Doc. 78-1] at 144:1–145:20; Ex. G [Doc. 78-8] at ¶ 6.  Once earned, a VSO could use comp time to take off of work without having to use vacation leave or sick leave. Ex. G [Doc. 78-8] at ¶ 6.

9.      All VSOs were salaried employees and their paychecks were for a set amount every pay period. Ex. C [Doc. 78-3] at 38:9-22; Ex. G [Doc. 78-8] at ¶ 7. Leave time was used to try and regulate attendance, but a VSO would not lose pay if she missed work and did not have some sort of leave to cover the missed time. Ex. G [Doc. 78-8] at ¶ 7.   Unlike an hourly employee, the availability or unavailability of comp time would not affect a VSO's pay if she missed work. *Id.*

### C.      Taking Away Ms. Jeter's Ability to Earn Comp Time

10.     For many years, Judy Yates and Cheryl Black were the only two VSOs. Ex. A [Doc. 78-1] at 16:14–17:2, 25:5-9.  The DA's Office eventually got a grant and Judy Yates was able to hire three new VSOs in 2019: Erin Barefield started on April 1; Ms. Jeter started on April 16; and Elise Driskill started on July 16.  *Id.* at 18:1-20, 25:5-9; Ex. D [Doc. 78-4] at 159:10–160:11; Ex. G [Doc. 78-8] at ¶ 8.

11.     Ms. Jeter is not aware of Micheal McCurry, the chief administrator, making any derogatory comments about African Americans or comments about favoring white people. Ex. G [Doc. 78-8] at ¶ 2; Ex. C [Doc. 78-3] at 60:5–61:19.

12.     Micheal McCurry gets copies of VSO leave requests, and by late summer of 2019, he thought he was routinely seeing Ms. Jeter's name on various

leave requests and leave authorizations.  Ex. G [Doc. 78-8] at ¶ 9.  It stuck out to him because Ms. Jeter was a new employee, and he typically did not see what appeared to be routine leave requests from new employees. *Id.*

13.    In September of 2019, Micheal McCurry decided to pull and review Ms. Jeter's time records.  Ex. G [Doc. 78-8] at ¶ 10.  By September 19, 2019, he had reviewed Ms. Jeter's time records for the approximately 23 weeks she had been employed.  *Id.*  During those 23 weeks, Ms. Jeter had used almost all her leave: she earned 40 hours of vacation leave and used all of it; she earned 40 hours of sick leave and used all of it; and she earned 66.75 hours of comp time and used 62 hours.  *Id.* at ¶ 11.  That leave was in addition to the 6 holidays during that 23 week period where the DA's Office was closed.  *Id.*

14.    Micheal McCurry did not compare Ms. Jeter's time records to the other new VSOs' time records because he had not noticed any similar trends with their use of leave.  Ex. G [Doc. 78-8] at ¶ 12.  Over that same 23 week period of Ms. Jeter's employment that Micheal McCurry examined, Erin Barefield (who started in on April 1) earned 40 hours of vacation leave and used 0, earned 40 hours of sick leave and used 32, and earned 42.25 hours of comp time and used 40.75.   *Id.* at ¶ 13.  Of the portion of that same 23 week period that Elise Driskill (who started on July 16) was employed, she had earned 20 hours of vacation leave and used 0, earned 20 hours of sick leave and used 0, and earned 65 hours of comp time and used 8.  *Id.*

at ¶ 14.  Ms. Jeter was the only new VSO who exhausted all of her vacation and sick leave and almost all of her accrued comp time.  *Id.* at ¶ 15.

15.    On September 16, 2019, shortly after Micheal McCurry started reviewing Ms. Jeter's time records, Ms. Jeter used comp time to – she claimed – attend a mediation in her husband's domestic relations case with his ex-wife.  Ex. C [Doc. 78-3] at plaintiff's exhibit 1 thereto at DA 0085, DA 00318, DA 00319[2]; Ex. I [Doc. 78-10].  Afterwards, Ms. Jeter told Judy Yates, Erin Barefield, and Elise Driskill that she attended the mediation, got angry over what her husband's ex-wife said, grabbed the ex-wife and slung or yanked her to the ground, and that she had to be placed in handcuffs until she calmed down.  Ex. C [Doc. 78-3] at 171:22–172:3, 178:14–180:15, and at plaintiff's exhibit 1 thereto at DA 00318, DA 00319.

16.    Neither the mediation nor Ms. Jeter's altercation with her husband's ex-wife actually occurred.  Ex. C [Doc. 78-3] at 180:11-15, 223:17–224:7; *cf. id.* at 174:6–177:23.  By September 19, 2019, after speaking with a judge, Micheal McCurry and Judy Yates were aware the event had not occurred and believed Ms. Jeter had made-up the story.  Ex. A [Doc. 78-1] at 86:8–88:23, 92:7–95:6; Ex. C [Doc. 78-3] at 180:11-15; Ex. G [Doc. 78-8] at ¶ 18.

17.    Also by September 19, 2019, Micheal McCurry had concluded Ms. Jeter was taking off work too much since she had used all her vacation and sick

---

[2]    The deposition exhibit is not in bates-order.  Ex. C [Doc. 78-3] at 146:5–149:21.

leave, and almost all her accrued comp time, during the first 23 weeks of her employment. Ex. G [Doc. 78-8] at ¶ 19. He also concluded that Ms. Jeter had lied about her use of comp time on September 16, 2019. *Id.* He did not think it would be appropriate to change Ms. Jeter's vacation or sick leave accrual, but he knew that earning comp time was discretionary. *Id.*; *cf.* Ex. A [Doc. 78-1] at 152:5-11.

18.    At some point between September 19, 2019 and September 22, 2019, Micheal McCurry informed Judy Yates generally about the perceived problems with Ms. Jeter's use of leave and that Ms. Jeter's ability to accrue comp time should be halted for a time. Ex. A [Doc. 78-1] at 156:16-18; Ex. G [Doc. 78-8] at ¶ 20. On September 23, 2019, Judy Yates told Ms. Jeter she could not earn comp time for a week and they would discuss the issue after that. Ex. A [Doc. 78-1] at 155:1-18, 156:19–158:2, and exhibit 20 thereto; Ex. C [Doc. 78-3] at 45:7-20, 187:1-10.

19.    Between Monday September 23, 2019 and Friday November 8, 2019, Ms. Jeter earned comp time on 3 occasions:  1 hour on October 2; 1 hour on October 29; and 0.25 hours on November 5. Ex. G [Doc. 78-8] at ¶ 21.   During that time period, Ms. Jeter took off work, Judy Yates never denied Ms. Jeter's requests to take off work, Ms. Jeter had some type of leave available to cover the time she missed (including accrued comp time), and Ms. Jeter's paycheck did not change.    Ex. A [Doc. 78-1] at 152:20–153:3, 158:15–159:14; Ex. C [Doc. 78-3] at 38:9-22, 43:4-9, 71:12–72:2; Ex. G [Doc. 78-8] at ¶ 21.

D.   **Having to Bring a Doctor's Excuse**

20.   Ms. Jeter claims it was discrimination when she was told to bring a doctor's excuse to confirm an appointment.  Ex. B [Doc. 78-2] at Resp. No. 6.

21.   On September 23, 2019, Ms. Jeter told Judy Yates she had a doctor's appointment later that day.  Ex. C [Doc. 78-3] at 50:21–52:13.  Judy Yates told Ms. Jeter she could go, but she needed to bring a doctor's excuse.  *Id.* at 50:21–53:15. Ms. Jeter went to the appointment, used comp time to cover the time she missed, brought back a doctor's excuse, and did not recall being asked for a doctor's excuse any other time.  *Id.* at 52:14–53:15, 76:8-19. She did not complain to any supervisor about having to bring back a doctor's excuse.  *Id.* at 77:10-14.

22.   Judy Yates asked Ms. Jeter for the doctor's excuse because she did not trust Ms. Jeter after she had lied to her about the mediation-fight-event the week before.  Ex. J [Doc. 78-11] at ¶ 6.

E.   **Being Watched and Reported On**

23.   Ms. Jeter claims she was discriminated against by being "watched and reported on," which was in reference to a September 25, 2019 meeting with Judy Yates and Micheal McCurry. Ex. B [Doc. 78-2] at Resp. No. 6; Ex. C [Doc. 78-3] at 82:23–83:19, 190:11-16, 191:3-9.

24.   In that meeting, Ms. Jeter claims she was told she was using her comp time as soon she accrued it and it had been noticed by co-workers.  Ex. C [Doc. 78-

3] at 82:23–83:19, 190:11-16, 191:3-9.  Ms. Jeter assumes someone complained to

Judy Yates, but she does not know who and she did not complain to anyone at the

DA's Office about supposedly being watched and reported on. *Id.* at 82:23–85:8.

25.     Micheal McCurry noticed Ms. Jeter's use of leave and her attendance,

reviewed her time records, and told Judy Yates that Ms. Jeter should not be allowed

to earn comp time for a while.  Ex. G [Doc. 78-8] at ¶¶ 9-11, 20.

### F.     <u>Ms. Jeter's Husband's Criminal Cases</u>

26.     Ms. Jeter claims she was retaliated against, and possibly discriminated

against, when the DA's Office "purposely mishandled, dismissed and no billed"

domestic violence and harassing communications cases where her husband was the

victim.  Ex. B [Doc. 78-2] at Resp. No. 9; Ex. C [Doc. 78-3] at 91:14-18.

27.     Ms. Jeter's husband was the victim in three criminal cases: a domestic

violence case involving Marquetta Murrell ("Case 1"); a harassing communications

case involving Marquetta Murrell ("Case 2"); and a harassing communications case

involving Angel Jones ("Case 3").  Ex. C [Doc. 78-3] at 102:20–104:17; Ex. K [Doc.

78-12]; Ex. L [Doc. 78-13]; Ex. M [Doc. 78-14]; Ex. O [Doc. 78-16].

28.     The DA's Office recused itself from Case 1 and the St. Clair County

DA's Office took over.  *See* Ex. K [Doc. 78-12]; *cf.* Ex. C [Doc. 78-3] at 108:21–

109:6.  Case 1 was presented to the grand jury and no-billed in October of 2019.  Ex.

C [Doc. 78-3] at 109:7-12; Ex. L [Doc. 78-13].  Ms. Jeter says her husband was not

allowed to testify, but she does not know what was presented to the grand jury or why the case was no-billed.  Ex. C [Doc. 78-3] at 108:6-9, 109:7–110:12.

29.     The DA's Office recused itself from Case 2 and the St. Clair County DA's Office took over.  *See* Ex. K [Doc. 78-12]; Ex. M [Doc. 78-14].  On February 5, 2020, the defendant pled guilty, was given probation, and was ordered to pay restitution.  Ex. C [Doc. 78-3] at 104:20–106:11, 112:6-19; Ex. M [Doc. 78-14].

30.     Warren Brooks, with the DA's Office, handled Case 3.  Ex. O [Doc. 78-16] at ¶ 3.  The judge dismissed the case when Ms. Jeter's husband was not called to testify.  *Id.* at ¶ 4. Warren Brooks was not aware of Ms. Jeter's complaints about accruing comp time or any other employment complaint she had made.  *Id.* at ¶ 5.

31.     Ms. Jeter does not mention anything about the cases in her EEOC Charge.  Ex. C [Doc. 78-3] at defendant's exhibit 3 thereto.  She only mentions them as an act of retaliation in her complaint, but not as discrimination.  *See* Third Am. Compl. [Doc. 61] at ¶ 59.

## G.     The Black Rat Cutout

32.     Ms. Jeter claims she was retaliated against, and possibly discriminated against, when a black rat cutout was placed above her office nameplate.  Ex. B [Doc. 78-2] at Resp. No. 9; Ex. C [Doc. 78-3] at 91:19–92:1, 96:20–97:4.

33.     On Monday, October 28, 2019, Ms. Jeter arrived to work and saw a cutout of a black rat above her office nameplate.  Ex. C [Doc. 78-3] at 92:12-18,

93:19-22, 96:20–97:4.   Other Halloween decorations had been put up before this time, including a witch picture and other black rat cutouts, in other locations. *Id.* at 93:3-18.  Ms. Jeter photographed the black rat cutout and two other VSO nameplates, one of which is by a decorated office door.  *Id.* at 98:4–99:1; Ex. Q [Doc. 78-18].

34.     Ms. Jeter did not complain to any supervisor about the cutout or take it down. Ex. C [Doc. 78-3] 96:2-4, 100:19–102:5.  It remained up through Wednesday October 30, Ms. Jeter was off on October 31 and November 1, and the cutout was removed before she returned the following Monday.  *Id.* at 99:9–100:1.

35.     Judy Yates placed the cutout near Ms. Jeter's office because there were no Halloween decorations there when Halloween week began.  Ex. J [Doc. 78-11] at ¶ 8.   She had put up similar decorations the prior Halloween, and had put up similar decorations for Halloween 2019 in other locations, including her own office. *Id.* at ¶¶ 7-8.  She did not put up any decorations near Erin Barefield's office because she already had a decoration on her door. *Id.* at ¶ 9; Ex. Q [Doc. 78-18].

### H.     "Restricted" Ability to Earn Comp Time

36.     Ms. Jeter claims she was retaliated against by having her ability to earn comp time "purposefully restricted" in November of 2019.  Ex. B [Doc. 78-2] at Resp. No. 9.  On November 12, 2019, Ms. Jeter says Judy Yates told her she could start accruing comp time again, but she could not clock-in before 7:30 AM.  Ex. C [Doc. 78-3] at defendant's exhibit 3 thereto.  Ms. Jeter claims other VSOs were

allowed to clock-in before 7:30 AM, which meant they could earn more comp time than her. *Id.* at 62:23–63:17, and at defendant's exhibit 3 thereto.

37.     On November 8, 2019, Ms. Jeter emailed DA Carr's assistant to request a meeting with DA Carr.  Ex. C [Doc. 78-3] at 33:7–34:1, 44:14-21; Ex. R [Doc. 78-19].  It was the only time Ms. Jeter ever emailed the assistant to request a meeting with DA Carr.  Ex. C [Doc. 78-3] at 37:14-17.  On November 12, the assistant emailed Ms. Jeter offering a meeting time for later that day.  Ex. R [Doc. 78-19].

38.     Ms. Jeter claims she then met with DA Carr and told him several things, including that having her ability to earn comp time taken away was discrimination. Ex. C [Doc. 78-3] at 32:10–34:14.[3]  Ms. Jeter said DA Carr did not know anything about her not earning comp time. *Id.* at 34:2-14.  If Ms. Jeter met with DA Carr, Judy Yates, Micheal McCurry, and Joe Roberts were all unaware of it.  Ex. A [Doc. 78-1] at 79:18-22; Ex. G [Doc. 78-8] at ¶ 38; Ex. J at ¶ 11; Ex. S [Doc. 78-20] at ¶ 4.

39.     On November 12, 2019, after Ms. Jeter's one and only supposed meeting with DA Carr, Judy Yates informed Ms. Jeter she could start accruing comp time again, and Ms. Jeter earned 1 hour of comp time that same day.  Ex. C [Doc. 78-3] at 31:22–32:1, 33:7–34:1, 61:20–63:17; Ex. G [Doc. 78-8] at ¶ 22.

---

[3]     DA Carr will assume, for summary judgment purposes only, that this meeting actually occurred, but he does not remember meeting with Ms. Jeter generally and does not remember any meeting where she complained about discrimination with regards to comp time.  Ex. D [Doc. 78-4] at 84:22–85:3, 91:20–93:18.  DA Carr said that as a Black man, he would remember a meeting with Ms. Jeter where she complained about discrimination.  *Id.* at 239:10–240:2.

40.     From November 12, 2019 through Friday, March 13, 2020 (i.e., the last day Ms. Jeter worked before her termination on Monday, March 16, 2020), Ms. Jeter earned 43.5 hours of comp time.  Ex. G [Doc. 78-8] at ¶ 24.  That was more than any other VSO during that time period other than Elise Driskill, who earned 44.75 hours of comp time (i.e., 1.25 hours more than Ms. Jeter).  *Id.* at ¶¶ 24, 30, 32.

41.     For the same time period, Ms. Jeter was permitted to clock-in before 7:30 AM 17 times, which was more than any other VSO, including Elise Driskill, who only clocked-in before 7:30 AM 12 times during that time period.  Ex. G [Doc. 78-8] at ¶¶ 25, 31-32; Ex. J [Doc. 78-11] at ¶ 3; *cf.* Ex. C [Doc. 78-3] at 42:21-23.

## I.     <u>Email to Joe Roberts</u>

42.     On November 21, 2019, Ms. Jeter emailed Joe Roberts that she did not "feel that [she was] being treated fairly in some situations and [she did] not know who [she was] supposed to report this to."  Ex. E [Doc. 78-6] at exhibit 26 thereto. The email did not specify the supposed unfair treatment or who was causing it.  *Id.* Joe Roberts responded that she must discuss her concern with Judy Yates first, and Ms. Jeter replied that she would have a discussion with Judy Yates the next day.  *Id.* It was the only time Ms. Jeter emailed a complaint to Joe Roberts, and she never talked with him about her complaint.  Ex. C [Doc. 78-3] at 68:18–69:19.

43.     After getting Ms. Jeter's email, Joe Roberts texted Judy Yates about the email and that he was directing Ms. Jeter to talk with Judy Yates first.  Ex. D [Doc.

16

78-4] at exhibit 5 thereto; Ex. T [Doc. 78-21].  Ms. Jeter did not complain to Judy Yates or any other supervisor about any comp time issues after emailing Joe Roberts. Ex. A [Doc. 78-1] at 42:20–43:3, 45:1-8; Ex. C [Doc. 78-3] at 71:3-11.

44.     Joe Roberts did not know who or what Ms. Jeter was referring to in the email, did not discuss Ms. Jeter's concerns with Judy Yates, did not follow-up with Judy Yates, and did not follow-up with Ms. Jeter.  Ex. E [Doc. 78-6] at 49:18–51:22, 52:5–54:4, 59:21–62:4.  As far as he knew, whatever Ms. Jeter was referring to could have been resolved because he did not hear anything else about it.  *Id.* at 103:4-17.

## J.     Not Receiving New Office Furniture

45.     Ms. Jeter claims she was discriminated against and retaliated against at some point after November 12, 2019 when she did not receive new office furniture even though Elise Driskill, who was hired after her, did. Ex. B [Doc. 78-2] at Resp. Nos. 6 and 9; Ex. C [Doc. 78-3] at 77:23–79:13, 115:11-19.

46.     The DA's Office purchased new furniture for the administrative staff. Ex. G [Doc. 78-8] at ¶ 39.  Judy Yates got some of the new furniture, but no other VSO did.  *Id.*  Some of the administrative staff's old furniture was moved to other offices. *Id.*  Micheal McCurry's old furniture was moved to Elise Driskill's office because her office was the only one the furniture would fit in and because of the age and condition of her desk.  *Id.*  The furniture Elise Driskill got was not new. *Id.*

47.     Ms. Jeter did not complain to any supervisor about this, *see* Ex. C [Doc. 78-3] at 79:14–80:7, and did not mention it in her EEOC Charge or her complaint. Ex. C [Doc. 78-3] at defendant's exhibit 3 thereto; Third Am. Compl. [Doc. 61].

**K.     Permission to Work Through Lunch**

48.     Ms. Jeter claims it was discrimination when, after November 12, 2019, she had to ask permission to work through lunch while working on a project.  Ex. B [Doc. 78-2] at Resp. Nos. 6; Ex. C [Doc. 78-3] at 63:18–64:20, 76:20–77:9.

49.     At some point after November 12, 2019, Ms. Jeter had a meeting that went through lunch.  Ex. C [Doc. 78-3] at 63:18–64:20, 76:20–77:9.  She says she had to leave the meeting to get permission to work though lunch.  *Id.* at 63:18–64:14. Judy Yates was out, so she found Micheal McCurry, who gave her permission to work through lunch and she earned comp time for that period. *Id.* at 63:18–64:20. Ms. Jeter could not recall any other time this happened to her.  *Id.* at 76:20–77:9.

50.     Ms. Jeter did not complain to any supervisor about this event, *see* Ex. C [Doc. 78-3] at 77:17-22, and did not mention it in her EEOC Charge or complaint. Ex. C [Doc. 78-3] at defendant's exhibit 3 thereto; Third Am. Compl. [Doc. 61].

**L.     Moving Into a Vacant Office**

51.     Ms. Jeter claims it was discrimination when, in 2019, Micheal McCurry made her ask Erin Barefield if she wanted an empty office before Ms. Jeter could move into it.  Ex. B [Doc. 78-2] at Resp. Nos. 6; Ex. C [Doc. 78-3] at 82:2-16.

52.     A VSO resigned, vacating a bigger office than Ms. Jeter's office.  Ex. C [Doc. 78-3] at 80:8–81:9.  Ms. Jeter asked Micheal McCurry if she could have the vacant office, and he told her to ask if Erin Barefield wanted it and, if she did not, then Ms. Jeter could move into it.  *Id.* at 81:5-16.  Ms. Jeter asked Erin Barefield, she did not want the vacant office, and Ms. Jeter moved into it.  *Id.* at 81:17–82:1.

53.     Ms. Jeter needed to ask Erin Barefield because she was hired before Ms. Jeter and, among the VSOs who were hired in 2019, she would have had first pick among those VSOs if an office became available.  Ex. G [Doc. 78-8] at ¶ 40.

54.     Ms. Jeter did not complain to any supervisor about this event, *see* Ex. C [Doc. 78-3] at 82:17-22, and did not mention it in her EEOC Charge or complaint.  Ex. C [Doc. 78-3] at defendant's exhibit 3 thereto; Third Am. Compl. [Doc. 61].

## M.     Ms. Jeter Wanting to Meet Someone in Her Office

55.     Ms. Jeter claims she was discriminated against when Judy Yates told her she would have to clock-out or "use time" when she wanted to have someone visit her office.  Ex. B [Doc. 78-2] at Resp. No. 6.

56.     On January 9, 2020, Ms. Jeter texted Judy Yates to ask if it was okay for her realtor to come to the office to go over some information.  Ex. A [Doc. 78-1] at exhibit 23 thereto; Ex. C [Doc. 78-3] at 136:7-14; Ex. D [Doc. 78-5] at exhibit 17 thereto at DA 0350-351; Ex. U [Doc. 78-22].  Judy Yates responded, "Yes[,] but clock out for lunch."  Ex. D [Doc. 78-5] at exhibit 17 thereto at DA 0350-351. Ms.

19

Jeter responded, "Okay," and she told the person not to come.  *Id.*; Ex. C [Doc. 78-3] at 86:9-17.

57.    Ms. Jeter never had to clock out or use any leave time to have someone visit her in her office, *see* Ex. C [Doc. 78-3] at 86:9-17, and did not mention this event in her EEOC Charge or her complaint.  *Id.* at defendant's exhibit 3 thereto; Third Am. Compl. [Doc. 61].

### N.    <u>Termination and Being Escorted Out of the Building</u>

58.    Ms. Jeter claims it was discrimination and retaliation when she was terminated.  Ex. B [Doc. 78-2] at Resp. No. 9; Ex. C [Doc. 78-3] at 87:1-6.

59.    In September of 2019, Micheal McCurry emailed DA Carr and Joe Roberts about Ms. Jeter making-up the physical-altercation-at-the-mediation-story and about issues with her attendance.  Ex. G [Doc. 78-8] at ¶ 18.  That same month, Judy Yates spoke to Joe Roberts about Ms. Jeter making-up the physical-altercation-at-the-mediation-story and issues with her attendance and Judy Yates thereafter did a memo to him and DA Carr about those things.  Ex. A [Doc. 78-1] at 103:4-6; Ex. D [Doc. 78-4] at exhibit 3 thereto; Ex. E [Doc. 78-6] at 27:4–28:11, 37:17–38:4.

60.    Judy Yates would then periodically report issues with Ms. Jeter to Joe Roberts, and he believed there continued to be issues with Ms. Jeter's employment after the events in September of 2019.  Ex. E [Doc. 78-6] at 54:5–55:12.

61.     One issue was in 2019 when a trial coordinator told Judy Yates that Ms. Jeter had fallen asleep while observing a trial.  Ex. A [Doc. 78-1] at 72:20–73:11; Ex. E [Doc. 78-6] at 86:2-15.  Ms. Jeter denied doing that.  Ex. C [Doc. 78-3] at 217:23–218:3.

62.     Another issue was in January of 2020, when Ms. Jeter signed out saying she would be in Judge May's courtroom, the attorney assigned there told Judy Yates the judge was not there that day, Judy Yates sent another VSO to look for Ms. Jeter, and the VSO reported back that the courtroom was empty and dark.  Ex. A [Doc. 78-1] at 121:1–122:9 and at exhibit 23 thereto; Ex. E [Doc. 78-6] at 55:13–56:5, 88:5-21. Ms. Jeter testified she was never asked about the event and was actually in the judge's chambers.  Ex. C [Doc. 78-3] at 157:21–158:15, 218:19–219:6.

63.     Another issue was in February of 2020 when Judy Yates observed Ms. Jeter outside the DA's Office building, going into a nearby building, and then returning to DA's Office, all without Ms. Jeter signing out.  Ex. A [Doc. 78-1] at 124:17–127:5 and at exhibit 22 thereto; Ex. E [Doc. 78-6] at 87:8-22.  Ms. Jeter testified she was never asked about it, that she left the building because she was having hot flashes, and that Judy Yates had not been in her office to let her know she was leaving.  Ex. C [Doc. 78-3] at 161:15–163:5, 181:15-18.

64.     On March 11, 2020, the World Health Organization declared COVID-19 a global pandemic and, that night, President Trump gave a prime time address about COVID-19.  Ex. V [Doc. 78-23].

65.     To address COVID-19 concerns, DA Carr and Joe Roberts discussed a plan to minimize the number of people who would be physically present in the office at any one time.  Ex. D [Doc. 78-4] at 237:7–238:17; Ex. E [Doc. 78-6] at 67:13–68:7; *cf.* Ex. P [Doc. 78-17] at CL 0034.  The plan was to only have rotating small groups of employees in the office at one time.  Ex. D [Doc. 78-4] at 237:7–238:17.  Only one VSO would be physically present in the office at any one time and the identity of that VSO would change day-to-day. *Id.* at 238:18–239:1.

66.     On or right before March 13, 2020, Joe Roberts asked Judy Yates to prepare a memo on the issues with Ms. Jeter.  Ex. A [Doc. 78-1] at 201:20–202:16; Ex. E [Doc. 78-6] at 68:13–69:11. He did that because he and DA Carr had had conversations about the ongoing issues with Ms. Jeter and he wanted to have something to refer to and have specific discussions regarding termination.  Ex. E [Doc. 78-6] at 69:12-18.  Judy Yates understood the memo was being asked for in the context of terminating Ms. Jeter.  Ex. A [Doc. 78-1] at 204:6-13.

67.     Judy Yates completed the memo on March 13, 2020.  Ex. D [Doc. 78-4] at exhibit 7 thereto.  It lists several issues, including abuse of earning time and taking time away from work, repeatedly telling stories that turned out to be untrue,

falling asleep while observing a trial, leaving the building without signing out and letting someone know she was unavailable, and signing out for an empty courtroom. *Id*.

68.     Joe Roberts did not attempt to verify or investigate the matters listed in Judy Yates' memo; he trusted what Judy Yates was telling him.  Ex. E [Doc. 78-6] at 59:9-20, 70:8–71:2, 81:6-18, 82:21–86:15, 87:8–90:23, 94:21–95:5.  DA Carr did not attempt to verify or investigate any of the matters listed in the memo; he also trusted Judy Yates.  Ex. D [Doc. 78-4] at 145:17–147:10.

69.     DA Carr made the decision to terminate Ms. Jeter's employment factoring-in the points in Judy Yates' March 13, 2020 memo and the COVID-19 staffing plan. Ex. D [Doc. 78-4] at 138:8-15, 182:5-11, 244:8-22, 248:11-19, 251:6-8;  Ex. E [Doc. 78-6] at 82:2-7.  When he made the decision, he had the memo as well as oral information from Judy Yates and Joe Roberts.  Ex. D [Doc. 78-4] at 141:10-23.

70.     Ms. Jeter was notified of her termination on Monday, March 16, 2020 and was then escorted out of the building by two DA's Office investigators, which is the standard practice when a DA's Office employee is terminated.  Ex. C [Doc. 78-3] at 87:10-23, 113:12-21, and at exhibit 4 thereto; Ex. S [Doc. 78-20] at ¶ 5.

71.     DA Carr has fired four other employees besides Ms. Jeter: three white and one African American.  Ex. D [Doc. 78-4] at 212:15-19, 235:3-16.

## II.   LEGAL ANALYSIS

### A.   DA Carr has Eleventh Amendment immunity to the § 1981 claims and Ms. Jeter did not make a claim under § 1983.

The Eleventh Amendment bars suits by private individuals in federal court against a state unless the state has consented to be sued, has waived its immunity, or Congress has abrogated the state's immunity. *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363-64, (2001); *Cross v. Ala. Dep't of Mental Health & Mental Retardation*, 49 F.3d 1490, 1502 (11th Cir. 1995). Alabama has not waived its Eleventh Amendment immunity. *Carr v. City of Florence, Ala.,* 916 F.2d 1521, 1525 (11th Cir. 1990). "[Congress] has not abrogated Eleventh Amendment immunity with respect to claims made under § 1981[.]" *McCurdy v. Ala. Disability Determination Serv.*, 753 Fed. Appx. 784, 789 (11th Cir. 2018). The immunity "extend[s] to state officials, acting in their official capacity, where an agency or individual may 'be treated as an arm of the State partaking of the Eleventh Amendment [i]mmunity.'" *Melton v. Abston*, 841 F.3d 1207, 1234 (11th Cir. 2016) (internal citations omitted). Alabama district attorneys are state officials. *See Hooks v. Hitt*, 539 So.2d 157, 159 (Ala. 1988); *see also* Ala. Code § 12-17-182 (1975).

Since Alabama has not waived the immunity, since Congress has not abrogated the immunity with respect to § 1981 claims, and since an Alabama district attorney is a state official, DA Carr has Eleventh Amendment immunity to Ms. Jeter's § 1981 claims and is entitled to summary judgment on those claims.

Alternatively, DA Carr is entitled to summary judgment to the § 1981 claims because "§ 1983 provides the exclusive remedy against state actors for violations of the rights contained in § 1981." *King v. Butts County*, 576 Fed. Appx. 923, 930 (11th Cir. 2014). Ms. Jeter did not plead any § 1983 claim and her complaint does not mention § 1983. *See generally* Third Am. Compl. [Doc. 61]. Accordingly, DA Carr is entitled to summary judgment on Ms. Jeter's § 1981 claims.

**B.    Ms. Jeter did not administratively exhaust all her Title VII claims.**

Ms. Jeter did not administratively exhaust all her Title VII discrimination and retaliation claims because she does not mention certain events in her EEOC Charge and, in some cases, does not mention them in her complaint.

"Prior to filing a Title VII action a plaintiff first must file a charge of discrimination with the EEOC." *Gregory v. Ga. Dep't of Human Resources*, 355 F.3d 1277, 1279 (11th Cir. 2004). "No action alleging a violation of Title VII may be brought unless the alleged discrimination has been made the subject of a timely-filed EEOC charge." *Alexander v. Fulton County,* 207 F.3d 1303, 1332 (11th Cir. 2000) (internal citations omitted), *overruled on other grounds by Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003). Each discrete claim of discrimination requires exhaustion, *see Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110-13 (2002), so claims involving new events are inappropriate. *Gregory v. Ga. Dept. of Human Resources,* 355 F.3d 1277, 1279-80 (11th Cir. 2004); *Wu v. Thomas*, 863 F.2d 1543,

1547 (11th Cir. 1989). Also, alleged retaliation claims that occur prior to the submission of an EEOC Charge and that are not included in the EEOC Charge have not been administratively exhausted and cannot be considered by the Court. *Thomas v. Miami Dade Public Health Trust*, 369 Fed. Appx. 19, 22-23 (11th Cir. 2010).

Ms. Jeter does not mention the handling of her husband's criminal cases in her EEOC Charge (and only alludes to them as an act of retaliation, but not as discrimination, in her complaint). She does not mention anything about new office furniture, having to ask permission to work through lunch on one occasion, having to ask permission to occupy a vacant office, or being told she would have to clock-out or use time when she wanted to have someone visit her office in her EEOC Charge or her complaint. None of the claims related to those events have been administratively exhausted, none of those claims are properly before the Court, and DA Carr is entitled to summary judgment on all of those claims.

### C.   Ms. Jeter cannot establish a *prima facie* case of discrimination or retaliation for many of her claims.

Even if Ms. Jeter had administratively exhausted all her Title VII claims, she cannot establish a *prima facie* case for many of them. A plaintiff establishes a *prima facie* case of discrimination by showing "(1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated 'similarly situated' employees outside her class more favorably." *Lewis v. City of Union City,*

26

918 F.3d 1213, 1220-21 (11th Cir. 2019).  A plaintiff establishes a *prima facie* of

retaliation by showing that: "(1) she engaged in an activity protected under Title VII;

(2) she suffered an adverse employment action; and (3) there was a causal connection

between the protected activity and the adverse employment action."  *Crawford v.*

*Carroll*, 529 F.3d 961, 970 (11th Cir. 2008).

### 1.   Many claims do not involve an adverse employment action.

### a.   No adverse employment action for many of the discrimination claims.

"Not all conduct by an employer negatively affecting an employee constitutes

adverse employment action." *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1238

(11th Cir.  2001).  For a discrimination claim, an adverse employment action must

"constitute[] a significant change in employment status, such as hiring, firing, failing

to promote, reassignment with significantly different responsibilities, or a decision

causing a significant change in benefits." *Burlington Indus. v. Ellerth,* 524 U.S. 742,

751 (1998).  Conversely, an action which does not result in any tangible

consequences such as a loss of pay or benefits does not rise to the level of an adverse

employment action.  *See Davis*, 245 F.3d at 1240.

Temporarily not being allowed to earn comp time was not an adverse

employment action because it did not affect Ms. Jeter's pay or benefits (she remained

a salaried employee whose paycheck did not change). She was still able to take off

work during that time, and she always had available leave to cover the time she

missed.  The temporary restriction did not change the terms of her employment (earning comp time was discretionary), the conditions of her employment (she continued to work as a VSO and her paycheck was unaffected by comp time), or the privileges of her employment (she had leave available to cover the time she missed).

Regarding her other discrimination claims, having to bring a doctor's excuse on one occasion, being "watched and reported on," the handling of her husband's cases, the black rat cutout, not receiving new office furniture, having to request permission to work through lunch on one occasion, having to ask Erin Barefield before being able to occupy an empty office, and being told she would have to clock-out or use time to meet with her realtor also do not constitute adverse employment actions.  None of those matters involved sustainable events (all were one-time events), and "[i]t has long been settled that Title VII makes discriminatory treatment actionable only if it reaches a sufficient level of substantiality."  *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 860 (11th Cir. 2020).  Moreover, none of those matters affected the terms and conditions of Ms. Jeter's employment (they did not alter her position, pay, or benefits).  Finally, regarding Ms. Jeter's husband's cases, that does not involve any *employment* action, much less an adverse one.

While these events may have made Ms. Jeter unhappy, "the protections of Title VII simply do not extend to 'everything that makes an employee unhappy.'" *Davis*, 245 F.3d at 1242 (internal citations omitted).  Since none of these events

constitute an adverse employment action, DA Carr is entitled to summary judgment on the discrimination claims involving these events.

**b.** **No adverse employment action for many retaliation claims.**

For a retaliation claim, an adverse employment action is one that might have "'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal citations omitted). The action must be materially adverse, and "trivial harms" or "petty slights or minor annoyances" are not sufficiently adverse. *Id.*

The handling of Ms. Jeter's husband's cases did not involve an *employment* action whatsoever, much less an adverse one. The black rat cutout (that Ms. Jeter did not take down) and not receiving new office furniture were, at best, trivial harms and petty slights, but not ones about which Ms. Jeter complained to her supervisors. The alleged restriction on Ms. Jeter's ability clock-in before 7:30 AM when she resumed regularly earning comp time on and after November 12, 2019 did not adversely affect Ms. Jeter whatsoever: she clocked-in before 7:30 AM more than any other VSO and earned more comp time than all but one other VSO. Since these events were not adverse employment actions, DA Carr is entitled to summary judgment on the retaliation claims involving these events.

## 2.     No close temporal proximity to establish a causal connection between protected activity and the termination.

Ms. Jeter claims she suffered retaliation when she was terminated on March 16, 2020.  The Court has already found that Ms. Jeter did not file an EEOC charge before her termination.  *See* Memorandum Opinion and Order [Doc. 47] at pp. 5, 9.[4] Instead, Ms. Jeter appears to be alleging an "opposition clause" retaliation claim, which involves "activity that occurs before the filing of a formal charge with the EEOC, such as submitting an internal complaint of discrimination to an employer, or informally complaining of discrimination to a supervisor."  *Muhammad v. Audio Visual Servs. Group*, 380 Fed. Appx. 864, 872 (11th Cir. 2010).

Ms. Jeter's November 21, 2019 email to Joe Roberts is not protected activity sufficient to trigger the "opposition clause."  The email does not explain what the alleged "unfair treatment" was or who was allegedly committing it.  Moreover, Ms. Jeter and Joe Roberts never talked about the issue, Joe Roberts never followed-up with Judy Yates after Ms. Jeter said she would talk with her, and Joe Roberts did not otherwise get any additional details about what Ms. Jeter was alleging.

Instead, presumably, Ms. Jeter is basing her retaliation claim on her alleged November 12, 2019 meeting with DA Carr.  In that meeting, she claims she told DA

---

[4]     Thus, this case does not involve alleged retaliatory termination following participation in an investigation of race-based employment discrimination pursuant to 42 U.S.C. § 2000e-3(a).  *See Muhammad v. Audio Visual Servs. Group*, 380 Fed. Appx. 864, 872 (11th Cir. 2010).

Carr she was being discriminated against by having her ability to earn comp time taken away and that DA Carr did *not* know anything about it. That meeting occurred *four months* before the termination and without other evidence, that delay between the protected activity and the adverse action is too long to prove causation. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007).

Since Ms. Jeter cannot establish a causal connection between her alleged meeting with DA Carr and her termination, DA Carr is entitled to summary judgment on Ms. Jeter's retaliation claim involving her termination.

### 3.  No causal connection between any protected activity and certain alleged retaliation.

To establish a causal connection for a retaliation claim, "a plaintiff must show that the decision-maker[s] [were] aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated." *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000). This "rests upon common sense. A decision maker cannot have been motivated to retaliate by something unknown to him." *Brungart v. Bellsouth Telecomm., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000).

Judy Yates, Micheal McCurry, and Joe Roberts were not aware of Ms. Jeter's alleged November 12, 2019 meeting with DA Carr and could not have been motivated to retaliate against Ms. Jeter based on that alleged meeting. Warren Brooks, the attorney who handled Case 3, was not aware of Ms. Jeter making any complaints about discrimination or any other work problems. There is no causal

31

connection between the protected activity involving the alleged meeting with DA Carr and the alleged retaliation involving Warren Brooks (i.e., the alleged "mishandling" of Case 3), Judy Yates (i.e., placing the cutout of the black rat near Ms. Jeter's door at Halloween, which occurred *before* the meeting with DA Carr, and allegedly restricting Ms. Jeter's ability to clock-in before 7:30 AM when she resumed regularly earning comp time on and after November 12, 2019), Micheal McCurry (i.e., not giving Ms. Jeter new office furniture), and Joe Roberts (i.e., playing a role in Ms. Jeter's husband's criminal cases and in the termination process).  Since Ms. Jeter cannot establish the requisite causal connection between her November 12, 2019 meeting with DA Carr and the alleged retaliatory events involving those individuals, DA Carr is entitled to summary judgment on the retaliation claims involving those events.

### 4. <u>Ms. Jeter was not treated less favorably than a white VSO.</u>

For her *prima facie* discrimination case, Ms. Jeter must show "her employer treated similarly situated employees outside of her protected class more favorably than she was treated[.]"  *Trask v. Sec'y, Dep't of Veterans Affairs*, 822 F.3d 1179, 1192 (11th Cir. 2016) (internal citations omitted).  The comparator must be "similarly situated in all material respects." *Lewis*, 918 F.3d at 1226.  "Ordinarily, a 'similarly situated comparator' will 'have engaged in the same basic conduct (or misconduct)

as the plaintiff.'" *Brown v. Jefferson Cty. Sheriff's Dept.*, 806 Fed. Appx. 698, 703 (11th Cir. 2020) (internal citations omitted).

No other VSO exhausted all of her available vacation leave, all her available sick leave, and nearly all of her accrued comp time in the first six months of her employment. No other VSO was caught lying about her use of comp time and caught making-up a story about a fight and a mediation that did not happen. No other non-supervisor VSO was given new office furniture, though one was given some used furniture. No other VSO was reported to Judy Yates as having fallen asleep while observing a trial. No other VSO signed out saying she was in a courtroom where it was later reported to Judy Yates that the judge was not there that day and the courtroom was empty. No other VSO violated Judy Yates' trust like Ms. Jeter, and no other VSO posed the potential problems that an unsupervised Ms. Jeter (especially with her real and perceived dishonesty) presented if she were the only VSO in the office as part of the COVID-19 staffing plan.

Since Ms. Jeter has not identified, and cannot identify, a similarly situated comparator that was treated more favorably than her - especially as it concerns her discrimination claims involving comp time and her termination – DA Carr is entitled to summary judgment on Ms. Jeter's discrimination claims.

**D.** **There were legitimate, non-discriminatory reasons for the events at issue.**

Even if Ms. Jeter could establish her *prima facie* case for all the events making-up her discrimination and retaliation claims, the claims still fail because there were legitimate, non-discriminatory reasons behind those events.

Once the employee establishes her *prima facie* case, the employer may "articulate some legitimate common nondiscriminatory reason" for the adverse employment action. *Maynard v. Board of Regents of the Div. of University of Fla. Dep't of Edu.*, 342 F.3d 1281, 1289 (11th Cir. 2003). Federal courts "are not in the business of adjudging whether employment decisions are prudent or fair." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999). "[F]ederal courts do not sit as a super-personnel department that reexamines an entity's business decisions . . . . Rather, [the] inquiry is limited to whether the employer gave an honest explanation of its behavior." *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) (citations omitted). The burden is "exceedingly light." *Gary v. Hale*, 212 Fed. Appx. 952, 956 (11th Cir. 2007) (citations omitted).

There are legitimate, non-discriminatory reasons behind the events that make-up Ms. Jeter's discrimination and retaliation claims. Following the approximate date order of those events, Ms. Jeter's ability to earn comp time was temporarily suspended because she was the only new VSO who had exhausted all of her available vacation time, all of her available sick time, and almost all of her accrued comp time,

and who had lied about her use of comp time.  Judy Yates asked Ms. Jeter to bring back a doctor's excuse because Ms. Jeter had lied about her use of comp time. Micheal McCurry "watched and reported" Ms. Jeter's use of leave after routinely seeing Ms. Jeter's name on various leave requests and leave authorizations, which stuck out because Ms. Jeter was a new employee.  Ms. Jeter's husband's cases (the majority of which the DA's Office recused itself on) ended in either being no-billed based on the determination of the grand jury, a guilty plea, or dismissed by a judge (not on a motion by the DA's Office).  Judy Yates put the black rat cutout up the week of Halloween, and took it (and the other similar decorations) down right after Halloween.  Ms. Jeter, like all VSOs, had to get permission to clock-in before 7:30 AM, and she clocked-in before 7:30 AM more than any other VSO (and earned more comp time than any other VSO save Elise Driskill) after November 12, 2019.  No VSO other than Judy Yates received new office furniture, but Elise Driskill did receive some used furniture because it would fit in her office and because of the age and condition of her furniture. Ms. Jeter was granted permission to work through lunch and earned comp time for doing so.  Ms. Jeter had to ask Erin Barefield about the vacant office (before Ms. Jeter moved into it) because Erin Barefield had been hired before Ms. Jeter and, thus, had first choice of a new office.  Judy Yates told Ms. Jeter to clock-out for lunch to meet with her realtor because the meeting was personal; Ms. Jeter chose to cancel the meeting altogether instead of doing so.

Finally, Ms. Jeter was terminated because of apparent continuing problems with her employment and factoring-in the DA's Office plans to scale-down to a skeleton crew to deal with COVID-19. That plan would have one VSO in the office at any one time, which could have resulted in Ms. Jeter, with her track record of real and perceived dishonesty and attendance issues, being there unsupervised.

Based on the foregoing, DA Carr is entitled to summary judgment on Ms. Jeter's retaliation and discrimination claims.

**E.    DA Carr and Ms. Jeter are the same race.**

The Eleventh Circuit recognizes that a Title VII violation may occur where the plaintiff and a decision-maker share the same race, but that generally happens when the decision-maker "held members of his own race to a higher standard of conduct than members of another race." *United States v. Crosby*, 59 F.3d 1133, 1135 n.4 (11th Cir. 1995). Thus, "[w]hile a supervisor can racially discriminate against an employee of the same race, the scenario is less plausible than discrimination against an employee of a different race." *Walker v. Love's Travel Ctr.*, 2017 U.S. Dist. LEXIS 179806, *6 n.4 (S.D. Ala. 2017).[5]

There is no evidence DA Carr held African Americans to a higher standard or that he terminated Ms. Jeter based on their shared race. Since DA Carr's decision

---

[5]    *See also Robinson v. UPS*, 2007 U.S. Dist. LEXIS 84497, *17 (N.D. Ga. 2007) ("When the decision-maker is in the same class as the plaintiff, it is very difficult to show a discriminatory motive") (citing *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1471 (11th Cir. 1991)).

to terminate Ms. Jeter was not motivated by racial animus, he is entitled to summary judgment on Ms. Jeter's discrimination claim involving her termination.

**F.     This is not a "cat's paw" or "mixed-motive" case**.

DA Carr did not independently investigate any of the matters discussed in Judy Yates' March 13, 2020 memo, matters which he considered when he decided to terminate Ms. Jeter.  Even if the memo contained disputed matters, it does not make DA Carr's decision to terminate discriminatory. *See Flowers v. Troup County*, 803 F.3d 1327, 1338 (11th Cir. 2015) ("Put frankly, employers are free to fire their employees for 'a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.").[6]

This is also not a "cat's paw" or "mixed-motive" case, which is "when a biased actor recommends that an adverse employment action be taken against an employee, but the biased actor is not the ultimate decision-maker." *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999). Those cases require evidence that the alleged discriminatory animus of the biased actor directly caused the decision-maker to take the adverse employment action. *Id.* at 1331. "The term discriminatory animus means prejudice, spite, or ill will."  *Wood v. President & Trustees of Spring Hill College*, 978 F.2d 1214, 1219 (11th Cir. 1992).  Here, there

---

[6]      *See also Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1262 (11th Cir. 2001) ("[R]acial discrimination is an intentional wrong. An empty head means no discrimination. There is no 'constructive intent,' and constructive knowledge does not show actual intent.").

is *no* evidence of discriminatory animus:  Ms. Jeter admitted that she is not aware of Judy Yates or Joe Roberts ever making any derogatory comments about African Americans or comments about favoring white people.  Race did not play any part in the events that led to the decision to terminate Ms. Jeter; Ms. Jeter's problematic employment history was the sole root cause of her termination. Since there is no evidence of discriminatory animus, DA Carr is entitled to summary judgment on Ms. Jeter's discrimination claim involving her termination.

## III.   CONCLUSION

For at least all of the reasons stated above, DA Carr is entitled to summary judgment on Ms. Jeter's claims.

Respectfully submitted,


*/s/ James E. Murrill, Jr.*
Robert R. Riley, Jr. (ASB-0909-168A)
James E. Murrill, Jr. (ASB-4329-A57M)

OF COUNSEL:
**RILEY & JACKSON, P.C.**
3530 Independence Drive
Birmingham, Alabama 35209
(205) 879-5000 *telephone*
(205) 879-5901 *facsimile*

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 1, 2022, a copy of the foregoing was electronically filed with the Clerk of the Court using the Pacer system, which sends notification of such filing to the following counsel of record in this cause:

Brian O Noble
CAPSTONE LAW, LLC
3105 Sunview Drive
P.O. Box 43888
Vestavia, AL 35243
brian.noble@caplawllc.com

Artur Davis
HKM EMPLOYMENT ATTORNEYS
3355 Lenox Road, NE
Atlanta, GA 30326
adavis@hkm.com


/s/ James E. Murrill, Jr.
OF COUNSEL