

FILED
2022 Jul-06  AM 10:00
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA SOUTHERN DIVISION

| | | |
|---|---|---|
| **LANITRA JETER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 2:20-CV-01863-ACA** |
| **V.** | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| **DANNY CARR, in his Official** | ) | |
| **Capacity as District Attorney** | ) | |
| **Of Jefferson County, Alabama,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFF'S MEMORANDUM BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Comes now Plaintiff Lanitra Jeter ("Jeter"), by and through her undersigned counsels, and files this Memorandum Brief in opposition to the Motion for Summary Judgment filed by Defendant Danny Carr ("Carr" or "DA Carr") (Doc. 79). Jeter relies on the following facts and legal authority.[1]

---

[1] Pursuant to Appendix II of the Court's Initial Order, Jeter references materials included in the moving party's initial evidentiary submission without resubmitting said materials.

1

**TABLE OF CONTENTS**

Table of Contents…………………………………………….2

I.      Plaintiff's Statement of Facts…………………………3

A.      Response to Movant's Statement of Facts……………3

B.      Plaintiff's Additional Undisputed Facts………………8

a.      Background regarding VSOs…………………………8

b.      Comp-time policy……………………………………9

c.      Restrictions on Jeter's comp time……………………10

d.      Jeter's internal complaints regarding discrimination…11

e.      Increasing scrutiny of Jeter at work…………………13

f.      Jeter's termination…………………………………14

C.      Additional Disputed Facts………………………….. 17

II.     Argument and Citations of Authority………………18

A.      Standard for Summary Judgment…………………...18

B.      Framework for Evaluating Title VII Retaliation Claims….19

1.      *McDonnell-Douglas* standard………………………..19

2.      Mosaic standard………………………………………21

3.      Evidence of a prima facie case………………………..22

4.      Pretext evidence………………………………………23

5.      Mosaic evidence……………………………………...31

## I.   **PLAINTIFF'S STATEMENT OF FACTS**

## A.   **Response to Movant's Statement of Facts**

2.      Disputed as written. As noted in Plaintiff's argument and citations authority below, Jeter advances one claim at the summary judgment stage: retaliatory termination. Jeter does not pursue discrete discrimination or retaliation claims based on the numbered assertions 1-9 in this paragraph, and relies on the aforementioned assertions only to the extent that they provide background evidence of retaliatory intent.

3.      Not disputed, but claims under 42 U.S.C.A. § 1981 and Title VII are governed by the same analytical framework. *See Jefferson v. Sewon America, Inc.*, 891 F.3d 911, 919 (11th Cir. 2018).

6.      Disputed as written.  Carr does not fully or accurately characterize the nature of the excerpted portion of the testimony of Deputy District Attorney Joe Roberts ("Roberts" or "Deputy DA Roberts").  The excerpted portion further states that while there was a chain of command protocol in which personnel concerns were to be advanced to an employee's immediate supervisor, employees were known to violate the protocol. Jeter does not dispute that there was an aspirational policy of employees relaying concerns to their next-level supervisor.

15.      Disputed as written.  The insertion of the phrase "she claimed" suggests without foundation that there is doubt as to whether Jeter took comp time

3

for the stated purpose of attending a mediation in a domestic relations case involving her husband.

16.    Disputed in part.  Carr misstates the record, which does not establish that a family court mediation did not occur on September 16, 2019 involving Jeter and her husband.

17.    Disputed in part. Whatever the administrator of the DA's Office Micheal McCurry may have concluded, there is no record evidence that Jeter "lied" about her use of comp time to attend a mediation involving her husband. While Jeter acknowledges that she misrepresented the specific events during that session in an effort to determine if the version she described would be circulated in the office, Jeter did not testify, and there is no record evidence to the effect, that Jeter was not participating in a mediation during the referenced period for which she took comp time (Doc. 78-3, Deposition of Lanitra Jeter at 171:20-178:13, ("Jeter depo.")).

18.    Disputed in part.  Jeter disputes that she was told that her comp time would only be suspended for one week.  On September 23, 2019, Yates told Jeter that her accrual of comp time would be frozen for the time being, for an undetermined amount of time, pending any exceptions subject to approval by the head of the VSO unit, Judy Yates (Jeter depo. at 45:15-46:1; Doc. 78-1, Deposition of Judy Yates at 154:2-16, ("Yates depo.").

4

20.    Disputed as written.  Jeter does not advance a discrete claim of discrimination based on Yates' stipulation that she was required to obtain a doctor's note for sick leave.

21.     Not disputed, but Jeter did express concerns about Yates' directive to two of her fellow VSOs (Jeter depo. at 77:10-16).

22.    Disputed as written. In its present form, the assertion about Yates' state of mind is an argument as to a disputed inference and is improperly labeled a fact not in dispute.

23.    Disputed as written.  Jeter does not advance a discrete claim of discrimination based on the allegation alluded to in ℙ 23.

26.    Disputed as written.  Jeter does not advance a discrete claim of discrimination or retaliation based on the allegation alluded to in ℙ 26.

27.    Immaterial.

28.    Immaterial.

29.    Immaterial.

30.    Immaterial.

31.    Immaterial.

32.    Disputed as written.  Jeter does not advance a discrete claim of discrimination or retaliation based on the allegation alluded to in ℙ 32.

35.     Immaterial.  To the extent that ℙ 35 describes Yates' motivation, the assertion is not properly characterized as an undisputed material fact.

36.     Disputed as written.  Jeter does not advance a discrete claim of retaliation based on the allegation alluded to in ℙ 36.

38.     Disputed in part.  ℙ 38 misstates as an uncontested fact the assertion that Yates was unaware of DA Carr's meeting on November 12 with Jeter. As noted below, Jeter disputes that assertion with circumstantial evidence and identifies Yates' knowledge of the November meeting as a central disputed fact.

44.     Disputed as written.  To the extent that ℙ 44 includes a reference that "as far as [Roberts] knew", the assertion is an inference as opposed to a fact not in dispute.

45.     Disputed as written.  Jeter does not advance a discrete claim of discrimination or retalaition based on the allegation alluded to in ℙ 45.

46.     Immaterial.

47.     Immaterial.

48.     Disputed as written. Jeter does not advance a discrete claim of discrimination based on the allegation alluded to in ℙ 48.

50.     Immaterial.

51.     Disputed as written.  Jeter does not advance a discrete claim of discrimination based on the allegation alluded to in ℙ 51.

52.     Immaterial.

53.     Immaterial.

54.     Immaterial.

55.     Disputed as written.  Jeter does not advance a discrete claim of discrimination based on the allegation alluded to in ₽ 55.

56.     Immaterial.

57.     Immaterial.

58.     Disputed as written, in part.  Jeter does not advance a discrete claim of discrimination based on the allegation alluded to in ₽ 58.

60.     Disputed in part.  The assertion that Roberts "believed there continued to be issues with Ms. Jeter's employment" omits material aspects of the substance of his testimony. Roberts testified that he did not even remember the details of most of the matters Yates included in the memo, and that not a single incident Yates described resulted in discipline or correction (Roberts depo. at 55:3-12; 56:13-20).

66.     Disputed in part.  In their present form, the assertions about Roberts' motivations for directing Yates to write a memo regarding Jeter's performance, and whether Roberts or Yates drove the discussion about Jeter's termination, are arguments as to disputed inferences and are improperly labeled facts not in dispute.

69.     Disputed in part.  In their present form, the assertions as to the factors Carr relied upon in terminating Jeter are arguments as to disputed inferences and are improperly labeled facts not in dispute.

71.     Immaterial.

**B.      Plaintiff's Additional Undisputed Facts**

**a.      Background regarding VSOs**

1.      The Victim Services Office and its employees are a unit of the District Attorney's Office for Jefferson County, Alabama (Doc. 78-4, Deposition of Danny Carr at Ex. 1, ("Carr depo.")).

2.      The Office's role is to service and support victims of crimes during various stages of the prosecutorial process (Jeter depo. at 22:1-23:2).

3.      In 2019 and 2020, during the time frame relevant to this lawsuit, there were four victims services officers ("VSOs") under the supervision of a director, Judy Yates (Yates depo. at 17:3-18:15).

4.      At the time, Plaintiff Jeter was the sole African-American VSO. The other three–Elise Driskill, Erin Barefield, and Cheryl Black–were all Caucausian (Carr depo. at 160:6-11).

5.      When Ms. Jeter was hired in April 2019, she was the first black person ever hired to serve as a VSO:  Jefferson County is a demographically

diverse county and the population of crime victims in the county is
overwhelmingly African-American (Yates depo. at 21:5-23:13).

6.      While their salaries are paid by a state source, the Office of
Prosecution Services, VSOs are treated as full-fledged staff members of the DA's
Office (Doc. 78-9).

7.      VSOs are governed by the DA's Office's policies and procedures, and
the DA himself is the final decision-maker regarding VSO firings (Carr depo. at
51:7-52:20; Doc. 78-6, Roberts depo. at 58:13-19).

8.      For roughly 25 years, Yates was in charge of hiring VSOs, but since
Jeter's termination and charge of discrimination with the Equal Employment
Oportunity Commission, Carr has actively participated in the hiring process for
VSOs (Yates depo. at 23:20-24:11; 28:5-13; 30:6-31:8).

**b.      Comp-time policy**

9.      VSOs, like other non-attorney personnel in the DA's office, are
permitted to accrue and take "comp time" (*Id*. at ₽ 6).  Comp time enables workers
to come in earlier or stay later, or to work through lunch,  to gain the flexibility to
take additional time out of the office day for personal use (Carr depo. at
70:11-71:8).

10.     While advance notice must be provided for comp time, the custom and practice in the DA's Office is to liberally approve comp time and to allow open ended use with no restrictions on the purpose (Yates depo at 148:19-149:13).

11.     There are no limits on the total comp time taken by an employee, and in contrast with leave, the benefit is one which VSOs are provided as of their first day of employment (*Id*. at. 151:4-22).

12.     Yates encouraged new employees to start exercising their rights to comp time immediately (*Id*. at 149:14-150:15).

**c.       Restrictions on Jeter's comp time**

13.     During her first several months as a VSO, Jeter suffered from a series of recurrent medical issues including hormonal problems with excessive perspiration and nausea that led to vomiting episodes (Jeter depo. at 57:6-16).

14.     She sought out several specialists for a diagnosis of these issues, which invariably meant missing time out of the work day for doctors' appointments (*Id*. at 58:5-12).

15.     In her first five months or so on the job, Jeter took the equivalent of two weeks combined vacation and sick leave and was a regular user of comp time: accruing 66.75 hours and drawing down 62 of those hours (Affidavit of Micheal McCurry at ₱11, ("McCurry affidavit")). As a new employee, of course, Jeter was not eligible for intermittent leave under the Family Medical Leave Act.

10

16.     Not a single one of Jeter's leave or comp time requests was rejected in her first five months (Yates depo. at 153:15-154:2).

17.     Jeter's attendance record, as well as her drawdown of leave and comp time, were not identified as problems until the third week in September 2019, when Chief Administrator McCurry contends that he spoke to Yates about the extent of Jeter's use of comp time (McCurry affidavit at ℙ20).

18.     On September 23, Yates told Jeter that her accrual of comp time would be frozen for the time being, pending any exceptions subject to Yates' approval (Jeter depo. at 45:15-46:1; Yates depo. at 154:2-16).

**d.    <u>Jeter's internal complaints regarding discrimination</u>**

19.     Jeter strenuously objected on the grounds that her frequent resort to comp time was primarily a function of her persistent doctors' visits and that other VSOs regularly took comp time for purposes including hairstyling appointments (Jeter depo. at 46:1-11; 57:6-58:12).

20.     In late September or early October, Jeter met with Yates and McCurry to complain that she was being singled out for attendance issues because she was black (*Id*. at 53:16-54:8; 56:20-57:4; 58:13-23.)

21.     Jeter's restrictions on comp time appear to have stayed in place for about seven weeks until November 12, 2019 (*Id*. at 61:20-62:1).

22.     That day, November 12, 2019, email records show that Jeter met with DA Carr (Doc. 78-19).

23.     Jeter testified in her deposition that she complained to Carr in their meeting about Yates and McCurry denying her access to comp time and her perception that there was a double standard for comp time usage by white VSOs (Jeter depo. at 32:10-15; 34:2-9).

24.     While Carr denies that the meeting took place, he admitted in his deposition testimony that if a supervisor were accused of discriminatory conduct, it would be his practice to notify the supervisor and give them a chance to respond (Carr depo. at 82:9-83:10).

25.     That same day, November 12, Yates informed Jeter that she could begin accumulating comp time again but with limitations: but Jeter could not obtain comp time by modifying her schedule to come in early or stay late, which meant in effect that she had to work through scheduled breaks (Jeter depo. at 63:2-17).

26.     Jeter still believed that the continuing restrictions on her use of comp time were unfair. Later that month, on November 21, Jeter emailed Chief Deputy Roberts to discuss with him what she described as unfair treatment (*Id*.at 68:2-17; Roberts depo. at 47:2-48:20).

27.    Roberts declined to meet with Jeter, telling her that she needed to raise her concerns first to Yates and to him only as a last resort (*Id*. at 49:2-17).

28.    Roberts has claimed that he did not know who or what Jeter was complaining about, but he concedes and text messages confirm that he told Yates about Jeter's email (*Id*. at 50:20-23; 52:5-53:6.).

29.    Yates made her own memo to file about Jeter's attempts to reach out to Roberts and acknowledges that she assumed she was the subject of the complaint, although she contended in the memo that she felt Jeter's grievance was about not being permitted to attend a VSO training (Yates depo. at 40:8-41:2).

e.    **Increasing scrutiny of Jeter at work**

30.    Yates began generating memos to file about Jeter's conduct. The majority of these memos were generated after November 12, 2019, which email records reflect was the date of Jeter's meeting with Carr (*Id*. at 171:17-172:4).

31.    These memos continued up until February 2020, about a month before Jeter's firing in March 2020, and included observations that Jeter declined to join other VSOs on a voluntary out of state training trip (*Id*. at 187:18-188:12);  that she had requested vacation time to assist her son with a legal matter in Atlanta; (*Id*. at 193:1-23); that she took an unauthorized 20 minute break out of the office; (*Id*. at Ex. 22); and that she declined to attend non-mandatory firearms training (*Id*. at 186:18-187:17).

32.    On another occasion, Yates noted that Jeter had requested and was granted permission to come in early to accrue extra hours, as an exception to the restrictions Yates had imposed on Jeter in November 2019 (*Id*. at Ex. 23).

33.    The sole post November 12 memo related to comp time described a January 2020 incident where Jeter failed to obtain pre-approval for comp time that Yates ended up approving after the fact (*Id*.).

34.    Yates admitted that none of the documented incidents resulted in discipline, counseling, or corrective action (*Id*. at 192:8-22; 194:9-14). Yet, these memos to file were delivered to Deputy DA Roberts when Jeter's termination was under consideration in March 2020 (*Id*. at 206:1-13).

**f.    Jeter's termination**

35.    Carr and Roberts acknowledge in their deposition that the reduced staffing model under COVID provided an occasion to reassess the staff structure in the Victims Services Office (Carr depo. at  237:10-23; Roberts Depo. at 68:1-7).

36.    The parties agree that the only VSO whose position was eliminated was Jeter (*Id*. at 68:8-12).

37.    On March 13, 2020, Yates compiled a memo listing roughly thirteen areas of concern over the entire course of Jeter's eleven month employment, including the six months out-of-date claims about excessive absence and use of comp time; the various incidents documented in the memos to file; some assorted

allegations that Jeter fell asleep while observing a trial; made disparaging comments to staffers about certain Jefferson County Judges;  claimed to be present in a courtroom when that court was actually not in session; and asked a YMCA advocate for her opinion about a family court judge in a matter involving Jeter's husband and his ex wife (Doc. 78-4 at Ex. 7).

38.     The memo included unsubstantiated assertions that Jeter lacked credibility with co-workers; and other broad-brushed charges that Jeter "has rarely worked an entire five day work week", and had made unidentified untrue claims on social media *(Id*).

39.     The clear intent of the memo was to outline a rationale for termination (Yates depo. at. 204:6-13).

40.     Carr admits that he did not in any manner attempt to verify any of the various items in the bill of particulars against Jeter contained in Yates' memo and says that he relied on Yates' and Roberts' assessment (Carr depo. at 146:6-147:8).

41.     The same lack of corroboration goes for Chief Deputy Roberts, who participated in the discussions about termination: Jeter's attendance records were not pulled, or compared with other VSOs; nor were a variety of other allegations in the memos verified in any manner (Roberts depo. at 70:12-71:2; 81:6-18; 82:5-7; 83:17-84:14; 85:11-21; 94:21-95:1).  Roberts acknowledged, for example, that he failed to confirm assertions that Jeter mentioned filing complaints about judges,

15

made questionable postings on social media, and was distrusted by other VSOs. (*Id*. at 83:17-84:14; 85:11-21; 94:19-95:19.)

42.     Yates, for that matter, concedes she did not bother to review attendance records before making the sweeping claim that Jeter had rarely worked a five day week, a claim that actual attendance records do not come close to bearing out (Yates depo. at 209:9-210:10).

43.     The attendance records between November 2019 and March 2020 do not support the argument that Jeter was especially aggressive in her use of comp time. One VSO, Elise Driskill, clocked <u>more</u> comp time during that period than Jeter (44.75 hours to Jeter's 43.5); another VSO, Erin Barefield, earned 35 hours in the same period, the equivalent of a difference in one work day between her and Jeter. (McCurry affidavit at ¶¶26, 30).  The cumulative leave and documented comp time records for the VSOs reveal that Jeter, with 14 total submissions, trailed Barefield at 19, and yet another white VSO, Cheryl Black at 31 (Carr depo. at 161:10-176:13).[2]

44.     Roberts concedes that he and Carr had no reason to believe that any of the incidents in the memo happened close in time to March 2020 (Roberts depo. at 95:16-96:4).

---

[2] Some of Jeter's comp time requests may have ended up not being documented, but the same can be said for the other VSOs.

45.     Jeter was presented a letter of termination on March 16, 2020, listing as grounds that "[i]t is no longer the pleasure of the District Attorney that you continue to serve as an employee in this office." (Carr depo. at Ex. 8).

46.     The parties agree that Jeter filed a charge of discrimination with the Equal Employment Opportunity Commission alleging race discrimination and various theories of retaliation.

47.     Jeter initially filed her lawsuit *pro se* on November 23, 2020, (Doc. 1), and subsequently filed the operative counseled Amended Complaint on October 12, 2021 (Doc. 61).

## C.     <u>Additional Disputed Facts</u>

Whether Jeter met with Carr on November 12, 2019, and if such a meeting happened, whether Jeter told Carr about allegations that she was being subjected to racially discriminatory treatment: Carr denies that the meeting occurred while Jeter testified that it did and that she complained that Yates' restrictions on her comp time were racially motivated (Carr depo. at 84:22-85:3; 91:20-93:18; Jeter depo. at 32:10-15; 34:2-9).  Jeter further relies on an email from Carr's assistant scheduling her for a meeting on November 12, 2019 (Doc. 78-19).

Whether Yates was aware of Jeter's November 12, 2019 meeting with Carr, and if she were aware, whether Carr disclosed to Yates that Jeter had accused her of discriminatory behavior: Yates denies that she ever learned of such a meeting

(Yates depo. at 79:18-22).  Jeter challenges that testimony with circumstantial

testimony: first, Carr testified that if he had received a discrimination complaint

regarding a supervisor, he would have notified the supervisor and given her/him a

chance to respond (Carr depo. at 82:9-83:10).  Second, the same day Jeter says she

complained about her comp time restrictions, Yates restored her comp time

privileges at least in part (Jeter depo.  at  63:2-17).  Next, Jeter points to the fact

that Jeter started keeping memos to file about Jeter after the November 12, 2019

meeting (*Id*. at 171:17-172:4).

## II.     ARGUMENT AND CITATIONS OF AUTHORITY [3]

### A.     Standard for Summary Judgment

Summary judgment is appropriate only if the Court concludes "there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. Pr. 56(a).  At this pretrial phase of the case, all facts

asserted by the plaintiff must be deemed as true and all reasonable factual

inferences must be drawn in favor of the non-moving party. *Strickland v. Norfolk

Southern Railroad Co*., 692 F.3d 1151, 1154 (11th Cir. 2012).  The Court is not to

weigh evidence or reach credibility judgments, as those "are jury functions, not

---

[3] Jeter does not contest Carr's motion for summary judgment as to her claims that she was
terminated based on her race or subjected to a retaliatory hostile environment, a theory of
liability the Eleventh Circuit recognized in *Monaghan v. Worldpay U.S. Inc.*, 955 F.3d 855 (11th
Cir. 2020).  The sole claim before the Court is whether Carr is entitled to summary judgment as
to Jeter's allegation that she was terminated in retaliation for complaints of discriminatory
conduct in the VSO unit.

those of a judge." *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013). The ultimate inquiry at the summary judgment stage is whether the record contains evidence that would permit a reasonable jury to return a judgment for the non-moving party. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505 (1986).

**B.   Framework for Evaluating Title VII Retaliation Claims**

**1.   *McDonnell Douglas* standard**

Title VII prohibits retaliation against an employee because she "has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C.A. § 2000e-3(a). Retaliation claims are always governed by a single-motive, but-for causation standard. *University of Texas Southwest Medical Center v. Nassar*, 570 U.S. 338, 352, 133 S.Ct. 2517, 2528 (2013).

A Title VII claim based on circumstantial evidence, as Jeter asserts, is ordinarily analyzed under the burden shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817 (1973); *Johnson v. Miami Dade-County*, 948 F.3d 1318, 1325 (11th Cir. 2020). Under this framework, a plaintiff must first establish a prima facie case that: (1) she engaged in protected activity under Title VII; (2) she suffered an adverse action; (3) there is "some causal relationship between the two events." (internal citations omitted). *Id*. Protected activity is not limited to formal administrative complaints, such as the

EEOC charge process, and includes informal internal complaints to supervisors and managers. *Skelton v. Birmingham Airport Authority*, 2021 WL 4476800 at *4 (11th Cir. 2021).

If the plaintiff establishes a prima facie case, the burden shifts to the employer to present legitimate, non-retaliatory reasons for the challenged employment actions. *Johnson,* 948 F.3d at 1325.  If a defendant makes this showing, the ultimate burden of persuasion rests with the plaintiff to establish that the defendant's explanation was "not the real basis for the decision, but a pretext for discrimination."  *Richardson v. Leeds Police Department*, 71 F.3d 801, 806 (11th Cir. 1995). The plaintiff must show not only that the ostensible reason was false, but the defendant acted based on an unlawful, in this case retaliatory, reason. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515, 113 S.Ct. 2742, 2752 (1993).

To establish a discriminatory pretext at the summary judgment stage, a plaintiff may demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factifinder could find them unworthy of credence." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997).

## 2. <u>Mosaic standard</u>

In this circuit, while *McDonnell Douglas* is treated as the primary method for evaluating discrimination claims at the summary jugment stage, it is not the

sole means for evaluating whether a plaintiff is able to present her claims to a jury. As an alternative to the burden-shifting test, a plaintiff may defeat summary judgment by presenting "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Smith v. Lockheed Martin Corp*., 644 F.3d 1321, 1328 (11th Cir. 2011). Under a mosaic theory, a plaintiff need not establish a prima facie case, and can rely on factors including "bits and pieces from which an inference of discriminatory intent might be drawn"; "systematically better treatment of similarly situated employees," including inconsistent applications of personnel policies; and traditional pretext evidence regarding the employer's stated reasons. *Lewis v. City of Union City II*, 934 F.3d 1169, 1185, 1188 (11th Cir. 2019).  As district courts within this circuit have recognized, a  "mosaic" analysis is effectively a "totality of circumstances test".  *See Gladden v. Procter & Gamble Distributing LLC* 2021 WL 4930535 at *31 (N.D. Ga. July 16, 2021); *Heard v. Georgia's Own Credit Union*, 2021 WL 82668243 at *15 (N.D. Ga. April 29, 2021).

To date, this circuit has not squarely addressed whether the mosaic test applies to retaliation claims as well as disparate treatment claims. But in various opinions, it has assumed that mosaic theory, if properly preserved, is equally applicable to claims of retaliation. See *Bailey v. Metro Ambulance Services Inc.*, 992 F.3d 1265, 1273 n.1 (11th Cir. 2021); *Lewis v. Blue Bird Corp*., 835 Fed. Appx.

526, 529 n.2  (11th Cir. 2020); *James v. City of Montgomery*, 823 Fed. Appx. 728, 735 (11th Cir. 2020);  *Calvert v. Doe*, 648 Fed. Appx. 925, 928-30 (11th Cir. 2016) (reversing a grant of summary judgment for a retaliation claim based on a mosaic analysis).

Various district courts have concluded that a plaintiff alleging retaliation may rely on mosaic as an alternative to *McDonnell Douglas*.  *Delk v. UPS,* 2022 WL 1399090 at *9 (N.D. Ga. March 24, 2022); *Billings v. Pettway*, 2021 WL 6050684 at *9 (N.D. Alabama, December 21, 2021 (Proctor, J.); *Berry v. Crestwood Healthcare LP*, 2021 WL 5866719 at *8 n.1 (N.D. Ala. December 10, 2021) (Burke, J.); *Change v. Midtown Neurology PC*, 2021 WL 2483368 at *25 (N.D. Ga. February 3, 2021).

**3.   Evidence of a prima facie case**

Regarding the sole claim Jeter advances, retaliatory termination, Carr appears to concede in his brief that Jeter's complaints to him on November 12, 2019 that the restrictions on her use of comp time were discriminatory would constitute protected activity.  But Carr argues that Jeter's termination five months later is too attenuated to establish a link to a November 12 2019 complaint for prima facie purposes.  Defendant's Memorandum Brief at pg. 31.

Carr is correct that when a close link in time, or temporal proximity, is the sole means to establish an inference of causation, five months is too long.  *See*

22

*Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007).  But in the event temporal proximity is not present, a plaintiff may rely on additional evidence, including the fact that the adverse action represented a plaintiff's first opportunity to retaliate. *Ward v. UPS, et al.*, 580 Fed. Appx. 735, 739 (11th Cir. 2014).  Here, Carr and Roberts testified that after the outbreak of the COVID-19 pandemic in March 2020, the DA's office adopted a pared-down staff structure that led to an active reassessment of which personnel "we can rely on to do the job that we trusted." (Carr depo. at 237:23.)  Since Roberts opined that terminations were rare in the DA's office, (Roberts depo. at 99:22-99:10), a jury could infer that the pandemic-induced realignment provided the first practical opportunity to retaliate. *Compare Ward,* 580 Fed. Appx. at 739 (the fact that the supervisor made "intervening decisions to re-employ" plaintiff meant that a subsequent firing did not meet the "first opportunity" test) *with Dale v. Wynn*, 497 F.Supp. 2d. 1337, 1346 (M.D. AL. 2007) (employee's return to work after leave of absence excused absence of temporal proximity, as there was no earlier opportunity to retaliate).

4.    **Pretext evidence**

Carr interchangeably conflates aspects of the prima facie case, such as comparator analysis, with elements of the *McDonnell Douglas* pretext inquiry. The gist of his argument, though, is there is an absence of evidence from which a jury could infer a retaliatory intent even if Jeter clears the prima facie bar.

First, Carr maintains that in terminating Jeter, he merely followed the recommendations of Judy Yates, and Chief Deputy DA Roberts that Jeter was expendable because she had a history of erratic behavior, attendance issues, and unreliability. (Carr depo. at 147:4-10).  Carr further argues that Yates denies knowing that Jeter ever complained about her, and as a result, lacked any retaliatory motive.

Yates' denial of knowledge, although unrebutted by testimonial evidence, may still be countered through circumstantial evidence that supports the inference that her denials are not credible. *See Martin v. Financial Asset Management Systems*, Inc., 959 F.3d 1048, 1054-55 (11th Cir. 2020).  During his deposition, while Carr claims to have no memory of Jeter meeting with him to complain about Yates, he also conceded that his practice in the event he received a discrimination complaint about a supervisor would have been to inform that individual and ascertain her side of the story. (Carr depo. at 82:9-83:10.)  If a jury disbelieves Carr's testimony that Jeter never reported discrimination to him, they could then infer that Carr would have followed his own stated practice and informed Yates; they could further reason that the fact that Jeter's comp time privileges were restored the same date that Jeter was scheduled to meet with Carr is evidence that Carr directed Yates to reinstate her privileges.  In other words, the strength of Yates' denial is tied to whether a jury believes Carr, which makes summary

24

judgment improper. *Jenkins v. Nell*, 26 F.4th 1243, 1251 (11th Cir. 2022) (reversing district court for granting summary judgment when record was replete with credibility disputes).

Because Jeter's evidence as to whether Yates knew she was the subject of a complaint hinges on credibility, this case is distinguishable from *Martin v. Financial Asset Management Systems*, *Inc.* There, the plaintiff's basis for establishing knowledge of protected activity was solely based on assumption evidence, such as the fact that the decision-maker met with the HR manager who received the complaint shortly before the termination, and the possibility that the employee handbook's instruction that targets of complaints be informed about the complaints might have been executed during that meeting. *Martin*, 959 F.3d at 1054-55. Jeter's evidence, in contrast, consists partly of Carr's testimony about his ordinary policies regarding notification, but is buttressed by cause-effect evidence that the policy Jeter complained about was reversed the same day as her meeting with Carr.

There is also the November 21, 2019 email from Jeter to Deputy DA Roberts seeking a meeting with him to discuss what she described as unfair treatment. *See supra* at pg. 12. While Roberts insists he did not assume Jeter's message had anything to do with complaints of discrimination, he did share the message with Yates; and Jeter testified in her deposition that she had complained to

25

Yates herself that the restrictions on her comp time were racially motivated. *See supra* at pg. 11.  If Jeter's testimony is credited, Yates would have had ample reason to suspect that Jeter's efforts to engage Roberts were an elevation of her earlier charges of racial bias, especially given that nine days earlier, Yates had kept intact several restrictions on Jeter's comp time usage.

In addition, a jury could readily infer that Yates' actions hint at a retaliatory motive on her part. The March 13, 2020 termination memo contains several purportedly factual assertions that are directly contradicted by the evidence. For example, Yates makes the following assertions about Jeter's attendance records:

> "Abuse of earning time and taking time away from work. She is more interested in being away from work than being present and contributing to the office.
>
> Has been repeatedly counseled about the constant abuse of her time, ex. Asking to come in early to leave early, leaving early, has rarely worked an entire five day work week." (Carr depo. at Ex. 7).

But even assuming that Jeter's use of comp time was excessive in her first five months on the job, there is a dearth of evidence that after her comp time was temporarily restricted for six weeks, and restored on November 12, 2019, that Jeter continued to abuse time. Yates' memos to file do not capture any continuing issues over comp time: the sole post November 12 memo related to comp time describes a January 2020 incident where Jeter failed to obtain pre-approval for comp time that Yates ended up approving after the fact. (Yates depo. at Ex. 23).  Nor do the attendance records between November 2019 and March 2020 bear out the claim of

overly aggressive use of comp time. By way of comparison, one VSO, Elise Driskill, clocked <u>more</u> comp time during that period than Jeter (44.75 hours to Jeter's 43.5); another VSO, Erin Barefield, earned 35 hours in the same period, the equivalent of a difference in one work day between her and Jeter. (McCurry affidavit at ¶¶26, 30).  Similarly, the cumulative leave and comp time records for the VSOs reveal that Jeter, with 14 total documented submissions, trailed Barefield at 19, and yet another white VSO, Cheryl Black at 31. (Carr depo. at 161:10-176:13.)[4]

While Yates contends that she did not review time records before writing the termination memo, (Yates depo. at 206:14-207:15), her failure to verify one of the central claims in the document, that Jeter chronically abused her time privileges, does Yates' credibility no favors. *See Patterson v. Georgia Pacific LLC, et al.*, ___ F. 4th ____, 2022 WL 2311665 at *13 (11th Cir. 2022) (finding evidence of pretext when decision maker cited attendance issues as basis for termination but admitted failing to inspect or verify employee's attendance records).  A jury could further infer that whether or not she reviewed attendance records, Yates would have been in ample position as the chief of the VSO unit to observe that Jeter and at least two of her counterparts were near equivalent or at least comparable in their usage of

---

[4] Carr in his deposition sought to distinguish Jeter from the most prolific user of comp and leave time, Cheryl Black, based on the fact that Black was a longtime VSO: but Carr conceded that the DA's office does not maintain separate leave or comp time policies for veteran and newer employees. (*Id*. at 180:2-181:21.)

comp time in the five months prior to the termination decision. Singling out an employee who has engaged in protected activity for workplace conduct engaged in by similarly situated co-workers is classic pretext evidence. *Jones v. City of Heflin, Alabama*, 207 F.Supp. 3d 1255, 1278 (N.D. Ala. 2016) (Hopkins, J.).

As to the various other assorted grounds for termination in the March 13 memo, a reasonable jury could be skeptical that Yates regarded any of them as legitimate grounds for termination. Yates conceded in her deposition that Jeter was never subjected to discipline or corrective action based on any of these incidents. *Supra* at pg. 14.  Even the most lurid-sounding allegation, that Jeter "told stories that turned out to be untrue" appears to be based on a seven month old incident, in which Jeter acknowledged manufacturing a story about a fight with her husband's ex-girlfriend for the purpose of testing whether a coworker would spread the story (Jeter depo. at 175:19-179:14).  The incident was not only dated, Yates had disclosed it to Carr and Roberts in September 2019 and no action was taken against Jeter as a result (Roberts depo. at 24:21-26:22; 91:1-92:23).  A jury could reasonably harbor doubts that a seven month old incident that had no initial disciplinary consequences was truthfully regarded as a valid basis for termination.

To the extent a jury could infer that Yates knew of Jeter's complaints, and framed the March 13, 2020 memo out of a retaliatory intent, Carr's concession that he relied on Yates' memo establishes liability under what this circuit has referred to

as a "cat's paw" theory: under this doctrine, a supervisor's discriminatory intent

may be imputed to the ultimate decisionmaker if the supervisor provides false

information contrived to manipulate the decisionmaker into making a termination

decision <u>and</u> the decisonmaker fails to independently investigate the allegation.

*Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999) ("[i]n such a

case, the recommender is using the decision-maker as a mere conduit…to give

effect to the recommender's discriminatory animus").

Carr admits, as does his chief deputy, that Yates' termination memo received

no critical scrutiny, and that no corroboration of its contents was even attempted.

Moreover, if Jeter's testimony is believed, Carr himself knew that Jeter had a

history of lodging internal complaints of discrimination.

Jeter is also entitled to rely on another piece of pretext evidence, that Carr's

explanation of why Jeter was fired has shifted over time. *See Cleveland v. Home*

*Shopping Network Inc.*, 369 F.3d 1189, 1194 (11th Cir. 2004) ("shifting reasons"

for an employment action can permit a jury to conclude that an employer's

ostensibly valid reasons are not credible).  Carr's COVID-related rationale for

assessing the personnel structure in the DA's office did not surface in this case until

the tail end of a four and a half hour deposition during his attorney's redirect (Carr

depo. at 246:2-248:22). A jury could easily conclude that the omission of this

factor from initial disclosures, written discovery responses, or four plus hours of

questioning from Jeter's co-counsel belies the credibility of Carr's late-blooming explanation. And Jeter's pretext case does not stop there: given that by March 2020, her attendance issues appeared to have stabilized five months earlier, and her leave and comp use history ended up being comparable to or less extensive than at least two other VSOs, Carr's claim that "we had to have people that we could rely on to be there" smacks of a conclusion in dire search of facts (Carr depo. at 237:20-23; 249:4-250:8). *See Patterson*, 2022 WL 2311665 at *12 (finding pretext evidence when objective aspects of an employee's record contradicted the employer's grounds for termination).

Even if there were record evidence that Jeter was too prone to take time out of work in her first six months on the job, or was overly focused on adjusting her schedule, or acted in a less than model professional manner on some occasions, the substantial evidence of pretext and retaliatory animus offsets those factors and creates a jury question as to to the true reason she was fired. *See Munoz v. Selig Enterprises*, 981 F.3d 1265, 1279 (11th Cir. 2020) (evidence of employee missteps before engaging in protected activity should not allow an employer to evade liability for retaliation).  *See also Bostock v. Clayton County*, 140 S.Ct. 1731 (2020) (under a "but for", single causation analysis, the presence of other contributing, non-discriminatory factors does not entitle an employer to summary

judgment if the impermissible factor was the tipping point in the employer's decision).

## 5.     Mosaic evidence

Carr's briefing does not address the issue of whether Jeter's evidence can establish a triable issue of fact under mosaic theory. In fact, this is a case where mosaic theory is a particularly valuable resource, in that two classic *McDonnell Douglas* tools, temporal proximity and comparator evidence, are not available to Jeter: as noted above, the temporal proximity between her complaints to Carr and her termination is insufficient by itself to entitle her to a presumption of retaliation. Similarly, because Jeter was terminated ostensibly for a grab bag of reasons, it is impossible to establish a valid similarly situated comparator. *See Lewis II*, 934 F.3d at 1185 ("Not every employee subject to unlawful discrimination will be able to produce a similarly situated comparator.  Among other things, a proper comparator may not exist in every workplace.")

Viewed under a mosaic lens, Jeter establishes a convincing mosaic of retaliation based on the following combination of factors: (1) the ostensible grounds for her termination are unsubstantiated or pointedly inaccurate; (2) Carr's reliance on factors that he deliberately failed to verify; (3) the credibility questions regarding Carr's and Yates' claims that Jeter never complained of discrimination,

which could lead a jury to disbelieve their claims about their true motivations;[5] (4) Yates' pattern of maintaining a file of unflattering incidents involving Jeter, the majority of which are created after the November 12, 2019 date when Jeter says she made allegations against Yates to Carr (Yates depo. at 183:18-22); (5) Roberts' admissions that Jeter was the sole employee who was terminated during the March 2020 reassessment of the staff structure in the DA's office; and (6) the fact that none of the assorted performance or judgment issues in the March 2020 termination memo ever arose to the level of discipline or correction. The fact that a jury could weigh these factors and find that retaliation was not at work is not grounds for summary judgment when the record is also replete with circumstantial evidence militating in the opposite direction. *Lewis* II, 934 F.3d at 1189.

The record establishes a major discrepancy between the testimony of Jeter and Carr about whether they met in November 2019 and whether Jeter in that meeting voiced concerns about discriminatory treatment by the head of the VSO unit.  Resolving that credibility clash is the clear province of a jury. If the jury concludes that Jeter has the better of the dispute, there is a ready pathway for a jury to determine that Jeter's eventual termination was driven by her ongoing

---

[5] In addition to the grounds for doubting Yates cited above, there is the non-speculative evidence that Carr did not testify honestly about his interactions with Jeter at deposition. For example, Carr emphatically denied that he met with Carr at all, but his assistant's email plainly schedules Jeter for a meeting with him on November 12, 2019. (Doc. 78-19).  " 'Where a fact-finder is required to weigh a deponent's credibility, summary judgment is simply improper.' " *Jenkins*, 26 F.4th at 1251 (quoting *Strickland*, 692 F.3d at 1162).

complaints about discriminatory treatment rather than the factors cited in the March 2020 pretermination memo.

For the foregoing reasons, Jeter has established disputes of material fact that entitle her to a jury trial and Carr's motion for summary judgment should be denied.

Submitted, the 6th day of July, 2022.

s/Artur Davis

Artur Davis
ASB-3672D-56A
**HKM Employment Attorneys**
2024 3rd Ave. N, Suite 307
Birmingham, AL 35203
Direct: 205-881-0935
adavis@hkm.com

Brian Noble
ASB-9735-R39N
**Capstone Law LLC**
2119 3rd Ave. N, Suite 202
Birmingham, AL 35203
Direct: 205-578-1210
brian.noble@caplawllc.com

Co-counsels for Plaintiff Lanitra Jeter

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that on this 6th day of July, 2022, **Plaintiffs' Memorandum Brief in Opposition to Motion for Summary**

33

**Judgment by Defendant** was served electronically upon the attorneys of record

for Defendant listed below:

Robert Riley Jr.
James Murrill Jr.
**Riley & Jackson PC**
3530 Independence Dr.
Birmingham, AL 35209

s/Artur Davis

Artur Davis
**HKM Employment Attorneys**
2024 3rd Ave. N, Suite 307
Birmingham, AL 35203
Direct: 205-881-0935
adavis@hkm.com