FILED
2022 Oct-31 PM 04:51
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **LANITRA JETER,** | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| **v.** | ] | **Case No.: 2:20-cv-01863-ACA** |
| | ] | |
| **DANNY CARR,** | ] | |
| | ] | |
| **Defendant.** | ] | |

**MEMORANDUM OPINION AND ORDER**

While Plaintiff LaNitra Jeter, an African American woman, was working as a victims services officer in the Jefferson County District Attorney's Office, she complained to District Attorney Danny Carr of racial discrimination because her supervisor disallowed her accrual of comp time. Four months after she made that complaint, Mr. Carr terminated her employment. Ms. Jeter filed a lawsuit asserting a number of claims against Mr. Carr in his official capacity but has conceded all but her claim of retaliatory termination in violation of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-3(a). (Doc. 83 at 18). The rest of this court's opinion will, therefore, address only the Title VII retaliatory termination claim.

Mr. Carr moves for summary judgment. (Doc. 77). The court has considered the arguments and evidence submitted by the parties and GRANTS Mr. Carr's motion because Ms. Jeter has not established: (1) a prima facie case of retaliation;

(2) a dispute of material fact about whether the articulated reasons for terminating her employment were pretextual; or (3) a convincing mosaic of circumstantial evidence from which a trier of fact could infer retaliatory intent.

The **WILL ENTER SUMMARY JUDGMENT** in favor of Mr. Carr and against Ms. Jeter.

## I. BACKGROUND

When approaching a motion for summary judgment, the court "view[s] the evidence and all factual inferences therefrom in the light most favorable to the non-moving party, and resolve[s] all reasonable doubts about the facts in favor of the non-movant." *Washington v. Howard*, 25 F.4th 891, 897 (11th Cir. 2022).

Danny Carr is the District Attorney of Jefferson County, Alabama. (Doc. 78-1 at 9; doc. 78-4 at 6). The Victim Services Office is a unit of the District Attorney's Office for Jefferson County (doc. 78-4 at 105) that provides support for victims of crime during the prosecutorial process (doc. 78-3 at 7). During the time relevant to the allegations in this case, the Victim Services Office employed five victims services officers who were supervised by Judy Yates. (Doc. 78-8 at 3 ¶ 3, 4 ¶ 8). Ms. Yates's supervisor was Chief Deputy District Attorney Joe Roberts, who reported directly to Mr. Carr. (Doc. 78-6 at 4–5).

Victim services officers could use three different types of leave to take time off work: vacation leave, sick leave, and comp time. (Doc. 78-1 at 36). Victim

services officers with accumulated leave time could use that time however they wished—although they generally needed to give advanced notice and Ms. Yates had authority to deny requests for leave. (*Id.* at 38–40). Ms. Yates kept files on each victim services officer under her command and would update their files with memoranda detailing any workplace incidents involving that employee. (*Id.* at 51). Mr. Carr testified that if an employee complained of discrimination by a supervisor, he would discuss the complaint with the supervisor in question. (Doc. 78-4 at 23). When an employee needed to be terminated, Mr. Carr was the final decision-maker. (Doc. 78-6 at 17).

LaNitra Jeter began work as a victims services officer in April 2019. (Doc. 78-3 at 7). During her first several months at the job, Ms. Jeter began suffering from health problems that caused her to seek help from a variety of specialists and required her to use a substantial amount of leave time. (*Id.* at 15–16). In September 2019, the DA's Office's chief administrator, Michael McCurry, noted Ms. Jeter's unusual use of her leave time and discussed this deviational use with Ms. Yates. (Doc. 78-8 at 9 ¶ 20). Over time, Ms. Yates and Mr. McCurry began to believe Ms. Jeter was abusing the leave policy. (*Id.*; doc. 78-1 at 24). Based on Mr. McCurry's recommendation, Ms. Yates informed Ms. Jeter that she would not be able to earn comp time for at least a week. (Doc. 78-1 at 41). Ms. Yates stated

they would discuss whether Ms. Jeter could begin earning comp time again after the week was up. (*Id.*).

Shortly after, Ms. Jeter met with Ms. Yates and Mr. McCurry to discuss her comp time restriction. (Doc. 78-3 at 15). During the meeting, Ms. Jeter told Ms. Yates and Mr. McCurry that she believed they were singling her out and treating her differently from the other victim services officers. (*Id.* at 16). At this meeting, Ms. Jeter expressed her opinion that, because she was the only African American victims services officer, applying different policies to her than other victims services officers was not fair. (*Id.* at 15–16).

On November 12, 2019, Ms. Jeter met with Mr. Carr to complain about her comp time being taken away. (*Id.* at 9). Mr. Carr testified that he does not recall this meeting but concedes that because Ms. Jeter testified that the meeting occurred, the court must accept as true Ms. Jeter's testimony. (Doc. 78-4 at 23; doc. 79 at 15). At this meeting, Ms. Jeter told Mr. Carr that she was being treated unfairly because she, the only African American victims services officer, was also the only victims services officer whose ability to earn comp time was restricted. (Doc. 78-3 at 10). Ms. Yates was not present at this meeting and testified that she did not know about Ms. Jeter's complaint until after her termination. (Doc. 78-11 at 5–6 ¶ 11). The same day that Ms. Jeter met with Mr. Carr, she requested to meet with Ms. Yates to discuss

reinstating her ability to earn comp time. (Doc. 78-3 at 17). Ms. Yates allowed Ms. Jeter to begin accruing comp time again with some limits. (*Id.*).

Later in November, Ms. Jeter emailed Mr. Roberts asking to whom she should report her concern that she "d[id] not feel that [she was] being treated fairly in some situations." (Doc. 78-6 at 51). Mr. Roberts responded that she should discuss any concerns with Ms. Yates, who would reach back out to Mr. Roberts if necessary. (*Id.*). Ms. Jeter told Mr. Roberts that she would discuss her concerns with Ms. Yates the following day (*id.*), but that conversation never occurred (doc. 78-3 at 19). Mr. Roberts forwarded this email to Ms. Yates, who believed Ms. Jeter was complaining about missing a domestic violence seminar that the other victim services officers attended. (Doc. 78-4 at 125).

From the end of September until Ms. Jeter's termination, Ms. Yates would periodically update her supervisor, Mr. Roberts, on issues Ms. Jeter was having at work. (Doc. 78-6 at 16). These issues included incidents where Ms. Jeter left the office without permission (doc. 78-1 at 31–32), made accusatory statements to a victim that came to the Victims Services Office (*id.* at 23), was not working but also not using comp time to make up for lost work hours (*id.* at 31), and was eating and sleeping in a courtroom during trial (*id.* at 20). Ms. Jeter has explanations for most of these incidents but does not deny that they took place. (Doc. 78-3 at 41–42, 44–45, 55–56). After the incidents, Ms. Yates would update Ms. Jeter's file with a report

explaining what happened (doc. 78-1 at 45), but Ms. Jeter did not receive formal discipline for any of these issues (*id.* at 15–16).

In March 2020, in an attempt to successfully operate the DA's Office during the COVID-19 outbreak, Mr. Roberts and Mr. Carr created a plan to limit the number of people physically present in the DA's Office every day. (Doc. 78-4 at 61). Under the plan, only one victims services officer would report to the DA's Office each day, with individual officers rotating. (*Id.* at 61–62). After creating this plan, Mr. Roberts asked Ms. Yates to prepare a memo detailing Ms. Jeter's employment issues throughout her tenure at the DA's Office. (Doc. 78-1 at 52). Ms. Yates created a bullet point list of issues she had with Ms. Jeter's employment:

- Abuse of earning time and taking time away from work. She is more interested in being away from work than being present and contributing to the office
- Failure to follow chain of command
- Repeatedly has told stories that turned out to untrue [sic], so loss of credibility and being trustworthy
- Has posted on social media stories that were untrue, just for the shock value
- Has used office time to deal with issues that are her husband's or her adult son's legal issues
- Repeatedly talks about filing Judicial complaints against various judges her husband has to deal with
- Has been repeatedly counseled about the constant abuse of her time, ex. Asking to come in early to leave early, leaving early, has rarely worked an entire five day work week
- Has fallen asleep while observing a trial
- Leaves the building without signing out or letting someone know she will be unavailable
- Signs out to a court that is empty and cannot be found

- Has no credibility with her co-workers, and is compromising the Grant Report we submit to OPS
- During a meeting with the YWCA Advocate Director, she asked questions about her husband's case where he is the defendant of a PFA and how to get the judge to allow them to speak and let her know the PFA was vindictive

(Doc. 78-4 at 128). Ms. Yates did not review any of Ms. Jeter's employment records before writing the memo. (Doc. 78-1 at 54). Neither Mr. Carr nor Mr. Roberts attempted to verify the issues Ms. Yates outlined in her memo. (Doc. 78-4 at 38–39; doc. 78-6 at 17).

On March 16, 2020—four months after the November meeting at which Ms. Jeter complained of discrimination—Mr. Carr terminated Ms. Jeter's employment. (Doc. 78-4 at 129). Mr. Carr testified he made the decision based on the issues contained in Ms. Yates' memo as well as the nature of the COVID-19 staffing plan, which required that the unsupervised victims services officers present in the office each day were trustworthy. (*Id.* at 37–39, 63). Ms. Yates was the only employee terminated in the DA's Office due to the COVID-19 staffing plan. (Doc. 78-6 at 19).

## II. DISCUSSION

Mr. Carr argues that he is entitled to summary judgment on Ms. Jeter's Title VII retaliation claim because, under the *McDonnell Douglas* test, Ms. Jeter cannot establish a *prima facie* case of retaliation and that even if she could, he had legitimate non-discriminatory reasons to terminate her employment. (Doc. 79 at 4). Ms. Jeter

responds that she has presented evidence satisfying the *McDonnell Douglas* test and, if she has not, her evidence creates a convincing mosaic of circumstantial evidence of retaliation. (Doc. 83 at 22–33).

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Bowen v. Manheim Remarketing, Inc.*, 882 F.3d 1358, 1362 (11th Cir. 2018) (quotation marks omitted). Courts must "review[] the evidence and draw[] all reasonable inferences in the light most favorable to the non-moving party." *Owen v. I.C. Sys., Inc.*, 629 F.3d 1263, 1270 (11th Cir. 2011).

Title VII prohibits employers from retaliating against employees "because [the employee] has opposed any practice made an unlawful employment practice" under Title VII. 42 U.S.C. § 2000e-3(a). When, as here, there is no direct evidence of retaliation, a plaintiff may use circumstantial evidence under the *McDonnell Douglas* burden-shifting framework to survive summary judgment. *Tolar v. Bradley Arant Boult Commings, LLP*, 997 F.3d 1280, 1289 (11th Cir. 2021). In Title VII discrimination cases, an alternative test is the convincing-mosaic framework. *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019). The Eleventh Circuit has not addressed whether a plaintiff can establish retaliation by presenting a

convincing mosaic of circumstantial evidence. *See Bailey v. Metro Ambulance Servs., Inc.*, 992 F.3d 1265, 1273 n.1 (11th Cir. 2021). The parties assume that framework is available, so the court will do the same. (Doc. 83 at 31–33; doc. 84 at 10). The court will begin by determining whether Ms. Jeter can survive the *McDonnell Douglas* test and will then turn to the convincing mosaic test.

1. *McDonnell Douglas* Framework

To avoid summary judgment under the *McDonnell Douglas* framework, "a plaintiff must establish a prima facie case of retaliation." *Ring v. Boca Ciega Yacht Club, Inc.*, 4 F.4th 1149, 1163 (11th Cir. 2021) (quotation marks omitted). If the plaintiff succeeds, the defendant then must "produc[e] evidence that the adverse employment actions were taken for a legitimate, [nonretaliatory] reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–07 (1993) (quotation marks omitted). If the defendant can do that, the plaintiff must "produce sufficient evidence for a reasonable factfinder to conclude that each of the [defendant's] proffered [nonretaliatory] reasons is pretextual." *Chapman v. AI Transp.*, 229 F.3d 1012, 1037 (11th Cir. 2000).

*a. Prima Facie Case*

A plaintiff satisfies her burden of establishing a *prima facie* case of retaliation under Title VII when she demonstrates "(1) that she engaged in statutorily protected activity, (2) that she suffered an adverse action, and (3) that the adverse action was

causally related to the protected activity." *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1135 (11th Cir. 2020) (quotation marks omitted).

Ms. Jeter argues that two separate complaints constitute protected activity: her November meeting with Mr. Carr (doc. 83 at 22) and her November emails to Mr. Roberts (*id.* at 25–26). Her November emails to Mr. Roberts are not protected activity because Ms. Jeter's email did not clarify that she was complaining of discrimination, only that she thought she was being treated unfairly. (Doc. 78-6 at 51). Generally treating an employee "unfairly" is not an unlawful employment practice under Title VII. *See* 42 U.S.C. § 2000e-3(a) (forbidding employers from retaliating against employees for "oppos[ing] any practice made an unlawful employment practice by" Title VII).

It is undisputed that Ms. Jeter's November meeting with Mr. Carr was protected activity and her termination was an adverse employment action (*see* doc. 79 at 26–32), but the parties do dispute whether Ms. Jeter can show a causal connection between that protected activity (the November 2019 meeting with Mr. Carr) and the adverse action (her March 2020 termination). (Doc. 83 at 22–23; doc. 84 at 7).

In the Eleventh Circuit, the causal link requirement is interpreted broadly. *Meeks v. Comput. Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994). "To establish a causal connection, a plaintiff must show that the relevant decisionmaker was aware

of the protected conduct, and that the protected activity and the adverse action[] were not wholly unrelated." *Patterson v. Ga. Pac., LLC*, 38 F.4th 1336, 1351 (11th Cir. 2022) (quotation marks omitted). Close temporal proximity is one way of showing causation. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007). On the other hand, a substantial delay between the protected activity and the adverse action defeats a claim of retaliation unless the plaintiff has "other evidence tending to show causation." *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004); *see also Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) (citing with approval decisions that concluded three-to four-month periods between protected activity and adverse employment action insufficient to establish temporal proximity).

Whether Ms. Jeter has established a causal connection is a close call. Mr. Carr was the final decisionmaker in Ms. Jeter's termination (doc. 78-4 at 37), and he was the person to whom she made her complaints of discrimination (doc. 78-3 at 9). Therefore, he was aware of her protected conduct. But whether Ms. Jeter has provided evidence that her meeting with Mr. Carr is related to her termination is questionable. About four months passed between Ms. Jeter's meeting with Mr. Carr and her termination. (*See id.*; doc. 78-4 at 37). Because four months is too attenuated to establish temporal proximity, *see Breeden*, 532 U.S. at 273–74, Ms. Jeter cannot

establish her *prima facie* case of retaliation unless she can point to other evidence of a causal connection.

Ms. Jeter contends that she can establish causation because terminations at the DA's Office were rare, Mr. Carr used the COVID-19 pandemic as the first excuse to terminate her. (Doc. 83 at 23). But she has provided nothing but her own speculation to support her assertion that Mr. Carr was waiting for an excuse to terminate her employment. (*See id.*). The <u>possibility</u> that Mr. Carr used the pandemic as an opportunity to fire Ms. Jeter is not evidence that he did in fact do so; it is only Ms. Jeter's speculation as to his motive. *See Kernel Recs. Oy v. Mosley*, 694 F.3d 1294, 1301 (11th Cir. 2012) ("Although all justifiable inferences are to be drawn in favor of the nonmoving party, inferences based upon speculation are not reasonable.") (cleaned up).

Further, in the months after the November meeting with Mr. Carr, Ms. Yates chronicled instances of Ms. Jeter misusing the DA's Office's leave policy (doc. 78-1 at 100, 102) and being absent from work during working hours (*id.* at 101). If Mr. Carr was searching for an excuse to fire Ms. Jeter after her complaints of retaliation, any of these incidents would have been easy for him to find out about and use as cover. Thus, the COVID-19 pandemic could not have been Mr. Carr's first opportunity to terminate Ms. Jeter's employment.

Ms. Jeter has not shown a causal connection between her protected activity and the adverse employment action, and she therefore cannot establish the *prima facie* case required by the *McDonnell Douglas* test. In the interest of completeness, the court will address the rest of the test.

*b. Non-Retaliatory Reasons*

Assuming Ms. Jeter could establish her *prima facie* case of retaliation, the burden would shift to Mr. Carr "to articulate a legitimate, nonretaliatory reason for" terminating Ms. Jeter's employment. *Tolar*, 997 F.3d at 1289. An employer "need not persuade the court that it was actually motivated by the proffered reasons. . . . It is sufficient if the [employer's] evidence raises a genuine issue of fact as to whether it [retaliated] against the" employee. *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254–55 (1981) (internal citation omitted).

Mr. Carr offers two legitimate, non-retaliatory reasons for Ms. Jeter's termination: (1) the continuing problems with her employment as outlined in Ms. Yates's memo, and (2) the COVID-19 staffing plan. (Doc. 79 at 36; *see* doc. 78-4 at 37–39, 61–63, 128; doc. 78-6 at 16, 19). Therefore, Mr. Carr has rebutted Ms. Jeter's *prima facie* case of retaliation.

*c. Pretext*

At the final stage, a plaintiff must prove that a defendant's "proffered explanations are a pretext for retaliation." *Meeks*, 15 F.3d at 1021. To accomplish

this, the plaintiff must provide evidence "both that the reason was false, and that [retaliation] was the real reason" for the adverse employment action. *Hicks*, 509 U.S. at 515. "[I]f a jury reasonably could infer from the evidence presented that the employer's legitimate justification is pretextual, the question becomes whether the evidence, considered in the light most favorable to the plaintiff, yields the reasonable inference that the employer engaged in" retaliatory conduct. *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1326 (11th Cir. 2011). "A plaintiff cannot rebut a reason by simply quarreling with the wisdom of that reason or by substituting her business judgment for that of the employer." *Patterson*, 38 F.4th at 1352 (quotation marks omitted). "[T]o establish pretext at the summary judgment stage, a plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Gogel*, 967 F.3d at 1136 (cleaned up).

Although it is sometimes difficult to tell what evidence Ms. Jeter maintains supports her argument, Ms. Jeter's pretext evidence seems to be: (1) that Ms. Yates could have known about Ms. Jeter's meeting with Mr. Carr, establishing a "cat's paw" theory of retaliation; (2) that Mr. Carr's explanation for Ms. Jeter's termination has shifted over the course of discovery; and (3) that Mr. Carr's proffered reasons

for terminating Ms. Jeter are not supported by the evidence. (Doc. 83 at 23–31). The court will address each argument in turn.

**i. "Cat's Paw" Theory**

Ms. Jeter's first pretext argument is that, under the "cat's paw" theory, Ms. Yates's retaliatory intent can be imputed to Mr. Carr. (*Id.* at 28–29). In cat's paw cases, "causation may be established if the plaintiff shows that the decisionmaker followed [a] biased recommendation without independently investigating the complaint against the employee." *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999). In this circumstance, the decisionmaker "is a mere conduit for the harasser's [retaliatory] animus." *Llampallas v. Mini-Circuits Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998). To succeed under this theory, "the plaintiff must prove that the [retaliatory] animus behind the recommendation, and not the underlying employee misconduct identified in the recommendation, was an actual cause of the other party's decision to terminate the employee." *Stimpson*, 186 F.3d 1331.

Although Ms. Jeter attempts to use the cat's paw theory to prove pretext (*see* doc. 83 at 24–29), the theory was crafted to establish causation at the *prima facie* stage. *See e.g.*, *Matamoros v. Broward Sheriff's Off.*, 2 F.4th 1329, 1336 (11th Cir. 2021) (acknowledging that the Eleventh Circuit has "held that causation may be established when a decisionmaker followed a biased non-decisionmaker's

recommendation without independently investigating the basis for the complaint"). Ms. Jeter has not cited any authority supporting her unwritten contention that a cat's paw theory can be used to overcome an employer's non-retaliatory reasons for termination (*see generally* doc. 83 at 24–29), but even if it can, Ms. Jeter's cat's paw argument fails.

First, this case is not factually analogous to a typical cat's paw case. Ordinarily, the decisionmaker in a cat's paw case is a "mere conduit" for retaliatory conduct because "the biased recommender and the actual decisionmaker are not the same person." *Stimpson*, 186 F.3d 1331. Here, it is undisputed that Mr. Carr knew about Ms. Jeter's protected activity because she complained of discrimination to him (doc. 78-3 at 9–10), so he could not be an unsuspecting conduit to Ms. Yates's retaliatory animus.

Second, even if the court were to assume that Ms. Yates's alleged retaliatory animus could be imputed to Mr. Carr, this evidence does not dispute Mr. Carr's proffered non-retaliatory reasons for terminating Ms. Jeter's employment. At the pretext stage, Ms. Jeter cannot only offer alternative explanations for her termination, she must rebut Mr. Carr's proffered explanations. *See Hicks*, 509 U.S. at 515. Even if Ms. Yates harbored retaliatory animus against Ms. Jeter and exaggerated the items listed in her memo as Ms. Jeter argues (*see* doc. 83 at 26), the undisputed evidence is that Ms. Jeter had been having disciplinary issues that

reasonably allowed Mr. Carr to consider her an unreliable employee (doc. 78-1 at 20, 23, 31–32). Further, a biased recommendation from Ms. Yates has no bearing on Mr. Carr's explanation that Ms. Jeter was terminated due to the COVID-19 staffing plan. Accordingly, the cat's paw theory cannot be used in this case to show that Mr. Carr's proffered non-retaliatory reasons for terminating Ms. Jeter's employment were pretextual.

**ii. Mr. Carr's Shifting Reasoning**

Next, Ms. Jeter contends that Mr. Carr's stated reasons for her termination have changed over time, casting doubt on the credibility of his reasons. (Doc. 83 at 29–30). According to Ms. Jeter, Mr. Carr did not mention the COVID-19 staffing plan in his initial disclosures or written discovery responses (*id.* at 29) and that he first brought it up the end of his deposition (*id.*, citing doc. 78-4 at 61). But Ms. Jeter did not submit Mr. Carr's initial disclosures or written discovery responses as part of the record, so the court cannot consider them. *See* Fed. R. Civ. P. 56(c)(1)(A) (stating that a party must cite to "parts of materials in the record" to support factual assertions). At the pretext stage, it is Ms. Jeter's burden to put forth evidence that casts doubt on the defendant's proffered non-retaliatory reasons for termination. *See Smith*, 644 F.3d at 1326. By failing to submit evidence that Mr. Carr did not mention the COVID-19 staffing plan during initial disclosures or written discovery, she has not shown that Mr. Carr's reasons for her termination have shifted.

To the extent Ms. Jeter argues that Mr. Carr's reasons shifted during the deposition (doc. 83 at 29–30), the court is not persuaded. Ms. Jeter relies on *Cleveland v. Home Shopping Network, Inc.* for the proposition that when an employer's non-discriminatory explanation for termination shifts, that explanation can be seen as less credible. 369 F.3d 1189, 1194 (11th Cir. 2004). In *Cleveland*, an employee brought a claim against her employer under the Americans with Disabilities Act for wrongful termination. *Id.* at 1191. At trial, the employer gave multiple inconsistent reasons for the employee's termination and the employee submitted evidence that each reason was not credible, along with independent evidence of disparate treatment. *Id.* at 1192. The jury found for the plaintiff, but the district court granted the employer's motion for judgment as a matter of law. *Id.* On appeal, the Eleventh Circuit concluded that the employer's shifting reasoning at trial—paired with the employee's evidence of disparate treatment—allowed the jury to question the employer's credibility and infer that the employee was fired because of her disability and not the employer's proffered reasons. *Cleveland*, 369 F.3d at 1194.

The transcript of Mr. Carr's deposition casts doubt on whether his reasoning for terminating Ms. Jeter's employment was actually a shifting reason or whether he brought up the COVID-19 staffing plan as soon as an appropriate question was

posed. (*See generally* doc. 78-4). But setting that aside, Ms. Jeter's case is distinguishable from *Cleveland* for two reasons.

First, Mr. Carr's explanations are not inconsistent with one another. The two reasons for Ms. Jeter's termination—that she was an unreliable employee and that the success of the COVID-19 staffing plan depended on all employees present in the office being reliable—are interconnected. Although Ms. Jeter's unreliability as an employee was the first reason Mr. Carr proffered, the COVID-19 staffing plan explanation is a rational extension to that reasoning, especially considering the timing of Ms. Jeter's termination. Thus, the COVID-19 staffing plan is less like shifting reasoning and more like a further clarification of the background that led to Ms. Jeter's termination.

Second, Ms. Jeter's evidence here is distinguishable from the evidence presented by the employee in *Cleveland*. In contrast to the interconnected reasons for Ms. Jeter's termination, in *Cleveland*, the employer's "shifting" reasons were inconsistent and thus could not all be real reasons for the employee's termination. *Cleveland*, 369 F.3d at 1195. Further, the employee in *Cleveland* presented evidence directly rebutting each of her former employer's inconsistent reasons, two comparators whose employment was not terminated for the exact conduct she engaged in, and evidence that the employee was treated differently after coming back to work with her disability. *Id.* at 1192, 1194–95. The Eleventh Circuit ruled

that the <u>combination</u> of all this evidence allowed the jury to infer the employer's proffered reason was pretext. *Id.* at 1195. Ms. Jeter's evidence is unlike that in *Cleveland* because all she has presented to rebut Mr. Carr's reasons for her termination is that her employer did not disclose one reason until he was deposed. That is not enough under *Cleveland* to assume the jury would believe both reasons are pretext. Because Ms. Jeter failed to meet her evidentiary burden and *Cleveland* is distinguishable from Ms. Jeter's case, Ms. Jeter's shifting explanation evidence of pretext fails to rebut either of Mr. Carr's proffered reasons for termination.

**iii. The Perception of Ms. Jeter as an Unreliable Employee**

Finally, Ms. Jeter argues that the record does not support Mr. Carr's view of her as an unreliable employee. (Doc. 83 at 30). She contends that she was reliable and thus Mr. Carr's differing classification of her establishes his retaliatory motivation.

Federal courts do not "sit as a super-personnel department that reexamines an entity's business decisions." *Denny v. City of Albany*, 247 F.3d 1172, 1188 (11th Cir. 2001) (quotation marks omitted). Employers may terminate employees for bad reasons as long as those reasons are not retaliatory. *See Chapman*, 229 F.3d at 1030. Thus, Mr. Carr's belief that Ms. Jeter was an unreliable employee, even if it was a mistaken belief, is a valid reason to terminate her employment. *See Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) ("[N]o matter how mistaken

[an employer's belief, Title VII] does not interfere. Rather our inquiry is limited to whether the employer gave an honest explanation of its behavior.").

Ms. Jeter cites no evidence demonstrating that Mr. Carr's belief that she was an untrustworthy employee is false. Although she contends her leave usage stabilized later in her employment (doc. 83 at 30), she still used more leave than other victims services officers (*see* doc. 78-8 at 14 ¶¶ 32–34, 15 ¶¶ 35–36). Ms. Jeter also had a history of disciplinary issues that other victims services officers did not have. (*See id.* at 8–10 ¶¶ 19–23; doc. 78-1 at 20, 23–24, 31–32). In essence, Ms. Jeter's argument that she was reliable "simply quarrel[s] with the wisdom of" Mr. Carr's reasons for terminating her employment which is insufficient to survive summary judgment. *Chapman*, 229 F.3d at 1030.

Further, even if Ms. Jeter had presented evidence from which a jury could find that, by the time of her termination, Mr. Carr no longer considered her to be an unreliable employee, she provides no evidence that this explanation was pretext for retaliation. *See Hicks*, 509 U.S. at 515 ("[A] reason cannot be proved to be a pretext for [retaliation] unless it is shown both that the reason was false, and that [retaliation] was the real reason.") (cleaned up). Because Ms. Jeter has not carried her burden of showing pretext, her retaliatory termination claim cannot survive summary judgment under the *McDonnell Douglas* framework.

2. Convincing Mosaic Framework

Ms. Jeter contends that, even if her claim fails under the *McDonnell Douglas* framework, it survives because she has presented a convincing mosaic of circumstantial evidence of retaliation. (Doc. 83 at 31–33). A plaintiff can survive summary judgment if she establishes "a convincing mosaic of circumstantial evidence that would allow a jury to infer" retaliatory conduct on the part of her employer. *Lewis*, 934 F.3d at 1185 (quotation marks omitted). "An inference[ ] is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact." *Smith*, 644 F.3d at 1328 n.25 (quotation marks omitted). A convincing mosaic "may be shown by evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, and other bits and pieces from which an inference of [retaliatory] intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis*, 934 F.3d at 1185 (cleaned up).

Ms. Jeter argues that the following factors when considered together are enough to create an inference that Mr. Carr terminated her in retaliation for her protected conduct: (1) the record does not support Mr. Carr's articulated reasons for her termination; (2) Mr. Carr relied on unverified information to terminate Ms. Jeter's employment; (3) Mr. Carr and Ms. Yates are not credible witnesses; (4) Ms. Yates kept a file on Ms. Jeter where she recorded issues with Ms. Jeter's

employment; (5) Ms. Jeter was the only employee terminated due to the COVID-19 staffing plan; and (6) Ms. Jeter was never disciplined for any of the incidents laid out in Ms. Yates's memo. (Doc. 83 at 31–32). The court has already addressed Ms. Jeter's first contention—that the grounds for her termination are unsubstantiated or inaccurate—and found that the argument is not persuasive. *See supra* pp. 20–21. The court will address Ms. Jeter's other contentions in turn.

Ms. Jeter's second point is that that Mr. Carr relied on Ms. Yates's memo when terminating Ms. Jeter without verifying each alleged infraction. (Doc. 83 at 31; *see* doc. 78-3 at 38–39). But Mr. Carr had no duty to corroborate the information Ms. Yates provided about Ms. Jeter's employment, it is reasonable for him to rely on the report of a supervisor he put in charge when making employment decisions. Mr. Carr's reliance on Ms. Yates's memo is not evidence of retaliatory intent and thus Ms. Jeter's second point fails to help establish her convincing mosaic.

Ms. Jeter's third point is that Mr. Carr and Ms. Yates are not credible because they claim ignorance of Ms. Jeter's complaints of discrimination. (Doc. 83 at 31–32). This presumably refers to the complaints Ms. Jeter made to Mr. Carr in their November meeting, and not the complaints made to Ms. Yates in September 2019 because Ms. Yates has not denied knowing of those complaints. (*See generally* doc. 78-1; doc. 84 at 3). Ms. Jeter argues that because Mr. Carr did not recall that their November meeting took place and Ms. Yates denies knowing about the meeting

before Ms. Jeter's termination, a jury could question their credibility as witnesses. (Doc. 83 at 31–32). And if the jury determines either party is lying about knowledge of the meeting, it could reject the rest of their testimony as incredible. (*Id.*).

The court does not find Ms. Jeter's credibility argument persuasive. Ms. Jeter cites no law to support her proposition that courts can assume at summary judgment that when there is conflicting testimony between witnesses, the court should not only accept the non-movant's testimony but should also reject the entirety of the movant's testimony. In fact, there is precedent that supports the opposite conclusion. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986) ("[D]iscredited testimony is not normally considered a sufficient basis for drawing a contrary conclusion. Instead, the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment.") (cleaned up); *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996) ("Inferences from the nonmoving party's 'specific facts' as to other material facts . . . may be drawn only if they are reasonable in view of other undisputed background or contextual facts and only if such inferences are otherwise permissible under the governing substantive law."). Assuming that a jury would disbelieve all of Mr. Carr and Ms. Yates's testimony because the court must assume that the jury would disbelieve some of their testimony is not reasonable.

Ms. Jeter's next point—that Ms. Yates kept a file on Ms. Jeter's employment mishaps (doc. 83 at 32)—is also not persuasive. There is undisputed evidence that Ms. Yates maintained files on every victims services officer and kept track of any incident that implicated a victims services officer's fitness as an employee. (Doc. 78-1 at 51). Ms. Jeter has presented no evidence that the file Ms. Yates maintained about her was different from the files she kept on all other victims services officers.

Ms. Jeter's fifth point is that because Mr. Carr only terminated one employee (Ms. Jeter) as part of the COVID-19 staffing plan, the plan must have been cover for his retaliatory intent. (Doc. 83 at 32; doc. 78-6 at 19). But Mr. Carr testified that Ms. Jeter was the only employee terminated under the plan because "no one else presented the potential problems that an unsupervised Ms. Jeter posed if she were the only victims services officer in the office" (doc. 78-4 at 63, 65), and Ms. Jeter has not presented any evidence to rebut that reason. Thus, Ms. Jeter's status as the only employee terminated during the COVID-19 staffing plan cannot be used to establish retaliation.

Ms. Jeter's final piece of mosaic evidence is that she was never disciplined for any of the performance issues laid out in Ms. Yates's memo. (Doc. 83 at 32; doc. 78-1 at 15–16). Ms. Jeter received formal discipline for her performance issues only once—when her ability to earn comp time was suspended from September to November 2019. (*See* doc. 78-1 at 41). If an employer does not discipline an

employee for the employee's negative conduct and then uses that conduct as a basis for termination after the employee complains of discrimination, a jury might be able to infer retaliatory intent on the part of the employer. Thus, the fact that Ms. Jeter did not receive discipline for most of her employment issues can be used as a piece of circumstantial evidence that they were fabricated to justify her retaliatory termination.

Ms. Jeter has presented only one piece of valid mosaic evidence, which is not enough to survive summary judgment. Interpreting this evidence in the light most favorable to Ms. Jeter, it casts doubt on Mr. Carr's proffered reasons for her termination. The evidence does not create a triable issue as to whether Mr. Carr's real reason for terminating Ms. Jeter was retaliatory. *See Lewis*, 934 F.3d at 1185 (stating that a plaintiff will survive summary judgment if she "presents circumstantial evidence that creates a triable issue concerning the employer's [retaliatory] intent"). That Ms. Jeter was almost never reprimanded for any of the points in Ms. Yates's memo might call into question whether Ms. Yates had a serious issue with any of Ms. Jeter's misconduct, but it does not go toward Mr. Carr's actual intent in terminating Ms. Jeter. Thus, Ms. Jeter has not established "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional" retaliation, *Lewis*, 934 F.3d at 1185, and she cannot survive summary judgment.

## III. CONCLUSION

The court **GRANTS** Mr. Carr's motion for summary judgment and **WILL ENTER SUMMARY JUDGMENT** in favor of Mr. Carr and against Ms. Jeter on all claims.

The court will enter a separate final judgment consistent with this memorandum opinion and order.

**DONE** and **ORDERED** this October 31, 2022.

**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE